ORIGINAL

FILED

E-filing

1  A. DAVID WILLIAMS (Cal. Bar No. 183854)
   williamsdav@sec.gov
2  JOSEPH V. JEST (DC Bar No. 412338)
   jestj@sec.gov
3

4  Attorneys for Plaintiff
   SECURITIES AND EXCHANGE COMMISSION
5  100 F Street, N.E.
   Washington, D.C. 20549-4010
6  Telephone:  (202) 551-4548 (Williams)
   Telecopier:  (202) 772-9246 (Williams)

7

8                  UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                       SAN JOSE DIVISION

11

                                                        RS
12 SECURITIES AND EXCHANGE COMMISSION,    Civil Action No.
                                                        2822
13              Plaintiff,              C 07
                                        COMPLAINT
14      vs.

15 MERCURY INTERACTIVE, LLC (F/K/A/
   MERCURY INTERACTIVE, INC.), AMNON
16 LANDAN, SHARLENE ABRAMS, DOUGLAS
   SMITH and SUSAN SKAER
17
                Defendants.
18

19

20      Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

21                          **SUMMARY**

22      1.      During the period from at least 1997 through 2005, Mercury Interactive, Inc.

23 ("Mercury" or the "company"), through its most senior officers and others, engaged in a fraudulent

24 and deceptive scheme to provide executives and other employees undisclosed, secret compensation.

25 Through the scheme, and without disclosure, Mercury's senior management, Chief Executive Officer

26 Amnon Landan ("Landan") and at various times Chief Financial Officers Sharlene Abrams

27 ("Abrams"), Douglas Smith ("Smith"), and General Counsel Susan Skaer ("Skaer"), backdated the

28

1  date on which stock options were granted to executives and employees so that those options appeared

2  to have been granted at times corresponding to low points of the closing price of the company's stock,

3  resulting in artificially and fraudulently low exercise prices for those options.  The accounting

4  consequences of these benefits were then concealed, as Landan, Abrams, Smith and Skaer caused

5  Mercury to fail to record hundreds of millions of dollars in compensation expense on its financial

6
7  statements, and to provide false and misleading compensation disclosures to Mercury's public

8  shareholders in filings with the Commission.  The backdating occurred from at least 1997 to April

9  2002, while the overstatements of income that resulted from the backdating continued to appear in the

10  company's financial statements through 2005.   Between 1997 and April 2002, the company

11  backdated 45 different stock option grants to executives and employees.  Of these grants, 24 were

12
13  fraudulently backdated by the company's Stock Option Committee, which consisted of Landan and at

14  various times Abrams and Smith.  The other 21 grants were approved by the company's Board or the

15  Board's Compensation Committee, at various times at the recommendation or with the direct

16  participation of Landan, Abrams, Smith, and Skaer.  Stock Option Committee, Compensation

17  Committee, and Board grants were documented by false documentation that was prepared by Skaer or

18  at her direction.  Senior executives, including Landan, Abrams, Smith and Skaer, each personally

19  benefited by receiving stock options that were in-the-money by, in the aggregate, millions of dollars

20
21  through the fraudulent scheme.

22        2.        In addition, Mercury, acting through Landan, Abrams, Skaer and others, made

23  fraudulent and misleading disclosures relating to stock option exercises by its senior officers.  While

24  ordinary employees were required to pay for their stock at the time of a stock option exercise, senior

25  executives were given preferential treatment, and on multiple occasions, were permitted to backdate

26
27  the date of exercise of stock options with the company.  These executives, including Landan and

28  Abrams, backdated exercises to dates consistent with low-points of the company's stock, in order to

minimize their taxable gain on exercise. For example, in connection with three backdated exercises, Landan was able to underreport over $18 million in gains upon exercise. Because the exercises were paid for with loans from the company, no up-front payment was made. By falsely understating their gain on exercise, the executives deprived Mercury of the tax deduction that the company was entitled to on the full extent of the gain.[1] And by holding the stock for a year after the purported exercise date, the executives received more favorable, long-term capital gains treatment on their remaining profit. The company then concealed this benefit from its shareholders through fraudulent proxy disclosures relating to officer stock option exercises.

3.      Also, during at least 1997 through 2001, Mercury, through Landan, Abrams and others, worked to ensure that management's stock option compensation was as valuable as possible by manipulating the company's reported earnings per share ("EPS") to meet or exceed financial analyst expectations. Landan and Abrams manipulated this metric by fraudulently manipulating the company's recognition of revenue. The company held shipping of its products once revenue targets for a period had been achieved, pushing the recognition of the revenue into subsequent periods, while concealing these practices from the public through fraudulent and misleading disclosures and omissions. The company began shifting significant amounts of revenue in 1998, pushing approximately $35 million in revenues (nearly 30% of the company's reported $121 million in revenue) into subsequent periods. By 2000, the company was shifting approximately $182 million in revenues into subsequent periods. Through 2001, the company continued the management of its earnings, shifting approximately $45 million of its revenues between periods. While manipulating its recognition of revenue, the company made fraudulent disclosures and omissions in its annual filings with respect to its "backlog" of product bookings.

---

[1]      The negative tax consequence to Mercury occurred when executives backdated the exercise of non-statutory options. The date of exercise of qualified Incentive Stock Options generally had no tax consequence for the company.

COMPLAINT                                        3
SEC v. MERCURY INTERACTIVE, et al., No. C
07-0_____

4.      Finally, between 1999 and 2005, at various times Skaer, Abrams and others participated in the fraudulent structuring of overseas employee stock option exercise transactions to conceal the variable accounting consequences of those transactions, causing the company to fail to report the approximately $24 million in compensation expense required under variable accounting.

5.      Based on its conduct, Mercury has engaged in acts, practices and courses of business that violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(b)(5), 78n(a) and 78p(a)] and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-13 and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13 and 240.14a-9].

6.      Based on their conduct, each of Landan, Abrams, Smith and Skaer have engaged in acts, practices and courses of business that violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(b)(5), 14(a) and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5), 78n(a) and 78p(a)] and Exchange Act Rules 10b-5, 13b2-1, 13b2-2, 14a-9 and 16a-3 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, 240.13b2-2, 240.14a-9 and 240.16a-3].  Landan and Smith also violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].  In addition, Landan, Abrams, Smith and Skaer aided and abetted Mercury's violations of Exchange Act Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].  The defendants, directly or indirectly, have made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities

1  of a national securities exchange in connection with the acts, practices and courses of business

2  alleged in this complaint.

3         8.     This district is an appropriate venue for this action under Section 22 of the Securities

4  Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  The transactions,

5  acts, practices, and courses of business constituting the violations alleged herein occurred within the

6  Northern District of California, and the defendants may be found in this district.

7  **INTRADISTRICT ASSIGNMENT**

8         9.     Assignment to the San Jose Division is appropriate pursuant to Civil Local Rule 3-

9  2(e) because a substantial part of the events that give rise to the Commission's claims occurred in

10  Santa Clara County.

11

12  **DEFENDANTS**

13      10.    **Mercury Interactive, LLC (formerly known as Mercury Interactive Corporation)**

14  was acquired by the Hewlett-Packard Company ("HP") by an agreement consummated on November

15  8, 2006, and is now a non-trading subsidiary of HP.   Prior to the consummation of the merger,

16  Mercury was a corporation headquartered in Mountain View, California, and organized under the

17  laws of Delaware.  The company made software used to test and optimize information technology

18  systems and software applications.  One of the product solutions it sold was marketed as a means to

19

20  implement best practices frameworks for Sarbanes-Oxley compliance.  At the time of the conduct

21  described in this Complaint, the company's common stock was registered with the Commission

22  pursuant to Section 12(g) of the Exchange Act and listed on the NASDAQ under the symbol MERQ.

23

24      11.    **Amnon Landan**, age 48, is an Israeli citizen who resides in Los Altos, California.

25  Landan served as Chief Executive Officer of Mercury beginning in February 1997, and Chairman of

26  the board of directors beginning in July 1999, until he was forced to resign in November 2005.  Prior

27  to becoming CEO, Landan served in various roles, including President, President of North American

28

COMPLAINT<br>
SEC v. MERCURY INTERACTIVE, et al., No. C<br>
07-0_____

5

1  Operations, and Chief Operating Officer.  Landan joined Mercury's Board in February 1996.  He

2  came to the company in November 1989.  He holds a B.Sc. degree in Computer Sciences from the

3  Technion-Israel Institute of Technology.

4         12.    **Sharlene Abrams**, age 49, resides in Los Gatos, California.  Abrams served as

5  Mercury's CFO, Vice-President of Finance and Administration, and Secretary between November

6  1993 and November 2001.  Prior to her tenure at Mercury, she was employed at Price Waterhouse

7  LLP, rising to the position of senior manager.  Abrams, a licensed CPA, holds a B.S. in Business

8

9  Administration from Boston University.

10         13.    **Douglas Smith**, age 55, resides in Ross, California.  Smith served as CFO to Mercury

11  between November 2001 and November 2005, when he was forced to resign. Prior to his tenure as

12  CFO, he served as Mercury's Executive Vice President of Corporate Development from 2000 until

13  November 2001.

14

15         14.    **Susan Skaer**, age 42, resides in Menlo Park, California.  Skaer served as General

16  Counsel and Secretary to Mercury between November 2000 and November 2005, when she was

17  forced to resign.  From October 1996 to November 2000, Skaer was a partner with the law firm GCA

18  Law Partners LLP (formerly General Counsel Associates LLP).  During her tenure with GCA Law

19  Partners LLP, Skaer served at various times as outside counsel to Mercury.  Skaer holds a bachelor's

20  degree from the University of North Carolina and a law degree from the University of Virginia.  She

21

22  has been admitted to the practice of law in California since 1990.

23                                   **FACTS**

24         15.    Mercury experienced substantial growth between its initial public offering in October

25  1993 and its November 2006 merger with the Hewlett-Packard Corporation.  One of the primary

26  sources of employee compensation that the company used to fuel its expansion was stock options.

