*SEC. v. Mercury Interactive, LLC, et al..*
United States District Court, Northern District, Case Number 07-cv-02822 JF

# TAB E

Not Reported in F.Supp.2d
Fed. Sec. L. Rep. P 91,678
(Cite as: 2001 WL 1658275 (S.D.N.Y.))

United States District Court, S.D. New York.

**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**
v.
**ARI PARNES, Adar Equities, LLC, Shauel Seitler, Jacob Herman, Yezhak Dov Knoll, and Myron Raisman, Defendants.**

**No. 01 CIV 0763 LLS THK.**

Dec. 26, 2001.

Opinion and Order

STANTON, D.J.

*1 This is a civil enforcement and disgorgement action brought by the Securities and Exchange Commission against six defendants who move to dismiss the complaint's major claims. (A single remaining claim, that some defendants were not properly registered as brokers or dealers, is not involved in the pending motions.)

THE COMPLAINT

As far as relevant here, the complaint alleges two fraudulent schemes.

1. The Immunogen Scheme

The first, called the Immunogen scheme (Compl.¶¶ 16-42), involves five of the defendants. Defendant Ari Parnes, the president and managing director of defendant Adar Equities, was the principal architect of the defendants' fraudulent scheme. (Compl.¶ 8.) Parnes effectively controls Adar Equities, a limited liability New York company based in Brooklyn, New York. Adar Equities serves as a placement agent for private placements of securities. (Compl.¶ 9.) Adar Equities employed defendants Shauel Seitler and Jacob Herman. (Compl.¶¶ 10-11.) The complaint frequently refers to Parnes, Adar Equities, Seitler and Herman collectively as "the ADAR Defendants." Also charged in the Immunogen scheme, defendant Yeshak Dov Knoll was "at all relevant times a registered representative at Datek Securities Corp., a registered broker-dealer." (Compl. ¶ 12 .)

The complaint describes three phases in the Immunogen scheme. In the first phase Parnes, Seitler and Herman, on behalf of Adar Equities, met with officers of ImmunoGen, Inc., a publicly held biotechnology company, and arranged to place $3.6 million in ImmunoGen convertible debentures with five Panamanian corporate subscribers. (Compl.¶¶ 2, 17, 18.) The debentures were to be issued pursuant to SEC Regulation S, 17 C.F.R. §§ 230.901-905, which at the time provided that certain offers and sales need not be registered with the SEC because they were deemed to occur outside the United States. (Compl.¶ 2.) Regulation S also provided that Regulation S securities could not be re-sold to U.S. purchasers during the 40 days following their issuance. For re-sales in the U.S. after the restricted period, Regulation S required either registration or exemption from registration. (Compl.¶ 16.) However, even if a transaction technically complied with Regulation S, the exemption was not available for transactions that were part of a scheme to evade the registration requirements of the Securities Act. Id. In this case, the ImmunoGen debentures were convertible after 45 days into shares of ImmunoGen common stock at a 25 percent discount from the market price (closing inside bid) on the trading day before conversion. (Compl.¶ 19.) The complaint alleges that the debentures were nominally placed with the Panamanian subscribers but were purchased through an ADAR escrow account controlled by Parnes and held by Parnes' attorney in New York. (Compl.¶¶ 2, 20.)

In the second phase of the scheme, the ADAR Defendants illegally sold short approximately 1.7 million shares of ImmunoGen common stock in the U.S. market. (Compl.¶ 22.) These short sales began in August 1995--eight days before Immunogen issued the convertible debentures--and continued through December 22, 1995. Id. According to the complaint, the short sales were designed to evade the legal restrictions on sales of unregistered securities to U.S. purchasers, to drive down ImmunoGen's stock price, and to generate substantial trading profits for the ADAR Defendants. Id. They took place in two cash brokerage accounts at Datek Securities in the names of two of the Panamanian subscribers to the ImmunoGen issuance. (Compl.¶ 23.) The SEC claims Parnes and his employees at ADAR

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

controlled both accounts and that the ADAR Defendants effected these short sales. Id. Defendant Knoll, the broker on these accounts, knew or recklessly ignored that the short sales he executed were intended to manipulate the market for ImmunoGen stock. (Compl.¶ 23.) The complaint recites regulatory violations by Knoll in executing these trades (Compl.24-41), including "pre-arranged trading, 'marking the close,' and 'piling on,' to drive the company's stock down." (Compl.¶ 3.) Knoll executed the short sales in cash, rather than margin, accounts (Compl.¶ 24). These short sales locked in a sale price for the ImmunoGen stock that was higher than the price the defendants would later pay for 'covering' shares obtained from the Panamanian subscribers. (Compl.¶ 34.)

**\*2** In the third phase of the scheme, the ADAR Defendants delivered to ImmunoGen notices of conversion on behalf of the Panamanian subscribers, entitling them to convert a portion of the debentures, upon which Immunogen delivered the stock certificate to ADAR's escrow agent, a lawyer for Parnes in Manhattan. (Compl.¶ 39, 40.) In one instance, Seitler picked up the stock certificate and delivered it to Knoll at Datek, which was located directly across the street from ADAR's office in Brooklyn, New York. Id. Knoll deposited the shares in an account for one of the Panamanian subscribers, FTS Worldwide Corporation ("FTS"), and then immediately used them to cover FTS's short position. Id.

The SEC claims the scheme continued between October 6, 1995, and December 22, 1995. During that period, the ADAR Defendants directed Knoll to execute illegal short sales and caused the Reg. S subscribers to convert all of their debentures into common stock. (Compl.¶ 40.) According to the complaint, the ADAR Defendants and Knoll profited from their illegal short sales by depressing the stock price, thereby increasing the number of shares issued upon conversion, which then permitted them to cover earlier short sales made at higher prices. (Compl.¶ 35.) The trading profits from the Datek accounts were wired to bank accounts in Switzerland, from which $2.3 million was later transferred back to accounts controlled by, or for the benefit of, defendant Parnes. (Compl.¶ 42.)

2. The Bank Stock Frauds

The bank stock frauds involved the conversions of two banks, BostonFed Bancorp and Roslyn Bancorp, Inc., from mutual to stock form. (Compl.¶¶ 45-46.) Parnes and defendant Raisman, an attorney and accountant licensed in New York, schemed to purchase stock illegally pursuant to non-transferable subscription rights in the initial public offerings of the two banks, Parnes acting alone in one scheme, and with Raisman in the other. (Compl.¶¶ 45-52.) That violated a regulation promulgated by the Office of Thrift Supervision, 12 C.F.R. § 563b.3(i), which prohibits the transfer of a bank depositor's subscription rights. (Compl.¶ 46.)

In the first scheme, involving BostonFed Bancorp, Parnes provided funds to bank depositors, who were eligible for subscription rights, and caused subscription agreements to misrepresent to the bank that the depositors (rather than Parnes) were the true purchasers of stock and had not transferred their subscription rights. (Compl.¶ 47.) One depositor received funds from Parnes to purchase stock, submitted those funds to the bank along with a subscription agreement, took delivery of the shares, and then transferred profits, presumably from the sale of those shares, into an account for an entity controlled by Parnes. (Compl.¶ 48.) A second depositor used funds drawn from the account of an entity controlled by Parnes, submitted them with a subscription agreement to the bank, took delivery of the shares, and then transferred the shares into an account held by Parnes' nephew, where they were sold for a profit. (Compl.¶ 49.)

**\*3** In the second scheme, involving Roslyn Bancorp, Inc., Parnes and Raisman purchased the subscription rights of two of Raisman's elderly clients. (Compl.¶ 50.) One of Parnes' Regulation S clients transferred funds to an ADAR escrow account held by a law firm, which then issued checks payable to Roslyn Bancorp. The depositors submitted personal checks and Parnes' checks together with subscription forms to the bank. Roslyn Bancorp then delivered stock certificates to Raisman. The shares were later transferred to Parnes' nephew's account and sold for a profit. (Compl.¶ 51.) Raisman also provided another client with funds to purchase stock from the same bank. Parnes and Raisman then caused the depositor to misrepresent himself to the bank as a true purchaser who had not transferred his rights. The depositor subsequently transferred shares received from the

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2001 WL 1658275, *3 (S.D.N.Y.))

bank into Parnes' nephew's account, where they were sold for a profit. (Compl.¶ 52.)

For the purposes of these motions to dismiss, all these factual allegations in the complaint are presumed to be true. See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir.1993); Luce v.. Edelstein, 802 F.2d 49, 52 (2d Cir.1986). All reasonable inferences are drawn in favor of the plaintiff. See Mills, 12 F.3d at 1174; Murray v. Milford, 380 F.2d 468, 470 (2d Cir.1967).

## STATUTORY VIOLATIONS

The first claim of the complaint alleges violations of Section 10(b) of the Exchange Act of 1933, 15 U.S.C. § 78j(b), SEC Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and the second claim alleges violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), by the Immunogen market manipulation scheme involving the convertible debentures. The third claim alleges violations of Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, by the sale of unregistered stock in the United States. The fifth [FN1] claim alleges violations of Section 7(f) of the Exchange Act of 1934, 15 U.S.C. § 78g(f), by the execution of short sales in cash rather than margin accounts.

> FN1. The fourth claim alleges failure to register as brokers or dealers and is not at issue on this motion.

The sixth and seventh claims of the complaint allege violations of Section 10(b) and Rule 10b-5 by the schemes to fraudulently purchase bank stock pursuant to depositors' non-transferable subscription rights.

## DISCUSSION

### I. First and Second Claims

Parnes, Adar Equities, Herman, and Seitler move pursuant to Fed.R .Civ.P. 9(b) to dismiss the market manipulation claims for failure to plead fraud with particularity. Dismissal is warranted only where it "appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

Although under Fed.R.Civ.P. 8 a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Rule 9(b) requires more for allegations of fraud. Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The heightened standard is meant to " 'provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." ' Shields v. Cititrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir.1994), quoting O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d Cir.1991).

*4 Courts in this circuit have distinguished between the pleading requirements for market manipulation and fraudulent misrepresentation claims. For market manipulation claims:

[A]llegations may not even need to reach the level of specificity ordinarily required by Rule 9(b) because details regarding the workings of a market manipulation scheme are often known only by the defendants. Nevertheless, a complaint based on such allegations must still specify what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.

Baxter v. A.R. Baron & Co., No. 94 Civ. 3913, 1995 WL 600720, at *6 (S.D.N.Y. Oct.12, 1995) (citations omitted); see also SEC v. U.S. Environmental, Inc., 82 F.Supp.2d 237, 240 (S.D.N.Y.2000); In re Blech Securities Litigation, 961 F.Supp. 569, 580 (S.D.N.Y.1997).

The defendants argue that claims one and two of the complaint are deficient in three respects.

First, the defendants argue that the complaint impermissibly lumps defendants together without distinguishing amongst them. A complaint "may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which it individually stands charged." In re Blech Securities Litigation, 928 F.Supp. 1279, 1292-3 (S.D.N.Y.1996), citing Jacobson v. Peat,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Marwick, Mitchell & Co., 445 F.Supp. 518, 522 n. 7 (S.D.N.Y.1977); see also Red Ball Interior Demolition Corp. v. Palmadessa, 908 F.Supp. 1226, 1238 (S.D.N.Y.1995)(holding the same); O & G Carriers, Inc. v. Smith, 799 F.Supp. 1528, 1538 (S.D.N.Y.1992)(dismissing claims because there was "repeated undifferentiated grouping of defendants so that it is impossible to tell what each individual defendant is accused of doing").

The SEC's complaint in this case makes undifferentiated references to defendants Parnes, Adar Equities, Herman and Seitler as the "ADAR Defendants." It alleges that the "ADAR Defendants" directed Knoll to execute short sales and marking-the-close, cross-trade, and covering transactions without specifying the role each particular defendant played. (Compl.¶¶ 22, 23, 36, 37, 40.) In another paragraph, the complaint does not specify which of the "Adar Defendants" delivered notices of conversion. (Compl.¶ 39.) In this respect, it fails to satisfy one of the principal purposes of Rule 9(b): to provide each defendant with "fair notice of the claim to enable preparation of a reasonable defense." Spear, Leeds & Kellog v. Public Service Co., 700 F.Supp. 791, 793 (S.D.N.Y.1988).

In cases cited by the SEC where grouping was excused, the fraud involved misrepresentations and omissions in corporate documents that could be characterized as "the collective product of the group" of directors, officers and other insiders. Corcoran v. America Plan Corporation, Civ. 86-1729(CPS), 1987 WL 4448, at *4-5 (E.D.N.Y. Feb. 6, 1987)(documents were created by the collective action of directors and other members of a conspiracy); see also Walltree Ltd. v. ING Furman Selz LLC, 97 F.Supp.2d 464, 469 n. 6 (S.D.N.Y.2000) (complaint referred to two corporations as one entity where those corporations issued and placed notes, while concealing the material terms of those notes); Seagoing Uniform Corp. v. Texaco, Inc., 705 F.Supp. 918, 933-34 (S.D.N.Y.1989)(misleading SEC filings). The complaint in this case, in contrast, charges overt conduct by individuals.

*5 Furthermore, here the SEC has had three years' discovery and access to records and documents. It cannot dispense, merely because a defendant invoked the Fifth Amendment privilege during the investigation, with the obligation to provide each defendant with fair notice of the specific conduct with which he is charged.

As to Knoll, however, the complaint has described his role in considerable detail. Knoll executed the illegal short sales in several Datek cash accounts; he also misrepresented the sales as long sales, failed to meet settlement date requirements, sold short in a declining market, and failed to report those trades to the market. (Comp.¶¶ 23-40).

Accordingly, in this respect the complaint is inadequate as against the Adar defendants and it is sufficient as against Knoll.

Second, the defendants argue that the complaint is deficient because it details only one particular covering transaction and then generally alleges that between October 6, 1995, and December 22, 1995, "Parnes and his employees continued to effect illegal short sales of ImmunoGen common stock in the United States and cover those short sales with stock issued to the Reg. S subscribers in exchange for their Reg. S debentures." (Compl. at ¶ 40.) Descriptions of market manipulation schemes which "provide detailed descriptions of a few sample trades," and allege more generally that the activity continued during a particular time frame and had an effect on the market, have been found to satisfy 9(b). U.S. Environmental, Inc., 82 F.Supp.2d at 240. "The SEC is simply not required at the pleading stage to list each and every specific trade," to satisfy Rule 9(b). SEC v. Blech, 99 Civ. 4770(RWS), 2000 WL 288263, at *3 (S.D.N.Y. March 20, 2000)(also finding complaint sufficient where specific stocks, methods of manipulation, the time frame, the effect on the market, and direct participation by defendants were set forth with specificity). The complaint in this case satisfies Rule 9(b) by its description of a particular trade and the mechanics of the scheme, including a time frame and the scheme's effect on the market.

Finally, the defendants argue that the complaint fails to allege scienter with the particularity required for claims under Section 10(b) and Section 17(a)(1) [FN2]. Although Rule 9(b) provides that in allegations of fraud, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally," the Second Circuit sets a higher standard for securities fraud and requires the SEC to "allege facts giving rise to a strong inference of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



fraudulent intent." Blech, 2000 WL 288263, at *3; see also Press v. Chemical Investment Services Corp., 166 F.3d 529, 538 (2d Cir.1999); Acito v. Imcera Group, Inc., 47 F.3d 47, 52 (2d Cir.1995); Shields, 25 F.3d at 1128. " '[F]acts establishing motive to commit fraud and an opportunity to do so," ' or alternatively, " 'facts constituting circumstantial evidence of either reckless or conscious misbehavior," ' give rise to a strong inference of fraudulent intent. Acito, 47 F.3d at 53, quoting In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir.1993); see also Press, 166 F.3d at 538, citing Shields, 25 F.3d at 1128.

> FN2. Claims under Section 17(a)(2) or 17(a)(3) do not require a showing of scienter. See Aaron v. SEC, 446 U.S. 680, 100 S.Ct. 1945, 1955-56, 64 L.Ed.2d 611 (1980) (holding that 17(a)(1) required showing of scienter, but 17(a)(2) and 17(a)(3) did not).

**\*6** To the degree that the complaint does not distinguish between the roles of certain defendants, one cannot evaluate whether the facts give rise to a strong inference of their individual fraudulent intent. As to Knoll, the only defendant whose role has been sufficiently described, the allegations of scienter suffice.

Defendants, relying on Shields, also argue that the short-sale scheme described by the SEC cannot support an inference of fraudulent intent because it defies economic reason. See 25 F.3d at 1130, quoting Atlantic Gypsum Co. v. Lloyds International Corp., 753 F.Supp. 505, 514 (S.D.N.Y.1990)( "Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent."). They claim that a downward manipulation of stock price would be adverse to their economic interests as beneficial owners of the convertible debentures. The argument is unpersuasive because the value of the debentures at issue here was not tied to the stock price: the terms of the debentures guaranteed a 25% discount upon conversion whether the stock price was high or low, and as the stock price fell, the number of shares obtained upon conversion increased, so the holder's economic interest remained the same. (Compl.¶¶ 19, 36.) Meanwhile, short sales of ImmunoGen stock in a declining market created additional profits, when cheaply acquired Regulation S shares were used to cover

sales made at a higher price. The scheme, as described, indicates that the defendants stood to gain; it therefore supports an inference of fraudulent intent.

In sum, as to defendants Parnes, Adar Equities, Seitler and Herman, claims one and two of the complaint are dismissed for failure to plead fraud with particularity, without prejudice and with leave to the SEC to amend the complaint. "Leave to amend should be freely granted, especially where dismissal of the complaint was based on Rule 9(b)." Acito, 47 F.3d at 55. As to defendant Knoll, the motion to dismiss claims one and two is denied.

## II. Third Claim

Defendants Parnes, Adar Equities, Herman, Seitler and Knoll move to dismiss the third claim of the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim under Section 5 of the Securities Act of 1933. They argue that the securities used to cover short sales were exempt from registration under the safe harbors of SEC Regulation S and therefore did not violate Section 5 and that denial of the exemption would violate Due Process.

Section 5 prohibits " 'any person' from directly or indirectly using the mails or the means of interstate commerce to offer or sell a security unless it is registered with the SEC or is exempt from registration.". See SEC v. Softpoint, 958 F.Supp. 846, 859 (S.D.N.Y.1997)(construing 15 U.S.C. §§ 77e(a), (c)). In order to state a claim under Section 5, a plaintiff must allege "(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." Europe and Overseas Commodity Traders, S.A. v. Bangue Paribas London, 147 F.3d 118, 124 n. 4 (2nd Cir.1998). A plaintiff need not plead scienter as it is not an element of a Section 5 claim. See SEC v. Cavanagh, 1 F.Supp.2d 337, 361 (S.D.N.Y.), aff'd, 155 F.3d 129 (2d Cir.1998); Softpoint, 958 F.Supp. at 859-60 (S.D.N.Y.1997). Furthermore, a plaintiff need not plead the inapplicability of an exemption, as the party claiming exemption from registration requirements bears the burden of proving that the exemption applies. See SEC v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 985, 97 L.Ed. 1494

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d                                                      **Page 78**
(Cite as: 2001 WL 1658275, *6 (S.D.N.Y.))

