1   MELINDA HAAG (STATE BAR NO. 132612)
    mhaag@orrick.com
2   JAMES A. MEYERS (ADMITTED *PRO HAC VICE*)
    jmeyers@orrick.com
3   JAMES N. KRAMER (STATE BAR NO. 154709)
    jkramer@orrick.com
4   M. TODD SCOTT (STATE BAR NO. 226885)
    tscott@orrick.com
5   LUCY E. BUFORD (STATE BAR NO. 244885)
    lbuford@orrick.com
6   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
7   405 Howard Street
    San Francisco, CA  94105-2669
8   Telephone:     415-773-5700
    Facsimile:     415-773-5759
9
    Attorneys for Defendant
10  SUSAN SKAER

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                         SAN JOSE DIVISION

14

15

16  SECURITIES AND EXCHANGE          Case No.  5:07-cv-02822-JF
    COMMISSION,
                                     **NOTICE OF MOTION AND
17            Plaintiff,             MOTION; MEMORANDUM OF
                                     POINTS AND AUTHORITIES IN
18        v.                         SUPPORT OF DEFENDANT SUSAN
                                     SKAER'S MOTION TO DISMISS
19  MERCURY INTERACTIVE, LLC (F/K/A/  COMPLAINT**
    MERCURY INTERACTIVE, INC.),
20  AMNON LANDAN, SHARLENE           Date:       March 14, 2008
    ABRAMS, DOUGLAS SMITH and SUSAN  Time:       9:00 a.m.
21  SKAER,                           Judge:      Honorable Jeremy Fogel
                                     Courtroom: 3
22            Defendants.

23

24

25

26

27

28
    No. 5:07-cv-02822-JF
    Notice of Motion and Motion;Memorandum In
    Support Of Susan Skaer's Motion To Dismiss

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION............................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .........................................................1

I.     INTRODUCTION ..........................................................................................1

II.    STATEMENT OF FACTS .............................................................................3

      A.    Ms. Skaer ............................................................................................4

      B.    Mercury's Options Grant Process........................................................4

      C.    Ms. Skaer Had No Responsibility For Accounting For Options Grants.................7

III.   THE SEC'S COMPLAINT ............................................................................8

IV.   ARGUMENT ................................................................................................8

      A.    The SEC Faces Heightened Pleading Standards .................................8

      B.    The SEC Has Not Adequately Pled A Securities Fraud Claim Against Ms. Skaer.................................................................................10

            1.    The SEC Has Failed To Adequately Allege Ms. Skaer's Scienter ...........11

                  a.    The Complaint Does Not Allege That Ms. Skaer Understood An Accounting Charge Had To Be But Was Not Properly Being Taken.................................................................................12

                  b.    The Complaint Does Not Allege That Ms. Skaer Was Reckless.................................................................................16

            2.    The Complaint Fails To Allege That Ms. Skaer Made An Actionable Statement.................................................................18

      C.    The SEC Has Failed To Sufficiently Plead A Violation Of Any Of The Non-Fraud Provisions Of The Federal Securities Laws .....................20

            1.    The SEC Has Failed To Plead Actual Knowledge Or Substantial Assistance For Purposes Of Its Aiding And Abetting Claims.................20

      D.    As To Its Other Non-Fraud Claims Against Ms. Skaer, The SEC Likewise Does Not Sufficiently Allege The Required Mental State...................22

V.    CONCLUSION ...........................................................................................25

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

*Acito v. IMCERA Group, Inc.,*
   47 F.3d 47 (2d Cir. 1995) ..................................................................22

5

*Bell Atlantic Corp. v. Twombly,*
   530 U.S. ___, ___, 127 S. Ct. 1955, 1966 (2007) ..................................9

6

*Clegg v. Cult Awareness Network,*
   18 F.3d 752 (9th Cir. 1994) .................................................................9

7

*Cooper v. Pickett,*
   137 F.3d 616 (9th Cir. 1997) ...............................................................9

8

*Ernst & Ernst v. Hochfelder,*
   425 U.S. 185 (1976) ...........................................................................11

9

*Fecht v. Price Co.,*
   70 F.3d 1078 (9th Cir. 1995) .............................................................10

10

*Gompper v. Visx, Inc.,*
   298 F.3d 893 (9th Cir. 2002) .............................................................12

11

*Hollinger v. Titan Capital Corp.,*
   914 F.2d 1564 (9th Cir. 1990) ...........................................................16

12

*In re Albert Glenn Yesner,*
   2001 WL 587989 (Init. Dec. May 22, 2001) ......................................23

13

*In re Alcatel Sec. Litig.,*
   382 F. Supp. 2d 513 (S.D.N.Y. 2005) ...............................................19

14

*In re Astea Intern. Inc. Sec. Litig.,*
   2007 WL 2306586, at *15 (E.D. Pa. Aug. 9, 2007)............................14

15

*In re CNET Networks, Inc. Shareholder Deriv. Litig.,*
   483 F. Supp. 2d 947 (N.D. Cal. 2007)..................................................2

16

*In re Cornerstone Propane Partners, L.P. Sec. Litig.,*
   416 F. Supp. 2d 779 (N.D. Cal. 2005).................................................18

17

*In re Cylink Sec. Litig.,*
   178 F. Supp. 2d 1077 (N.D. Cal. 2001)...............................................18

18

*In re ESS Tech., Inc. Sec. Litig.,*
   2004 WL 3030058 (N.D. Cal. Dec. 1, 2004) ............................... 18, 19

19

*In re Glenfed, Inc. Sec. Litig.,*
   42 F.3d 1541 (9th Cir. 1994) .............................................................19

20

*In re Mercury Interactive Corp. Sec. Litig.,*
   2007 WL 2209278 (N.D. Cal. July 30, 2007)......................................10

21

*In re Meris Labs., Inc.,*
   1994 WL 523841 (SEC Sept. 26, 1994) .............................................25

22

*In re Party City Sec. Litig.,*
   147 F. Supp. 2d 282 (D.N.J. 2001) ...................................................14

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3    *In re Software Toolworks Inc.*,
      50 F.3d 615 (9th Cir. 1994) ...................................................................................15

4    *In re Stac Elecs. Sec. Litig.*,
5      89 F.3d 1399 (9th Cir. 1996) ...............................................................................9, 10

    *In re Stone & Webster, Inc. Sec. Litig.*,
6      414 F.3d 187 (1st Cir. 2005) .....................................................................................10

7    *In re Syncor Int'l Corp. Sec. Litig.*,
      2007 WL 1729968 (9th Cir. June 12, 2007) ...........................................................22

8    *In re Tibco Software*, Inc.,
9      2006 WL 1469654 (N.D. Cal. May 25, 2006) .........................................................18

    *Ponce v. SEC*,
10     345 F.3d 722 (9th Cir. 2003) .....................................................................................20

11   *Schlifke v. Seafirst Corp.*,
      866 F.2d 935 (7th Cir. 1989) .....................................................................................12

12   *SEC v. Baxter*,
      2007 WL 2013958 (N.D. Cal July 11, 2007) .........................................................9, 23

13   *SEC v. Blackwell*,
      477 F. Supp. 2d 891 (S.D. Ohio 2007)......................................................................24

14   *SEC v. Cedric Kushner Promotions, Inc.*,
15     417 F. Supp. 2d 326 (S.D.N.Y. 2006) ......................................................................20

    *SEC v. Durgarian*,
16     477 F. Supp. 2d 342 (D. Mass. 2007) ................................................................10, 14

17   *SEC v. Fehn*,
      97 F.3d 1276 (9th Cir. 1996) ..............................................................................10, 20

18   *SEC v. ICN Pharms.*,
19     Inc., 84 F. Supp. 2d 1097 (C.D. Cal. 2000) ...........................................................10

    *SEC v. Lucent Techs. Inc.*,
20     2005 WL 1206841 (D.N.J. May 20, 2005) ...............................................................10

21   *SEC v. Parnes*,
      2001 WL 1658275 (S.D.N.Y. Dec. 26, 2001) ...........................................................10

22   *SEC v. Roanoke Tech. Corp.*,
      2006 WL 2470329 (M. D. Fla. Aug. 24, 2006) .........................................................10

23   *SEC v. Rubera*
      350 F.3d 1084 (9th Cir. 2003) ............................................................................15, 16

24

25   *SEC v. Siebel Sys., Inc.*,
      384 F. Supp. 2d 694 (S.D.N.Y. 2005)...........................................................................9

26   *SEC v. Tambone*,
      417 F. Supp 2d. 127 (D. Mass. 2006)...............................................................9, 21, 22

27   *SEC v. Todd*,
28     2007 WL 1574756 (S.D. Cal. May 30, 2007)..........................................................16, 23

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

4

*SEC v. Yuen*,
   221 F.R.D. 631 (C.D. Cal. 2004) ................................................................. 9, 19

5

*Simpson v. AOL Time Warner Inc.*,
   452 F.3d 1040 (9th Cir. 2006) ....................................................................... 18

6

*Southland Sec. Corp. v. Inspire Ins. Solutions Inc.*,
   365 F.3d 353 (5th Cir. 2004) ......................................................................... 19

7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499 (2007) ................................................................................... 13

8

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ......................................................................... 9

9

10

## STATUTES

11

28 U.S.C.
   § 2462 ............................................................................................................... 6

12

Securities Act of 1933
   §17(a) ............................................................................................................... 8

