# EXHIBIT A

Home | Previous Page

**U.S. Securities and Exchange Commission**

**Speech by SEC Commissioner:**
**Remarks Before the International Corporate Governance Network 11th Annual Conference**

*by*

**Commissioner Paul S. Atkins**

*U.S. Securities and Exchange Commission*

Washington, D.C.
July 6, 2006

Thank you Alastair for the kind introduction. It is a pleasure to be a part of this international discussion of corporate governance issues. Before I begin my remarks, I must tell you that the views that I express here are my own and do not necessarily represent those of the Securities and Exchange Commission or my fellow commissioners.

The title of this conference, "Creating Value — Building Trust" is refreshingly upbeat. It is certainly appropriate for the nearly 57 million American households and the millions of other international investors that own stock in U.S. markets directly or through mutual funds to feel positive about their prospects these days. Although many press reports would have you believe otherwise, America's economy is strong and growing.

The Dow Jones Industrials is currently at around 11,200, nearing the all-time peak it reached on January 14, 2000. The gross domestic product expanded at a solid 3.5 percent pace last year. In the first quarter of this year, the American economy grew at an impressive rate of 4.8% — the fastest of any industrialized nation. Unemployment has fallen to 4.6 percent, lower than the average for any decade since the 1950s, and more Americans than ever own their own homes. Without doubt, the U.S. capital markets have created value for those who have invested over the last several years. With the U.S. Treasury estimating about $7 trillion in foreign holdings of U.S. securities, investors from all over the world have contributed to and enjoyed this growth.

Although the current state of the American economy is a success story — one that I take great pleasure in telling two days after we celebrated our 230th> Independence Day — the issues that you are discussing at this conference span national borders. Multi-national groups like this one, by bringing together a wide variety of perspectives, can be a fruitful source of ideas for improving corporate governance.

As a regulator, I believe that it is not best to mandate any particular model of corporate governance. My agency tried that recently in the mutual fund

context. We adopted a rule mandating that the chairman and 75 percent of the directors of mutual fund boards be independent of the advisor of the funds. After an embarrassing defeat in court, we are rethinking our options.

The main reason that I reject the notion of regulators' prescribing corporate governance models on the macro-level is that *shareowners* are best placed to determine the governance model of their corporations. History has shown that one-size-fits-all models rarely produce good results and tend to stymie innovation. Stockholders are, after all, the owners of the corporations in which they invest. I believe that it is my obligation as a regulator to remain vigilant in protecting the rights of shareowners.

Managers are stewards of stockholders' property and are charged with maximizing the value of that property for the stockholders. The problem is that the interests of managers are not perfectly aligned with those of the shareholders. Adam Smith recognized the agency problem of management when, in the *Wealth of Nations*, he wrote the following assessment of management:

> being the managers rather of other people's money than of their own, it cannot well be expected that they should watch over it with the same anxious vigilance with which the partners in a private copartnery frequently watch over their own. Like the stewards of a rich man, they are apt to consider attention to small matters as not for their master's honour, and very easily give themselves a dispensation from having it. Negligence and profusion, therefore, must always prevail, more or less, in the management of the affairs of such a company.[1]

These are tough words, but they clearly set out the inherent challenge. In the face of such potential for managers' conflicts of interest, directors, as shareholders' elected representatives, act as watchdogs. They are bound to guard zealously the interests of shareholders and to ensure that managers do their jobs. They also perform an extremely important advisory role to management. The dispersion of ownership and the consequent gaping divide between owners and managers that characterizes the modern corporation makes the role of directors all the more important.

The importance of having the interests of those who manage property on behalf of owners aligned with the interests of owners is a key thread underlying the Sarbanes-Oxley Act, which Congress adopted and the SEC implemented in the wake of the corporate scandals of the early part of this decade. Fundamentally, the Act acknowledges the importance of stockholder value. It takes steps to strengthen the role of directors as representatives of stockholders and reinforces the role of management as stewards of the stockholders' interests. Even the Act's Section 404, cited as the law's most costly provision because of the excessive way in which accountants and management have implemented it, can serve to improve the quality of financial information provided to stockholders. But we must work towards better implementation.

