# EXHIBIT D

Home | Previous Page

**U.S. Securities and Exchange Commission**

Mr. Lawrence Salva, Chairman
Committee on Corporate Reporting
Financial Executives International
200 Campus Park Drive, PO Box 674
Florham Park, NJ 07932-0674

Mr. Sam Ranzilla, Chairman
Center for Public Company Audit Firms
American Institute of Certified Public Accountants
Harborside Financial Center
201 Plaza Three
Jersey City, NJ 07311-3881

September 19, 2006

Dear Sirs:

Several companies have recently issued press releases announcing the restatement of their financial statements due to errors in their accounting for grants of stock options to employees, members of the board of directors, and other service providers. Many other companies have announced that they are currently looking into their past practices related to the granting of stock options. The Office of the Chief Accountant has prepared this letter to discuss certain of the existing accounting guidance related to grants of stock options. As with all staff guidance, this letter has not been approved by the Commission.

The accounting guidance applicable to the grants in question was, in most cases, Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" (Opinion 25). The accounting under Opinion 25 relies heavily on the determination of the *measurement date*, which is defined as "the first date on which are known both (1) the number of shares that an individual employee is entitled to receive and (2) the option or purchase price, if any." Under Opinion 25, the final amount of compensation cost of an option is measured as the difference between the exercise price and the market price of the underlying stock at the measurement date. As such, for the purpose of determining compensation cost pursuant to Opinion 25, it is important to determine whether a company's stock option granting practices resulted in the award of stock options with an exercise price that was lower than the market price of the underlying stock at the date on which the terms and recipients of those stock options were determined with finality. The topics addressed in this letter largely relate to questions about whether a company's determination of the measurement date of past stock option awards was appropriate.

This letter expresses only the views of the Office of the Chief Accountant on accounting issues related to Opinion 25, and its limited application should not be extended by analogy or relied upon in any other circumstances.

Certain option granting practices might raise legal or regulatory issues. It should be noted that the views presented herein are limited to the ramifications of these questions to the financial statements (including the footnotes thereto), and that this letter does not address how these questions might affect disclosures outside of the financial statements or the circumstances under which any of these practices could violate laws or regulations. Of course, any analysis will be heavily dependent on the particular facts and circumstances of each company, and evidence of fraudulent or manipulative conduct would require different or additional analysis.

As can be seen from the views expressed in this letter, the staff believes that many of the issues that have been raised in public disclosures or uncovered in reviews of option granting practices resulted in the grant of in-the-money options and accordingly do have an accounting consequence under Opinion 25. On the other hand, there may also be situations where an at-the-money grant was actually decided with finality, but there were unimportant delays in the completion of administrative procedures to document the grant that did not involve misrepresentation of the option granting actions. In those situations, if compensation cost would not have otherwise been recorded pursuant to Opinion 25, short delays in completing the administrative procedures to finalize the grant would not result in an accounting consequence.

The staff's views are presented in several sections. In the discussion regarding each issue, we briefly describe the issue and the application of the applicable accounting guidance. For ease of discussion, each section of the letter addresses a particular question or issue on its own, and implicitly assumes no other issues exist. That is, we have not attempted to provide specific discussion on all possible combinations of issues that might arise. Therefore, companies may need to consider the views expressed in multiple sections of the letter. As always, we encourage companies that have questions about the application of the accounting literature to consult with us. Instructions for doing so may be found at http://www.sec.gov/about/offices/oca/ocaaccount.htm.

### A. Dating an Option Award to Predate the Actual Award Date

As noted previously, pursuant to paragraph 10(b) of Opinion 25, the measurement date for determining the compensation cost of a stock option is the first date on which both of the following are known: (1) the number of options that an individual employee is entitled to receive and (2) the option or purchase price. Thus, even if documents related to an award of options are dated as of an earlier date, the measurement date cannot occur until the date the terms of the award and its recipient are actually determined. As such, dating the underlying stock option grant documents as of a date prior to the date on which the terms of the award and its recipient are determined does not affect the appropriate measurement date under Opinion 25.

