John D. Cline (State Bar No. 237759)
K.C. Maxwell (State Bar No. 214701)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104-1500
Telephone: (415) 626-3939
Facsimile: (415) 875-5700
E-mail: jcline@jonesday.com
kcmaxwell@jonesday.com

Andrew T. Solomon (*Pro Hac Vice*)
Franklin B. Velie (*Pro Hac Vice*)
SULLIVAN & WORCESTER LLP
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 660-3000
Facsimile: (212) 660-3001
E-mail: asolomon@sandw.com
fvelie@sandw.com

Attorneys for Defendant
AMNON LANDAN

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

vs.

MERCURY INTERACTIVE, LLC (F/K/A MERCURY INTERACTIVE, INC.), AMNON LANDAN, SHARLENE ABRAMS, DOUGLAS SMITH and SUSAN SKAER,

Defendants.

**CASE NO. 5:07-CV-02822 JF**

**NOTICE OF MOTION AND MOTION OF DEFENDANT AMNON LANDAN TO DISMISS AND MOTION FOR A MORE DEFINITE STATEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Date: March 14, 2008
Time: 10:30 a.m.
Place: Courtroom 3
Judge: Honorable Jeremy D. Fogel

Complaint Filed: May 31, 2007
Trial Date: None

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on Friday, March 14, 2008 at 10:30 a.m., or as soon thereafter as the matter may be heard, in Courtroom 3 of the United States District Court for the Northern District of California, located at 280 South First Street, San Jose, California 95113, defendant Amnon Landan will move, and hereby does move, this Court for an order dismissing the First and Second Claims for Relief under Fed. R. Civ. P. 9(b) and 12(b)(6) or, in the alternative, for a more definite statement under Fed. R. Civ. P. 12(e).

This motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, the supporting Declaration of John D. Cline, and the records and files herein; and such other evidence and argument as may be presented at the hearing on this motion.

Dated: October 1, 2007

Respectfully submitted,

JONES DAY

By: /s/ John D. Cline
John D. Cline

Attorneys for Defendant
AMNON LANDAN

# TABLE OF CONTENTS

Page

STATEMENT OF THE ISSUES .......... 1

STATEMENT OF FACTS .......... 1

I. VALUING OPTIONS UNDER THE STOCK OPTION PLANS USES A DIFFERENT METHODOLOGY THAN THE REQUIREMENTS OF GAAP .......... 2

II. THE SEC ALLEGES THAT MERCURY EXECUTIVES PRICED OPTIONS, USING HINDSIGHT, TO OBTAIN THE LOWEST POSSIBLE EXERCISE PRICE .......... 3

III. MERCURY'S STOCK OPTION GRANTING PROCESS DISPLAYS NO BADGES OF FRAUD .......... 5

IV. MERCURY RESTATES ITS 2002-2004 FINANCIALS DUE TO ITS FAILURE TO RECORD STOCK OPTION EXPENSES .......... 7

V. LANDAN DID NOT MISLEAD MERCURY'S AUDITORS .......... 8

VI. LANDAN DID NOT KNOW THAT MERCURY HAD FAILED TO ACCOUNT FOR THE COMPANY'S STOCK OPTION GRANTS IN ACCORDANCE WITH GAAP .......... 9

ARGUMENT .......... 9

I. STANDARD ON A MOTION TO DISMISS .......... 9

II. THE SEC HAS FAILED TO ADEQUATELY PLEAD SCIENTER AGAINST LANDAN .......... 10

CONCLUSION .......... 13

# TABLE OF AUTHORITIES

Page

## Cases

*Aaron v. S.E.C.*, 446 U.S. 680 (1980) ..... 10

*Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422 (6th Cir.1980) ..... 12

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ..... 11

*Clegg v. Cult Awareness Network*, 18 F.3d 752 (9th Cir. 1994) ..... 9

*Conley v. Gibson*, 355 U.S. 41 (1957) ..... 11

*Ditech Networks, Inc. Derivative Litig*, No. C 06-5157JF, 2007 WL 2070300 (N.D. Cal. July 16, 2007) ..... 11

