# EXHIBIT 1

Westlaw.

75 S.E.C. Docket 156,  Release No. ID - 184, 2001 WL 587989 (S.E.C. Release No.)

**H**

75 S.E.C. Docket 156, Release No. ID - 184, 2001 WL 587989 (S.E.C. Release No.)

S.E.C. Release No.

Initial Decision

IN THE MATTER OF ALBERT GLENN YESNER, CPA

Administrative Proceeding File No. 3-9586

May 22, 2001

APPEARANCES:
Kenneth L. Miller and Peter H. Bresnan for the Division of Enforcement, Securities and Exchange Commission
John M. Fedders for Respondent Albert Glenn Yesner

BEFORE: Robert G. Mahony, Administrative Law Judge
INITIAL DECISION

## I. INTRODUCTION

On April 27, 1998, the Securities and Exchange Commission (Commission) instituted public administrative cease and desist proceedings against Albert Glenn Yesner (Yesner or Respondent), pursuant to Section 8A of the Securities Act of 1933 (Securities Act), Section 21C of the Securities Exchange Act of 1934 (Exchange Act), and Rule 102(e)(1)(ii) and (iii) of the Commission's Rules of Practice. 17 C.F.R. § 201.102(e)(1)(ii) and (iii).

The Order Instituting Proceedings (OIP) alleges that from at least July 1, 1993, through July 10, 1995, Sensormatic Electronics Corporation (Sensormatic or the company) improperly

recognized revenue on shipments made outside the appropriate accounting period in order to manipulate its quarterly revenue and earnings to meet analysts' quarterly earnings projections. (OIP ¶ 1.) As a result of this practice, it is alleged that Sensormatic's quarterly earnings, included in periodic reports and registration statements filed with the Commission, were misstated from the first quarter of fiscal year 1994 through the third quarter of fiscal year 1995. (OIP ¶ 2.) In addition, the company issued a press release on July 10, 1995, allegedly containing inflated preliminary estimates for fourth quarter and year-end earnings for fiscal year 1995. (OIP ¶ 2.)

The OIP alleges that Yesner, as controller and director of business controls (DBC), knew of and participated in improper accounting practices and therefore willfully violated Exchange Act Rules 13b2-1 and 13b2-2; caused and willfully aided and abetted Sensormatic's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act; and caused Sensormatic's violations of Section 17(a) of the Securities Act, Sections 10(b) and 13(a) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder. (OIP ¶ 12-15.) The OIP further alleges that Yesner violated Rule 102(e)(1)(ii) and (iii) of the Commission's Rules of Practice. (OIP ¶ 16.)

On June 16, 1998, Yesner filed his answer and moved for partial summary disposition of the Rule 102(e)(1)(ii) charge based on the holding in Checkosky v. SEC, 139 F.3d 221 (D.C. Cir. 1998), dismissing charges against an accountant because the Commission had stated no mental standard for liability under Rule 102(e)(1)(ii). I orally granted Yesner's motion for partial summary disposition after the close of the Division of Enforcement and Office of the Chief Accountant's (collectively the Division) case-in-chief on the grounds that the holding in Checkosky controlled and required the dismissal of the Rule 102(e)(1)(ii) charge. The Division moved for reconsideration and requested that ruling on the motion be deferred on the grounds that the Commission was about to publish an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,   Release No. ID - 184, 2001 WL 587989 (S.E.C. Release No.)

Page 2

amended Rule 102(e)(1)(ii) standard. I orally granted the Division's motion for reconsideration, but denied the requested relief. The Division was granted leave to refile the motion to reconsider after publication of the amended Rule 102(e)(1)(ii).

*2  The Commission published amended Rule 102(e)(1)(ii) on October 19, 1998, and the Division renewed its motion for reconsideration. See Amendment to Rule 102(e) of the Commission's Rules of Practice, 68 SEC Docket 707 (Oct. 19, 1998) (Amendment to Rule 102(e)). On December 3, 1998, I granted the motion, but denied the relief requested and dismissed the Rule 102(e)(1)(ii) charge (December Order). See December Order, 68 SEC Docket 2141 (Dec. 3, 1998). The Division filed an application to have the December Order certified to the Commission, which I certified on December 11, 1998. On October 19, 1999, the Commission reversed the partial summary disposition, remanded for further proceedings, and directed that, as to the Rule 102(e)(1)(ii) charge, Yesner's conduct be judged against an intentional, knowing, or reckless standard because "there was no question Rule 102(e) reached intentional and reckless misconduct, and the Division had asserted that it would attempt to prove that Yesner engaged in misconduct that was intentional, knowing, or reckless." See Albert Glenn Yesner, 70 SEC Docket 2743 (Oct. 19, 1999).

A hearing was held in Miami, Florida, October 5 through 9, 1998. The Division submitted 148 exhibits and called seven witnesses, in addition to Respondent. Yesner submitted twenty-eight exhibits and called one expert witness. The parties submitted posthearing briefs.[FN1]

Yesner argues that the misstatements in the quarterly reports for fiscal years 1994 and 1995 are not material, emphasizing that, after examination by Ernst & Young (E&Y), PricewaterhouseCoopers LLP (PWC), and the Commission, only the third quarter of fiscal year 1995 had to be restated. (Resp. Br. 106-08.) Further, there was no proof that the July 10, 1995, press release included material misstatements. (Resp. Br. 41-43, 116-17.)

Yesner asserts that the Division mischaracterizes his role and responsibilities within the company. He did not have any responsibility for the preparation of

financial statements, corporate filings, or press releases, and had only limited responsibility for the accuracy of books and records. Yesner asserts that he was not a decision-maker within the accounting department, and had only a fragmented awareness of the practices involving the company's computer. Furthermore, with the limited resources of the business controls group he could not perform all of the necessary internal audit functions. Lastly, Yesner argues that, at all times, he acted in good faith. (Resp. Br. 4, 7-8, 81, 118.)

## II. SUMMARY OF THE EVIDENCE

### Corporate Background

Sensormatic manufactures, markets, and services loss prevention systems utilized in retail, commercial, and industrial facilities to deter shoplifting and internal theft. Among the products offered by the company are electronic surveillance tags, closed circuit televisions, and access control systems. (Div. Ex. 126 at 4.) Sensormatic's stock is traded on the New York Stock Exchange and its principal executive offices are located in Deerfield Beach, Florida (Deerfield). The company primarily shipped out of Puerto Rico, with some shipping out of Boca Raton, Florida. (Tr. 51-52, 231.) United States based operations accounted for just over 50% of the overall earnings and revenue for the company. (Tr. 287, 404.) Sensormatic is associated with approximately seventy companies located throughout Europe, Asia, Australia, and the Americas. (Tr. 51; Div. Ex. 69.) Its fiscal year is July 1 through June 30. (Tr. 424; Div. Ex. 190.) Arthur Milnes (Milnes), a member of Sensormatic's board of directors, testified that the company experienced significant growth in the 1990s due to several acquisitions and joint ventures.[FN2] He estimated that Sensormatic went from annual revenue of $100 million in 1990 to approximately $900 million in 1995. (Tr. 51.)

*3  The corporate hierarchy at Sensormatic was extensive. There were three levels of officers below the board of directors: executive corporate officers, business unit officers, and subsidiary officers. (Tr. 381-82.) Ronald Assaf (Assaf) was chairman and chief executive officer. Joseph Pardue (Pardue) initially held the position of vice president of finance and later became the chief financial officer

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and chief operating officer. Pardue was also a member of the board of directors and reported to Assaf. (Tr. 60-62, 111-12, 301-04, 784-85.) They were the primary decision-makers of the company. There was a substantial drop-off in authority below them. (Tr. 303-04.)

Lawrence Simmons (Simmons), while vice president of finance, reported to Pardue, the chief operating officer.[FN3] He supervised Yesner as controller for the U.S. retail group.[FN4] (Tr. 213, 790, 813-15.) Yesner supervised Joy Schneider (Schneider), head of the revenue accounting group, who supervised James Lininger (Lininger), manager of revenue accounting and finance manager of U.S. operations.[FN5] (Tr. 210, 212-13, 384, 790; Resp. Ex. 160 at SRM 250036.)

Simmons testified that the company prided itself on a growth rate of about 20% per year, which it touted in press releases. Maintaining growth was very important to senior management. There was a company-wide goal to continue the 20% growth trend and increase market penetration and market share. (Tr. 366-67.) As a means of continuing the growth, sales revenue goals were set internally. Each business unit would present a business plan to Assaf and Pardue, who would then translate the plan into quarterly goals for each unit. (Tr. 368.) It was very important in terms of corporate culture and an individual's salary to achieve the revenue goals. (Tr. 369.) If salespersons achieved their sales quota, they could attend what was called the Hundred Percent Club and receive recognition for their efforts.[FN6] (Tr. 370.) The heads of the business units and certain senior management would also attend the Hundred Percent Club. (Tr. 254, 383.) Yesner never attended the Hundred Percent Club. (Tr. 384.)

At the end of each quarter, significant efforts were made to achieve the revenue goal, and weekly "to-go" memoranda were circulated among select members of senior management and the accounting staff. (Tr. 276, 370-71.) Simmons controlled the distribution of the "to-go" memoranda. (Tr. 285-86, 403.) Yesner received "to-go" memoranda through January 1994. (Tr. 863; Div. Ex. 84, Resp. Ex. 161.) The memoranda showed the quarterly revenue goal for U.S. operations only. (Tr. 286-87, 404.) They also showed what products had been shipped,

and what had to be shipped in order to achieve the revenue goal. (Tr. 276, 286-87, 370; Div. Ex. 84, Resp. Ex. 161.) The memoranda did not reflect earnings, costs, expenses, or discounts, and there was a "cushion" incorporated to account for sales, credits, and returns. (Tr. 288, 405-06.) The memoranda did not indicate that revenue would be recognized improperly. (Div. Ex. 84, Resp. Ex. 161.)

## Booking Revenue

*4 When an order was received, it was entered in the order entry system, a function of the customer information system (CIS). (Tr. 221-23.) The sales administration and finance departments would then evaluate the profitability of the transaction, equipment configuration, inventory availability, and credit approval. (Tr. 223-24.) If the order was approved, it was termed "open" and routed to the shipping department. Shipping configured the "open " orders and coordinated shipments from various warehouses using an inventory control software package called AMAPS.[FN7] Inventory was " tagged" in the AMAPS system to reflect that it was allocated to an order. (Tr. 225-28.) The shipping department would then change the order designation in the CIS from "open" to """shipped," which caused the computer system to generate a "ship-to" notice. When the revenue accounting group received the "ship-to" notice, it was matched up to a contract in the contract system and processed. (Tr. 228-32.)

Processing the contracts created a sales transaction, receivables transaction, and invoicing transaction used for billing. At month end, the revenue accounting group received a record of transactions, and would update the general ledger manually. Processing contracts and updating the general ledger were termed "booking revenue." (Tr. 215, 230-34, 237-38, 247.) The corporate reporting and consolidation departments used the information in the general ledger to prepare the financials. (Tr. 234.)

## Out-of-period Shipments

Sensormatic's accounting policy was to recognize

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,  Release No. ID - 184, 2001 WL 587989 (S.E.C. Release No.)

Page 4

revenue upon shipment. (Tr. 312, 744; Div. Ex. 24 at SRM 047988-92, Div. Ex. 114 at F-9.) However, Sensormatic employed various practices to recognize revenue prematurely, such as warehouse shipments, free on board (FOB) shipments, slow shipments, and out-of-period shipments. (Tr. 360-66, 443.) The focus of this proceeding is the out-of-period shipments, which involved shipping product past quarter end for three or four days, while reporting revenue based on those shipments in the previous quarter. (Tr. 312, 318-19.) Some sales in the United States were recognized prematurely as revenue by stopping the computer clock and generating "ship-to" notices dated the last day of the quarter.[FN8] Revenue was booked based on the "ship-to" notices, but there was no way to distinguish the out-of-period shipments. (Tr. 234-36, 238, 246-47.)

Prior to 1995, the amount of revenue was not on the "ship-to" notices and could only be determined by matching a "ship-to" notice to a contract in the contract system. (Tr. 229-30.) When Sensormatic was recognizing revenue on out-of-period shipments, parts of the CIS system, such as the order entry screens, became inaccessible to employees in several departments and new orders could not be entered. (Tr. 238-39.)

In the mid-1980s, when he was controller, Simmons heard rumors regarding this practice and questioned Pardue. Pardue confirmed that the out-of-period shipments had been a long-standing practice at Sensormatic and had become standard operating procedure. (Tr. 312-13, 315, 318.) Simmons rationalized the practice by maintaining that regardless of whether the start and end dates of the quarter varied, it was still only a ninety-day revenue period. This would later be dubbed the "rollover effect," "wash effect," or "turnaround effect." (Tr. 149-50, 313, 402, 857.) Simmons testified that the practice was contrary to generally accepted accounting principles (GAAP) and company policy. It resulted in inaccuracies in the company's books, records, and financial statements. While the amounts were always represented as immaterial, the exact amounts of the out-of-period shipments were never quantified. (Tr. 312-14, 316-17, 319-20, 373-76.)

*5 Simmons attempted to ensure the quarters had

no more than ninety revenue-earning days. He created a document showing the final day of each quarter for fiscal years 1993 through 1995, and indicated the additional days in each quarter revenue was recognized. Typically, shipments would continue from quarter end until the following Sunday. For the twelve quarters, three had extensions of four days, four had extensions of three days, four had extensions of two days, and one had a one-day extension. (Tr. 319-20, 333; Div. Ex. 99.)

Cross-departmental meetings were held near the end of each quarter to manage the process of closing the books for the quarter. These discussions included the revenue recognition process on out-of-period shipments. (Tr. 241-46.) Representatives from the finance, management information systems, sales, and administration departments attended these meetings almost every quarter. (Tr. 242.) In addition, the finance department periodically held "wrap-up" meetings near the end of the quarter. (Tr. 248, 823.)

### Ernst & Young

E&Y was Sensormatic's outside auditor. (Tr. 58, 424.) During the fiscal year 1994 audit (1994 Audit), E&Y noticed an increase in large volume sales transactions. As a result, E&Y changed its audit strategy and began to focus more on revenue cut-offs at the end of quarterly reporting periods and testing controls. (Div. Ex. 64 at EY000245.)

E&Y usually limited its document requests to company "ship-to" notices, but because of the increase in volume, E&Y requested the original bills of lading that specified when carriers picked up shipments. (Tr. 259; Div. Ex. 64 at EY000245.) The finance department was responsible for providing E&Y with this information. Don Cumming (Cumming), manager of corporate finance, approached Lininger with a list of requested documents.[FN9]   (Tr. 259-60.) Approximately three of the documents showed product being picked up after midnight. (Tr. 264, 341, 346.) Lininger was not sure whether revenue had been booked on these shipments, but it was a possibility. Lininger presented the documents to Simmons who initially asked him to do more research and avoid turning the documents over to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

E&Y.[FN10]   (Tr.   262-64,   341-43,   346-47.)
Simmons eventually took possession of the
documents and told Lininger to wait until he spoke
to Pardue. (Tr. 262-63.)

Even though Simmons knew about the out-of-period
shipments, he thought that there may be another
explanation for the bills of lading. (Tr. 351.) He
was hesitant to turn over the documents because "if
[E&Y] found out[,] there would be an extended
audit, expanded audit, and there would be an
embarrassment on the part of the company." (Tr.
351-52.) Simmons knew that the amount of the
out-of-period shipments had never been quantified
and was concerned that the long-standing belief that
they were immaterial was wrong. (Tr. 314, 320,
352, 375.) Simmons wanted to consult Pardue and
see if there was any way to avoid turning over the
documents. Pardue agreed with Simmons's
instructions to Lininger. (Tr. 262-63, 347-48.)

*6 In July 1994, Lininger approached Yesner, who
had been appointed DBC in the fall of 1993, to
discuss the 1994 Audit, and stated that Simmons
had asked him to withhold documents from E&Y.
(Tr. 763-64; Div. Ex. 14.) At this point, Yesner did
not know what the documents would show, and
never actually saw the documents. (Tr. 768-69; Div.
Ex. 158 at 71.) Yesner testified that, at the time, this
did not seem to be a significant event and he told
Lininger, "to work with the appropriate people,
specifically Larry Simmons, to resolve the issue
satisfactorily." (Tr. 266, 769-70; Div. Ex. 158 at
67.) After this conversation, Yesner believed that
Lininger understood that "when I told him that
Ernst & Young was going to need the documents
that meant to turn them over." (Tr. 769.) Yesner
knew that if Lininger was withholding documents or
was being asked to withhold documents, it "would
make somebody feel uncomfortable." (Tr. 769.)

Yesner brought up the possibility of withholding
documents with Simmons and Schneider. They both
indicated that Lininger had only been asked to
research some documents, not withhold them. [FN11]
(Tr. 770; Div. Ex. 158 at 85.) This lead
Yesner to think that there had been a
miscommunication and that the documents would
be turned over to E&Y. Lininger never approached
Yesner again regarding the 1994 Audit, even
though they had numerous conversations each day.

E&Y never approached Yesner about missing
documents or uncooperative management. (Tr.
770-71.)

E&Y signed off on the 1994 Audit without
receiving all of the requested documents.[FN12]
There was no mention of problems in the
management letter or at the audit committee
meeting on September 16, 1994. (Tr. 263, 269,
503-04, 771-73.) Yesner was present during this
meeting and did not say anything about the
documents. He never knew whether or not the
documents had actually been turned over to E&Y,
but since it signed off on the audit he assumed the
problem had been resolved. (Tr. 772-73, 784.)