27

28

COMPLAINT                                        6
SEC v. MERCURY INTERACTIVE, et al.,  No. C
07-0_____

**A.    The Relevant Mercury Stock Option Plans**

16.    The company granted to its employees options pursuant to shareholder-approved stock option plans. A plan adopted in August of 1989 ("the 1989 plan") required, as disclosed by the company, ordinary stock options to be given exercise prices that were at least 85% to the fair-market value on the grant date. "Incentive" stock options ("ISOs"), which received favorable treatment under the tax laws, were required under the plan to be priced at 100% of fair market value of the company's stock on the grant date. The 1989 plan expired by its own terms in August 1999.

17.    On May 20, 1998, the company sought shareholder approval of a stock option plan to replace the 1989 plan. The pricing requirements for options under the proposed plan were identical to the requirements of the 1989 plan. The company's shareholders rejected the proposed plan.

18.    On August 14, 1998, the company's shareholders approved the 1999 Stock Option Plan ("1999 plan"), which replaced the 1989 plan. The pricing requirements for options granted under the 1999 plan differed from the 1989 plan in that under the new plan, all options granted were required to be priced at 100% of the fair market value of the company's stock on the date of grant.

19.    All Mercury stock option plans, including the 1989 plan and the 1999 plan provide that "[t]he date of grant of an Option shall, for all purposes, be the date on which the Board makes the determination granting such Option."

**B.    Accounting for Employee Stock Options**

20.    Generally Accepted Accounting Principles ("GAAP"), and in particular Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB 25"), did not require a company to record any compensation expense for employee stock options so long as the option exercise price was not below the stock's market price on the date of the grant. Under APB 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date." The measurement date, as defined by APB 25, is the

first date on which the following information is known: (i) the number of options that an individual employee is entitled to receive, and (ii) the exercise price.

21.    An employee option granted with an exercise price lower than the quoted market price of the company's stock on the date of grant (an "in-the-money" option) has "intrinsic value," and thus the difference between the exercise price and the quoted market price of the company's stock must be recorded as compensation expense to be recognized over the vesting period of the option.  Options that are at-the-money or out-of-the-money on the measurement date need not be expensed.

## C.    The Backdating Scheme

### a.    Employee Grants

22.    The company granted options to both its executives and employees approximately once per year.  In addition to this annual "refresher" grant for executives and employees, the company made numerous grants to new-hire employees throughout the year.

23.    Grants to executives were made by the Compensation Committee of the company's Board of Directors.  In 1998, the Board delegated to a Stock Option Committee the authority to grant options to the bulk of the company's employees.  Beginning in July of 1999, the Stock Option Committee consisted of Landan and the company's then-CFO (first Abrams and later Smith).

24.    Prior to the formation of the Stock Option Committee, grants to the bulk of the company's employees were made by the full Board, which at the time consisted of the three Compensation Committee members, as well as the Chairman and the CEO.

25.    Notwithstanding the distinction between executive and employee grants, the senior executives of the company — Landan, Abrams, and later Smith and Skaer — exerted substantial influence over the pricing of all of the company's options.

26.    When stock options were to be granted to rank-and-file employees, managers from across the company submitted the names of employees recommended for grants, and the

COMPLAINT                                                    8
SEC v. MERCURY INTERACTIVE, et al., No. C
07-0_____

1  recommended number of options for each employee to these senior executives and the company's

2  stock option administrator.  Once senior management approved the recommendations, the

3  administrator compiled the names and amount of options into a list of grant recipients.

4          27.     During this period – sometimes before the list of recipients was complete and

5  sometimes after – Landan and Abrams would look back and pick the "grant date" that would be

6  reflected on the options.  For certain grants, Abrams asked the administrator for a historical stock

7  price chart in order to pick the "grant date."

8

9          28.     These dates coincided with low points of the company's stock, despite the fact that the

10  date bore no relation to when the grant was actually approved.  Landan and Abrams (or later Smith)

11  signed a unanimous written consent representing that options were granted "as of" the selected grant

12  date, despite the fact that there was no decision, or other agreement, to grant options on the stated

13  date and the terms of the grant had not been fixed and finalized on that date.  The dates were chosen

14  by Landan, Abrams and Smith with hindsight to provide option recipients the most valuable options

15  possible, while creating the false appearance that the options were priced in accordance with the

16  company's shareholder-approved stock option plan.

17

18          29.     By causing the options to be priced at less than fair market value of the company's

19  stock on the date of grant, Landan, Abrams, Smith and Skaer caused Mercury to incur significant,

20  undisclosed compensation expense which they failed to record in the companies financial reports in

21  contravention of GAAP.

22

23          30.     After Abrams left the company in November of 2001, Smith replaced Abrams as CFO

24  and assumed her role in selecting stock option grant dates in hindsight based on the stock price, and

25  signing with Landan backdated written consent documents memorializing the grants.

26

27          31.     Skaer not only assisted Landan, Abrams and Smith in selecting historical dates for

28  backdated grants while serving as the company's general counsel, but also prepared the false

COMPLAINT                                          9
SEC v. MERCURY INTERACTIVE, et al., No. C
07-0_____

1   documentation (unanimous written consents) memorializing backdated Stock Option Committee

2   grants, both as general counsel and prior to that time as outside counsel to the company.

3   **b.      Executive Grants**

4   32.     Grants to senior executives were priced in a similar manner, and usually used the same

5   false grant date, as the employee grants.  Landan determined the amount of options that he wanted to

6   be granted to senior executives, including himself, then forwarded the recommendation to the

7

8   Compensation Committee for approval.

9   33.     The members of the Compensation Committee approved the options, either by

10  unanimous written consent or in a meeting of the Board or Compensation Committee.

11  Notwithstanding the date that the Compensation Committee actually gave its approval for the stock

12  option grant, the members of the Committee signed written consents, and on occasion signed Board

13  meeting minutes, which memorialized that grants had been made "as of" a particular day, when in

14

15  fact no grant or agreement to grant had occurred on that  date.  Likewise, the terms of the grant had

16  not been fixed and finalized on the "as of" date.

17  34.     The dates reflected on the grant documents corresponded to relative low-points of the

18  company's stock, and were chosen by Landan, Abrams and Smith with hindsight to provide option

19  recipients the most valuable options possible, while creating the false appearance that the options

20  were priced in accordance with the company's shareholder-approved stock option plan.

21

22  35.     By causing the options to be priced at less than fair market value of the company's

23  stock on the date of grant, Landan, Abrams, Smith and Skaer caused Mercury to incur significant,

24  undisclosed compensation expense which they failed to record in the companies financial reports in

25  contravention of GAAP.

26

27  36.     Skaer not only assisted Landan, Abrams and Smith in selecting historical dates for

28  backdated grants while serving as the company's general counsel, but also prepared the false

documentation memorializing backdated grants by the Board and Compensation Committee, both as

general counsel and prior to that time as outside counsel to the company. The documents Skaer

prepared included falsified unanimous written consents and meeting minutes, false Forms 4 reporting

the grants to the SEC, the proxy statements and annual and quarterly reports on Forms 10-K and 10-Q

which made false disclosures associated with the fraudulent backdating.

### c.    The Defendants were Aware of the Pricing Requirements for Options

37.    The company's policy, as stated in its Annual Reports on Form 10-K, was that the

company priced its employee options at 100% of the fair market value of the company's stock price

on the date of grant, even though until 1998 the company's employee option plan allowed for some

options (non-qualified options) to be granted at a 15% discount.[2]  In March of 1998, as the

company's 1989 Option Plan was close to expiring, the company proposed a replacement plan that

Skaer helped draft that continued the provision that permitted non-qualified stock options to be

granted at less than the fair market value of the company's stock on the date of grant.  By a vote of

43% for, and 56% against, the company's shareholders voted down the proposal.  The company

promptly re-submitted a revised plan in a special proxy two months later (July 1998), specifically to

require all options to be priced at 100% of fair market value, and the shareholders approved the plan

at a Special Meeting the following month.

38.    At a board meeting in March of 1999, attended by Landan, Abrams and Skaer, there

was specific discussion of the fact that the company's shareholders had insisted that options be priced

at the 100% of fair market value on the date of grant.  Landan, Abrams and Smith served at various

times on the Stock Option Committee and each of them signed various Forms 10-K, prepared by

---

[2]    All of the Mercury's stock option plans for employees required that incentive stock options be priced "at no less than 100% of the Fair Market Value per Share on the date of grant." For non-qualified stock options, Mercury's 10-year 1989 Option Plan allowed the exercise price to be discounted to no less than 85% of fair market value on the grant date; however, the company always disclosed that it did not grant in-the-money options, and this provision was changed in the 1999 Option Plan to require that non-qualified options also be granted at 100% of the fair market value on the grant date.

Skaer, which described the pricing restrictions of the plans. Landan and Abrams also received drafts

and final versions of various proxy statements, prepared by Skaer, which similarly described the stock

plans' pricing requirements.

39.    Each of Landan, Abrams, Smith and Skaer, as officers of Mercury, owed a fiduciary

duty to the company and its shareholders.

40.    Each of Landan, Abrams, Smith and Skaer breached that fiduciary duty to Mercury

and its shareholders by causing stock options granted to themselves and others to be backdated in

violation of the company's shareholder-approved stock option plan.

41.    In addition, Landan, Abrams, Smith and Skaer either knew, should have known or

acted in reckless disregard of the fact, that their backdating was generating unreported compensation

expense for Mercury. Abrams, as a CPA, was trained in accounting, worked for five years at a major

accounting firm rising to the level of senior manager, and served in various accounting positions at

other public companies. On the basis of this experience, Abrams stated in e-mail communications in

2000 with other Mercury employees that backdating to obtain lower-priced options "is illegal and

causes a charge to earnings."

42.    Abrams shared her knowledge of options accounting with Landan and Skaer. At the

March 1999 Mercury board meeting discussed above when there was discussion of the shareholders'

rejection of the proposed option plan containing the discount provision for non-qualified options,

Skaer's notes of the meeting show that Abrams explained to Landan, Skaer and others that the

company's publicly stated policy was already that it did not grant in-the-money options, because such

a grant would result in a compensation charge for the company.