(1953); Byrnes v. Faulkner, Dawkins & Sullivan, 550 F.2d 1303, 1311 (2d Cir.1977).

**\*7** In addition to claiming exemption, however, the defendants argue that denial of the exemption would violate Due Process, because the transactions at issue here were in technical compliance with Regulation S, which at the time provided safe-harbor for re-sales of unregistered securities in the United States after the 40-day restricted period. But Regulation S did in fact provide notice that exemption would not be available "with respect to any transactions or series of transactions that, although in technical compliance with these rules, was part of a plan or scheme to evade the registration provisions of the Act." 17 C.F.R. § 230.901-905, Preliminary Note 2.

Here, in addition to alleging that defendants sold unregistered ImmunoGen securities in the U.S. market using the means of interstate commerce, the complaint describes a scheme "designed to evade the legal restrictions on sales of ImmunoGen's Reg. S securities to U.S. purchasers" (Compl.¶ 22), where defendants "nominally placed" (Compl.¶ 2) convertible debentures with Panamanian corporations, then effected unreported short sales in the United States in violation of securities regulations (Compl.¶¶ 32, 33), where these sales represented at least in one instance "three and a half times the total reported trading volume for ImmunoGen stock for that day" (Compl.¶ 33), and where 2.4 million of the issued shares were promptly transferred to U.S. accounts of the Panamanians, of which 1.7 million shares were then used to cover prior short sales made in the U.S. market (Compl.¶ 41). This is sufficient, at least for pleading purposes. Whether the proof is sufficient to establish a scheme to evade registration requirements and preclude application of the exemption is a question for trial.

III. Fifth Claim

Defendants Parnes, Seitler and Herman move to dismiss the fifth claim pursuant to 12(b)(6) for failure to state a claim under Section 7(f) of the Exchange Act [FN3], because the SEC has not alleged that their violations were willful. The defendants are accused of violating Regulation X, which implements Section 7(f) and which imposes (by reference to another regulation, Regulation T)

initial margin requirements on certain securities transactions. See Regulation X, 12 C.F.R. § 224, and Regulation T, 12 C.F.R. § 220. The defendants allegedly violated these margin requirements by directing the execution of short sales in cash accounts rather than margin accounts. (Com pl.¶ ¶ 67-69.) Defendants argue, however, that willfulness must be pleaded because Regulation X exempts non-willful violations from its purview. Regulation X states, in relevant part: "The following borrowers are exempt from the Act and this part: (1) Any borrower who obtains purpose credit within the United States, unless the borrower willfully causes the credit to be extended in contravention of Regulations T or U." 12 C.F.R. § 224.1(b)(1) [FN4]. To the extent that willfulness must be pleaded to demonstrate the inapplicability of the exemption, the complaint alleges facts sufficient to support a finding that the violations were willful. The complaint states that the Adar defendants "directed Knoll to execute illegal short sales in Hoxton and ACM's cash accounts." (Compl.¶ 40.) Drawing all inferences in favor of the plaintiff, this allegation supports the inference of willfulness: that the defendants knew their deliberate behavior was illegal.

> FN3. Section 7(f) provides in relevant part: It is unlawful for any United States person...to obtain, receive, or enjoy the beneficial use of a loan or other extension of credit from any lender...for the purpose of (A) purchasing or carrying United States securities...if, under this section or rules and regulations prescribed thereunder, the loan or other credit transaction is prohibited or would be prohibited if it had been made or the transaction had otherwise occurred in a lender's office or other place of business in a State. 15 U.S.C. § 78g(f).

> FN4. "Purpose credit" is credit "extended for the purpose of purchasing or carrying margin stock...without collateral or on collateral other than stock." 12 C.F.R. § 221.120.

IV. Sixth and Seventh Claims

**\*8** Defendant Parnes moves to dismiss claims six and seven, and defendant Raisman moves to dismiss claim seven, for failure to state a claim under Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 thereunder. They argue that the allegations in claims six and seven fail to allege fraud "in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d                                              Page 79
(Cite as: 2001 WL 1658275, *8 (S.D.N.Y.))

connection with" the purchase or sale of securities.

Section 10(b) makes it unlawful to:
use or employ, in connection with the purchase or
sale of any security registered on a national
securities exchange or any security not so
registered, any manipulative or deceptive device
or contrivance in contravention of such rules and
regulations as the SEC may prescribe as necessary
or appropriate in the public interest or for the
protection of investors.
15 U.S.C. 78j(b). SEC Rule 10b-5 thereunder
makes it unlawful, "in connection with the purchase
or sale of any security:"
(a) To employ any device, scheme, or artifice to
defraud, (b) To make any untrue statement of a
material fact or to omit to state a material fact
necessary in order to make the statements made, in
light of the circumstances under which they were
made, not misleading, or (c) To engage in any act,
practice, or course of business which operates or
would operate as a fraud or deceit upon any
person...
17 C.F.R. § 240.10b-5. To state a claim under §
10(b), a plaintiff must allege fraud in connection
with the purchase or sale of any security. See O & G
Carriers, Inc. v. Smith, 799 F.Supp. 1528, 1539
(S.D.N.Y.1992).

The Second Circuit has recognized that Section
10(b) "must be read flexibly, not technically and
restrictively." See Press v. Chemical Investment
Services Corp., 166 F.3d 529, 537 (2d Cir.1999),
quoting Superintendent of Insurance v. Bankers Life
& Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 169, 30
L.Ed.2d 128 (1971). As stated in Press, this Circuit
"has broadly construed the phrase 'in connection
with,' interpreting the Congressional intent
underlying the phrase to mandate only that the act
complained of somehow induced the purchaser to
purchase the security at issue." 166 F.3d at 537,
citing SEC v. Texas Gulf Sulphur Co., 401 F.2d
833, 860-61 (2d Cir.1968)(en banc).

In this case, allegations in the complaint make it
clear that the banks were tricked into parting with
bank stock to an ineligible purchaser. Had the bank
known that the subscription rights had been
transferred, the consideration for the stock would
not have been accepted, for the transaction violated
an Office of Thrift Supervision regulation.

In Manela v. Garantia Banking Ltd., 5 F.Supp.2d
165 (S.D.N.Y.1998), the plaintiffs were deceived as
to the identity of the seller of bonds, but the court
held that because there was "no evidence supporting
the possibility that knowledge of the seller's identity
was relevant to the value of the securities or the
consideration paid," the deception could not support
a claim under Rule 10b-5. Id. at 175. Here, unlike
Manela, the identity of the buyer was material to
whether the consideration would be accepted.

*9 The motions to dismiss claims six and seven
for failure to state a claim under Section 10(b) and
Rule 10b-5 are denied.

V. Motion to Sever and Change Venue

Defendant Raisman moves pursuant to
Fed.R.Civ.P. 21 to sever the seventh claim and
transfer it to the Eastern District of New York. The
seventh claim, the only claim against Raisman,
charges both Parnes and Raisman with the illegal
purchase of stock by use of depositors' subscription
rights to the initial public offering of Roslyn
Bancorp.

Fed.R.Civ.P. 21 "permits a court to add or drop
parties to an action when doing so would serve the
ends of justice and further the prompt and efficient
disposition of the litigation." German v. Federal
Home Loan Mortgage Corp., 896 F.Supp. 1385,
1400 (S.D.N.Y.1995), citing E.I. Du Pont De
Nemours & Co. v. Fine Arts Reproduction Co.,
No. 93 Civ. 2462(KMW), 1995 WL 312505, at *1-
2 (S.D.N.Y. May 22, 1995). Rule 21 provides:
Misjoinder of parties is not ground for dismissal
of an action. Parties may be dropped or added by
order of the court on motion of any party or of its
own initiative at any stage of the action and on
such terms as are just. Any claim against a party
may be severed and proceeded with separately.
Furthermore, "[t]he decision whether to grant a
severance motion is committed to the sound
discretion of the trial court." New York v.
Hendrickson Bros., Inc., 840 F.2d 1065, 1082 (2d
Cir.1988). In deciding a severance motion, a court
considers: "(1) whether the issues sought to be tried
separately are significantly different from one
another, (2) whether the separable issues require the
testimony of different witnesses and different
documentary proof, (3) whether the party opposing
the severance will be prejudiced if it is granted and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1658275, *9 (S.D.N.Y.))

Page 80

(4) whether the party requesting the severance will be prejudiced if it is not granted." German, 896 F.Supp. at 1400.

Raisman argues that the claim against him is improperly joined with the other claims in the complaint because it is wholly unrelated and dissimilar to claims one through six. In the alternative, he argues that severance would still be proper here to avoid the prejudice inherent in trying the claim against him, for accessorial conduct, with the many and more sophisticated claims against other defendants.

The claim against Raisman meets the minimum requirements for joinder and none of the above factors mandates its severance. The sixth and seventh claims allege substantially similar schemes to purchase shares in the initial public offerings of banks using the depositors' subscription rights. Thus, there is economy in trying both claims to the same jury, which would in any event hear claim six. While they involve different witnesses and documents, the claims relate to the other claims in the complaint to the extent that Parnes is claimed to have used the proceeds from the Immunogen Scheme to fund both bank frauds. (Compl.¶ 45.) On the whole, severance would be more prejudicial to the SEC (which would have to try one of its claims against Parnes in a separate proceeding) than denial of severance is to Raisman.

*10 Since severance would neither serve the interests of justice nor the prompt and efficient resolution of the claims, Raisman's motion to sever is denied.

### CONCLUSION

Claims one and two against Parnes, Adar Equities, Herman and Seitler are dismissed for failure to plead fraud with particularity, without prejudice and with leave to replead. The motion to dismiss claims one and two against Knoll is denied. The motions to dismiss claims three, five, six and seven for failure to state a claim are denied. Raisman's motion to sever and transfer claim seven against him is also denied.

So ordered.

2001 WL 1658275 (S.D.N.Y.), Fed. Sec. L. Rep.

P 91,678

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



*SEC. v. Mercury Interactive, LLC, et al..*
United States District Court, Northern District, Case Number 07-cv-02822 JF

# TAB F

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

**H**S.E.C. v. Yuen
C.D.Cal.,2006.
Only the Westlaw citation is currently available.
United States District Court,C.D. California, Western
Division.
SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,
v.
Henry C. YUEN, Elsie M. Leung, Jonathan B. Orlick, and
Craig M. Waggy, Defendants.
No. CV 03-4376MRP(PLAX).

March 16, 2006.

Andrew J. Dunbar, Elizabeth Perry Smith, John B. Bulgozdy, Jose F. Sanchez, Karoll L. K. Pollock, Kelly Curtis Bowers, Martin J. Murphy, Michael A. Piazza, Nicolas Morgan, Robert H. Conrad, Jr., Sandra J. Harris, Securities & Exchange Commission, Thomas A. Zaccaro, Akin Gump Strauss Hauer and Feld, Los Angeles, CA, for

Plaintiff.
David C. Wheeler, Joseph John Sheehan, Wheeler and Sheehan, Jack P. Dicanio, Richard Marmaro, Skadden ArpsSlate Meagher and Flom, Jonathan E. Rich, Proskauer Rose, Aaron C.Gundzik, John W. Cotton, Cotton & Gundzik, Patricia L. Glaser, Mark G. Krum, Mark Patrick Lynch, Christensen Miller Fink Jacobs Glaser Weil & Shapiro, Los Angeles, CA, Michelle A. Rice, Niall E. O'Hegarty, Paul R. Niehaus, Sean R. O'Brien, Stanley S. Arkin, Arkin & Kaplan, New York, NY, Kieran P. Ringgenberg, David W. Shapiro, John F. Cove, Jr., Boies Schiller and Flexner, Oakland, CA, Edward P. Davis, Jr., Pamela R. Davis, DLA Piper RudnickGray Cary US, San Francisco, CA, Robert W. Brownlie, Susan D. Resley, Gray Cary Ware & Freidenrich, San Diego, CA, for Defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PFAELZER, J.

*TABLE OF
CONTENTS*

|     |                                                      | Page |
| --- | ---------------------------------------------------- | ---- |
| I.  | FINDINGS OF FACT.                                    | 1    |
|     | A. Background                                        | 1    |
|     | B. Procedural History.                               | 7    |
|     | C. Yuen's Management And Control Of Gemstar.         | 8    |
|     | D. Gemstar's Financial Reporting.                    | 9    |
|     | E. Revenue Recognition Under GAAP And Gemstar Revenue Policies. | 13 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

F. IPG Advertising Revenue Targets.    14

G. Gemstar's Independent Auditors.    18

H. Recording And Reporting Of IPG Licensing Revenue.    20

1. Scientific-Atlanta $113.5 Million Licensing Revenue Under License and Settlement Agreement.    20

2. Time Warner Cable $18.1 Million Licensing Revenue.    26

3. $23.5 Million Licensing Revenue From Up-Front Payment Under AOL IPG Agreement.    29

I. Recording And Reporting Of IPG Advertising Revenue.    30

1. Thomson Relationships.    30

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

a) Background Of The Various Thomson And Gemstar Transactions ... 30

b.) Purported Oral Modification Of DSS Agreement. ... 30

c) e-Book Inventory Purchase And e-Book Licensing Restructuring. ... 36

2. Fantasy Sports $20 Million IPG Advertising Revenue Recorded In 2001. ... 39

3. $26 Million IPG Advertising Revenue From Tribune's Purchase Of WGN Business From Gemstar. ... 44

4. $17.5 Million Prepaid IPG Advertising From Motorola Settlement. ... 47

5. Shifting Of $5.6 Million 2001 Revenue ... 51

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 4
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

|  | | |
|---|---|---|
| | From Media Sector To IP Sector. | |
| | J. Yuen's Compensation from Gemstar. | 55 |
| | K. Yuen's Destruction Of Evidence And Obstruction Of Justice. | 56 |
| | L. Testimony of Yuen and Leung. | 56 |
| II. | CONCLUSIONS OF LAW. | 56 |
| | A. Jurisdiction. | 56 |
| | B. Liability. | 57 |
| | 1. Yuen Committed Securities Fraud. | 57 |
| | a) Yuen Made Misrepresentations And Omissions Of Material Fact About Gemstar's IPG Licensing And IPG Advertising Revenues. | 58 |
| | b) Yuen Acted With Requisite Mental State. | 62 |
| | c) Reliance On KPMG's Accounting Work Or Advice To | 65 |

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Negate Scienter.

d) Yuen's Misrepresentations And Omissions Were Made "In Connection With" Securities Transactions.     67

2. Yuen Violated The Periodic Reporting And Record Keeping Control Requirements.     67

a) Reporting Violations: Section 13(a) Of The Exchange Act And Rules 12b-20, 13a-1, 13a-11, And 13a-13 Thereunder.     68

b) Record-Keeping Violations: Sections 13(b)(2)(A) Of The Exchange Act And Rule 13b2-1 Thereunder.     70

3. Yuen Misrepresented To Auditors In Violation of Rule 13b2-2     71

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Of
Exchange
Act.
C.                    72
Remedies.

*1 This action came on for trial on December 7, 2005, against Defendant Henry C. Yuen ("Yuen"). Plaintiff Securities and Exchange Commission ("Commission") charged Yuen with (1) securities fraud, (2) violation of the periodic reporting, record-keeping, and internal control provisions of the federal securities laws, and (3) lying to auditors. The Court, having considered the testimony of the witnesses, the evidence submitted by the parties, the pleadings and other documents filed in this action, and the legal arguments of counsel, makes the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

### A. Background

1. Gemstar-TV Guide, International, Inc. ("Gemstar" or the "Company"), a Delaware corporation with offices in Pasadena, California, is a media and technology company focused on developing, licensing, and providing products and services that simplify and enhance consumer entertainment.

2. Gemstar's securities are registered with the Commission pursuant to Section 12(g) of the Exchange Act. Gemstar's common stock is traded on the Nasdaq Stock market under the symbol "GMST," and its stock is covered by securities analysts who routinely issue quarterly and annual earnings estimates.

3. Defendant Henry C. Yuen ("Yuen") was the co-founder of Gemstar's predecessor company, and served as Gemstar's Chief Executive Officer ("CEO") from August 1994 to November 7, 2002, President from August 1994 to July 2000, Chairman of the Board of Directors from January 1999 to April 2003, and a director from April 1992 to April 2003. Before 1989, Yuen was a research scientist and held various faculty positions. Yuen holds a B.S. in Mathematics, a Ph.D. in Applied Mathematics, and a Juris Doctor degree.

4. Elsie M. Leung ("Leung") was Gemstar's Chief Financial Officer ("CFO") from 1994 to November 7, 2002, a Co-President from July 2000 to November 7, 2002, Chief Operating Officer or a Co-Chief Operating Officer from January 1996 to November 7, 2002, and a director from 1994 to May 2003. Before Gemstar, Leung worked for Yuen at his private company, Gemstar Development Corporation ("GDC"), as in-house controller and financial officer from approximately 1990 throughout 1995, and then, when Gemstar International Group Limited ("GIGL") was formed and became a NASDAQ-listed public foreign company, as the chief financial officer of GIGL. GIGL was managed by a small, tightly knit group, which included Yuen and Leung.

5. Beginning in 1999 and continuing through the third quarter of 2002 (the "relevant period"), Gemstar licensed for a fee an interactive program guide for television ("IPG") that allowed viewers to navigate, sort, select, and schedule television programming for viewing and recording. The IPG technology was installed on consumer electronic devices such as television sets as well as on cable and digital set top boxes and transmitted via cable systems.

6. By 2000, Gemstar was selling advertising on the IPG, which was a new medium for advertising. Throughout the relevant period, Gemstar was the only company in the United States selling advertising on an IPG.

*2 7. Gemstar was formed as a result of a merger between GIGL and TV Guide, Inc. ("TV Guide"), which published TV Guide magazine. GIGL and TV Guide entered into a merger agreement in October 1999. The merger with TV Guide closed on July 12, 2000.

8. The merged company had an Office of the Chief Executive comprised of Yuen, Leung, Joachim Kiener ("Kiener"), and Peter Boylan ("Boylan") ("senior management"). During the relevant period, Yuen and Leung worked out of Gemstar's Pasadena office. Boylan and Kiener, who had been the CEO and COO of TV Guide, negotiated the merger on behalf of TV Guide and came to Gemstar with the TV Guide merger.

9. After its merger with TV Guide in July 2000, in addition to reporting consolidated financial results, Gemstar started to categorize its business into three main segments and to report revenues separately for each of these segments. One business segment was the Technology and Licensing Sector ("Licensing Sector"),

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

which developed, licensed and protected proprietary technologies, such as Gemstar's IPG. Another segment was the Interactive Program Sector ("Interactive Sector" or "IP Sector"), which reported revenues from advertising, interactive services, and e-commerce on Gemstar's interactive platforms, including the IPG. The third business segment was the Media and Services Sector (the "Media Sector"), which reported revenues from Gemstar's established, non-interactive platforms and media properties such as the TV Guide Magazine, the TV Guide Channel, and SkyMall catalogue sales.

10. In 2000 and early 2001, internal disagreements among members of Gemstar's senior management developed regarding the future of TV Guide's print business as well as Yuen's internal and public financial targets for IPG advertising and the IP Sector. Kiener, who was a member of senior management and head of Gemstar's advertising sales force, as well as other Gemstar employees, told Yuen that Yuen had set overly aggressive and unrealistic revenue projections for 2001 IPG advertising and IP Sector revenues. Yuen disagreed, explaining to Kiener in October and November 2000 that any mention of poor expectations or weak performance to the market would cause the market to question the merger between Gemstar and TV Guide, would negatively impact Gemstar's stock price, and ultimately would destroy the company.