13

Securites Exchange Act of 1934
   § 13(b)(5) ............................................................................................... 8, 22, 23

14

   § 10(b) ............................................................................................................... 8

15

   § 13(b)(2)(A) ..................................................................................................... 8

16

   § 13(b)(2)(B) ..................................................................................................... 8

17

   § 14(a) ............................................................................................................... 8

18

   § 16(a) ..................................................................................................... 8, 22, 24

19

## OTHER AUTHORITIES

20

Accounting Principles Board Opinion No. 25 ................................................... *passim*

21

Fed. R. Civ. P.
   9(b) ............................................................................................................. 1, 10

22

   12(b)(6) ............................................................................................................. 1

23

Securities Exchange Act of 1934
   Rule 13a-13 ....................................................................................................... 8

24

   Rule 10b-5 ......................................................................................................... 8

25

   Rule 13a-1 ......................................................................................................... 8

   Rule 13b2-2, ...................................................................................................... 8

26

   Rule 14a-9 ......................................................................................................... 8

27

   Rule 16a-3 ............................................................................................... 8, 22, 24

28

   Rules 12b-20 ...................................................................................................... 8

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

      PLEASE TAKE NOTICE that on March 14, 2008, at 9 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Jeremy Fogel, United States District Court, 450 Golden Gate Avenue, San Francisco, CA 94102, defendant Susan Skaer will move the court for an Order dismissing the Complaint pursuant to the Federal Rule of Civil Procedure 12(b)(6). This motion is based on the Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the Request for Judicial Notice, Declaration of James Meyers, the [Proposed] Order; all pleadings and papers filed herein, oral argument of counsel, and any other matter that may be submitted at the hearing.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

      Even after conducting a 1-1/2 year investigation of its own and receiving the results of an exhaustive, six-month internal investigation conducted by independent counsel for a Special Committee, the SEC cannot state a claim for relief under the federal securities laws against Susan Skaer, the former General Counsel of Mercury Interactive Corporation ("Mercury" or "Company") in this case involving alleged improper stock options granting practices at Mercury in the late 1990s and early 2000s.  While the SEC alleges that Ms. Skaer had a role in options administration at Mercury, it never pleads, with the particularity required by Fed. R. Civ. P. 9(b) or otherwise, specific facts that, if proven, would show that (i) Ms. Skaer knew or was reckless in not knowing that Mercury was improperly accounting for its options grants and that, as a result, the Company's public filings were misstated; or (ii) Ms. Skaer herself made any materially false or misleading statements.  As to its aiding and abetting claims, the SEC fails to plead specific facts that Ms. Skaer had the required *actual knowledge* of wrongdoing or provided *substantial* assistance to the allegedly unlawful scheme.  Similarly, as to its other non-fraud claims, the SEC fails to allege that Ms. Skaer had the requisite mental state.

      Though the SEC seeks to lump the individual defendants together to create the appearance

1    of a coordinated conspiracy, in actuality its allegations against Ms. Skaer are quite thin and

2    legally insufficient.  The SEC makes clear throughout that the decisions as to options grant dates

3    were made *not* by Ms. Skaer, but by the other individual defendants (allegedly by Mercury's CEO

4    and CFOs during the relevant period).  *See* Compl. ¶¶ 27, 30, 32, 34.  The SEC broadly asserts

5    that Ms. Skaer "assisted" these defendants in selecting "historical dates" for options grants (*id*. ¶¶

6    31, 36), but the few *facts* it alleges do not support that conclusory assertion, are inconsistent with

7    it, and, even if proven, would not establish her liability for any securities law violation.

8         The SEC itself has acknowledged that the use of an historical grant "measurement date"

9    does not by itself establish that an option grant has been illegally "backdated," and that

10   companies can use an historical measurement date without taking a compensation charge in a

11   variety of circumstances that do not result in a violation of law or the accounting principles set

12   forth in APB 25.[1]  To plead that Ms. Skaer violated the securities laws or aided and abetted a

13   violation, the SEC must allege more than Mercury's mere use of "historical dates" or even that

14   Ms. Skaer knew that Mercury was using "historical dates" as measurement dates.  In addition, it

15   must plead specific facts that, if proven, would show that Ms. Skaer knew or was reckless in not

16   knowing that (i) the historical dates being used were not the correct "measurement dates" under

17   APB 25; (ii) as a result, Mercury was required to take a compensation charge; (iii) Mercury was

18   not taking a compensation charge; and (iv) Mercury's financial statements were thereby

19   materially misstated.  But even after having collected some 3 million pages of documents and

20   interviewing more than a dozen insiders, and after having received the findings and conclusions

21   of Mercury's own Special Committee investigation, the SEC comes nowhere close to shouldering

22   its burden.

23

---

24   [1] Under Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees*
     ("APB 25"), stock option grants with an exercise price lower than the fair market value of the
25   stock on the "measurement date" (the first date on which the number of options an individual is
     entitled to receive and the exercise price are known) — so-called "in the money" grants —
26   incurred a compensation expense over the period of time that services were performed by the
     employees.  *See* APB 25 §§ 10(b), 12-14.  Grants whose value on the "measurement date"
27   equaled the exercise price — so-called "at the money" grants — did not incur a compensation
     expense under APB 25.  *See* Compl. ¶ 20; *In re CNET Networks, Inc. Shareholder Deriv. Litig.*,
28   483 F. Supp. 2d 947, 955 (N.D. Cal. 2007).

1   The SEC's sole effort to plead Ms. Skaer's knowledge of these subjects is contained at ¶¶

2   42-43 of its Complaint, where the SEC alleges that (i) "notes" of Mercury's March 1999 Board

3   meeting, attributed to Ms. Skaer, "show" that defendant Sharlene Abrams, Mercury's CFO from

4   November 1993 through November 2001, "explained" to defendant Amnon Landan, Mercury's

5   CEO throughout the relevant period, Ms. Skaer, "and others that the company's publicly stated

6   policy was that it did not grant in-the-money options, because such a grant would result in a

7   compensation charge for the company"; and (ii) years later, Ms. Skaer repeated this or a similar

8   statement to unnamed others.  These alleged communications are insufficient on their face.

9   Though, as we show, the SEC has misconstrued and distorted the pertinent document, which is

10  properly considered on this motion, even fully accepting the SEC's allegations, the SEC has

11  failed to plead that Ms. Skaer knew that (i) using a historical date as the effective or "as of" date

12  for an options grant was improper (and, indeed, it was not necessarily improper); (ii) what

13  "measurement dates" Mercury was using for APB 25 purposes; or (iii) Mercury was not taking

14  compensation charges when it should have.  If anything, these allegations cut against an inference

15  of scienter — a fair reading of these paragraphs is that, as a result of what Ms. Abrams

16  purportedly said at the March 1999 Board meeting, Ms. Skaer understood that Mercury was

17  properly accounting for its options grants.

18      Given the SEC's lengthy, comprehensive investigation, the failure to plead the necessary,

19  facts is both inexcusable and telling.  Since the SEC, which has more experience than anyone in

20  bringing actions under the federal securities laws, cannot plead a satisfactory claim against Ms.

21  Skaer despite the mass of evidence it collected before bringing its Complaint, there is no reason to

22  believe that it could cure the defects in its pleading if given leave to amend.  Accordingly, the

23  SEC's Complaint against Ms. Skaer should be dismissed with prejudice.

24  **II.    STATEMENT OF FACTS[2]**

25      **A.  Ms. Skaer**

26  _____

27  [2] Ms. Skaer accepts the well-pleaded factual allegations of the SEC's Complaint solely for
    purposes of this motion, and shows herein that the SEC has failed to state a claim against her even
28  despite its skewed, incomplete, and out of context presentation of the facts.

1    Ms. Skaer became Mercury's General Counsel in November 2000. Compl. ¶ 14. Before

2    then, as a partner at GCA Law Partners LLP, she served at "various" unspecified times as outside

3    counsel to Mercury. *Id.* The SEC does not allege that Ms. Skaer had any accounting in her

4    educational or professional background, much less any expertise in or knowledge of options

5    accounting or APB 25. Nor does the SEC allege that Ms. Skaer had any role in or responsibility

6    for Mercury's accounting for options grants or that she made decisions as to options grant dates.

7    **B. Mercury's Options Grant Process**

8    Mercury's established program for granting options had been in place for more than two

9    years by the time Ms. Skaer became General Counsel. *Id.* ¶ 18. Grants to executives were made

10   by the Board of Directors' Compensation Committee, which "delegated to a Stock Option

11   Committee the authority to grant options to the bulk of the company's employees"; Ms. Skaer

12   was not a member of the Compensation or the Stock Option Committee. *Id.* ¶ 23. "Prior to the

13   formation of the Stock Option Committee, grants to the bulk of the company's employees were

14   made by the full Board," of which Ms. Skaer was never a member. *Id.* ¶ 24.

15   As to employee grants, the SEC alleges that Mr. Landan and Ms. Abrams "would look

16   back and pick the 'grant date' that would be reflected on the options" and that these dates

17   coincided with low points of the Company's stock but not the dates the grants were actually

18   approved. *Id.* ¶¶ 27-28. According to the SEC, defendant Douglas Smith replaced Ms. Abrams

19   as CFO in November 2001, "and assumed her role in selecting stock option grant dates in

20   hindsight based on the stock price, and signing with Landan backdated written consent documents

21   memorializing the grants." *Id.* ¶ 30. The SEC further alleges (*id.* ¶ 28) that

22   
23   Landan and Abrams (or later Smith) signed a unanimous written
     consent representing that options were granted "as of" the selected
     grant date, despite the fact that there was no decision, or other
24   agreement, to grant options on the stated date and the terms of the
     grant had not been fixed and finalized on that date. The dates were
25   chosen by Landan, Abrams and Smith with hindsight ….