The recognition that corporations exist for the benefit of stockholders has led me to oppose the imposition of financial penalties on corporations in instances, such as financial frauds, in which the stockowners have been harmed by the very misconduct at issue. Last January, the Commission took an important step on this front when it issued its statement concerning

the imposition of financial penalties against corporations in enforcement actions. The statement recognized the too-often-overlooked concept that "[i]f the victims are shareholders of the corporation being penalized, they will still bear the cost of issuer penalty payments (which is the case with any penalty against a corporate entity)."[2] We will continue to work on this issue as the policy statement is applied to the facts and circumstances of the cases before the Commission. It would be unfortunate if, after all our efforts to the contrary, the Commission were to allow a boiler-plate nod to the penalty statement, thereby reverting to its prior practice of inappropriately imposing penalties on stockholders.

Although a corporation is a private entity, it is an artificial person created by law. One of the key rights of the owners of the corporation is their vote. As with any voting system, we must ensure that the proxy process has integrity. One encouraging recent step is the Commission's so-called e-proxy proposal. This proposed rulemaking, which we published last December, would allow for the Internet delivery of proxy materials. Issuers could take advantage of the Internet, which would achieve cost savings that would inure to the benefit of the stockholders. The time is right for such a move. The Internet has become not only a more common source of information for people in all walks of life, but is the preferred source for many. Shareholders who prefer paper, of course, would be able to continue to receive proxy materials in paper form. The convenience and interactive potential of the Internet offers those shareholders who choose Internet delivery an opportunity to achieve a deeper level of familiarity with the companies in which they invest.

Another effort that the SEC is pursuing concerns our proposal regarding disclosure to stockholders of the compensation that they pay to their top management. This issue goes to the heart of Adam Smith's ambivalence about a corporation as a form of ownership structure: his worry about agents' operating in their self-interest, rather than in their employers' best interests. Executive compensation has provoked comment like no other issue, chiefly because many shareholders have a keen and legitimate interest in knowing how boards are compensating top executives — they want to know whether the managers' interests are aligned with their own. Shareholders have a particular interest in transparency in this area.

In ICGN's comment letter on the executive compensation proposal, ICGN referred to its own ongoing efforts to update its Executive Remuneration Guidelines. That sparked my curiosity, so I went over to the website to take a look at the draft guidelines, which I found to be very thoughtful and thought-provoking.[3] Indeed, one section of the document so struck me that I was inspired to comment myself. However, because the due date for comments was five days ago, I decided to provide my comments here today.

The issue that caught my attention is one that has garnered a fair amount of attention from many quarters in recent months — the practices by which companies grant stock options. Yes, stock options. A controversial topic, perhaps, and a concept that has become anathema in some quarters. We all know of the abuses that many have ascribed to stock options: pussy-cat boards of directors showering fat-cat CEOs and other top officers of a company with millions and millions of dollars worth of options grants in return for poor or average corporate performance.

Section 3.4.2 of the ICGN draft Executive Remuneration Guidelines describes "discount options; re-load provisions; gross-up provisions; accelerated vesting upon change in control; and, repricing without shareholder approval" as "inappropriate." That Section also directs companies to "provide clear guidance regarding the circumstances under which key plan criteria may be amended, including performance targets, including notification to shareowners ... ." The Section later states that "[e]quity grants should be scheduled at regular annual intervals," directs companies to "adopt and disclose a formal pricing methodology for establishing the strike price of grants," and deems as altogether unacceptable the backdating of options grants to achieve a more favorable strike price.

I respect the ICGN for weighing in on this issue and look forward to seeing the Guidelines in final form. My own views are driven by looking at options grants from the perspective of the stockowner. Imagine, if you will, that you are a shareowner in a young, promising, cash-strapped business. Key to the success of the budding corporation is the ability to attract and retain good talent. This is particularly so in small, innovative companies that lack the perfectly manicured corporate campuses, plush offices, generous benefit packages, and lavish expense accounts of their more established, successful competitors. Would you not normally prefer to work in such comfort than in a spartan cubicle in a dreary warehouse?

What does it take to attract people to take a bigger risk on a company that is long on dreams and short on cash? Boards of these companies often find that they can lock in the talent that they need only by offering talented employees a future potential ownership interest in the company — not cash up front. Although options do have a cost to shareholders in the overhang of dilution, the options do not drain cash from the company's coffers; granting options does not require resources to be diverted from other aspects of the business. In addition, for companies at all stages of maturity, options, which do not vest immediately, provide a strong incentive for employees to stay and devote their energy to the company's success. Would you as the shareholder not applaud a board that employed such a clever, cash-preserving approach to compensation?