### B. Option Grants with Administrative Delays

In most instances, the determination of the measurement date of a stock

option involves little or no uncertainty. Typically, a company's corporate governance provisions, stock option plans, and applicable laws specify the actions required in order to effect the grant of a stock option (collectively referred to as "required granting actions"). Absent provisions of the option or company practices that indicate the terms of the award could change at a later date, the date when these actions are completed in full has generally been regarded as the measurement date.

However, we understand that some companies have accounted for their option grants using a measurement date that is other than the date at which all required granting actions have been completed. Two such examples that we have become aware of are as follows.

> a) Companies may have been awarding stock options by obtaining oral authorization from the board of directors (or compensation committee thereof) and subsequently completing the documents evidencing the award at a later date, or
>
> b) Companies may have delegated the authority to award options to a member or committee of management. That member or committee of management determined option awards to be made to subordinates within specific parameters previously communicated by the board of directors (or compensation committee thereof) and obtained any appropriate approvals at a later date.

The delay in completion of all required granting actions suggests that options terms may not have been final until the completion of those actions. Nonetheless, some companies that utilized the practices described above have asserted that the measurement date occurred before the required granting actions were completed because all option terms and recipients were final and known at an earlier date, and the completion of required granting actions represented only an administrative delay, rather than a period during which any of the terms of the award remained under consideration or subject to change.

The staff believes that a conclusion that a measurement date occurred before the completion of required granting actions must be considered carefully, as the fact that the applicable corporate governance provisions, terms of the stock option plans, or applicable laws require certain procedures to be completed in order to effect a stock option grant suggests that option terms may not have been final (or "known") until those procedures were completed. Question 18 of FASB Interpretation No. 44, "Accounting for Certain Transactions Involving Stock Compensation" (Interpretation 44) addresses a similar circumstance, noting that a measurement date for an option cannot occur before shareholder approval except in the very limited circumstance that management and the board of directors control sufficient shareholder votes to approve the plan. That guidance illustrates the underlying principle that the terms of a stock option cannot be considered known and no longer subject to change until the persons empowered to make grants have determined, *with finality*, the terms and recipients of those awards.

In many cases, when options were awarded before (or in the absence of) completion of required granting actions, the terms cannot be considered to have been determined with finality until (and unless) such actions were

completed. Indeed, as evidenced by some of the option granting practices and patterns of conduct that the staff has become aware of, awarding options in a manner that did not comply with the required granting actions does suggest that the terms and recipients of the options may have been subject to change. For example, in the event that the company's stock price declined prior to finalizing the required granting actions, the company may have retracted awards (e.g., failed to follow through with the initially determined awards) or lowered the exercise price of options. This type of practice indicates that, for all awards (including those awards for which the terms were not changed), the terms and recipients were not determined with finality (and therefore were not "known") prior to the completion of all required granting actions. Similarly, any evidence indicating that the preparation of documentation was done in a manner calculated to disguise the true nature of the option granting actions would preclude a company from concluding that a measurement date occurred prior to the completion of all required granting actions. **If a company operated as if the terms of its awards were not final prior to the completion of all required granting actions (such as by retracting awards or changing their terms), the staff believes the company should conclude that the measurement date for all of its awards (including those awards that were not changed) would be delayed until the completion of all required granting actions.**

On the other hand, in certain instances where a company's facts, circumstances, and pattern of conduct evidence that the terms and recipients of a stock option award were determined with finality on an earlier date prior to the completion of all required granting actions, it may be appropriate to conclude that a measurement date under Opinion 25 occurred prior to the completion of these actions. This would only be the case, however, when a company's facts, circumstances, and pattern of conduct make clear that the company considered the terms and recipients of the awards to be *fixed and unchangeable* at the earlier date. The practices described in the preceding paragraph would, of course, preclude a company from concluding that a measurement date occurred prior to the completion of all required granting actions.