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ..... 11

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ..... 10, 11

*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir. 1990) ..... 10, 11

*In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541 (9th Cir.1994) ..... 11

*In re Software Toolworks Inc.*, 50 F.3d 615 (9th Cir. 1994) ..... 12

*In re Verisign, Inc., Derivative Litig.*, No. C 06-4165 PJH, 2007 WL 2705221 (N.D. Cal. 2007) ..... 13

*In re. Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999) ..... 10, 12

*Jenkins v. McKeithen*, 395 U.S. 411 (1969) ..... 9

*Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015 (5th Cir. 1996) ..... 12

*N. Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578 (9th Cir. 1983) ..... 10

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*S.E.C. v. Dain Rauscher, Inc.*, 254 F.3d 852 (9th Cir. 2001) .......... 10

*S.E.C. v. Price Waterhouse*, 797 F. Supp. 1217 (S.D.N.Y. 1992) .......... 12

*Shad v. Dean Witter Reynolds*, 799 F.2d 525 (9th Cir. 1986) .......... 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) .......... 11

*Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273 (11th Cir. 2006) .......... 10

**Statutes**

Fed. R. Civ. P. 12(b)(6) .......... 1, 9

Fed. R. Civ. P. 12(e) .......... 1, 10

Fed. R. Civ. P. 8(a)(2) .......... 11

Fed. R. Civ. P. 9(b) .......... 1, 11

**Other Authorities**

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (2d ed. 1997) .......... 10

Holman W. Jenkins, Jr., "Apple's Gore," *The Wall Street Journal*, p. A16 (January 10, 2007) .......... 1

Defendant Amnon Landan respectfully submits this memorandum of law in support of his motion for an order dismissing the Complaint, under Fed. R. Civ. P. 12(b)(6) for failure to plead scienter as required under Fed. R. Civ. P. 9(b), or, in the alternative, under Fed. R. Civ. P. 12(e), for a more definite statement.

**STATEMENT OF THE ISSUES**

1. Whether the First and Second Claims for Relief should be dismissed under Fed. R. Civ. P. 9(b) and 12(b)(6) for failure adequately to allege scienter.

2. In the alternative, whether Plaintiff should be required under Fed. R. Civ. P. 12(e) to provide a more definite statement of its First and Second Claims for Relief.

**STATEMENT OF FACTS**

> Much reporting has made it sound like backdating was the equivalent of executives taking erasers and white-out to their paychecks to add a couple of zeros—and public understanding still suffers from this bum steer. *But all that backdating comes down to is a nonmaterial accounting irregularity (yes, readers, accounting rules should be obeyed!) involving a defective judgment about whether "in the money" options needed to undergo expensing.*[1]

Holman W. Jenkins, Jr., "Apple's Gore," *The Wall Street Journal*, p. A16 (January 10, 2007).

At Mercury, there were no "erasers." No "white-out." No "badges of fraud." The practice of granting options to executives and rank-and-file employees at Mercury was an open practice. The documents approving the grants—the "Unanimous Written Consents"—far from being deceptive, disclosed *on their face* that the grants did not take place on the date of approval, but on a prior date, an "as of" date.

There is no question that Mercury should have recorded a compensation expense associated with its stock option grants. As it happened, the Company had to correct that error with the July 2005 restatement. But an error in Generally Accepted Accounting Principles ("GAAP") accounting is not securities fraud. And Amnon Landan, who is an engineer, not a lawyer or accountant, had no way of knowing that the Company got it wrong. Nothing in the Complaint shows otherwise.

[1] Unless otherwise indicated, all emphasis is supplied.