Simmons brought the shipping practice to the
attention of senior management numerous times. In
September 1994, he discussed the out-of-period
shipments with Assaf at an audit wrap-up meeting,
also attended by Pardue and Cumming. This
meeting was held after the 1994 Audit to discuss
issues that had come up during the audit and
potential concerns of the audit committee. (Tr.
321.) Even though previous conversations with
Pardue indicated that Assaf already knew of the
out-of-period shipments, Simmons and Cumming
wanted to ensure that both Assaf and Pardue were
aware of the practice when it inevitably became an
issue, and in the hopes that it would be stopped. (Tr.
321-22.)

Many routine issues were discussed at the audit
wrap-up meeting, including E&Y's emphasis on
revenue cut-offs and a new task force to explore
speeding up the process of closing the books at
quarter end. The task force was going to look at
streamlining the order process and lessening the
volume of orders received at quarter end. (Tr.
270-71, 324-25, 359.) Pardue was chairman of the
task force and it was comprised of representatives
from various functional areas, senior managers, vice
presidents, and others. Lininger was not an original
member of the task force, but attended a few of the
meetings upon the invitation of Schneider. (Tr. 271,
325.)

*7 In April 1995, Simmons had another discussion
with Assaf after the quarter ended on March 31.
Simmons once again informed Assaf that there had
been out-of-period shipments. Assaf was not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,   Release No. ID - 184, 2001 WL 587989 (S.E.C. Release No.)                                                                        Page 6

surprised and never told Simmons to stop the practice. (Tr. 326-27.) With the hope of stopping the practice and because he was getting no support from Assaf or Pardue, Simmons started a rumor that E&Y would be at the shipping docks on June 30, 1995, the last day of the quarter and fiscal year. (Tr. 328.) In spite of this rumor, shipping did not stop until the following Sunday. (Tr. 331-32.) In July 1995, Simmons had another conversation with Assaf, informing him that there had not been a clean quarter-end, revenue cut-off. (Tr. 339.)

On August 4, 1995, at an executive session held after a special board meeting, Assaf mentioned to some individuals that some out-of-period shipments had been improperly recognized as revenue in the prior quarter. Milnes testified that it did not appear as though Assaf was going to involve the internal audit department; Assaf was going to investigate by going to the chief financial officer himself to determine the magnitude. (Tr. 82-85.)

Also in early August 1995, during the fiscal year 1995 audit (1995 Audit), Louis Pugliese (Pugliese), partner for E&Y, approached Simmons and expressed some concern about accurate cut-off dates, warehousing shipments, and the withholding of documents.[FN13] (Tr. 355, 423-25, 438-39; Div. Ex. 64 at EY000245-47.) Pugliese was uncomfortable with Simmons's answers, particularly regarding the year-end cut-off and decided to probe further.[FN14] Pugliese arranged another meeting with Simmons and Michael Flores (Flores), vice president and treasurer of Sensormatic. (Div. Ex. 64 at EY000247, Resp. Ex. 160 at SRM 250027.) After trying to skirt the issue, Simmons finally admitted that there was not an accurate cut-off, but he believed the amounts involved were not material and that Assaf was aware of the issue. (Tr. 438-39, 441, 443; Div. Ex. 64 at EY000248.)

Pugliese also began to take the necessary steps to quantify the amount of incorrectly reported revenue and evaluate E&Y's responsibilities in accordance with generally accepted auditing standards (GAAS). It was necessary to determine the impact on the financial statements, materiality of the inaccuracies, and whether the revenue was recorded in accordance with GAAP. (Tr. 440.) Soon after the meeting with Pugliese, Simmons and Flores contacted Pardue and told him that they wanted to

turn over the documents and "let the chips fall where they may." (Tr. 356.) Pardue agreed, but wanted them to discuss it with Assaf first. After Assaf was in agreement, Simmons informed E&Y about the out-of-period shipments and made sure E&Y was provided with all of the documents. (Tr. 356-57.)

Around August 12, 1995, Pugliese contacted Milnes regarding substantial accounting irregularities discovered at Sensormatic. (Tr. 86-87.) An audit committee meeting was held on August 14, 1995, with all of the audit committee members and representatives from the Atlanta and Miami E&Y offices. (Tr. 87-88.) E&Y advocated doing an intensive audit and recommended the audit committee hire special counsel to investigate the matter. (Tr. 89, 91, 446.) Assaf met with E&Y just prior to the audit committee meeting and acknowledged his responsibility for the irregularities. (Tr. 485.) E&Y expanded the 1995 Audit to examine the impact of the out-of-period shipments. (Tr. 446.)

*8 By memorandum dated October 11, 1995, E&Y detailed its efforts concerning the expanded audit. E&Y stated that it:

> discovered an accounting irregularity relating to the timing of revenue recognition - revenue was intentionally recorded in the incorrect period. This irregularity affected the annual financial statements for 1995, 1994, and 1993. It also affected all of the quarters in those years and may have affected earlier annual and quarterly financial statements. This practice was concealed from E&Y.

(Div. Ex. 64 at EY000244.) After the expanded audit, Sensormatic's management and E&Y decided that the third quarter of fiscal year 1995 was the only period with significant irregularities that required restatement. (Tr. 460; Div. Ex. 64 at EY000255.) Pugliese testified that this was a company decision, but that E&Y had a professional obligation to speak up if it did not conform to GAAP. (Tr. 480.)

**Albert Glenn Yesner**

Yesner was an employee of Sensormatic from 1989 until November 1995.[FN15] From March 1989

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,  Release No. ID - 184, 2001 WL 587989 (S.E.C.    Page 7
Release No.)

through October 1993, he was Sensormatic's controller, and from November 1993 until November 1995, he was Sensormatic's director of business controls. (Tr. 789; Div. Exs. 1, 14.) Yesner is a licensed CPA and member of the American Institute of Certified Public Accountants (AICPA). (Div. Ex. 1 at 5, Div. Ex. 3.)

## Corporate Controller

Yesner was controller of the U.S. retail group at Sensormatic after Simmons.[FN16] (Tr. 301-02, 789.) According to the corporate hierarchy, the cost, general, and revenue accounting departments reported to Yesner, and he reported to Simmons. [FN17] (Tr. 302, 790-91.) Within the revenue accounting group, Lininger reported to Schneider, who was supposed to report to Yesner. However, Schneider typically would report directly to Simmons concerning revenue accounting issues. (Tr. 212, 790-91, 805.)

Yesner's testimony, which is supported by his performance evaluations as controller, indicates that he was primarily involved in inventory and cost accounting for the U.S. retail group, product cost issues, and special projects resulting from company acquisitions. (Tr. 789-90, 813-14; Div. Exs. 4-6, Div. Ex. 7 at SENSOR 00055, Div. Ex. 158 at 33-34.) He was also very involved in preparing information used in various meetings and strategy sessions for Simmons, Pardue, Flores, and Assaf. (Tr. 816-19; Div. Ex. 6 at SENSOR 00062.)

Yesner did not participate in the day-to-day operation of the revenue accounting department. He did not know what source documents were used to book revenue and was generally not involved in the quarter-end closing process.[FN18] (Tr. 283, 762-63, 805; Div. Exs. 4-8, Div. Ex. 158 at 33-34.) He never reviewed general ledgers or made general ledger entries. Yesner was not responsible for preparing or verifying financial statements, or corporate filings. (Tr. 391, 470, 806, 809-12, 867-69; Div. Exs. 4-6.) He never signed corporate filings or made representations as a member of Sensormatic management to the Commission or E&Y. (Tr. 392, 470-71, 869.) Occasionally, Yesner would research accounting issues and report back to Simmons or Flores, but he never made or

acquiesced in the ultimate accounting decisions. [FN19] (Tr. 391, 867-68.)

*9 Lininger testified that Yesner was responsible for "the daily administrative operational things that go in to running a finance department" and that " [Yesner's] jurisdiction was from Mr. Simmons." (Tr. 251-52.) Lininger also emphasized that he took direction from Simmons and Schneider, not Yesner. (Tr. 283.) Simmons's testimony supports that Yesner's responsibilities as controller were different than his, and that Yesner was not responsible for corporate filings, preparing financial statements, or making accounting treatment decisions. (Tr. 301-02, 379-80, 391-93.) However, Daniel Dooley (Dooley), who testified as Yesner's accounting expert, stated that, as controller, Yesner had a role in the preparation of the books and records as """ that is what a controller does." (Tr. 1129.)

Yesner indicated in several performance reports that he wanted his job to develop into a more " well-rounded" controllership position. However, Simmons repeatedly told him that he should focus exclusively on cost accounting and not get involved with GAAP compliance, because that was an issue for corporate reporting. (Tr. 805-06, 811-13; Div. Ex. 4 at SENSOR 00078, Div. Exs. 5-6.) His ability to expand his controller position was limited by the presence of other controllers in the commercial industrial group, export sales, European operations, international division, and U.S. subsidiaries. (Tr. 813-14.) Yesner was not considered an officer of Sensormatic while he was controller. (Tr. 113, 378, 383, 470; Div. Ex. 4 at SENSOR 00077.)

## Director of Business Controls

Due to the growth that occurred in the early 1990s, E&Y suggested the company implement an internal audit function that would also encompass business review. (Tr. 57-58.) The audit committee agreed. [FN20] In September 1993, the audit committee formally recommended to the board of directors that Sensormatic establish an internal audit function that could serve an oversight function, check on reporting, and help manage the expenses of the audit.[FN21] (Tr. 59; Div. Ex. 12 at SENSOR 000230-31.) In October 1993, Assaf sent a memorandum (October Memo) to the company's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,  Release No. ID - 184, 2001 WL 587989 (S.E.C.     Page 8
Release No.)

officers, directors, managers, and supervisors announcing that Yesner had been appointed DBC. (Tr. 60; Div. Ex. 13.)

The DBC position was independent of other departments and reported directly to Assaf, and on a dotted line basis to the audit committee. There was concern that the integrity of the work performed by the DBC could be compromised if the DBC's supervisor was subject to an audit. (Tr. 61-62, 144-45, 306-07, 801; Div. Ex. 13, Div. Ex. 158 at 38.) Yesner was not considered an officer of the company as DBC. (Tr. 113, 378, 383, 470.)

Yesner prepared the original DBC job description and based it on the October Memo, the job descriptions of similar positions in other companies, and what he envisioned the position would become. [FN22] (Tr. 795, 806-07; Div. Ex. 16.) The basic function of the DBC as stated in the job description, was:

> *10  reviewing, auditing, analyzing and evaluating the controls, policies and processes in effect in Sensormatic worldwide business operations to ensure that such business controls and policies are effective and related processes or procedures are efficient and consistent with policies. This position will formulate corporate-wide audit strategies, standards and plans considering the Company's goals and objectives and areas of opportunity or exposure. The function will review, audit and analyze the various ways that the Company conducts business, as well as the controls and policies that need to be in effect, to ensure that " best practices" are implemented and that resources are utilized to help maximize benefits and opportunities or to minimize costs and exposures.

(Div. Exs. 16, 22, 53.) In addition, the position was expected to "participate in other Corporate projects and studies, with a focus on enhancing control structures and adoption of efficient procedures." (Div. Ex. 21.)

His enumerated duties and responsibilities included: developing and implementing audit and review plans worldwide; directing and performing operational reviews to ensure the effectiveness of business controls and procedures; evaluating internal accounting, managerial control, and reporting systems; analyzing complex transactions; preparing reports reflecting the results of reviews; making recommendations to management to improve business controls, policies, and processes; cooperating with independent auditors; assisting in financial due diligence of potential acquisitions; and developing the business controls department. (Div. Ex. 16, 22, 53.) The DBC position emphasized business controls and operations, not just financial controls, transactions, and operations. (Div. Ex. 22 at SRM253434.) The business controls group did not have a role in financial reporting. (Tr. 390.)

The DBC job description was continually undergoing development. (Div. Ex. 15 at 3-4.) Simmons testified that the DBC had two functions: an internal audit function and a function that would attempt to incorporate the best practices of various units throughout the company to improve business processes. (Tr. 305.) Yesner testified that he understood the title to mean that he would be looking at business improvement opportunities as well as internal auditing functions. (Tr. 792.) Milnes recounted a conversation with Yesner where one of his functions was described as reporting impermissible accounting practices to the audit committee, making judgments based on GAAP, and whether there were any matters that would be of concern to a CPA. (Tr. 66-67, 117.) Milnes also testified that he understood that the DBC position was created to facilitate external audits and make them more efficient, evaluate business practices, and perform any activities suggested by E&Y. (Tr. 61.)

Yesner contends that his responsibilities did not change during the time he was DBC, just the particular emphasis. (Tr. 795.) For instance, in September 1994, there was a shift in emphasis from business practices to internal auditing functions. (Tr. 73-74, 471-72; Div. Ex. 28.)

*11 For the first year, Yesner was the only member of the business controls group. He gained one staff member in October 1994 and a second member in February 1995. Because it was a very small department trying to perform work for a company with sixty to seventy locations, about 7,000 employees, and almost a billion dollars in revenue, there was never a time when he performed all of the tasks listed in his job description at once. (Tr.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,   Release No. ID - 184, 2001 WL 587989 (S.E.C.    Page 9
Release No.)

389-90, 740, 796.)

Yesner developed plans for the internal auditing function and business controls activities, and then would submit the plan to the audit committee for review. (Div. Ex. 15 at 5.) He reported to the audit committee on a quarterly basis, and whenever it was necessary or appropriate. (Tr. 68; Div. Ex. 15 at 4.) His reporting relationship to the audit committee provided him with a forum independent of company management to present any concerns that he had " about things that were not in agreement with general practices and in agreement with his regulations as a CPA." (Tr. 145.)

In his October 1994 performance appraisal, Yesner listed some of the ""highlights" of his first year as DBC. Among them were: a review of accounts receivable, revenue and inventory operations in Brazil resulting in over thirty recommendations for improvement; an operational audit regarding employee relocations in Deerfield resulting in numerous recommendations to lower relocation costs and improve the relocation process; an analysis of slow-moving inventory in Puerto Rico and Boca Raton, Florida; an audit at Sensormatic Mexico of financial controls and procedures resulting in twenty-six recommendations to improve internal controls; a review of purchasing operations at various company operations in France, United Kingdom, and Germany; and completion of various corporate acquisition issues. In addition, Yesner developed a preliminary policy to standardize the handling and accounting of cross-border sales and technical assistance, and updated Sensormatic's procurement policy. Finally, Yesner served on various committees addressing human resource issues, product codes, and return policies, among others. (Div. Ex. 9 at SENSOR 00042-43, Div. Ex. 19.)

In the fall 1994, Yesner informed the audit committee, Assaf, and Pardue of his anticipated activities for the next six months, which included numerous projects in Deerfield, Brazil, Europe, and various manufacturing plants. (Div. Ex. 29.) In Deerfield, he planned to perform operational audits of revenue equipment, inventory and manufacturing planning, and accounts receivable collection; update corporate policies regarding procurement, capital appropriation requests, global sales cooperation incentives, and global purchasing of resale products; and handle programs regarding slow moving and excess inventory, and the company's returned products policy. Yesner planned a diagnostic review of the general controls and business practices in Brazil and Europe. He also planned to review the handling of returned products and the general control environment at the new manufacturing facility in Ireland. (Div. Ex. 29.)

*12 By letter dated January 31, 1995, Yesner informed Milnes that he was continuing to pursue the previously proposed projects and added several more projects that represented his agenda into the spring of 1995. (Div. Ex. 34.) From February through July, the business controls group worked on returned goods processes in Puerto Rico and Boca Raton, Florida; general controls and preliminary consulting on inventory accounting and systems in Mexico; physical inventory observation and preliminary year-end closing review in Brazil; analytical reviews for nine companies regarding third quarter financial statements per E&Y instruction; preparation of the fiscal year 1996 operating budget; diagnostic review of revenue and accounts receivable cycle in the United Kingdom, Spain, France, and Germany; physical inventory observations at various locations upon the instruction of E&Y; on-site limited review in Canada; and general controls review from a manufacturing perspective in Ireland. (Div. Exs. 42, 79.)

During the 1994 Audit, there was minimal coordination between Yesner and E&Y. They did not truly coordinate any activities until the 1995 Audit. (Tr. 129, 387, 429-30, 432-33, 467-68, 770.) Yesner also did not have any oversight function, and was not the primary contact person with E&Y on behalf of Sensormatic. (Tr. 388, 393-94, 471.) Pugliese testified to individuals' responsibilities as he perceived them in the context of his contact with the company: Pardue had principal oversight over books and records; Flores, Cumming, and David Friend were responsible for the consolidated financial statements and filings with the Commission; Simmons was responsible for operational accounting issues; Schneider was responsible for the internal controls associated with receivables; and Lininger was responsible for the internal controls associated with revenue

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,   Release No. ID - 184, 2001 WL 587989 (S.E.C. Release No.)

Page 10

accounting. (Tr. 465-66.) Yesner never signed management or representation letters to E&Y. (Tr. 393, 471, 872.) After September 1995, Larry Hatfield replaced Yesner as DBC. (Tr. 139.)

## Yesner's Knowledge of Out-of-period Shipments

Yesner learned of the out-of-period shipments around 1990, when he was controller. He believed that this was due to what was known throughout the company as the "quarter-end crunch." (Tr. 727.) The company extended discounts to customers in order to generate a higher volume of business at quarter end. (Tr. 734.) It was Yesner's understanding that the "quarter-end crunch" was to meet customer needs. (Tr. 747-49.) This was a common occurrence, and there was never any kind of secrecy or collusion regarding this practice. (Tr. 732.) When the out-of-period shipments were discussed, it was within the context of the "" quarter-end crunch," which was well known throughout the company, and thought of as normal, routine, and immaterial. (Tr. 731.)