43.    In connection with two merger transactions in 2001 and 2003, where Mercury acquired

smaller companies, Skaer explained to others that granting options to new employees at prices below

the then-market value of Mercury stock would incur a compensation expense for Mercury.

44.     Smith, who was not trained as a CPA, also demonstrated his understanding of the accounting for stock options in a late 2002 communication to an employee who wanted options priced as of a prior day.  Smith explained to the employee (and to Landan, Skaer and others) that the price of an option must be "determined when the Comp Committee of the Board of Directors approves the grant" and that "deliver[ing] in the money options would . . . Create a Comp Charge."

45.     Despite their awareness of how options were supposed to be priced under the shareholder-approved plans, the Landan, Abrams, Smith and Skaer consistently caused Mercury to backdate options in violation of those pricing requirements.  Between 1997 and April 2002, the company, either through the Board, its Compensation Committee, or the Stock Option Committee, made a total of 45 grants of options to executives and employees.  *Every* single one of those grants was backdated to a date corresponding to a relative low point of the company's stock, as set forth in the chart below:

**Mercury Option Grants (Dated November 1996 - March 2002)**

| Claimed Grant Date | Actual Grant Date | Committee | Memorializing Document | Exercise Price | Price on Actual Grant Date | Difference in Share Price | Total Shares[3] |
|---|---|---|---|---|---|---|---|
| 11/29/1996 | 2/4/1997 | BOD | UWC | $2.50 | $3.31 | $0.81 | 1,795,000 |
| 3/31/1997 | 6/9/1997 | CC | UWC | $2.44 | $3.97 | $1.53 | 1,260,000 |
| 3/31/1997 | 6/9/1997 | BOD | UWC | $2.44 | $3.97 | $1.53 | 1,683,000 |
| 7/23/1997 | 10/29/1997 | BOD | UWC | $3.81 | $5.28 | $1.47 | 888,000 |
| 10/27/1997 | 10/29/1997 | BOD | UWC | $4.88 | $5.28 | $0.40 | 448,000 |
| 1/9/1998 | 5/6/1998 | BOD | UWC | $6.31 | $10.09 | $3.78 | 1,920,225 |
| 1/9/1998 | 3/9/1998 | CC | UWC | $6.31 | $8.75 | $2.44 | 960,000 |
| 3/24/1998 | 5/6/1998 | BOD | UWC | $8.48 | $10.09 | $1.61 | 445,000 |
| 6/1/1998 | 7/21/1998 | BOD | UWC | $8.09 | $10.69 | $2.60 | 292,000 |
| 10/5/1998 | 12/9/1998 | SOC | UWC | $6.03 | $13.25 | $7.22 | 1,550,800 |
| 1/21/1999 | 3/9/1999 | CC | UWC | $12.03 | $17.50 | $5.47 | 1,180,000 |
| 1/21/1999 | 5/3/1999 | SOC | UWC | $12.03 | $14.81 | $2.78 | 1,906,800 |
| 4/20/1999 | 8/2/1999 | SOC | UWC | $11.81 | $21.72 | $9.91 | 299,000 |
| 7/15/1999 | 11/9/1999 | CC | Minutes | $18.25 | $48.28 | $30.03 | 198,000 |
| 7/15/1999 | 10/5/1999 | SOC | N/A | $18.25 | $34.58 | $16.33 | 666,500 |

3 The share totals are adjusted to account for 2-for-1 stock splits that occurred in 1999 and 2000.

COMPLAINT             13
SEC v. MERCURY INTERACTIVE, et al.,  No. C
07-0_____

Mercury Option Grants (Dated November 1996 - March 2002)

| Claimed Grant Date | Actual Grant Date | Committee | Memorializing Document | Exercise Price | Price on Actual Grant Date | Difference in Share Price | Total Shares[3] |
|---|---|---|---|---|---|---|---|
| 8/10/1999 | 10/5/1999 | SOC | N/A | $21.44 | $34.58 | $13.14 | 58,000 |
| 9/30/1999 | 10/5/1999 | SOC | UWC | $32.28 | $34.58 | $2.30 | 82,000 |
| 10/27/1999 | 12/20/1999 | SOC | UWC | $36.50 | $51.13 | $14.63 | 209,500 |
| 12/1/1999 | 12/21/1999 | SOC | UWC | $41.34 | $54.69 | $13.35 | 184,358 |
| 12/9/1999 | 1/3/2000 | SOC | UWC | $45.47 | $50.98 | $5.51 | 72,500 |
| 1/6/2000 | 1/19/2000 | CC | Minutes | $40.72 | $57.47 | $16.75 | 1,200,000 |
| 1/6/2000 | 1/21/2000 | SOC | UWC | $40.72 | $63.66 | $22.94 | 2,493,800 |
| 1/14/2000 | 3/16/2000 | SOC | UWC | $47.31 | $104.44 | $57.13 | 116,200 |
| 2/1/2000 | 4/11/2000 | SOC | N/A | $58.19 | $72.88 | $14.69 | 25,000 |
| 4/14/2000 | 6/7/2000 | SOC | UWC | $58.75 | $85.12 | $26.37 | 339,850 |
| 5/23/2000 | 5/16/2000[4] | CC | Minutes | $65.20 | $84.50 | $19.30 | 175,000 |
| 5/23/2000 | 7/25/2000 | CC | Minutes | $65.20 | $94.69 | $29.49 | 450,000 |
| 5/23/2000 | 7/25/2000 | SOC | UWC | $65.20 | $94.69 | $29.49 | 264,450 |
| 6/27/2000 | 7/25/2000 | SOC | UWC | $89.00 | $94.69 | $5.69 | 124,500 |
| 7/28/2000 | 9/27/2000 | SOC | UWC | $85.12 | $146.00 | $60.88 | 107,550 |
| 8/23/2000 | 9/27/2000 | SOC | UWC | $103.44 | $146.00 | $42.56 | 229,750 |
| 9/12/2000 | 10/24/2000 | SOC | UWC | $112.39 | $127.06 | $14.67 | 66,500 |
| 9/18/2000 | 10/24/2000 | SOC | UWC | $125.44 | $127.06 | $1.62 | 32,000 |
| 11/29/2000 | 12/21/2000 | BOD | UWC | $63.06 | $80.56 | $17.50 | 390,000 |
| 11/29/2000 | 1/17/2001 | SOC | UWC | $63.06 | $80.94 | $17.88 | 2,298,950 |
| 1/8/2001 | 2/8/2001 | CC | UWC | $60.88 | $75.31 | $14.43 | 1,988,000 |
| 4/4/2001 | 7/6/2001 | CC/BOD | UWC/Minutes | $31.88 | $48.69 | $16.81 | 92,500 |
| 4/4/2001 | 7/20/2001 | SOC | N/A | $31.88 | $36.63 | $4.75 | 2,092,772 |
| 10/1/2001 | 11/6/2001 | CC | UWC | $18.74 | $28.05 | $9.31 | 100,000 |
| 10/1/2001 | 10/29/2001 | SOC | N/A | $18.74 | $25.16 | $6.42 | 580,600 |
| 10/1/2001 | 2/12/2002 | CC | N/A | $18.74 | $36.43 | $17.69 | 60,000 |
| 11/2/2001[5] | 11/6/2001/2/12/02 | CC | UWC | $24.29 | $28.05/$36.43 | $3.76/$12.14 | 625,000 |
| 1/22/2002 | 2/12/2002 | CC | UWC | $29.29 | $36.43 | $7.14 | 1,890,000 |
| 1/22/2002 | 1/30/2002 | SOC | UWC | $29.29 | $38.66 | $9.37 | 2,427,454 |
| 3/20/2002 | 4/1/2002 | SOC | UWC | $36.35 | $39.40 | $3.05 | 300,000 |

46.    The manner by which the Defendants carried out the scheme is illustrated by the details of the following specific grants:

---

[4] With respect to a small number of grants, the grant was actually approved at a board meeting prior to the represented date of grant.

**d.    January 1999 Compensation Committee Grant**

47.    In order to determine how many options to allocate to senior executives in Mercury's 1999 annual grant to existing employees, Landan obtained "personnel summaries" from the company's stock option administrator so that Landan could see what the executives had been granted in the past. The personnel summaries, which listed the total options granted to each executive, indicated that no options had been granted in 1999 to any senior executive as of the date the summaries were generated, February 5, 1999.

48.    Landan did not actually generate his list of grant recommendations until early March 1999. On the evening of March 6, 1999, Abrams, Mercury's then-CFO, left a message on Landan's home answering machine reminding him that the grants needed to be finalized because Forms 4 reporting the grants to officers had not been filed and were overdue.

49.    The next day, Landan forwarded his recommendations to Aryeh Finegold, who at the time was the Chairman of the Board. Finegold then proceeded to contact Compensation Committee members individually by telephone and seek their approval for the grants.

50.    While Finegold was obtaining oral approval for the grants, Landan and Abrams, on March 8, looked back at the stock price of Mercury in order to determine the day on which Mercury's stock price was at a low-point. The lowest price of the year through early March was January 21, 1999.

51.    By March 9, 1999, at least two of the Compensation Committee members had indicated their intended approval of the grant in separate phone calls. Forms 4 were signed that same day and filed with the SEC on March 11, 1999, reflecting that Landan, Abrams, and other senior

---

[5] Of the options with this claimed grant date, 450,000 were approved on November 6, 2001, and the remaining 175,000 on February 12, 2002.

COMPLAINT                            15<br>
SEC v. MERCURY INTERACTIVE, et al., No. C<br>
07-0_____

executives had been granted options.  The reported grant date was backdated to January 21, 1999, the

yearly low-point of the company's stock at the time.