11. By March 2001, and continuing throughout 2001, Yuen knew there also was a substantial shortfall in actual and projected 2001 IPG advertising revenues from Gemstar's advertising sales force when compared to Yuen's public 2001 guidance for the IP Sector. Kiener recommended to Yuen and other members of senior management that they seek legal advice about the company's legal exposure related to its public guidance, to issue an earnings warning for 2001 IPG advertising revenue, and to, at the very least, revise downward Yuen's $100 million guidance for 2001 IP Sector revenue. Yuen did not follow any of Kiener's recommendations.

*3 12. Despite the Company's internal problems and disagreements, throughout 2001 and early 2002 Gemstar and Yuen consistently reported to the market that Gemstar was meeting its own projections as well as analyst expectations concerning IPG licensing and IPG advertising revenues and earnings as reported in the Licensing and IP Sectors. Yuen stated in Gemstar's press releases and analyst conference calls that the Licensing and IP Sectors were the fastest growing segments of the business, comprised the vast majority of the Company's valuation, and were the value and revenue drivers for the Company.

13. In public filings, analyst conference calls, and earnings releases, Yuen and Leung attributed the growth in revenues and earnings before interest, taxes, depreciation and amortization ("EBITDA") in the Licensing and IP Sectors directly and primarily to the growth in IPG licensing and IPG advertising revenues.

14. By meeting Gemstar's targets and analyst expectations for 2001, Yuen was able to show to the market that he had succeeded in establishing IPG as a profitable business for Gemstar and as an attractive new mass media for interactive entertainment and advertising.

15. On April 1, 2002, Gemstar filed and disclosed for the first time in its Form 10-K for the year ended December 31, 2001, that Gemstar had recorded $107.6 million in IPG licensing revenue from Scientific-Atlanta, Inc. ("Scientific-Atlanta") that was the subject of litigation and had been accrued under an expired agreement, as well as $20 million in IPG advertising revenue from a barter transaction related to Gemstar's acquisition of certain intellectual property from Fantasy Sports Properties, Inc. ("Fantasy Sports")..

16. The market reacted negatively to these disclosures. On April 2, 2002 Gemstar's stock price declined by approximately 37%, causing a market loss in excess of $3 billion.

17. At the end of March 2002 and early April 2002, Yuen disposed of seven million Gemstar shares, receiving an initial payment of $59 million.

18. In mid-April 2002, the Commission called an informal meeting with Gemstar to discuss the accounting of the Scientific-Atlanta and Fantasy Sports transactions. Yuen and Leung, among others, were present at this meeting.

19. Thereafter, the Gemstar Board of Directors (the "Board") authorized and the Audit Committee conducted an independent review of the Company's accounting procedures and policies with respect to the Company's 2001 financial statements.

20. On June 27, 2002, the Commission issued Order No. 4-460, which required Yuen and Leung to file with the SEC a statement in writing, under oath, declaring that Gemstar's most recent Form 10-K and any Form 8-K filed subsequent thereto: (i) did not contain any untrue statement of material fact; (ii) did not omit to state a material fact necessary to make the statements made in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

the SEC filings not misleading; and (iii) had been reviewed with the Company's Audit Committee, or in the absence of an Audit Committee the independent members of the Company's Board of Directors.

**\*4 21.** On August 14, 2002, as part of a Form 8-K, a filing used to report "material events or corporate changes" that may have an effect on the value of a company's securities, Gemstar filed sworn statements from Yuen and Leung declaring that they were not able to certify the accuracy of the financial statements and that they were not able to comply with written Commission orders to do so. Gemstar also disclosed in this Form 8-K that it intended to restate its 2001 financial results and to reverse $20 million of revenues and $20 million of related amortization expenses associated with a non-monetary transaction, and make substantial corrections.

22. On September 25, 2002, Gemstar filed yet another Form 8-K disclosing: (i) that it had been notified by NASDAQ that its securities were subject to delisting for failure timely to file a Form 10-Q for the quarter ending on June 30, 2002; (ii) that because of an unresolved dispute between Gemstar and its outside auditors KPMG LLP ("KPMG"), the company could not file its quarterly Form 10-Q report; and (iii) that resolution of these accounting and financial matters involving restatement of financial statements was "uncertain" and "unpredictable."

23. In October 2002, the Commission began a formal investigation of Gemstar and issued investigative subpoenas to Gemstar and its officers. On October 17, 2002, the Commission issued a formal order of investigation against Gemstar, a copy of which was contemporaneously provided to Yuen.

24. Around this same time period, Yuen and Leung negotiated a new deal with the Company's Board to resign as executive officers in exchange for stock, stock options, and payments in excess of $37 million from Gemstar (the "termination cash payments"). Yuen's portion of the termination cash payments is $29.48 million. Gemstar reported these developments on November 12, 2002, in another Form 8-K filing.

25. The termination cash payments, however, were not paid to Yuen and Leung at the time. Upon application by the Commission, the Court issued an order in June 2003, which was affirmed by the Ninth Circuit en banc on March 22, 2005, placing the contemplated one-time termination cash payments into an escrow on the ground that the payments were extraordinary subject to Section

1103 of the Sarbanes-Oxley Act, 15 U.S.C. § 78u-3(c)(3).SEC v. Gemstar-TV Guide, 401 F.3d at 1034-1048.

26. Since November 2002, Gemstar has restated or reversed IPG licensing and IPG advertising revenues totaling approximately $357 million of which in excess of $230 million were the result of transactions at issue in this case.

### B. Procedural History

27. On June 19, 2003, the Commission filed its original complaint in this action against defendants Yuen and Leung.

28. On January 5, 2004, the Commission filed a Second Amended Complaint, which added Peter Boylan, Gemstar's former Chief Operating Officer and Co-President, Jonathan Orlick ("Orlick"), Gemstar's former General Counsel, and Craig Waggy ("Waggy"), TV Guide's Chief Financial Officer, as defendants.

**\*5 29.** On August 9, 2004, the Commission filed the Consent of Defendant Peter C. Boylan to Entry of Final Judgment of Permanent Injunction and Other Relief (the "Boylan Consent"). As part of the Boylan Consent, Boylan agreed to, without admitting to or denying liability, a judgment that, among other things, enjoined him from committing fraud and required him to pay $150,000 in disgorgement and $150,000 in civil penalties. On August 12, 2004, the Court entered the Final Judgment of Permanent Injunction and Other Relief as To Defendant Peter C. Boylan.

30. On July 23, 2004, the Commission filed its Third Amended Complaint, the operative complaint in this action, against Yuen, Leung, Orlick, and Waggy.

31. On January 14, 2005, the Commission filed the Consent of Defendant Jonathan B. Orlick to Entry of Final Judgment of Permanent Injunction and Other Relief (the "Orlick Consent"). As part of the Orlick Consent, Orlick agreed to, without admitting to or denying liability, a judgment that, among other things, enjoined him from committing fraud and barred him for ten years from serving as an officer or director of a public company. In addition, as part of the Orlick Consent, Orlick agreed to a judgment that required him to pay $150,000 in disgorgement and $150,000 in civil penalties. On January 18, 2005, the Court entered the Final Judgment of Permanent Injunction and Other Relief as To Defendant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Jonathan B. Orlick.

32. In late January 2005, the week before the first trial date, the parties informed the Court that the Commission's staff and Waggy had arrived at a negotiated settlement pending Commission approval. On January 26, 2005, the Court entered the Stipulation and Order Staying Action Against Defendant Craig M. Waggy Pending Entry of Final Judgment.

33. In January 2005, the parties arrived at negotiated settlements with Yuen and Leung. Those negotiations did not result in final agreements, however, and the matter was set for trial.

34. On November 29, 2005, the parties informed the Court that Leung and the Commission's staff had arrived at a negotiated settlement, which is currently pending Commission approval. On December 1, 2005, the Court entered the Stipulation and Order (1) Severing Plaintiff's Claims and Causes of Action Against Defendant Elsie M. Leung; and (2) Staying the Severed Action Against Defendant Elsie M. Leung Pending Entry of Final Judgment.

### C. *Yuen's Management And Control Of Gemstar*

35. Gemstar was managed by Yuen and Leung, both of whom were directly involved in and knowledgeable about the business operations, accounting, and financial reporting of Gemstar.

36. Yuen supervised the structuring of transactions, and communicated with and provided information to Gemstar employees regarding those transactions.

37. As testified to by Gemstar's outside auditors and documented in their workpapers for the 2000 and 2001 yearly audits: (1) Yuen and Leung had a highly controlled and autocratic management style, and most if not all high-level decisions were made by them or with their knowledge; and (2) Yuen and Leung controlled the flow of information and wanted to know when information was being shared with other people. Gemstar's former management as well as key finance and business employees corroborated KPMG's testimony concerning Yuen's and Leung's management style and control over Gemstar's business, financial, and accounting operations.

\*6 38. Yuen also played a significant role in Gemstar's accounting. Yuen specifically discussed and supported the accounting for transactions at issue in this case with Gemstar's finance employees, Audit Committee, Board members, and outside auditors.

39. Yuen also played a significant role in Gemstar's financial reporting. Yuen reviewed and approved Commission filings and earnings press releases, and signed Gemstar's Forms 10-K for the relevant period.

40. Yuen conducted the quarterly conference calls with Wall Street analysts covering Gemstar, and led senior management's discussion and answering of analyst questions during the calls related to the transactions at issue in this case. Yuen also spoke directly with analysts and institutional investors outside of the analyst conference calls.

41. Yuen ran the meetings of Gemstar's Board and made presentations with Leung showing the revenues and EBITDA for each of the Company's business sectors and for the company as a whole.

42. Yuen and Leung were present at all Gemstar Audit Committee Meetings in 2001 and 2002. Following the merger, from approximately July 2000 through June 2001, Leung served as the Chairperson of Gemstar's Audit Committee.

43. Yuen had direct contact and personally negotiated with potential and existing licensees and advertisers.

### D. *Gemstar's Financial Reporting*

44. Public companies report the financial results of their operations in periodic reports filed with the Commission, earnings press releases issued to the public, and conference calls held with securities analysts and investors. Gemstar reported its financial results in quarterly reports on Form 10-Q, and in annual reports on Form 10-K filed with the Commission.

45. Gemstar filed with the Commission Forms 10-K for the fiscal years ended March 31, 2000, December 31, 2000, and December 31, 2001. Gemstar also filed quarterly reports on Forms 10-Q for the quarters ended June 30, 1999, September 30, 1999, June 30, 2000, September 30, 2000, March 31, 2001, June 30, 2001, September 30, 2001, and March 31, 2002. Gemstar also filed a current report on Form 8-K, dated September 25, 2002, that contained preliminary financial and other information for the quarter ended June 30, 2002.

46. Gemstar issued its press releases and held conference

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

calls with securities analysts and investors on a periodic basis, usually shortly before the time Gemstar made its filings with the Commission.

47. In its financial reports beginning with the quarter ended September 30, 2000, in addition to reporting its consolidated results, Gemstar reported unaudited "pro forma" financial results for its Media, Licensing, and Interactive Sectors. The reason for the "pro forma" financials results was explained as follows: "The Company believes pro forma results represent a better comparative standard for assessing revenues, expenses, and EBITDA trends, as the pro forma presentation includes the results of operations of TV Guide for all periods presented."(Plaintiff Ex. 6100 at 15-18).FN1 Yuen further explained Gemstar's justification for segmenting the company during a November 2000 analyst conference call as follows: "We have segmented the company ... because they actually compete in different areas. They have to be run differently.... Another reason for the segmentation is to provide the community with a fair means of valuing these companies as they are compared to their peers and to apply the proper multiples to each of these businesses."(Plaintiff Ex. 150 at 2).

FN1. All citations contained herein to "Plaintiff Ex." are to exhibits presented by the Commission at trial. All citations contained herein to "Defendant Ex." are to exhibits presented by the Defendant at trial.

*7 48. Gemstar, through Yuen, Leung, and others, emphasized to securities analysts and the public that the best measure of the company's financial performance was not its consolidated financial statements for the company as a whole, but rather its Licensing and Interactive Sectors' revenue, and Gemstar's definition of EBITDA, which it used as a measure of cash flow.

49. As early as November 2000, Yuen made it clear to analysts and investors that IP would be the fastest growing sector within Gemstar and, in time, the largest portion of revenue for the Company. Gemstar and Yuen touted growth in the Licensing and Interactive Sectors as the "value drivers" and "core sectors" of Gemstar, emphasized increases in revenue and EBITDA in these sectors, and downplayed expected declines in revenue from TV Guide as reported in the Media Sector.

50. Beginning in November 2000, Gemstar and Yuen also provided financial projections by sector to analysts and investors. During a November 16, 2000 conference call

with securities analysts and investors, Yuen forecast that, in 2001:(i) Licensing Sector revenue would increase by 30% to 35% over 2000 Licensing Sector revenues, and Licensing Sector EBITDA would increase by 50% over 2000 Licensing Sector EBITDA; and (ii) IP Sector revenue would increase by 400% to 450% over 2000 IP Sector revenues, IP Sector EBITDA would round up to less than 10% of the revenues, and quarterly IP Sector revenue would grow about 40% to 50% with operational breakeven in the last quarter of 2001.

51. Throughout 2001, Yuen reaffirmed Gemstar's guidance for the IP Sector in analyst conference calls. During the May 14, 2001 Conf. Call, Yuen stated that, for the IP Sector, "current average analyst expectations for Q2 are $19.9 million in revenue and $8.6 million in negative EBITDA" are "consistent with our target" and "[f]or the fiscal year, our target is slightly higher than the current consensus expectations of $105 million in revenue and $22 million in negative EBITDA."(Plaintiff Ex. 6032 at 15). Yuen also reaffirmed Gemstar's guidance with respect to IPG advertising: "[D]uring our guidance call, we were very much hoping to have a 50% type of quarter to quarter growth, but last quarter, we have outperformed our previous expectations and therefore the number went up. This time, therefore, we only have 37% growth, but it is really quite in line with our original targets.... I think the expectations that we have put out, I don't have it now in front of me, is probably still consistent with the quarter to quarter type of growth that we originally had in our minds."*Id.* at 21.Similarly, during the November 14, 2001 Conf. Call, Yuen stated that "we will still be targeting for the year slightly in excess of $100 million or so, very close to the consensus expectations" for the IP Sector. (Plaintiff Ex. 2277 at 16). Yuen further stated during the November 14, 2001 Conf. Call that: "From the EBITDA standpoint, ... we are comfortable with the current targets for all of the sectors, and we reconfirm our target to break-even and go positive in the Interactive Platform sector in Q4."*Id.*

*8 52. On March 18, 2002, almost two weeks before disclosing the Scientific Atlanta accrual and Fantasy Sports transactions on April 1, 2002, Gemstar issued a press release and convened an analyst conference call to announce its financial results for the quarter and year ended December 31, 2001. Yuen and Leung, among others, represented Gemstar during the call.

53. During the March 18, 2002 analyst conference call, Yuen reported that Gemstar had met its revenue and earnings projections and analyst expectations for the IP and Licensing Sectors for 2001. Gemstar reported IP

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Sector revenues of $101.4 million for 2001, exceeding Yuen's $100 million guidance by $1.4 million, reflecting an increase of 339% over 2000 revenues. Gemstar reported Licensing Sector revenues of $ 327 million, an increase of 30% over 2000 revenues, and EBITDA of $229.2 million, an increase of 42% over 2000 EBITDA. Gemstar also reported that it had achieved break-even EBITDA in the fourth quarter 2001 in the IP Sector, as Yuen had projected in November 2000.

54. On May 15, 2002, Gemstar announced its financial results for the first quarter of 2002. The earnings release announced the "second consecutive profitable quarter" for the IP Sector with a $1.7 million EBITDA. (Plaintiff Ex. 2548 at 3-4).

*E. Revenue Recognition Under GAAP And Gemstar Revenue Policies*

55. Under Generally Accepted Accounting Principles ("GAAP"), as described in Statement of Financial Accounting Concepts Number 5 of the Financial Accounting Standards Board, revenues are not recognized until realized or realizable and earned. (Plaintiff Ex. 10161 at 3 (Staff Accounting Bulletin ("SAB") 101); <u>In re Daou Systems, Inc.,</u> 411 F.3d 1006, 1016 (9th Cir.2005) ("under GAAP, 'revenue must be *earned* before it can be recognized.' ") (emphasis in original)). Revenues are realized when goods and services are exchanged for cash or claims to cash, whereas revenues are realizable when assets received or held are readily convertible to known amounts of cash or claims to cash. (Ex. 10161 at 3 (SAB 101)). Revenues are earned when an entity has substantially accomplished what it must to be entitled to the benefits represented by the revenues. *Id.*

56. <u>SAB 101</u> states that, "revenue generally is realized or realizable and earned when all four of the following criteria are met:
• Persuasive evidence of an arrangement exists;
• Delivery has occurred or services have been rendered;
• The seller's price to the buyer is fixed or determinable; and
• Collectibility is reasonably assured."

<u>Id.</u> SAB 101 adopts the four criteria above from the American Institute of Certified Public Accountants' Statement of Position ("SOP") 97-2, which is dated October 27, 1997 and effective March 31, 1998. <u>Barrie v. Inervoice-Brite, Inc.,</u> 397 F.3d 249, 258 (5th Cir.2005) ("<u>SAB 101</u>'s stated purpose was to provide additional guidance in applying GAAP principles to revenue

recognition in financial statements. <u>SAB 101</u> added a topic entitled 'Revenue Recognition' that restated SOP 97-2's test for revenue recognition.").

*9 57. Following GAAP, Gemstar's internal revenue recognition policy for licensing revenue required the existence of an agreement or arrangement before any licensing revenue could be recognized.

58. It was Gemstar's policy and practice, consistent with GAAP, not to record licensing revenue based on the belief that Gemstar would recover licensing fees through pending litigation. Both Leung and Yuen knew that GAAP did not allow revenue to be recorded under such circumstances, which is commonly referred to as a "gain contingency."

59. Gemstar's public filings before April 2002 did not disclose that it recognized licensing revenue when no licensing agreement or arrangement existed, when a license expired, or when litigation over Gemstar's patents was pending.

60. With respect to IPG advertising revenue, Gemstar's internal revenue recognition policy required that the advertising be aired and that the customer actually request the advertising on the IPG platform.

61. Both Yuen and Leung repeatedly represented to the auditors that this was Gemstar's internal revenue recognition policy with respect to IPG advertising. Yuen and Leung represented in the management representation letters they signed in connection with the 2001 audit and first quarter 2002 review that: "Interactive program guide advertising revenue recognized has been requested by the customer and is supported by affidavits of airing."(*See, e.g.,* Plaintiff Ex. 3019 at ¶ 32, Plaintiff Ex. 3026 at ¶ 37). Yuen understood that the auditors required Gemstar to show that the IPG advertisements were actually requested by the customer in order to recognize IPG advertising revenues.