26   The SEC alleges that the process for options grants to executives was similar. According

27   to the SEC, "Landan determined the amount of options that he wanted to be granted to senior

28   executives, including himself, then forwarded the recommendation to the Compensation

1    Committee for approval." *Id*. ¶ 32.  The Compensation Committee approved grants either by

2    unanimous written consent ("UWC"), or the Board or Compensation Committee would approve

3    grants in a meeting. *Id*. ¶ 33.  The paperwork made clear that the grants had been made "as of" a

4    particular day, though the SEC alleges that no grant or agreement to grant had occurred on such

5    date. *Id*.  "The dates reflected on the grant documents corresponded to relative low-points of the

6    company's stock, and were chosen by Landan, Abrams and Smith …." *Id*. ¶ 34.

7        In contrast to these specific, direct allegations that the other individual defendants decided

8    options grant dates, the SEC makes no such allegation against Ms. Skaer.  Instead, it alleges that

9    Ms. Skaer (i) "assisted Landan, Abrams and Smith in selecting historical dates for backdated

10   grants … [and] prepared the false documentation ([UWCs]) memorializing backdated Stock

11   Option Committee grants"; (ii) "exerted substantial influence over the pricing of all of the

12   company's options"; and thereby (iii) "caus[ed] the options to be priced at less than fair market

13   value of the company's stock on the date of grant, … [and] caused Mercury to incur significant,

14   undisclosed compensation expense." *Id*. ¶¶ 25, 29, 31, 35, 36.  But, the SEC fails to allege

15   specific facts to support, and the only facts it does allege contradict, these conclusory assertions.

16       The SEC alleges that all 45 executive and employee grants between November 1996 (four

17   years before Ms. Skaer joined the Company) and April 2002 were "backdated to a date

18   corresponding to a relative low point of the company's stock." *Id*. ¶ 45.  Thirty-three of those

19   grants (nearly 75%) were made before Ms. Skaer joined Mercury as General Counsel. *Id*. (chart).

20   The SEC elaborates on four grants — presumably those as to which it believes its evidence is

21   strongest — as purported illustration of how the options granting process was carried out in an

22   improper way.  Two of these grants (the January 1999 Compensation Committee grant and the

23   April 1999 Stock Option Committee Grant) occurred before Ms. Skaer was employed at Mercury,

24   and the SEC does not allege that Ms. Skaer had *any* involvement in them. *Id*. ¶¶ 47-59.  The

25   other two (the January 2002 and March 2002 grants) occurred while Ms. Skaer was employed at

26   Mercury, but the SEC fails to allege facts that, if proven, would establish that she substantially

27   assisted a scheme that she actually knew was unlawful.[3]

28   _____

[3] The only two grants as to which the SEC alleges specific facts of Ms. Skaer's purported

1    As to the January 2002 grant, the SEC alleges that "Smith and Landan executed the

2    consent with the December 3, 2001 effective date" and that "Landan and Smith approved the

3    Stock Option Committee grant on or about February 1, 2002, … dated and priced as of January

4    22, 2002." *Id.* ¶¶ 63, 69.  Ms. Skaer's *only* alleged role is that she told the Human Resources

5    manager on January 23, 2002 that the "word [was]" that an unidentified "they" had "'locked' on"

6    to the prior day's closing price and that "we should wait and see at least until the board meeting";

7    Ms. Skaer wanted to "wait and see" because she "'really didn't want [the people in stock option

8    administration] to have to redo this all a third time.'"  *Id.* ¶¶ 66-67.  These allegations fail to plead

9    that Ms. Skaer understood that (i) the January 22 date was not the appropriate "measurement

10   date" under APB 25; (ii) the Company was required to take a compensation charge under APB 25

11   based on January 22 as the grant date; or (iii) the Company did not take a compensation charge.

12   To the contrary, the SEC alleges that the grant date was the one that Ms. Skaer understood on

13   January 23 that "they" had "'locked' on" the previous day.  If anything, the SEC's allegations cut

14   against an inference of scienter, since they show that Ms. Skaer was concerned about

15   administrative issues and easing the burden on the HR staff, not on pricing issues or maximizing

16   the benefit for employees.[4]  Similarly, as to the senior executive options grant, the allegations (¶¶

17   71-72) do not reflect any substantive participation by Ms. Skaer in the pricing or grant date

18

19

20   involvement both took place more than five years before the SEC filed its Complaint.  This fact
     both shows the stale nature of the conduct here at issue and precludes the SEC from seeking or
21   the Court from imposing any penalty as to such grants under the five-year statute of repose set
     forth in 28 U.S.C. § 2462 ("an action, suit or proceeding for the enforcement of any civil fine,
22   penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within
     five years from the date when the claim first accrued").  Ms. Skaer understands that other
23   defendants may be seeking dismissal on this or similar grounds.  Ms. Skaer requests that, if the
     Court dismisses any substantive or relief claims on statute of repose or limitations grounds as to
24   those other defendants, it accord the analogous relief to Ms. Skaer.

25   [4] The SEC alleges that "a new date had been tentatively identified" and that changes to the
     employee grant continued to be made through January 30, 2002 "as a result of discussions
26   between Smith and Skaer" (Compl. ¶ 68), but it does not specify who identified the tentative
     "new date," whether the "new date" was a modified *grant* date or date for *announcing* the grant,
27   that Ms. Skaer knew of the tentative "new date," or that the alleged changes to the employee grant
     would result in a change in the measurement date (and, if so, that Ms. Skaer knew the
28   measurement date would change).  It is undisputed that the grant date Mercury identified was the
     same date Ms. Skaer had understood that "they" had "'locked' on."  *Id.* ¶¶ 66, 69, 74.

1   process. Instead they suggest only a ministerial role of collecting signatures for the UWCs.[5]

2          As to the March 2002 grant, the SEC alleges that Ms. Skaer sent an email to Mr. Smith

3   regarding possible pricing and later met with him and "recommended" that Messrs. Landan and

4   Smith approve a proposed grant. *Id.* ¶¶ 75, 77. However, the SEC does not allege that Ms. Skaer

5   knew of the grant date that Messrs. Landan and Smith ultimately chose (or the date they made the

6   decision). Nor does the SEC allege that Ms. Skaer knew that (i) the grant date chosen was not the

7   proper "measurement date" under APB 25; (ii) Mercury was required to take a compensation

8   charge for the grant; or (iii) Mercury did not take a compensation charge. The SEC also fails to

9   allege that Ms. Skaer made or participated in the actual decision as to the grant date. Rather, the

10  SEC squarely alleges that "Smith approved the grant" and "Smith and Landan then executed a

11  Stock Option Committee consent ...." *Id.* ¶¶ 77-78.[6]

12         **C. Ms. Skaer Had No Responsibility For Accounting For Options Grants**

13         The SEC nowhere alleges that Ms. Skaer had any accounting responsibilities at Mercury,

14  including with respect to options grants. Its only allegations that even purport to describe her

15  knowledge of applicable accounting rules are contained at ¶¶ 42-43 of the Complaint. At ¶ 42,

16  the SEC alleges that, at Mercury's March 1999 Board meeting, "Abrams shared her knowledge of

17  options accounting with Landan and Skaer. ... Skaer's notes of the meeting show that Abrams

18  explained to Landan, Skaer and others that the company's publicly stated policy was already that

19  it did not grant in-the-money options, because such a grant would result in a compensation charge

20  for the company." At ¶ 43, the SEC alleges that, at unspecified times in 2001 and 2003, Ms.

21

22  [5] The SEC alleges that the SEC filings reflecting the executive grants were "prepared at the
    direction of Skaer." Compl. ¶ 74. But, it fails to allege what directions Ms. Skaer purportedly

23  gave or to whom. Nor does it allege that she was substantively involved in or reviewed the filings
    or knew their contents. As shown below, this utterly non-particularized allegation does not meet

24  the "statement" element of a fraud offense or the actual knowledge and substantial assistance
    requirements of an aiding and abetting offense.

25  [6] The SEC alleges that "[b]etween at least 1997 and 2001, Mercury's senior management, led by
    Landan and Abrams, orchestrated a systematic effort to manage the company's earnings ... by

26  fraudulently manipulating Mercury's recognition of revenue." Compl. ¶ 117. The SEC does not
    allege that Ms. Skaer participated in or knew of this purported scheme. *See id.* ¶¶ 117-130.

27  These "earnings management" allegations further underscore that Ms. Skaer had no role in or
    knowledge of Mercury's financial accounting or disclosures and was not a member of "senior

28  management" making such decisions.

1  Skaer repeated this or a similar purported understanding to unnamed others in connection with

2  two unidentified merger transactions. As shown *infra* at 13, these allegations are plainly

3  insufficient to plead Ms. Skaer's scienter or actual knowledge of wrongdoing.