After all, you are a shareowner because you are not averse to risk — otherwise you could invest in bonds or insurance policies. Options are an arrangement between current shareholders and *potential* shareholders. They are a quid pro quo: you work for me to build value, and you are rewarded with stock so that you can share in that value.

In the United States, broad-based stock options have been the catalyst for corporate success since they were pioneered by venture capitalists over four decades ago. Their theory was that stock option grants to employees, not just to executives, would result in a new owner class of employees who would be given an incentive to maximize the value of the company's stock. This theory proved correct, and employee stock options have been one of the main reasons that innovative corporations have flourished.

Recently, however, there have been a slew of stories regarding alleged transgressions in the granting of stock options. Indeed, some of the reported facts are grim — stories of executives and directors conspiring to manipulate stock option prices for their own gain, or purposefully

"backdating" options grants, in contravention of the company's public disclosure, to avoid recognizing compensation expenses. If true, I expect there will be little sympathy for, and intense regulatory reaction to, these scenarios.

But it is worth taking a step back before we plunge headlong into wholesale condemnation of all options practices. We need to distinguish scenarios that are black-and-white fraud from legitimate practices that are being attacked with attenuated theories of liability. With respect to the former, there have been many reported stories of clear-cut doctoring of documents done knowingly by executives and/or directors. I will not quibble with the vigorous pursuit of the knowing perpetrators of this kind of activity: a fraud is a fraud. Attempts to evade legal obligations through intentional alteration of documents or deliberate flouting of internal controls cannot be tolerated, because they strike at the core of our system of corporate governance.

Backdating of options sounds bad, but the mere fact that options were backdated does not mean that the securities laws were violated. Purposefully backdated options that are properly accounted for and do not run afoul of the company's public disclosure are legal. Similarly, there is no securities law issue if backdating results from an administrative, paperwork delay. A board, for example, might approve an options grant over the telephone, but the board members' signatures may take a few days to trickle in. One could argue that the grant date is the date on which the last director signed, but this argument does not necessarily reflect standard corporate practice or the logistical practicalities of getting many geographically dispersed and busy, part-time people to sign a document. It also ignores that these actions reflect a true meeting of the minds of the directors, memorialized by executing a unanimous written consent.

I suspect that the bulk of the questionable options granting activity occurred before Sarbanes-Oxley was enacted in 2002. After Sarbanes-Oxley, companies have been subject to tougher internal control requirements, and have filled compensation committees with independent directors. More importantly, the SEC requirement for disclosure of stock option grants to executives and directors has been greatly accelerated to two days from the previous one-year requirement. Moreover, I anticipate that the Commission will include additional disclosure requirements for options grants in the pending executive compensation rules.

Many of the hypothetical fact patterns being bandied about seem to be rooted in a questionable reading of the law. A scenario that has drawn much attention is the colorfully named "springloading," which has been defined as the practice by which a company purposefully schedules an option grant ahead of good news, or purposefully postpones an option grant until after bad news. I am not sure where the term springloading came from, but it certainly has an ominous ring to it.

Not only are there difficult factual issues that need to be proven, such as the nexus between the grant decision and the subsequent news event, but there are also substantive legal issues that need to be addressed. Specifically, we need to ask ourselves whether there has been a securities law violation even if a nexus can be identified between the grant and the news event. Isn't the grant a product of the exercise of business judgment by the board? For example, a board may approve an options grant for

senior management ahead of what is expected to be a positive quarterly earnings report. In approving the grant, the directors may determine that they can grant fewer options to get the same economic effect because they anticipate that the share price will rise. Who are we to second-guess that decision? Why isn't that decision in the best interests of the shareholders? We also need to remember that predicting the stock price effect of an upcoming event is difficult, let alone predicting the trajectory of the stock price over the next twenty quarters until the options vest.

Also swirling about are accusations of insider trading by corporate boards in connection with options grants. Again, one has to ask whether there is a legitimate legal rationale for pursuing *any* theory of insider trading in connection with option grants. Boards, in the exercise of their business judgment, should use all the information that they have at hand to make option grant decisions. An insider trading theory falls flat in this context where there is no counterparty who could be harmed by an options grant. The counterparty here *is* the corporation — and thus the shareholders! They are intended to benefit from the decision.

Practically speaking, because corporate boards are almost always in possession of material nonpublic information, it would be difficult (if not impossible) to require them to refrain from making options grants when they are in possession of such information. Along those lines, would we call it insider trading if a board chose not to grant options because it knew of impending bad news?