In evaluating whether a company's facts and circumstances do support a conclusion that the terms of stock option awards were fixed ("known") prior to the completion of all required granting actions, it is important that all information be considered. As previously noted, the fact that such actions were not yet completed suggests that the terms may not have been final. As such, we believe that the existence of other evidence indicating that option terms or recipients were not yet considered final until all required granting actions were complete would make a conclusion that a measurement date occurred at an earlier time difficult to reach. Reference should be made to Section G of this letter for a discussion of certain factors that should be considered in this analysis, such as the company's pattern of historical stock option grants and the presence or absence of documentation of past stock option granting actions.

Any analysis will be heavily dependent upon the particular facts and circumstances of each company, and evidence of fraudulent or manipulative conduct would affect the analysis. Additionally, as a company's practices may have varied for different groups of employees or categories of awards, the staff recognizes that a company may reach different conclusions with

respect to these matters for different employee groups or award categories. Of course, any changes to an award subsequent to the completion of required granting actions must be evaluated to determine whether a modification (such as a repricing) or cancellation has occurred. We encourage companies to discuss unique facts and circumstances with the staff.

### C. Validity of Prior Grants

We understand that, in certain circumstances, the validity of past option grants has been called into question, even though both the company and the affected employees have and continue to comply with the terms of such options. For example, an option plan may preclude grants that are in-the-money at the grant date, or may contain a cap on the number of options that may be issued. Notwithstanding these restrictions, options that may not have complied with the terms of the plan were awarded to employees. This could arise due to some of the practices described in this letter.

Questions have arisen as to whether an option can be accounted for as a fixed option with a measurement date on the date that the terms and recipient of the award were determined if uncertainty exists as to the validity of the grant. Specifically, the following questions have arisen:

> a) If, for example, a shareholder-approved option plan only permits at-the-money grants, some have questioned whether the compensation committee may have lacked the authority under the entity's corporate governance procedures to authorize an in-the-money grant. If that were the case, under the plan, only the shareholders had the ability to approve such a grant and shareholder approval was not obtained. Pursuant to Question 18 of Interpretation 44, absent such authorization, it is possible that a measurement date did not occur at the date that the terms and recipient of the award were determined.
>
> b) Some have questioned whether the non-compliance of options with the company's option plan may create uncertainty as to whether the company will ultimately have the ability to settle the award in stock or instead may be required to settle the award in cash. Absent an ability to settle the award in stock, it is possible that the option would be accounted for as a cash-settled stock appreciation right pursuant to FASB Interpretation No. 28, "Accounting for Stock Appreciation Rights and Other Variable Stock Option or Award Plans."

We understand that, in many of these cases, (a) the company has, as applicable, been honoring the awards and settling in stock, (b) the company intends to honor outstanding unexercised awards and has a reasonable basis to conclude that the most likely outcome is that the awards will be honored, and (c) the company intends to settle the outstanding unexercised awards in stock and has a reasonable basis to conclude that it will be able to do so (even if such settlement is not entirely within the company's control). In those circumstances, the staff believes that the substantive arrangement that is mutually understood by both the company and its employees represents the underlying economic substance of the past option grants, and should serve as the basis for the company's accounting. Accordingly, assuming all other conditions for the establishment of a measurement date have been satisfied, the staff

believes it would be appropriate to account for the awards as fixed options with a measurement date on the date that the terms and recipients were determined with finality. While legal opinions regarding the validity of the option grant and the company's ability to honor the award would be helpful, the staff does not believe that a company would necessarily be required to obtain a legal opinion in order to reach these accounting conclusions.

When a company either does not intend to or does not have a reasonable basis to conclude that it will be able to honor the award or settle it in stock, further analysis of the facts and circumstances would be necessary to determine the appropriate accounting for the options. The staff understands that significant uncertainty as to a company's ability to honor options arises more often for grants that were made to senior officers of the company (particularly officers who were involved in the option granting process), and less often for grants made to rank-and-file employees. Accordingly, the staff believes that the need for a legal analysis may be greater when questions exist as to the validity of grants made to senior officers who participated in the option granting process.