**I. VALUING OPTIONS UNDER THE STOCK OPTION PLANS USES A DIFFERENT METHODOLOGY THAN THE REQUIREMENTS OF GAAP.**

The *grant* of employee stock options at Mercury was governed by the requirements of Mercury's stock option plans; that is a matter of internal corporate governance. The *accounting* for those grants was governed by the accounting rules dictated by GAAP. The SEC's Complaint conflates these two distinct sets of rules and procedures. It argues that the Company's alleged violation of the stock option plan means (by that fact alone) that Landan intended to commit securities fraud. But one does not follow from the other.

Mercury had two stock options plans: the 1989 Plan and the 1999 Plan (the "Option Plans"). (¶16[2]). The Option Plans authorized both non-statutory stock options ("NSOs") and incentive stock options ("ISOs"). (¶¶16-18). Under both Option Plans, ISOs had to be priced "at the money" (or "out of the money"), meaning that the exercise price of the option had to equal (or exceed) the fair market price of the stock as of the grant date. (¶16). NSOs, by contrast, could be awarded "in the money," but not less than 85% of the fair market value of the stock as of the date of grant under the 1989 Plan. (¶16). Under the 1999 Plan, however, NSOs, like ISOs, had to be awarded with exercise prices at the money (or greater). (¶18).

Whether an option is "in the money" or "at the money" depends on the market price of the underlying security, *i.e.*, Mercury's stock price. The Option Plans required the Company to use the stock price on the "date of grant." (¶16). "Date of grant" is defined in the Plans as "*the date on which the Board makes the determination granting such option.*" (¶19).

The "date of grant" for purposes of the Option Plans is different from the date used to assess options under GAAP. Under Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB 25"), the relevant date for measuring an option is the "measurement date." The "measurement date" of an employee stock option is the date on which "the following information is known: (1) the number of options that an individual employee is entitled to receive, and (ii) the exercise price." (¶20). If on the *measurement date* the option is

[2] Paragraph numbers cite to the SEC's Complaint. In accordance with the standards governing Fed. R. Civ. P. 12(b)(6), we treat the allegations in the Complaint as true for these purposes only.

"in the money," the Company must record an expense equal to the "intrinsic value" of that option. (*Id.*). (Intrinsic value is the difference between the stock price on the measurement date and the exercise price of the option.) That "expense" must be recognized over the vesting period of the option. (¶21). It is this "expense" (which is a non-cash charge) that the SEC contends Mercury omitted to disclose through "backdating" in supposed violation of Mercury's Option Plans.

The difference in the definition of "grant date" and "measurement date" means that an option could be "at the money" for purposes of the Option Plan, yet "in the money" for purposes of accounting, or vice versa, or the same. The following hypothetical illustrates this point: on January 15, 2001, with the Company's stock at $10, the board could determine to issue 1,500,000 options to the Company's rank-and-file members with an exercise price of $10. The board could then take one month to determine the allocation of those options among the employees, and make its final determination about that on February 15, 2001. Assume the Company's stock has increased to $15 by that point. For purposes of the Option Plans, the "grant date" could justifiably be January 15, 2001, making all of the options "at the money." But for GAAP, the "measurement date" would be February 15, 2001, making the options "in the money."

## II. THE SEC ALLEGES THAT MERCURY EXECUTIVES PRICED OPTIONS, USING HINDSIGHT, TO OBTAIN THE LOWEST POSSIBLE EXERCISE PRICE.

Mercury followed different procedures for granting options to rank-and-file employees (¶¶22-31) and to executives (¶¶32-36). The Compensation Committee of the Board of Directors made grants to executives. (¶23). The full Board made grants to employees until July 1999 (¶23). After that date, the Stock Option Committee, which included Landan and the Company's CFO (first defendant Abrams, later defendant Smith), made the employee grants. (¶¶23-24). Landan and the other defendants were not members of the Compensation Committee but, according to the SEC, they "exerted substantial influence over the pricing of all of the company's options." (¶25).