Yesner was aware of the out-of-period shipments during fiscal years 1994 and 1995, and he never reported it to the audit committee or E&Y. (Tr. 726, 728.) He knew that the out-of-period shipments were inconsistent with GAAP and the company's policy of recognizing revenue upon shipment. (Tr. 744, 746.) Yesner testified that "[his] knowledge was always that it was immaterial. But the reason 1 didn't bring it to their attention, it didn't cross my mind at the time as I gained knowledge about this quarter-end crunch phenomena and the types of things associated with it." Yesner never attempted to quantify the amount of improperly recognized revenue. (Tr. 729-30.) Yesner obtained most of the information regarding the out-of-period shipments in the fall 1995, during E&Y's expanded audit. (Tr. 727.)

*13 Sometime prior to June 30, 1993, while he was controller, Yesner received a phone call from an employee in Puerto Rico who inquired how long they would have to "process transactions." This was the earliest indication for Yesner that shutting down the computer system was part of the out-of-period shipment process. (Tr. 752.) It was Yesner's understanding that this was necessary to accommodate the processing of paperwork and recording transactions, even if all of the orders went out. (Tr. 751.) He thought that the computers could not process transactions and update the system at the same time. (Tr. 756.) However, at some point Yesner was aware that whatever was shipped beyond quarter end would be dated with the last date of the quarter to allow the revenue recognition process to take place. (Tr. 760.) Yesner was not involved with shutting down the computer and did not have access to the CIS system. (Tr. 756.)

Yesner had numerous conversations with individuals in the accounting department, namely Simmons, Schneider, and Lininger, and was told that the amounts of the out-of-period shipments were immaterial. (Tr. 732; Div. Ex. 158 at 105-07.) These individuals had been with the company longer than Yesner, and were specifically involved in revenue accounting. Yesner thought they were the ""experts" in what they were doing and did not think he needed to verify their representations. (Tr. 731-32.)

Yesner did not attend the cross-departmental meetings held to discuss the process of closing the quarter, which included, among other things, revenue recognition issues and bringing down the computers. (Tr. 241-46, 285.) He did not attend the "wrap-up" meetings of the finance department held near the end of each quarter. (Tr. 248, 823.) Yesner was also not on the task force established in September 1994 to look at the quarter-end process generally. (Tr. 787.) Yesner understood, from conversations with Cumming, that the task force was "going to be established to address the quarter-end problem." (Tr. 786.) He knew the out-of-period shipments were not the main objective of the task force, but thought the out-of-period shipments would be fixed as a result of fixing the other quarter end problems. In essence, he believed that the matter was being handled. (Tr. 98, 786-87, 845; Div. Ex. 158 at 58-60, 154-55.)

## Willkie Farr & Gallagher Investigation

In late summer 1995, E&Y suggested that the audit committee hire a law firm to investigate the accounting problems, so it could incorporate any findings into its opinion of the financial statements

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,  Release No. ID - 184, 2001 WL 587989 (S.E.C.     Page 11
Release No.)

for fiscal year 1995. (Tr. 174, 446.) From late August through November 1995, Jonathan Bassett (Bassett) and Sean Anderson (Anderson), attorneys from Willkie Farr & Gallagher (WF&G), interviewed people associated with Sensormatic. [FN23] Anderson estimates that he participated in fifteen to twenty interviews, although there were more. Bassett asked almost all of the questions, and Anderson took contemporaneous, although not verbatim, notes during the interviews. He prepared summary memoranda several days to a week after the interviews. A stenographer was not present, interviewees were not given an opportunity to review the notes or memoranda, and at least Lininger was told he could not have counsel present. (Tr. 124-26, 153-58, 175-76, 291, 416-17.) Anderson's handwritten notes were destroyed after the preparation of the memoranda. (Tr. 159, 190-91.)

*14 On September 13 and 14, 1995, for about two and a half hours, a two-part interview with Yesner was conducted at Sensormatic's offices in Deerfield. (Tr. 154-55.) Yesner was not given an opportunity to review the memorandum of the interview. (Tr. 125-26.) The memorandum asserted, among other things, that Yesner first became aware of the out-of-period shipments in 1992 and that he discussed the practice with various individuals. In or about 1993, Yesner was aware of various individuals meeting to plan the shipments. The memorandum also asserts that Lininger had approached Yesner about altering or withholding documents from E&Y. Yesner acknowledged that the audit committee did not know about this practice and that they should have been told. (Tr. 165-67.)

## Audit Committee Action

The audit committee was advised by both WF&G and E&Y regarding who should be disciplined. [FN24] (Tr. 94-95, 124, 462.) It was E&Y's prior experience that officers who had direct knowledge and participated in accounting irregularities, as well as other individuals who acted in a way that nullified their responsibilities, should be terminated. (Tr. 462.) E&Y advised that Simmons be fired and an acting chief financial officer be appointed before it would sign off on the 1995 Audit. (Tr. 484.)

The audit committee concluded that Simmons, Flores, Yesner, Schnieder, and Lininger had employed, or at least knew of, several methods to manipulate revenue recognition, including out-of-period shipments. (Tr. 103-05.) Milnes testified that the audit committee concluded that the "accounting irregularities ... had reached a magnitude that was not immaterial, that is, considerably more than say 1% of revenue had been improperly recognized." (Tr. 103.) There is no evidence in the record that establishes how the audit committee arrived at this conclusion.

The audit committee was originally going to recommend that Yesner be terminated, but later decided that he was an asset to the company and, with the agreement of E&Y, merely demoted him. (Tr. 95.) With the help of E&Y, the audit committee prepared a potential "action" to take against Yesner. The action involved a reprimand to be read to Yesner by the acting chief financial officer, Ray Monteleone (Monteleone), and internal counsel, Walter Engdahl (Engdahl), indicating that the company and the audit committee were very distressed at his failure to act. [FN25] (Tr. 96, 101.)

Prior to the reading, Milnes met with Yesner because he had been impressed with his performance as DBC, and wanted to speak with him to get his side of the story. (Tr. 96-97.) Milnes testified that Yesner professed loyalty to the company and admitted that things had been going " slightly" wrong since about 1992, but was advised by Simmons that a task force was dealing with the problem, that it had been immaterial in earlier years, and maybe it was still immaterial. (Tr. 98.) Milnes testified that Yesner admitted he should have reported the accounting problems as they occurred. (Tr. 97.) The meeting did not change the audit committee's recommendation for disciplinary action. (Tr. 98-99.) Two weeks later, Yesner was reprimanded for his awareness and participation in the revenue recognition practices and efforts to withhold documents from E&Y during the 1994 and 1995 Audits. (Div. Ex. 58 at 1-2.)

## Yesner's Response to the Reprimand

*15 On November 16, 1995, Yesner presented a response to the reprimand to Bob Vanourek

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,  Release No. ID - 184, 2001 WL 587989 (S.E.C.                    Page 12
Release No.)

(Vanourek), Jim Lineberger, Monteleone, Engdahl, and one or more representatives of WF&G.[FN26] (Div. Ex. 61.) Yesner wanted to clarify his role in the events underlying the accusation, and request a re-evaluation and correction of the reprimand.

Yesner emphasized that he never participated in the decision to ship past quarter end, had no knowledge of the extent of such activities, and never reviewed any documents or reports related to the revenue recognition issues. (Div. Ex. 61 at 2.) He also emphasized that he had not been on the distribution list for the weekly "to-go" memos for the past two years, and therefore, "was NOT PRIVY to whether [the company] was going to potentially miss [its revenue] goals." (Div. Ex. 61 at 3.)

Yesner discussed how he coordinated a clean cut-off in June 1993, the only quarter end in which he had an active involvement, and how afterwards, he, Lininger, and Schneider were "chastised" for his involvement. (Div. Ex. 61 at 2.) Simmons told Yesner that many officers "were not comfortable with [his] involvement and the way that revenue recognition was cut-off."[FN27] He assumed that this was because there had been a proper cut-off and that this was apparently different than previous quarters. (Div. Ex. 61 at 2-3.)

Yesner also denied any involvement in efforts to mislead E&Y by withholding documents during the 1994 and 1995 Audits. He maintained that "[he] was only informed of potential alternative efforts that were UNDER CONSIDERATION on how to deal with information or document requests by E&Y." (Div. Ex. 61 at 3.) He never saw any of the documents in question, and was informed that most of the alternatives being considered were not implemented. (Div. Ex. 61 at 3-4.) Yesner represented that either Cumming or Simmons informed him that E&Y had received all of the requested documents. Furthermore, E&Y signed off on the fiscal year 1994 financial statements without any mention of revenue recognition issues in letters to management and the audit committee. (Div. Ex. 61 at 4.)

Yesner represented that during the 1995 Audit, the only audit with significant coordination between E&Y and Yesner, "[he] instructed [his] staff to fully investigate, document, and communicate all

findings and potential adjustments, favorable or unfavorable to the Company, to E&Y, [himself,] and certain other Sensormatic management." (Div. Ex. 61 at 2.) Yesner also emphasized the numerous internal control recommendations and potential accounting adjustments that were documented and communicated by the business controls group. (Div. Ex. 61 at 4.)

Yesner represented that he was very proud of his department's work, pointing to issues it addressed which were missed by E&Y, and the magnitude of recommendations made. (Div. Ex. 61 at 4.) He also did not believe E&Y cited any deficiencies in the work product of his department during the 1995 Audit. (Div. Ex. 61 at 2.) Yesner felt the underlying reason for the reprimand was that he did not report to the audit committee the "hearsay" related to revenue recognition. (Div. Ex. 61 at 5.)

*16 Yesner did not feel secure enough in his job to report the issues he had only heard of, and that there was no real line of communication for reporting. [FN28] He did not feel securely independent from his superiors, the highest ranking officers of the company who were making the decisions and directing the revenue recognition process. (Div. Ex. 61 at 5.) He had already been "chastised" for the correct coordination of a cut-off and thought that top management would view negatively further action, with retaliatory measures likely. (Div. Ex. 61 at 6.)

Yesner was also uncomfortable with his line of communication with the audit committee. He never received feedback from the audit committee regarding the job description that he prepared or his proposed 1995 audit plan. (Div. Ex. 61 at 6.) He was never given the opportunity to speak candidly with the audit committee without the presence of top Sensormatic management or E&Y. (Div. Ex. 61 at 7.)

Yesner did not feel as though he could change the revenue recognition practices. Several others, such as Simmons, Pardue, Davell, and Schneider, had more involvement in the practice, and were also CPAs. He believed that the task force would address and resolve the causes of the revenue recognition problems. (Div. Ex. 61 at 7.) In addition, every time he discussed the practice with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Simmons or Schneider he was told that what he had heard was not accurate and that the amounts were immaterial. Flores told him "not to be negative" when he expressed dissatisfaction with the practices. (Div. Ex. 61 at 2.)

"The whatever it takes [sic] culture at Sensormatic and focus on revenue and earnings growth above all else were communicated to newly formed or acquired companies and new employees." (Div. Ex. 61 at 8.) Yesner did not know of anyone that, in some way, did not know what was going on. He asked why many individuals at higher management levels with much more participation in the problems were not targeted for reprimand. (Div. Ex. 61 at 9.)

Lastly, Yesner maintained that he never had definitive information as to the magnitude of the revenue recognition problems with the out-of-period shipments and was never informed of the end result of actions to mislead E&Y. He was confident that if he had this knowledge, he would have properly reported it to the audit committee. (Div. Ex. 61 at 10.)

### Dwayne Brown

Dwayne Brown (Brown) is a staff accountant with the Division. (Tr. 516.) He prepared Division Exhibit 133, entitled Materiality Analysis, for the Division's expert witness, Douglas Carmichael (Carmichael), to use in his analysis. (Tr. 517, 531.)

The first eleven pages of the Materiality Analysis were prepared entirely by Brown. Pages twelve through twenty-two are source documents produced by the company that were used in the preparation of the exhibit. (Tr. 520-22; Div. Ex. 133 at 12.) For calculations, Brown focused on only the shipments that might relate to revenue recognition practices known to Yesner. (Tr. 522.) Brown used E&Y work papers that summarize the difference between Sensormatic's reported net income and actual net income, if transactions were recorded in the correct quarter for fiscal years 1994 and 1995. (Tr. 520; Div. Ex. 133 at 2-4, 12-14.)

*17 Brown did not duplicate any of E&Y's expanded 1995 Audit. (Tr. 544, 548.) He did not do a complete quarterly analysis, just a computation

showing the effect of misstatements on reported or actual net income.[FN29] (Tr. 541, 544.) He neither checked any of E&Y's determinations as to misstatements, nor analyzed quarterly or annual financials during the preparation of the Materiality Analysis. (Tr. 537-38, 544, 552-53.) Brown did not analyze the transactions to determine in which quarter they occurred, but merely transferred whatever he determined to be an out-of-period shipment into the following quarter. He used a 50% profit impact for all of the transactions in his analysis, when Sensormatic only used a 50% profit impact for all but large shipments. (Tr. 554-56, 563-64.) Brown also incorporated a number from the July 10, 1995, press release into the analysis as opposed to obtaining all of his data from the company's financial statements. (Tr. 551.)

### Expert Witnesses

### Douglas R. Carmichael

Carmichael was retained as an expert witness by the Division to evaluate the materiality of the alleged misstatements in Sensormatic's financial statements and whether Yesner violated the applicable professional standards.[FN30] Carmichael opined that Sensormatic's misstatements of revenue and earnings "had a material effect on the presentation of operating results," and that Yesner violated professional ethical standards that require a CPA to maintain objectivity and integrity, be free of conflicts of interest, and not knowingly misrepresent facts or subordinate professional judgment. (Tr. 583; Div. Ex. 192 at 3-4.)

He also opined that Sensormatic manipulated its quarterly revenue and earnings to reach its earnings goals and meet analysts' quarterly earnings expectations. Carmichael based this opinion on Sensormatic's efforts at quarter end to meet goals and how close the company's actual earnings came to the published expectations, which was usually exactly or within one cent. In his view, when revenue for fiscal years 1994 and 1995 is adjusted, the earnings fall considerably short of analysts' expectations. (Tr. 604-06; Div. Ex. 192 at 3.)

Carmichael reviewed the investigative testimony of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156, Release No. ID - 184, 2001 WL 587989 (S.E.C. Release No.)

Yesner and Simmons. Other matters reviewed included the E&Y audit papers and memoranda, and the WF&G investigative report. He also considered Dooley's report, accounting literature, and analysts' reports, among other things. (Tr. 583-85; Div. Ex. 192 at exhibit 3.)

Carmichael used Brown's Materiality Analysis in determining the company's net income for each quarter in fiscal years 1994 and 1995. (Tr. 670; Div. Ex. 193.) Carmichael was aware that Brown's Materiality Analysis excluded several shipments from European subsidiaries, warehouse shipments, consigned inventory, and FOB shipments, among others. (Tr. 674-75.)

In Carmichael's opinion, Sensormatic violated GAAP by improperly recognizing revenue on a quarterly basis, during fiscal year 1994 through July 10, 1995, because transactions were not recorded accurately as to account, amount, and period. (Tr. 597-98.) Carmichael stated that Sensormatic engaged in certain practices that resulted in recognizing revenue prematurely, before it was earned.[FN31] (Tr. 598, 600.) He believed that this was intentional, and therefore an irregularity. As support for his conclusion, Carmichael pointed to E&Y's conclusions and the company's press releases that admit that there was a premature recognition of revenue, as well as testimony at the hearing. (Tr. 602.)

Materiality Analysis

*18 Carmichael opined that when there is a departure from GAAP, the materiality of the departure has to be evaluated because if the effect of the departure is not material to the financial statements, then GAAP does not have to be followed. (Tr. 690-91.) Carmichael stated that materiality determinations are judgments, and while there is no arithmetic formula that can be applied, the accounting literature provides guidelines that can be used. (Tr. 688-89.)

In Carmichael's opinion, the definition of materiality in accounting is very similar to the legal definition in that it relates the perceived needs of the users of information. He analyzed the overstatements in light of the surrounding circumstances, focusing on materiality in the context of when the information was first issued. He also considered the perceived needs of the users, and whether "it is probable that the decisions of the users of the information would be changed or influenced by the misstatement." (Tr. 634; Div. Ex. 192 at 11.) He concluded that the misstatements were quantitatively material because of the magnitude, as well as the effect on the earnings trend. (Tr. 642-43; Div. Ex. 192 at 14-15.)

Carmichael distinguished his analysis from E&Y's in that E&Y looked at whether there was a need to restate past historical information. Carmichael looked to Accounting Principles Board Opinion No. 28, Interim Financial Reporting (1973) (APB Opinion No. 28), because it specifically addresses how to determine materiality in interim financial statements. Materiality is determined by comparing the correction to annual financial statements and the trend in earnings. (Tr. 665-66.) Carmichael opined that it is not inconceivable for something to be materially misstated when issued, but need not be restated after the fact. He asserted that accountants apply a higher materiality threshold when considering whether to restate prior quarterly or annual financial statements. (Tr. 666-67, 700.) He emphasized that different tests for materiality are used to assess whether there are additional reasons for disclosing, but never to eliminate the need to disclose. (Tr. 635.)