52.    Given that the Compensation Committee did not approve the options at the earliest

until March 9, 1999, the 1,180,000 options granted to the company's senior executives were in-the-

money by $5.47 per share, or more than $6.4 million in the aggregate, on the earliest date the options

could have been approved.  Mr. Landan's 600,000 options alone were in-the-money by nearly $3.3

million.

**e.      April 1999 Stock Option Committee Grant**

53.    The Stock Option Committee purportedly granted a total of 149,500 stock options to

Mercury employees on April 20, 1999, with an associated exercise price of $23.625.  Yet, this grant

was not actually made on April 20, 1999, but, instead, was made more than three months later, on

August 2, 1999.  On August 2, Mercury's common stock closed at $43.44, nearly double the closing

price on the purported grant date of April 20, 1999, which was the low closing price for Mercury's

stock between that date and August 1999.

54.    On May 5, 1999, the stock option administrator sent an e-mail to Abrams, asking:

"[W]hat is the date for the April grant going to be?  Right now I have it as April 7 with a price of

$27.125.  You had mentioned that this might change, any news?"

55.    Later, on June 29, 1999, an officer in Mercury's Israel office requested in an e-mail to

the stock option administrator, which was copied to Abrams, that a grant of 3,000 options to a

particular employee be included "among the final list of [the] April grant, hopefully to be approved

soon."

56.    That same day, in an e-mail to Landan, the stock option administrator stated that

"[Abrams] asked that I get your approval before adding this request to the April grant.  Please let me

know as soon as possible whether or not I should input this."  Landan replied, on July 19, 1999, that a

grant of 1,500 options "should work if [it] still can be done. Check with [Abrams]." Abrams

responded the next day, on July 20, 1999, stating that "[w]e put 1500 in the April grant for Rafi."

57. Abrams' practice was to inform the stock option administrator what date (and price) would be used for a stock option grant once the grant had been approved by the Stock Option Committee. Only after that final approval occurred were grant notices and related paperwork to be finalized and forwarded to the options recipients either directly or through their supervisors.

58. An August 2, 1999 e-mail from the stock option administrator to an employee under her supervision indicated that "[Abrams] has finally approved the April grant" and asked the employee to begin to print out the stock option paperwork.

59. Mercury's common stock closed at $43.44 per share on August 2, 1999, $19.82 higher than the closing price of $23.62 on the purported grant date of April 20, 1999. Thus, the options backdated to April 20, 1999, were in-the-money by nearly $3 million in the aggregate on the actual grant date.

**f.  January 2002 Grant**

60. Smith replaced Abrams as CFO in November of 2001. He also assumed her role in the backdating scheme.

61. Landan, Smith and Skaer targeted December 3, 2001 – and its closing price of $29.94 per share – as the "grant date" for an employee grant being assembled in late December 2001 and early January 2002.

62. A stock option consent dated December 3, 2001, was created on January 7, 2002. Also created in January 2002 was a list including the names of options recipients and the number of options each would receive with the date of December 3, 2001, and an exercise price of $29.94, on a document entitled "Exhibit A" which was typically attached to a Mercury stock option grant unanimous written consent.

63.     Smith and Landan executed the consent with the December 3, 2001 effective date and price of $29.94 per share on or about January 10, 2002. However, on or about January 17, 2002, Smith discussed the pending grant with Mercury's manager of human resources and directed him to instruct the stock option administrator that she should "not send out any of the options approval emails until I get back with you tomorrow."

64.     Approximately an hour later, additional proposed changes to the tentative grant were forwarded to the stock option administrator by her supervisor, the assistant controller, who added, "Here's something to add to the grant if we keep it."

65.     However, Mercury and Stock Option Committee members Landan and Smith did not "keep" the grant. Two days later, on January 19, 2002, as the price of the company's stock began to decline to levels near the grant price from December 3rd, the manager of human resources sent Mercury's senior managers, with a copy of Smith and Landan, an e-mail explaining:

> "Our goal is to ensure the best possible out-come for the employees receiving options in this grant. For this reason we will be delaying the communication of the annual grant information for a little longer. I will let you know as soon as we have the grant date and strike price. At that time we will email your approval spreadsheets so you and your management team can let the employees know the detail of their grants."

66.     Following a sharp up-tick in the stock price on January 23, 2002, which followed an earnings announcement by Mercury on January 22, Skaer told the HR manager after 11:00 p.m. on January 23 that "the word is that they have 'locked' on yesterday's closing price for the employees and the execs (Doug contacted the Comp Committee) – I think we should wait and see at least until the board meeting."

67.     Skaer wanted to "wait and see" because she "really didn't want [the people in stock option administration] to have to redo this all a third time."

68.     Notwithstanding the fact that a new date had been tentatively identified, changes to the employee grant continued to be made through at least January 30, 2002, as a result of discussions between Smith and Skaer.

69.     Landan and Smith approved the Stock Option Committee grant on or about February 1, 2002, the date of the first of the e-mails indicating that a grant had been approved, dated and priced as of January 22, 2002. A number of the approval e-mails regarding this grant were sent to Mercury managers on February 5, 2002. On that date, the company's COO e-mailed Smith and asked, "Are the options approved? If so, how come I am hearing about it via notes from Europe?" The next day, Smith responded, "Yeah and have been since we revised the list in early Jan. after our go arounds. We were just waiting on price and settled on the $29.29 price from the day of the earnings call."

70.     On February 1, 2002, Mercury's stock closed at $38.62 per share. The options granted pursuant to the backdated January 22, 2002 consent were priced at $29.29 per share, the lowest closing price for Mercury's stock in January 2002, and thus were "in-the-money" by $9.33 per share, that is, by more than $22.6 million in the aggregate.

71.     Meanwhile, options to senior executives including Landan, Smith and Skaer, were still being assessed by senior management. On February 1, 2002, Skaer sent Smith an analysis of options granted to senior officers in the past, the amount of those options that were presently in-the-money, and the size of the "2002 recommended grant." A personnel summary report generated for Landan on February 8, 2002, indicated that to that point he had been granted no stock options in 2002.

72.     Options to Landan, Smith, Skaer and other senior executives were actually approved at a meeting of Mercury's board on February 12, 2002. The day after the Board meeting, Skaer sent each of the Compensation Committee members a written consent to memorialize the grant. The e-mail accompanying the document states: "Attached is a compensation committee consent for your signature. Unfortunately, you all left yesterday before I could get it. It is to approve the executive

COMPLAINT                                              19
SEC v. MERCURY INTERACTIVE, et al., No. C
07-0_____

1  option grants that were agreed upon yesterday." Each member of the Compensation Committee

2  signed the written consent despite the fact that the grant was approved at a meeting. The minutes of

3  the meeting do not reflect that the grant took place.

4        73.    The last of the signed consents was faxed back to the company on February 15, 2002.

5  That same day, Skaer forwarded the list of executives granted options to the stock option

6  administrator, to generate the confirming grant documents: "Here are the ones you have been waiting

7  for – see the list attached to the consent – $29.29 – date is 1/22/02. Amnon is telling his folks today."

8  

9        74.    A few days later, on February 21, 2002, filings prepared at the direction of Skaer were

10  made with the SEC representing that stock options were granted to various executives of the company

11  on January 22, 2002. Because the executive options were falsely represented to have been granted on

12  January 22, 2002, the options were in-the-money by a total of $13.5 million on the day that the

13  options were actually approved, February 12, 2002.

14  

15       **g.**    **March 2002 Stock Option Committee Grant**

16        75.    Skaer e-mailed Smith on March 15th of 2002: "Right now the price on March 1[st] is

17  $35.20 (lowest in March so far) – we could do [a certain employee]'s grant on that day and it would

18  probably make sense to do the other new employees as well as of that date – unless we think the price

19  will be better than that later this month."

20  

21        76.    Smith then forwarded that e-mail to Landan to obtain Landan's views on when the

22  options should be priced, based on the movement of Mercury's stock price. Landan indicated that he

23  would leave the choice of the date and price to Smith and Skaer.

24        77.    Smith and Skaer finally met on April 1, 2002, to discuss the grant. Skaer

25  recommended that Landan and Smith approve the grant and included new hires through the date of

26  

27  the grant. Smith approved the grant on that day and selected March 20, 2002 as the grant date even

28  

COMPLAINT                  20
SEC v. MERCURY INTERACTIVE, et al., No. C
07-0_____

1  though no action to approve the grant actually occurred on March 2 and the terms of the grant were

2  not fixed on that date.

3      78.    Smith and Landan then executed a Stock Option Committee consent memorializing

4  the backdated grant.  On April 2, 2002, a Mercury officer in Europe e-mailed Smith and indicated that

5  he had some employees, including a particular senior employee, whom he "would like to put on a

6  March grant to allow them to enjoy a favorable price."  Smith responded that "I believe that Susan

7  included [the employee] in the authorization I just signed.  Who else??"

8

9      **h.    The Defendants Concealed the Scheme**

10     79.    The backdating scheme, among other things, allowed the defendants (i) to disguise the

11  fact that the Company was paying higher compensation to executives and employees by awarding

12  them in-the-money options and (ii) to avoid having to expense the in-the-money portion as a

13  compensation expense and thus avoid reductions in the company's net income and EPS.  Keeping the

14  scheme secret also hid the injury to the Company and shareholders which occurred when the

15  executives and employees exercised the options and made capital contributions to Mercury that were

16  less than they should have paid, had the options not been granted in-the-money.  Landan, Smith,

17  Abrams and Skaer each filed false Forms 4 with the Commission, prepared by Skaer or under her

18  direction, which misreported the grant date of stock options each received.  Skaer knew that

19  materially false and misleading disclosures were made in the Forms 4 she prepared.  In addition,

20  Landan, Abrams, Smith and Skaer made false statements and representations to Mercury's auditors,

21  caused Mercury to create false documentation for stock option grants and file materially false and

22  misleading filings with the Commission, as described below.

23     80.    The scheme also conferred on each of the defendants substantial hidden benefits.