*F. IPG Advertising Revenue Targets*

62. Yuen and Leung were directly involved in developing, setting and announcing internally and to analysts the IPG advertising and IP Sector revenue projections and results for 2001. Yuen explained to Gemstar's Board as early as November 2000, that by reporting financial results by sector, the Company would be able to separate out the fast-growing businesses, which Yuen believed were the value drivers of the Company and comprised 90% of its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 12
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

valuation, from the slow-growing or flat assets such as the TV Guide magazine, which, even though they generated the majority of the revenues, were given low multiples and market value due their slow growth.

63. Yuen and Leung established the IPG advertising revenue targets in a "top-down" approach. Yuen repeatedly rejected the internal revenue projections for IPG advertising sales proposed by the Company's advertising sales executives and told Kiener and others at Gemstar that these figures could not be used as the basis for Yuen's guidance to analysts. Yuen told Kiener as early as August 2000 that: "This is completely unacceptable. The street, based on our successes so far with 2.5 sales people and TVG's previous statements, expects some sort of explosive growth. I have already telegraphed the message that we will be executing a controlled growth instead of 'explosive growth,' but we cannot suffer any departure from the trend that I have laid out ..., or else no one will believe the synergy story we have."(Plaintiff Ex. 138).

*10 64. Kiener continued throughout the latter part of 2000 to try to convince Yuen that the revenue projections provided by the Company's advertising sales force were realistic and that Yuen's $100 million figure for IPG advertising revenues should be lowered at least to $50 million. Kiener explained to Yuen that the reason Gemstar could not achieve $100 million in 2001 was not due to the advertising sales force as Yuen maintained but rather to real obstacles that Gemstar was facing in the market place related to introducing a new advertising medium that had limited functionality, limited distribution, and virtually no media research to prove its effectiveness. Kiener further explained to Yuen that clients did not have funds allocated in their budgets to this type of new advertising medium.

65. On November 13, 2000, in response to criticism from analysts regarding the Company's failure to provide clear cut guidance for 2001 and a decline in Gemstar's stock price, senior management held another earnings call.

66. Before the November 16, 2000 analyst conference call in which Yuen announced Gemstar's guidance, Kiener, once again, tried to dissuade senior management from announcing Yuen's internal $100 million IPG advertising revenue forecast to analysts. In an email to senior management, Kiener stated, among other things, that: (i) Yuen's Interactive Sector forecast of approximately $125 million, which included the $100 million from IPG advertising, was extraordinarily aggressive and a "huge stretch based on the current assessment of the market

place and the rate of acceptance for the platform" based on "all the feedback from clients and agencies"; (ii) existing expectations for the IP Sector from all but one analyst are significantly below Yuen's proposed $125 million figure at an average of $60 million; (iii) the $125 million "is predicated upon a number of things falling into place with zero room for error" including $50 million from transactions by the advertising sales force and $52 million in "corporate deals"; (iv) the "corporate deals" are "not all ... 'in thre [sic] bag' and could be particularly tricky as to timing and calendarization over the 4 quarters"; and (v) "the short term upside of recovery of stock price" was not "worth the exposure of getting pummeled if we fail in one or more of the 2001 quarters."(Plaintiff Exs. 147, 9213).

67. Yuen dismissed Kiener's arguments. Yuen responded to Kiener's November 15, 2000 email in relevant part as follows: "I ... do not think that the damage is over if we come out with a doom and gloom forecast. I think what happened was only the beginning. Now people are question [sic] Gemstar's wisdom to merge with TV Guide, [and] we need to give them a good strong reason by backing up all of our merger reasons."(Plaintiff Ex. 9213).

68. Gemstar did not have a budget of revenues and expenses in place when Yuen announced his $100 million guidance for IP Sector revenues. Thereafter, Yuen instructed Gemstar's senior management to fit the budget to the guidance and develop cost cutting strategies to compensate for any negative profit impacts resulting from any revenue shortfalls. In December 2000, Yuen told senior management in an email: "The guidance for 2001 has already been announced. We must deliver.... I have instructed Elsie to make sure the following occurs: (a) maintain EBITDA if our revenues is [sic] on track; (b) and if the revenues fall short, we need to further improve EBITDA to counterbalance the negative."

*11 69. Yuen knew, by March 2001, and throughout 2001, that Gemstar's advertising sales force did not have enough IPG advertising market sales and revenue to meet his $100 million guidance and analyst expectations without the strategic advertising deals. In a February 2001 email to Kiener and other members of senior management, Yuen acknowledged that "the shortfall is significant" and, to fill the gap, he planned "to use Motorola for Q1" and "Fox ... [to] come in strategically (rather than through normal sale) to help out in the 3Q and 4Q, not in Q1."(Plaintiff Ex. 9218). Yuen also knew as of March 2001, that the advertising sales force projected only $1.45 million in IPG advertising revenue

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

for the first quarter of 2001 and no more than $2.5 million in IPG advertising revenue for the second quarter 2001, in part because advertisers were not buying IPG advertising as a line item and there was a depressed advertising market.

70. On March 5, 2001, there also was an internal conference call involving Yuen, Leung, Boylan, Kiener, and Waggy to prepare for Gemstar's fourth quarter 2000 earnings call (the "internal March 2001 conference call"). During this call, Kiener, raised concerns about Gemstar's ability to meet the $100 million revenue projection for 2001 IPG advertising and the revenue growth of 50% per quarter in 2000 for IPG advertising, as announced by Yuen during the November 16, 2000 conference call.

71. During the internal March 2001 conference call, Kiener recommended to Yuen that Gemstar issue an earnings warning in light of the actual and projected IPG advertising sales for 2001. Yuen rejected this recommendation, stating that he did not see any reasons for an earnings warning, in part because of the corporate deals in the works that would help meet the $100 million target for IPG advertising revenue. Yuen explained during this call that based on the expected IPG advertising revenue from the corporate deals, the advertising sales force would only need to make up a shortfall of approximately $30 million for 2001. The corporate deals that were referenced during the March 2001 conference call included Motorola for $17.5 million, Tribune for $16 million, Fantasy Sports for $20 million, and Fox for $15 million, for a total of $68.5 million.

72. In March 2001, Kiener suggested to Yuen and other members of Gemstar's senior management that Gemstar obtain legal advice as to whether the Company had an obligation to revise its IP Sector guidance downward in light of the fact that the internal projections for the advertising sales force were substantially below Yuen's November 2000 IP Sector guidance. Kiener also expressed to Yuen his concern over legal exposure the Company might face related to its failure to revise its guidance downward. Yuen stated that no change in guidance was necessary and that he was comfortable with his interpretation and did not need to seek legal advice.

G. *Gemstar's Independent Auditors*

*12 73. KPMG was the independent auditor for Gemstar before and after the merger with TV Guide.

74. KPMG's workpapers for the relevant period

documented KPMG's procedures, analyses, and conclusions related to Gemstar. KPMG documented: (1) procedures, decisions, and conclusions reached concerning Gemstar's routine and non-routine revenue streams; (2) fraud risk factors identified by the KPMG engagement team and the team's responses to those risk factors; (3) detailed summaries of the analyses and testing which KPMG performed on a quarterly and yearly basis for IPG licensing and IPG advertising revenue streams related to Scientific-Atlanta, Motorola, Thomson, Time Warner Cable, and Fantasy Sports; and (4) oral representations made by Yuen, Leung, and other members of Gemstar's senior management to KPMG's engagement team during its quarterly reviews and yearly audits.

75. Some of the oral representations that Yuen and Leung made during KPMG's quarterly reviews and yearly audits were documented in management representation letters that were signed by Yuen and Leung and provided to KPMG. The management representation letters that were signed by Yuen and Leung were required by KPMG as part of the quarterly reviews and audits of Gemstar's financial statements and represented important audit evidence. Yuen knew the importance of KPMG's management representation letters, that the auditors relied on these letters as part of their audit work, and that the audit would not have been completed if they had not received these letters.

76. Yuen and Leung directed KPMG to work with Gemstar's legal department in drafting the language of and finalizing the management representation letters they signed. The first drafts of the management representation letters were usually prepared by KPMG's engagement team and then provided to Gemstar for review and approval. The engagement team discussed with Yuen and Leung the representations in the management representation letters that concerned the customers and transactions at issue in this case.

77. KPMG relied on the oral and written representations made by Yuen and Leung in evaluating Gemstar's accounting for the transactions at issue here, in completing KPMG's quarterly reviews and yearly audits, and in issuing KPMG's audit opinions for Gemstar's year-end financial statements.

78. On October 20, 2004, the Commission issued an administrative order which censured KPMG. KPMG and the members of the engagement team did not deny that they had engaged in improper professional conduct in auditing Gemstar's financial statements. *In the Matter of KPMG LLP, Bryan E. Palbaum, John M. Wong, Kenneth*

Not Reported in F.Supp.2d                                                    Page 14
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

*B. Janeski, David A. Hori,*2004 SEC Lexis 2388 *2 (October 20, 2004). In its administrative order, the Commission also imposed sanctions against several KPMG auditors for failing to exercise professional care and skepticism, failing to obtain sufficient competent evidential matter, and relying on management representations. 2004 SEC Lexis 2388 *33–*36. The Order states that KPMG failed to "test[ ] Gemstar's representations," "substituted management's representations" for competent revenue evidence, and failed to "exercise[ ] professional care and skepticism." *Id.*

H. *Recording And Reporting Of IPG Licensing Revenue*

1. *Scientific-Atlanta $113.5 Million Licensing Revenue Under License and Settlement Agreement*

*13 79. In April 1997, Scientific-Atlanta and StarSight Telecast, Inc. entered into a three-year License and Settlement Agreement ("LSA"), wherein Scientific-Atlanta agreed to settle an ongoing arbitration dispute by, among other things, paying a per unit fee for each unit incorporating an IPG until July 1999. Gemstar acquired StarSight in May 1997.

80. Both before and after the LSA expired, Gemstar representatives attempted unsuccessfully to negotiate a new agreement with Scientific-Atlanta.

81. Throughout the negotiations before and after the LSA's expiration, Scientific-Atlanta consistently maintained that it was not infringing Gemstar's patents and did not owe Gemstar any payments for past infringement. In December 1998-almost eight months before the LSA expired in July 1999-Scientific-Atlanta filed a declaratory judgment suit against Gemstar in order to have a court determine that it was not infringing any of Gemstar's patents. Scientific-Atlanta sent a letter to Gemstar dated March 17, 2000, that stated it owed Gemstar no further royalties under the LSA and that Scientific-Atlanta's obligations under the LSA were completed. At no time during this period did Gemstar and Scientific-Atlanta ever renew the terms of the LSA or reach any agreement that Scientific-Atlanta would continue to pay royalties or license fees under the terms of the LSA, and no one at Scientific-Atlanta ever represented or proposed to Gemstar that Scientific-Atlanta would sign a new licensing agreement or that it was willing to extend the terms and conditions of the expired LSA as if it had not expired.

82. Throughout the negotiations with Scientific-Atlanta, Orlick kept Yuen and Leung informed of the status of the negotiations and the litigation between Gemstar and Scientific-Atlanta, including he fact tthat the negotiations ultimately did not result in any agreement and that the lawsuits brought by and against SA did not settle.

83. Gemstar initially stopped recording any revenue from Scientific-Atlanta after the LSA expired. For the quarters ended September 30, 1999 and December 31, 1999, Gemstar did not record any revenue from Scientific-Atlanta and removed Scientific-Atlanta from its list of "major licensees" in its public disclosures for that quarter, including its press release and Form 10-Q.

84. Beginning with the quarter and year ended March 31, 2000, however, Gemstar began recording and reporting revenue from Scientific-Atlanta based upon the economic terms of the expired LSA. Yuen approved the decision to begin recording the Scientific-Atlanta revenue and approved the continued accrual of the Scientific-Atlanta revenue.

85. In May 2000, after the close of the fiscal year and during the audit of Gemstar's fiscal year ended March 31, 2000, Yuen and Leung were involved in discussions concerning the accrual of revenue from Scientific-Atlanta. Yuen and Leung met with Gemstar's outside auditors, KPMG, during this period to discuss Scientific-Atlanta revenues. KPMG identified the post-LSA Scientific-Atlanta revenue accruals as a critical audit area in the course of each of the audits and reviews in which KPMG considered the Scientific-Atlanta accruals. KPMG questioned the Scientific-Atlanta revenue accruals during its reviews and audits because: (1) there was no licensing contract signed between Gemstar and Scientific-Atlanta after the LSA expired; (2) the parties were engaged in litigation; and (3) the receivables from Scientific-Atlanta were aging and growing each quarter. The KPMG engagement team evaluated, and had discussions with Yuen, Leung and others about, the Scientific-Atlanta revenue accruals during each quarterly review and yearly audit KPMG performed, commencing with the March 31, 2000 audit.

*14 86. In connection with each of the quarterly reviews and audits following the audit for fiscal year ended March 31, 2000, Yuen and Leung signed management representation letters dated August 14, 2000, November 14, 2000, August 13, 2001, March 18, 2002, and May 15, 2002 to KPMG. In letters dated March 18, 2002 and May 15, 2002, Yuen and Leung represented: "During discussions with Scientific-Atlanta, Scientific-Atlanta has

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 15

represented to the Company its willingness to extend the terms and conditions of the expired contract as if it had not expired."

87. Yuen knew at the time he signed those management representation letters that KPMG relied on the representations therein as part of their audit confirmation work. Yuen also knew that if the auditors had not received those representations, the audit would not have been completed.

88. In addition to his written misrepresentations in the management representation letters, Yuen also made oral misrepresentations to KPMG about Scientific-Atlanta and the Scientific-Atlanta litigations. Yuen told KPMG at various times throughout the period between 2000 and early 2002 that, despite the ongoing litigation, Scientific-Atlanta was willing to extend the LSA as if it had not expired, that the Scientific-Atlanta receivable was collectible, and that a settlement with Scientific-Atlanta would soon be finalized. Yuen also told KPMG during the 2001 year-end audit that during settlement discussions Scientific-Atlanta had discussed settlement amounts equal to or in excess of the revenues Gemstar had accrued and that Gemstar was engaged in ongoing settlement discussions with Scientific-Atlanta. Yuen repeated those representations during Audit Committee meetings that KPMG attended.

89. KPMG understood, based on their conversations with Yuen and members of senior management that: (1) settlement discussions occurred throughout 2000-2002; (2) Scientific-Atlanta was prepared to sign a new contract at the LSA rates; and (3) the only reason no new contract had been signed or amounts accrued under the expired contract paid was because Gemstar was trying to license additional patents not covered under the LSA. Based on its conversations with Yuen, Leung and Orlick, KPMG understood that if Gemstar had not wanted the additional Gemstar patents included in the new contract, then Scientific-Atlanta was prepared to sign the new contract based on the same rates and the same technology provided by the expired LSA. By early 2002, Yuen told KPMG that Scientific-Atlanta had offered to enter into a new agreement on the same terms as the expired LSA.

90. Gemstar calculated the revenue owed by Scientific-Atlanta by applying the IPG licensing fees under the expired LSA to the cable set-top box sales disclosed in Scientific-Atlanta's quarterly press releases.

91. Gemstar never disclosed in its public filings for 2000,

2001, or the first quarter of 2002 that: (1) there was no licensing agreement or other arrangement in effect with Scientific-Atlanta; (2) Scientific-Atlanta was not making any payments, and disputed that it owed Gemstar any IPG licensing fees under the expired agreement; (3) Gemstar and Scientific-Atlanta were far from settling the litigation between the companies; (4) there had been no significant progress to negotiate a new agreement; and (5) because in 2000 Scientific-Atlanta stopped reporting to Gemstar the number of units it shipped, Gemstar used Scientific-Atlanta's earnings releases to calculate the revenue accrual after the LSA expired.

*15 92. Gemstar recorded and reported $12.23 million of revenue and a corresponding account receivable from Scientific-Atlanta for the year ended March 31, 2000. The $12.23 million was 14.5% of Gemstar's reported revenues for the year and accounted for 28.3% of Gemstar's net earnings.

93. From the period ending March 31, 2000, through the period ending March 31, 2002, Gemstar recorded and reported a total of $113.5 million in Licensing Sector revenue attributed to Scientific-Atlanta based on the terms of the expired LSA. During this period, Gemstar had not received from Scientific-Atlanta any of this revenue, and had never recorded a reserve on its books related to the Scientific-Atlanta receivable during this period. Gemstar never received a promise to pay, or any other acknowledgment from Scientific-Atlanta that it owed the amounts recorded by Gemstar. Throughout this entire period, Gemstar never sent an invoice to Scientific-Atlanta, or otherwise demanded payments for the specific amounts recorded and reported in Gemstar's financial statements.

94. The revenue that was recorded as a receivable from Scientific-Atlanta based upon the expired and disputed LSA was material to Gemstar's financial results and enabled Gemstar to meet Yuen's financial forecasts.

95. In Gemstar's Form 10-K for the fiscal year ended December 31, 2000, signed by Yuen and Leung, Gemstar failed to disclose that Gemstar recognized a material amount of IPG licensing revenue that had not been received and that was purportedly owed under an expired and disputed agreement that was the subject of litigation. Although during this period Gemstar disclosed that it was engaged in litigation with Scientific-Atlanta over patent infringement, it never disclosed that it was recognizing revenue from Scientific-Atlanta in its periodic reports for the periods ended March 31, 2000 through September 30, 2001. Likewise, although Gemstar continued to list

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

"major licensees" in its public statements throughout this period, Scientific-Atlanta was not included in the list.

96. Throughout 2001 and 2002, Yuen told the Audit Committee that an arrangement was in place between Gemstar and Scientific-Atlanta. Yuen told the Audit Committee at its August 13, 2001 and March 17, 2002 meetings that Scientific-Atlanta agreed to pay at least the IPG licensing fee that was in place under the expired agreement, but was refusing to pay additional IPG licensing fees for patents not covered by the agreement.

97. During Gemstar's internal investigation, Yuen repeated the misrepresentations he made to KPMG and to the Audit Committee. In a July 1, 2002 interview, Yuen told Counsel for the Audit Committee and the Chair of the Audit Committee, James Meyer ("Meyer"), that Yuen and Orlick had met in Chicago with James McDonald, Scientific-Atlanta's CEO and William Eason, Scientific-Atlanta's General Counsel. Yuen also stated during the interview that Scientific-Atlanta had agreed to pay the amount provided for in the expired LSA that covered the StarSight technology and a small amount to cover Gemstar's technology. Yuen also stated that McDonald had stated that Scientific-Atlanta factored into its cost of sales the rate under the expired LSA. This was important to the Audit Committee's investigation because it provided an indication that Scientific-Atlanta intended to pay the revenues that Gemstar had accrued.

**\*16** 98. Scientific-Atlanta revenue was not properly recorded and reported as revenue. Gemstar's recognition of revenue from Scientific-Atlanta under the expired LSA did not conform to GAAP. First, there was no agreement or evidence of an arrangement in existence with respect to the Scientific-Atlanta accrual. Second, collectibility of the Scientific-Atlanta receivable was not reasonably assured given that Scientific-Atlanta was litigating any potential IPG licensing fees Gemstar claimed, no substantial progress had been made in settling the litigation, and Scientific-Atlanta's management denied any infringement and refused to pay what Gemstar demanded. Third, the revenue was not realized or realizable because the Scientific-Atlanta receivable was in dispute, and Gemstar had been unable to effect a settlement.