4  **III.    THE SEC'S COMPLAINT**

5       The SEC's Complaint, filed on May 31, 2007, alleges that Ms. Skaer **(i)** violated the

6  antifraud provisions of §17(a) of the Securities Act of 1933 and § 10(b) of the Securities

7  Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [First and Second Claims];

8  **(ii)** violated § 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder, which prohibit *knowing*

9  falsification of books and records or *knowing* failure to implement or maintain a system of

10  internal accounting controls [Third Claim]; **(iii)** violated Exchange Act Rule 13b2-2, which

11  prohibits making or causing to be made materially false or misleading statements or omissions to

12  auditors [Fourth Claim]; **(iv)** aided and abetted Mercury's alleged violations of several Exchange

13  Act provisions, i.e., the provisions pertaining to **(a)** the filing of annual and quarterly reports (§

14  13(a) and Rules 12b-20, 13a-1, and 13a-13 thereunder [Fifth Claim], **(b)** maintaining books,

15  records, and accounts (§ 13(b)(2)(A)) [Seventh Claim], and **(c)** devising and maintaining a system

16  of internal accounting controls (§ 13(b)(2)(B)) [Eighth Claim]; **(v)** filed and aided and abetted the

17  other individual defendants' filing with the Commission of false or misleading Forms 3 and 4 in

18  violation of § 16(a) of the Exchange Act and Rule 16a-3 thereunder [Ninth Claim]; and **(vi)** made

19  or aided and abetted the other defendants' making of false or misleading statements or omissions

20  in proxy solicitations in violation of Exchange Act § 14(a) and Rule 14a-9 thereunder [Tenth

21  Claim].[7]

22  **IV.    ARGUMENT**

23       **A.  The SEC Faces Heightened Pleading Standards**

24

25  ---

[7] The Commission's improper effort to lump Ms. Skaer in with the other defendants so as to avoid pleading the required specific facts or conduct as to her is highlighted by its Exchange Act

26  § 14(a) claims.  Compl. ¶¶ 186-187.  In ¶ 186, the SEC alleges that "Mercury, Landan, Abrams and Smith" improperly solicited materially false and misleading proxies; then, remarkably, in ¶

27  187, the SEC alleges that "[b]y engaging in the conduct described above, "Defendants Mercury, Landan, Abrams[,] Smith *and Skaer*" committed a primary violation of Exchange Act § 14(a) and

28  Rule 14a-9 thereunder.  (Emphasis added.)

1    In evaluating a Rule 12(b)(6) motion, "the Court must accept well-pleaded allegations as

2    true, but it is not required to accept 'legal conclusions cast in the form of factual allegations if

3    those conclusions cannot reasonably be drawn from the facts alleged.'" *SEC v. Yuen*, 221 F.R.D.

4    631, 634 (C.D. Cal. 2004) (dismissing SEC complaint; quoting *Clegg v. Cult Awareness Network*,

5    18 F.3d 752, 754-55 (9th Cir. 1994)); *accord SEC v. Siebel Sys., Inc.*, 384 F. Supp. 2d 694, 710

6    (S.D.N.Y. 2005) (dismissing SEC complaint and stating that the Court is "not bound to accept as

7    true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances

8    supporting such an assertion").  Moreover, even under the so-called "notice pleading" standard of

9    Rule 8(a)(2), the SEC is required to plead *specific facts* that, if proven, would establish its claims.

10   *Bell Atlantic Corp. v. Twombly*, 530 U.S. ___, ___, 127 S. Ct. 1955, 1966 (2007) (*every* claim

11   must be supported by *facts* "beyond the mere possibility" of relief).

12       Because it has alleged fraud, the SEC faces heightened pleading standards in this case, for

13   two reasons.  *First*, Fed. R. Civ. P. 9(b) provides:  "In all averments of fraud or mistake, the

14   circumstances constituting fraud or mistake shall be stated with particularity."  This rule extends

15   to allegations made by the SEC (*Yuen*, 221 F.R.D. at 634), and requires it to specifically allege

16   "the 'who, what, when, where, and how' of the misconduct charged."  *Vess v. Ciba-Geigy Corp.*

17   *USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir.

18   1997).  It is especially appropriate to enforce Rule 9(b) here, where the SEC investigated and

19   gathered facts for about 1-1/2 years before filing its Complaint.  *See, e.g.*, *SEC v. Tambone*, 417

20   F. Supp 2d. 127, 131 (D. Mass. 2006) (granting Rule 12(b)(6) dismissal and refusing to relax

21   Rule 9(b) given the SEC's extensive prelitigation investigation).

22       Notably, this particularity requirement applies not only to fraud claims, but also to non-

23   fraud claims grounded in allegations of fraudulent conduct.  *Vess*, 317 F.3d at 1103-04 (claim

24   alleging a unified course of fraudulent conduct and relying entirely on that course of conduct as

25   the basis of a claim is said to be "grounded in fraud" or to "sound in fraud," and the pleading of

26   that claim as a whole must satisfy Rule 9(b)).  On this basis, several Ninth Circuit decisions have

27   applied Rule 9(b) to non-fraud provisions of the federal securities laws.  *See In re Stac Elecs. Sec.*

28   *Litig.*, 89 F.3d 1399, 1404-05 (9th Cir. 1996) (applying the particularity requirements of Rule 9(b)

1    to claims brought under Section 11 of the 1933 Act where those claims are "grounded in fraud");

2    *SEC v. Baxter*, 2007 WL 2013958, at *8 (N.D. Cal July 11, 2007) (Rule 9(b) "heightened

3    pleading standard" applies to claims under Section 13 of the Exchange Act).  Thus, Rule 9(b)'s

4    particularity requirement applies to the SEC's non-fraud as well as fraud claims.

5         *Second*, though the Private Securities Litigation Reform Act ("PSLRA") does not apply to

6    the SEC (*see SEC v. ICN Pharms., Inc.*, 84 F. Supp. 2d 1097 (C.D. Cal. 2000)), numerous other

7    courts throughout the country have held that the SEC is nevertheless required to plead facts that,

8    if proven, would create a *strong inference* of scienter.[8]

9         As this Court recently held in dismissing the private class action complaint in the Mercury

10   options matter, though review of a motion to dismiss is generally "limited to the face of the

11   complaint and matters judicially noticeable[,] … under the 'incorporation by reference' doctrine,

12   the Court also may consider documents which are referenced extensively in the complaint and

13   which are accepted by all parties as authentic, which are not physically attached to the

14   complaint."  *In re Mercury Interactive Corp. Sec. Litig.*, 2007 WL 2209278, at *3 (N.D. Cal. July

15   30, 2007).  Thus, the Court is not bound by the SEC's self-serving characterization of documents

16   cited in the Complaint, and may consider the full text of the documents the SEC quotes only in

17   part, without turning this motion to dismiss into a motion for summary judgment.  *See In re Stac*

18   *Elec. Sec. Litig.*, 89 F.3d at 1405 n.4; *Fecht v. Price Co.*, 70 F.3d 1078, 1080, n.1 (9th Cir. 1995);

19   *see generally* accompanying Request for Judicial Notice ("RJN").

20        **B.  The SEC Has Not Adequately Pled A Securities Fraud Claim Against Ms. Skaer**

21        To establish Ms. Skaer's liability under the antifraud provisions of the federal securities

22

23   ───────────────
     [8] *E.g.*, *SEC v. Durgarian*, 477 F. Supp. 2d 342, 353 (D. Mass. 2007) (granting Rule 12(b)(6)
24   dismissal as to three of the six defendants, and stating that "with respect to alleged securities
     fraud violations, the SEC must also 'set forth facts giving rise to a 'strong inference' that the
25   defendants acted with the required state of mind'"; quoting *In re Stone & Webster, Inc. Sec.
     Litig.*, 414 F.3d 187, 204 (1st Cir. 2005)); *SEC v. Roanoke Tech. Corp.*, 2006 WL 2470329, at *6
26   (M. D. Fla. Aug. 24, 2006) (granting Rule 12(b)(6) dismissal because the facts alleged by SEC
     were "not sufficient to raise a strong inference that Clark intended to deceive, manipulate or
27   defraud any investor"); *SEC v. Lucent Techs. Inc.*, 2005 WL 1206841, at *5 (D.N.J. May 20,
     2005) (Rule 12(b)(6) dismissal of SEC complaint; noting that any plaintiff alleging securities law
28   violations must plead facts raising a strong inference of scienter "regardless whether the PSLRA
     applies"); *SEC v. Parnes*, 2001 WL 1658275, at *5 (S.D.N.Y. Dec. 26, 2001).

1   laws, the SEC must plead and then prove that Ms. Skaer, acting with scienter, made a

2   misstatement or omission of a material fact. *SEC v. Fehn*, 97 F.3d 1276, 1289 (9th Cir. 1996).

3   Here, the SEC has failed to sufficiently allege that Ms. Skaer acted with scienter or that, in the

4   first instance, she misrepresented or failed to disclose a material fact.

5          **1.    The SEC Has Failed To Adequately Allege Ms. Skaer's Scienter**

6          Scienter is a "mental state embracing intent to deceive, manipulate or defraud." *Ernst &*

7   *Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Though scienter can be pled through specific

8   facts that, if proven, would show recklessness amounting to an extreme departure from the

9   standards of ordinary care (*see infra* at 16), the theory apparent from the SEC's Complaint is not

10  that Mercury executives were asleep at the switch, but that they knowingly conspired together to

11  mislead investors through improper accounting for "backdated" options. In any event, the SEC

12  has not sufficiently pled scienter under either a knowledge or recklessness theory.