We should also consider some of the business purposes behind such grants. Imagine yourself a board member, whose job it is, as I discussed earlier, to maximize shareholder value. The shareholders have entrusted you and the rest of the board with a fixed number of shares to allocate with options. You ought not simply hand out options with abandon. Your job is to use these options, as you use any other corporate resource, to maximize shareholder value. Deciding to whom and when to grant these options is a complicated calculus that is fraught with uncertainty since one never knows what will happen to the stock price. As with other business decisions, it is protected by the business judgment rule. Over the years, the courts in the various States have built up what we call the "business judgment rule", a rule under which courts will not second-guess judgments regarding business matters made by corporate officers and directors in good faith. Judges, recognizing that business decisions often must be made quickly on sketchy information, refrain from substituting their own views in hindsight.

Of course, even boards that try to issue options at opportune times for the recipients often may miss the mark because they cannot perfectly predict how the stock price will move. A further element of uncertainty is added by the fact that options are typically subject to a vesting period; the ultimate value of the option to a recipient only becomes clear at the end of the vesting period.

In the best exercise of their business judgment, directors might very well conclude that options should be granted in advance of good news. What better way to maximize the value that the option recipient attaches to the option? Conversely, a board would avoid granting options right before bad news hits since recipients are likely to place a lower value on such options. A board that times its options grants wisely can achieve the same result

that it would by granting more options at a time when the stock price is likely to stagnate or drop. A board that makes a consistent practice of timing options grants before the stock price rises should be able to pay lower cash salaries than a board that makes options grants without taking into consideration likely prospective changes in the stock price, precisely because there is a greater chance of the options being worth something and achieving their intended objective.

As the ICGN's draft Guidelines remind us, "boards and their mechanisms for deciding upon executive pay play a critical role in representing owners in the process of remuneration design and oversight."[4] Part of what this entails is using resources in a way that gets the biggest bang for the buck. A board, by issuing options at an opportune time, maximizes the effect of those options. In other words, it takes fewer well-timed options to make the employee happy, and the company does not need to burn cash. So from the shareholders' point of view and from the point of view of the board member who is representing the shareholders' interests, there is good reason why options grants would not be made according to a rigid, pre-set schedule. In fact, underwater options actually do more harm than good. They make employees *more* susceptible to being picked off by competitors than no options at all. They give the employee no reason to stay to exercise the option and they are a constant reminder of the firm's diminished prospects.

It is true that when granting *any* form of compensation to themselves, there is a potential conflict of interest between the board members and the best interests of the shareholders. Safeguards are in place, however, to deal with these conflicts, such as disclosure requirements. Investors, of course, should monitor this situation just as they do other compensation matters. One comforting aspect is that shareholders have the directors' own personal reputation as a protection against abuse — because most directors have had successful careers in their own right (that is why, after all, they are invited to become directors in the first place), most directors have a great incentive to maintain their own reputation.

And, this is an important point on which to end. I hear over and over from lawyers, investment bankers, institutional investors, and directors that it is becoming more and more difficult to find good men and women willing to serve as directors. Directors are already a nervous lot following the scandals of the past and the increased risk and liability that they feel that they carry for their actions.

Following the reforms of the last few years, we have more disclosure, more transparency, more accountability, and more tools for directors and stockholders than ever before. We should not through enforcement actions undercut the business judgment rule — we do so to the peril of stockholders. When we focus on corporate compensation arrangements and on practices regarding granting of stock options, we must take care not to undermine a compensation arrangement that has served shareowners so well for so many years.

Thank you for indulging me by listening to my comments this afternoon. I am interested in hearing your comments as well, either today or sometime in the future when you are back in Washington and have a chance to drop by my office.

[1] Adam Smith, An Inquiry into the Nature and Causes of the Wealth of Nations, at Book V, Chapter I (1776) (available at: http://www.econlib.org/LIBRARY/Smith/smWN.html).

[2] Statement of the Securities and Exchange Commission Concerning Financial Penalties, Release 2006-4, Jan. 4, 2006 (available at: http://www.sec.gov/news/press/2006-4.htm).

[3] http://www.icgn.org/issues/2006/consultations/erc/executive_remuneration_guidelines.doc

[4] *Id.*

*http://www.sec.gov/news/speech/2006/spch070606psa.htm*

Home | Previous Page                                   Modified: 07/07/2006