### D. Uncertainty as to Individual Award Recipients

We understand that some companies may have approved option awards before the number of options to be granted to each individual employee was finalized. For example, the compensation committee may have approved an award by authorizing an aggregate number of options to be granted prior to the preparation of a final list of individual employee recipients. In these cases, the allocation of options to individual employees was completed by management after the award approval date, or the unallocated options were reserved for grants to future employees. Pursuant to paragraph 10(b) of Opinion 25, no measurement date can occur until "the number of shares that an individual employee is entitled to receive" is known.

In certain circumstances, the approved award may contain sufficient specificity to determine the number of options to be allocated to individual employees, notwithstanding the absence of a detailed employee list. If management's role was limited to ensuring that an allocation was made in accordance with definitive instructions (e.g., the approved award specified the number of options to be granted based on an individual's level within the organization), the measurement date could appropriately be the date the award was approved. However, if management was provided with discretion in determining the number of options to be allocated to each individual employee, a measurement date could not occur for such options prior to the date on which the allocation to the individual employees was finalized. If the allocation of a portion of the award is specified at the award approval date with the allocation of the remainder left to the discretion of management, the measurement date could appropriately be the date the award was approved only for those options whose allocation was specified.

The staff also has become aware that some companies may have changed the list of recipients or the number of options allocated to each recipient subsequent to the preparation of the initial list at the award approval date. When changes to a list are made subsequent to the preparation of the list that was prepared on the award approval date, based on an evaluation of the facts and circumstances, the staff believes companies should conclude

that either (a) the list that was prepared on the award approval date did not constitute a grant, in which case the measurement date for the entire award would be delayed until a final list has been determined or (b) the list that was prepared on the award approval date constituted a grant, in which case any subsequent changes to the list would be evaluated to determine whether a modification (such as a repricing) or cancellation has occurred. When a company determines that a repricing occurred, variable accounting should be applied to the option from the date of modification to the date the award is exercised, is forfeited, or expires unexercised.

### E. Exercise Price Set by Reference to a Future Market Price

Some companies have awarded options with provisions designed to protect an employee from immediate declines in the stock price. Typically, these awards do not have a stated exercise price at the award approval date but instead include a formula for establishing the exercise price. For example, an award may establish an exercise price as the lowest market price of the company's stock over a 30-day period beginning with the award approval date. If the market price of the company's stock increases following the award approval date, the exercise price will be equal to the price of the company's stock on the award approval date. If the market price of the company's stock declines following the award approval date, the exercise price will be equal to the lowest price of the company's stock during the 30-day period following the award approval date.

Pursuant to paragraph 10(b) of Opinion 25 and Question 11(a) of Interpretation 44, if the original terms of a stock option award provide for a reduction to the award's exercise price if a specified future event or condition occurs, variable accounting would be required from the award approval date until that uncertainty is resolved. However, a measurement date would occur and variable accounting would cease at the date the contingency is resolved or the contingency provision expires. In the fact pattern described above, the amount of compensation cost related to the option would be the difference between the market price of the underlying stock at the end of the 30-day contingency period and the lowest market price of the stock during the contingency period, which would be the exercise price of the option.

In contrast, if the original terms of an award do not include terms that would cause an adjustment of the exercise price upon the occurrence of a contingent event and the exercise price is nonetheless reduced after the award approval date, the staff believes a repricing of the award has occurred. Variable accounting would therefore be appropriate for the option from the date of modification to the date the award is exercised, is forfeited, or expires unexercised.

It should be noted that the views expressed in this section of the letter do not apply to arrangements that meet the criteria for a noncompensatory plan pursuant to paragraph 7 of Opinion 25.

### F. Grants Prior to the Commencement of Employment

Many companies grant options to new employees at the commencement of their employment. We understand that, in some cases, companies have determined the terms and conditions of awards to certain new employees

prior to the commencement of employment. For example, the exercise price for a stock option may have been determined based on the market price of the stock on the date an offer of employment was extended to and accepted by an individual, with employment commencing subsequent to the date of offer. The appropriate accounting in this circumstance will depend upon whether the individual performs services in the capacity of a non-employee prior to commencing employment. If awards were provided to individuals who rendered services to the company prior to the commencement of employment, the provisions of FASB Statement No. 123, "Accounting for Stock-Based Compensation" (Statement 123) and EITF Issue No. 96-18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services" should be applied. Once the individual becomes an employee, the accounting for the change in grantee status should be evaluated pursuant to Interpretation 44.