The process for granting employee options began with the various managers, who would submit recommendations for how options should be allocated among employees. (¶26). This information ultimately culminated in a list showing the employee names and the proposed amount

of options to be issued to each. (¶26). During this process, the SEC alleges that Landan and Abrams (or Smith) would look back and pick the "grant date" that would be reflected on the options. (¶27). The dates they allegedly selected "coincided with low points of the Company's stock, despite the fact that the date bore no relation to when the grant was actually approved." (¶28). Ultimately, for the employee options, "Landan and Abrams (or later Smith) signed a unanimous written consent representing that the options were granted 'as of' the selected grant date." (¶28). The consents were prepared by the Company's counsel. (¶31).

The SEC contends that this "unanimous written consent," which granted the options "as of" a prior date, created a "*false appearance* that the options were priced in accordance with the company's shareholder-approved stock option plan." (*Id.*). This (a) supposed deception (b) caused the options to be priced less than the fair market value on the "date of grant," which (c) "caused Mercury to incur significant, undisclosed compensation expenses which they [presumably the Company] failed to record in the Company's financial reports in contravention of GAAP." (¶29).

Here, the SEC gets its ABCs wrong. (A) "As of" is the exact opposite of "deceptive." "As of" means, and in fact *clearly discloses*, that the effective date selected is not the date of the action. (B) The "date of grant" is not a GAAP concept. It is a defined term under the Option Plans, which is interpreted by the administrator of the Plan (*see, e.g.,* 1999 Plan at §4(c)). The administrator is the Board of Directors or a Committee of the Board (*see* 1999 Plan at §2(a)).[3] (C) Even if options priced in hindsight violated the terms of the Option Plans, that did not "cause" Mercury to account for the options incorrectly. It was for Mercury's outside accounting experts, including its auditors PricewaterhouseCoopers, to determine the "measurement date" under GAAP principles, and then assess whether the Company had to recognize an expense under APB 25.

Unlike rank-and-file employee options, Landan did not vote on grants to the senior executives. That was the province of the Compensation Committee. (¶33). The SEC alleges that

[3] Copies of the 1989 and 1999 Option Plans are attached as exhibits 1 and 2 of the Declaration of John D. Cline.

Landan was nevertheless involved. He would determine the amount of options to be granted to the senior executives. (¶32). The Compensation Committee would approve the grants either by unanimous written consent or by meeting minutes prepared by the company's general counsel. (¶33, ¶36). Whichever document was used, it would be dated "'as of' a particular day, when in fact no grant or agreement to grant had occurred on that date." (*Id.*). As with the employee grants, the "as of date" coincided with a relative low-point of Mercury's stock. (¶34).

The SEC claims that Landan, Abrams, and Smith selected the "as of" grant date with hindsight, "creating the false appearance that the options were priced in accordance with the company's shareholder-approved stock option plan." (¶34). This, in turn, supposedly caused Mercury to "incur significant, undisclosed compensation expense which they [presumably the Company] failed to record in the Company's financial reports in contravention of GAAP." (¶35).

These allegations are implausible on their face. First, the SEC appears to insinuate that the Compensation Committee, whose members are not defendants in this action, were somehow deceived through this process. (*See* ¶¶33, 36). But no one could have signed a document on one date, but "as of" a prior date, without knowing what was happening. This is especially so, because the SEC alleges that the "backdating" sometimes covered a period of months. In any event, whatever "grant date" the Compensation Committee (not Landan) used, that selection set the exercise prices of the options, but it was not determinative of the "measurement date" for GAAP. One does not "cause" the other. As shown above, they are separate inquiries, by separate parties (the Compensation Committee, on the one hand; the company's outside accounting professionals on the other.

## III. MERCURY'S STOCK OPTION GRANTING PROCESS DISPLAYS NO BADGES OF FRAUD.

To illustrate the option granting process at Mercury, the SEC provides four examples: the grants dated January 1999, April 1999, January 2002, and March 2002. (¶¶47-78). The Complaint's allegations, if true, do demonstrate that the Company's executives, Landan among them, were involved, to varying degrees, in pricing the option grants by selecting dates with the most favorable prices available. (e.g., ¶¶50, 53-54, 69). But the Complaint also shows, beyond

any doubt, that none of them—and certainly not Landan—believed they were engaged in fraudulent conduct.