Carmichael asserted that the starting point in determining materiality is the magnitude of the individual quarter.[FN32] If that is not material then reference to other periods must be considered. (Tr. 635.) Carmichael analyzed the effect of the adjustments on after-tax net income and compared it to the published numbers in the company's Forms 10-Q. Carmichael then calculated the percent of misstatement on adjusted net income, the amount of net income that should have been reported for each quarter.[FN33] (Tr. 645-48; Div. Ex. 193.) He considered the misstatements to be material under this analysis. (Tr. 648.)

Carmichael concluded that the quarterly earnings were much more volatile than reported. He asserted that stock price is influenced by analysts' expectations, and the failure of a public company to meet analysts' expectations may have an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unfavorable effect on stock price. He also believed that analysts prefer a smooth, upward trend in earnings. (Tr. 638, 651, 660-61; Div. Ex. 192 at 12.) Analysts' reports emphasized the company's quarter-to-quarter growth and its ability to meet analysts' expectations; this became a key factor in the company's stock price. (Tr. 660-61; Div. Ex. 192 at 12-13.) Carmichael opined that even a slight failure to meet analysts' expectations would be significant and may have a negative impact on the stock price. (Tr. 654-55.)

*19 Carmichael also concluded that the misstatements were qualitatively material because of the involvement of senior management and the intentional nature of the practice.[FN34] (Div. Ex. 192 at 14-15.) Management integrity is important in the audit of financial statements and the knowledge of intentional misstatements would have been a material fact to an independent auditor. (Tr. 644, 663; Div. Ex. 192 at 15-16.) In Carmichael's opinion, the misstatements of revenue and earnings in each of the quarterly financial statements for fiscal years 1994 and 1995 had a material effect on operating results. (Div. Ex. 192 at 4.)

Professional Conduct

The AICPA Code of Professional Conduct (AICPA Code) provides guidance to members in the performance of their professional responsibilities whether in public practice, industry, government, or education. Rule 102 of the AICPA Code mandates that members maintain objectivity and integrity, and not knowingly misrepresent facts or subordinate their judgment to others in the performance of professional services. See AICPA Code, Rule 102 (Jan. 12, 1988). As a member of the AICPA, the AICPA Code applied to Yesner in both positions he held at Sensormatic. (Tr. 607-08; Div. Ex. 192 at 4.) Carmichael applied Rule 102 of the AICPA Code and the interpretations thereunder to Yesner. (Tr. 614-20, 626-27; Div. Ex. 192 at 6-7.)

Interpretation 102-1 of the AICPA Code provides that members violate Rule 102 of the AICPA Code by knowingly making, or permitting or directing another to make, false and misleading entries in an entity's financial statements or records. See AICPA Code, Interpretation 102-1 (Jan. 12, 1988).

Carmichael opined that by knowing about the out-of-period shipments and permitting the practice to continue, Yesner "permitted knowing misrepresentations in the preparation of financial statements or records and violated Rule 102 [of the AICPA Code]." (Div. Ex. 192 at 7.) He believed the "permit" language imposes a duty on Yesner to come forward and be candid with information regarding the out-of-period shipments. (Tr. 613-15; Div. Ex. 192 at 6-7.)

Carmichael also stressed that members are required to be candid and not knowingly misrepresent facts or knowingly fail to disclose material facts to an employer's independent auditor.[FN35] (Tr. 615.) He emphasized that candor is important, and members do not have to be asked questions on the matter before they are required to act. Carmichael asserted that the possibility of documents being withheld from E&Y or changed, and the out-of-period shipments were material facts that Yesner should have disclosed to E&Y. (Tr. 616; Div. Ex. 192 at 10-11.) Carmichael stated that this duty includes responding honestly to inquiries and " informing the auditor of facts that could be material to the performance of the audit." (Div. Ex. 192 at 10.)

Carmichael also asserted that Yesner had a duty to comply with Interpretation 102-4 of the AICPA Code, which prohibits members from subordinating their judgment when a member and supervisor have a disagreement or dispute regarding the preparation of financial statements or the recording of transactions.[FN36]   Carmichael   characterized Yesner's admission of a GAAP departure, and the company's message "not to worry about it" as a disagreement or dispute. Yesner was aware of the out-of-period shipments, knew that it was inconsistent with the company's disclosed revenue recognition policy, and knew that the practice violated GAAP. (Tr. 617-18.)

*20 In Carmichael's opinion, Yesner should have given more consideration to the current practice at Sensormatic and whether it was an acceptable alternative to the way revenue should be recognized as outlined in the accounting literature. (Tr. 620.) Carmichael does not think this practice was an acceptable alternative because it was not consistent with the company's disclosed revenue recognition

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,   Release No. ID - 184, 2001 WL 587989 (S.E.C.                Page 16
Release No.)

procedures and the company was incurring time and cost to manipulate the clock. Basically, "you don't intentionally depart from GAAP and say that's okay because it's not material." (Tr. 619.)

According to Carmichael, Yesner had an affirmative obligation to perform the necessary research to be personally satisfied that the company's financial statements were not materially misstated. If he could not evaluate the materiality himself, or if he concluded that the misstatements could be material, then he should have made his concerns known to an appropriate level of management within the organization. Simmons was not the appropriate person to contact and reliance on his statement that the shipments were immaterial was not in accordance with Interpretation 102-4 of the AICPA Code. (Tr. 620-21; Div. Ex. 192 at 8-10.) Carmichael asserted that, at the very least, Yesner had an obligation to inform a higher level of the organization, specifically the audit committee, so an investigation could have been conducted. (Tr. 623-24.)

**Daniel V. Dooley**

Yesner retained Dooley as an expert witness.[FN37] He reviewed and analyzed Sensormatic's financial information for the years ended June 30, 1990, through June 30, 1996. In particular, he evaluated the effect of potential adjustments to account for certain revenue recognition practices on Sensormatic's published quarterly results, for the period May 31, 1990, through December 31, 1996. (Resp. Ex. 196 at 1.)

Dooley was previously engaged by Sensormatic to review E&Y's determinations as to materiality and whether there was a need to make adjustments to the quarters in question for fiscal years 1993, 1994, and 1995.[FN38] (Tr. 928.) He reviewed E&Y's analysis of the revenue recognition practices by reviewing its work papers, findings, and conclusions. (Tr. 933.)

Materiality Analysis

After the extended audit, E&Y presented a " summary of audit differences" or """"effects

schedule" to Sensormatic's management.[FN39] E&Y identified potential adjustments to reported net income of $2.3 million, $2.3 million, and zero for the fiscal years 1993, 1994, and 1995, respectively. The adjustments represent 4.2%, 3.2%, and 0% of net income for these years, respectively. Sensormatic management decided that these amounts were immaterial. E&Y agreed, as did Dooley. (Tr. 930, 943; Resp. Ex. 196 at 6-7.)

Dooley opined that Sensormatic's reported revenue and net income for fiscal years 1993, 1994, and 1995 were not materially misstated. Considering the circumstances of the accounting adjustments as identified by E&Y's "summary of audit differences," the accounting errors appeared to relate to misapplications of GAAP. These errors could reasonably be considered inconsequential, and deemed immaterial to senior management. This is because misapplications of GAAP, in respect to immaterial items, are not of consequence and therefore comport with GAAP. (Resp. Ex. 196 at 3-4.) Accounting errors, such as misapplications of accounting principles, involving immaterial items, could reasonably be considered a mistake and/or of no consequence, and not an irregularity. (Resp. Ex. 196 at 5.)

**\*21** Dooley opined that Carmichael's analysis of Sensormatic's quarterly net income was unreliable. In his opinion, the numbers were wrong because they were "cherry picked" and did not include all the numbers that would be included in a cumulative analysis. This is because Brown only selected shipments that he thought might relate to Yesner when he prepared his Materiality Analysis. Dooley's analysis showed that, in addition to some shipments being left out, Brown did not account for all of the appropriate costs associated with the revenues, even though E&Y had put these items on its schedules. Brown had also misused the effective tax rate. Dooley further opined that Carmichael erred by only comparing quarterly financial statements to other quarterly financial statements and not quarterly financial statements to annual financial statements. (Tr. 953-55.)

Dooley also agreed with E&Y and Sensormatic that, except for the quarter ending March 31, 1995, the quarterly financials from September 30, 1993, through June 30, 1995, were not materially

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

misstated, did not require adjustments, and comported with GAAP.[FN40] (Tr. 931; Resp. Ex. 196 at 3, 7.) He analyzed the effect of the adjustments on reported net income. He reviewed the quarters on a three-month cumulative basis, not individually. Dooley concluded that the effect of the adjustments on net income was less than 8% for every quarter, except for the quarter ending March 31, 1995.[FN41] (Tr. 1074; Resp. Ex. 196 at 8, exhibit E.)

Dooley emphasized that a materiality threshold in the range of 8-10% is not uncommon for quarterly financial statements filed with the Commission. (Resp. Ex. 196 at 12.) He cited Statement of Financial Accounting Concepts No. 2, Qualitative Characteristics of Accounting Information (1980) (Concepts Statement No. 2), for the proposition that even though attendant circumstances are considered, materiality judgments are primarily quantitative. (Resp. Ex. 196 at 10.) Dooley also asserted that a higher threshold of materiality is applied to quarterly financial statements than to annual financial statements. (Tr. 965, 1057.)

Dooley testified that, since none of the annual financial statements were required to be restated, the focus was on the interim statements, which are governed by APB Opinion No. 28. (Tr. 943-44.) He testified when making materiality determinations auditors relate the amount in question to estimated net income for the fiscal year, then look at the effect on the trend of earnings. He believed that if an auditor finds that the item is immaterial after a quarter to annual comparison, then the analysis stops. (Tr. 344-45, 956-58, 1051-52.) Dooley also performed a trend analysis based on cumulative earnings for the year, not each quarter individually, and concluded that the general trend is not affected by the misstatements and would "wash out by the end of the year." (Tr. 945, 957, 1082; Resp. Ex. 196 at 9, F.)

On cross-examination, the Division questioned Dooley on his failure to analyze the quarters on a stand-alone basis and his position that APB Opinion No. 28 creates a hierarchy of procedures to assess materiality. The Division asserted that APB Opinion No. 28 requires materiality to be assessed by all three methods. In essence, it is necessary to compare the amount to annual net income, the

earnings trend, and the interim period. (Tr. 1047-48.) Dooley insisted that "there are no material individually stand-alone quarters if you don't sucker punch the numbers[.]" (Tr. 1048.) E&Y performed an analysis of single quarters. Dooley did not agree that it was necessary for E&Y to do so, but that E&Y ultimately got it right. (Tr. 1053, 1055.)

*22 Dooley also opined on materiality in relation to the perceived needs of the users of information. He agreed that the "hypothetical user" of information is a consideration, but asserted that "the literature teaches us, that nobody has really gotten a handl[e] on what those perceived needs are." (Tr. 972-73.)

Dooley concluded that the determinations made by Sensormatic and E&Y were reasonable and consistent with GAAP, GAAS, and other guidance. He would have made the same determinations based on the same or similar information. (Resp. Ex. 196 at 12.)

Professional Conduct

Dooley applied external auditor standards, specifically SAS No. 53 to Yesner's conduct.[FN42] These standards typically apply to independent auditors and establish a higher threshold of professional duty than actually existed for Yesner. (Resp. Ex. 196 at 13.)

SAS No. 53 defines errors and irregularities in financial statements. The distinguishing factor between errors and irregularities is intent. If the underlying cause of the misstatement or omission is unintentional, then it is an error. Examples of errors are incorrect accounting estimates, mistakes in gathering or processing data, and mistakes in the application of accounting principles. Irregularities are intentional misstatements or omissions in financial statements. Irregularities may involve manipulation or falsification of accounting records, and intentional misapplication of accounting principles.

Dooley asserted that not every intentional misapplication of GAAP is an irregularity, and corresponding violation of SAS No. 53, because Concepts Statement No. 2 says that GAAP does not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

need to be applied to immaterial items. (Tr. 989-90.) He noted that every set of financial statements with an ""effects schedule" has items that are not adjusted and technically do not comport with GAAP. (Tr. 990.) Dooley testified, "If you believe, in your judgment, that the items are immaterial, individually and cumulatively, you can intentionally not follow GAAP." (Tr. 990.) Dooley characterized the accounting adjustments as errors resulting from mistakes in the application of accounting principles.[FN43] (Tr. 1021; Resp. Ex. 196 at 3-4.)

Citing SAS No. 53 ¶ 5, Dooley asserted that Yesner was obligated to assess the risk of possible misstatement upon learning that Sensormatic was recognizing revenue improperly. (Resp. Ex. 196 at 14.) It was his opinion that Yesner's assessment that the misstatements were immaterial was reasonable. From Yesner's perspective, this was a long-time practice. It was known by employees and officers, even at the board of directors level, who believed the amounts to be immaterial. Dooley pointed to the consensus among other officers and employees that the misstated amounts were immaterial and the apparent long time use of this practice as indicators that the assessment was reasonable. (Resp. Ex. 196 at 15-17.)

Dooley asserted that Yesner fulfilled his duty to refer the matter to an appropriate level of management under SAS No. 53 ¶ 24. Yesner inquired of Simmons and Schneider and it was reasonable for him to rely on their representations. Dooley emphasized that it was not right or wrong for him to inquire of the individuals he did; it was a process. Furthermore, he did not have a role in the preparation of financial statements or record keeping and he did not participate in audit planning or attestation services as part of the 1994 Audit. Finally, Dooley relied on SAS No. 53 ¶ 28 as authority that Yesner did not have to report the practice to the audit committee because the irregularities were inconsequential, based on Yesner's July 1994 inquiry. (Tr. 997; Resp. Ex. 196 at 25-27.)

**\*23** Yesner would have had a similar duty to assess the possibility of material misstatements based on the knowledge that documents might be altered or withheld from E&Y. Again, Dooley believed that

Yesner's assessment of the risk that this was an irregularity as defined by SAS No. 53 ¶ 3, was reasonable because he inquired of various individuals about whether Lininger was asked to withhold or alter documents.[FN44] He did not know of the nature of the documents in question, was never approached by E&Y concerning uncooperative management, or even directly responsible for monitoring or getting the documents to the auditors. (Tr. 1008; Resp. Ex. 196 at 120-24.)

Dooley was questioned about Rule 102 of the AICPA Code at the hearing. Dooley opined that the AICPA Code and auditing standards require due professional care, but not perfection. (Tr. 992-93.) Dooley read a materiality standard into Rule 102 of the AICPA Code and its interpretations, claiming that GAAP does not apply to an immaterial item and "you don't get to the standard of 102 if your judgment is that it's immaterial." (Tr. 1101-03.)

Dooley did not believe that Yesner violated Interpretation 102-3 of the AICPA Code by not disclosing what he knew about out-of-period Shipments. Dooley testified, "A reasonable person would not consider that to be a material fact, because they wouldn't consider it. If they could reasonably deem that not to be material it is not a violation of GAAP. It's not a material fact." (Tr. 1106.) Dooley did not think this information was treated as a material fact by E&Y. (Tr. 1105-06.)

Dooley testified that if Yesner reasonably believed that he could rely on the representations he received, then he did not subordinate his judgment and violate Interpretation 102-4 of the AICPA Code. (Tr. 1109.) If Yesner had a reasonable basis for his judgment, then it was unnecessary to continue with the Interpretation 102-4 of the AICPA Code analysis. (Tr. 1113-14.)

Dooley testified that, during the time Yesner was DBC, "[a] reasonable response could be to have done nothing, to have said, you know, I'm not even in the line of this anymore, I'll let the auditors do the audit." (Tr. 1003.) Dooley concluded that by doing more, by actually inquiring about the practices, Yesner put himself in a more precarious situation because it questioned the reasonableness of his believing what he was told. (Tr. 1003.) Dooley, as an internal auditor, would not have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156, Release No. ID - 184, 2001 WL 587989 (S.E.C.    Page 19
Release No.)

considered the practice consequential enough to report to the audit committee. (Tr. 1004-05, 1013-14.)

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW[FN45]

The findings and conclusions contained herein are based upon the record, my observation of the testifying witnesses, all arguments, and proposals of fact, as well as the relevant statutes and regulations. Preponderance of the evidence was applied as the standard of proof. See Steadman v. SEC, 450 U.S. 91, 102 (1981). All arguments, proposed findings, conclusions, and contentions put forth by the parties were considered and those consistent with this Initial Decision are accepted.

### Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

#### Sensormatic's Violations

**\*24** The OIP alleges that Sensormatic violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, collectively referred to as the antifraud provisions, by improperly recognizing revenue in order to manipulate its quarterly revenue and earnings to reach its budgeted earnings goals and thereby meet analysts' quarterly earnings projections. (OIP ¶ 1.) Sensormatic allegedly misstated its quarterly earnings in financial statements contained in periodic reports and registration statements filed with the Commission from the first quarter of fiscal year 1994 through the third quarter of fiscal year 1995, by intentionally and improperly recognizing revenue prematurely, in violation of GAAP. (OIP ¶ ¶ 2, 8.) The company issued a press release on July 10, 1995, that allegedly inflated its preliminary estimates of net income by over 40% for the fourth quarter of 1995 and 18% for the fiscal year. (OIP ¶ 8.)

Section 17(a) of the Securities Act prohibits using the mails or instruments of interstate commerce in the offer or sale of securities to (1) employ any device, scheme, or artifice to defraud; (2) use false statements or omissions of material fact to obtain

money or property; or (3) engage in any transaction, practice, or course of business which is or would operate as a fraud or deceit upon a purchaser of securities.

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder make it unlawful for any person, directly or indirectly, in connection with the purchase or sale of any security, to make an untrue statement or omission of material fact; use any device, scheme or artifice to defraud; or engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

#### Materiality

For liability under the antifraud provisions, omissions or misstatements must be material. The test for materiality is whether there is a substantial likelihood that a reasonable investor would consider the information important to the investment decision, and would view it as having significantly altered the total mix of available information. See Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) ; TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).