24  Landan, Abrams, Skaer and Smith were each able to improperly obtain millions of dollars in potential

25  profit as a result of the in-the-money options that they received.  Each actually exercised some of

26

27

28

COMPLAINT                                    21
SEC v. MERCURY INTERACTIVE, et al., No. C
07-0_____

these backdated options and reaped tangible financial benefits from their fraud.  Abrams, Landan,

Smith and Skaer have each profited by an in-the-money amounts of at least hundreds of thousands of

dollars as a result of the fraudulently low exercise prices attached to her options as a result of the

backdating scheme.

81.    They also obtained additional profits through the sale of the shares they acquired

through their exercises of Mercury options, which were sold into the market at times when the price

of Mercury's stock was inflated by the fraud.  They all also obtained significant cash bonuses.  While

these bonuses were largely discretionary, their award was at least in part related to the financial

performance of the company during the period of the fraud, which resulted in material GAAP

expenses being omitted from the company's financial reports.

**C.    The Backdating of Stock Option Exercises**

82.    In addition to backdating stock option grants to make them more valuable, between

1998 and 2001, Landan and Abrams also backdated their exercises of stock options to reap even

greater profits at the expense of the company.  While under the company's shareholder-approved

stock option plan it was the policy "for regular employees" that the date of exercise of an option was

the date the employee actually carried out the exercise, officers of the company were permitted to

have "a date back," whereby the reported date of exercise could be weeks or even months prior to the

true exercise date.

83.    The point of backdating the date of exercise was to enable the executive to obtain a tax

benefit, including tax benefits obtained at the expense of the company.  The exercise of a non-

statutory stock option usually has an income tax consequence to the person exercising – the difference

between the exercise price and the fair market value of the company's stock on the date of exercise is

treated as ordinary income.  The company receives an associated tax deduction on this gain.  If the

1  stock obtained through the exercise is then held for at least one year prior to sale, any additional gain

2  between exercise and sale is treated as a capital gain under the tax laws.

3       84.    The exercise of an incentive stock option also can have tax implications for the person

4  exercising an option, depending on whether there is a qualifying or disqualifying disposition. If the

5  disposition is disqualifying, because, for example, the shares acquired through exercise are not held

6
7  for at least a year, then the tax treatment is similar to that applicable to the exercise of a non-statutory

8  option. Backdating the exercise of an ISO effectively reduces the post-exercise holding period and

9  thus helps avoid the incurrence of ordinary income tax liability that would be associated with a

10 disqualifying disposition. If the holding period and other requirements are met for a qualifying

11 disposition, the spread between the exercise price and the fair market value on the date of exercise is

12
13 treated as an "item of adjustment" for Alternative Minimum Tax ("AMT") purposes. By using

14 backdating to reduce the amounts considered items of adjustment, the person exercising the options

15 can reduce his or her potential AMT liability.

16      85.    On a number of occasions, senior Mercury executives including Landan and Abrams

17 manipulated the date of their stock option exercises, including the exercise of both incentive and non-

18 qualified options, backdating exercise dates to correspond with low points of the closing price of the

19
20 company's stock.

21      86.    These backdated exercises were inconsistent with the terms of the company's

22 shareholder-approved stock option plans, the 1989 Plan and the 1999 Plan, under which options could

23 be exercised only by transmitting to the company on the date of exercise written notice of intent to

24 exercise along with actual payment for the shares.

25      87.    Through the backdating of the exercise documentation, Abrams and Landan were able
26
27 to minimize the gain from these transactions reported as ordinary income on their tax returns, while

28 maximizing the capital gains treatment of their profits. In fact, in order to obtain these tax benefits,

COMPLAINT                                    23
SEC v. MERCURY INTERACTIVE, et al., No. C
07-0_____

Landan and Abrams at times backdated the exercise of options that had been backdated when granted in the first place.

88.    Landan backdated at least three exercises, including exercises of 260,000 shares with purported exercise dates of January 9, 1998 (backdated from March 25, 1998 and reducing Landan's gain by $698,100), 886,000 shares on October 5, 1998 (backdated from January 9, 1999 and reducing Landan's gain by more than approximately $7 million) and 284,000 shares April 4, 2001 (backdated from on or about May 2, 2001, and reducing Landan's gain by approximately $10 million).

89.    Abrams likewise backdated at least six exercises, including purported exercises of 152,000 shares on October 5, 1998 (backdated from January 9, 1999 and reducing her gain by approximately $1.2 million) and 45,501 shares on April 4, 2001 (backdated from May 7, 2001 and reducing her gain by approximately $1.4 million).   Indeed, 390,000 of the options for which Landan backdated exercise dates to October 1998, and all of the options for which Abrams backdated exercise dates to April 2001, had backdated grant dates as well.

90.    To accomplish the fraud, Abrams and Landan:

   a.   looked back to choose favorable exercise dates, and failed to comply with the exercise requirements of the stock option plan;

   b.   failed to disclose the practice in the Mercury's public filings that made disclosures about the stock plans and about the gains realized by senior executives; and

   c.   caused to be filed Forms 4 which falsely reported the "transaction date" of option exercises.

91.    Skaer assisted Abrams and Landan in the concealment of this fraud from Mercury's shareholders by creating the false documents that memorialized and reported the transactions.  These actions are illustrated by the following example of a particular exercise:

92.    On March 10, 1998, Landan filed a Form 4 for the month of February.  The document was prepared and signed by Skaer, on the signature line which informs signers that "[i]ntentional misstatements or omissions of facts constitute Federal Criminal Violations."  The document reflects two exercises of options by Landan, a 20,000 share cashless exercise on February 11, 1998 and a 30,000 share cashless exercise on February 17.  Because Landan had not filed a Form 4 for the month of January, the form also reported a January transaction, a January 9, 1998 grant of 80,670 shares to Landan.  The document does not reflect that Landan exercised any options in January 1998.

93.    That same day, March 10, Skaer sent a facsimile to Mercury's Controller providing him with information relating to shares held by Mercury officers, directors and 10% or greater shareholders, for an SEC filing that the Controller was preparing.  Skaer qualified the information she provided by stating, in bold letters, "PLEASE NOTE THAT THIS NUMBER MAY CHANGE AS AMNON MAY EXERCISE 100,000 SHARES EFFECTIVE AS OF A PRIOR DATE . . . . WE NEED TO FIND OUT FROM SHARLENE WHEN AMNON WILL DECIDE – SHE SAID WHEN HE GETS BACK FROM HIS TRIP. . . ."

94.    Two weeks later, on March 25, 1998, Skaer filed another Form 4 on Landan's behalf, an "amended" form for the period of January 1998.  This form, in addition to reflecting the previously reported January grant, also reported for the first time that Landan had exercised 65,000 options on January 9, 1998.

95.    That same day, March 25, 1998, Abrams sent an e-mail to Mercury's stock option administrator that stated that Landan "would like to pay for the options he exercised on January 9 with his 1997 bonus," and indicated the appropriate journal entries to be made to reflect the payment.

96.    The closing price of Mercury's stock on January 9, 1998, was $25.25, the lowest closing price of the company's stock in the year 1998 through March 25th, the day Landan actually exercised the options.  On that day, the closing price of the company's stock was $36 per share.

97.    By misrepresenting the date of his exercise, Landan was able to reap a potential tax advantage by concealing more than $698,000 in gain upon exercise, and effectively shortened the period he would need to hold the stock in order to obtain the most favorable tax treatment on disposition.

**D.    The Defendants Caused Mercury to File Materially False Financial Statements and other Filings**

98.    As a public company, Mercury filed with the Commission annual reports that included audited financial statements, certified by the Company's outside auditors.  Mercury's public filings affirmatively stated that the Company accounted for its stock options granted to employees in accordance with generally accepted accounting principles, also known as GAAP, which are the accounting conventions, standards, and rules required for preparing financial statements.

99.    In each of its Annual Reports on Form 10-K filed on March 26, 1997, March 31, 1998, March 31, 1999, March 22, 2000 and March 29, 2001, Mercury disclosed that "[t]he Company's policy is to grant options with an exercise price equal to the quoted market price of its stock on the grant date.  Accordingly, no compensation cost has been recognized in the statements of operations." In each annual report, the company reported no compensation expense for options granted to employees with exercise price below the company's stock price on the date of grant

100.    In its Annual Reports on Form 10-K filed on March 27, 2002, March 14, 2003, March 5, 2004, and March 14, 2005, Mercury disclosed that it incurred compensation expense as a result of the assumption of stock options that it assumed in connection the acquisition of certain other companies and as a result of accelerated vesting of certain options in connection with a restructuring. The company reported no compensation expense for options granted to employees with exercise price below the company's stock price on the date of grant, and each filing reported that "all options granted under the 1999 Plan must be at exercise prices not less than 100% of the fair market value."

In addition, the Annual Reports on Form 10-K filed on March 5, 2004 and March 14, 2005 disclose that "[n]o stock-based compensation was recorded for stock options granted to our employees because we have granted stock options to our employees equal to the market price of the underlying stock on the date of grant."

101.    Contrary to the representations in paragraphs 98 and 99, Mercury was incurring substantial compensation expense as a result of granting in-the-money employee stock options.  On July 3, 2006, Mercury restated its financial results for fiscal years 2004, 2003 and 2002, and its selected financial data for the fiscal years 2004, 2003, 2002, 2001 and 2000.  The restatement reflected that the company failed to disclose compensation expense associated with backdated stock options in the aggregate amount of $258 million.  For instance, the company admitted that its reported income before taxes of $107.1 million in 2004 was overstated by $17.8 million; that its reported income before taxes of $57.7 million in 2003 was overstated by $79.5 million (resulting in a loss); that its reported income before taxes of $82.4 million in 2002 was overstated by $47.6 million; and that its reported income in the ten years  prior to 2002 was overstated in the aggregate by $113.4 million.