99. In 2002, after Yuen and Leung resigned as Gemstar officers, Gemstar reversed its recognition of all $113.5 million of revenue from Scientific-Atlanta that had been reported in its financial statements.

 2. *Time Warner Cable $18.1 Million Licensing Revenue*

100. In May of 1999, Gemstar entered into a contract with America Online, Inc. ("AOL") pursuant to which AOL licensed Gemstar's IPG technology.

101. In January of 2000, AOL announced its intention to merge with Time Warner, Inc. ("Time Warner"). The merger was not consummated until January 2001

102. Time Warner owned and controlled Time Warner Cable, Inc. ("Time Warner Cable"). Time Warner Cable made use of set-top boxes containing IPG technology.

103. After AOL had announced the merger with Time Warner, Gemstar engaged in discussions with AOL concerning their relationship.

104. Gemstar took the position that Time Warner Cable was automatically subject to the terms of Gemstar's May 1999 agreement with AOL, and that the merged entity ("AOL Time Warner") should pay Gemstar license fees for set-top boxes distributed by Time Warner Cable at the rate set forth in the May 1999 agreement.

105. Gemstar also claimed that Time Warner Cable was obligated to pay for past patent infringement related to IPG technology included in set-top boxes provided to Time Warner Cable by Scientific Atlanta. Gemstar's claims under the AOL IPG licensing agreement and for patent infringement were referred to as "past sins" claims.

106. In January of 2001, AOL made a non-binding proposal which included a payment to Gemstar of $50 million to settle Gemstar's past sins claims.

107. In April 2001, Yuen and Boylan attended a meeting with Richard Parsons ("Parsons"), Robert Pittman ("Pittman") and David Colburn ("Colburn"), senior executives of AOL Time Warner in order to address disputes over whether Time Warner Cable was covered by the AOL IPG agreement.

108. At the conclusion of the meeting, Pittman instructed Colburn to move ahead to resolve the issues between the parties.

109. Gemstar and representatives of AOL Time Warner continued to discuss their relationship throughout 2001 and into 2002. Those discussions included the extent to which AOL Time Warner would be responsible to pay for set-top boxes shipped by Time Warner Cable, and how

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

the 1999 agreement might be amended to address those set-top boxes.

**\*17** 110. Gemstar accrued revenue for the Time Warner Cable boxes in the quarters ending September 30, 2001, December 31, 2001 and March 31, 2002. The form 10-K and 10-Qs covering these quarters were filed on November 14, 2001, April 1, 2002 and May 15, 2002, respectively. In total $18.1 million of revenue was recorded and reported.

111. The accruals were based upon the terms of the AOL IPG contract, which Gemstar believed applied to Time Warner Cable as a result of the merger, and the status of the negotiations.

112. KPMG approved the accrual of all the AOL Time Warner revenues. When KPMG approved the accruals for the AOL Time Warner revenues, it was aware that: (i) AOL had not paid any of the accrued amounts; (ii) the contract that formed the basis for the accrual was still in negotiation; and (iii) that Gemstar and Time Warner disputed the extent of past sins liability.

113. KPMG detailed in a workpaper for the period ended December 31, 2001, that "as of 12/31/2001 the company had not agreed to any renegotiated terms with AOL."(Plaintiff Ex. 3037 at KP00464)

114. At the March 17, 2002 Audit Committee meeting relating to the 2001 year-end financials, KPMG stated that the AOL Time Warner accrual was not material to Gemstar's financial statements.

115. In connection with the March 30, 2002 financials, Gemstar and KPMG created a memorandum dated May 14, 2002. The memorandum concluded: "While negotiations for a new license agreement continue and final settlement post-merger past sins has not been reached, the Company continues to believe the entire accrual as of March 31, 2002, will be collected either through successful completion of negotiations which will result in a payment of an amount equal to or greater than $18.1 million (the Company has no intention to settle for less), or through legal enforcement of the AOL license agreement should negotiations be terminated on the amended agreement."(Emphasis added). (Defendant Ex. 16492 at KP 07747).

116. The Audit Committee approved the accrual of the AOL Time Warner revenues even though it was aware that AOL Time Warner had not paid any money, and that

negotiations were ongoing.

117. At a May 12, 2002 Audit Committee meeting, the AOL Time Warner accrual was discussed, including the fact that an agreement was not signed and negotiations continued. KPMG representatives attended this meeting.

118. The Audit Committee decided to disclose the AOL Time Warner accrual in its 10-Q for the quarter ended March 31, 2002, a filing which was issued on May 15, 2002.

119. Insufficient evidence was presented that Yuen misled KPMG or the Audit committee with respect to the AOL Time Warner accruals, the status of the past sins negotiations or whether AOL acknowledged that Time Warner Cable was covered by the AOL agreement.

120. The fact that the April 2001 meeting with AOL Time Warner executives resolved the stalemate between the parties and led to the negotiations concerning an amendment to the existing agreement is corroborated by the parties' conduct following the meeting, including documents indicating that an amendment was being negotiated, as well as the offers made by AOL Time Warner.

**\*18** 121. The specific content of the April 2001 meeting was not material to KPMG. KPMG's workpapers in the period August 2001 to May 2002 reflect KPMG's knowledge that the "coverage" issue and "past sins" issue had not been finally resolved. KPMG approved the accrual nonetheless.

### 2. $23.5 Million Licensing Revenue From Up-Front Payment Under AOL IPG Agreement

122. In May 1999, Gemstar and AOL entered into an IPG licensing agreement ("AOL IPG Agreement"). Generally, the agreement provided for AOL to have an eight-year license to use Gemstar's IPG technology, with Gemstar providing technology and support services to AOL. AOL agreed to pay Gemstar an up-front fee of $25 million, a monthly fee for each AOL subscriber who accessed the IPG through AOL, and a share of AOL's advertising revenue from the IPG.

123. In May 1999, AOL paid Gemstar $23.5 million for the up-front fee of $25 million, less a $1.5 million credit provided for in an earlier agreement.

124. Gemstar recorded and reported the up-front fee over

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 18
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

five quarters, beginning with the quarter ended June 30, 1999, and continuing through the quarter ended June 30, 2000.

125. Insufficient evidence was offered that Yuen was involved in the accounting for the $23.5 million up-front license fee related to the AOL IPG agreement or that he misled KPMG with respect to this transaction.

126. KPMG reviewed and approved Gemstar's accounting for the $23.5 million up-front fee on two separate occasions.

127. KPMG concluded at the time that the accounting treatment for the AOL initial fee was consistent with GAAP because Gemstar had agreed to be available to provide services to AOL in the first year of the agreement as reflected in the $23.5 million initial fee. Under GAAP, as interpreted by KPMG, the $23.5 million was appropriately recognized on a straight-line basis over the expected period of performance of such services-here, twelve months.

128. Even if the initial fee at issue were deemed a pure license fee, KPMG believed that it would nonetheless have been permissible under applicable accounting literature for Gemstar to have recognized all of it up-front.

I. *Recording And Reporting Of IPG Advertising Revenue*

1. *Thomson Relationships*

a) *Background Of The Various Thomson And Gemstar Transactions*

129. Thomson, S.A. ("Thomson"), a French corporation based in Paris, France, manufactures consumer electronics, including RCA products. Thomson licensed various technologies from Gemstar.

130. Gemstar improperly recorded and reported IPG advertising revenue from Thomson during 2001 and 2002 relating to three different transactions: a DSS Agreement, an e-Book Inventory Purchase, and the restructuring of an e-Book Licensing Agreement which led to a $20 million advertising commitment.

b) *Purported Oral Modification Of DSS Agreement*

131. In 1999, Gemstar entered into an agreement with Thomson under which Thomson acquired a license to incorporate Gemstar's IPG technology into DirecTV satellite units (the "DSS Agreement"). In addition to the terms of this license, the DSS Agreement also provided that Thomson would pay Gemstar a $9 licensing fee for each unit sold, and that Gemstar would pay Thomson a "market development fund" ("MDF") of $4 for each unit sold. MDF are market development funds that are fundamental tools used in merchandising consumer electronics, and are used to help teach the retail community and the consumer about a new technology. Gemstar provided a portion of the MDF under the DSS Agreement, either 30% or 70% of the $4 MDF fee, in advertising from Gemstar (the "advertising value" portion), and a portion paid in cash. The proportional split between advertising and cash depended on whether the unit sold contained Gemstar's IPG (the "MDF split").

*19 132. By the end of 2000, Thomson disputed the amount of MDF it was owed in cash by Gemstar. Discussions were held between Thomson representatives and Yuen at this time concerning this dispute over the amount of MDF owed in cash by Gemstar. During these discussions, a proposal was made by James Meyer, who in addition to his position on the Gemstar Audit Committee, was also then the Senior Executive Vice President and Chief Operating Officer of the Americas for Thomson, to modify the DSS agreement to include a $4 "platform fee" in lieu of the MDF. In contrast to a MDF, a platform fee is a subsidy from a service provider that is intended to compensate a manufacturer for something that was included in a product, at some extra cost, that helps enable the service provider's service. In connection with this modification, Meyer also proposed that Thomson would commit to purchase some amount of IPG advertising in 2001. Although Meyer's proposal regarding the replacement of the MDF component of the DSS Agreement with a platform fee and the related advertising purchase was discussed on several occasions and in some detail, no final agreement was reached and the DSS Agreement was never modified.

133. For 2000, Gemstar recorded $9 per unit in licensing revenue and a $1.20 per unit expense for Thomson related to the DSS agreement. This $1.20 amount represented 30% of the $4 MDF. During 2000, Gemstar did not record any revenue from the "advertising value" portion of the MDF under the DSS Agreement for 2000.

134. In early 2001, Yuen told Leung that Thomson had orally agreed to modify the DSS Agreement (the "oral modification"). The oral modification purported to change the per-unit $4 MDF split to a per-unit $4 platform fee. In addition, Yuen indicated that Thomson also verbally

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

agreed to purchase $2.80 in IPG advertising per DSS unit shipped under the DSS Agreement for 2001.

135. In early 2001, consistent with Yuen's description of the purported oral modification to the DSS Agreement, Leung directed Gemstar to change its accounting of the DSS Agreement, with a resulting increase in IP Sector revenue. For 2001, Gemstar recorded $9 per unit as Licensing Sector revenue, $4 per unit as an expense for the purported new platform fee, and $2.80 per DSS unit as IPG advertising revenue.

136. Gemstar recorded approximately $10.1 million in IPG advertising revenue in 2001 based upon the purported oral modification to the DSS Agreement.

137. Leung and Yuen controlled the timing and placement of all advertising run by Thomson under the purported oral modification of the DSS agreement. Each quarter in 2001, either Yuen or Leung instructed Gemstar's Manager of Licensing, Lisa Jochums ("Jochums"), of a specific dollar amount or dollar amount range that Thomson had requested in IPG advertising.

138. Throughout 2001, Yuen and Leung knew that Thomson representatives disputed the IPG advertising that Gemstar was running on behalf of Thomson, and sought confirmation from Gemstar that Thomson was not being billed for IPG advertising run by Gemstar without approval pursuant to the MDF split of the DSS Agreement. Nevertheless, Yuen and Leung instructed Gemstar personnel to continue to run and record revenue in 2001 for IPG advertising on behalf of Thomson.

**\*20** 139. Yuen knew that the DSS Agreement had not been modified in 2001 to replace the MDF split with a platform fee, or to provide for the purchase of IPG advertising at a rate of $2.80 per DSS unit shipped under the DSS Agreement. From November 2001 through March 2002, Yuen sent several emails to Gemstar employees as well as Thomson representatives in which he acknowledged that the DSS Agreement still had an MDF split in 2001, and offered various proposals to resolve the MDF split dispute for 2001, in each case without ever mentioning any oral modification or platform fee.

140. In early 2002, during the 2001 audit work, KPMG informed Yuen and Leung of the importance of getting signed audit confirmations from Thomson for receivables recorded on Gemstar's books for 2001. KPMG told Yuen and Leung that KPMG needed confirmations returned by Thomson without exception to have as part of the audit evidence and to support management's representations to KPMG about the Thomson transactions and receivables, including all of the IPG advertising run for Thomson. KPMG specifically warned Yuen that if KPMG did not receive the Thomson audit confirmations, KPMG could not complete the 2001 audit.

141. During February 2002, when Gemstar was involved in its 2001 year-end audit by KPMG, the dispute between Thomson and Gemstar regarding the amount of advertising associated with the MDF split had not been resolved. After various proposals were exchanged between Gemstar and Thomson regarding the DSS Agreement, Yuen learned in early 2002, that Thomson was willing to pay $2.80 in advertising for 2000 and 2001, on the condition that Gemstar agree that the advertising portion of the MDF split for 2002 and thereafter would be $1.20. On February 28, 2002, Yuen instructed Gemstar's Vice President of Business Development, Mark Jeffress ("Jeffress") to accept Thomson's proposal.

142. As part of the parties' agreement, Gemstar requested that Thomson "reaffirm" an accounts receivable confirmation for the 2001 IPG advertising amounts.

143. By March 11, 2002, Gemstar had not received the confirmations that Yuen needed for KPMG to complete its audit. On March 12, 2002, Yuen sent to Thomson a draft rider to the DSS Agreement, which set forth Gemstar's willingness to accept Thomson's interpretation of the MDF split under the DSS Agreement beginning in calendar year 2002. Yuen also attached two draft confirmation letters, one seeking confirmation of $12,425,348 in IPG advertising and the other seeking confirmation of the $9 per unit licensing fee Thomson agrees to pay Gemstar.

144. On March 12, 2002, the same day Thomson signed the audit confirmation letters confirming, among other things, the 2001 IPG advertising and the $9 per unit licensing fee under the DSS Agreement, Yuen signed the rider to the DSS Agreement.

145. Gemstar's accounting for the DSS Agreement for 2001 did not comport with GAAP, because recognition of the revenue was not in accordance with the terms of the agreement between Gemstar and Thomson, Thomson had not requested or authorized the advertising (with exception of a $600,000 advertising buy that had been authorized by Thomson), and payment by Thomson was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 20

uncertain. It was also not possible to determine the fair value of the advertising, because Gemstar did not have any comparable transactions in the medium of IPG advertising to support any valuation.

*21 146. Because the DSS Agreement had not been modified, GAAP required Gemstar management to record the $9 licensing fee on a net basis (after subtracting any cash MDF). Because the DSS Agreement had not been modified, the accounting methodology should not have been modified, and Gemstar should not have recorded IPG advertising revenue related to the DSS Agreement. This had been the recommendation provided to Gemstar by KPMG during the 2000 audit work in early 2001. The KPMG auditors believed this issue had become moot because they believed, based on Yuen's representations, that the MDF had been replaced by a platform fee under the DSS Agreement for 2001.

147. The Thomson DSS IPG advertising revenue was material to Gemstar's financial statements, and enabled Gemstar to meet Yuen's projections, as well as those of analysts. The $10.1 million was approximately 10% of Gemstar's reported IP Sector revenue for 2001. Because Gemstar exceeded its IP Sector guidance by $1.4 million, and reported break-even EBITDA for the fourth quarter 2001, the amount of IPG advertising revenue represented by this transaction was material in 2001.

148. KPMG did not object to Gemstar's accounting related to the DSS Agreement for 2001 based on Yuen's and Leung's representations that the DSS Agreement had been verbally modified in 2001, and that the MDF fee had been replaced by a platform fee for 2001. Yuen and Leung represented to KPMG that the DSS Agreement was orally modified to provide for a $4 platform fee instead of the $4 MDF, and that Thomson separately had agreed to purchase IPG advertising on a stand-alone cash basis. Yuen knew Thomson had not agreed to such a modification.

149. Neither Yuen, Leung, nor anyone else at Gemstar ever told KPMG that Thomson had not agreed to the platform fee and was disputing the terms of the DSS Agreement throughout 2001, that the MDF was still part of the DSS Agreement in 2001, or that Thomson had agreed to sign an IPG advertising audit confirmation requested by KPMG in part because Yuen agreed to accept Thomson's interpretation of the MDF under the DSS Agreement going forward in 2002.

150. Yuen and Leung represented in their March 18, 2002

Management Representation Letter that the "[t]ransactions with Thomson" were "properly recorded or disclosed in the consolidated financial statements" for 2001.

151. After Yuen and Leung resigned as Gemstar officers, Gemstar reversed the recognition of approximately $8.7 million of the IPG advertising revenue connected to the oral modification of the DSS Agreement and restated its financial statements.

### c) e-Book Inventory Purchase And e-Book Licensing Restructuring

152. Gemstar recorded and reported $9.6 million in IPG advertising revenue from two Thomson e-Book transactions in the last quarter of 2001 and the first two quarters of 2002. This IPG advertising revenue related to the unwinding of a business and licensing relationship that Gemstar and Thomson had entered into in 1999 to produce e-Book, a handheld electronic device that allowed users to download and view reading material. Thomson manufactured the device and Gemstar supplied the technology and content.

*22 153. Under the 2000 e-Book licensing agreement, Gemstar granted Thomson a five year license to the e-Book technology for $25 million. In late 2000, Thomson and Gemstar began selling e-Books. By mid 2001, Thomson decided to exit the e-Book business due to poor sales and Gemstar's failure to provide adequate content.

154. In October 2001, Gemstar, through Yuen, and Thomson agreed that Gemstar would purchase Thomson's remaining e-Book inventory, and Thomson would purchase IPG advertising.

155. The initial terms of the transaction provided that Gemstar was to purchase approximately 40,000 of the model REB 1100 e-Book for $116 each and approximately 9,000 of the model REB 1200 e-Book for $299 each (for a total purchase price of approximately $7.3 million) and Thomson was to purchase $2 million in IPG advertising from Gemstar in the fourth quarter 2001. On November 8, 2001, Yuen received a copy of the draft e-Book inventory purchase agreement, which contained these initial terms negotiated between Yuen and Thomson.

156. During November 2001, Yuen agreed to change the deal to increase the IPG advertising purchase by Thomson. Yuen agreed to Thomson's proposal that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 21
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Gemstar pay a higher per unit price for Thomson's e-Book inventory and Thomson purchase a commensurate amount from Gemstar in IPG advertising.

157. On November 14, 2001, Thomson sent Gemstar revised documents relating to the e-Book inventory purchase, reflecting an increase in the overall purchase price of the e-Book inventory of approximately $4.6 million, and an additional IPG advertising commitment by Thomson of $4.6 million for 2002.

158. The e-Book inventory transaction was finalized on or about November 15, 2001. The final documents relating to this transaction included side letters and related promissory notes from Thomson agreeing to purchase $2,287,200 in IPG advertising in the fourth quarter 2001, and $4.6 million in IPG advertising for 2002.

159. The November 19, 2001 side letter and promissory note relating to the Thomson $4.6 million IPG advertising purchase for 2002 reflected the additional amount Gemstar agreed to pay for Thomson's e-Book inventory.