13         As shown above, the SEC does not allege that Ms. Skaer made decisions regarding grant

14  dates or prices. Instead, it alleges that she "assisted" the other individual defendants "in selecting

15  historical dates" for options grants, thereby causing the options to be priced at less than fair

16  market value on the purported actual grant date. *See* Compl. ¶¶ 29, 31, 35-36. This claim sounds

17  only in "aiding and abetting" but, even assuming *arguendo* both that such conclusory allegations

18  were true and that they go to the existence of a *primary* violation by Ms. Skaer, they are

19  insufficient to plead Ms. Skaer's scienter.

20         Selecting historical dates for options grants is not in and of itself illegal; the practice can

21  be illegal only if the company, having selected the wrong "measurement date" under APB 25,

22  fails to take a required compensation charge, thereby rendering the accounting for the grant

23  materially misstated. *See* Paul S. Atkins, SEC Commissioner, Remarks Before the International

24  Corporate Governance Network 11th Annual Conference (July 6, 2006) (available at

25  http://www.sec.gov/news/speech/2006/spch070606psa.htm) ("Atkins Speech") (RJN, Ex. A).

26  Even then, the use of historical grant dates cannot support a fraud charge unless the SEC can

27  show that Ms. Skaer knew or was reckless in not knowing that (i) the historical date was the

28  wrong "measurement date" under the arcane principles of APB 25 — *but see CNET Networks*,

1    483 F. Supp. 2d at 956 ("determining the correct measurement date depends on the facts"); (ii)

2    the selection of the wrong "measurement date" necessitated a compensation charge; (iii) the

3    Company did not in fact take a compensation charge; and (iv) the Company's financial statements

4    were materially misstated as a result.

5          Here, the SEC has failed to plead with that Ms. Skaer was ever aware or recklessly

6    disregarded that (i) the dates that Mercury identified as the grant dates were not the correct

7    "measurement dates" under APB 25; (ii) the alleged "historical pricing" of which she was aware

8    necessitated a compensation charge; (iii) Mercury was not properly accounting for "historically

9    dated" options grants; or (iv) the alleged improper accounting rendered the Company's financial

10    statements materially misstated.  Absent such specific, particularized, factual allegations to

11    connect Ms. Skaer's actions and an awareness that her acts were wrong, the Complaint must be

12    dismissed.  *See Gompper v. Visx, Inc.*, 298 F.3d 893, 895-96 (9th Cir. 2002) (complaint dismissed

13    because it failed to plead link between awareness of a patent claim and knowledge that the

14    company's patents were therefore invalid); *Schlifke v. Seafirst Corp.,* 866 F.2d 935, 946 (7th Cir.

15    1989) (banker's knowledge of withheld facts was insufficient to plead scienter; what was required

16    was specific knowledge of the danger of misleading buyers).

17          **a.    The Complaint Does Not Allege That Ms. Skaer Understood An**
                    **Accounting Charge Had To Be But Was Not Properly Being Taken**

18

19          The *sole* allegations in the SEC's 46-page Complaint regarding Ms. Skaer's knowledge of

20    accounting for options grants in general or Mercury's accounting for options grants in particular

21    are that (i) "notes" of Mercury's March 1999 Board meeting, attributed to Ms. Skaer, purportedly

22    show "that Abrams explained to Landan, Skaer and others that the company's publicly stated

23    policy was that it did not grant in-the-money options, because such a grant would result in a

24    compensation charge for the company"; and (ii) "[i]n connection with two merger transactions in

25    2001 and 2003, Skaer explained to others that granting options to new employees at prices below

26    the then-market value of Mercury stock would incur a compensation expense for Mercury."

27    Compl. ¶¶ 42-43.  For several reasons, these two paragraphs do not suffice to plead Ms. Skaer's

28

1    scienter.[9]

2        *First*, these two paragraphs do not allege, and the SEC nowhere alleges, that Ms. Skaer

3    knew as a matter of law or accounting that using an historical date as the measurement date for an

4    options grant was improper (and indeed an historical date *can* be the appropriate measurement

5    date). *Second*, and perhaps most critically, these paragraphs do not allege, and the SEC nowhere

6    specifically alleges, that Ms. Skaer knew what "measurement dates" Mercury was using for APB

7    25 purposes or that Mercury was not taking compensation charges when it should have. *See*

8    *Lucent Techs.*, 2005 WL 1206841, at *5 (Rule 12(b)(6) dismissal where SEC failed to make

9    specific factual "allegations from which the Court could infer that Dorn had any knowledge of

10   accounting principles or that she had any role in Lucent's decisions to recognize revenue in

11   connection with the transactions Dorn executed"). *Third*, these two paragraphs actually cut

12   against an inference of scienter: a reasonable, more-than-plausible reading of these paragraphs is

13   that Ms. Abrams, the Company's CFO and a CPA, was informing the recipients of her email —

14   and they were entitled to infer — that she was on top of the issue and that Mercury was properly

15   accounting for its options grants and would continue to do so following the impending revisions

16   to APB 25 and the Company's policy.[10]

17       It is telling that the SEC chose to characterize these "notes" rather than attach or quote

18   from them. This is because the actual "notes," which the Court may consider on this motion to

19   dismiss (*see supra* at 10 and RJN), do not support and in fact are inconsistent with the SEC's

20   allegations. The document in question is a March 16, 1999 email from Ms. Abrams to multiple

21   ───────────────
     [9] The Complaint also vaguely asserts (¶ 41) that, at some unspecified point in 2000, Ms. Abrams
22   stated in emails to "other Mercury employees," none of whom is identified, that "backdating to
     obtain lower-priced options 'is illegal and causes a charge to earnings.'" The SEC does not allege
23   that this email was addressed to Ms. Skaer or that Ms. Skaer ever even saw it.

24   [10] In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the Supreme Court held that, to survive a
     motion to dismiss under the PSLRA, the plaintiff must plead an inference of scienter that is
25   cogent, compelling, and "*at least as compelling as any opposing inference* one could draw from
     the facts alleged." 127 S. Ct. 2499, 2510 (2007) (emphasis added). The SEC itself urged the
26   Court to adopt this standard, writing in its amicus brief: "When the facts alleged in the complaint
     give rise to a substantial possibility that the defendant acted without scienter, the necessary
27   'strong inference' of scienter will be lacking, because there will be an insufficient likelihood that
     the conclusion that the defendant acted with scienter follows from the facts alleged in the
28   complaint as a whole." *See* RJN Ex. B (SEC amicus brief in *Tellabs*), at 25. Though the SEC is
     not subject to the PSLRA, it would be highly ironic, to say the least, for it to contend that the
     Court should not consider anti-scienter inferences from the facts it alleges.

1   recipients, including Ms. Skaer as a cc, and it sets forth "the proposed agenda for the telephonic

2   BOD meeting scheduled" for six days later.  *See* RJN Ex. C at p. MEC 0350695.  There are

3   handwritten notes on the document, which the SEC apparently attributes to Ms. Skaer.  In the

4   paragraph on which the SEC apparently relies, Ms. Abrams wrote (*id*. at p. MEC 0350696):

5               We would like to make certain amendments to the 1999 stock
            option plan.  The first would be to add wording to the plan that
6           'options will only be granted at the fair market value of the stock
            price on the date of grant'.  This is already our policy since any
7           discount (except for ESPP) will create a compensation charge.
            However, during the proxy solicitation last year, several
8           shareholders noted that we could grant shares at less than fair
            market value and were therefore opposed to the plan.

9

10  There is a handwritten notation next to that paragraph, appearing to state "approved."

11          This document is hardly sufficient to create an inference, much less a strong inference, of

12  Ms. Skaer's scienter.  This document was from March 1999, more than 1-1/2 years before Ms.

13  Skaer joined Mercury as its General Counsel, and three years before the only two options grants

14  as to which the SEC makes specific allegations as to Ms. Skaer's involvement.  This fact alone

15  substantially undercuts, if not guts, an inference of scienter.  *See Durgarian*, 477 F. Supp. 2d at

16  354-355 (D. Mass. 2007) (dismissing SEC complaint for lack of sufficient pleading of scienter in

17  light of lapse of two years between employees' attendance at meeting and alleged misstatements

18  to auditors).  *See also In re Astea Intern. Inc. Sec. Litig.*, 2007 WL 2306586, at *15 (E.D. Pa.

19  Aug. 9, 2007) (broad temporal distance between stock sales and restatement does not support

20  scienter); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) (same).

21          Contrary to the SEC's representations that these "notes" show that Ms. Abrams

22  "explained" at the meeting that Mercury's then "publicly stated" policy was that it did not grant

23  in-the-money options, (i) the document evidences that Ms. Abrams referred only to Mercury's

24  policy and did not indicate that the policy was "publicly stated" (an important difference given

25  the SEC's allegations that Ms. Skaer knew or was reckless in not knowing of misrepresentations

26  in Mercury's financial disclosures); and (ii) the document does not evidence that Ms. Abrams

27  gave any explanation of Mercury's policy at the telephonic Board meeting six days later.  Further,

28  the document states that the accounting rules regarding options grants were then in flux (*see*

1    multiple references to the FASB's likely, but not definite, impending "repair" of APB 25 (pp.