If the individual provided no services to the company prior to commencing employment, the staff believes that, generally, a measurement date cannot occur prior to the date that the individual begins rendering employee service in exchange for the stock options. Opinion 25 applies only to share-based payment awards issued to *employees*; as clarified by Question 1(b) of Interpretation 44, prior to commencing employment, the individual would not be considered an employee. As such, the staff believes compensation cost for a fixed stock option would be measured based on the difference between the exercise price of the option and the market price of the underlying stock at the commencement of employment.

### G. Documentation of Option Granting Activities is Incomplete or Cannot be Located

We understand that, in the course of reviewing their option-granting activities several years after the fact, some registrants have not been able to locate definitive and complete documentation evidencing certain of their past option granting activities. For example, (a) the legal documents evidencing past grants may not exist in the company's records, (b) contemporaneous documentation of the date on which a telephonic or in-person meeting of the compensation committee was held may not have been prepared, (c) written documentation includes only "as of" dates, and not the dates the documentation was actually prepared and approved, or (d) the company may have reason to believe that the documentation that is contained in the company's records is not accurate.

The appropriate accounting in circumstances where records cannot be located or may be inaccurate will depend on the particular facts and circumstances. We understand that, in some cases, the lack of documentation or existence of contradictory documentation may lead a company to conclude either that the terms of options cannot reasonably be considered fixed, resulting in the application of variable accounting, or that awards do not substantively exist until the board of directors affirms which awards will be honored. However, the staff does not believe that the lack of complete documentation being available several years after the activities occurred should necessarily result in a "default" to variable accounting or to treating the awards as if they had never been granted. Rather, a company must use *all available relevant information* to form a reasonable conclusion as to the most likely option granting actions that occurred and the dates on

which such actions occurred in determining what to account for. The existence of a pattern of past option grants with an exercise price equal to or near the lowest price of the entity's stock during the time period surrounding those grants could indicate that the terms of those grants were determined with hindsight. Further, in some cases, the absence of documentation, in combination with other relevant factors, may provide evidence of fraudulent conduct. The staff expresses no view in this letter as to the manner in which various facts and forms of evidence should be evaluated under Opinion 25 to determine whether a company's historical accounting records are accurate. We encourage companies to discuss unique facts and circumstances with the staff.

### H. Timing of Option Grants

Some companies appear to have engaged in techniques to select their award dates in coordination with the disclosure of information to the public. For example, a company may have granted stock options while it knew of material non-public information that was likely to result in an increase to the stock price. Alternatively, a company may have delayed the grant of options until after material information that was expected to result in a decrease to the stock price was issued. To the extent such practices were used, questions have been raised as to whether an adjustment would be necessary to the market price of the stock at the measurement date for the purpose of measuring compensation cost. Pursuant to paragraph 10(a) of Opinion 25, the staff believes that compensation cost must be computed on the measurement date by reference to the unadjusted market price of a share of stock of the same class that trades freely in an established market.

### I. Changes to Option Grants Due to the Release of New Information

The staff is aware that some companies may have changed the terms of previously granted awards due to the release of new information to the public. For example, a company may have granted options to employees at one date, subsequently released information to the public that caused the stock price to decline, and lowered the exercise price of the previously granted options to the market price immediately following the release of the unfavorable news. In that circumstance, the staff believes a repricing of the award has occurred. Variable accounting should therefore be applied to the option from the date of modification to the date the award is exercised, is forfeited, or expires unexercised.

### J. Income Tax Benefits Related to Options

We understand that some companies may have documented option exercises as though such exercises occurred as of a date other than the actual date of exercise, which resulted in a reduction of the amount of income taxes due by the employee, with a corresponding reduction in the income tax benefit received by the company. Pursuant to paragraph 17 of Opinion 25, any tax deduction that the company is entitled to receive in excess of the compensation cost recorded for financial reporting purposes is recorded as an addition to paid-in capital. Accordingly, the staff believes that the company should record the excess tax benefit it otherwise would have been entitled to receive on the actual exercise date as an addition to paid-in capital. Any amount of such benefit forgone by the company due to the mischaracterized exercise, and any other tax obligations of the

employee paid by the company, should be recorded as compensation cost to the employee.