The Compensation Committee, whose members had no financial stake in the options grants, approved the backdated grants. (¶51). For instance, with respect to the executive grant dated "as of" January 21, 1999 (the "January 1999 Compensation Committee Grant"; ¶¶47-52), the Compensation Committee approved the grant, by telephone, on March 9, 1999. (¶51). If backdated option grants, dated "as of" prior dates, were so clearly in violation of the Option Plans, it is unreasonable to believe that the Compensation Committee, with no stake in the grant, would have been a party to the so-called scheme.

Moreover, the Company's process of selecting favorable grant dates was openly discussed at Mercury, without any hint of concealment. Again, this emerges compellingly and beyond dispute from the SEC's Complaint itself. If Mercury's practice of granting stock options "as of" the most favorable dates were the product of some intentional fraud, would the Manager of Human Resources have written the following email to *all of Mercury's senior managers*?

> Our goal is to ensure the best possible out-come for the employees receiving options in this grant. For this reason we will be delaying communication of the annual grant information for a little longer. I will let you know as soon as we have the grant date and strike price. At that time we will email your approval spreadsheets so you and your management team can let the employees know the details of their grants. (¶65).[4]

If these defendants were engaged in a "scheme" or "deception," innocent emails of this nature would not have been circulated. Indeed, *nothing* in the Complaint shows any attempt by the defendants, and Landan in particular, to conceal the alleged scheme. The SEC labors to create the opposite impression, with a stark and exciting subhead ("The Defendants Concealed the Scheme") introducing a three-paragraph section of the Complaint (¶¶79-81). But *nothing in the*

---

[4] The Complaint reveals numerous other examples as well. On May 5, 1999, the stock option administrator emailed defendant Abrams to determine whether a particular grant date would remain at the April 7 price or be changed. (¶54). A June 1999 email from "Mercury's Israel office" sought to add an employee to "[the] April grant, hopefully to be approved soon." (¶55). On the same day in June, Landan received an email soliciting his approval for the adjustment to the yet-to-be-approved April grant. (¶56). And an August 1999 email openly confirmed the actual grant of April 1999. (¶58).

*succeeding paragraphs supports that dramatic conclusion.* The only supposedly damning "fact" alleged by the SEC is that the defendants filed "false Form 4s," which did not disclose that the options were "in the money." (¶79). But that is circular reasoning, which assumes that defendants knew, at the time, that granting options "as of" prior dates was improper. Moreover, as to Landan, the SEC does not allege that he prepared the Form 4s. (¶79).

In light of the utter absence of *facts,* the SEC pads the empty space with conclusory filler. And so we learn that "Landan, Abrams, Smith and Skaer made false statements and representations to Mercury's auditors, caused Mercury to create false documentation for stock option grants and file materially false and misleading filing with the commission, *as described below.*" (¶ 79). But, notwithstanding its promise, the SEC never "describes below" what misstatements or false actions Landan took to deceive Mercury's auditors or to corrupt its public filings with respect to stock option grants.

## IV. MERCURY RESTATES ITS 2002-2004 FINANCIALS DUE TO ITS FAILURE TO RECORD STOCK OPTION EXPENSES.

On July 3, 2006, Mercury restated its financial results for the years 2004, 2003, and 2002. (¶101). The restatement resulted from the Company's failure to record compensation expenses associated with Mercury's "backdated' stock option grants from 1997 to 2002. (¶1). In its Form 10-Ks and Annual Reports from 1997 to 2001, Mercury had disclosed that the Company's policy was to grant options with "an exercise price equal to the quoted market price of its stock on the *grant date.*" (¶99). That was undoubtedly correct, insofar as the Company had set the grant dates using hindsight. The next sentence was also correct as far as it went: "Accordingly, no compensation cost has been recognized in the statements of operations." (*Id.*). But, of course, under GAAP standards, there was indeed a compensation cost, and the Company should have recognized it.