Materiality is a mixed question of law and fact, dependant on the circumstances at the time of the alleged misstatement. See Ganino v. Citizens Utils. Co., 228 F.3d 154, 162, 165 (2d Cir. 2000). There is a presumption of materiality for information concerning the financial condition of a company. See SEC v. Murphy, 626 F.2d 633, 653 (9th Cir. 1980); SEC v. Blavin, 557 F. Supp. 1304, 1313 (E.D.Mich. 1983) aff'd, 760 F.2d 706 (6th Cir. 1985). Investors are particularly interested in earnings because they are highly relevant to investment decisions. See Ganino, 228 F.3d at 164; In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 n.9 (3d Cir. 1997).

This proceeding focuses on the inclusion of out-of-period shipments in reported revenues when the financial statements were issued. Misstatements of quarterly earnings do not become immaterial just because profits for the year are unaffected by the misrepresentation. Investors are entitled to a full disclosure of all facts known to the corporation at the time financial statements are issued.[FN46] See

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,   Release No. ID - 184, 2001 WL 587989 (S.E.C.    Page 20
Release No.)

Ganino, 228 F.3d at 165 (citing Kaiser-Frazer Corp.
v. Otis & Co., 195 F.2d 838, 843 (2d Cir. 1952)).

**\*25** Sensormatic's Deerfield office was responsible
for approximately 50% of the revenue for the
company. (Tr. 287-88, 815.) The company included
out-of-period shipments in its quarterly revenue
calculations, which were incorporated into its
annual reports. Both quarterly and annual reports
were filed with the Commission. This practice
falsely represented to analysts and investors that the
company was experiencing a continuous growth rate
for over thirty quarters, which was touted in
analysts' reports, articles, and press releases. (Tr.
366-67; Div. Exs. 134, 137-44, 146-47, 150-51,
153, 156.) This practice also fulfilled investor
expectations, based on analysts' forecasts, and
promoted shareholder confidence in the company.
Sensormatic's ability to publicize its continuous
growth rate and the impact this had on the
company's reputation is also relevant to the issue of
materiality. See In re Kidder Peabody Sec. Litig.,
10 F.Supp.2d 398, 411 (S.D.N.Y. 1998).

The accounting method employed at Sensormatic
that permitted premature revenue recognition was
not in accordance with the company's stated
revenue recognition policy. (Tr. 316-17, 375.) This
is relevant to the issue of materiality. A change in
accounting method alone can be a material
misstatement or omission, even though there was no
change in the "bottom line," because it can "
fundamentally and basically alter[] the total mix of
information that is made available to the public,
shareholders, and potential investors." SEC v.
Crowell & Co., 1992 Fed. Sec. L. Rep. (CCH) ¶
96,879, at 93,591 (S.D. Ga. July 1, 1992).
Sensormatic's 1994 Form 10-K states that "revenue
from sales of equipment is recognized upon
shipment, acceptance of a customer order to
purchase presently installed equipment, or
acceptance by a third party financing institution of
an operating lease and the related equipment." (Div.
Ex. 114 at F-9.) Sensormatic did not disclose to
investors the change in accounting method that
allowed the premature recognition of revenue. This
omission is material because the effect, when
viewed in conjunction with misstatements
uncovered by E&Y's expanded audit, was to alter
the total mix of information, and furthered the
scheme. I conclude that the misstatements and

omissions as set out above were material.

Scienter

Scienter is a required element under Section
17(a)(1) of the Securities Act, Section 10(b) and
Rule 10b-5 of the Exchange Act, but not Sections
17(a)(2) and 17(a)(3) of the Securities Act. See
Aaron v. SEC, 446 U.S. 680, 697 (1980). The
Supreme Court has defined scienter as "a mental
state embracing intent to deceive, manipulate, or
defraud." Ernst & Ernst v. Hochfelder, 425 U.S.
185, 193 n.12 (1976). The scienter requirement is
also satisfied by showing that the respondent acted
recklessly, defined as "an extreme departure from
the standards of ordinary care ... which presents a
danger of misleading buyers or sellers that is either
known to the defendant or is so obvious that the
actor must have been aware of it." Meyer Blinder,
50 S.E.C. 1215, 1229-30 (1992) (quoting
Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d
1033, 1045 (7th Cir. 1977)); see also Hollinger v.
Titan Capital Corp., 914 F.2d 1564, 1568-69 (9th
Cir. 1990); Hackbart v. Holmes, 675 F.2d 1114,
1117 (10th Cir. 1982).

**\*26** Proof of scienter need not be direct, but may be
"a matter of inference from circumstantial evidence.
" Herman & Maclean v. Huddleston, 459 U.S. 375,
390 n.30 (1983). The mental state of a corporation
is established through the mental states of its
officers.[FN47] See SEC v. Manor Nursing Ctrs.,
Inc., 458 F.2d 1082, 1088 n.3 (2d Cir. 1972).

The Division argues that scienter has been
demonstrated by the following: management's
knowledge that the revenue recognition practice
was inconsistent with GAAP and the company's
revenue recognition policy; management's
indifference to the magnitude of the out-of-period
shipments; and management's efforts to withhold
documents from E&Y. (Div. Br. 82-83.)

Disseminating inaccurate accounting figures, or a
failure to follow GAAP, alone does not establish
scienter or recklessness. The party must know it is
disseminating materially false information, or be
reckless in doing so. See Lovelace v. Software
Spectrum Inc., 78 F.3d 1015, 1020 (5th Cir. 1996);
Chill v. Gen. Elec. Co., 101 F.3d 263, 270 (2d Cir.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,   Release No. ID - 184, 2001 WL 587989 (S.E.C.
Release No.)

Page 21

1996); In re Baan Co. Sec. Litig., 103 F. Supp. 2d
1, 20 (D.D.C. 2000); Rehm v. Eagle Fin. Corp., 954
F. Supp. 1246, 1255 (N.D. Ill. 1997). However, "
violations involving the premature or inappropriate
recognition of revenue suggest a conscious choice
to recognize revenue in a manner alleged to be
improper, and may therefore support a stronger
inference of scienter." Baan, 103 F. Supp. 2d at 21.

Sensormatic engaged in the intentional improper
recognition of revenue by bringing down the
computer system and backdating documents. (Tr.
234-37, 246-47, 318-19.) By intentionally recording
revenue in periods it was not realized or earned,
Sensormatic intentionally violated GAAP.[FN48]
(Tr. 599-600.) Respondent asserts that at all
relevant times management possessed a good faith,
reasonable belief that the company's financial
statements met the requirements of GAAP. (Resp.
Br. 112-15.) There is nothing in the record to
support this belief. The record illustrates that senior
management was fully aware that the revenue
recognition practices deviated from GAAP, but
believed them to be immaterial deviations, which
were not required to be remedied.[FN49] However,
other than Simmons's efforts to track the extra
shipping days, senior management made no effort to
quantify the GAAP deviations before recording
them. (Tr. 313-14, 316, 318-20, 375; Div. Ex. 99.)

There are other factors that are probative of
scienter. First, the revenue recognition practices at
Sensormatic were not in compliance with the
company's internal policy, which was stated in
documents filed with the Commission. See Provenz
v. Miller, 102 F.3d 1478, 1490 (9th Cir. 1996);
Chalverus v. Pegasystems, Inc., 59 F. Supp. 2d 226,
234-35 (D. Mass. 1999). Second, Sensormatic met
analysts' growth projections and earnings per share
estimates, sometimes within one cent, for several
consecutive quarters. (Div. Exs. 134, 137-44,
146-47, 150-51, 153, 156.) In the July 10, 1995,
press release, Assaf expressed disappointment that
this was the first time in ten years that the company
was below the range of analysts' expectations. (Div.
Ex. 129.) The ""ability" of the company to meet
analysts' projections for several consecutive
quarters misrepresented the financial condition of
the company. This falsely bolstered shareholder
confidence and is relevant to the issue of scienter.
See Chalverus, 59 F. Supp. 2d at 236. Third,

Sensormatic withheld documents from E&Y that
would show out-of-period shipments. (Tr. 261,
263-64, 269, 341-43, 346-48.) This strongly
suggests that senior management was aware of the
possibility that the amounts had reached an
unacceptable level, yet did nothing. In light of the
above, I find that Sensormatic acted with the
requisite scienter.

**\*27** Section 17(a) of the Securities Act requires
proof of an offer or sale of securities. In the record
are three registrations statements filed by
Sensormatic to issue 4.5 million, 450,000, and
460,000 shares of common stock dated February 3,
1994, January 12, 1995, and June 2, 1995,
respectively.[FN50] (Div. Ex. 120 at 4, Div. Ex.
125 at 2, Div. Ex. 126 at 2.) These registrations
statements incorporate the material misstatements
and omissions in the quarterly and annual reports
filed by Sensormatic. (Div. Ex. 120 at 6, Div. Ex.
125 at 3, Div. Ex. 126 at 3.)

I conclude that Sensormatic violated Sections
17(a)(1), 17(a)(2), and 17(a)(3) of the Securities
Act. The materiality of the misstatements and
management's scienter has been established.
Sensormatic's scheme included long-standing,
intentional, material violations of GAAP in order to
meet analysts' expectations and give the appearance
of constant growth. This practice operated as a
fraud in the offer or sale, or upon any purchaser of
Sensormatic securities because it misrepresented the
company's financial performance. Lastly, by
incorporating the materially misleading periodic
reports into its registration statements, Sensormatic
used false statements and omissions to obtain
money and property.

Section 10(b) of the Exchange Act and Rule 10b-5
thereunder require proof that the alleged
misconduct was "in connection with" the purchase
or sale of a security. The "in connection with"
requirement has been liberally construed to embrace
a wide range of misconduct and protects investors
against fraud. See Superintendent of Ins. v. Bankers
Life and Cas. Co., 404 U.S. 6, 12 (1971); In re
Ames Dep't Stores, Inc. Stock Litig., 991 F.2d 953,
964-66 (2d Cir. 1993). When fraud is accomplished
through the dissemination of false information, such
as press releases, quarterly and annual reports, and
other documents, the "in connection with"

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,   Release No. ID - 184, 2001 WL 587989 (S.E.C.    Page 22
Release No.)

requirement is generally satisfied by proof of the means of dissemination and the materiality of the misrepresentations or omissions. See SEC v. Rana Research, Inc., 8 F.3d 1358, 1362 (9th Cir. 1993); Ames Dep't Stores, 991 F.2d at 963, 965; SEC v. Antar, 15 F. Supp. 2d 477, 528 (D.N.J. 1998); SEC v. Softpoint, Inc., 958 F.Supp. 846, 862 (S.D.N.Y. 1997).

Sensormatic's common stock was listed on the New York Stock Exchange, and it filed and distributed quarterly and annual reports, through jurisdictional means, that contained material misrepresentations and omissions. (Tr. 52; Div. Exs. 111-19, 121-24, 127, 190.) Furthermore, the company acted with scienter by employing different accounting practices than those disclosed to the investing public and engaging in long-standing, material violations of GAAP that evolved into a very elaborate scheme to meet analysts' expectations and give the appearance of constant growth. I conclude that Sensormatic violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## Yesner's Violations

**\*28** The OIP alleges that Yesner caused Sensormatic's violations of the antifraud provisions because he knew or should have known that revenue was improperly recognized for inclusion in the company's reports filed with the Commission. (OIP ¶ 15.)

Yesner was controller when he first realized the company was shipping past quarter end. He was aware that revenue had been recognized on out-of-period shipments during fiscal years 1994 and 1995, and never reported it to the audit committee or E&Y. (Tr. 726-28.)

The Division argues that it is not objectively reasonable for Yesner to have failed to make efforts to quantify the amounts of the out-of-period shipments or disclose this practice and possibility of withholding documents from outside auditors to the audit committee and E&Y. (Div. Br. 87.) The Division relies on Yesner's knowledge of Sensormatic's corporate culture, the revenue recognition practice and its noncompliance with GAAP and company policy, and his experience as a

CPA. (Div. Br. 86-87.)

Yesner argues that there is no evidence that he should have known material facts inconsistent from those provided to him by other individuals in the company. (Resp. Br. 118.) He took reasonable steps in response to hearing there was a possibility of withholding documents and that it was reasonable for Yesner to rely on the representations of his superiors and colleagues. (Resp. Br. 118.) He asserts that there is no evidence he acted fraudulently, negligently, or with anything other than good faith. Furthermore, his positions as controller and DBC are not an adequate basis for scienter, willfulness, or negligence. (Resp. Br. 121.) He maintains there is no proof that he had any intent to deceive or defraud, and his conduct was not so extremely unreasonable to be reckless. (Resp. Br. 118.)

Yesner is charged with "causing" Sensormatic's violations of the antifraud provisions. Therefore, Yesner must act with the requisite scienter to violate Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Yesner was aware of the practice, and that it was inconsistent with GAAP and company policy. (Tr. 744-46.) However, he did not participate in shutting down the computer, making revenue recognition decisions, or preparing financial statements. The revenue recognition department reported to him through Schneider, but he was not involved in the revenue recognition process, and was circumvented regarding supervision within the department.[FNS1] (Tr. 283, 761, 790-91, 805, 867, 873-75.) Furthermore, he relied on the assertions of individuals with more familiarity with the practice, who represented that it was immaterial. These individuals had been with the company longer than Yesner, and were specifically involved in revenue accounting. Yesner thought they were the "experts" in what they were doing and did not think he needed to verify their representations. (Tr. 731-32.)

When this accounting practice was discussed, it was within the context of the "quarter-end crunch," which was well known throughout the company and thought of as "a very normal, routine process that was not material." (Tr. 731.) Yesner never attempted to quantify the amount of improperly recognized revenue because it "was always

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,  Release No. ID - 184, 2001 WL 587989 (S.E.C. Release No.)

Page 23

described as being an immaterial practice at the company" and "never rose to a level of such importance in [his] mind that … [he] believed the [he] needed to research the magnitude of the level of shipments." (Tr. 729-30.) Yesner believed that people even at the board level, like Assaf and Pardue, knew about the out-of-period shipments, and that the task force would eventually alleviate the problem by eliminating the "quarter-end crunch. " (Tr. 731, 786-87.) To Yesner, there never seemed to be an effort to get revenue in or do things improperly. (Tr. 747-49.)

**\*29** When Lininger approached Yesner to discuss the 1994 Audit, and said that Simmons had asked him to withhold documents from E&Y, Yesner inquired of various individuals.[FN52] (Tr. 266, 763-64.) He spoke to both Simmons and Schneider and, getting consistent answers, believed that there had been a miscommunication and that documents were going to be turned over to E&Y. (Tr. 770-71.) Yesner did not know what the documents would show and he never actually saw them. (Tr. 768-69.) Yesner testified that, at the time, this did not seem to be a significant event and he told Lininger, "to do the right thing" and, "satisfactorily resolve this with [Simmons]." (Tr. 266, 769-70, 782.) After the conversation, Yesner believed Lininger understood that "E&Y was going to need the documents [and] that meant to turn them over." (Tr. 769.) Yesner acknowledged that if Lininger decided to withhold the documents it would be serious, but he never " followed-up" to make sure E&Y received the documents. (Tr. 767, 783-84.)

Yesner believed the matter was resolved when E&Y signed off on the audit without mention in its report or to the audit committee that requested documents were not received or that management had been uncooperative.[FN53] (Tr. 269, 771-73.) E&Y did not approach Yesner about any problems obtaining documents and he did not discuss this with Lininger again in 1994.[FN54] (Tr. 771.) He testified that he never thought that E&Y would sign off on an audit without receiving requested documents. (Tr. 772-73.) I find Yesner's inference that E&Y received all of the documents because it signed off on the audit reasonable. Therefore, I find that Yesner did not act with scienter or that his conduct was so extremely unreasonable to be reckless when he failed to report to the audit committee that there

was a possibility documents were withheld from E&Y. I find that Yesner did not cause Sensormatic's primary violations of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

With respect to the non-scienter primary violations Yesner is alleged to have caused, a negligence standard will be applied, and Yesner's conduct will be measured by reasonableness. See Jeffrey M. Steinberg, 68 SEC Docket 120, 124 (Sept. 11, 1998); see also KPMG Peat Marwick LLP, 74 SEC Docket 384, 423, 426 (Jan. 19, 2001) (finding that accountants' actions were unreasonable), appeal filed , D.C. Cir., No. 01-1131. The reasonableness standard is in accord with the due care standard articulated in Statement on Auditing Standards No. 1  ¶¶  1-6, Due Professional Care in the Performance of Work (1972) (SAS No. 1  ¶¶  1-6), which enunciates a standard of care being that of a reasonable man under like circumstances.[FN55]

Yesner had knowledge of the out-of-period shipments and improperly recognized revenue, and some awareness that documents were misdated to facilitate the recording of revenue. (Tr. 726-27, 760.) As DBC, he was responsible for evaluating processes and practices within the company, serving as an internal consultant, performing internal audit activities as suggested by E&Y, and reporting his findings to the audit committee. (Tr. 61, 66-67, 117, 305-07, 799-801; Div. Exs. 16, 21-22, 53.)