102.    Landan reviewed and signed each of the Annual Reports on Form 10-K referenced in paragraphs 98 and 99, which made these false representations and failed to report stock option compensation expense, and he also signed Sarbanes-Oxley Section 302 certifications for the Annual Reports on Form 10-K for fiscal years 2003, 2004 and 2005.  Abrams similarly reviewed and signed the Annual Reports on Form 10-K for fiscal years 1997, 1998, 2000 and 2001.  Smith likewise reviewed and signed the Annual Reports on Form 10-K for fiscal years 2002, 2003, 2004 and 2005, and signed Sarbanes-Oxley Section 302 certifications for fiscal years 2003, 2004 and 2005.  In addition, Skaer drafted and prepared the Annual Reports on Form 10-K for at least the 2001, 2002, 2003, 2004 and 2005 fiscal years.

103.    Each of the Annual Reports on Form 10-K described in paragraphs 98 and 99 materially misrepresented Mercury's stock-based compensation expense and net income and loss, and made materially false and misleading disclosures and omitted material information about Mercury's stock option practices.

104.    The certifications Landan and Smith signed for Mercury's 2003, 2004 and 2005 annual reports filed on Form 10-K stated that the reports "fairly present in all material respects the financial condition and results of operations" of Mercury.  Both Landan and Smith had ample information at the time they signed the certifications that they were not true.

105.    In addition, Mercury filed twenty five quarterly reports between May 14, 1997 and May 6, 2005, in which falsely reflect that Mercury incurred no compensation expense for options granted to employees with exercise price below the company's stock price on the date of grant. Abrams reviewed and signed each of the fourteen Mercury quarterly reports filed with the Commission between May 14, 1997 and August 14, 2001.  Smith reviewed and signed each of the eleven Mercury quarterly reports filed with the Commission between November 14, 2001 and May 6, 2005.  For each of the eight Mercury quarterly reports filed with the Commission between November 12, 2002 and May 6, 2005, Smith and Landan each certified that the reports "fairly present[] in all material respects the financial condition and results of operations" of Mercury.  Both Landan and Smith had ample information at the time they signed the certifications that they were not true.

106.    Landan, Abrams, Smith and Skaer knew, should have known, or were reckless in not knowing that they made materially false and misleading statements and disclosures in the financial statements referenced in paragraphs 98, 99 and 101 they prepared, reviewed and/or signed.  In addition, Skaer knew that she was aiding and abetting the making of the false statements in the financial statements referenced in paragraphs 98, 99 and 100 that she prepared.

107.    During the period from 1997 through 2002, using the unanimous written consents or meeting minutes which memorialized the grants and were prepared by Skaer and Abrams, persons working in Mercury's finance department recorded the stock option grant information into

1   Mercury's books and records. From those books and records, the persons in the finance department

2   incorporated the grants into Mercury's financial statements.

3       108.    Mercury, as directed by Abrams and Skaer, also provided the same documentation

4   about stock option grant dates to the Company's external auditors in connection with their annual

5   audits of Mercury's financial statements. Relying on the false documentation supplied to them,

6   Mercury's auditors concurred with the Company's assessment that no compensation expense should

7   be recorded for the options granted to employees.

8       109.    In addition, between 1998 and 2005, Landan, Smith and Abrams signed numerous

9   representation letters to Mercury's auditors representing that the company's financials were fairly

10  presented and that there were no fraudulent practices ongoing at the company. These letters include

11  letters signed on February 8, 1998 (by Landan and Abrams), April 4, 2000 (by Landan and

12  Abrams), January 15, 2001 (by Landan and Abrams), January 22, 2002 (by Landan and Smith),

13  March 14, 2003 (by Landan and Smith), March 5, 2004 (by Landan and Smith), and March 14,

14  2003 (by Landan and Smith).

15      110.    In particular, in a representation letter dated February 4, 1998, attesting to Mercury's

16  1997 financial statement, signed by Landan and Abrams, represented that Mercury's financial

17  statements was fairly presented and in conformity with GAAP, and that "[w]e are not aware of any

18  irregularities involving management or employees who have significant roles in the system of

19  internal accounting control, or any irregularities involving other employees that could have a

20  material effect on the financial statements." This letter also represented that "[t]he disclosure in

21  the footnote to the financial statements represents management's best estimates, based on the

22  weights of evidence available, . . . of the fair value of options grants issued during 1995, 1996 and

23  1997." A representation letter dated January 22, 2002, attesting to Mercury's 2001 financial

24  statement, signed by Landan and Smith, represented that there has been no "[f]raud involving

25  management or employees who have significant roles in the Company's internal control."

26      111.    As described in paragraphs 106 through 109, Landan, Abrams, Smith and Skaer

27  knew, should have known or were reckless in not knowing that they made materially false and

28  misleading statements and provided false documents to Mercury's auditors.

COMPLAINT                                    29
SEC v. MERCURY INTERACTIVE, et al., No. C
07-0_____

1    112.   Mercury sent shareholders a proxy statement in connection with its annual

2  shareholder meeting and periodically for special shareholder meetings during the period 1997

3  through 2003.  Skaer participated in the drafting of all of Mercury's proxy statements during this

4  period and she signed the notice to shareholders on page one of the proxies in her capacity as

5  Mercury's Corporate Secretary from 2002 to 2003.  Abrams also participated in the drafting of the

6  proxy statements between 1997 and 2001, and she signed the notice to shareholders on page one of

7  the proxies in her capacity as Mercury's Corporate Secretary.  Landan prepared and/or reviewed

8  each proxy statement between 1997 and 2003, as did Smith between 2000 and 2003, prior to the

9  statements being sent to shareholders and filed with the Commission.

10    113.   In each year, the stock option grant dates for options granted to Landan, Abrams,

11  Smith and others were falsely reported.  Landan (1998 through 2003 proxy statements), Abrams

12  (1998 through 2002 proxy statements), and Smith (2001 through 2003 proxy statements) each

13  permitted materially false and misleading information with respect to the grant dates of their stock

14  options to be reported in these proxy statements.  Skaer, by preparing these proxy statements

15  knowing that they misrepresented the true grant dates of the stock options for the executive officers

16  named in the filing, knowingly aided in the presentation of materially false information in these

17  filings.

18    114.   Throughout the relevant period, Landan, Abrams and Smith also signed various

19  registration statements filed with the Commission on Forms S-3.  Registration statements on Forms

20  S-3 filed on January 20, 2000 and October 2, 2000 are signed by Landan and Abrams.  A

21  registration statement on Form S-3 filed on June 26, 2003, was signed by Landan and Smith.  Skaer

22  participated in the preparation of these registration statements and signed an opinion of counsel

23  attesting to the statement filed on January 20, 2000.  These three registration statements

24  incorporated by reference materially false and misleading financial statements, as well as materially

25  false and misleading disclosures, from Mercury's Annual Reports on Form 10-K, quarterly reports

26  on Form 10-Q and proxy statements.

27

28

COMPLAINT                                                30
SEC v. MERCURY INTERACTIVE, et al., No. C
07-0_____

115.    Landan, Abrams, Smith and Skaer knew, should have known or were reckless in not knowing that they made materially false and misleading statements and disclosures in these registration statements they prepared, reviewed and/or signed.

116.    As a result of the misconduct of Landan, Abrams, Smith and Skaer, Mercury's books and records falsely and inaccurately reflected, among other things, the dates of option grants, the Company's stock-based compensation expenses, and the Company's financial condition. Additionally, Landan, Abrams, Smith and Skaer circumvented internal accounting controls and, by virtue of their misconduct, failed to maintain a system of internal accounting controls sufficient to provide assurances that stock option grants were records as necessary to permit the proper preparation of financial statements in conformity with GAAP.

## E.    Earnings Management

117.    While participating in the scheme to fraudulently backdate their stock options, Landan and Abrams also took fraudulent steps to ensure that the external view of the company's performance met or exceeded the expectations of the financial markets.  Between at least 1997 and 2001, Mercury's senior management, led by Landan and Abrams, orchestrated a systematic effort to manage the company's earnings to either meet or exceed analyst expectations by fraudulently manipulating Mercury's recognition of revenue.

118.    Landan and Abrams were keenly interested in the company's reported earnings per share, one of the key metrics used by analysts to assess the company's performance.  For example, in an April 1998 e-mail to Landan, Abrams observed that with respect to the company's second quarter results, "[t]he analysts expect revenue to be between $23M (Ben) and $24.3M (Melissa) with average revenue at $23.7 with consensus EPS of $.19 (and a range of ($.18-$.21)."  During the second quarter of 1998, Mercury reported an EPS of $.21 – precisely at the high end of the analyst consensus expectations.

119.    Indeed, between 1997 and 2001, Mercury either met or slightly exceeded analyst EPS expectations in every single quarter – which the company accomplished in significant part by creating a secret backlog of revenue recognizable at the discretion of management.

120.    Through the practice of directing others to hold and not ship ordered products toward the end of a quarter once external targets had been achieved, Landan and Abrams created a significant backlog of revenue which they used to smooth Mercury's earnings, while concealing this source of revenue from its shareholders and the market as a whole.

121.    For example, near the close of the 1998 fiscal (and calendar) year, Abrams told Landan: "We need to stop shipping in Europe and ROW now. If we do that, we have the flexibility to recognize anywhere from about 37.5 to 40M, even more if you want (up to 42). Let's discuss. No matter what we do, we can show whatever EPS we want. We would accrue some of 1999 expenses that can be related to 1998 in one way or another."

122.    At the same time it was using this secret backlog of revenue to manipulate its earnings, management was making fraudulent disclosures to its shareholders to conceal it. While stopping shipments to manage the recognition of revenue is not necessarily a violation of GAAP, companies are required to disclose "[t]he dollar amount of backlog orders believed to be firm, as of a recent date and as of a comparable date in the preceding fiscal year, together with an indication of the portion thereof not reasonably expected to be filled within the current fiscal year, and seasonal or other material aspects of the backlog." Reg. S-K, Item 101(c)(1)(viii).

123.    In the company's annual reports on Form 10-K filed in March 1998, and March 1999, each under Landan and Abrams' signature, the company fraudulently disclosed that "[b]ecause of the short period between order receipt and shipment of products, the Company typically does not have a significant backlog of unfilled orders and believes that backlog is not significant to an understanding of its business nor representative of potential revenue for any future period."