160. After the transaction was completed, Yuen and Leung received by email on December 3, 2001, a summary of the final terms, financial figures, and per unit prices related to the e-Book inventory transaction. The summary stated that Gemstar agreed to purchase the REB 1100's for $200 a unit and the REB 1200's for $499 a unit for a total purchase price of $11,642,500, and that Thomson agreed to spend $2,287,000 on advertising to be run in 2002, and $4.6MM for advertising to be run in 2002. The email further stated that Thomson would sign an unconditional, irrevocable promissory note for the advertising buy on December 15, 2001 concurrently with Gemstar making payment for the inventory asset purchase.

161. Yuen knew of and approved the structure of the e-Book inventory purchase transaction, including the fact that the IPG advertising purchase was always a term of the transaction.

*23 162. In February or March 2002, as part of the 2001 audit, KPMG discussed the e-Book inventory purchase transaction with Yuen and Leung. Based on these conversations, KPMG understood that Gemstar had purchased the e-Book inventory for cash, and that there were no other components of this transaction. Neither Yuen nor anyone at Gemstar ever told KPMG that there was any IPG advertising component of this deal.

163. Between November 2001 and January 2002, Yuen negotiated a restructuring of the e-Book licensing agreement with Thomson (the "restructuring"), which included a reduction of the total licensing fee from $25 million to $20 million, a $20 million market development fund ("e-Book MDF") to be paid by Gemstar to Thomson ($2.5 million quarterly for 2002 and 2003), and a $20 million IPG advertising purchase to be paid by Thomson to Gemstar ($2.5 million quarterly for 2002 and 2003).

164. The transaction was finalized on or about February 20, 2002. The final documentation relating to the restructuring of the e-Book licensing agreement included: the new e-Book Licensing Agreement signed by Yuen, side letters signed by Jeffress and a corresponding promissory note signed by Yuen relating to $20 million in MDF, side letters addressed to Yuen and signed by Thomson and a corresponding promissory note relating to Thomson's purchase of IPG Advertising in 2002 and 2003. Yuen knew and approved the terms of this transaction.

165. Although KPMG knew that Thomson had entered into an agreement in early 2002 to purchase $20 million in IPG advertising from Gemstar in 2002 and 2003, KPMG did not know that at the same time Gemstar had agreed to provide $20 million in cash for the e-Book MDF support for 2001, 2002 and/or 2003. Neither Yuen, Leung nor anyone at Gemstar told KPMG that the $20 million advertising agreement entered into in early 2002 by Thomson was connected in any way to any market development funds offered by Gemstar, or to the restructuring of the e-Book licensing agreement.

166. The IPG advertising revenue from both the e-Book inventory purchase and the e-Book licensing restructuring was material to Gemstar's financial statements, and enabled Gemstar to meet Yuen's projections, as well as those of analysts. In the fourth quarter of 2001, Gemstar recorded and reported approximately $2.3 million in revenue from the e-Book inventory transaction, which was approximately 6.2% of IP Sector revenue. During the first two quarters in 2002, Gemstar recorded and reported approximately $3.65 million in IP Sector revenue from these e-Book deals, or approximately 16% of IP Sector revenue each quarter.

167. Gemstar's accounting for these transactions did not comply with GAAP. There was no evidence to support any economic substance associated with the agreement to overpay for the e-Book inventory or to "round-trip" the MDF funds to provide IP Sector revenue. Gemstar appears to have created the e-Book MDF obligation solely

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

for the purpose of providing funds for Thomson to 'purchase' a corresponding amount of IPG advertising from Gemstar.

*24 168. Gemstar did not disclose that a material amount of its IP Sector revenues for the fourth quarter of 2001 and the first three quarters of 2002 resulted from these transactions with Thomson. Gemstar also did not disclose that it had increased the amount it paid for the e-Book inventory so that Thomson could purchase an equal amount of IPG advertising. Gemstar failed to disclose that it agreed to pay an e-Book MDF to Thomson that was used to purchase an equal amount of IPG advertising.

169. After Yuen and Leung resigned as Gemstar officers, Gemstar reversed the recognition of Thomson's IPG advertising revenue relating to the e-Books inventory purchase and the e-Books licensing restructuring.

2. *Fantasy Sports $20 Million IPG Advertising Revenue Recorded In 2001*

170. Gemstar recorded and reported $20 million in IP Sector revenue in 2001 from Fantasy Sports.

171. Fantasy Sports is a Virginia corporation with its principal place of business in Reston, Virginia. Fantasy Sports operates an internet-based business engaged in the creation and implementation of fantasy sports games. During the late 2000 to early 2001 time period, Gemstar was involved in negotiations with Fantasy Sports to purchase the Fantasy Sports business and intellectual property from them.

172. On November 10, 2000, Jeffress informed Yuen and Leung in an email that Fantasy Sports was interested in pursuing a transaction with Gemstar. There was no mention of IPG advertising at that time.

173. By February 15, 2001, Fantasy Sports, through one of its principals, had agreed to sell its entire business to Gemstar for approximately $5 to $10 million. At this time, the Fantasy Sports transaction included a side letter for the purchase of advertising in an amount above $5 million on whatever advertising platform Gemstar dictated.

174. On March 23, 2001, Gemstar and Fantasy Sports entered into a letter of intent and term sheet called "Agreement in Principle." The Agreement in Principle provided that (1) Gemstar would acquire Fantasy Sports' intellectual property for $21 million; (2) Gemstar would

pay $2 million for an option giving it the right to acquire 100% of the Company at a price of $3 million within two years; (3) Fantasy Sports would agree to "guarantee to purchase at least $20 million in advertising revenue by end of 2001;" and (4) Fantasy Sports would agree "that such advertising will be made at TV Guide's discretion and the money therefore shall come from the Escrow Account ..." (Plaintiff Ex. 196).

175. On June 28, 2001, Gemstar entered into a transaction with Fantasy Sports in which Gemstar (1) acquired Fantasy Sports' intellectual property for approximately $20.75 million, of which $750,000 was to be paid in cash and $20 million was to be paid in the form of advertising run by Gemstar at Gemstar's discretion in 2001; and (2) paid $2 million to acquire a two-year option to purchase Fantasy Sports for $3 million.

176. During this time period, Leung and others kept Yuen informed about the status of the negotiations and about discussions with KPMG involving the Fantasy Sports transactions. Yuen received emails between February 2001 and April 2001 that described the proposed structure and deal terms of the Fantasy Sports transaction.

*25 177. On or about February 28, 2001, Yuen learned that Gemstar had set the amount of proposed advertising purchases by Fantasy Sports at $20 million in exchange for Gemstar purchasing Fantasy Sports' intellectual property for $20 million and paying $2 million for an option to acquire all the shares of Fantasy Sports. Yuen also learned the parties were contemplating Fantasy Sports' prepaying advertising of $20 million through the use of an escrow account.

178. In a February 28, 2001 email, Boylan forwarded a business summary to Yuen and Leung that provided detailed financial information about Fantasy Sports. The summary reflected that Fantasy Sports projected gross revenues of $732,000 for 2000 and $1.75 million for 2001, and that it had been operating at a loss since 1996 and projected a loss of almost $200,000 for 2000 and only $200,000 in EBITDA for 2001.

179. Yuen learned by April 2001 that Fantasy Sports did not have the need for $20 million in IPG advertising nor cash to pay for it. Jeffress told Yuen and Leung in a March 27, 2001 email that Gemstar's cash investment, "would enable fantasysports to buy advertising on our IPG platforms" and that "[g]iven that the fund would go into an escrow account-there is not a huge risk here but a potentially strong upside."(Plaintiff Ex. 9066).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 23

180. For the year 2001, Gemstar recorded and reported a total of $20 million in IP Sector revenue from Fantasy Sports. No cash payment from Fantasy Sports to Gemstar for the $20 million in purported advertising was ever made.

181. The $20 million in recorded and reported revenue from Fantasy Sports for 2001 was material to Gemstar's financial statements. This revenue was 19.7% of Gemstar's total 2001 IP Sector revenue, and contributed substantially to Gemstar's ability to meet its projected IP Sector revenues for 2001. Because Gemstar exceeded its IP Sector guidance by $1.4 million, and reported break-even EBITDA for the fourth quarter 2001, the amount of IPG advertising revenue represented by this transaction was material.

182. Gemstar's recognition of revenue from the Fantasy Sports transaction throughout 2001 did not conform with GAAP. The advertising revenue was never earned because it resulted from a transaction that lacked economic substance and was merely a pretext to permit Gemstar to record IP Sector revenue. Yuen knew Fantasy Sports did not have the financial ability to pay for the advertising. All of the $20 million that Gemstar purportedly received for the advertising came solely from Gemstar's agreement to purchase the Fantasy Sports' intellectual property that was purportedly valued at $20.75 million.

183. Although required by GAAP, Gemstar lacked any reasonable basis to determine the fair value of the IPG advertising. In 2001, Gemstar did not have stand-alone IPG advertising transactions with unrelated parties from which the company received cash in amounts comparable to those recognized in connection with the Fantasy Sports transaction. Gemstar could not use the IPG advertising run for the strategic or corporate customers as cash comparables because Gemstar controlled the placement of the advertising on the IPG platform, the specific quarter in which to run and record revenue from the IPG advertising, the specific dollar amount to run and record as IPG advertising revenue each quarter, and the rate charged for the IPG advertising. Gemstar senior management, including Yuen, falsely represented to KPMG that IPG advertising revenue recorded for 2001 from the strategic advertising deals involving Thomson, Motorola, and Tribune was the result of stand-alone cash transactions and supported the IPG advertising revenue recorded by Gemstar for Fantasy Sports.

*26 184. Because Gemstar paid no more than $3 million total in cash to Fantasy Sports to obtain the intellectual property and option to purchase the business, there was no basis under GAAP to recognize the $20 million in advertising revenue in 2001.

185. In connection with KPMG's second or third quarter review of Gemstar's financial statements, KPMG recommended to Gemstar that the Fantasy Sports transaction should be disclosed in the quarterly filings in part because the transaction was non-monetary. Leung rejected KPMG's recommendation stating that she did not believe the disclosure was necessary because it was not material.

186. Yuen and Leung, however, knew by February 2001, that barter and non-monetary transactions had to be disclosed in the company's public filings.

187. During the 2001 year-end audit, KPMG again recommended to Gemstar that it disclose the Fantasy Sports transaction in the Form 10-K. Gemstar agreed and disclosed in its Form 10-K that it had entered into a non-monetary transaction involving the purchase of $20 million in IPG advertising from Gemstar in 2001, in exchange for intellectual property.

188. Prior to the Audit Committee investigation, no one at Gemstar ever told KPMG or the Audit Committee that one of the principals from Fantasy Sports was willing to sell the company, including the intellectual property, for somewhere between $5 to $10 million; that Gemstar dictated the purchase of IPG advertising as a condition of the deal; that Fantasy Sports was willing to buy whatever amount of IPG advertising Gemstar requested; and that Gemstar selected the IPG advertising platform and the dollar amount recorded in IPG advertising for Fantasy Sports each quarter in 2001.

189. In November 2002, Gemstar announced that it was reversing recognition of the $20 million in IPG advertising from the Fantasy Sports transaction.

3. *$26 Million IPG Advertising Revenue From Tribune's Purchase Of WGN Business From Gemstar*

190. Gemstar recorded and reported $26 million of IP Sector revenue related to the sale of Gemstar's WGN distribution business for the periods ended June 30, 2001, through September 30, 2002.

191. The Tribune Company ("Tribune") operates various

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 24

media businesses, including the WGN TV station. Under a 1990 agreement, a Tribune affiliate supplied a Gemstar affiliate with the WGN signal for nationwide distribution.

192. In or about December 1999, before the Gemstar-TV Guide merger was consummated, Tribune informed TV Guide that it wanted to end the relationship by buying the WGN distribution business. In or about August 2000, after the merger with TV Guide, Gemstar sent a proposal to Tribune to sell the WGN distribution business for approximately $300 million. On or about November 21, 2000, Gemstar sent another proposal to Tribune for the sale of the WGN rights for $224 million, of which 50% was to be paid by a five-year, $112 million advertising commitment by Tribune. Tribune then sent a counter-proposal to Gemstar, which included an advertising component. However, members of senior management of Tribune who were involved in the negotiation of the transaction testified that Tribune had not otherwise been interested in advertising with Gemstar and had viewed the advertising component of the transaction primarily as a means of acquiring the WGN distribution business from Gemstar.

*27 193. In or about April 2001, Gemstar and Tribune finalized the transaction. The final transaction included, among others, two agreements: (1) a Stock Purchase Agreement in which Tribune paid $106 million in cash to Gemstar for the stock of the WGN distribution business; and (2) an Advertising Agreement in which Tribune committed to purchase $100 million of advertising from Gemstar over a six-year period, regardless of whether Tribune used the advertising. The documentation for the transaction was split at the direction of Gemstar into these two component parts to create a "clean trail" for tax and audit purposes. However, the Stock Purchase Agreement included an express closing condition requiring the execution of the Advertising Agreement. Yuen received copies of the final documents.

194. Gemstar controlled the timing and placement of the advertising that it ran for Tribune. The Advertising Agreement provided that Gemstar had sole discretion over the timing and placement of the advertising, provided that Gemstar could not run more than 50% of any year's advertising in any one quarter, and that at least 15% of the advertising had to be run in *TV Guide* magazine.

195. Although negotiations with Tribune were conducted mainly out of TV Guide's Tulsa headquarters by a team headed by Boylan, Yuen was informed of the progress of the negotiations, knew that the advertisement element of

the deal constituted a portion of the purchase consideration for the distribution business, and directed Boylan to ensure that the deal was structured so that Gemstar had control over the timing and placement of the advertising purchased by Tribune.

196. Yuen and Gemstar's senior management misled KPMG concerning the connection between the Stock Purchase Agreement and the Advertising Agreement. KPMG became aware of the Advertising Agreement only after seeing a reference to it. In response to its inquiry about the Advertising Agreement, Leung and Waggy told KPMG that the Advertising Agreement was not related to, but rather was negotiated separately from, the sale of the WGN distribution business. Waggy also told KPMG that Tribune wanted to purchase and requested advertising from Gemstar, and that Gemstar sold Tribune the advertising at fair value based upon arm's length negotiation.

197. No one at Gemstar told KPMG that Gemstar requested the advertising purchased by Tribune as part of the sale of the WGN business, that the advertising transaction was negotiated as part of the sale of the WGN business, or that Gemstar controlled the timing and dollar amount of IPG ad spending each quarter.

198. KPMG was never consulted about nor provided advice on whether the Advertising Agreement should have been disclosed in Gemstar's public filings, earnings releases, or analyst conference calls.

199. Despite the fact that he had been kept informed of the details of the Tribune transaction throughout its negotiation and execution, Yuen failed to disclose in Gemstar's press releases, conference calls, and public filings that the Tribune advertising revenue was part of the deal for the sale of the WGN distribution business, that Gemstar had requested the IPG advertising purchase, and that Gemstar controlled the timing, platform placement, and dollar amount of IPG advertising run per quarter.

*28 200. In Gemstar's May 14, 2001 press release, Gemstar disclosed the sale of the WGN distribution business, but stated that although certain specific terms of the transaction wee confidential, the transaction was not material to either company. Likewise, at the May 14, 2001 analyst conference call, Yuen disclosed that Gemstar had sold the WGN distribution business, but noted that the terms of the transaction were confidential.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 25
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

201. Gemstar's recognition and reporting of $26 million in Tribune advertising revenue failed to comply with GAAP. Gemstar violated SAB 101 in that the fair value of the advertising assigned by Gemstar to the Tribune transaction was not reliable, verifiable, and objectively determinable because: (1) the Advertising Agreement was linked to the Stock Purchase Agreement, and Tribune wanted to purchase the WGN distribution rights, not advertising; (2) the IPG was a new advertising medium with practically unlimited capacity; (3) there was no other legitimate contemporaneous advertising deal with which to reasonably compare the $100 million Advertising Agreement; and (4) the advertising was entirely at Gemstar's discretion and control. Gemstar should have allocated such advertising to the sale of the WGN distribution business as if the entire arrangement were a single element transaction.

202. Yuen thus knew that Gemstar's publicly reported financial results, SEC filings and press releases contained material misstatements and omitted to disclose material information regarding the recognition and reporting of revenue from Tribune.

203. After Yuen and Leung resigned as Gemstar officers, Gemstar reversed the recognition of $26 million in IPG advertising revenue and allocated it to the sale of the WGN distribution business and interest income.

### 4. *$17.5 Million Prepaid IPG Advertising From Motorola Settlement*

204. Gemstar recorded and reported $17.5 million in IP Sector revenue from a 2001 settlement with Motorola, Inc. ("Motorola"). This reporting for the periods ended March 31, 2001 through March 31, 2002 was in violation of GAAP.

205. Motorola is a Delaware corporation with its principal place of business in Schaumburg, Illinois. In 1992, predecessors of Gemstar and Motorola entered into a license and technical assistance agreement that enabled Motorola to use Gemstar's IPG technology.

206. In May 1997, Gemstar commenced an arbitration alleging a breach of the 1992 agreement and misappropriation of technology and trade secrets by Motorola. In November 1998, Gemstar filed a patent infringement suit against Motorola. Gemstar obtained a favorable arbitration award in March 2000. In May 2000, Motorola filed a court action to set aside the award, and Gemstar counterclaimed in June 2000.

207. In the fall of 1999, Gemstar and Motorola commenced negotiations to settle this litigation. Yuen was Gemstar's principal negotiator until the July 2000 merger with TV Guide, after which Boylan took over at Yuen's request. Although Boylan negotiated the deal on Gemstar's behalf, during the negotiations Gemstar's negotiators repeatedly stated to Motorola that they had to run proposals by Yuen or that Yuen would have to make a decision.

*29 208. Yuen regularly received updates from Boylan on the status of the negotiations with Motorola as well as the latest versions of the draft agreement. Orlick also updated Yuen and provided the latest version of the draft agreement.

209. From the fall of 1999 through approximately August 2000, the negotiations did not include any provision for Motorola to purchase advertising from Gemstar.

210. In or around September 2000, Gemstar proposed to Motorola that $45 million of the payment could be used by Motorola as prepaid advertising.

211. On October 8, 2000, Motorola and Gemstar signed a settlement agreement, which, effective September 2000, resolved all issues between the parties. Motorola agreed to pay Gemstar $188 million in cash and to allow Gemstar to characterize $17.5 million of that amount as advertising to be run over a 48 month period. Under the agreement, Gemstar retained final discretion as to timing and platform placement of the advertising.

212. Gemstar's control of advertising timing and platform placement allowed it to determine for Motorola when to air advertising, the platform on which to air it (such as the IPG or *TV Guide* magazine), and the quarterly dollar amount to record. All of the Motorola advertising under the settlement agreement ran on the IPG and was recorded as IP Sector revenue. Yuen knew that Gemstar controlled the timing and platform placement for the advertising.

213. Yuen knew that without running the IPG advertising for Motorola in 2001, Gemstar would not have met Yuen's $100 million guidance for the IP Sector. Indeed, Yuen often looked to Motorola to fill in any shortfall in IPG advertising revenue. In a December 30, 2000 email to Kiener and other members of senior management, Yuen wrote: "it is now too late to bring in Motorola, as I was assured by all that we were fine with the quarter, we cannot insert the advertising in time to make up the

Not Reported in F.Supp.2d                        Page 26
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

number if my interpretation somehow fall short."(Plaintiff Ex. 9217). Similarly, on February 9, 2001, Yuen told Kiener concerning the internal IPG advertising projections that, "the shortfall is significant.... We plan to use Motorola for Q1."(Plaintiff Ex. 9218).