2    MEC 0350696-97)) and indicated that Mercury's then-apparent policy of not granting in-the-

3    money options was not hard and fast (*see* MEC p. 0350696 ("any discount (*except for ESPP*) will

4    create a compensation charge" and "*several shareholders noted that we could grant shares at less*

5    *than fair market value*" (emphasis added)).

6          There is no basis for inferring that Ms. Skaer not only gleaned, but years later retained,

7    from this two-line snippet in a three-page single-spaced March 1999 email "knowledge of options

8    accounting" (Compl. ¶ 42), i.e., the complex accounting principles of APB 25, or what Mercury's

9    accounting policy was from November 2000 through November 2005.  More critically, nothing in

10   the document suggests that Ms. Skaer knew or was reckless in not knowing that the Company

11   was, then or later, picking the wrong measurement date under APB 25, improperly accounting for

12   options grants, and making false and misleading public statements regarding its options grants; if

13   anything, the document suggests just the opposite.

14         Similarly unavailing is the SEC's related allegation that at unspecified points in "2001 and

15   2003," Ms. Skaer purportedly "explained" to unidentified "others" in connection with merger

16   transactions that granting in-the-money options to new employees "would incur a compensation

17   expense for Mercury."  Compl. ¶ 43.  As an initial matter, this extraordinarily vague allegation

18   fails Rule 9(b)'s particularity requirement of pleading the dates, times, and places of these

19   communications or the name of even one purported "other" to whom Ms. Skaer allegedly

20   communicated this information.  Even assuming for purposes of this motion that the allegation

21   were true, it would still not establish that Ms. Skaer was ever aware that Mercury used the wrong

22   measurement dates under APB 25 or was not taking a required accounting charge with regard to

23   any grant at issue in this Complaint.[11]  Again, if anything, it reflects Ms. Skaer's understanding

24

25   [11] Even if the SEC could allege that Ms. Skaer, a non-accountant, had been briefed on the
     Generally Accepted Accounting Principles ("GAAP") implicated by use of historical grant dates,
26   which it cannot, a GAAP violation without more is not sufficient to plead her scienter.  *See In re
     Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir. 1994).  *See also SEC v. Rubera*, 350 F.3d
27   1084, 1096 (9th Cir. 2003) (SEC failed to prove securities law violations where the financial
     statements violated GAAP, but defendant CEO was unaware that they contained false
28   information).

1    that the Company was properly accounting for its options grants.

2            **b.        The Complaint Does Not Allege That Ms. Skaer Was Reckless**

3            The SEC has failed to sufficiently allege recklessness on Ms. Skaer's part.  Recklessness

4    requires a showing of "highly unreasonable" conduct, "involving not merely simple, or even

5    inexcusable negligence, but an extreme departure from the standards of ordinary care, and which

6    presents a danger of misleading buyers or sellers that is either known to the defendant or is so

7    obvious that the actor must have been aware of it."  *Rubera*, 350 F. 3d at 1094 (affirming

8    judgment against SEC due to lack of scienter despite SEC's evidence that defendant personally

9    reviewed documents containing allegedly false statements, regularly participated in company

10   meetings at least once a week, and spoke on a daily basis with other executives in charge of

11   operations matters and preparation of financial reports; quoting *Hollinger v. Titan Capital Corp.*,

12   914 F.2d 1564, 1569 (9th Cir. 1990)).

13           In this case, Ms. Skaer, a non-accountant, was plainly not reckless in relying on others

14   within Mercury to properly account for options grants so as to ensure that the Company's public

15   disclosures regarding options grants were accurate.  A corporate officer is not only permitted, but

16   expected, to access, use, and rely on the expertise of other corporate officers and their staff in

17   performing her duties.  So long as Ms. Skaer did not engage in "an extreme departure from the

18   standards of ordinary care" — and the SEC has alleged no actual facts to support any such

19   allegation, which in any event it did not make — she could appropriately rely on not only the

20   documents and reports from others in the Company, but also any actions or statements by others.

21   *Id*.; *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990).  This is particularly so

22   in a situation like this one, where one officer relies on the statements, reports and actions of other,

23   high level corporate officers with significant accounting expertise.  *See Rubera*, 350 F.3d at 1094-

24   95 (no scienter where owner of company relied in good faith on employees); *SEC v. Todd*, 2007

25   WL 1574756, at *11 (S.D. Cal. May 30, 2007) (granting Rule 50 judgment against SEC,

26   explaining that business professionals must be able to trust the opinions and actions (or inactions)

27   of other business professionals within the company).

28           Presumably, the SEC will argue that the mere use of "historical" dates should have raised

1  a "red flag" in Ms. Skaer's mind.  But, even assuming *arguendo* for purposes of this motion that

2  Ms. Skaer was aware that grants were made using "historical" dates or prices, there is no

3  indication that she recklessly disregarded that the practice would raise an accounting or disclosure

4  "red flag."  She was not an accountant, came into a process the Company had already been

5  employing for at least two years, and had no reason to believe that the Company's accounting or

6  accounting disclosures were inaccurate.  Absent specific facts indicating otherwise, there is no

7  basis on which Ms. Skaer's recklessness may be inferred.

8         Further precluding any inference of Ms. Skaer's scienter is the fact that even to this day,

9  one of the SEC's own Commissioners and the SEC's own Office of the Chief Accountant

10  recognize the great difficulty in applying the principles of APB 25 to practices identical or at least

11  substantially similar to those that the Complaint here alleges occurred at Mercury.  In the July 6,

12  2006 Atkins Speech, *supra*, SEC Commissioner Paul Atkins explained:

13         Backdating of options sounds bad, but the mere fact that options
        were backdated does not mean that the securities laws were
14         violated.  Purposefully backdated options that are properly
        accounted for and do not run afoul of the company's public
15         disclosure are legal.  Similarly, there is no securities law issue if
        backdating results from an administrative, paperwork delay.  A
16         board, for example, might approve an options grant over the
        telephone, but the board members' signatures may take a few days
17         to trickle in.  One could argue that the grant date is the date on
        which the last director signed, but this argument does not
18         necessarily reflect standard corporate practice or the logistical
        practicalities of getting many geographically dispersed and busy,
19         part-time people to sign a document.  It also ignores that these
        actions reflect a true meeting of the minds of the directors,
20         memorialized by executing a unanimous written consent.

21         To the same effect, in recent public guidance relating to options grants, the SEC's Office

22  of the Chief Accountant stated its understanding that "some companies have accounted for their

23  option grants using a measurement date that is other than the date at which all required granting

24  actions have been completed" and added that, while using such a historical measurement date for

25  purposes of APB 25 is not proper in "many" cases, "in certain instances where a company's facts,

26  circumstances, and pattern of conduct evidence that the terms and recipients of a stock option

27  award were determined with finality on an earlier date prior to the completion of all required

28  granting actions, it may be appropriate to conclude that a measurement date [APB] 25 occurred

1    prior to the completion of these actions.  Letter from Conrad Hewitt, SEC Chief Accountant, to

2    Messrs. Lawrence Salva and Sam Ranzilla (Sept. 19, 2006) (available at

3    http://www.sec.gov/info/accountants/staffletters/fei_aicpa091906.htm) (RJN, Ex. D).

4        These pronouncements by an SEC Commissioner and the SEC Office in charge of

5    accounting that use of an historical grant or measurement date may under various circumstances

6    be used without incurring a compensation charge under APB 25 preclude any inference that Ms.

7    Skaer was reckless.  These statements show that, even for these senior level SEC officials, the

8    accounting consequences under APB 25 of practices identical or similar to those used at Mercury

9    remained, at minimum, ambiguous and difficult to apply even after the options "scandal" had hit

10    and the SEC was able to develop its own thinking on the subject as a result of its investigations of

11    some 140 companies.  Given the SEC's inability even in 2006 to articulate clear, hard and fast,

12    generally applicable principles on this subject, it is ironic to say the least for the agency to take

13    the position here that Ms. Skaer — a non-accountant with no accounting experience and whose

14    only alleged accounting knowledge was obtained by (possibly) reading a two-line excerpt from an

15    email she had been sent 1-1/2 years before she joined the Company — was reckless in the early

16    2000s for failing to appreciate that use of historical dates, often occasioned by the very

17    administrative or paperwork issues of which Commissioner Atkins spoke (*see*, *e.g.*, Compl. ¶¶ 67,

18    72-73), might result in the need for a compensation charge under APB 25.

19        **2.    The Complaint Fails To Allege That Ms. Skaer Made An Actionable
         Statement**

20

21        A person cannot be held primarily liable unless (s)he makes a material misstatement, signs

22    a document (e.g. an SEC filing) containing a material misstatement, or substantially participates

23    in the making of a material misstatement.[12]  The Complaint fails to allege that Ms. Skaer made an

24    _____

25    [12] *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006); *In re Cylink Sec.
     Litig.*, 178 F. Supp. 2d 1077, 1085 (N.D. Cal. 2001) (dismissing complaint); *In re Cornerstone
     Propane Partners, L.P. Sec. Litig.*, 416 F. Supp. 2d 779, 790 (N.D. Cal. 2005) (dismissing

26    complaint); *In re Tibco Software*, Inc., 2006 WL 1469654, at *28 (N.D. Cal. May 25, 2006)
     (dismissing claim against officer where plaintiff failed to plead that defendant was directly

27    involved in the preparation of allegedly misleading statements); *In re ESS Tech., Inc. Sec. Litig.*,
     2004 WL 3030058, at *12 (N.D. Cal. Dec. 1, 2004) (plaintiffs must "state, with particularity,

28    facts indicating that the individual defendant was directly involved in the preparation of the
     allegedly misleading statements;" (quotation omitted).