We also understand that the discovery of information about option practices, such as the practices discussed in the previous paragraphs, have caused some companies to question the availability or amount of income tax deductions related to options, the period in which those deductions would be available, and the possibility of other obligations including interest, penalties, and additional payroll taxes. Prior to the adoption of FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes," companies should consider the guidance in FASB Statement No. 5, "Accounting for Contingencies" and FASB Statement No. 109, "Accounting for Income Taxes" with respect to these tax contingencies.

The determination of the grant date for income tax purposes may differ from the determination of the measurement date pursuant to Opinion 25. The income tax determination will depend upon the statutes, laws, and regulations of the jurisdictions in which a company operates. The staff expresses no view as to the appropriate grant date of an option for income tax purposes, or on the manner in which the issues addressed in this letter should be evaluated in regard to income tax considerations.

\* \* \* \* \*

The views noted herein are based upon and in accordance with pre-existing accounting literature. Companies that determine their prior accounting to be in error and that those errors are material should restate their financial statements to reflect the correction of those errors. Evaluation of materiality requires a consideration of all relevant facts and circumstances. Qualitative factors (for example, if the error is intentional) may cause misstatements of quantitatively small amounts to be material. When disclosures of these issues are made, it is important that the registrant discuss not only the accounting restatements, but also the circumstances that gave rise to the errors.

Generally, previously filed reports containing financial statements determined to be materially misstated require amendment. The staff understands that errors related to the issues addressed in this letter may affect several years of filings, and that companies may believe that amending all of the affected filings is unnecessary. Companies that propose to correct material errors without amending all previously filed reports should contact the staff of the Division of Corporation Finance. No amendment of previously filed reports is necessary to correct prior financial statements for immaterial errors. Such corrections, if necessary, may be made the next time the registrant files the prior financial statements.

Registrants that have applied Opinion 25 in historical periods for recognition purposes and provided the footnote disclosures required by Statement 123 may determine that the amount of pro forma compensation cost previously disclosed pursuant to Statement 123 was in error. Although the staff's views expressed herein are discussed in the context of awards accounted for pursuant to Opinion 25, these views may also be useful to registrants in their determination of the grant date and measurement date under Statement 123. While a complete reconsideration of measurements made under Statement 123 to adjust inputs such as volatility and expected term

may not be possible, the staff would expect registrants to make appropriate adjustments to the input related to the market price of the underlying stock used in the measurement of fair value under Statement 123. If a registrant determines that material errors existed in the amount of pro forma compensation cost previously disclosed, the staff believes that the registrant should correct the footnote disclosures provided for prior periods. It should be noted that, because of differences in standards, the views expressed herein are not necessarily representative of the staff's views with respect to the determination of the grant date and measurement date pursuant to FASB Statement No. 123R, "Share-Based Payment."

As you know, the staff is continuing to consider these and related matters and may have further discussions on the accounting for stock options with companies and their independent auditors. We encourage companies that wish to discuss the particular facts and circumstances of their stock option grants and the accounting conclusions they have reached to contact the Office of the Chief Accountant.

Further questions about these matters should be directed to Joe Ucuzoglu, Professional Accounting Fellow in the Office of the Chief Accountant (202-551-5301), or Alison Spivey, Associate Chief Accountant in the Office of the Chief Accountant (202-551-5305). Questions on filing requirements should be directed to the staff of the Division of Corporation Finance (202-551-3400).

Sincerely,

Conrad Hewitt
Chief Accountant

    cc: Carol Stacey, Chief Accountant, Division of Corporation Finance
    Robert Herz, Chairman, Financial Accounting Standards Board
    Mark Olson, Chairman, Public Company Accounting Oversight Board

*http://www.sec.gov/info/accountants/staffletters/fei_aicpa091906.htm*