It is now known that the "grant date" selected for purposes of the Option Plans did not qualify as the "measurement date" for purposes of APB 25. As evidenced by the restatement, the Company made an error in its GAAP accounting, and Landan, as CEO, "reviewed and signed" these financial reports. (¶102).

Mercury's failure to recognize stock option grants from 1997 to 2002 as "in the money" allegedly had a flow-through effect on Mercury's filings in 2002, 2003, 2004, and 2005, even though no options were "backdated" after April 2002. (¶100). Landan and Smith certified that the 2003-2005 annual reports "fairly present in all material respects the financial condition and results of operations" of Mercury. (¶104). The SEC alleges that Landan and Smith had "ample information at the time they signed the certifications that they were not true." (¶104). But it does not allege how, exactly, these financial statements were materially misleading as to Mercury's "financial condition" or "results of operations." Further, and more to the point, the SEC does not allege—nor could it—that stock option grants from 1997 to 2002 had a material impact on Mercury's "financial condition" or "operations" in 2003 to 2005. And, finally, it does not allege how Landan, this non-accountant, "knew" that a practice openly embraced at the Company, and approved by Mercury's outside accounting professionals, was somehow "fraudulent."

## V. LANDAN DID NOT MISLEAD MERCURY'S AUDITORS.

Apparently ready to give Mercury's outside accounting experts a pass, the SEC alleges that Mercury's auditors were somehow misled by Mercury's stock option granting practices. (¶¶107-111). The unanimous written consents ("UWCs") and meeting minutes relating to the grants were allegedly supplied to Mercury's external auditors. (¶¶107-08). But, as shown by the SEC's own Complaint, "backdated" options were no secret at Mercury, and the documents effecting the grants, the UWCs and meeting minutes, were clearly identified as being effective "as of" prior dates, with prices selected – every single time – at the lowest available point. Yet, somehow, Mercury's auditors were deceived.

But even if the auditors had been deceived—and there is no allegation that supports it—the Complaint contains nothing in any event to suggest that Landan personally lied to the auditors or provided false information. (¶108). The *only* communication alleged between Landan and the Auditors were form "representation letters," confirming that the Company's financials were "fairly presented and that there were no fraudulent practices ongoing at the company." (¶109). Again, nowhere in the Complaint does the SEC allege that Landan knew that the Company's financials were inaccurate, or that any fraud was on-going.

## VI. LANDAN DID NOT KNOW THAT MERCURY HAD FAILED TO ACCOUNT FOR THE COMPANY'S STOCK OPTION GRANTS IN ACCORDANCE WITH GAAP.

Until his resignation in November 2005, defendant Landan was the Chief Executive Officer and Chairman of the Board of Directors of Mercury. (¶11). He started with Mercury in 1989, joined the Board in February 1996, and became CEO in 1997. (*Id.*). Landan is not an accountant or lawyer, having joined Mercury as an engineer, with a B.Sc. in Computer Science from the Technion-Israel Institute of Technology. (*Id.*).

The SEC bases its contention that Landan was aware of the Plans' requirement of pricing shares at "100% percent of fair market value on the date of grant," and the correct accounting treatment for options, on his attendance at a March 1999 Board meeting, where the pricing issue was allegedly discussed. (¶¶37-38). The SEC does not allege a single statement from that meeting that should have alerted Landan to an accounting problem with stock options.[5]

The SEC cites other statements by executives in which they explained the basic rule that "in the money" options create an accounting charge. (¶¶43-44). Leaving aside the inherent unfairness of isolating a line or two from a document, sifted from reams of documents that were created over nearly a decade, it must be said that knowledge of a basic "rule" does not inform a CEO, who is a computer scientist, whether the Company actually accounted for options correctly. To know that, the CEO would have had to be intimately familiar with APB 25 and, in particular, the definition of the "measurement date." The SEC makes no such allegation.