**\*30** His failure to report the accounting practices resulted in the conduct proscribed by Sections 17(a)(2) and 17(a)(3) of the Securities Act. Yesner is a CPA with seven years of auditing experience with a large accounting firm. (Div. Ex. 1 at 5-6.) I find Yesner's failure to report this practice to the audit committee unreasonable, and I conclude that he was negligent in remaining silent about the revenue recognition practices. His silence permitted the practices to continue. I recognize that Yesner had vast responsibilities as DBC with little help. (Tr. 389-90, 740; Div. Exs. 16, 22, 53.) However, there were sufficient indicators regarding Sensormatic's course of conduct involving the revenue recognition practices, and Yesner should have brought the matter to the attention of, at least, the audit committee. Therefore, I conclude that Yesner's inaction was a cause of Sensormatic's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,  Release No. ID - 184, 2001 WL 587989 (S.E.C.    Page 24
Release No.)

primary violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act.

## Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder

The OIP alleges Sensormatic's reports filed with the Commission were materially misstated and violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder, collectively referred to as the filing provisions. (OIP ¶¶ 8, 15.)

### Sensormatic's Violations

Section 13(a) of the Exchange Act requires issuers subject to the Exchange Act's reporting provisions to file reports, documents, and other information. Issuers must file annual and quarterly reports as required by Exchange Act Rules 13a-1 and 13a-13, respectively. Exchange Act Rule 12b-20 requires issuers to include all information necessary to ensure that statements and reports filed with the Commission are not materially misleading.

Courts interpreting Section 13 of the Exchange Act and the rules thereunder have held that "the reporting provisions of the Exchange Act … are satisfied only by the filing of complete, accurate, and timely reports." SEC v. Savoy Indus., Inc., 587 F.2d 1149, 1165 (D.C. Cir. 1978); see also SEC v. Gallagher, 1989 U.S. Dist. LEXIS 9556, at *18-19 (E.D. Pa. 1989); SEC v. World-Wide Coin Invs., Ltd., 567 F. Supp. 724, 758-59 (N.D. Ga. 1983). Scienter is not an element under Section 13 of the Exchange Act. See e.g., SEC v. McNulty, 137 F.3d 732, 740-41 (2d Cir. 1998).

The definition of "material" in the context of registration and reporting is similar to that in the antifraud provisions and is defined in Exchange Act Rule 12b-2 as "those matters to which there is a substantial likelihood that a reasonable investor would attach importance in determining whether to buy or sell the securities registered." In accordance with the prior discussion regarding materiality, the misstatements concerning revenue and the omission as to the failure to follow Sensormatic's revenue accounting policy were material at the time the information was provided to investors.

*31 Financial reports that are not in accordance with GAAP are presumed to be misleading. See 17 C.F.R. § 210.4-01(a)(4). There is an expectation that issuers follow Commission and GAAP rules, especially when it is explicitly stated that they comply with GAAP, as in the independent auditor's opinion filed with company Forms 10-K. (Div. Ex. 114 at F-1, Div. Ex. 190 at F-1.) Therefore, it is misleading to anyone trying to analyze an issuer's financial statements when they are published if those financial statements do not comply with GAAP. See Baan, 103 F. Supp.2d at 14-15.

Sensormatic's quarterly and annual reports did not comport with GAAP. The prematurely recognized revenue was included in the company's quarterly and annually filed reports with the Commission, with little if any determination by Sensormatic as to amount. (Tr. 313-14, 316-17, 319-20, 375; Div. Ex. 99.) In addition, the resulting misstatements from these practices were misleading to investors because the reported revenues included prematurely recognized revenue of an undetermined amount, giving the appearance of meeting analysts' expectations. Therefore, Sensormatic violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

### Yesner's Violations

The Division relies on the same evidence and arguments that Yesner caused Sensormatic's violations of the filing provisions as the antifraud provisions. In essence, the Division argues that it was unreasonable for Yesner not to have sought quantification of the amounts or reported the practice to the audit committee or E&Y. (Div. Br. 86-87.)

For the same reasons discussed in the previous section, I find that Yesner's conduct was unreasonable. Yesner was not responsible for the company's financial statements or filings with the Commission. (Tr. 379-80, 390-93, 470, 809-12, 867-69.) However, he knew of the revenue recognition practices and was responsible for assessing the processes and practices of the company and reporting to the audit committee. (Tr. 726-28; Div. Exs. 16, 22, 53.) Therefore, I conclude that his failure to bring the matter to the attention of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,  Release No. ID - 184, 2001 WL 587989 (S.E.C.  Page 25
Release No.)

the audit committee was a cause of Sensormatic's violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

## Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act

The OIP alleges that Sensormatic improperly recognized revenue on out-of-period shipments by bringing down the computer and misdating shipping documents used to book revenue. This resulted in the falsification of books and records and the circumvention of the company's internal control systems. (OIP ¶¶ 6-8.)

### Sensormatic's Violations

Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, collectively referred to as the accounting provisions, are part of the Foreign Corrupt Practices Act (FCPA) passed by Congress in 1977 to combat corrupt business practices such as corporate bribery. See generally Foreign Corrupt Practices Act of 1977, Statement of Policy, 21 SEC Docket 1466, 1468 (Jan. 29, 1981). The accounting provisions were enacted to assure books and records accurately and fairly reflected transactions and the disposition of assets, to protect the integrity of the independent audit, and to promote reliability and completeness of financial information that is disseminated to investors. See World-Wide Coin, 567 F. Supp. at 747. Proof of a violation does not require scienter, materiality, or that the transactions are above a specific dollar amount. See World-Wide Coin, 567 F. Supp. at 749-52.

**\*32** Section 13(b)(2)(A) of the Exchange Act regulates corporate financial record keeping. It requires issuers who are registered with the Commission pursuant to Section 12 of the Exchange Act, or are otherwise required to file reports with the Commission under Section 15(d) of the Exchange Act, to "make and keep books, records, and accounts which in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer." Section 13(b)(7) of the Exchange Act defines the term " reasonable detail" to mean the level of detail as would satisfy prudent officials in the conduct of

their own affairs.

The court in World-Wide Coin enumerated objectives for Section 13(b)(2)(A) of the Exchange Act: books and records reflect transactions in conformity with accepted methods of reporting economic events; deliberate acts resulting in inaccurate financial books and records are unlawful; and transactions are reflected in books and records to permit the preparation of financial statements in conformity with GAAP and other applicable criteria. 567 F. Supp. at 748.

The misdating of documents used to book revenue was a deliberate act that resulted in inaccurate books and records, namely the general ledger. (Tr. 235-38, 316-19.) Revenue was booked based on misdated "ship-to" notices. It was impossible to discern from the "ship-to" notices, the base documents used to book revenue, the sales that legitimately occurred within the quarter from out-of-period shipments. (Tr. 246-47, 328.) All of this revenue was recorded in the company's general ledger and incorporated in the financial statements. (Tr. 232-34, 247.) The company's financial statements could not be prepared in conformity with GAAP based on the books and records. This practice went on for several years with scant, if any, attempt to track the quantity of the out-of-period shipments. (Tr. 313-16, 319-20, 375; Div. Ex. 99.) In light of these facts, I find that Sensormatic violated Section 13(b)(2)(A) of the Exchange Act because its books and records were not maintained in reasonable detail, or in accordance with a level of detail and degree of assurance as would satisfy prudent officials in the conduct of their own affairs.

Section 13(b)(2)(B) of the Exchange Act requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP, or other applicable criteria.[FN56] Section 13(b)(7) of the Exchange Act defines the term "reasonable assurances" to mean the level of detail as would satisfy prudent officials in the conduct of their own affairs.

Under Section 13(b)(2)(B) of the Exchange Act, the system of internal accounting controls need only

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,   Release No. ID - 184, 2001 WL 587989 (S.E.C.   Page 26
Release No.)

provide reasonable assurance of the reliability of financial records, not ensure the absolute accuracy of such records. Internal controls are not required to be fail-safe because they could be implemented improperly due to carelessness, misunderstanding, or misjudgment, as well as circumvented by collusion or at the direction of management. See Statement on Auditing Standards No. 55 ¶ 16, Consideration of Internal Control in a Financial Statement Audit (1988) (SAS No. 55). "There are no specific standards by which to evaluate the sufficiency of controls; any evaluation is inevitably a highly subjective process in which knowledgeable individuals can arrive at totally different conclusions." World-Wide Coin, 567 F. Supp. at 751.

**33** Internal controls are the policies and procedures adopted within an organization that operate as a means of promoting operational efficiency, reliability in financial reporting, and encouraging adherence to managerial policies, applicable laws, and regulations. See World-Wide Coin, 567 F.Supp. at 750; see generally SAS No. 55 ¶ 6; Vincent M. O'Reilly et al., Montgomery's Auditing 9-2 (John Wiley & Sons, Inc. 12th ed. 1998). Internal accounting controls are one element of a control system implemented to safeguard assets and promote reliable financial records. They provide reasonable assurance that transactions are authorized and recorded as necessary to permit the preparation of financial statements in conformity with GAAP, or other applicable criteria, as well as limiting access to records and providing for periodic review to test for inconsistencies. See World-Wide Coin, 567 F. Supp. at 750; Montgomery's Auditing, at 9-2 through 9-6.

Examples of internal accounting controls that promote the above objectives are: separation of tasks and duties; separation of authorization ability; manual or automated review to check for completeness, accuracy, and authenticity; defined customer order and shipping processes; method to record transactions completely and accurately in the period which they occur; and reconciliation of accounting entries to detect errors in posting and malfeasance. See generally SAS No. 55 ¶ 32; Montgomery's Auditing, at 9-7 through 9-10, 9-13 through 9-14.

E&Y representatives expounded on the existence of internal accounting controls in September 1993, when they told the audit committee, "there were such checks and balances and a general internal monitoring of controls ... [E&Y] confirmed that ... there were no internal control problems." (Div. Ex. 12 at 4-5.) In a report dated June 30, 1994, E&Y gave a detailed assessment of the controls present at Sensormatic, noting comprehensive policies and procedures, the use of access control software, management's ongoing consultations with E&Y, extensive procedures of authorizing transactions, separation of duties, developed hierarchy of command, a system of checks and balances, and an audit committee that meets with E&Y. (Div. Ex. 70.) While E&Y's observations cannot establish compliance with Section 13(b)(2)(B) of the Exchange Act, they can serve as evidence of the presence and breadth of Sensormatic's internal controls.

The Division asserts that the routine manipulation of the computer clock to misdate documents demonstrates the company's inadequate internal accounting controls. (Div. Br. 69.) However, this does not establish that the whole system of internal accounting controls was inadequate. The record clearly establishes that Sensormatic had several internal accounting controls in place throughout the company. Sensormatic was a very large corporation with several locations and an extensive hierarchy of employees. (Tr. 51, 303-04, 381-82.) Lininger testified to the separation of duties and extensive order-processing pipeline. Different departments were responsible for various stages of processing transactions and reconciling information, increasing the possibility of noticing inconsistencies. The company had a standardized process to effect transactions and a computer system, with restricted access, which automatically dated documents. (Tr. 228-34, 238-40.)

**34** Notwithstanding extensive controls, Sensormatic improperly booked revenue because senior management directed the coordination of several departments to circumvent the controls. (Tr. 234, 238-39, 240-46, 321-23.) This occurred for an extended period of time and became standard operating procedure. (Tr. 312-13, 315.) The involvement of senior management in the process makes it improbable that any system of controls

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

would have prevented this practice. I find that this is not a situation where controls were inadequate, but where the internal accounting controls were intentionally overridden and circumvented. Accordingly, I conclude that Sensormatic did not violate Section 13(b)(2)(B) of the Exchange Act by having inadequate internal controls.[FN57]

### Yesner's Violations

The OIP alleges that Yesner caused and aided and abetted Sensormatic's violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act by knowing about and not reporting the practice of misdating documents that resulted in the falsification of books and records. (OIP ¶¶ 12-13.)

The elements of aiding and abetting are: an independent securities law violation by another party; substantial assistance of the principal violation by the aider and abettor; and a general awareness or knowledge that his role was part of an overall activity that was improper.[FN57] See Donald T. Sheldon, 52 SEC Docket 3826, 3837 (Nov. 18, 1992), aff'd, 45 F.3d 1515 (11th Cir. 1995); Kirk A. Knapp, 50 SEC Docket 1840, 1842 (Feb. 21, 1992); William R. Carter, 47 S.E.C. 471, 503 (1981); see also Woodward v. Metro Bank, 522 F.2d 84, 94-97 (5th Cir. 1975); IIT v. Cornfeld, 619 F.2d 909, 922 (2d Cir. 1980).

I have already concluded that Sensormatic violated Section 13(b)(2)(A) of the Exchange Act. The Division must next show that the alleged aider and abettor provided substantial assistance to the primary violator. The second and third elements of aiding and abetting vary inversely with one another and must be viewed together. Accordingly, if there is scant evidence of substantial assistance, then there must be more evidence of scienter. See Metge v. Baehler, 762 F.2d 621, 624 (8th Cir. 1985); IIT, 619 F.2d at 922.

The Division's allegations focus on Yesner's inaction. Inaction can create liability if the individual "either consciously intended to assist [the primary] violation, or ... breached a duty to disclose or act and had some degree of scienter." Carter, 47 S.E.C. at 507; see also Zoelsch v. Arthur Andersen & Co., 824 F.2d 27, 36 (D.C. Cir. 1987); Woods v.

Barnett Bank, 765 F.2d 1004, 1010 (11th Cir. 1985) ; Armstrong v. McAlpin, 699 F.2d 79, 91 (2d Cir. 1983); IIT, 619 F.2d at 926-27; SEC v. Coffey, 493 F.2d 1304, 1316-17 (6th Cir. 1974). The evidence does not support a conclusion that Yesner intended to substantially assist the primary violations through inaction or silence, or that by his inaction, he possessed the requisite degree of scienter.

*35 An important principle of aiding and abetting liability is that the individual "associate himself with the venture, that he participate in it as something that he wishes to bring about, [and] that he seek by his action to make it succeed." Zoelsch, 824 F.2d at 36 (quoting Nye & Nissen v. United States, 336 U.S. 613, 619 (1949) (citations omitted)). The Division must go farther than a mere inference that an individual must have known the facts. The Division must support the inference and by giving "reason to conclude that the [respondent] has thrown in his lot with the primary violators." Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 497 (7th Cir. 1986); accord Investors Research Corp. v. SEC, 628 F.2d 168, 177 (D.C. Cir. 1980) (holding that awareness of wrongdoing insures that innocent, incidental participants in what is later found to be illegal are not subjected to harsh, civil, criminal, or administrative penalties). Such evidence is absent from the record.

Recklessness can satisfy the knowledge requirement for aiding and abetting. See Graham v. SEC, 222 F.3d 994, 1004 (D.C. Cir. 2000); Woods, 765 F.2d at 1010; Armstrong, 699 F.2d at 91. However, Yesner's conduct does not rise to the level of recklessness. Yesner did not know what documents were used to book revenue, was not involved in the quarter end closing process, and did not have access to the CIS. (Tr. 750-51, 755-57, 760, 762-63.) He believed stopping the computer was a normal part of processing paperwork to complete transactions, not to execute new transactions. (Tr. 751.) He thought that it was a processing problem where the computer system could not process and update at the same time. (Tr. 756.) The record is also unclear as to what responsibility Yesner had for the books and records.[FN58]

In the context of these events, I find that Yesner did not act knowingly, recklessly, or with a conscious intent to further Sensormatic's violation of Section

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,  Release No. ID - 184, 2001 WL 587989 (S.E.C. Release No.)                                Page 28

13(b)(2)(A) of the Exchange Act. Therefore, I conclude that Yesner did not aid and abet Sensormatic's violation of Section 13(b)(2)(A) of the Exchange Act.

The Division relies on its arguments regarding the aiding and abetting allegation to establish that Yesner was a cause of Sensormatic's violation of Section 13(b)(2)(A) of the Exchange Act. (Div. Br. 72-73.) The Division also asserts that Yesner had duties "stemm[ing] from the positions he held in the company and his status as a CPA and a member of AICPA." The Division argues that Yesner remained silent when he had a clear duty to speak. (Div. Reply 28.)

It is unnecessary that Yesner know the exact process by which the company recognized revenue on the out-of-period shipments, or have direct oversight responsibility for the accuracy of the company's reports, books, or records. At some point during the relevant period, Yesner knew that whatever was shipped beyond quarter end would be dated with the last date of the quarter to allow the revenue recognition process to take place. (Tr. 760.) In conjunction with his knowledge of the out-of-period shipments and dating of documents, the clear result being inaccuracies in the company's books and records, he should have inquired about the practices employed by the revenue accounting department and reported them. In light of Yesner's positions and responsibilities within Sensormatic, I find his failure to report the practice to the audit committee unreasonable and that Yesner was a cause of Sensormatic's violations of Section 13(b)(2)(A) of the Exchange Act.

### Exchange Act Rules 13b2-1 and 13b2-2

**\*36** The OIP alleges that Yesner willfully violated Exchange Act Rule 13b2-1 while he was controller and DBC, because he was responsible for the accuracy of Sensormatic's books and records, and allowed the conduct to continue even though he knew that the company was misdating documents and prematurely recognizing revenue. (OIP ¶ 12.) The OIP further alleges that Yesner willfully violated Exchange Act Rule 13b2-2 because he participated in the withholding of documents and information from E&Y, and never disclosed the

out-of-period shipments to them. (OIP ¶ 13.)

Exchange Act Rules 13b2-1 and 13b2-2 are intended to promote compliance with the accounting provisions by making individuals directly liable for conduct that undermines the reliability of financial information disseminated to investors or the integrity of the independent audit. See Promotion of the Reliability of Financial Information and Prevention of the Concealment of Questionable or Illegal Corporate Payments and Practices, 16 SEC Docket 1143, 1144 (Feb. 15, 1979) (Reliability of Financial Information).