124.    The company made the disclosure in the 1999 10-K despite the fact during the pre-filing review of the document, the accuracy of the statement was questioned by the company's auditors, Price Waterhouse Coopers ("PwC").

125.    Beginning the next year, 2000, Abrams simply removed the fraudulent disclosure from the Company's 10-K, instead of correcting it and accurately disclosing the company's backlog. The company additionally added the misleading disclosure to the "Risk Factors" section of the Management Discussion and Analysis: "[Quarterly revenue and operating result] fluctuations are due to a number of factors, many of which are outside our control, including . . . deferrals by our customers of orders in anticipation of new products or product enhancements."

126.    While the company's shareholders were kept in the dark about the true nature of the company's revenues, management was not. Indeed, in mid-January 1999, the company's Controller presented a report to Landan and Abrams which compared the company's historical reported revenues to its "normalized" revenues. These "normalized" revenues were the company's revenues without the effect of the secret backlog created by the stop-shipping practice. The report pointed out that, in at least one quarter (Q3 1998), reported revenues increased while "normalized" revenues dropped – according to the Controller, "[r]evenue growth exceeded booking growth to meet external growth expectations."

127.    Landan and Abrams caused the company to make the fraudulent disclosures and omissions relating to the stop shipment practices, and attendant backlog, knowing that the facts were material to investors.

128.    For example, the significance of the backlog was highlighted by Abrams, who made a Powerpoint presentation in May 1999 at an "operations" meeting, attended by Landan and others, where Abrams gave an overview on the company's financial picture. The presentation slide covering

the backlog caused by the stop-shipping practices was entitled, "Our Hidden Backlog . . . What Any Analyst Would Love to Get Their Hands On!"

129.    The company's practice of shifting significant amounts of revenue began in 1998, pushing approximately $35 million in revenues (nearly 30% of the company's reported $121 million in revenue) into subsequent periods.  In 1999, the amount shifted increased to $59 million (32% of revenue).  By 2000, the company was shifting approximately $182 million (39% of annual revenue) into subsequent periods.  During 2001, the amount of revenue manipulated through the management of earnings decreased, with approximately $45 million (12% of annual revenue) being shifted between periods.  The practice effectively came to an end in 2002, after Abrams had left the company.

130.    By maintaining a cushion of revenue that the company used to smooth its earnings, Mercury consistently met or exceeded consensus analyst expectations, in every single quarter between 1998 and 2002, even during periods in 1998 and 2001 when the company's actual quarterly earnings would have otherwise fallen short of projections.

## F.    European Exercises

131.    Mercury Interactive was an international corporation that had employees around the world.  Many European countries, including France, Sweden and Switzerland, imposed a "social tax" on companies whose employees exercised stock options.  The tax was on the gain received by the employee as a result of the exercise.

132.    In an effort to avoid payment of this tax, Mercury caused its employees in the United Kingdom, France, and other European countries to exercise options before options were vested in order to minimize the gain upon exercise that would be subject to the tax.  Indeed, beginning in 1999, Mercury required European employees to exercise options at the same time as the options were granted, completely eliminating any gain that would incur a social tax liability for the company.

133. In order to carry out these exercises, the company made loans to its European employees, and required the employees to execute promissory notes to secure the obligation.

134. The transactions, implemented by Skaer along with Abrams and others, were structured as loans because payment of an exercise price was required to exercise the option, and a loan was the only way to obtain an up-front payment from employees for stock that would not vest for years.

135. Skaer, Abrams, and others understood when the transactions were structured that if the loan arrangements were in fact non-recourse arrangements that employees were not truly obligated to repay, that the accounting rules, such as Financial Accounting Standards Board Interpretation Number 44 ("FIN 44") enacted in 2000, required that the options be treated as if the exercise price was unknown, and that the options be subject to variable accounting.[6]

136. In order to avoid the potential accounting expense that variable accounting would have created, in the latter part of 2001 Skaer and others fraudulently structured the loan documentation provided for exercises so that the loans appeared to be full recourse obligations, when in fact they knew that the loans were truly non-recourse to the employees.

137. One indication of whether loans are recourse obligations under accounting principles is whether the loans carry a market rate of interest. Abrams communicated to employees at the time loans were provided beginning in late 1999 that the employees would not be required to pay any interest on the loans. The stock option paperwork reflected that the advances used to accomplish the exercises would be interest free.

---

[6]   Under the variable accounting methodology, a compensation charge is assessed based on changes in the fair market value of the company's stock on a quarterly and yearly basis. Typically, the use of variable accounting will result in greater volatility in reported income and expenses. Variable accounting is generally triggered in connection with stock options where the amount the option holder will actually pay for the option is subject to some uncertainty or ambiguity.

COMPLAINT                                                      35
SEC v. MERCURY INTERACTIVE, et al., No. C
07-0_____

138.    However, with respect to a grant of options in April 2001, following the implementation of FIN 44, the documentation associated with the loans was changed. The documentation indicated that the loans were required to bear a market rate of interest. This change, made by Skaer and others in late August or early September of 2001, was done to cause the loan arrangements to appear to be fully recourse, and in compliance with FIN 44.

139.    In December of 2001, after the documentation associated with stock option exercise loans were sent to European employees, management in Europe communicated to Skaer and others that employees "were told that there is 0% interest on this loan and the[y] are surprised to see that they must pay interest."

140.    Skaer directed the response to this concern, explaining that, "I believe our plan was to bonus them the interest when they paid it – if you recall – without the interest – they aren't real loans and don't achieve our objectives."

141.    The European managers were told that "[d]ue to recent accounting pronouncements (FIN 44) we are not able to give loans for stock options without interest rates that are close to what financial institutions would lend to those individuals. If we did, the loans would cause variable accounting." The European manager's response was, "I guess the main issue here is that the employee has to trust us as we cannot have an agreement to this effect or we have variable accounting."

142.    In practice, during 2003 and 2004 when the terms of many of the loans required repayment, for every employee that sold stock to pay for the loan, the company issued a "bonus" to the employee in the amount necessary to "gross up" the amount of interest due. Where options were under-water and employees failed to pay the principal amount, the shares that had been exercised were simply recaptured by the company and outstanding principal and interest amounts due were

written off.  The company, as a matter of practice, never had any intention of collecting the full value of the loan.

143.    Indeed, until approximately February of 2003, the purported interest being charged was not even being accrued on the books and records of the company.  Despite the fact that the company in mid 2003 began accruing the interest in its records, it maintained a consistent practice of "grossing up" the interest and not enforcing the obligations of the loans, consistent with the original intentions of Skaer and Abrams.

144.    As a result of fraudulently structuring the loan transactions to appear to be recourse obligations, Abrams, Skaer and others caused Mercury to fail to use variable accounting to account for these options between 1999 and 2005, thereby causing the company to fail to disclose a compensation expense of approximately $24 million that should have been reported on the company's financial statements during that period.

## FIRST CLAIM FOR RELIEF

*Violations of Section 17(a) of the Securities Act by All Defendants*

145.    The Commission realleges and incorporates by reference Paragraphs 1 through 144, above.

146.    By engaging in the conduct described above, Mercury, Landan, Smith, Abrams and Skaer, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

      (a)     with scienter, employed devices, schemes or artifices to defraud;

      (b)     obtained money or property by means of untrue statements of a material fact or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

      (c)     engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

COMPLAINT                                                    37
SEC v. MERCURY INTERACTIVE, et al., No. C
07-0_____

1    147.    By reason of the foregoing, Mercury, Landan, Smith, Abrams and Skaer have

2    violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities

3    Act [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**

4

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder by All Defendants*

5

6    148.    The Commission realleges and incorporates by reference Paragraphs 1 through 144,

7    above.

8    149.    By engaging in the conduct described above, Mercury, Landan, Smith, Abrams and

9    Skaer, with scienter, directly or indirectly, in connection with the purchase or sale of securities, by

10    the use of means or instrumentalities of interstate commerce or of the mails, or of facilities of a

11    national securities exchange:

12        (a)    employed devices, schemes, or artifices to defraud;

13        (b)    made untrue statements of a material fact or omitted to state a material fact

14            necessary in order to make the statements made, in the light of the

15            circumstances under which they were made, not misleading; and

16        (c)    engaged in acts, practices, or courses of business which operated or would

17            operate as a fraud or deceit upon other persons, including purchasers and

18            sellers of securities.

19    150.    By reason of the foregoing, Mercury, Landan, Smith, Abrams and Skaer have

20    violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange

21    Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

22    151.    Skaer also knowingly provided substantial assistance to Mercury's, Landan's,

23    Smith's and Abrams' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and

24    Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

25    152.    By reason of the foregoing, Skaer has aided and abetted Mercury's, Landan's,

26    Smith's and Abrams' violations, and unless restrained and enjoined will continue to aid and abet

27    such violations, of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

28    thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

*Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 Thereunder*
*by Landan, Abrams, Smith and Skaer*

153.    The Commission realleges and incorporates by reference Paragraphs 1 through 144, above.

154.    By engaging in the conduct described above, Landan, Smith, Abrams and Skaer knowingly falsified books, records, or accounts of Mercury, or knowingly circumvented or knowingly failed to implement a system of internal accounting controls subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

155.    By engaging in the conduct described above, Landan, Smith, Abrams and Skaer, directly or indirectly, falsified or caused to be falsified, books, records, or accounts subject to 15 U.S.C. § 78m(b)(2)(A).

156.    By reason of the foregoing, Landan, Smith, Abrams and Skaer have violated, and unless restrained and enjoined will continue to violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

### FOURTH CLAIM FOR RELIEF

*Violations of Exchange Act Rule 13b2-2 by Landan, Abrams, Smith and Skaer*

157.    The Commission realleges and incorporates by reference Paragraphs 1 through 144, above.

158.    Landan, Abrams, Smith and Skaer, each as officers of an issuer, by engaging in the conduct described above, directly or indirectly, in connection with (a) an audit, review, or examination of the financial statements of the issuer required to be made pursuant to Commission rules, or (b) the preparation or filing of any document or report required to be filed with the Commission pursuant to Commission rules:  (1) made or caused to be made a materially false or misleading statement to an accountant, or (2) omitted to state, or caused another person to omit to state, a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading to an accountant.