214. KPMG was told that the advertising component of the Motorola settlement agreement was a separate transaction and that Motorola had wanted to buy the advertising. KPMG met with Yuen, Leung, and Boylan, and was told that the accounting was consistent with the parties' negotiations and Gemstar's past and current business practices. No one at Gemstar told KPMG that Gemstar had requested that part of the settlement payment be characterized as prepaid advertising or that Motorola had no actual control over the platform on which the advertising would run under the settlement agreement. Gemstar never consulted KPMG, nor did they provide advice, as to whether the Motorola advertising agreement should have been disclosed in Gemstar's public filings, earnings releases, or analyst conference calls.

*30 215. Gemstar's accounting for the Motorola IPG prepaid advertising did not comply with GAAP because the fair value of the IPG advertising provided by Gemstar was not realizable, verifiable, or objectively determinable, and the $17.5 million in prepaid advertising should have been recognized as licensing revenue over the ten-year term of the licensing provisions.

216. Yuen and Leung failed to disclose that Gemstar was recognizing revenue in violation of GAAP, or that it was recognizing the revenue on an accelerated basis in violation of its agreement with Motorola. They each knew that, even though the advertising commitment was for four years, Gemstar had recorded the entire amount of prepaid advertising in about 15 months, exercising discretion over the timing and placement of the advertising. They also knew that the advertising was directly linked and intertwined with the licensing component of the Motorola settlement and that Gemstar proposed the advertising component.

217. Yuen and Leung failed to disclose in Gemstar's public filings that the Motorola settlement agreement contained an advertising component. In its Form 10-K for the year ended December 31, 2000, Gemstar only disclosed that it entered into a "long-term make-and-sell license agreement" through which Gemstar had received approximately $190 million from Motorola related to the settled arbitration, litigation, and future license fees. Yuen and Leung failed to disclose that the settlement included $17.5 million in prepaid advertising, or any advertising

component, and their description of the agreement as only a licensing agreement omitted material facts about the agreement, including its impact on Gemstar's IP Sector revenue.

218. In its 2001 Form 10-K and first quarter 2002 Form 10-Q, Gemstar made a general disclosure regarding its strategic advertising. Gemstar disclosed that it had relationships with licensees, vendors, and strategic partners, many of which purchased a "significant amount" of IPG advertising, but that it "believe[d] that these transactions [were] not related."This statement was false and misleading because Yuen and Leung knew that the Motorola IPG advertising buy was part of the overall settlement with Motorola, and not a separate transaction.

219. Gemstar also misrepresented the Motorola settlement transaction in its October 16, 2000 press release and conference call when it disclosed that it had reached a settlement with Motorola. In the press release, Gemstar disclosed that it had entered into a "long-term make-and-sell license agreement for Gemstar-TV Guide's IPG technology and patents to interface with GMST's IPG's."(Plaintiff Ex. 10142 at 1). The press release stated: "Specific terms of the agreement are confidential but include payments to Gemstar-TV Guide International, Inc. relating to the settled litigations as well as license fees going forward."*Id.* The press release, however, failed to disclose that the settlement agreement included $17.5 million in prepaid advertising to be aired at Gemstar's discretion.

*31 220. In Gemstar's October 16, 2000 conference call to announce the Motorola settlement, the "primary terms" of the settlement were stated to be: (1) that Motorola had "entered into a global in scope, long term make and sell only license agreement ...."; and (2) that Motorola "agreed to certain payment obligations under this agreement that approach approximately $200 million." (Plaintiff Ex. 4074 at 1). Yuen and Leung represented Gemstar on this conference call. During the call, Yuen failed to disclose that $17.5 million of the settlement had been designated for prepaid advertising to be aired at Gemstar's discretion.

221. In March 2003, Gemstar restated its financial statements to recognize the $17.5 million as licensing revenue over the ten-year term of the agreement, and restated the IP Sector revenues.

      *5. Shifting Of $5.6 Million 2001 Revenue From Media Sector To IP Sector*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 27

222. Yuen and Leung were involved in diverting revenue from the Media and Licensing Sectors to the IP Sector for 2001.

223. In the second half of 2001, Gemstar recognized and reported as IP Sector revenue at least $5.6 million for IPG advertising that, in fact, related to Gemstar's sale of print or channel advertising.

224. During 2001, the focus of the advertising sales department at Gemstar was to package IPG advertisements together with print or broadcast ads so as to generate as much revenue as possible on the IPG platform. This resulted in reducing the profitability of print and broadcast because some of their revenues were passed to IPG while the applicable costs remained in the other sectors.

225. Gemstar accomplished this shift in revenue from TV and print to IPG in a number of ways: (1) if an advertiser agreed to use IPG as well as TV or print, Gemstar would allocate most, if not all of the revenue to IPG regardless of the actual breakdown between the different media; (2) if an advertiser purchased TV or print media, Gemstar would bonus them with IPG advertising and then allocate some or all of the revenue to the IPG; (3) Gemstar approached advertisers who had committed to spending money either on TV or in the TV Guide magazine and tried to get them to buy IPG advertising. If the client was not interested, then Gemstar offered the opportunity to get onto the IPG platform at no additional charge. Gemstar then allocated some or all of the TV or magazine advertising revenue to the IPG platform.

226. In early 2001, Yuen learned that Gemstar's advertising sales force was having difficulty selling IPG advertising and was highly likely not to meet the forecasts.

227. Between March and June 2001, Yuen informed Jeffrey Mahl, the President of the Media Sales Group of Gemstar, about approaching current advertisers and convincing them to move 10% of the traditional advertising to IPG.

228. However, the advertising sales force had difficulty finding advertisers willing to shift 10% of traditional advertising to IPG. Accordingly, Yuen and the advertising sales force attempted to devise a new strategy to drive business to the IPG. One new strategy discussed with Yuen was rather than attempting to convince advertisers to shift 10% of print and channel advertising to the IPG,

Gemstar would approach a fewer number of advertisers and convince them to shift 100% of their print or channel advertising to the IPG, in exchange for Gemstar providing them print or channel advertising at no cost.

*32 229. Shortly after July 23, 2001, Yuen received a copy of an email (the "Harty Email") that listed three possible approaches to shift revenue to the IPG. The Harty Email stated these approaches would "jump start IPG sales for the remainder of 2001."(Plaintiff Ex. 6).

230. The second approach listed in the Harty Email involved approaching "existing clients who are committed to running print pages during the remainder of 2001 and convert them to IPG buys. We don't get any incremental money, but we invoice them for the IPG and run the print pages without an invoice as free. Our print forecast would be reduced."(Plaintiff Ex. 6).

231. A few days after July 23, 2001, Yuen instructed Mahl to implement the second approach as listed in the Harty Email given to him. After his instruction, Yuen was regularly updated on the progress of implementing the second approach of the Harty Email.

232. On August 2, 2001, Yuen and Leung were informed in an email that the 2001 print forecast needed to be reduced by $7.5 million due to the shifting of revenue from print to IPG strategy in the second half of 2001.

233. On August 29, 2001, Leung again was informed by email, from Victoria Stull ("Stull"), that revenue was being shifted from the print and channel to the IPG. Stull wrote in the email: "Here is the perfect example of how we are going to get in trouble if we do not get something established. They took an existing deal with Bose ... for Q4 ... to be worth $350k and are adding 350k of IPG to the deal and selling it for a package price of $350 which they want to allocate 100% of to IPG. I don't have an issue with the concept (except the 100% to IPG part), but we have to be careful on how we document and calculate what we deliver-no one can tell me how much IPG we expect to deliver."(Plaintiff Ex. 10).

234. On October 15, 2001, Yuen and Leung were informed in an email that the advertising department had started to push the second option from the Harty Email. The advertising department again informed Yuen about the difficulty of selling IPG advertising and problems they were encountering in implementing Yuen's strategy.

235. In October 2001, Gemstar employee David Aimone

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

told Yuen and Leung of the shifting of revenues from print and channel to IPG in connection with communications regarding the 2002 budget.

236. On October 23, 2001, Jochums sent to Yuen and Leung an email explaining the shifting of revenues from the print and channel to the IPG for one of Gemstar's advertisers. The email stated that "Wrangler agreed to run on the IPG during 4th quarter in excha[n]ge for three of their print advertisements running at no charge.... Wrangler would not be charged for their ... insertions via a print invoice. Instead, these dollars would be invoiced via an IPG invoice."(Plaintiff Ex. 10418).

237. In this same email, Jochums informed Yuen and Leung that "I am beginning to receive numerous emails like this one-which appear to be circulating to a lot of people. I have told Dave Aimone on several occasions that the information that I see for multiplatform should not show an ad value for print with no ad value associated with IPG. Just wanted to give you a heads up-this really needs to be addressed sooner rather than later. I have several other emails similar to this one-and just recently received a fax which is even worse."(Plaintiff Ex. 10418).

*33 238. Gemstar's practice of shifting advertising revenue from the print and channel platform to the IPG violated GAAP because (1) the advertisers had already committed to purchase print advertising; (2) Gemstar gave the advertisers an equal amount of IPG advertising for free; and (3) Gemstar shifted the revenue from the Media Sector to the IP Sector by invoicing the advertisers for the IPG and print advertising together, but recording the revenue only as IPG advertising revenue.

239. At least $5.6 million of print and channel advertising revenue was shifted to the IP Sector. The $5.6 million constituted 5.4% of Gemstar's total 2001 IP Sector revenue, and without this revenue Gemstar would not have met Yuen's projection for IP Sector revenue in 2001. Because Gemstar exceeded its IP Sector guidance by $1.4 million, and reported break-even EBITDA for the fourth quarter 2001, the amount of IPG advertising revenue represented by this transaction was material.

240. Neither Yuen, Leung or anyone at Gemstar told KPMG that (i) for 2001, Gemstar was providing equal amounts of IPG advertising as a "discount" to its existing print and channel advertising customers in connection with multiplatform advertising sales but only recording IPG advertising revenue from these transactions; (ii) that before the close of the 2001 audit that Gemstar offered

IPG advertising at no additional cost to customers who had committed to purchase advertising on other platforms and recorded IPG advertising revenue from these multiplatform transactions; and (iii) that before the close of the 2001 audit that Gemstar had sold advertising on multiple platforms to customers but only invoiced and/or recorded advertising revenue for the IPG platform from these transactions.

241. Yuen knew that the shifting of revenue from the Media Sector to the IP Sector in 2001 violated GAAP, and that Gemstar's public statements, including periodic filings and press releases, contained material misstatements and omitted to state material facts about this improper revenue recognition practice.

242. After Yuen and Leung resigned as officers, Gemstar reallocated at least $5.6 million in revenue to the Media Sector.

### J. Yuen's Compensation From Gemstar and Amounts Allegedly Owed To Him Under a Restructuring Agreement

243. From 1999 through 2002, Yuen received approximately $24 million in salary and bonuses, exercised stock options for a taxable profit of approximately $14.6 million, and realized approximately $59 million from the disposition of Gemstar securities.

244. Portions of Yuen and Leung's compensation were based on Gemstar's reported financial results. Increases in Yuen's base salary and incentive compensation were directly tied to and largely derived from Gemstar's reported financial results, including growth in revenues and EBITDA for both the Company as a whole and specifically for the IP and Licensing Sectors.

245. Yuen contends that additional cash payments from Gemstar of approximately $29.48 million, which consist of a termination fee, and amounts due from salary, bonus, and vacation pay (the "termination payments") are still owed to him in connection with the Restructuring Agreements that led to his and Leung's termination from Gemstar in November 2002.

### K. Yuen's Destruction Of Evidence And Obstruction Of Justice

*34 246. Beginning on or about November 6, 2002, Yuen began deleting from the hard drive of his Gemstar office computer (the "hard drive") e-mails and other items, such

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

as Gemstar corporate documents, that were within the scope of the Commission's October 28, 2002 subpoena, which Yuen had received before November 6, 2002.

247. In addition, after receiving a subpoena to testify, and the day before he was scheduled to testify before the Commission on April 1, 2003, Yuen installed a program called "Eraser 2003" on his Gemstar office computer and "wrote over" and erased all of the unallocated space on the hard drive, thereby making it impossible to retrieve any files that had been manually deleted.

### L. Testimony of Yuen and Lenng

248. In resolving the factual disputes in this case, the court did not find the testimony of either Yuen or Leung to be persuasive or credible. However, in reaching its factual conclusions, the court gave no weight to the evidence concerning Yuen's destruction of evidence, which is unnecessary to either the court's factual findings or its conclusions of law.

### II. CONCLUSIONS OF LAW

#### A. Jurisdiction

1. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) and 78aa.

2. Yuen directly or indirectly made use of the mails, means or instruments of transportation or communication in interstate commerce, or means or instrumentalities of interstate commerce in connection with the transactions, acts, practices and courses of business described above. Yuen disseminated materially false and misleading statements through Commission filings and press releases, as well as through telephone conference calls with analysts covering Gemstar.

#### B. Liability

##### 1. Yuen Committed Securities Fraud

3. Section 10(b) of the Exchange Act, Rule 10b-5 of the Exchange Act, and Section 17(a) of the Securities Act (collectively referred to as the "antifraud provisions of the federal securities laws" expressly prohibit misrepresentations and omissions of material fact as well as any manipulative or deceptive devices or conduct which operates as a fraud or deceit upon investors. See SEC v. Rana Research, Inc., 8 F.3d 1358, 1361 (9th Cir.1993); SEC v. First Jersey Securities, Inc., 101 F.3d 1450 (2d Cir.1996).

4. Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder, prohibit fraud in connection with the purchase or sale of any security. Section 10(b) of the Exchange Act and Rule 10b-5 thereunder make it unlawful to, among other things, (1) "employ any manipulative or deceptive device"; (2) "make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 15 U.S.C § 78j(b); 17 C.F.R. § 240.10b-5.

*35 5. Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), prohibits fraud in connection with the offer or sale of securities. Section 17(a) makes it unlawful to: (1) "employ any device, scheme, or artifice to defraud"; (2) "obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading"; and (3) "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).

6. To establish liability under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. § 240.10b-5, of the Exchange Act, and/or Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a)(1), the Commission must prove by a preponderance of the evidence three basic elements: (1) a material misrepresentation, omission of material fact, or other fraudulent device; (2) in connection with the purchase, offer, or sale of a security; and (3) with the requisite mental state. SEC v. Rana Research, Inc., 8 F.3d at 1364; SEC v. TLC Investments and Trade Co., 179 F.Supp.2d 1149, 1153 (C.D.Cal.2001).

##### a) Yuen Made Misrepresentations And Omissions Of Material Fact About Gemstar's IPG Licensing And IPG Advertising Revenues

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

7. Violations of the antifraud provisions require that the misrepresentations and omissions concern material facts. *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

8. One of the main purposes of the antifraud provisions is "to substitute a philosophy of full disclosure for the philosophy of caveat emptor,"*SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963), and thus to ensure that investors obtain disclosure of material facts in connection with their investment decisions, *SEC v. Hasho,* 784 F.Supp. 1059, 1106 (S.D.N.Y.1992) (citing *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972)).

9. Accordingly, liability under the antifraud provisions of the federal securities laws arises not only from affirmative misrepresentations but also from failures to disclose material information. *SEC v. GLT Dain Rauscher,* 254 F.3d at 855-856. As the Ninth Circuit has made clear, federal securities law " 'imposes a duty to disclose material facts that are necessary to make disclosed statements, *whether mandatory or volunteered,* not misleading." ' *SEC v. Fehn,* 97 F.3d 1276, 1290 n. 12 (9th Cir.1996) (citations omitted) (emphasis added); *see also Ackerman v. Schwartz,* 947 F.2d 841, 846 (7th Cir.1991) ("Federal [securities] law requires persons to tell the truth about material facts once they commence speaking"); *U.S. v. Cannistraro,* 800 F.Supp. 30, 81 (D.N.J.1992) ("it is a well-settled principle that once disclosures are made, there is a duty to disclose all material information regardless of a fiduciary duty owed to the shareholders.... Once a defendant chooses to speak, he or she is not free to lie or mislead.")

*36 10. The Ninth Circuit further has stated that " '[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." ' *In re Convergent Technologies Sec. Lit.,* 948 F.2d 507, 512 (9th Cir.1991) (citations omitted). "[T]he disclosure required by the federal securities laws is measured not by literal truth, but by the ability of material to accurately inform rather than mislead [investors]." *Id.; see, e.g., SEC v. C.R. Richmond & Co.,* 565 F.2d 1101, 1106-1107 (9th Cir.1977) (finding advertisements "deceptive and misleading in their overall effect even though when narrowly and literally read, no single statement of material fact was false").

11. The Commission need only prove one misrepresentation or omission of material fact to establish liability. *Provenz v. Miller,* 102 F.3d 1478, 1484 (9th Cir.1996) (citing *In re Convergent Technologies Sec. Lit.,* 948 F.2d 507, 512 (9th Cir.1991) (citations omitted)).

12. As discussed in the above findings of fact, from at least the period ended March 31, 2000, through the first quarter 2002, Yuen misrepresented and caused Gemstar to misrepresent the company's financial performance by overstating the company's IPG licensing and IPG advertising revenues and earnings.

13. Yuen knew but failed to disclose in earnings press releases, analyst conference calls, and Commission filings that (1) a substantial amount of the reported IPG licensing revenue for 2000 and 2001 was being recognized under an expired and disputed licensing agreement involving Scientific-Atlanta; and that (2) a substantial portion of reported IPG advertising revenue for 2001 and early 2002 was the result of undisclosed round-trip, non-monetary, or multi-element transactions in which the customer did not request and/or want IPG advertising.

14. As part of the so-called "strategic" or "corporate" advertising deals entered into by Gemstar with Motorola, Tribune, Fantasy Sports, and Thomson, Gemstar's CFO, Leung, with Yuen's knowledge and at his direction, controlled the timing, platform selection, and dollar amount of the advertising and ran all advertising on the IPG to meet Gemstar's revenue targets for the IP Sector in 2001 and early 2002. The fact Gemstar could determine the IPG advertising to run and to record as revenue each quarter was never disclosed to investors, analysts, or the Commission.

15. The Court finds that by a preponderance of the evidence that Yuen made misrepresentations to and withheld material information from the auditors and the market. Gemstar's financial statements reflect those misrepresentations and omissions.