1  actionable statement.  The SEC alleges that Ms. Skaer "drafted and prepared the Annual Report

2  on Form 10-K" for the years 2001-2005, "participated in the drafting of all Mercury's proxy

3  statements during this period and … signed the notice to shareholder on page one of the proxies

4  in her capacity as Mercury's corporate Secretary from 2002 to 2003."  Compl. ¶ 6.  Later, it

5  Complaint alleges that she "participated in the preparation of … registration statements" that

6  "incorporated by reference" Mercury's Forms 10-K, and "signed an opinion of counsel attesting

7  to the statement filed on January 20, 2000."  *Id*. ¶ 114.  As a threshold matter, such conclusory

8  allegations do not satisfy the Rule 9(b) particularity requirement of specifically alleging which

9  fraudulent statements *Ms. Skaer* purportedly made.  *See, e.g.*, *In re Glenfed, Inc. Sec. Litig.*, 42

10  F.3d 1541, 1548 (9th Cir. 1994); *SEC v. Yuen*, 221 F.R.D. at 636-637 ("unreasonable" for SEC to

11  rely on defendants' "alleged participation in disclosure of public statements" pursuant to group

12  published information or doctrine to satisfy Rule 9(b) requirements of pleading the defendants

13  misrepresentation with particularity); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534

14  (S.D.N.Y. 2005).

15  Moreover, while the Complaint alleges in only the most general terms that Ms. Skaer

16  "drafted and prepared" Forms 10-K containing particular statements that the SEC is challenging

17  (*see* Compl. ¶¶ 99-100, 102), the SEC fails to make the required allegation that Ms. Skaer drafted

18  those particular statements (as opposed to, e.g., passing along the work of others, cutting and

19  pasting from prior submissions that she did not author, or not having any role in the making of

20  those statements).  Based on the SEC's allegations, it is unlikely that Ms. Skaer herself drafted

21  these statements, as the SEC alleges that these alleged false and misleading statements were

22  contained in Mercury's SEC filings long predating Ms. Skaer's employment at the Company.  *See*

23  Compl. ¶ 99 (alleging misstatement relating to Mercury's options granting policy dating back to

24  the filing of Mercury's Form 10-K for 1996).  Accordingly, the Complaint fails to allege with

25  sufficient particularity that Ms. Skaer made an actionable misstatement. [13]

26  _____

27  [13] *In re ESS Tech., Inc. Sec. Litig.*, 2004 WL 3030058, at *12 (plaintiffs must "state, with particularity, facts indicating that the individual defendant was directly involved in the preparation of the allegedly misleading statements" (quotation omitted); *Southland Sec. Corp. v.*

28  *Inspire Ins. Solutions Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) (plaintiff must allege specific facts

1

### C. The SEC Has Failed To Sufficiently Plead A Violation Of Any Of The Non-Fraud Provisions Of The Federal Securities Laws

2

3

#### 1. The SEC Has Failed To Plead Actual Knowledge Or Substantial Assistance For Purposes Of Its Aiding And Abetting Claims

4       The SEC claims that Ms. Skaer aided and abetted Mercury's alleged violations of several

5   Exchange Act provisions and related rules and the other individual defendants' alleged violations

6   of an additional Exchange Act provision and related rule (Fifth and Seventh through Tenth

7   Claims).  *See supra* at __.  Under settled Ninth Circuit law, the elements of an aiding and abetting

8   violation are "(1) the existence of an independent primary violation; (2) actual knowledge by the

9   alleged aider and abettor of the primary violation and of his or her own role in furthering it; and

10  (3) 'substantial assistance' by the defendant in the commission of the primary violation."  *Fehn*,

11  97 F.3d at 1288.  These same strict standards and pleading requirements — including the actual

12  knowledge requirement — apply to the SEC's claims of aiding and abetting defendants' alleged

13  non-fraud violations of the Exchange Act, even if scienter is not required to state a claim for a

14  primary violation of those provisions.  *Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003); *SEC v.*

15  *Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 336-37 (S.D.N.Y. 2006); *Lucent Techs.*,

16  2005 WL 1206841, at *5.  An allegation of recklessness is insufficient.  *Cedric Kushner*, 417 F.

17  Supp. 2d. at 334-35 ("recklessness, even for fiduciaries, is no longer sufficient"; "knowing

18  misconduct must now be shown" to establish aiding and abetting liability).  The SEC appears to

19  acknowledge these principles here, pleading in each of its aiding and abetting claims that Ms.

20  Skaer (and the other individual defendants) "knowingly" provided substantial assistance to the

21  alleged primary violator(s).  *See* Compl. ¶¶ 163, 171, 176, 183, 188.

22      Here, the SEC has not sufficiently pleaded either that Ms. Skaer had *actual knowledge* of

23  any of the alleged primary violations, or that she knowingly provided *substantial assistance* in the

24  commission of the primary violations.  As detailed above, the SEC has pleaded no facts that, if

25  proven, would support a finding that Ms. Skaer *actually knew* that (i) Mercury was filing

26

27  tying officer to a statement); *Tibco Software, Inc.*, 2006 WL 1469654, at *28 (dismissing
    complaint where plaintiffs "failed to provide any particulars regarding [officer's] involvement in
28  preparing any of the challenged statements").

1   materially false and misleading annual and quarterly reports with the SEC (Fifth Claim); (ii)

2   Mercury was not making and keeping accurate books and records (Seventh Claim); (iii) Mercury

3   was failing to devise and maintain a sufficient system of internal accounting controls (Eighth

4   Claim); (iv) the other individual defendants were filing false and misleading Forms 3 and 4

5   (Ninth Claim); or (v) Mercury and the other individual defendants were soliciting proxies through

6   false and misleading statements or omissions (Tenth Claim).  All of these charges flow from the

7   same premise, namely, that Mercury's accounting for options grants was improper and

8   improperly disclosed.  But, the SEC does not and cannot allege that Ms. Skaer possessed the

9   required actual knowledge because, among other things, it does not and cannot allege in the first

10  instance that Ms. Skaer actually knew (i) the applicable accounting principles (particularly how

11  the "measurement date" was determined under APB 25), (ii) what Mercury was using as the

12  "measurement date"; (iii) that Mercury needed to take a compensation charge under APB 25; and

13  (iv) that Mercury was not taking a required compensation charge.

14      Nor does the Complaint specifically allege facts that, if proven, would show that Ms.

15  Skaer provided substantial assistance.  To allege substantial assistance, the SEC must plead facts

16  that, if proven, would demonstrate that Ms. Skaer's conduct was a substantial causal factor in the

17  perpetuation of the underlying violation.  *See Cedric Kushner*, 417 F. Supp. 2d at 334-35.  There,

18  the court held that the defendant was not a substantial causal factor in his company's alleged

19  fraud and books and records violations where he had a "very limited" role of "gathering backup

20  documentation for [the company's] accountants and auditors, and answering questions about

21  subsequent events and pending litigation . . . ." *Id*. at 336.  Moreover, the SEC had failed to show

22  that the defendant, by presenting an incomplete draft SEC filing to the company's CEO as "OK to

23  sign," had substantially assisted in the company's alleged violation, because the CEO "did not

24  sign the forms in reliance upon any alleged representations made by [defendant], and would have

25  done so regardless of [defendant's] assurances." *Id*.  Similarly, in *Tambone*, 417 F. Supp. 2d at

26  136-37, the court made clear that in a situation where, as here, the SEC claims that the defendant

27  failed to make purportedly required disclosures, the SEC is required to meet the "particularly

28  exacting" standard of pleading *facts* that, if proven, would show a "conscious intent" to assist the

1    alleged primary violation by "throwing in [her] lot" with the alleged primary violators.  Applying

2    these principles, the court in *Tambone* dismissed the aiding and abetting claim because the SEC

3    had "made no allegation to suggest that the defendants consciously threw in their lot with the

4    primary violators," and its assertion that defendants benefited economically by collecting fees

5    was "too remote and minimal to demonstrate conscious intent." *Id*. at 137.[14]

6            The same considerations apply here.  Though the SEC alleges in its "Facts" section that

7    Ms. Skaer "assisted" the other defendants (Compl. ¶¶ 31, 36), it does not specifically allege

8    "substantial assistance," and the specific facts it pleads do not rise to that level.  Rather, as in

9    *Cedric Kushner*, she is alleged to have had only a limited, largely ministerial role in the options

10   administration process and there is no allegation she had any more significant role in the

11   "drafting" of SEC filings or "preparation" of Forms 4.  And, as in *Tambone*, the SEC does not

12   allege that Ms. Skaer consciously threw in her lot with the alleged primary violators.