# ARGUMENT

## I. STANDARD ON A MOTION TO DISMISS.

On a motion to dismiss, a court must take plaintiff's allegations as true, and construe the complaint in the light most favorable to the plaintiff. Fed. R. Civ. P. 12(b)(6); *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). The court need not, however, accept as true legal conclusions framed as facts, unless they can be reasonably drawn from the facts alleged. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994); *see also* Charles Alan Wright &

[5] And not a single statement made at that meeting, which the SEC relies on to create an inference of knowledge, was attributed to Landan (¶¶41-42).

Arthur R. Miller, *Federal Practice and Procedure* § 1357 (2d ed. 1997) (deciding 12(b)(6) motions, courts have rejected "legal conclusions," "unsupported conclusions," "unwarranted inferences," "unwarranted deductions," "footless conclusions of law," or "sweeping legal conclusions cast in the form of factual allegations"). In considering the motion, the court's review is limited to the face of the complaint, matters judicially noticeable, *N. Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983), and any documents "incorporat[ed] by reference" in the complaint, which are authentic beyond dispute, *In re. Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999).

## II. THE SEC HAS FAILED TO ADEQUATELY PLEAD SCIENTER AGAINST LANDAN.

The First and Second Claims in the Complaint allege securities fraud. In bringing these serious charges, the SEC does not identify which specific factual allegations or even, more generally, which transactions give rise to the fraud alleged. This defect, often criticized as "shotgun pleading,"[6] at a minimum warrants an order directing the SEC to provide a more definite statement under Fed. R. Civ. P. 12(e).[7] If, however, the Court considers the two securities fraud claims in their current "shotgun" form, they must be dismissed for failure to plead scienter.

The SEC's claims under Section 10 of the 1934 Securities Exchange Act, Rule 10b-5, and Section 17(a) of the 1933 Securities Act require "scienter" as an element of proof. *S.E.C. v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001) (citing *Aaron v. S.E.C.*, 446 U.S. 680, 701-02 (1980)). Scienter is the "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 n. 12, 96 S.Ct. 1375, 1381 n.12 (1976). In the Ninth Circuit, this is satisfied if the SEC proves that the defendant acted recklessly in connection with the fraud. *Shad v. Dean Witter Reynolds*, 799 F.2d 525, 530 (9th Cir. 1986); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990). Recklessness, in this context is:

---

[6] *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1280 (11th Cir. 2006).

[7] On this point, Landan joins and incorporates by reference that portion of the memorandum of law filed by Sharlene Abrams.

> a highly unreasonable omission [act, or statement], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Hollinger*, 914 F.2d at 1569 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1044-45 (7th Cir. 1977)).[8]

The SEC is not subject to the heightened pleading standards of the PSLRA, but must still comply with the strictures of Fed. R. Civ. P. 9(b). Under Ninth Circuit precedent that is now, we respectfully submit, effectively overruled by recent Supreme Court authority, to satisfy the Rule 9(b) requirements as to scienter, "plaintiffs may aver scienter generally, just as the rule states-that is, simply by saying that scienter existed." *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547 (9th Cir. 1994) (en banc). But *Glenfed* applied Rule 9(b) in a vacuum, divorced from the general requirements of Fed. R. Civ. P. 8(a)(2). Since *Glenfed*, the Supreme Court has made it abundantly clear that Fed. R. Civ. P. 8(a)(2) requires more than a conclusory recitation of a critical element of a cause of action. *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007); *see also Ditech Networks, Inc. Derivative Litig*, No. C 06-5157JF, 2007 WL 2070300, at *6 (N.D. Cal. July 16, 2007) ("[T]he conclusory allegation that each individual defendant had knowledge or acted with reckless disregard of the truth is insufficient to state a claim even under the more liberal Rule 12(b)(6) standard."). A plaintiff must also provide "fair notice of what the plaintiff's claim is and the grounds upon which it rests," *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)), and facts suggesting that its right to relief is more than merely conceivable, but plausible on its face. *See Bell Atlantic,* 127 S. Ct. at 1974. Even with its liberal language, articulated long before *Bell Atlantic* and *Dura*, the Ninth Circuit, in *Glenfed,* concedes that a complaint must allege the