Willfulness does not require intent to violate the law, nor does it require ""deliberate or reckless disregard of a regulatory requirement." Jacob Wonsover, 69 SEC Docket 694, 711 (Mar. 1, 1999), petition for review denied, Wonsover v. SEC, 205 F.3d 408 (D.C. Cir. 2000). A willful violation arises when the individual intentionally commits an act that does not fulfill the regulatory requirement, or "if charged with a duty, he failed to meet his responsibility." Anthony Tricario, 51 S.E.C. 457, 460 n.5 (1993); Frank Humphreys, 48 S.E.C. 161, 164 (1985); see also Arthur Lipper Corp. v. SEC, 547 F.2d 171, 180 (2d Cir. 1976); Tager v. SEC, 344 F.2d 5, 8 (2d Cir. 1965).

Exchange Act Rule 13b2-1 creates liability for individuals who, directly or indirectly, falsify or cause to be falsified any book, record, or account subject to Section 13(b)(2)(A) of the Exchange Act. In 1981, Chairman Harold M. Williams gave guidance as to what constituted a violation of the FCPA's accounting provisions:

> Neither its text and legislative history nor its purposes suggest that occasional, inadvertent errors were the kind of problem that Congress sought to remedy in passing the [FCPA].... A failure to correct a known falsification-or a falsification that reasonably should be known-or any attempt to cover-up a falsification-is, of course, prohibited. But, this responsibility arises only when the individual in question is in some respect responsible for the records or controls, or otherwise supervises the activity giving rise to the violation.

Foreign Corrupt Practices Act of 1977, 21 SEC Docket 1466, 1471 (Jan. 29, 1981).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,   Release No. ID - 184, 2001 WL 587989 (S.E.C. Release No.)    Page 29

Yesner argues there is no evidence that he engaged in, or directed others to engage in falsification, or that he caused any book, record, or account to be falsified. (Resp. Br. 98.) The record does not support a finding that Yesner was responsible for Sensormatic's compliance with Section 13(b)(2)(A) of the Exchange Act. He was responsible for evaluating essentially any practice, policy, or procedure within Sensormatic and reporting his findings to the audit committee. His unsatisfactory job performance does not automatically amount to a willful violation of the securities laws. In addition, as controller, Yesner did not supervise the activity giving rise to the violation; individuals in the revenue accounting department took their direction from Simmons, the vice president of finance. Therefore, I find that Yesner's failure to report the accounting practices to the audit committee was not a willful violation of Exchange Act Rule 13b2-1.

*37 Exchange Act Rule 13b2-2 prohibits any director or officer of an issuer from making, or causing to be made, a materially false or misleading statement, or omitting to state, or causing another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to any accountant in the connection with an audit or filings with the Commission. The purpose of Exchange Act Rule 13b2-2 is to enhance the integrity of the financial disclosure system and to ensure fair dealing in securities by encouraging accurate and careful communications between auditors and issuers, and deterring false, misleading, or incomplete statements to accountants. See Reliability of Financial Information, 16 SEC Docket at 1153.

Exchange Act Rule 3b-2 defines "officer" as "a president, vice president, secretary, treasurer or principal financial officer, comptroller or principal accounting officer, and any person routinely performing corresponding functions with respect to any organization whether incorporated or unincorporated."

Yesner was never considered an officer within Sensormatic. (Tr. 113, 378, 383, 390, 470; Div. Ex. 4 at SENSOR 00077.) The Division argues that Yesner does not have to be considered an officer within the company to have violated Exchange Act

Rule 13b2-1, because "controller" is a position included in the definition of officer. (Div. Br. 59-60.)

The primary source of interpretation of Exchange Act Rule 3b-2 is in the context of Section 16 of the Exchange Act, which is a strict liability provision that targets an insider's trading profits without inquiry into whether the insider actually possessed material, non-public information. See Ownership Reports and Trading by Officers, Directors and Principal Shareholders, 42 SEC Docket 570, 571-72 (Dec. 13, 1988); Interpretive Release on Rules Applicable to Insider Reporting and Trading, 23 SEC Docket 856, 860-61 (Sept. 24, 1981) (Insider Reporting and Trading). Because the emphasis of Section 16 of the Exchange Act is on individuals with routine access to material, non-public information, courts were hesitant to base liability on title alone and looked to an individual's specific functions and duties. See C.R.A. Realty Corp. v. Crotty, 878 F.2d 562, 566 (2d Cir. 1989) (citing Colby v. Klune, 178 F.2d 872 (2d Cir. 1949) ); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Livingston, 566 F.2d 1119, 1121-23 (9th Cir. 1978).

In 1981, the Commission staff interpreted Exchange Act Rule 3b-2 in the context of Section 16 of the Exchange Act and took the position that the determination of whether an individual is an officer hinges on an examination of all the facts. It stated, " an employee who holds a title may nonetheless not be an officer because his functions and duties are insignificant, despite his formal position." See Insider Reporting and Trading, 23 SEC Docket at 860-61. Yesner's duties and responsibilities as controller were limited and not those of an officer. He did not prepare or verify financial statements and never signed corporate filings or made a representation as a member of management to the Commission. In addition, he never made or acquiesced in the ultimate accounting decisions. His involvement was mostly limited to cost and inventory accounting for the U.S. retail group. (Tr. 391-92, 470-71, 789, 813-15, 867-69.) Yesner was very involved in preparing information for meetings, strategy sessions and special projects. (Tr. 790, 816-19; Div. Exs. 4-7.) I conclude that, as controller, Yesner's functions and duties were not so significant that he should be considered an officer.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 30

**\*38** The Division argues that Yesner violated Exchange Act Rule 13b2-2 when he failed to report to E&Y the material information he had about the accounting irregularities. The Division asserts that the materiality is shown by E&Y's activities upon learning this information–namely disclosing the information to the audit committee, recommending the audit committee engage special counsel, and expanding the scope of its 1995 Audit. (Div. Br. 63-64, Div. Reply 19.)

Even assuming that his title of controller alone is enough to find that Yesner was an officer in the context of Exchange Act Rule 13b2-2 (and controller is synonymous with comptroller), Yesner would have been an officer for four months of the relevant period, from July 1, 1993, until October 31, 1993.[FN59]

Yesner was not a primary contact for E&Y while he was controller, and whatever contact he did have seemed to consist of tracking the costs of audits. There is no evidence that he prepared, or directed the preparation, of any reports, particularly regarding revenue accounting, that were given to E&Y in the course of its audits or eventually filed with the Commission during this four-month period. (Tr. 394, 872-73; Div. Exs. 4-8.)

The Division argues that Yesner was also an officer as DBC. (Div. Br. 60.) Since DBC is not one of the enumerated titles within Exchange Act Rule 3b-2, the relevant inquiry is whether the position performed "corresponding functions." The Division asserts that, as DBC, Yesner performed corresponding functions to those of a principal financial officer, comptroller, or principle accounting officer because he played a significant role in ensuring the accuracy of the company's financial reports and the propriety of its accounting practices, as well as having regular contact with E&Y and attending audit committee meetings with E&Y and other senior financial officers. (Div. Br. 60, 62.) In addition, Yesner was one of the few people that reported directly to the CEO of the company and to the audit committee. (Tr. 144; Div. Br. 60.)

I find that, as DBC, Yesner did not perform corresponding functions to a principal financial officer, comptroller, or principle accounting officer.

He did not supervise the accounting departments or have any decision-making authority pertaining to accounting treatment decisions. As DBC, he was not considered an officer within the company, a primary contact for E&Y, or involved in the preparation of filings. In fact, Yesner had minimal contact with E&Y until the 1995 Audit. (Tr. 203, 387-88, 391, 393-94, 471, 867-73.)

Yesner's reporting relationships also fail to establish that he was performing "corresponding functions." Yesner reported to Assaf so the financial officers could not pressure him and impede his work. (Tr. 61-62, 144-45, 306-07; Div. Ex. 13.) This does not establish that he was of high rank within the company or had duties corresponding to a principal officer. Furthermore, Yesner's reports detailed the projects he worked on as DBC. The projects ranged from analyzing employee relocation procedures to corporate acquisition work to consulting at manufacturing locations worldwide, as well as serving on committees regarding human resource issues, product codes, and return policies. (Div. Exs. 9, 19, 29, 42, 79.) His duties were not focused on finance or accounting, but to analyze all practices, policies, and procedures within Sensormatic. Accordingly, I conclude that Yesner was not an officer while DBC of Sensormatic. [FN60] Therefore, I conclude that Yesner did not violate Exchange Act Rule 13b2-2.

### Rule 102(e) of the Commission's Rules of Practice

**\*39** The OIP alleges that Yesner violated Rule 102(e)(1)(ii) of the Commission's Rules of Practice because he engaged in improper professional conduct in connection with his role in improper revenue recognition, materially false filings with the Commission, and his failure to report the company's conduct. (OIP ¶ 16.) The OIP further alleges that Yesner violated Rule 102(e)(1)(iii) of the Commission's Rules of Practice because he willfully violated and aided and abetted violations of the federal securities laws. (OIP ¶ Part I.)

Under Rule 102(e)(1) of the Commission's Rules of Practice, the Commission may censure a person or deny, temporarily or permanently, the privilege of appearing or practicing before it if, after notice and opportunity for hearing, the Commission finds the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,  Release No. ID - 184, 2001 WL 587989 (S.E.C. Release No.)

individual: (i) not to possess the requisite qualifications to represent others; or (ii) to be lacking in character or integrity or to have engaged in unethical or improper professional conduct; or (iii) to have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws or rules and regulations thereunder. 17 C.F.R. § 201.102(e)(1).

In 1998, the Commission amended Rule 102(e)(1) to define "improper professional conduct." See 17 C.F.R. § 201.102(e)(1)(iv)(A) and (B). On October 19, 1999, the Commission directed that Yesner's conduct be judged against a knowing or reckless standard. See Albert Glenn Yesner, 70 SEC Docket 2743 (Oct. 19, 1999.) Therefore, as relevant to this proceeding, only 102(e)(1)(iv)(A) is applicable and defines "improper professional conduct" as " intentional or knowing conduct, including reckless conduct, that results in a violation of applicable professional standards." The amendment to Rule 102(e) defines recklessness:

> "[R]ecklessness" in subparagraph (A) of the rule amendment should mean the same thing as courts have defined "recklessness" to mean under the antifraud provisions. "Recklessness" under the antifraud provisions "is not merely a heightened form of ordinary negligence; it is an 'extreme departure from the standards of ordinary care, … which presents a danger of misleading buyers or sellers that is either known to the (actor) or is so obvious that the actor must have been aware of it." This recklessness standard is a lesser form of intent.

Amendment to Rule 102(e), 68 SEC Docket 707, 710 (Oct. 19, 1998) (citations omitted). I previously concluded that Yesner did not act with intent to deceive or out of recklessness. For this reason, I conclude that Yesner did not engage in improper professional conduct within the meaning of Rule 102(e)(1)(ii).

Yesner was not found to have willfully violated or willfully aided and abetted any violations of the securities laws. As discussed throughout this Initial Decision, Yesner was not involved in the preparation of financial statements while employed at Sensormatic. His violations stemmed from negligent conduct-his failure to report the out-of-period shipments to the audit committee. Therefore, he is not subject to discipline under Rule

102(e)(1)(iii).

## IV. SANCTIONS

### Cease and Desist

*40 Section 8A of the Securities Act and Section 21C(a) of the Exchange Act allow the Commission, upon a finding that a "person is violating, has violated, or is about to violate any provision of this title, or any rule or regulation thereunder," to impose a cease and desist order on "such person, and any person that is, was or would be a cause of the violation, due to an act or omission the person knew or should have known would contribute to such a violation." A finding that a respondent has violated the federal securities laws does not necessarily mandate the imposition of such an order. See, e.g., Warren G. Trepp, 70 SEC Docket 2037 (Sept. 24, 1999).

In determining to impose a cease and desist order, the following factors should be taken into consideration:

> the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that his occupation will present opportunities for future violations.

Joseph J. Barbato, 69 SEC Docket 178, 200 n.31 (Feb. 10, 1999) (quoting Steadman v. SEC, 603 F.2d 1126, 1140 (5th Cir. 1979) (citation omitted)). Before imposing a cease and desist order, there must be some likelihood of future violations; however, the risk does not need to be very great. " Absent evidence to the contrary, a finding of [a] violation raises a sufficient risk of future violation." KPMG, 74 SEC Docket at 429-430.

In addition to the above, the Commission has enumerated several other factors to consider when determining whether to issue a cease and desist order, including the harm caused by the violations, whether the violation is recent, and the remedial function to be served in the context of other sanctions sought in the same proceedings. This is a flexible inquiry, and no one factor is determinative. KPMG, 74 SEC Docket at 436.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,  Release No. ID - 184, 2001 WL 587989 (S.E.C.        Page 32
Release No.)

The Division argues that Yesner's conduct was egregious and his failure to take action was highly reckless in view of the responsibilities he had as controller, DBC, and CPA. Although I have concluded that Yester's violations did not involve scienter or recklessness, he failed to take action that would have prevented or disclosed the company's financial irregularities and financial fraud in fiscal years 1994 and 1995. He is a CPA with several years experience, had knowledge of the improper accounting practices, and a responsibility to bring such matters to the attention of the audit committee. Furthermore, he has offered no assurances against future violations or any recognition of the wrongful nature of his conduct, and plans to continue work as a CPA.[FN61] (Tr. 866; Div. Br. 93.)

As discussed throughout this Initial Decision, the record does not support a finding that Yesner was responsible for the company's books and records, financial filings, or computer system. He was not involved in revenue recognition decisions, did not directly supervise the revenue accounting group, and did not actively participate in any of the practices alleged in this proceeding.

**\*41** Respondent contends that a cease and desist order is inappropriate because he has no disciplinary history and did not realize monetary or other gain. Yesner fully cooperated with the Division in its investigation, and made no attempt to conceal any aspect of his conduct. He demonstrated reasonable reliance on the advice of competent accounting professionals and fulfilled his duties by reporting to E&Y and Sensormatic's management problems and issues at numerous company locations. (Resp. Br. 140.) While these factors counsel against relief, they are not enough.

In consideration of the above factors, I find that Yesner's violations of the securities laws warrant a cease and desist order. Yesner was a cause of Sensormatic's violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act, Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, 13a-13 thereunder. He has also expressed a desire to continue working as a CPA. Such a position would clearly present opportunities for future violations.

## V. RECORD CERTIFICATION

Pursuant to Rule 351(b) of the Commission's Rules of Practice, 17 C.F.R. § 201.351(b), I certify that the record includes the items set forth in the record index issued by the Secretary of the Commission on October 5, 2000.

## VI. ORDER

Based on the findings and conclusions set forth above:

IT IS ORDERED that, pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Albert Glenn Yesner shall cease and desist from causing violations of Sections 17(a)(2) and 17(a)(3) of Securities Act of 1933, Sections 13(a) and 13(b)(2)(A) of the Securities Exchange Act of 1934 and Rules 12b-20, 13a-1, and 13a-13 thereunder.

IT IS FURTHER ORDERED that this administrative proceeding, insofar as it alleges that Albert Glenn Yesner violated, aided and abetted, or caused violations of Section 17(a)(1) of the Securities Act of 1933, Sections 10(b) and 13(b)(2)(B) of the Securities Exchange Act of 1934 and Rules 10b-5, 13b2-1, and 13b2-2 thereunder, IS DISMISSED.

IT IS FURTHER ORDERED that this administrative proceeding, insofar as it alleges that Albert Glenn Yesner violated Rule 102(e)(1)(ii) and (iii) of the Commission's Rules of Practice IS DISMISSED.

This order shall become effective in accordance with and subject to the provisions fo Rule 360 of the Commission's Rules of Practice, 17 C.F.R. § 201.360. Pursuant to that rule, a petition for review of this initial decision may be filed within twenty-one days after service of the decision. It shall become the final decision of the Commission as to each party who has not filed a petition for review pursuant to Rule 360(d)(1) within twenty-one days after service of the initial decision upon such party, unless the Commission, pursuant to Rule 360(b)(1), determines on its own initiative to review this initial decision as to any party. If a party timely files a petition for review, or the Commission acts to review as to a party, the initial decision shall not become final as to that party.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,  Release No. ID - 184, 2001 WL 587989 (S.E.C.     Page 33
Release No.)

**\*42** Robert G. Mahony
Administrative Law Judge

FN1. The Division's posthearing brief is referred to as "(Div. Br. __.)," the Division's reply brief is referred to as "(Div. Reply __.)," and the Respondent's posthearing brief is referred to as " (Resp. Br. __.)." Citations to the transcript are referred to as "(Tr. __.)." Division's exhibits are referred to as "(Div. Ex. __.)," and the Respondent's exhibits are referred to as "(Resp. Ex. __.)."

FN2. Milnes was on the board of directors of Sensormatic from 1968 through 1997 and a member of the audit committee from 1980 through 1997. He became chairman of the audit committee in 1989. (Tr. 48, 52.)

FN3. Simmons is a certified public accountant (CPA). He was manager of budgeting and financial analysis for Sensormatic until 1985, corporate controller until 1988, and then vice president of finance until 1996. (Tr. 294-96, 301.)

FN4. There were separate controllers for the U.S. commercial industrial group, export sales, European operations, and the international division. There were also other controllers in the U.S. subsidiaries. (Tr. 813-15.)

FN5. Lininger was manager of revenue accounting and finance manager for U.S. operations of Sensormatic from 1989 through 1996. (Tr. 210.)

FN6. Each business unit had a Hundred Percent Club. (Tr. 370.)