159.    Landan, Abrams, Smith and Skaer, each as officers of an issuer, by engaging in the conduct described above, directly or indirectly took actions to mislead or fraudulently influence independent public or certified public accountants engaged in the performance of an audit or review of the financial statements of Mercury, while they each knew or should have known that their actions, if successful, could result in rendering Mercury's financial statements materially misleading.

160.    By reason of the foregoing, Landan, Abrams, Smith and Skaer have violated, and unless restrained and enjoined will continue to violate, Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## FIFTH CLAIM FOR RELIEF

*Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1,*
*and 13a-13 Thereunder by All Defendants*

161.    The Commission realleges and incorporates by reference Paragraphs 1 through 144, above.

162.    Based on the conduct alleged above, Mercury violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13], which obligate issuers of securities registered pursuant to the Exchange Act to file with the Commission annual and quarterly reports that, among other things, do not contain untrue statements of material fact or omit to state material information necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

163.    By engaging in the conduct described above, Landan, Abrams, Smith and Skaer knowingly provided substantial assistance to Mercury's filing of materially false and misleading reports and filings with the Commission.

164.    By reason of the foregoing, Mercury has violated, and unless restrained and enjoined will continue to violate Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

1    165.   By reason of the foregoing, Landan, Abrams, Smith and Skaer have aided and

2    abetted Mercury's violations, and unless restrained and enjoined will continue to aid and abet such

3    violations, of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and

4    13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13.

5                               **SIXTH CLAIM FOR RELIEF**

6              *Violations of Rule 13a-14 under the Exchange Act by Landan and Smith*

7    166.   The Commission realleges and incorporates by reference Paragraphs 1 through 144,

8    above.

9    167.   Landan and Smith signed, as Mercury's principal executive officer and principal

10   financial officer, respectively, false certifications pursuant to Rule 13a-14 of the Exchange Act that

11   were included in Mercury's 2003, 2004 and 2005 annual reports filed on Forms 10-K, as well as its

12   quarterly reports filed on Forms 10-Q for the quarters ended November 12, 2002 through May 6,

13   2005.  In each such certification, Landan and Smith falsely stated, among other things, that: (a)

14   each report did not contain any untrue statement of a material fact or omit to state a material fact

15   necessary to make the statements made, in light of the circumstances under which such statements

16   were made, not misleading; (b) each financial statement, and other financial information included in

17   each report, fairly presented in all material respects the financial condition, results of operations,

18   and cash flows of Mercury as of, and for, the period presented in the report; and (c) Landan and

19   Smith had disclosed to Mercury's auditors all significant deficiencies in the design or operation of

20   Mercury's internal controls and any fraud, whether or not material, that involved management or

21   other employees who had a significant role in Mercury's internal controls.

22   168.   By reason of the foregoing, Landan and Smith have violated, and unless restrained

23   and enjoined will continue to violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

24                             **SEVENTH CLAIM FOR RELIEF**

25            *Violations of Section 13(b)(2)(A) of the Exchange Act by All Defendants*

26   169.   The Commission realleges and incorporates by reference Paragraphs 1 through 144,

27   above.

28

COMPLAINT                                              41
SEC v. MERCURY INTERACTIVE, et al., No. C
07-0_____

1  170.    Based on the conduct alleged above, Mercury violated Section 13(b)(2)(A) of the

2  Exchange Act [15 U.S.C. § 78m(b)(2)(A)] which obligates issuers of securities registered pursuant

3  to Section 12 of the Exchange Act [15 U.S.C. § 78l] to make and keep books, records, and

4  accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions

5  of the assets of the issuer.

6  171.    By engaging in the conduct described above, Landan, Abrams, Smith and Skaer

7  knowingly provided substantial assistance to Mercury's failure to make and keep books, records,

8  and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and

9  dispositions of the assets of Mercury.

10  172.    By reason of the foregoing, Mercury has violated, and unless restrained and enjoined

11  will continue to violate Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

12  173.    By reason of the foregoing, Landan, Abrams, Smith and Skaer have aided and

13  abetted Mercury's violations, and unless restrained and enjoined will continue to aid and abet such

14  violations, of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

15  **EIGHTH CLAIM FOR RELIEF**

16  *Violations of Section 13(b)(2)(B) of the Exchange Act by All Defendants*

17  174.    The Commission realleges and incorporates by reference Paragraphs 1 through 144,

18  above.

19  175.    Based on the conduct alleged above, Mercury violated Section 13(b)(2)(B) of the

20  Exchange Act [15 U.S.C. § 78m(b)(2)(B)] which obligates issuers of securities registered pursuant

21  to Section 12 of the Exchange Act [15 U.S.C. § 78l] to devise and maintain a sufficient system of

22  internal accounting controls.

23  176.    By engaging in the conduct described above, Landan, Abrams, Smith and Skaer

24  knowingly provided substantial assistance to Mercury's failure to devise and maintain a sufficient

25  system of internal accounting controls.

26  177.    By reason of the foregoing, Mercury has violated, and unless restrained and enjoined

27  will continue to violate Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

28

178.    By reason of the foregoing, Landan, Abrams, Smith and Skaer have aided and abetted Mercury's violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

### NINTH CLAIM FOR RELIEF

*Violations of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder*
*by Landan, Abrams, Smith and Skaer*

179.    The Commission realleges and incorporates by reference Paragraphs 1 through 144, above.

180.    Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 thereunder, [17 C.F.R. § 240.16a-3], require officers, directors, and beneficial owners of more than ten percent of any class of equity security registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to file periodic reports disclosing any change of beneficial ownership of those securities.

181.    Defendants Landan, Abrams, Smith and Skaer filed Forms 3 and 4 with the Commission that contained false or misleading statements with regard to the options' grant dates, expiration dates and exercise prices.

182.    By reason of the foregoing, Landan, Abrams, Smith and Skaer have violated Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Exchange Act Rule 16a-3 [17 C.F.R. § 240.16a-3], and unless restrained and enjoined will continue to commit such violations.

183.    Skaer also knowingly provided substantial assistance to, Landan's, Abrams' and Smith's violations of Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Exchange Act Rule 16a-3 [17 C.F.R. § 240.16a-3].

184.    By reason of the foregoing, Skaer has aided and abetted Landan's, Abrams' and Smith's violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Exchange Act Rule 16a-3 [17 C.F.R. § 240.16a-3].

**TENTH CLAIM FOR RELIEF**

*Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Thereunder*
*by all Defendants*

185.    The Commission realleges and incorporates by reference Paragraphs 1 through 144, above.

186.    Defendants Mercury, Landan, Abrams and Smith, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or of the facility of a national securities exchange, knowingly, recklessly or negligently solicited proxies by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing statements which, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, or which omitted to state material facts which were necessary in order to make the statements made not false or misleading or which were necessary to correct statements in earlier false or misleading communications with respect to the solicitation of proxies for the same meeting or subject matter.

187.    By engaging in the conduct described above, Defendants Mercury, Landan, Abrams Smith and Skaer violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Exchange Act Rule 14a-9 [17 C.F.R. § 240.14a-9], and unless restrained and enjoined will continue to commit such violations.

188.    Skaer also knowingly provided substantial assistance to Mercury's, Landan's, Abrams' and Smith's violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Exchange Act Rule 14a-9 [17 C.F.R. § 240.14a-9].

189.    By reason of the foregoing, Skaer has aided and abetted Mercury's, Landan's, Abrams' and Smith's violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Exchange Act Rule 14a-9 [17 C.F.R. § 240.14a-9].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

I.

Issue an order permanently restraining and enjoining all Defendants and their agents, servants, employees, attorneys, and assigns, and those persons in active concert or participation with them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]; issue an order permanently restraining and enjoining Landan, Abrams, Smith and Skaer and their agents, servants, employees, attorneys, and assigns, and those persons in active concert or participation with them, from violating Sections 13(b)(5), 14(a) and 16(a) of the Exchange Act [15 U.S.C. §§ 78m(b)(5), 78n(a),78p(a)] and Exchange Act Rules 13b2-1, 13b2-2, 14a-9 and 16a-3 [17 C.F.R. §§ 240.13b2-1, 240.13b2-2, 240.14a-9, 240.16a-3], and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Exchange Act Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13]; issue an order permanently restraining and enjoining Landan and Smith and their agents, servants, employees, attorneys, and assigns, and those persons in active concert or participation with them, from violating Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]; and issue an order permanently restraining and enjoining Mercury and its agents, servants, employees, attorneys, and assigns, and those persons in active concert or participation with it, from violating Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)], and Exchange Act Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

II.

Issue an order directing Defendants to disgorge all wrongfully obtained benefits, plus prejudgment interest.

COMPLAINT
SEC v. MERCURY INTERACTIVE, et al., No. C
07-0_____

45

III.

Issue an order directing Defendants to pay civil monetary penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

IV.

Issue an order barring Defendants Landan, Abrams, Smith and Skaer from serving as officers and directors of any public company, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. §§ 77t(e)].

V.

Issue an order directing Defendants Landan and Smith to repay bonuses and stock profits, pursuant to Section 304 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7243.

VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

VI.

Grant such other and further relief as this Court may determine to be just and necessary.

Respectfully submitted,

A. David Williams / MJE

A. David Williams
Christopher Conte
Timothy N. England
Joseph V. Jest
SECURITIES AND EXCHANGE COMMISSION
100 F St., N.E.
Washington, D.C. 20549-5561
(202) 551-4548 (D. Williams)
(202) 772-9231 (Fax)
*Attorneys for Plaintiff*

Dated: May 31, 2007

COMPLAINT
SEC v. MERCURY INTERACTIVE, et al., No. C
07-0_____