16. These misrepresentations and omissions were material because there is a substantial *likelihood* that a reasonable investor would consider the misrepresented and omitted information important in making an investment decision. *Basic,* 485 U.S. at 231-32;*TSC Indus.,* 426 U.S. at 449. Indeed, the Ninth Circuit has held that information relating to a company's financial condition and profitability is generally material. *SEC v. Murphy,* 626 F.2d 633, 653 (9th Cir.1980).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 31
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

**\*37** 17. Accounting, auditing, and legal authorities recognize that the concept of "materiality" is not limited to a percentage of a company's total profits, but rather requires *assessment* of qualitative and quantitative factors so that even quantitatively small amounts can still present a materially misleading picture of a company's health. *See* SAB No. 99, 64 Fed.Reg. 45150, 45152 (August 19, 1999) ("Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are ... Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability."); *Fech v. Price Cot, 70 F.3d 1078, 1080-81* (9th Cir.1995) (rejecting argument that omission was not material "because it is the profitability of the Company as a whole, not any particular aspect of the Company's operations, that is significant."); *Ganino v. Citizens Util. Co., 228 F.3d 154, 163 (2d Cir.2000)* (recognizing that SAB No. 99 is persuasive and stating that, to the extent magnitude is measured, the line item at issue "should be compared to like items on the corporate financial statement"); *In re Kidder Peabody Sec. Litig., 10 F. Supp 2d 398, 410* (S.D.N.Y.1998) (declining to hold as a matter of law that misstatements affecting profits by no more than 2.54% were immaterial); *In re Home Health Corp. of America, Inc. Sec. Litig., 199 U.S. Dist. Lexis 1230, 1999 WL 79057 at \*6-7 (E.D.Pa. Jan.20, 1999)* (declining to hold immaterial as a matter of law failure to report loss of a de minimis percentage of total revenue where qualitative factor rendered the loss significant).

18. Yuen's misrepresentations and omissions were both quantitatively and qualitatively material. Yuen's misrepresentations concerned Gemstar's revenues and earnings in the Licensing and Interactive Sectors, which Yuen and others in Gemstar's senior management claimed were key indicators of Gemstar's present and future performance. IPG licensing and IPG advertising revenues that were recorded and reported in violation of GAAP allowed Gemstar to meet Yuen's financial targets by significant percentages. The fact Gemstar's stock lost a third of its market value following the company's announcement on April 1, 2002, that it had recorded over $100 million in licensing revenues from Scientific-Atlanta and $20 million in IPG advertising revenue from a non-monetary transaction-all of which was disclosed before there was any disclosure about any revenue and earnings restatements, accounting improprieties by Gemstar's senior management, or the existence of any SEC investigation-is evidence that investors considered this previously omitted information material.

### b) *Yuen Acted With Requisite Mental State*

19. Violations of Section 17(a)(1), Section 10(b), and Rule 10b-5 require scienter, while violations of Section 17(a)(2) and (a)(3) only require negligence. *SEC v. GLT Dain Rauscher, Inc., 254 F.3d 852, 856 (9th Cir.2001).*

**\*38** 20. Scienter is defined as a "mental state embracing intent to deceive, manipulate, or defraud." *Provenz v. Miller, 102 F.3d at 1491* (quotations and citations omitted). In the Ninth Circuit, scienter may be established by a showing of reckless conduct, and proof of this element can be inferred from circumstantial evidence. *Id.* (citing *Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568-69 (9th Cir.1990)* (en banc), *cert. denied,449 U.S. 976 (1991)*; *SEC v. Burns, 816 F.2d 471, 474 (9th Cir.1987)*).

21. The Ninth Circuit has held that the recklessness standard can be established by demonstrating (1) a defendant's motive and opportunity to engage in securities fraud; and (2) red flags casting doubt on the truthfulness or accuracy of representations. *Howard v. Everex Systems, Inc., 228 F.3d 1057, 1063-65 (9th Cir.2000).* The recklessness standard is cited here for completeness, as the court has found and concluded that Yuen acted with an intent to deceive, manipulate and defraud, the mental state which is required for scienter.

22. The evidence at trial established that Yuen acted with scienter in his conduct with respect to the transactions challenged by the Commission, with the exception of the AOL and Time Warner transactions.

23. Yuen was informed of the true facts and circumstances surrounding the improper recording and reporting of revenue from the transactions at issue in this case but did nothing to stop the improper revenue recognition and reporting practices, and instead made misrepresentations and omissions to the Audit Committee, the outside auditors, and the public to ensure that Gemstar met its financial targets for the IP and Licensing Sectors.

24. Despite knowing that there was no contractual or other licensing arrangement between Gemstar and Scientific-Atlanta, Yuen directed and approved the improper recording and reporting of IPG licensing revenue from Scientific-Atlanta. Indeed, he provided the purported basis for beginning these licensing accruals. Yuen intentionally misled Gemstar's outside auditors and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 32
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

the Audit Committee about:
• that Scientific-Atlanta had agreed to extend and pay the same IPG licensing rates as set forth in the expired licensing and settlement agreement, when he knew there was no reasonable basis for such representations; and
• that the IPG advertising revenue from Thomson and other strategic or corporate partners had resulted from stand-alone cash transactions that were not connected or related to any other agreement or relationship, when he knew there was no reasonable basis for such representations.

25. The evidence at trial further established that Yuen did not have a reasonable basis to support the guidance for 2001 revenues and earnings for the Interactive Sector that Yuen announced in a November 2000 analyst conference call and press release and reconfirmed to the market throughout 2001. Not only did Yuen know at the time that as of year-end 2000 there was no internal budget in place for 2001 relating to revenues and expenses for the Interactive Sector, but Yuen also ignored obvious warnings brought to his attention in the latter part of 2000 and early 2001 that showed that his 2001 guidance for IPG advertising revenues was unrealistic and not supported by the internal projections of Kiener, as well as other Gemstar's advertising sales force executives.

*39 26. Yuen also knew in late 2000 and throughout 2001, but failed to disclose to analysts, investors, and the SEC that in order to achieve the $100 million in IPG advertising sales that Yuen projected, Gemstar was relying on its optional sources of IPG advertising from undisclosed multi-element, non-monetary, roundtrip, and fraudulent multi-platform advertising transactions that Yuen knew gave Gemstar complete control over the timing, platform selection, and dollar amount of advertising recorded each quarter.

27. Yuen knew that Gemstar was recording and reporting IPG advertising revenue from customers who had not requested or wanted IPG advertising on a stand-alone basis, or at all, but failed to stop or disclose this improper revenue recognition practice.

28. Yuen directed Gemstar's advertising sales force to shift advertising sales and revenue from the print and channel platform to the IPG to improve the financial results of the Interactive Sector, where the IPG advertising revenue was recorded and reported by Gemstar.

29. Yuen held significant amounts of Gemstar securities during the period of Gemstar's overstatements of revenue and earnings, and his salary and bonus were tied to results in the IPG advertising and IPG licensing sectors. Yuen negotiated an agreement to receive approximately $29.48 million in payments in connection with his termination, all of which occurred before the Company disclosed any restatements or improper accounting improprieties about which he knew.

### c) Reliance On KPMG's Accounting Work Or Advice To Negate Scienter

30. Yuen contends that his good faith reliance on Gemstar's auditors negates any finding of scienter. This contention, however, misreads the prevailing law and is contrary to the Court's Memorandum of Decision Re: Plaintiff's and Defendants' Motions for Summary Judgment ("MOD"), entered September 6, 2005. MOD at 8. Under applicable legal precedent, Yuen must show that the prerequisites for his purported reliance upon Gemstar's auditors are met. Except with respect to the AOL and Time Warner transactions, he has not done so.

31. As the Ninth Circuit has explained:
If a company officer knows that the financial statements are false and misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance.

*Goldfield,* 758 F.2d at 467 (quoting *United States v. Erickson,* 601 F.2d 296, 305 (7th Cir.1979)).[FN2]

> FN2. *See also SEC v. Bonastia,* 614 F.2d 908, 914 (3d Cir.1980); *SEC v. Softpoint, Inc.,* 958 F.Supp. 846, 864-65 (S.D.N.Y.1997), *aff'd* 159 F.3d 1348 (Table) (2d Cir.1998); *SEC v. McNulty,* 1996 WL 422259, at *7 (S.D.N.Y. July 29, 1996) (holding businessman liable for quarterly report he signed even though it had been prepared by an accountant).

32. The Ninth Circuit in *Provenz v. Miller,* 102 F.3d at 1491, made clear that "[i]f ... defendants withhold material information from their accountants, defendants will not be able to rely on their accountant's advice as proof of good faith."

33. Contrary to Yuen's contention, good faith reliance upon the advice of auditors does not negate the fact a defendant acted with scienter, nor is it a complete defense to securities fraud. As this Court previously noted in its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 33
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Memorandum of Decision, reliance on a professional is not an affirmative defense but merely one factor that a court may consider, along with the rest of the evidence presented, when evaluating whether a defendant acted with scienter.

**\*40** 34. Courts consistently have held that defendants who claim good faith based upon reliance on a professional must show they "(1) made a complete disclosure to [the professional]; (2) requested [the professional's] advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice." MOD at 8 (citing *SEC v. Goldfield Deep Mines*, 758 F.2d at 467); *see also SEC v. Caserta, 75 F.Supp.2d 79, 94-95 (E.D.N.Y.1999)* (collecting cases); *SEC v. Kenton Capital, 69 F.Supp.2d 1, at 10 n. 7 (D.D.C.1998).*

35. Numerous courts specifically have held that a claim of "good faith" or reliance on professionals is not available when a defendant has withheld material information from the professionals. *See Provenz, 102 F.3d at 1491; SEC v. Goldfield Deep Mines Co., 758 F.2d at 467; C.E. Carlson, Inc. v. SEC, 859 F.2d 1429, 1436 (10th Cir.1988); SEC v. Savoy Industries, Inc., 665 F.2d 1310, 1314 n. 28 (D.C.Cir.1981); Bisno v. United States, 299 F.2d at 719-720; SEC v. Fitzgerald, 135 F.Supp.2d 992, 1024 (N.D.Cal.2001); SEC v. Kenton Capital, Ltd., 69 F.Supp.2d at 10 n. 7.*

36. Because the evidence in this case shows that Yuen misrepresented to and withheld material information from the auditors with respect to the challenged transactions (excluding the AOL and Time Warner transactions), Yuen cannot rely on KPMG's advice or audit work to negate scienter.

### d) Yuen's Misrepresentations And Omissions Were Made "In Connection With" Securities Transactions

37. The "in connection" requirement is satisfied here, as Yuen's fraudulent statements and omissions coincide with securities transactions. *SEC v. Zandford, 535 U.S. 813, 822, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002).* Consistent with *Zandford*, the Ninth Circuit has repeatedly stated that this requirement "is met if the fraud alleged 'somehow touches upon' or has 'some nexus' with 'any securities transaction.' " *SEC v. Rana Research, Inc., 8 F.3d 1358, 1362 (9th Cir.), cert. denied, 510 U.S. 963 (1993)* (citations omitted). Because Yuen disseminated false and misleading information in periodic reports, in press releases, and to securities professionals for the express

purpose of reporting the revenues of a publicly traded company, defendant's conduct was clearly "in connection" with a securities transaction. *See id.* ("[w]here the fraud alleged involves public dissemination in a document such as a press release, annual report, ... or such document on which an investor would presumably rely, the 'in connection with' requirement is generally met").

### 2. Yuen Violated The Periodic Reporting, Record Keeping, And Internal Control Requirements

38. As a corporation with securities registered with the Commission, Gemstar filed periodic reports with the Commission and was required to maintain a system of accounting that facilitated accurate reporting. To establish a violation of the periodic reporting, record keeping, and internal control requirements, the Commission is not required to establish scienter. *SEC v. McNulty*, 137 F.3d at 740-41 (Section 13 of the Exchange Act and the rules thereunder do not require scienter)); *SEC v. Savoy Indus., Inc., 587 F.2d 1149, 1167 (D.C.Cir.1978)* (no showing of scienter is required to establish violation of Section 13(a) of the Exchange Act); *SEC v. Softpoint, Inc., 958 F.Supp. 846, 865-66 (S.D.N.Y.1997)* (under Rule 13b2-1 "[t]here is no scienter requirement; liability is predicated on 'standards of reasonableness.' "), *aff'd, 159 F.3d 1348 (2d Cir.1998); see also, SEC v. World Wide Coin Inv., Ltd., 567 F.Supp. 724, 749 and 751 (N.D.Ga.1983)* (neither the books and records provision of Section 13(b)(2)(A) nor the accounting controls provision of 13(b)(2)(B) requires scienter).

### a) Reporting Violations: Section 13(a) Of The Exchange Act And Rules 12b-1, 13a-1, 13a-11, And 13a-13 Thereunder

**\*41** 39. Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 (the "reporting provisions") require issuers of securities registered pursuant to Section 12 of the Exchange Act, such as Gemstar, to file with the Commission accurate periodic and current reports. An issuer violates these provisions if it files a report that contains materially false or misleading information. *SEC v. Falstaff Brewing Corp., 629 F.2d 62, 72 (D.C.Cir.1980); SEC v. Savoy Indus., Inc., 587 F.2d 1149, 1165 (D.C.Cir.1978).* Rule 12b-20 under the Exchange Act similarly requires that these reports contain any material information necessary to make the required statements made in the reports not misleading. *See Savoy Indus., 587 F.2d. at 1167.* Moreover, Rule 4.01(a)(1) of Regulation S-X requires that financial statements not be misleading and states that a financial statement that is not prepared in accordance with GAAP is presumptively

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 34

misleading or inaccurate. 17 C.F.R. § 210.4-01(a)(1).

40. Secondary liability is also available under Section 20(e) of the Exchange Act against "any person that knowingly provides substantial assistance" to another violator of the Exchange Act. 15 U.S.C. § 78t(f). For aiding and abetting liability, the Commission must prove the existence of an independent primary violation, "substantial assistance" in the commission of the primary violation, and actual knowledge by the alleged aider and abettor of the primary violation and of his or her own role in furthering it. SEC v. Fehn, 97 F.3d 1276, 1288 (9th Cir.1996).

41. Yuen aided and abetted Gemstar's primary violations of the reporting provisions. First, Gemstar committed primary reporting violations by filing with the Commission reports on Form 10-Q for the quarters ended June 30, 1999, September 30, 1999, December 31, 1999, June 30, 2000, September 30, 2000, March 31, 2000, June 30, 2001, September 30, 2001, March 31, 2002; annual reports on Form 10-K for the fiscal years ended March 31, 2000, December 31, 2000, and December 31, 2001; and current reports on Forms 8-K, dated September 26, 2002, that contained financial statements that did not comply with GAAP and that misrepresented and omitted to disclose material information regarding the transactions discussed above (with the exceptions of the AOL and Time Warner transactions), the company's IPG licensing and IPG advertising business, and the revenues and earnings for the IP and Licensing Sectors.

42. Second, Yuen provided substantial assistance in the commission of Gemstar's reporting violations. Yuen was involved in structuring and approving transactions. Yuen directed Gemstar's employees to increase IP and Licensing Sector revenues and communicated with Gemstar's outside auditors, Audit Committee and analysts regarding the transactions discussed above. Yuen reviewed and approved Commission filings and earnings press releases. Yuen also signed Gemstar's Forms 10-K. Yuen also signed false and misleading representation letters to Gemstar's outside auditors in connection with their annual audits and quarterly reviews.

*42 43. Third, Yuen had actual knowledge of Gemstar's primary violations and his role in furthering them. Yuen was informed of all of the facts and circumstances surrounding the recording and reporting of revenues for each of the transactions at issue. He, nevertheless, participated in approving and causing the filing of the reports that he knew contained financial statements that improperly recognized and reported revenue and that

misrepresented and omitted to disclose material information concerning Gemstar's revenues and earnings.

44. By engaging in the conduct described above, Yuen aided and abetted Gemstar's violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13.

b) Record-Keeping Violations: Sections 13(b)(2)(A) Of The Exchange Act And Rule 13b2-1 Thereunder

45. Section 13(b)(2)(A) of the Exchange Act requires reporting companies registered pursuant to Section 12 of the Exchange Act to "make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflect the transactions ... of the issuer."15 U.S.C. § 78m(b)(2)(A). These provisions have been read to require issuers to employ and supervise reliable personnel, to ensure that transactions are executed as authorized, to segregate accounting functions, and to have procedures designed to prevent errors and irregularities. SEC v. World Wide Coin Invs., Ltd., 567 F.Supp. at 750. Rule 13b2-1 under the Exchange Act prohibits any person from directly or indirectly falsifying any book, record, or account described in Section 13(b)(2)(A).17 C.F.R. § 240.13b2-1.

46. Yuen aided and abetted Gemstar's violations of Section 13(b)(2)(A) of the Exchange Act and violated Rule 13b2-1 under the Exchange Act. Gemstar's books and records failed to accurately and fairly reflect Gemstar's transactions in that they recognized revenue for IPG licensing where there was no licensing agreement or other arrangement and for IPG advertisements that were not requested by a customer. By directing the shifting of revenue from the print and channel advertisements to the IPG platform, Yuen caused Gemstar to create false and misleading books and records to support this improper revenue recognition practice. Yuen substantially assisted in Gemstar's record-keeping violation, and Rule 13b2-1, by directing the improper recognition of IPG licensing revenue and approving the shifting of revenues on Gemstar's books from one advertising platform to another, in order to recognize IPG advertising revenue.

47. By engaging in the conduct described above, Yuen aided and abetted Gemstar's violations of Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A), and violated Exchange Act Rule 13b2-1, 17 C.F.R. § 240.13b2-1, by, directly or indirectly, falsifying or causing to be falsified Gemstar's books,

Not Reported in F.Supp.2d                                                              Page 35
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

records, and accounts subject to Section 13(b)(2)(A) of
the Exchange Act.

### 3. *Yuen Misrepresented To Auditors In Violation of Rule 13b2-2 Of Exchange Act*

**\*43** 48. Rule 13b2-2 of the Exchange Act, 17 C.F.R. §
240.13b2-2, prohibits an officer or director of an issuer
from making or causing to be made a materially false or
misleading statement, or omitting to state information
necessary to render statements not misleading, to an
accountant in connection with any required audit of the
issuer's financial statements or the preparation of a report
required to be filed with the Commission.

49. Yuen misrepresented and omitted to disclose material
information to KPMG regarding the Scientific-Atlanta
and Thomson transactions. Yuen also omitted to disclose
to KPMG that Gemstar, with his knowledge and approval,
had shifted revenues from one advertising platform to
another and structured transactions to be able to record
IPG advertising revenue at its discretion to meet
Gemstar's financial targets. These omissions rendered the
statements made in public filings, earnings releases, and
Conf. Calls false and misleading.

50. By engaging in this conduct, and in connection with
audits and examinations of the financial statements of
Gemstar and the preparation and filing of statements and
reports required to be filed with the Commission, Yuen,
directly or indirectly, made or caused to be made
materially false or misleading statements to accountants
and omitted to state, or caused another person to omit to
state to accountants, material facts necessary in order to
make statements made to the accountants, in light of the
circumstances under which such statements were made,
not misleading in violation of Exchange Act Rule. 13b2-
2, 17 C.F.R. § 240.13b2-2.

### C. *Remedies*

51. The Commission seeks the following relief against
Yuen: (1) permanent injunction prohibiting future
violations of the federal securities laws; (2) disgorgement
of illgotten gains from the conduct at issue here; (3)
payment of civil penalties; and (4) a permanent officer
and director bar. Based on the findings of fact and law
contained herein, the court is prepared to grant
appropriate relief to the Commission, and will set a
further hearing to hear and consider argument from the
Commission and Yuen as to what remedies are to be
granted and in what amounts.

C.D.Cal.,2006.
S.E.C. v. Yuen
Not Reported in F.Supp.2d, 2006 WL 1390828 (C.D.Cal.)

**END OF DOCUMENT**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.