13   Accordingly, the SEC's aiding and abetting claims against Ms. Skaer should be dismissed.

14           **D.  As To Its Other Non-Fraud Claims Against Ms. Skaer, The SEC Likewise Does
              Not Sufficiently Allege The Required Mental State**
15

16           The SEC's remaining claims against Ms. Skaer are for alleged violations of § 13(b)(5) of

17   the Exchange Act and Rule 13b2-1 thereunder (Third Claim), Rule 13b2-2 of the Exchange Act

18   (Fourth Claim), and § 16(a) of the Exchange Act and Rule 16a-3 thereunder (Ninth Claim).  Each

19   of these claims has a mental state element requiring the SEC to plead at least recklessness and, in

20   the case of § 13(b)(5), actual knowledge.  As detailed above, the SEC has not pled either

21

22   ──────────────
     [14] The SEC alleges that the individual defendants received "potential" profits from receipt of in-
     the-money options they received (tacitly recognizing that many of these options were never
23   exercised) and actual profits from some in-the-money options that they did exercise; further, it
     alleges that they received cash bonuses based "at least in part" on Mercury's financial
24   performance.  Compl. ¶¶ 80-81.  Even assuming the truth of these allegations, if the SEC is
     claiming that these circumstances give rise to an inference of scienter, it is wrong.  As the Ninth
25   Circuit very recently put it, "[a]llegations that defendants had a motive to inflate [the company's]
     stock, through bonus incentives tied to stock price, fail to show scienter.  Stock-based bonuses are
26   common and have limited probative value as to scienter." *In re Syncor Int'l Corp. Sec. Litig.*,
     2007 WL 1729968, at *2 (9th Cir. June 12, 2007 (unpublished)).  *See also Acito v. IMCERA*
27   *Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (allegation that defendants possessed scienter because
     an inflated stock price would increase their compensation is insufficient because, under such a
28   theory, every company in the U.S. would be exposed to a securities fraud claim).

1    knowledge or recklessness, compelling dismissal of these remaining claims.

2          Section 13(b)(5) provides that "[n]o person shall *knowingly* circumvent or *knowingly* fail

3    to implement a system of internal accounting controls or *knowingly* falsify any book, record, or

4    account …." (Emphasis added). Though Rule 13b2-1 does not specifically use the word

5    "knowingly," it must be construed in accordance with § 13(b)(5), under which it was

6    promulgated. Thus, the SEC acknowledges that it must plead actual knowledge to prevail on its

7    Third Claim. *See* Compl. ¶ 154. Similarly, as to the SEC's Rule 13b2-2 claim for allegedly

8    making material misstatements or omissions to auditors, courts in the Ninth Circuit have

9    understood the Rule to require at least a showing of scienter, and one has gone so far as to require

10   actual "knowledge of the falsity of the statements." *Todd*, 2007 WL 1574756, at *15. *See also*

11   *Baxter*, 2007 WL 2013958, at *8 ("Rule 13b2-2 appears to also impose a scienter requirement"'

12   adding that the "heightened pleading standard" of Rule 9(b) also applies to Rule 13b2-2 claims).

13         Here, the Complaint is devoid of any specific factual allegation that, if proven, would

14   show that Ms. Skaer *knowingly* circumvented or *knowingly* failed to implement a system of

15   internal accounting controls or *knowingly* falsify any of Mercury's books or records. Nor is there

16   any such specific factual allegation that either Ms. Skaer *actually knew* or recklessly disregarded

17   that the statements she allegedly made to Mercury's outside auditors were false. Indeed, the SEC

18   does not claim that she made any statements to Mercury's outside auditors, alleging only that Ms.

19   Skaer "provided false documents" to the auditors. *See* Complaint ¶¶ 108, 111. This ministerial

20   function is too limited and inconsequential to result in a Rule 13b2-2 violation, as the SEC itself

21   has recognized in one of its administrative decisions. *See In re Albert Glenn Yesner*, 2001 WL

22   587989, at *38 (Init. Dec. May 22, 2001) (controller not liable under Rule 13b2-2 in light of facts

23   that he "was not a primary contact" with auditor and there was "no evidence that he prepared, or

24   directed the preparation, of any reports … that were given to [the auditor] in the course of its

25   audits or eventually filed with the Commission"), *issued as final Commission decision*, 2001 WL

26   698308 (June 19, 2001). In any event, the SEC pleads no specific facts as to Ms. Skaer's

27   knowledge or intent when providing the documents to the auditors. In short, the Rule 13b2-2

28   claim fails to plead the requisite mental state and is not pled with the required particularity under

1    Rule 9(b). It should accordingly be dismissed.

2        Section 16(a) requires certain owners of an issuer's securities, including officers and

3    directors, to file with the SEC statements of ownership and changes in ownership regarding those

4    securities. Rule 16a-3 requires that these persons make an initial filing on Form 3 and report

5    changes in ownership on Form 4. To establish a violation of these provisions, the SEC must

6    prove that (i) a person was subject to the disclosure requirements of Section 16(a); (ii) the person

7    was required to make a filing; (iii) the person failed to make a required filing; and (iv) the

8    person's "failure to do so was not inadvertent." *SEC v. Blackwell*, 477 F. Supp. 2d 891, 905 (S.D.

9    Ohio 2007). A "failure to file the required forms" is "not inadvertent" if it "was either purposeful

10   or a result of willful blindness." *Id*. at 906.

11        Here, the SEC does not allege that Ms. Skaer or any of the other individual defendants

12   failed to file any required forms. Rather, it alleges that the forms they did file "contained false or

13   misleading statements" and that Ms. Skaer aided and abetted the other defendants' filing of forms

14   purportedly containing false or misleading information. Compl. ¶¶ 181-183. *Blackwell* and the

15   other cases involving § 16(a) indicate, however, that the statute applies only to the *failure to file*

16   required forms, not to allegations of filing false or misleading forms. *See SEC v. Blackwell*, 291

17   F. Supp. 2d 673, 694-95 (S.D. Ohio 2003) (citing enforcement actions). As mentioned, there is

18   no allegation that Ms. Skaer or anyone else failed to file required Forms 3 or 4. Even assuming

19   *arguendo* § 16(a) were, for the first time to our knowledge, deemed applicable to the filing of

20   false forms, the SEC still has failed to state a claim against Ms. Skaer thereunder. As to the claim

21   that Ms. Skaer herself violated § 16(a), the SEC has not pled any facts, that if proven, would

22   show that her alleged failure to file truthful forms was either purposeful or a result of willful

23   blindness. Specifically, the SEC has failed to allege that, in the face of Mr. Landan's, Ms.

24   Abrams', and Mr. Smith's decisions to grant options to her "as of" a particular prior date (*see*

25   Compl. ¶ 33), Ms. Skaer filed false or misleading forms on purpose or as the result of willful

26   blindness. For the same reason, as to its claim that Ms. Skaer aided and abetted the other

27   individual defendants' filing of allegedly false or misleading forms, the SEC has failed to allege

28   that Ms. Skaer had the required *actual knowledge* of the falsity of the forms; and it has also failed

1   to allege that she provided substantial assistance in the filing of such forms.[15]

2   **V.    CONCLUSION**

3           For the foregoing reasons, Ms. Skaer's motion to dismiss should be granted, and the

4   SEC's Complaint against her should be dismissed with prejudice.

5   Dated: October 1, 2007                          Respectfully submitted,

6

7                                                   _/s/ Melinda A. Haag_____
                                                    MELINDA HAAG
                                                    JAMES A. MEYERS
8                                                   JAMES N. KRAMER
                                                    M. TODD SCOTT
9                                                   LUCY E. BUFORD
                                                    ORRICK, HERRINGTON & SUTCLIFFE LLP

10
                                                    Attorneys for Defendant
11                                                  SUSAN SKAER

12

13

14

15

16

17  _____
    [15] The SEC alleges that "between 1999 and 2005, at various times Skaer, Abrams and others
18  participated in the fraudulent structuring of overseas employee stock option exercise transactions
    to conceal the variable accounting consequences of those transactions, causing the company to
19  fail to report the approximately $24 million in compensation expense required under variable
    accounting." Compl. ¶ 4; *see also id.* ¶¶ 131-144. These so-called "European Exercises"
20  allegations fail for three reasons. *First*, though the SEC includes a totally conclusory allegation
    that Ms. Skaer understood that Mercury's accounting for these transactions was improper under
21  the complex provisions of Financial Accounting Standards Board Interpretation No. 44 ("FIN
    44") (*see* Compl. ¶ 135), it fails to allege a single fact that, if proven, would establish that she
22  understood the applicable accounting or that Mercury was improperly accounting for these
    transactions. Thus, the SEC has failed to sufficiently plead Ms. Skaer's scienter or actual
23  knowledge of wrongdoing. *Second*, while the SEC alleges that Mercury failed to disclose
    approximately $24 million in compensation expense in the 7-year period from 1999-2005, there is
24  no allegation as to the amount that the Company failed to disclose in any particular year and, thus,
    there is no allegation as to (i) which financial statements were misstated, (ii) by how much; or
25  (iii) the impact on the financial statements during the years Ms. Skaer was at the Company and
    had involvement with the transactions in question. Indeed, the SEC does not even allege that the
26  amount in question was material in any particular year, thus dooming not only any fraud charges
    based on the European Exercises, but any books and records charges, since materiality is a
27  required element of such charges. *See, e.g., In re Meris Labs., Inc.*, 1994 WL 523841, at *7 (SEC
    Sept. 26, 1994) (and federal court cases cited therein). *Third*, at all events, the SEC does not
28  allege whether the conduct relating to the so-called European Exercises forms the basis of fraud
    charges, charges under the so-called "books and records" provisions of the Exchange Act, or
    both. For this reason alone, these allegations fail Rule 9(b)'s particularity requirement.