---

[8] Every Court of Appeals has found that some form of "recklessness" satisfies the scienter requirement for Section 10 liability, but the issue is not settled. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, n. 12 (1976); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2507 n.3 (2007). While accepting that standard for purposes of this motion only, Landan's position is that recklessness is not enough to establish civil liability for securities fraud, and that the SEC must prove that Landan acted with actual intent to deceive.

circumstances constituting fraud with sufficient particularity such that, as a general matter, "an inference of scienter could be drawn." 42 F.3d at 1546.

The SEC's case against Landan for securities fraud does not pass the plausibility test. The fact that the Company failed to comply with GAAP and had to restate its prior financials, standing alone, is not evidence of Landan's scienter. *See, e.g., In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir. 1994) ("the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter") (citations and internal quotation marks omitted); *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 432 (6th Cir.1980); *S.E.C. v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992) (misapplication of accounting principles by an independent auditor does not establish scienter); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1020 (5th Cir. 1996).

Aside from the alleged GAAP violation, nothing is left to make a *plausible* case for fraud against Landan. Notably absent from the Complaint are any actual badges of fraud. Frauds are done in secret and involve concealment. Yet Mercury's procedure for selecting advantageous grant dates was openly practiced. Employees at all levels were involved in relevant communications. The SEC alleges no facts showing any kind of cover-up. Frauds also involve false documentation. Yet the SEC has alleged no facts of misdated (as opposed to "as of" dated) or destroyed documents.

If Mercury's executives were engaged in a fraud, the independent directors or auditors would have detected it. The independent directors of the Board, who comprised the Compensation Committee, were hardly deceived: "as of" is crystal clear in its meaning. Nor could they have been unaware of the so-called backdating practices: They signed documents "as of" prior dates, and all of the exercise prices selected were obviously at relative low points.

Not only was "backdating" known within the Company, it must have been known to the outside auditors. First, the practice of backdating occurred from at least 1997 to 2002 (indeed longer). Over that time, with a practice so openly administered, it is implausible that the auditors were kept in the dark. Second, the auditors, like the independent Board members, must have observed the "as of" dated documents and the fact that the prices were all at relative low points.

Indeed, the only *plausible* explanation for the auditors' conduct is that they believed, perhaps in error, that options granted based on prior dates could be accounted for without showing a compensation charge. It is simply not *plausible* that these auditors were "tricked" by "as of" dated unanimous written consents.

As for Landan, who is neither an accountant nor an attorney, it is not *plausible* that he knew that Mercury was violating GAAP, where Mercury's practice of selecting favorable grant dates was known to (among others) the independent members of the Board and Mercury's outside, independent auditors. Moreover, backdating option grants is not inherently or per se illegal. *In re Verisign, Inc., Derivative Litig.*, No. C 06-4165 PJH, 2007 WL 2705221, at *1 (N.D. Cal. 2007). What is plausible (indeed, ineluctable) is that Landan, like Steve Jobs, and like many other chief executive officers in Silicon Valley, believed that pricing employee stock options in this manner was permissible. In any event, after the SEC's lengthy investigation, it is apparently unable to allege a single fact showing the Landan knew the accounting treatment for options at Mercury was improper.

Because the SEC has failed to plead scienter sufficiently, the Court should dismiss the First and Second Claims for Relief.

**CONCLUSION**

For the reasons set forth above, the First and Second Claims for Relief should be dismissed as against Landan. In the alternative, Plaintiff should be required to provide a more definite statement of those claims.

Dated: October 1, 2007

Respectfully submitted,

JONES DAY

By: /s/ John D. Cline
John D. Cline

Attorneys for Defendant
AMNON LANDAN