FN7. The AMAPS system was not used to record revenue and it was not automatically linked to the CIS system. (Tr. 227, 283.)

FN8. Throughout the hearing, this process was referred to in a variety of ways: "bringing down" the computers, "the clock was kept open," and " turning back the clock." These terms refer to the same process, where the computer systems were shut down prior to midnight on the last business day before the date automatically changed. (Tr. 244-45, 317-18, 751.)

FN9. Cumming was one of the individuals that oversaw the preparation of consolidated financial statements and was responsible for the company Forms 10-K and 10-Q. (Tr. 466.)

FN10. Lininger was bothered by the possibility of withholding documents and voiced his concerns to several individuals within the company including Simmons, Schneider, and Cumming, just prior to the conclusion of the audit. (Tr. 464-65.) However, he believed that his job would be jeopardized if he did not follow the orders of Simmons, and did not think that it was his responsibility to divulge this information. (Tr. 266-67.)

FN11. Simmons did not specifically recall discussing this issue with Yesner. (Tr. 352-53.)

FN12. E&Y accepted the representations of management that the documents were missing. (Tr. 502-03.) E&Y reserved the right to return and still request the documents that had not been turned over. (Tr. 264, 269.)

FN13. E&Y had discovered an abnormally large shipment during the last week of the fiscal year, which should not have gone out in such a short period of time. (Tr. 88, 443-44; Div. Ex. 64 at EY000245-46.)

FN14. Lininger was asked again to withhold documents during the 1995 Audit. The unavailability of these documents was one of the factors that raised E&Y's level of skepticism. (Tr. 273-75; Div. Ex. 64 at EY000246.) Lininger, again, brought this to the attention of several individuals, including Yesner, who was purportedly informed that "document withholding" actions being considered were not going to be implemented. (Tr. 273-75; Div. Ex. 61 at 3-4.) Simmons did not recall speaking to Yesner about this issue in 1995. (Tr. 356-58.)

FN15. Yesner graduated from the University of South Carolina in 1980 with a degree in accounting. He worked as an auditor and manager in the Atlanta, Georgia office of what is now PWC from 1980 through 1987. In September 1987, Yesner accepted the position of controller for Macrotel International Corporation, and then in April 1988 moved to the accounting firm of Laventhol &

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,   Release No. ID - 184, 2001 WL 587989 (S.E.C.   Release No.)

Horwath until March 1989. (Div. Ex. 1 at 4, 6.)

FN16. In 1988, Simmons became an officer of Sensormatic when he was promoted to vice president of finance. He continued to report to Pardue. (Tr. 301-02.)

FN17. The three accounting groups had specific duties at different stages in the accounting pipeline. Cost accounting focused on tracking inventory. General accounting kept the books and records for the Deerfield location and prepared the general ledger. Revenue accounting recorded revenue upon shipment, billed the customer, and collected receivables. (Tr. 296-97.)

FN18. In June 1993, Yesner was among several individuals, including Lininger, involved with closing the fourth quarter because the senior managers were away as part of the Hundred Percent Club. This was the only time Yesner was involved with closing the books. (Tr. 254, 288, 753, 853.) As far as Yesner knew, there was a "clean" cut-off. However in August or September 1995, it was learned that there had been out-of-period shipments. (Tr. 856.) Lininger testified that Simmons criticized him for involving Yesner in the quarter-end cut-off. (Tr. 289.)

FN19. There was testimony that Yesner may have been involved with reviewing portions of Sensormatic's quarterly and annual reports, but the record is unclear. Simmons asserted that Yesner did not "work on" the quarterly and annual reports, but Yesner might "review" these items for Flores. Simmons could not specify the extent of Yesner's involvement. (Tr. 392-93.) Yesner asserted that Flores would give him small portions of a Form 10-K to see whether it ""appeared right." He would do a little bit of research to develop footnote disclosures, and report on his research. Flores would then work with E&Y and decide what to put in the annual report. It would not be a reading or reviewing of the Form 10-K. (Tr. 745.) There is no indication that Yesner's "input" was even incorporated into the filings.

FN20. The audit committee was made up of three men: Milnes, John T. Ray (Ray), and Tom Buffett (Buffett). In addition to being on the audit committee, Ray and Buffet were also independent

board members of Sensormatic. (Tr. 54.)

FN21. Prior to the creation of the present internal audit function, there was an internal audit and budget unit operated under the direction of Chris Davell (Davell). The record does not reflect what the responsibilities of this unit were or why it was discontinued. Davell went on to head sales administration in the early 1990s. (Tr. 127-28, 224, 385-86.) Senior corporate finance management performed the internal audit and business review functions until Yesner accepted the DBC position. (Div. Ex. 11 at SRM 277983-84.)

FN22. Around July 1994, Yesner was asked to put the description into a new format, but not update or rewrite it. (Tr. 802-04; Div. Ex. 22.)

FN23. Subsequently, it was learned that Bassett had never been admitted to a bar. (Tr. 174.)

FN24. E&Y did not interview Yesner. All of the information pertaining to Yesner came from WF&G, who refused to turn over its interview notes to E&Y, due to attorney work-product privilege. WF&G only disclosed information in the form of answers to hypothetical questions. (Tr. 475.) Any determinations made by E&Y were then based on these hypotheticals. (Tr. 506-07.)

FN25. WF&G prepared the first draft of the reprimand, based on its investigation. The audit committee did not do any independent investigation and relied solely on the work of WF&G. (Tr. 124.)

FN26. Vanourek was the president and CEO of Sensormatic at the time. (Tr. 257.)

FN27. It is unclear when Simmons said this to Yesner.

FN28. Yesner testified that he was not insecure about his job until the fall of 1995, when WF&G was conducting the interviews. (Tr. 844-45.)

FN29. Brown used E&Y's numbers representing adjustments. Brown was unsure whether these numbers included non-revenue recognition adjustments and were included in the calculation for adjusted net income. (Tr. 566-67.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156, Release No. ID - 184, 2001 WL 587989 (S.E.C. Release No.)    Page 35

FN30. Carmichael is a CPA, certified fraud examiner, and the Wollman Distinguished Professor of Accountancy at Baruch College of the City University of New York. He possesses a Ph.D. and a master's degree in accountancy, as well as a bachelor's degree in economics. He spent nearly fourteen years at the AICPA developing professional standards and served as a technical resource for the AICPA ethics division. At the time he left, he was the vice president of auditing, head of the auditing standards division. (Tr. 569-73.)

FN31. Carmichael referenced Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in Financial Statements of Business Enterprises (1984) (Concepts Statement No. 5) in explaining that revenue should be recognized when it is earned or when it is realized or realizable. This is ordinarily when the product has been shipped or delivered to the customer. Carmichael testified that revenue typically is recognized when the sale is complete. (Tr. 599-600.)

FN32. He contrasted the approaches for addressing misstatements in Accounting Principles Board Opinion No. 20, Accounting Changes (1971) (APB Opinion No. 20) and Statement on Auditing Standards No. 53, The Auditor's Reponsibility to Detect and Report Errors and Irregularities (1988) (SAS No. 53). APB Opinion No. 20 states that changes should be looked at individually and in the aggregate because individual changes may be material even though in the aggregate there may be a small net effect. SAS No. 53 is applied at the end of the audit, but before the financial statements are issued. According to SAS No. 53 the auditor considers the aggregate or cumulative effect of adjustments that might have to be made to the financial statements in deciding whether they are material. Therefore, in considering materiality, the items may have to be looked at individually as well as in the aggregate. (Tr. 678-80.)

FN33. For fiscal year 1994, the percentage misstatements were: first quarter, 5.7; second quarter, 9.2; third quarter, 18.8, and fourth quarter, 0.5. For fiscal year 1995, the percentage misstatements were: first quarter, 0.0; second quarter, 10.9; third quarter, 19.9, and fourth quarter 7.8-6.6. (Div. Ex. 193.)

FN34. Carmichael cited to Statement on Auditing Standards No. 47, Audit Risk and Materiality in Conducting an Audit (1983) as additional authority for the importance of quantitative and qualitative factors of a materiality determination. (Tr. 664.)

FN35. Interpretation 102-3 of the AICPA Code requires members to be candid and not knowingly misrepresent facts or knowingly fail to disclose material facts when dealing with their employer's external accountant. See AICPA Code, Interpretation 102-3 (Nov. 30, 1993).

FN36. Interpretation 102-4 of the AICPA Code provides that in situations where there is a dispute, members need to make a judgment regarding the materiality of the misrepresentation in light of existing authority. If, in the member's judgment, material misrepresentations do exist, the member is obligated to bring it to the attention of the appropriate level of management. In the most extreme cases, members should consider disclosure to third parties or discontinuing employment. See AICPA Code, Interpretation 102-4 (Nov. 30, 1993).

FN37. Dooley is a partner in the securities litigation consulting practice at PWC. He is a CPA with a bachelor's degree in accounting and an MBA in finance. He has about twenty-four years of experience in internal corporate investigations, securities litigation, bankruptcy and reorganization, fraudulent conveyances, and financial institution assignments that include audits, director examinations, and mergers and acquisitions. (Tr. 912-13, 915-16; Resp. Ex. 196 at B.)

FN38. Sensormatic did not compensate Dooley for his appearance in this proceeding. His fees were paid by Yesner. (Tr. 930.)

FN39. Dooley explained that the "summary of audit differences," or "effects schedule," summarizes non-GAAP accounting. He stated that there is an acceptable level of deviation from GAAP in every audit because it is impossible to make every entry GAAP compliant. (Tr. 938-40.)

FN40. There was a 12.5% difference between reported revenue and actual revenue for the quarter ending March 31, 1995. (Resp. Ex. 196 at 11, F.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN41. Dooley believed that the adjustments were small because of the "wash effect" or "turnaround effect" and that "the misapplication of GAAP due to incorrect period-end cut-offs were mutually offsetting, among periods." (Resp. Ex. 196 at 9.)

FN42. Dooley also discussed Statement on Auditing Standards No. 82, Consideration of Fraud in a Financial Statement Audit (1997) (SAS No. 82); however, it was not in effect during the relevant time period of this proceeding. (Tr. 946, 988-89.) SAS No. 82 changed the auditor's duties from SAS No. 53. (Tr. 994.)

FN43. E&Y determined that the items could be an irregularity and their effect could be material. (Tr. 440-41.) Simmons and Carmichael also testified that this was an irregularity. Dooley believed that reasonable minds could differ as to this determination. (Tr. 1019-21.)

FN44. Dooley was not convinced that this was an irregularity. He believed there was a "difference of opinion ... as to whether the documents were withheld or just not turned over, not because they were intentionally being withheld." (Tr. 1023-24.)

FN45. Sensormatic is not charged as a primary violator in this proceeding. The Commission has stated that it is not necessary to charge the principal wrongdoer in order to charge an aider and abettor. See Swartwood, Hesse, Inc., 50 S.E.C. 1301, 1304 n.8 (1992) (citing United States v. Mann, 811 F.2d 495, 497 (9th Cir. 1987)).

FN46. During the expanded audit, E&Y quantified the quarterly misstatements for fiscal years 1994 and 1995. It concurred with Sensormatic that the financial statements for fiscal years 1994 and 1995 were not materially misstated. Only the third quarter of 1995 required restatement. (Div. Ex. 64 at EY000253-55, Div. Ex. 190 at 69, 75-76, Resp. Ex. 179 at 10, 12.) E&Y's acquiescence to restate only one quarter is not determinative of the issue of materiality. (Tr. 460; Div. Ex. 64 at EY0000255.) Its conclusion regarding whether or not to restate previously issued financial statements does not address the impact of the alleged misstatements when made. In addition, Dooley's conclusion that none of the quarters were misstated by more than 8% does not foreclose a finding of materiality

because courts and the accounting literature reject numerical benchmarks as the sole determinants of materiality. See Basic, 485 U.S. at 236 n.14; Ganino , 228 F.3d at 162; Concept Statement No. 2 ¶ 125. The inclusion of these amounts in the company's filings is a material misstatement, notwithstanding what an after-the-fact accounting analysis concluded. I afford no weight to either Carmichael or Dooley insofar as they rely solely on numerical benchmarks to determine the materiality of the alleged misstatements.

I agree with Respondent that Brown's Materiality Analysis, which served as a basis for Carmichael's quantification of the misstatements, is entitled to no weight. I further conclude that to the extent Carmichael's opinion is predicated on this analysis, it is also entitled no weight. Several reasons were proffered for disregarding Brown's Materiality Analysis. The most persuasive is that it included only out-of-period shipments that "might" have been known to Yesner. However, no evidence was introduced to support a finding regarding out-of-period shipments that Yesner "might" have known about. The analysis was based on unsupported assumptions and is too speculative to be accorded any weight. (Tr. 522-23, 531, 541, 544.) Further, Brown "cherry picked" numbers, and did not take all adjustments into account. He merely moved out-of-period shipments from one quarter to another, rather than adhering to E&Y's approach of determining the correct quarter the sales revenue should have been recorded. He also excluded several elements of revenue recognition. (Tr. 554, 556-64.)

Brown did not review Sensormatic's 1994 and 1995 quarterly statements or attempt to analyze Sensormatic's 1993, 1994, or 1995 annual financial statements. (Tr. 538, 553.) His analysis did not appear to bear any reasonable relationship to what Sensormatic filed in its published reports.

FN47. Simmons was the only Sensormatic officer who testified at the hearing.

FN48. Revenue is earned when an entity has substantially accomplished what it must do to be entitled to the revenue, usually either delivery or shipment of the product. Revenue is realized when the product is exchanged for payment, or claim to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,   Release No. ID - 184, 2001 WL 587989 (S.E.C.   ·                    Page 37
Release No.)

payment. See Concepts Statement No. 5 ¶ 83; Accounting Principles Board Opinion No. 10 ¶ 12, Omnibus Opinion (1966).

FN49. Concepts Statement No. 2 ¶ 161 states " Each Statement of Financial Accounting Standards issued by the Board has concluded by stating that: ' The provisions of this Statement need not be applied to immaterial items."DD' In addition, it references Rule 4-02 of the Commission's Regulation S-X, which states that if an "amount which would otherwise be required to be shown with respect to any item is not material, it need not be separately set forth." 17 C.F.R. § 210.4-02.

FN50. The February 3, 1994, registration statement concerned shares offered and subsequently issued in connection with the acquisition of Knogo Corporation in December 1994. (Div. Ex. 120, Div. Ex. 190 at 4.) The January 12, 1995, registration statement concerned shares issuable to the shareholders of Glen Industrial Communications, Inc. (GIC) pursuant to a stock purchase agreement in the acquisition of all outstanding shares of GIC, consummated in January 1995. (Div. Ex. 125 at 2, Div. Ex. 190 at 3.) The June 2, 1995, registration statement concerned shares issuable to outstanding warrants related to Sensormatic's purchase of substantially all of the assets of Senvest Capital Inc. (Div. Ex. 126.)

FN51. The one time he did participate in the revenue closing process, in June 1993, he coordinated a clean cut-off. Yesner, as well as Lininger and Schneider were later criticized for his involvement. (Tr. 289; Div. Ex. 61 at 2-3.)

FN52. Lininger's testimony was that he was afraid of losing his job if he did not follow orders from his direct supervisor. (Tr. 266.) Yesner does not recall Lininger expressing this level of concern. (Tr. 764.)

FN53. E&Y reserved the right to come back and request the documents that had not been turned over. (Tr. 269.)

FN54. The issue of withholding documents from E&Y came up again during the 1995 Audit. Lininger went through the same process as during the 1994 Audit. (Tr. 273-75.) Shortly thereafter, E&Y expanded the 1995 Audit. (Div. Ex. 64 at

000246.)

FN55. In 1997, SAS No. 1 ¶¶ 1-6 were superseded by SAS No. 82.

FN56. Section 13(b)(2)(B) of the Exchange Act also mandates that the system of internal accounting controls be sufficient to provide reasonable assurance that transactions and access to assets are in accordance with management's general or specific authorization, recorded accountability for assets is periodically reconciled with existing assets, and accountability for assets is maintained.

FN57. Since, as relevant to this proceeding, Sensormatic was found not to have violated Section 13(b)(2)(B) of the Exchange Act, there is not an independent securities law violation, and the causing and aiding and abetting allegations against Yesner are dismissed.

FN58. The only evidence that Yesner had any responsibility for the company's books and records is in paragraph 14 of Respondent's answer to the OIP where he admits to having "some limited responsibility for the accuracy of the books and records" prior to November 1993. However, it is unclear what this means since his limited responsibility for books and records was not developed at the hearing and is not discussed in his performance reviews. (Div. Exs. 4-8.) In addition, E&Y representatives believed that Pardue was responsible for the company's books and records during the relevant time period. (Tr. 465.) >

FN59. See Barron's Dictionary of Finance and Investment Terms 109 (4th ed. 1995).

FN60. The Division also argues that Yesner violated Exchange Act Rule 13b2-2 when he failed to report to E&Y that Lininger had been asked to consider withholding documents from E&Y. (Div. Br. 63-64, Div. Reply 19.) Lininger did not approach Yesner about being asked to withhold documents from E&Y until July or August 1994. (Tr. 266, 763-64.) Yesner was not an officer during this time. Therefore, I conclude that Yesner did not willfully violate Exchange Act Rule 13b2-2.

FN61. Yesner's posthearing brief focused on his position that the Division did not prove the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 S.E.C. Docket 156,  Release No. ID - 184, 2001 WL 587989 (S.E.C.                          Page 38
Release No.)

allegations.

75 S.E.C. Docket 156, Release No. ID - 184,
2001 WL 587989 (S.E.C. Release No.)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.