# EXHIBIT 3

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
In re ESS Technology, Inc. Securities Litigation
N.D.Cal.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
In re ESS TECHNOLOGY, INC. SECURITIES
LITIGATION
**No. C-02-04497 RMW.**

Dec. 1, 2004.

Luke O Brooks, Patrick J. Coughlin, Lionel Z.
Glancy, Michael M. Goldberg, John K. Grant,
Robert A. Jigarjian, William S. Lerach, Kevin Ruf,
David R. Scott, for Plaintiff(s).
Meredith N. Landy, for Defendant(s).

ORDER ON DEFENDANTS' MOTION TO
DISMISS PLAINTIFF'S SECOND AMENDED
COMPLAINT AND STRIKE PORTIONS
THEREOF

WHYTE, J.

[Re Docket No. 89]

*1 This Document Relates to: ALL ACTIONS.

Currently before the court is the motion by
defendants ESS Technology, Inc. ("ESST"), Robert
L. Blair ("Blair"), Patrick Ang ("Ang"), Frederick
S.L. Chan ("Chan"), and James Boyd ("Boyd")
(collectively "defendants") to dismiss lead plaintiff
Steve Bardack's ("Bardack" or "plaintiff") Second
Amended Complaint ("SAC") or to strike portions
thereof. Plaintiff opposes the motions. The motion
was heard on March 19, 2004. The court has read
the moving and responding papers and heard the
argument of counsel. For the reasons set forth
below, the court denies the motion to dismiss Count

I as to defendants Blair, Boyd and ESST except as
to allegations of fraud committed prior to February
27, 2002.[FN1] Those allegations are stricken and
dismissed. The motion to dismiss Count I as to
defendants Ang and Chan and Count III as to
defendant Chan is granted. The motion to dismiss
Count II is denied as to all defendants.

FN1. Defendants have not moved to strike
claims on behalf of class members who
purchased ESST shares after February 27,
2002.

I. BACKGROUND

A. General Nature of Case

This is a securities fraud action brought on
behalf of a proposed class of persons who
purchased the publicly-traded securities of ESST
between the dates of January 23, 2002 and
September 12, 2002 ("class period"). Plaintiff
contends that certain ESST officers and directors
made false and misleading statements concerning
ESST's operations and the prospects for the year
2002. Plaintiff alleges that in December 2001,
ESST's founder, defendant Chan, learned that one
of ESST's competitors, MediaTek, had developed a
superior competing chip that would be offered at
approximately the same price as ESST's chip, and
that at least one of ESST's largest customers,
Shinco, intended to shift its business to MediaTek.
From this foundation, plaintiff alleges that various
statements made by defendants between January 23,
2002 and September 12, 2002 with respect to
ESST's financial outlook were false and misleading.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 2

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

B. Procedural Background

Plaintiff filed this securities fraud action on September 13, 2002. On January 21, 2003, the court appointed plaintiff Barrack to serve as lead plaintiff for the proposed class. Barrack then filed an amended complaint on February 6, 2003, which defendants moved to dismiss. However, prior to the noticed May 23, 2003 hearing on the motion, the parties submitted a stipulation allowing plaintiff to file an amended complaint and taking defendants' motion off calendar.

Plaintiff then filed a First Amended Complaint ( "FAC"),[FN2] on May 20, 2003. The FAC alleged three causes of action: (1) violation of section 10 of the 1934 Act and Rule 10b-5 promulgated thereunder as against all defendants; (2) violation of section 20(a) of the 1934 Act against the individual defendants; and (3) violation of section 20A of the 1934 Act against defendant Chan. Defendants again moved to dismiss on June 18, 2003. On October 3, 2003 the court granted defendants' motion to dismiss with 30 days leave to amend the complaint.

> FN2. This was actually the second amended complaint filed by Barrack.

**\*2** On November 3, 2003 plaintiff filed a Second Amended Complaint ("SAC"). Defendants now move to dismiss the SAC.

C. Plaintiff's Allegations

Plaintiff alleges that starting on January 23, 2002 with ESST's announcement of fourth quarter results for 2001, and continuing through September 12, 2002 when ESST revised earnings and revenue downward, defendants misled investors by making a number of false and misleading statements designed to boost the price of the stock. SAC ¶¶ 22-37. One motivation for this purported scheme was the February 1, 2002 Secondary offering of 5.52 million shares of ESST stock, which raised $45 million for ESST at a price of $19.38 per share. SAC ¶ 21. According to plaintiff, negative news

about the loss of a major customer, Shinco, was on the horizon, yet defendants failed to reveal such information. This omission allegedly kept the share price inflated, which gave defendants Chan, Boyd, and Blair an opportunity in the following months to take profits before the release of negative information.

Plaintiff's argument focuses in part on his allegation that ESST's management advised analysts at A.G. Edwards on September 9, 2002 that the third quarter was tracking as expected, just three days before ESST announced that the third quarter revenues would be between $60 and $64 million, down from the previous estimate of $86 to $90 million, and that net earnings would be between $.13 and $.21 instead of between $.35 and $.38. SAC ¶ 35, Ex. 2. Plaintiff asserts that ESST knew before the September 9 report to A.G. Edwards that it would not meet earnings estimates because, in a conference call on October 23, 2002, Boyd, the Chief Financial Officer for ESST, admitted *"by the late part in August* it became obvious there was going to be a problem with the quarter."SAC Ex. 4 (emph.added).

D. Factual Background

Defendant ESST is a designer, developer, and marketer of highly-integrated digital processor chips used in multimedia applications. SAC ¶ 13. ESST chips are the primary processors driving digital video and audio players including DVD, video CD and MP3 players. *Id.* Defendant Chan is ESST's founder and chairman. Defendant Blair is ESST's president and chief executive officer. Defendant Boyd is ESST's chief financial officer, and defendant Ang is ESST's chief operating officer. SAC ¶¶ 14(a)-(d), 15. Plaintiff alleges that, with knowledge to the contrary as early as December 2001, defendant ESST made a number of positive statements in its filings and in conference calls during the January 23, 2002 to September 12, 2002 class period.

Plaintiff quotes heavily from numerous press releases and conference calls made by ESST during

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

the class period and appears to allege that they were all intentional falsehoods. Defendants made upward adjustments to expected first and second quarter revenues in conference calls and press releases. The forecasts were met. Defendant ESST failed, however, to meet its expected third quarter revenue estimates, which ultimately resulted in a 30% drop in ESST's share price. The public statements with which plaintiff takes issue can be divided generally into the following categories: (1) misleading statements leading up to the Secondary offering (SAC ¶¶ 21-22); (2) misleading statements regarding first quarter revenue and earnings (SAC ¶¶ 23-26); (3) misleading statements regarding second quarter revenue and earnings (SAC ¶¶ 27-28, 30); (4) misleading statements regarding third quarter revenue and earnings (SAC ¶¶ 29-30, 32-35); and (5) misleading statements about market share and competition (SAC ¶¶ 26-27, 31).

*3 During the class period, plaintiff claims that certain officers made optimistic forecasts, downplayed competitive pressures and potential customer defections, and predicted that ESST would continue to be the market leader in DVD chips. *See, e.g.,* SAC ¶¶ 26, 31.

A significant portion of plaintiff's allegations that defendants knowingly made misleading statements are based on information obtained from anonymous sources. The court first turns to the SAC's allegations with respect to the information provided by these unnamed witnesses. The court will then proceed to plaintiff's allegations concerning false statements made and finally to the allegations of scienter.

1. Information Provided By Confidential Witnesses

In an attempt to plead the requisite scienter, plaintiff presents information allegedly obtained from a number of confidential witnesses about defendants' knowledge of the MediaTek product and ESST's impending losses of sales.

a. Confidential Witness 1

Confidential Witness 1 ("CW1") voluntarily contacted plaintiff and "represented that he was involved in the preparation of ESST's financial results and had personal contact with Chan and defendant Blair."SAC ¶ 16(a). CW1 states:

that Chan learned in December 2001 from Steven Shen ("Shen") that MediaTek had developed a new DVD chip that combined the encoder function with the servo chip function, that the chip would be offered at the same price as a single ESST chip, resulting in a 50% price reduction and that four of ESST's largest customers, including Shinco, APEX, Chang Hong and TONIC intended to purchase the new chip and that Shinco had decided to shift at least 50% of its purchases [from ESST] to MediaTek.

*Id.* According to CW1, Chan assigned the company's Hong Kong director, Andy Ho, to confirm this information. Two days later, the Hong Kong director advised Chan that "ESST's customers intended to cut their purchases in six to twelve months."*Id.*

Chan then reportedly began looking to acquire a company with technology that could compete with MediaTek. Finally, CW1 "states that ESST reacted to the adverse information regarding the expected competition with MediaTek, by offering chips at lower prices to their existing customers so that the customers would stock-pile the DVD chips."*Id.*

Plaintiff provides no information about CW1's job title, tenure at ESST or job responsibilities. Although CW1 provides details about what Chan allegedly learned from Steven Shen about MediaTek's new DVD chip, and a potential shift in customer purchases in six to twelve months, plaintiff fails to state how CW1 came to learn of this information. Notably, plaintiff fails to establish a nexus between CW1's job responsibilities and his allegations, so there is no basis upon which to infer that CW1 had first hand knowledge of these events, or that he was basing his information on anything more than rumor. Further, CW1's allegations regarding customer purchase orders are vague as to what commitments those customers had actually

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

made. Since the information from CW1 lacks meaningful detail and evidence of reliability, it fails to support a 'strong inference' of scienter. Even accepting the veracity and reliability of CW1's contentions, defendants' actions after learning of this competing chip do not suggest that defendants knew that ESST would not meet its earnings projections.

**b. Confidential Witness 2**

**\*4** Confidential Witness 2 ("CW2") was employed as a software engineer at ESST's corporate headquarters during the class period. SAC ¶ 16(b). CW2 "states that in December 2001, ESST implemented a plan to reduce its workforce in response to expected competitive pressures in 2002."*Id.* CW2 "recalls being told by his supervisor in December 2001 that ESST had some 'tough times ahead' and that one of ESST's competitors was 'going to kick the * * * * out of us.' ' *Id.* CW2 also "recalls that during December 2001, Chan (who typically made one or two business trips to Asia a quarter) increased the frequency of his trips to Asia in response to competitive problems and slipping business in the Far East and made a number of trips in December," ostensibly to meet with customers in Asia who were threatening to cut orders. *Id.*

CW2 apparently has no firsthand basis for this information but relies instead on an unnamed source. [FN3]Accordingly, the information fails to meaningfully support a 'strong inference' of scienter. Even accepting CW2's basis as adequate, CW2 merely describes pressure from competitors and ESST's efforts to maintain market share.

> FN3. CW2 also alleges a slowdown in demand in December 2001, a plan to reduce workforce, "tough times ahead," and vague statements about ESST competitors taking market share. SAC ¶ 16(b). All of these allegations come from other unnamed sources, and CW2 has no firsthand basis for making them.

**c. Confidential Witness 3**

Confidential Witness 3 ("CW3") was employed as a senior software engineer during the class period and "confirms that ESST began laying off employees in December 2001."SAC ¶ 16(c). He does not provide a basis for his knowledge or his conclusion that the layoffs were in response to competitive pressure from MediaTek's new DVD chip.

**d. Confidential Witness 4**

Confidential Witness 4 ("CW4") was an employee in ESST's IT department during the class period and states "that beginning in late 2001 ESST was under considerable pressure to control costs" and that "ESST was threatened with losing some of its market share for its DVD chips."SAC ¶ 16(d).

CW4 provides no nexus between his job duties and his statement and no foundation upon which to conclude that the layoffs were in response to competitive pressures from MediaTek's new DVD chip or, more significantly, that the layoffs meant that defendants knew they could not produce and obtain the numbers represented.

**e. Confidential Witness 5**

Confidential Witness 5 ("CW5") was a senior design engineer at ESST during the class period. CW5 states "that he had discussions with colleagues in April 2002 regarding the competitive threat presented by MediaTek and how this was resulting in ESST losing market share."SAC ¶ 16(e). CW5 also "recalls that ESST did not have a chip that could compete with MediaTek's new offering."*Id.* As a senior design engineer, CW5 would presumably have technical knowledge about MediaTek's new chip and how it compared with ESST's product. However, no foundation is offered as to his knowledge about ESST's market share.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 5

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

f. Confidential Witness 6

Confidential Witness 6 ("CW6") was an applications engineer at ESST during the class period and states that ESST started reducing employees in late 2001. SAC ¶ 16(f). In addition, CW6 attended a new DVD product demonstration in March 2001 and was told that a second session would be held in July 2001. CW 6 states that this second session was canceled due to failure of the DVD product at the initial test stage. This allegation regarding the reason for the cancellation lacks a basis for first hand knowledge and provides no specifics about the product demonstration, or its significance to the development by ESST of an upgraded chip, or ESST's ability to compete with MediaTek or other competitors.

g. Confidential Witness 7

*5 Confidential Witness 7 ("CW7") was an employee at Shinco, one of ESST's customers who allegedly intended to transfer half of its ESST purchases to MediaTek. CW7 was a sales director during the class period and states that "he was responsible for sales of Shinco's DVD products and was familiar with Shinco's practices in dealing with suppliers."SAC ¶ 16(g). CW7 states that Shinco has started to shift to a new "system-on-a-chip" DVD chip in the first half of 2002. *Id.* CW7 further states that the design and production of DVD products is a six-to-eight month process as it requires considerable investment in research, development and testing, and opines that "Shinco would have advised ESST of the change to the new chip in late-2001."*Id.*

CW7 provides no basis for knowing first hand that Shinco's orders to ESST had decreased, or that ESST knew of Shinco's alleged plan to place fewer orders. Further, the allegation that Shinco "would have alerted ESST" in late 2001 of their shift to a new chip is speculative.

h. Confidential Witness 8

Confidential Witness 8 ("CW8") was an ESST chip production planner during the Class period, responsible for planning and placing wafer and chip orders with ESST's wafer and chip manufacturers.[FN4]SAC ¶ 16(h). During the first quarter of 2002, CW8 states that Patrick Yeto, ESST's Vice President of Operations (who reported directly to Blair), directed the department to stop wafer and chip orders from these manufacturers as a result of MediaTek's competition. In August 2002, CW8 received an email from Yeto directing him to cut back production of certain DVD chips-representing over 30% of ESST's forecasted revenues-by 20% to 50%.

> FN4. Taiwan Semiconductor Manufacturing Company, United Microelectronics Corporation, Advanced Semiconductor Engineering, and Silterra.

CW8 also states that ESST's weekly sales flash reports in August 2002 were actually decreasing rather than increasing, and these reports were submitted directly to Blair.

CW8's statement about stopping the purchase of wafers in the first quarter of 2002 provides little specific information (e.g. the status of existing inventory, length of stoppage, etc.). The alleged August direction to cut production by 20% to 50%, although lacking specifics about the circumstances, does tend to bolster other evidence that by August ESST knew it would not make its third quarter earning forecasts.

i. Confidential Witness 9

Confidential Witness 9 ("CW9") was an ESST Director of Sales responsible for supervising sales to DVD manufacturers in China during the class period. SAC ¶ 16(i). CW9 states that ESST knew by May 2002 that ESST was losing market share because of MediaTek's sales to ESST's customers, including Shinco.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 6

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

j. Confidential Witness 10

Confidential Witness 10 ("CW10") was an ESST Senior Marketing Manager also responsible for sales to DVD manufacturers in China during the class period. SAC ¶ 16(j). CW10 states that ESST realized it was losing market share to MediaTek and Zoran Corporation by early 2002, and that this loss would negatively impact earnings. ESST allegedly had specific knowledge of loss of market share at Shinco, and a loss to MediaTek of about 20%. This information was allegedly conveyed to Lawrence Ko, a supervisor in ESST's China office.

k. Confidential Witness 11

**\*6** Confidential Witness 11 ("CW11") was employed as a manager of sales administration by ESST during the class period. CW11 "was aware that competition from MediaTek constituted a significant problem in the second half of 2001 and that in late 2001 ESST was aware of a significant loss of business due to MediaTek's product introductions of advanced DVD chips."SAC ¶ 16(k). ESST's development of a competing chip was allegedly six to eight months behind Blair's public representations. In light of these sales trends and customer migration, CW11 states that ESST's third quarter public revenue forecasts had "no meaningful basis."

Similar to plaintiff's allegations attributed to other confidential witnesses, the information allegedly obtained from CW9, CW10 and CW11 lack meaningful foundation, details and specificity. These allegations, even taken as true, do not support a strong inference that defendants were consciously making false and misleading statements before mid-2002 when other evidence suggests ESST recognized it would have an unfavorable third quarter.

l. Confidential Witness 12

Confidential Witness 12 ("CW12") was an area

sales manager at ESST during the class period. CW12 states that ESST had two major design cycles each year, one starting in August for spring release, and the other in January for August release. SAC ¶ 16(l).

m. Confidential Witness 13

Confidential Witness 13 ("CW13"), an employee at Dynax Electronics during the class period, merely identifies Shen as the president of Dynax. SAC ¶ 16(m).

2. False Statements

During the Class period, plaintiff alleges that defendants made various false statements beginning with one made February 28, 2002 and continuing until the revelation of the truth on September 12, 2002. Specifically, plaintiff claims that defendants assured investors in March, April, May, June and July 2002 that ESST was not at risk of losing significant market share to competitors, including MediaTek, Inc., and that ESST would continue to report large revenue increases throughout 2002. Defendants stated on July 24, 2002 that ESST expected to report third quarter 2002 revenues of $86 to $90 million. In an August 8, 2002 ESST press release, defendants repeated their assurance that third quarter 2002 revenues would reach $86 to $90 million. One month later, on September 9, 2002, ESST assured financial analysts that the quarter was tracking according to expectations. On September 12, 2002, only three days after ESST management advised that the third quarter was on track, ESST publicly announced that third quarter revenues would miss defendants' public forecast of $86 to $90 million and that revenues would be between $60 and $64 million and that earnings per share would not be between $.35 and $.38 as previously estimated but between $.13 and $.21.

In an October 23, 2002 conference call, defendants admitted that in August 2002 they were aware that ESST was experiencing critical negative

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                               Page 7

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

trends. During the October 23, 2002 conference call, defendant Blair stated that sales did not ramp as expected in mid-August and that the weak demand impacted all product lines and all geographies. Defendant Boyd admitted that "by the late part in August it became obvious there was going to be a problem with the quarter."(SAC ¶ 35, Ex. 4).

3. Scienter

*7 Plaintiff claims that the information obtained from the confidential witnesses shows that defendants knew they were making false representations. Plaintiff further contends that ESST knew that it was facing a significant financial downturn before its secondary offering completed on February 1, 2002, and that defendants were motivated not to disclose that adverse information so that the offering would be successful. ESST obtained an infusion of $45 million from the offering. SAC ¶ 19. Plaintiff also alleges that the individual defendants were further motivated in their scheme to keep ESST's stock price inflated because they stood to gain by selling their own shares during or around the time of the offering.

Plaintiff also claims that defendants engaged in channel stuffing in order to meet fourth quarter results in December 2001, to complete the secondary offering on February 1, 2002, and to benefit Chan so he could sell $55 million of his shares. Channel stuffing "is the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as distributors no longer make orders when depleting their excess supply."*Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1298 (9th Cir.1998)."[C]hannel stuffing claims may have some probative value insofar as the channel stuffing was done so as to artificially inflate income, but there may also be other legitimate reasons for attempting to achieve sales earlier."*Broudo v. Dura Pharms.,* 339 F.3d 933, 940 (9th Cir.2003); *see Greebel v. FTP Software, Inc.,* 194 F.3d 185, 203 (1st Cir.1999) (value of channel stuffing evidence weak, and does not support strong inference of scienter). Here,

plaintiff fails to state with particularity the facts upon which the allegations of channel stuffing are based.

II. LEGAL STANDARD

To determine whether a private securities fraud complaint can survive dismissal under Federal Rule of Civil Procedure 12(b)(6), the court must determine whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or with deliberate recklessness made false or misleading statements to investors. *In Re Read-Rite,* 335 F.3d 843, 846 (9th Cir.2003); *Ronconi v. Larkin* 253 F.3d 423, 429 (9th Cir.2001)."In an effort to deter abusive and frivolous securities fraud claims, Congress enacted the PSLRA, which amended the 1934 Act and raised the pleading standards for private securities fraud claims."*No. 84 Employer-Teamster v. America West Holding ("America West" ),* 320 F.3d 920, 931 (9th Cir.2003) (citing *In re Silicon Graphics Inc. Sec. Litig. ("Silicon Graphics" ),* 183 F.3d 970, 973 (9th Cir.1999))."[P]laintiffs proceeding under the PSLRA can no longer aver intent in general terms of mere 'motive and opportunity' or 'recklessness,' but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Silicon Graphics,* 183 F.3d at 979;*America West,* 320 F.3d 920 at 931 ("The PSLRA altered the pleading requirements for private litigants by requiring that a complaint plead with particularity both falsity and scienter."); *Ronconi,* 253 F.3d at 429 n. 6.

*8 To survive the higher pleading standards required by the PSLRA, the complaint must " specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed."15 U.S.C. § 78u-4(b)(1); *America West,* 320 F.3d at 931. The complaint must also "state with particularity facts

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

giving rise to a strong inference that the defendant acted with the required state of mind."15 U.S.C. § 78u-4(b)(2). The dual pleading requirements of §§ 78u-4(b)(1) and (b)(2) are incorporated into a single inquiry, because falsity and scienter are generally inferred from the same set of facts. *Read-Rite Corp.,* 335 F.3d at 846;*Ronconi,* 253 F.3d at 429. If a plaintiff fails to plead either the alleged misleading statements or scienter with particularity, his or her complaint must be dismissed. *See America West,* 320 F.3d at 931-32;§ 78u-4(b)(3)(A). Here, plaintiff relies on the statements of various confidential witnesses to establish falsity and, in large part, to show scienter. As discussed below, the pleading standard is met as to defendants Blair, Boyd and ESST except as to allegations of fraud prior to February 27, 2002.

The PSLRA provides a safe harbor from liability for certain forward-looking statements. Forward-looking statements contain "a projection of revenues, income, or earnings per share, management's plans or objectives for future operations, and a prediction of future economic performance."*In re Splash Tech. Holdings, Inc. Sec. Lit.,* 160 F.Supp.2d 1059, 1068 (N.D.Cal.2001); 15 U.S.C. § 78u-5(i)(1)(A)-(C). Assumptions underlying these statements are also forward-looking. *Id.;*15 U.S.C. § 78u-5(i)(1)(D). On the other hand, statements concerning historical or current facts are not forward-looking.*In re Splash,* 160 F.Supp.2d at 1068. For Safe Harbor protection under the PSLRA to apply, the forward-looking statements must either be: (1) accompanied by " meaningful cautionary statements identifying important factors that could cause actual results to differ materially;" or (2) must not be made with actual knowledge of falsity. *See*15 U.S.C. § 78u-5(c)(1)(A); 15 U.S.C. § 78u-4(b)(1)-(2).) "It is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood."*Yourish v. Cal. Amplifier,* 191 F.3d 983, 997 (9th Cir.1999).

"A present-tense statement can qualify as a forward-looking statement as long as the truth or falsity of the statement cannot be discerned until some point in time after the statement is made."*In re Splash,* 160 F.Supp. at 1067;*Harris v. Ivax*

*Corporation,* 182 F.3d 799, 805 (11th Cir.1999), reh'g denied, 209 F.3d 1275 (11th Cir.2000) (classifying the statement "the challenges unique to this period in our history are now behind us" as forward-looking)."Whether a statement qualifies for the safe harbor is an appropriate inquiry on a motion to dismiss."*In re Splash,* 160 F.Supp.2d at 1068;15 U.S.C. § 78u-5(e).

### III. ANALYSIS

A. Section 10(b) of the 1934 Act and Rule 10(b)(5) Promulgated Thereunder

*9 Plaintiff's SAC lists several statements made by defendants, in particular several financial projections for the third quarter of 2002, which are forward-looking. SAC ¶¶ 25-31. For example, plaintiffs cite defendants' press release dated June 24, 2002, which updates guidance for the third quarter, stating that "ESS expects third quarter revenue and earnings to exceed previous guidance." *Id.* at ¶ 29.Other examples include a press release dated July 24, 2002 where defendants state, "We believe we will maintain our leadership position in the areas of new products, features and services.... With these new product introductions, we believe we can continue to lead the high growth market for digital home entertainment products...."*Id.* at ¶ 30.This same press release reiterates defendants' estimate of revenues of $86 to $90 million with earnings per share o $.35 t0 $.38 for the third quarter.*Id.* at ¶ 30.Plaintiff's complaint also cites a July 24, 2002 conference call, during which defendants' CEO stated, "I think we will remain the dominant supplier at Shinco...."*Id.* at ¶ 31.Each of these statements involve predictions about economic performance, the truth or falsity of which could not be discerned until some point after it was made. Similarly, the veracity of statements in paragraphs 25 through 28 about future trends and performance issued with first and second quarter results could not be determined until some point after the statements were made. Consequently, these

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

statements are forward-looking, and protected by the PSLRA Safe Harbor provisions if they were accompanied by either meaningful cautionary statements, or the defendants had no actual knowledge of their falsity.

"Cautionary statements must, within context, be meaningful; boilerplate, generalized warnings do not suffice to balance specific predictions."*In re Clorox Co. Sec. Litig.,* 238 F.Supp.2d 1139, 1142 (N.D.Cal.2002). In *Clorox* the plaintiffs claimed that during an April 22, 1999 conference call Clorox materially misrepresented the financial health of one of its companies. *Id.* at 1144.The court found that the challenged statements were forward-looking because a Clorox representative " began the conference call by asserting that some of her statements would be forward-looking, and a prediction about future events is self-evidently a forward-looking statement."*Id.* at 1145.The court also found the representative made meaningful cautionary statements when she "began the call by disclaiming certainty, and referred listeners to additional cautions in Clorox's June 30, 1998, Form 10K filing. That filing contained additional, albeit general, statements about the potential difficulties Clorox might face and the potential problems with the merger."*Id.* The court found that these "cautions provide the requisite contextual warnings for the Safe Harbor provision ... to apply."*Id.*

Defendants' warnings in the instant case are almost identical to those presented by Clorox. Plaintiff claims that defendant made misleading statements in several press releases. However, each of these press releases warn that the matters discussed in each respective press release include forward-looking statements. The releases also disclaim certainty and direct readers to defendants' SEC filings (Form 10-K and Form 10-Q). ESST's Form 10-K for 2001 includes an extensive discussion about increased pricing pressures, strong competition from competitors with significant competitive advantages, and concerns about sales being concentrated with relatively few distributors and customers. That the 2001 Form 10-K predates the 2002 press releases does not affect its applicability to statements made in 2002. The *Clorox* court relied on Clorox's 1998 Form 10-K

even though the challenged statements were made in April 1999. Consequently, it is permissible to rely on defendants' 2001 10-K to provide meaningful cautionary statements for the challenged press releases made in 2002. ESST's press releases, therefore, contain sufficient meaningful cautionary language related to its forward-looking statements in the releases to protect ESST under the PSLRA's Safe Harbor provisions.

*10 In addition, the evidence does not support the allegation that defendants had actual knowledge of the falsity of their statements until sometime in mid-2002. Plaintiff relies on the information obtained from the anonymous sources. "Reliance on confidential witnesses is not *per se* improper under the PSLRA, notwithstanding its requirement that a plaintiff plead 'all facts' when making allegations based on information and belief."*In re Northpoint Communications Group, Inc., Sec. Litig.,* 221 F.Supp.2d 1090, 1097 (N.D.Cal.2002) (" *Northpoint II*" ) (citing *In re McKesson HBOC, Inc., Sec. Litig.,* 126 F.Supp.2d at 1271. "To contribute meaningfully toward a 'strong inference' of scienter, however, allegations attributed to unnamed sources must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge." *Northpoint II,* 221 F.Supp.2d at 1097 (citations omitted); *In re U.S. Aggregates, Inc. Securities Litigation,* 235 F.Supp.2d 1063, 1075 (N.D.Cal.2002). Such detail should include each witness' job title, tenure, and a description of his or her responsibilities while at the company, as this " background detail allows for a better evaluation of each witness' basis of knowledge."*Id.* Further, when such allegations must prove a "strong inference" of scienter, a basis for establishing first hand knowledge, rather than secondhand rumor, is required. *See id.* at 1098.Witnesses must also state how they came to learn of the information provided. *Northpoint I,* 184 F.Supp.2d at 1000. Here, plaintiff relies on confidential sources but fails in the main to provide the particularized information that would permit a reasonable conviction that defendants knew their forward looking statements were false when made. At most, the sources suggest that ESST faced competitive pressures, made efforts to contain costs, and may have learned sometime in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 10

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

mid-August 2002 that their estimates for the third quarter were not going to be met. They do not permit a strong inference that defendants knew before mid-2002 that their revenue and earning estimates could not be met or that their competitive advantage could not be maintained.

Plaintiff also points to certain sales of ESST shares by defendants Blair, Boyd and Chan as showing scienter. Blair sold 5000 shares at $18.85 per share on January 23, 2002, 5000 shares on January 24, 2002 at $19.60 per share, 20,000 shares on March 7, 2002 at $25.00 per share and 20,000 shares on March 11, 2002 at $25.01. The total revenue received for these shares was $1,289,200 (29% of his holdings). It appears that Blair's sales were disclosed pursuant to a pre-planned trading program established in December 2001. Request J. Notice Ex. U. Defendant Chan sold 2,300,000 shares on February 6, 2002 at $18.22 per share and 720,000 shares on March 11, 2002 at $18.22 for total revenue of $13,118,400 (22% of his holdings). Defendant Boyd sold 20,000 shares on May 7, 2002 at $25.78 per share for total revenue of $515,600 (29% of his shares). Defendant Ang, ESST's Executive Vice President and Chief Operating Officer ("COO"), made no sales. The timing and amounts of these sales do not suggest that defendants were scheming to keep the price of ESST shares up while they unloaded part of their holdings. Sales took place before the first alleged misleading statement and before there is convincing evidence that defendants recognized that the third quarter would be down from expectations. Further, although the revenue realized from the sales was significant, the percentage of holdings sold do not suggest an attempt to unload a majority of their shares.

*11 "Insider stock sales are not inherently suspicious...."*In re Vantive,* 283 F.3d at 1092. For stock sales to be probative of scienter, insider trading must be "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."*In re Silicon Graphics,* 183 F.3d at 986, quoting *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989). The factors to consider when evaluating the probity of insider

stock sales are: (1) the amount and percentage of shares sold by the insider; (2) the timing of the sales; (3) whether the sales were consistent with the insider's prior trading history.*In re Silicon Graphics,* 183 F.3d at 986. Each factor should be considered, while none is dispositive. *See In re Vantive,* 283 F.3d at 1092-93 (sale of 74% of shares, while suspicious, did not raise a strong inference of scienter where remaining factors did not raise suspicion). Here, the timing of the individual defendants' insider trading does not support an inference of scienter. Nor does the percentage of shares sold. *See, e.g., Ronconi,* 253 F.3d at 435 (amount sold by CEO and CFO not suspicious where they sold 10% and 17%, respectively, of shares and options.); *cf. America West,* 320 F.3d at 939 (amount suspicious where nine individual defendants all sold between 88% and 100% of holdings).

Plaintiff argues that three statements made by Boyd and Blair are not forward-looking. Specifically, plaintiff cites a September 9, 2002 meeting between those defendants and A.G. Edwards wherein defendants stated: (1) the third quarter was progressing as expected, (2) that third quarter pricing trends continued to play out as expected without material variance, and (3) the third quarter was tracking as expected. Opp. at 8. [FN5] Plaintiff is correct that these are not forward-looking statements, because their truth or falsity could be determined at the time they were made. *See Harris v. Ivax Corp.,* 183 F.3d 799, 866 (11th Cir.1999) (explaining that observed facts such as "prices have continued to decline" do not constitute assumptions and are not forward-looking statements). Thus, the question is whether the Second Amended Complaint pleads sufficient facts showing defendants were deliberately or consciously reckless when making the three statements. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 931 (9th Cir.2003) ( "In this Circuit the required state of mind [under the PSLRA] is one of 'deliberate or conscious recklessness.' "). The court concludes that it does.

FN5. The statements made during this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

interview became the basis of a subsequent A.G. Edwards analyst report which stated, "We had the opportunity to meet with management of ESS Technology yesterday[.] The following are the more salient points from our meeting: Business Update-Pricing trends continue to play out as expected, with no material variance either positively or negatively.... Q3 appears to be tracking according to expectations."SAC ¶ 35, Ex. 2.

The facts showing that there is a strong inference that defendants knew before September 12, 2002 that the third quarter revenues and earnings were "not tracking according to expectations" include: (1) the admission by Blair on October 23, 2002 that "by the late part in August it became obvious there was going to be a problem with the [third] quarter;" (2) the temporal proximity between the September 9, 2002 statement that ESST would meet its estimates and the September 12, 2002 disclosure that ESST would miss its forecast by $26 million; and (3) the e-mail from Yeto to CW8 directing a cutback of certain DVD chips representing over 30% of ESST's forecasted revenues by 20%.

*12 The temporal proximity between the September 9 assurance and the September 12 announcement that third quarter revenues would be $26 million short is not in itself enough to satisfy the requirements of Rule 9(b). However, it certainly bolsters the allegations that defendants knew their positive statements on September 9 were false when made. *See Yourish v. California Amplifier,* 191 F.3d 983, 997 (9th Cir.1999).

The court, in determining whether plaintiff has sufficiently alleged scienter, can properly consider the total of the allegations made by plaintiff.
In assessing whether Plaintiffs have sufficiently pled scienter, we must consider whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness. In determining whether a strong inference of scienter exists, we must consider all reasonable inferences, whether or not favorable to

the plaintiff.

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1230 (9th Cir.2004).

Defendants Ang and Chang submit that plaintiff has failed to allege that they made or participated in any of the allegedly misleading statements. Plaintiff counters the SAC is sufficient to hold them in the case pursuant to the "group-published" doctrine because of their positions at ESST. Although the law is not settled as to the effect of the PSLRA on the "group-published" doctrine, it appears that "[i]n order to satisfy the stringent pleading requirements of the PSLRA, a complaint seeking to attribute information published by an organization to an individual defendant should state, with particularity, facts indicating that the individual defendant was directly involved in the preparation of the allegedly misleading statements."*In re Lockheed Martin Corp. Securities Litigation,* 272 F.Supp.2d 928, 936 (C.D.Cal.2002). Plaintiff has failed to do this with respect to defendants Ang and Chang. Therefore, the motion to dismiss Count I as to them is granted.

**B. Section 20(a) of the 1934 Securities Act (Control Liability)**

Plaintiff contends that by reason of their executive and managerial positions with ESST the individual defendants had the power and authority to cause ESST to engage in the wrongful conduct alleged. Neither side's briefing addresses the control liability question. However,

[i]n order to prove a prima facie case under Section 20(a), a plaintiff must prove: (1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator. In order to make out a prima facie case, it is not necessary to show actual participation or the exercise of power; however, a defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation.

Whether the defendant is a controlling person is an intensely factual question, involving scrutiny

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions. "Control" is defined in the regulations as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."

**\*13** *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 945 (9th Cir.2003) (internal citations omitted). In light of the significant and responsible positions of Chan and Ang, a factual question exists as to whether they were controlling persons.

C. Section 20A of the 1934 Act

Under Section 20A of the 1934 Securities Act, [a]ny person who violates any provision of this title or the rules and regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable ... to any person who, contemporaneously with the ... sale of securities that are the subject of such violation, has purchased ... of the same class.

Plaintiff contends that Chan's sales in on February 6, 2002 and February 19, 2002 violated Section 20A. However, the SAC does not show that Chan had material nonpublic information in February 2002. Therefore, Count III is dismissed.

D. Leave to amend

Leave to amend is to be freely granted when justice so requires. *See*FED. R. CIV. P. 15(a); *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir.2000) (leave to amend should be granted unless the district court "determines that the pleading could not possibly be cured by the allegation of other facts "). Plaintiff has filed three amended complaints. Because plaintiff has had ample opportunity to plead a viable complaint, leave to amend is denied. "

[T]he purpose of the PSLRA would be frustrated if district courts were required to allow repeated amendments to complaints filed under the PSLRA." *Miller v. Champion Enterprises Inc.,* 346 F.3d 660, 692 (9th Cir.2003); *see Lipton,* 284 F.3d at 1039 (where basic facts alleged and analyzed, and plaintiff cannot cure flaws in pleading, dismissal with prejudice proper); *Silicon Graphics,* 183 F.3d at 991 (denying leave to amend where defects in pleadings not curable by amendment).

IV. ORDER

For the foregoing reasons, it is hereby ordered that the motion to dismiss Count I as to defendants Blair, Boyd and ESST is denied except as to allegations pleading fraud prior to February 27, 2002. Those allegations are stricken and dismissed. The motion to dismiss Count I as to defendants Ang and Chan and Count III as to defendant Chan is granted. The motion to dismiss to Count II is denied as to all defendants.

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

N.D.Cal.,2004.
In re ESS Technology, Inc. Securities Litigation
Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Westlaw.

Slip Copy                                                                                    Page 1

Slip Copy, 2007 WL 2209278 (N.D.Cal.), Fed. Sec. L. Rep. P 94,367
(Cite as: Slip Copy)

C
In re Mercury Interactive Corp. Securities Litigation
N.D.Cal.,2007.

United States District Court, N.D. California,
San Jose Division.
In re MERCURY INTERACTIVE CORP.
SECURITIES LITIGATION.
No. C 05-3395 JF (PVT).

July 30, 2007.

Arthur L. Shingler, III, Scott & Scott, LLC, San Diego, CA, Michael M. Goldberg, Glancy & Binkow LLP, Los Angeles, CA, David R. Scott, Scott & Scott LLC, Colchester, CT, for Archdiocese of Milwaukee Supporting Fund, Inc.
Dennis J. Johnson, pro se.
Karel Munao, pro se.
Chandra Singhal, pro se.
Charter Township of Clinton Police and Fire Pension System, pro se.
City of Dearborn Heights Police and Fire Retirement System, pro se.
City of Sterling Heights General Employees Retirement System, pro se.
Longshoreman's Association Pension Fund, pro se.
Steamship Trade Association International, pro se.
Peter Arthur Binkow, Glancy Binkow & Goldberg LLP, Los Angeles, CA, for Archdiocese of Milwaukee Supporting Fund, Inc. and Mercury Pension Fund Group.
Alan I. Ellman, Christopher J. Keller, Joel H. Bernstein, Michael H. Rogers, Russel N. Jacobson, Labaton Sucharow & Rudoff LLP, Donald Delaney, Louis J. Gottlieb, Goodkind Labaton Rudoff & Sucharow LLP, New York, NY, Glenn E. Mintzer, Baltimore, MD, Jayson E. Blake, Rochester, MI, for Mercury Pension Fund Group.
Cecilia Y. Chan, Howard S. Caro, Nicole Acton Jones, Heller Ehrman, San Francisco, CA, Robin Wechkin, Heller Ehrman LLP, Seattle, WA, for Mercury Interactive Corporation.

Sara B. Brody, Heller Ehrman, San Francisco, CA, for Mercury Interactive Corporation, Anthony Zingale, David James Murphy, III, Yuval Scarlat.
K.C. Maxwell, Esq., Adam Richard Sand, Esq., John D. Cline, Jones Day, San Francisco, CA, Andrew T. Solomon, Franklin B. Velie, Sullivan & Worcester, LLP, New York, NY, for Amnon Landan.
Jeffrey S. Facter, Alicia G. Huffman, Patrick David Robbins, Shearman & Sterling LLP, Azadeh Gowharrizi, San Francisco, CA, for Douglas P. Smith.
Michael Todd Scott, Lucy Edmond Buford, Orrick, Herrington & Sutcliffe LLP, San Francisco, CA, for Susan J. Skaer.
Asim M. Bhansali, Benedict Y. Hur, Attorney at Law, Jan Nielsen Little, Keker & Van Nest, LLP, San Francisco, CA, for Igal Kohavi, Giora Yaron, Yair Shamir.
C. Brandon Wisoff, Farella Braun & Martel LLP, San Francisco, CA, for Sharlene Abrams.
Michael Cecchini, Scott A. Fink, Gibson Dunn & Crutcher, San Francisco, CA, for Pricewaterhousecoopers Inc.

ORDER [FN1] GRANTING MOTIONS TO
DISMISS WITH LEAVE TO AMEND

FN1. This disposition is not designated for publication and may not be cited.JEREMY FOGEL, United States District Judge.

I. BACKGROUND

1. Procedural Background

*1 The initial complaint in this action was filed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2209278 (N.D.Cal.), Fed. Sec. L. Rep. P 94,367
**(Cite as: Slip Copy)**

on August 19, 2005. On December 8, 2005, in light of the filing of several related cases, the Court issued an order setting a briefing schedule for competing motions for appointment as lead plaintiff. On May 5, 2006, the Court appointed Mercury Pension Fund Group ("Lead Plaintiff") to lead the litigation and approved its choice of lead counsel. On June 7, 2006, the Court established a schedule for the filing of a consolidated complaint and the briefing of any subsequent motions to dismiss. On September 8, 2006, the instant consolidated class action complaint ("the Complaint ") was filed. The class is defined as "all persons and entities who purchased or otherwise acquired Mercury securities between October 17, 2000, and November 1, 2005, inclusive, and who were damaged thereby."Complaint ¶ 352.

The Complaint names nine defendants: Mercury Interactive Corporation ("Mercury" or " the Company"), Amnon Landan, Douglas Smith, Sharlene Abrams, Susan Skaer, Igal Kohavi, Yair Shamir, Giora Yaron, and PricewaterhouseCoopers ( "PWC"). The Complaint refers to Landan, Smith, Abrams, and Skaer as the "Officer Defendants," and to Kohavi, Shamir, and Yaron as the " Compensation Committee Defendants." It refers to the Officer Defendants and the Compensation Committee Defendants as the Individual Defendants, and to the Individual Defendants and Mercury as the Mercury Defendants. The Complaint asserts three claims: (1) violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, against the Mercury Defendants; (2) violation of Section 20(a) of the Securities Exchange Act, against the Officer Defendants and the Compensation Committee Defendants; and (3) violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, against PWC.

On November 17, 2006, seven separate motions to dismiss [FN2] were filed by: (1) PWC; (2) Abrams; (3) Skaer; (4) Smith; (5) Mercury; (6) Landan; and (7) the Compensation Committee Defendants. Lead Plaintiff has filed two oppositions, the first to the motions filed by Mercury and the Individual Defendants, and the second to the motion filed by PWC. The Court

heard oral argument on March 30, 2007.[FN3]

> FN2. Defendants also have joined in various portions of each other's motions.

> FN3. During the briefing of the instant motions, a dispute arose as to the unsealing of the derivative complaint in a factually-related state court action. That dispute is not the subject of the instant order.

**2. Factual Allegations**

This action arises from the alleged backdating of stock options at Mercury Interactive Corporation ("Mercury"). The Complaint contains the following allegations, which the Court assumes to be true for the purposes of this motion.

Mercury provides software and services to the business technology optimization marketplace. Complaint ¶ 13. It is incorporated under Delaware law and is headquartered in California. *Id.* Landan was Chairman of the Board of Mercury ("the Board" ) from July 1999 until he resigned on November 2, 2005.*Id.* at ¶ 14.He was Chief Executive Officer from February 1997 until his resignation, and a director from February 1996 until his resignation. *Id.* Smith was Chief Financial Officer and Executive Vice President from November 2001 until November 2, 2005, when he resigned. *Id.* at ¶ 15.Previously, Smith was Executive Vice President of Corporate Development. *Id.* Abrams was Chief Financial Officer and Vice President of Finance and Administration from November 1993 until November 2001, when she resigned. *Id.* at ¶ 16.Skaer was Vice President, General Counsel, and Secretary of Mercury from November 2000 until November 2, 2005, when she resigned. *Id.* at ¶ 17.The Compensation Committee Defendants were the only outside directors on the Board and the only members of the Compensation and Audit Committees from October 1996 to July 2002. *Id.* at ¶ 22.Kohavi and Shamir have been directors since 1994. *Id.* at ¶¶ 19-20.Each was a member of the Compensation and Audit Committees from 1996

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2209278 (N.D.Cal.), Fed. Sec. L. Rep. P 94,367
**(Cite as: Slip Copy)**

through June 2006. *Id* . Yaron has been a director since 1996 and Chairman of the Board since November 2, 2005. *Id.* at ¶ 21.He was chair of the Compensation Committee from 2002 through June 2006. *Id.* He was a member of the Audit Committee from 1996 to 2002. *Id.* PWC was Mercury's outside public auditor during the class period. *Id.* at ¶ 24.

*2 Mercury has had at least four options plans: the 1989 Stock Option Plan and its replacement, the 1999 Stock Option Plan; the 1994 Directors' Plan; and the 1998 Employee Stock Purchase Plan. *Id.* at ¶¶ 37-41.The 1989 Stock Option Plan, under which options no longer are granted, permitted purchase at less than one hundred percent of the fair market value for statutory stock option grants. *Id.* at ¶ 37.The 1998 Employee Stock Purchase Plan allows purchase at less than one hundred percent of the fair market value. *Id.* at ¶ 41.The 1999 Stock Option Plan and the 1994 Directors' Plan require that the exercise price of options granted thereunder be one hundred percent of fair market value on the date of the grant. *Id.* at ¶¶ 39, 41.

In November 2004, the SEC launched an informal investigation into Mercury's past stock option grants. *Id.* at ¶ 45.In July 2005, the Company revealed that there were potential problems with the dating and pricing of stock option grants and with the accounting for these option grants. *Id.* The Board formed a Special Committee to investigate the Company's stock option practices. *Id.* at ¶ 46.In August 2005, the Special Committee concluded that the actual grant dates of certain past stock option grants differed from the dates on which they should have been granted. *Id.* The Special Committee found that on fifty-four separate occasions between 1994 and 2005, stock options reflected a grant date that differed from the date on which the option actually had been granted.*Id.* at ¶ 48.In almost every such instance, the price on the actual grant date was higher than the price on the originally stated date. *Id.* Of those fifty-four grants, twenty-four were approved by the Compensation Committee.*Id.* The Special Committee also found that option exercise dates were incorrectly reported, that some option documentation was missing, and that a loan was made by Mercury to Landan without proper

documentation. *Id.* at ¶¶ 50, 52, 56.As a result, the Board concluded that Mercury's financial statements from 2000 through the first quarter of 2005 no longer should be relied upon because they contained misstatements of material facts and would need to be restated. *Id.* at ¶ 47.On August 29, 2005, Mercury issued a press release stating that it had undertaken a restatement. *Id.* at ¶ 204.[FN4]

> FN4. Unlike the other press releases discussed herein, the August 29, 2005 press release is not described in detail in the Complaint.

On October 4, 2005, Mercury issued a press release that described the pending restatement but that did not disclose the full impact of the backdating on Mercury's financial position. *Id.* at ¶ 204.It also reported that the SEC inquiry had been converted into a formal investigation. *Id.* Mercury's stock price fell from $36.90 to a closing price of $31.61 on October 4, 2005. *Id.* at ¶ 351.On November 2, 2005, Mercury issued a press release stating that it had identified forty-nine instances of improper backdating and that it had concluded that internal controls had been inadequate. *Id.* at ¶ 206.Mercury also announced that it had accepted the resignations of Landan, Smith, and Skaer, and stated:

*3 Chief Executive Officer Amnon Landan, Chief Financial Officer Douglas Smith, and General Counsel Susan Skaer were each aware of and, to varying degrees, participated in the practices discussed above. Each of them also benefited [sic] personally from the practices. While each of these officers asserts that he or she did not focus on the fact that the practices and their related accounting were improper, the Special Committee has concluded that each of them knew or should have known that the practices were contrary to the options plan and proper accounting. While the Special Committee is appreciative of and sympathetic to the far-reaching demands of these executives' positions during this critical period, missing or overlooking a practice as basic and important as the proper granting of options is not acceptable.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                          Page 4

Slip Copy, 2007 WL 2209278 (N.D.Cal.), Fed. Sec. L. Rep. P 94,367
**(Cite as: Slip Copy)**

*Id.* Upon this full disclosure of the improper stock options practices, Mercury stock fell from its November 1, 2005 closing price of $35.00 to $25.66 on November 2, 2005. *Id.* at ¶ 207.Mercury subsequently admitted that each of the financial statements issued from fiscal year 1992 through the end of the first month of fiscal year 2005 was materially false and misleading. *Id.* at ¶ 208.On July 3, 2006, Mercury filed a Form 10-K/A restating its consolidated financial statements for 2002, 2003, and 2004. *Id.* at ¶ 59.

## II. LEGAL STANDARD

### 1. Motion to Dismiss

For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Department of Corrections,* 66 F.3d 245, 248 (9th Cir.1995). When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp,* 90 F.3d 386, 393 (9th Cir.1996). On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *North Star International v. Arizona Corporation Commission,* 720 F.2d 578, 581 (9th Cir.1983); *MGIC Indemnity Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986); *Beliveau v. Caras,* 873 F.Supp. 1393, 1395 (C.D.Cal.1995). However, under the " incorporation by reference" doctrine, the Court also may consider documents which are referenced extensively in the complaint and which are accepted by all parties as authentic, which are not physically attached to the complaint. *In re Silicon Graphics, Inc. Securities Litigation,* 183 F.3d 970 (9th Cir.1999).

### 2. Heightened Pleading Standard Under Rule 9(b) and the PSLRA

Fed.R.Civ.P. 9(b) requires that "the circumstances constituting fraud ... be stated with particularity."The Ninth Circuit has explained that a "plaintiff must include statements regarding the time, place, and nature of the alleged fraudulent activities, and that mere conclusory allegations of fraud are insufficient."*In re GlenFed, Inc. Securities Litigation,* 42 F.3d 1541, 1548 (9th Cir.1994). A plaintiff asserting fraud "must set forth an explanation as to why the statement or omission complained of was false or misleading."*Id.* (internal quotation marks omitted); *see also Yourish v. California Amplifier,* 191 F.3d 983, 992-93 (9th Cir.1999). The Private Securities Litigation Reform Act ("PSLRA") raises the pleading standard even further:

*4 (1) Misleading statements and omissions
In any private action arising under this chapter in which the plaintiff alleges that the defendant-
(A) made an untrue statement of a material fact; or
(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
(2) Required state of mind
In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4b(1)-(2).

## III. DISCUSSION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 5

Slip Copy, 2007 WL 2209278 (N.D.Cal.), Fed. Sec. L. Rep. P 94,367
**(Cite as: Slip Copy)**

**1. Claim One: Violation of Section 10(b) and Rule 10b-5 Against the Mercury Defendants**

a. *Elements of the Claim*

Lead Plaintiff alleges that the Mercury Defendants violated Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder. Section 10(b) makes it unlawful

[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person to use interstate commerce(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. In cases involving publicly-traded securities and purchases or sales in public securities markets, the elements of an action under Section 10(b) and Rule 10b-5 are: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 341-42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

b. *The Class Period and the Statute of Limitations*

i. The Beginning of the Asserted Class Period

Mercury argues that the statute of limitations bars claims by investors who purchased Mercury stock before September 8, 2001, five years prior to the filing of the Complaint. This would exclude a portion of the asserted class because the class period asserted in the Complaint includes purchasers of Mercury stock between October 17, 2000 and November 1, 2005. Complaint ¶ 352. In contrast, the initial complaint in this action asserted a class period that includes purchasers of Mercury stock between December 1, 2004 and July 5, 2005. Initial Complaint ¶ 119.[FN5] The relevant statute of limitations provides:

> FN5. Because the initial complaint was filed on August 15, 2005, the class period asserted in the Complaint would have begun within five years of that date.

**\*5** [A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47)), may be brought not later than the earlier of-

(1) 2 years after the discovery of the facts constituting the violation; or

(2) 5 years after such violation.

28 U.S.C. § 1658(b). The five-year period of repose is not subject to tolling. *See Durning v. Citibank, In'l,* 990 F.2d 1133, 1136-37 (9th Cir.1993).

The class period asserted in the Complaint includes individuals who purchased Mercury stock more than five years before the filing of the Complaint. However, Lead Plaintiff argues that the Complaint relates back to the initial complaint in this action and that, accordingly, no portion of the class period is time-barred. The Ninth Circuit has held that:

An amendment adding a party plaintiff relates back to the date of the original pleading only when:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2209278 (N.D.Cal.), Fed. Sec. L. Rep. P 94,367
**(Cite as: Slip Copy)**

1) the original complaint gave the defendant adequate notice of the claims of the newly proposed plaintiff; 2) the relation back does not unfairly prejudice the defendant; and 3) there is an identity of interests between the original and newly proposed plaintiff.

*In re Syntex Corp. Securities Litigation,* 95 F.3d 922, 935 (9th Cir.1996). The court found identity of interests absent in *Syntex* because "[t]he claims of the proposed plaintiffs are different because the newly proposed class members bought stock at different values and after different disclosures and statements were made by Defendants and analysts."*Id.* The court also cited its earlier decision in *Besig v. Dolphin Boating & Swimming Club,* 683 F.2d 1271, 1278-79 (9th Cir.1982), in which it had focused on the "central issue of th[e] litigation," the "goals" of the litigants, and the relief sought, in determining whether an identify of interests existed. *Id.*

Applying *Syntex* to the facts now before it, this Court concludes that an identity of interests does not exist between the class members who purchased Mercury stock before September 8, 2001 and those who purchased Mercury stock after that date. Class members who purchased Mercury stock between October 17, 2000 and September 8, 2001 bought their stock at a much higher price than did purchasers of Mercury stock after September 8, 2001: the Complaint alleges that the share price averaged between $80/share and $100/share in the fourth quarter of 2000 and between $20/share and $40/share during the fourth quarter of 2001. Complaint ¶¶ 222, 259. Accordingly, while the relief sought may be similar in kind, and may have been triggered by the same disclosures of improper accounting, the quantum of relief sought is vastly different in scale. Moreover, while they may have been similar in kind and effect, different statements also were made as to the state of Mercury's financials prior to the purchases at issue. The Court does not hold that a difference in stock price by itself is enough to avoid application of the relation-back doctrine, but *Syntex* does not allow the Court to ignore the significant difference in stock price that is present here. Because the class should not include individuals or entities that

purchased Mercury stock prior to September 8, 2001,[FN6] the Complaint will be dismissed with leave to amend.

> FN6. Lead Plaintiff cites *In re Network Associates, Inc. II Securities Litigation,* 2003 WL 24051280 (N.D.Cal., Mar.25, 2003) (unpublished). The court in that case emphasized that the claims of the new class members were "based on the same underlying allegations as the original class members" and "[m]ore importantly, all of the claims are based on the same ... disclosure and subsequent stock drop."*Id.* at *7. The court read the reference to " disclosures and statements" in *Syntex* as pertaining to the disclosures that caused the stock price drop, not to the statements causing stock purchase and supporting the higher stock price. This reading avoids the conclusion, decried by Lead Plaintiff, that the relation-back doctrine cannot apply in securities class actions because the new plaintiffs always will have purchased the stock at a different price. While the Court might have reached a different conclusion in the instant case were the stock prices roughly similar, the stock price difference in this action is sufficiently large to bar application of the relation-back doctrine. The Court notes that at least one other court in this district has reached a similar conclusion on similar facts. *See In re Commtouch Software Ltd. Securities Litigation,* 2002 WL 31417998 (N.D.Cal. July 24, 2002) (unpublished) (finding lack of identity of interests).

ii. The Statute of Limitations as to Claims Against Abrams

*6 Abrams argues that the Complaint alleges no wrongful conduct by her after September 8, 2001. Lead Plaintiff responds that the Complaint alleges in fact wrongful conduct by Abrams in the form of an earnings release dated October 16, 2001. However, the Complaint does not name Abrams as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2209278 (N.D.Cal.), Fed. Sec. L. Rep. P 94,367
**(Cite as: Slip Copy)**

a person responsible for that release. If Lead Plaintiff can assert that Abrams committed a wrongful act during the class period, it should do so in an amended complaint.

### c. Loss Causation

Mercury and Landan argue that the Complaint does not allege loss causation sufficiently. Mercury notes that the Complaint identifies five disclosures occurring on: July 5, 2005; July 28, 2005; August 8, 2005; October 4, 2005; and November 2, 2005. The analysis of each of the disclosures is governed by the decisions of the Supreme Court in *Dura Pharmaceuticals* and of the Ninth Circuit in *In re Daou Systems, Inc. Securities Litigation,* 411 F.3d 1006 (9th Cir.2005). In *Dura Pharmaceuticals,* the Supreme Court held that the fact that a purchase price was inflated, by itself, does not establish causation of economic loss. Instead, the Supreme Court reaffirmed the principle that a securities plaintiff must allege both cause and loss. In *Daou Systems,* the Ninth Circuit described the loss causation inquiry as considering whether "the misrepresentations or omissions caused the harm." *Daou Sytems,* 411 F.3d at 1025. In that case, the court found a lack of loss causation: "if the improper accounting did not lead to the decrease in Daou's stock price, plaintiffs' reliance on the improper accounting in acquiring the stock would not be sufficiently linked to their damages."*Id.* at 1026.The court concluded that a loss suffered in an earlier period could not be considered causally related to the alleged fraudulent conduct because that stock drop occurred when "the true nature of Daou's financial condition had not yet been disclosed."*Id.* at 1027.

The theory of Lead Plaintiff's case appears to be that multiple, individual disclosures caused multiple, individual economic losses. Such a theory fits within the constraints articulated by *Dura Pharmaceuticals* and *Daou* to the extent that it does not attempt to capture losses attributable to other causes. By way of example, if a stock fell from $110/share to $10/share over the course of a year, the total loss attributable to the full universe of

causes would be $100/share. If, however, after three disclosures of wrongdoing during that overall descent, the stock price fell from $80/share to $70/share, from $60/share to $50/share, and from $40/share to $30/share, and those losses were attributable to the disclosed wrongdoing, a plaintiff would be able to plead loss caused by the wrongdoing in the amount of $30/share, not $100/share. Any attempt to recover an amount of loss including loss unattributable to the wrongdoing at issue would be barred under *Dura Pharmaceuticals* and *Daou.*No Defendant has cited authority indicating that a plaintiff only may recover for damages stemming from a single disclosure. While an earlier disclosure may be relevant to reasonable reliance, an earlier disclosure does not necessarily strip a later disclosure of its ability to cause loss. Accordingly, while it is not entirely clear that the claims in the Complaint are limited to losses caused by the individual disclosures, Lead Plaintiff may proceed on such a theory in an amended complaint.

### i. The July 5, 2005 Disclosure

*7 Lead Plaintiff alleges that "[o]n July 5, 2005, Mercury disclosed that it had initiated an internal investigation to determine whether it had been improperly accounting for stock option grants, that the SEC had initiated an informal investigation into the matter, and that Mercury would potentially need to restate its past financial statements." Complaint ¶ 348. Lead Plaintiff does not allege any specific drop in share price as a result of this disclosure. Accordingly, Lead Plaintiff fails to plead loss causation with respect to the July 5, 2005 disclosure.

### ii. The July 28, 2005 Disclosure

Lead Plaintiff alleges that "[o]n July 28, 2005, Mercury disclosed a 'preliminary' conclusion that the resulting restatement of earnings would likely be material and impact prior year's earnings. The price of Mercury stock dropped more than a dollar on this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2209278 (N.D.Cal.), Fed. Sec. L. Rep. P 94,367
**(Cite as: Slip Copy)**

news, closing at $39.15 or $1.11 lower than the previous day's close."*Id.* Mercury asserts that this alleged drop is not what it appears to be, in that the disclosure came after the market already had closed for the day and that when the market had the opportunity to digest the information the next day, the stock price actually went up twenty-two cents. Lead Plaintiff argues that it is not appropriate to consider such assertions at the pleading stage. While this argument is correct generally, considering that leave to amend is required on other bases, Lead Plaintiff either should omit this disclosure from an amended complaint or plead it with more contextual facts. It is not in the interest of judicial economy to encourage artful pleading of claims that will be subject to summary adjudication.

iii. The August 8, 2005 Disclosure

Lead Plaintiff alleges that "[o]n August 8, 2005, the Company announced it would miss the deadline for filing its second quarter 2005 Form 10-Q 2005 report with the SEC as a result of the restatement. Mercury's stock price dropped again to close $0.65 lower at $37.62."*Id.* The implication of these allegations is that the reported need to restate financials, which was caused by the improper backdating, caused the decline in the price of Mercury's stock. However, this drop in share price does not appear to be statistically significant, and Lead Plaintiff seemed to concede at oral argument that this disclosure did not form the basis of any economic loss. Accordingly, while Lead Plaintiff may include this disclosure in an amended complaint, the Court notes its skepticism that such an allegation would survive a future motion to dismiss.

iv. The October 4, 2005 Disclosure

Lead Plaintiff alleges that "[o]n October 4, 2005, in its press release reporting preliminary 3Q05 results, Mercury revealed that the SEC's informal investigation had been converted to a formal investigation. On this news, Mercury's stock

price dropped $5.29, or 14.3%, from $36.90 to $31.61, although the full extent of the problems at Mercury still had yet to be revealed."*Id.* at ¶ 351.However, the press release also included the disclosure that Mercury would record third quarter 2005 revenue of $198-205 million, rather than the $205-215 million that previously had been predicted. *Id.* at ¶ 204.The Complaint does not allege what portion of the loss is attributable to the news regarding the SEC investigation as distinguished from the portion that is attributable to the Company's failure to hit revenue targets. As the Fifth Circuit observed in *Greenberg v. Crossroads Systems, Inc.,* 364 F.3d 657 (5th Cir.2004), failure to establish that the disclosure of the relevant wrongdoing played a significant role in a loss merits entry of summary judgment for failure to show loss causation. This action remains at the pleading stage, however, raising the question as to how specifically a securities plaintiff must plead loss caused by the relevant disclosure, as opposed to loss caused by other simultaneous events. Because the Complaint will be dismissed with leave to amend on other grounds, the Court need not answer that question at this time. The Court notes that further specificity as to the loss caused by the October 4, 2005 disclosure would increase the likelihood that an amended version of this aspect of the Complaint will survive a future motion to dismiss.

v. The November 2, 2005 Disclosure

*8 Lead Plaintiff alleges that "[w]hen the full extent of the options backdating scandal was revealed on November 2, 2005, the market reacted swiftly and decisively with the price of Mercury's common stock plummeting 27% from its November 1 closing price of $35 .00 to close down $9.44 at $25.66 on November 2." Complaint at ¶ 351. Mercury does not appear to contest the pleading of loss causation as to this disclosure. Landan argues that the loss could have been the result of other causes, but it reasonably may be inferred that these other causes (officer resignations, delisting, delayed financial statements, and a poor outlook) all stem from the underlying wrong. Accordingly, Landan's challenge to the allegation that the November 2,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2209278 (N.D.Cal.), Fed. Sec. L. Rep. P 94,367
**(Cite as: Slip Copy)**

2005 disclosure of the scope of the backdating problem caused a share price drop of $9.44/share is unpersuasive.

However, Mercury also argues that Lead Plaintiff may not graft onto the November 2, 2005 disclosure the effects of other disclosures made after the end of the class period. Mercury argues that the Company's improper accounting for options exercisable with promissory notes was not revealed until July 2006, nine months after the close of the class period. Lead Plaintiff appears to concede that this is correct, but states that events occurring after the close of the class period remain relevant to scienter. Opposition to Mercury Motion 30 n.29. Lead Plaintiff should ensure that any amended complaint is clear as to the relevance of such allegations and that it does not attempt to support loss causation in an inappropriate manner.[FN7]

> FN7. Mercury argues that because the November 2, 2005 disclosure announced that *intentional* misconduct ended in April 2, 2002, Plaintiff cannot establish loss causation for any intentional misconduct occurring after April 2, 2002. This argument is unpersuasive. While a wrong must be disclosed and that disclosure must cause a loss for it to be actionable, Mercury cites no authority indicating that such disclosure must be made in the terms of the relevant claims for relief under federal securities law. Such a rule would create perverse incentives for companies to frame their releases to investors in the most legally insulating manner. The ultimate responsibility for determining whether an action was intentional or negligent does not lie with the Company, but with the Court. Here, Mercury disclosed that a series of wrongful acts had occurred and the market responded to that disclosure. The use of terms of art does not foreclose potential liability.

*d. Reliance*

Abrams [FN8] and Landan argue that the Complaint contains insufficient allegations regarding reliance. Lead Plaintiff argues that it has pled reliance adequately under both the fraud on the market theory allowed under *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The Supreme Court described the fraud on the market theory as follows:

> FN8. Abrams's argument regarding reliance depends in part on the assertion that the Complaint alleges no actions in which she participated. Because leave to amend will be granted in order that Lead Plaintiff may attempt to make such allegations, the Court does not consider Abrams's reliance arguments to the extent that they may be rendered moot by amendment.

The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business .... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements .... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.
*Basic Inc.,* 485 U.S. at 241-42 (citing *Peil v. Speiser,* 806 F.2d 1154, 1160-61 (3d Cir.1986)).

The Supreme Court adopted a rebuttable presumption of reliance based on fraud on the market theory and identified situations in which it might be rebutted:
Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance. For example, if petitioners could show that the "market makers" were privy to the truth about the merger discussions here with Combustion, and thus that the market price would not have been affected by their

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2209278 (N.D.Cal.), Fed. Sec. L. Rep. P 94,367
**(Cite as: Slip Copy)**

misrepresentations, the causal connection could be broken: the basis for finding that the fraud had been transmitted through market price would be gone. Similarly, if, despite petitioners' allegedly fraudulent attempt to manipulate market price, news of the merger discussions credibly entered the market and dissipated the effects of the misstatements, those who traded Basic shares after the corrective statements would have no direct or indirect connection with the fraud. Petitioners also could rebut the presumption of reliance as to plaintiffs who would have divested themselves of their Basic shares without relying on the integrity of the market. For example, a plaintiff who believed that Basic's statements were false and that Basic was indeed engaged in merger discussions, and who consequently believed that Basic stock was artificially underpriced, but sold his shares nevertheless because of other unrelated concerns, *e.g.,* potential antitrust problems, or political pressures to divest from shares of certain businesses, could not be said to have relied on the integrity of a price he knew had been manipulated.

\*9 *Basic,* 485 U.S. at 248-49.

The Court concludes that Lead Plaintiff is entitled at the pleading stage to a presumption of reliance under the fraud on the market theory. The Court does not read *Dura Pharmaceuticals* as limiting *Basic Inc.* The presumption of reliance created in *Basic Inc.* is based upon the efficiency of markets, whereas the language highlighted by Landan in *Dura Pharmaceuticals* refers to the severing of loss causation.[FN9] While reliance, or transaction causation, and loss causation are related, an extended period of time between purchase and sale does not necessarily affect the underlying efficiency of the market.

> FN9. *See Dura,* 524 U.S. at 342-43 ("Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i.e.,* the more likely that other factors caused the loss.").

Because the Court concludes that Lead Plaintiff is entitled to a presumption of reliance under *Basic*

*Inc.,* it need not consider Lead Plaintiff's alternative argument that it can invoke a reliance presumption under *Affiliated Ute Citizens v. United States,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The Court notes that the filing of the initial complaint and its implicit suggestion that the market price no longer could be trusted may be relevant to the reliance analysis if this action passes the pleading stage and defendants seek to rebut the presumption.

*e. Economic Loss*

Landan argues that the Complaint fails to plead economic loss.[FN10] Landan argues that the Lead Plaintiff and other named plaintiffs sold their stock too early to be affected by the drop in the stock price allegedly caused by the disclosure of the options backdating. Lead Plaintiff disputes this assertion. In light of the dismissal of the Complaint with leave to amend, the Court need not address the dates of the sales at issue. Lead Plaintiff should ensure that any amended complaint alleges that sales of Mercury stock by the named plaintiffs occurred during the appropriate period.

> FN10. This argument is made jointly with the argument, discussed above, that the Complaint fails to plead loss causation. It is discussed here to the extent that it is separate from the loss causation argument.

Landan argues that no economic loss can be established on the basis of sales occurring after the commencement of this lawsuit. In *Dura Pharmaceuticals,* the Supreme Court cited a series of sources discussing the common law requirement that a plaintiff in an action based upon fraudulent misrepresentation suffer economic loss before bringing suit. *See Dura Pharmaceuticals,* 544 U.S. at 344 (citing *e.g.* M. Bigelow, Law of Torts 101 (8th ed.1907) (damage "must already have been suffered before the beginning of the suit"). However, the Supreme Court did not address the question, presented by the facts alleged in the Complaint, as to whether the filing of an initial

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                                          Page 11

Slip Copy, 2007 WL 2209278 (N.D.Cal.), Fed. Sec. L. Rep. P 94,367
**(Cite as: Slip Copy)**

complaint based upon an initial and incomplete disclosure of wrongdoing precludes the filing of an amended complaint after a fuller disclosure has been made. Landan cites no authority prohibiting such an amendment. Instead, while *Dura Pharmaceuticals* prohibits the filing of a complaint without *any* allegation of loss and loss causation, the Court concludes that it does not bar the filing of an amended complaint alleging a greater loss for which loss causation also can be pled.[FN11]

> FN11. Landan's argument is stronger in the contexts of loss causation and reliance. It suggests that the class cannot have relied upon the stock price after the filing of the initial complaint. It also implies that, since an earlier complaint was filed on the basis of a cause that occurred prior to such filing, any injury after that time must have been the result of other causes. In other words, if the initial complaint captured the loss caused by the misrepresentations at issue in this action, the losses that occurred after the filing of the initial complaint must not have caused by those misrepresentations. However, while these are interesting arguments that are potentially compelling in other contexts, the Court concludes that they are premature at the pleading stage.

### f. *Scienter*

**\*10** The Ninth Circuit has explained:

[A] private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct.... [A]lthough facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a strong inference of deliberate recklessness. In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity. Accordingly, ... particular facts giving rise to a

strong inference of deliberate recklessness, at a minimum, is required to satisfy the heightened pleading standard under the PSLRA.

*In re Silicon Graphics Inc. Securities Litigation,* 183 F.3d 970, 974 (9th Cir.1999). Each defendant argues that the Complaint alleges its scienter inadequately.

#### i. The Compensation Committee Defendants

The Compensation Committee Defendants, each of whom served as an outside director during the relevant period, argue that the Complaint fails to allege sufficient facts regarding scienter as to those financial statements signed by them.[FN12]This argument is well taken. The Complaint contains insufficient allegations of fact giving rise to the inference that the Compensation Committee Defendants acted knowingly or with deliberate recklessness in approving backdated options. Instead, the Complaint alleges that those defendants signed incorrect financial statements and that the " Special Committee found that questions should have been raised in the minds of the Compensation Committee members from 1998 to 2002-including Kohavi, Shamir and Yaron-as to whether grants they approved were properly dated."Complaint ¶ 247. While their alleged conduct throughout this period, and particularly their alleged failure to recognize or pursue warning signs, may have been negligent, the allegations of the Complaint are insufficient to create a strong inference of knowledge or deliberate recklessness as required by *Silicon Graphics.*

> FN12. The Compensation Committee Defendants also argue that the Complaint fails to allege that they signed the large bulk of the financial statements at issue in this action. Lead Plaintiff appears to concede that liability does not attach to those defendants for the bulk of the misstatements, as it focuses upon five Form 10-K's filed during the asserted class period that were signed by the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 12

Slip Copy, 2007 WL 2209278 (N.D.Cal.), Fed. Sec. L. Rep. P 94,367
**(Cite as: Slip Copy)**

Compensation Committee Defendants.

**ii. The Officer Defendants**

The Complaint alleges that the Company lacked effective internal controls during the period of the backdating, and that the Special Committee concluded that Landan, Smith, and Skaer knew or should have known that the Company's accounting practices violated GAAP and that those defendants knew or should have known about the backdating practices. One court in this district has concluded that similar allegations are sufficient to establish scienter. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248 (N.D.Cal.2000). In light of its decision to dismiss the Complaint with leave to amend on other grounds, and considering that the question of scienter appears close, particularly as to Landan and Skaer, the Court concludes that it should not attempt to resolve this question without the benefit of the anticipated amendment. Accordingly, in addition to the amendments discussed elsewhere in this order, an amended complaint should include all specific allegations relevant to the scienter of Landan, Smith, Abrams, and Skaer.

**ii. Mercury**

**\*11** As Mercury argues, to the extent that the Complaint fails to plead scienter with respect to any of the individual defendants, it also fails to plead scienter with respect to Mercury. *See In re Apple Computer, Inc., Securities Litigation*, 243 F.Supp.2d 1012, 1023 (N.D.Cal.2002) ("A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time that he or she makes the statement."). Accordingly, a claim against Mercury in an amended complaint will be subject to dismissal if Lead Plaintiff fails to allege scienter by one of the individual defendants.

*g. Scheme Liability*

Rule 10b-5(b) pertains to "untrue statement[s] of a material fact" or the omission of such 17 a fact. The bulk of the Complaint focuses on such untrue statements, with approximately one hundred and fifty paragraphs dedicated to that purpose. *See* Complaint ¶¶ 59-205. However, Lead Plaintiff also alleges that the Mercury Defendants "carried out a plan, scheme and course of conduct" that caused violations of Rule 10b-5(a) & (c).*See Id.* at ¶¶ 362-63.Lead Plaintiff alleges that the scheme was carried out by:

(1) intentionally selecting a more favorable price for option grants that had previously been granted at a higher price; (2) failing to adhere to the legal terms of promissory notes used by employees to exercise stock options, evidenced by interest and principal forgiveness, subsequent modifications to the length and collateral of the notes, and additional principal added to the note without additional collateral; (3) failing to properly account for stock-based compensation to certain individuals who held consulting, transition or advisory roles with the Company either preceding or following their full-time employment with the Company; and (4) reporting false exercise dates for options whereon the price of Mercury stock was substantially lower on the reported exercise date than on the date the option was actually exercised.

*Id.* at ¶ 34.

The Ninth Circuit has explained that:
Participation in a fraudulent transaction by itself, however, is insufficient to qualify the defendant as a "primary violator" if the deceptive nature of the transaction or scheme was not an intended result, at least in part, of the defendant's own conduct. We hold that to be liable as a primary violator of § 10(b) for participation in a "scheme to defraud," the defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme. It is not enough that a *transaction* in which a defendant was involved had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose and effect.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                        Page 13

Slip Copy, 2007 WL 2209278 (N.D.Cal.), Fed. Sec. L. Rep. P 94,367
**(Cite as: Slip Copy)**

**\*12** *Simpson v. AOL Time Warner Inc.,* 452 F.3d 1040, 1048 (9th Cir.2006). Because the Complaint contains insufficient allegations that the various defendants' contributions to the overall scheme had a deceptive purpose and effect, the scheme allegations will be dismissed. Lead Plaintiff stated at oral argument that the scheme allegations were part of a "belts and suspenders" approach in the Complaint. While Lead Plaintiff is not precluded by this order from including scheme allegations in an amended complaint, the Court notes its skepticism that Lead Plaintiff will be able to state a separate claim for scheme liability and directs Lead Plaintiff not to include redundant allegations in any amended complaint.

h. *Challenges to the Class Definition*

Landan challenges the class definition asserted in the Complaint, arguing that there must be individualized determinations as to who should be included in the class. Landan Motion 10-11. The Court concludes that this challenge is premature. In light of its conclusion that the Complaint should be dismissed with leave to amend, the Court notes that an amended complaint may address any deficiencies in the class definition.

**2. Claim Two: Violation of Rule 20(a) Against the Mercury Defendants**

Section 20(a) provides:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a)."To establish 'controlling person' liability, the plaintiff must show that a primary violation was committed and that the

defendant 'directly or indirectly' controlled the violator."*Paracor Finance, Inc. v. General Elec. Capital Corp.,* 96 F.3d 1151, 1161 (9th Cir.1996). As discussed above, Lead Plaintiff has failed to state a claim for a primary violation of the securities laws. However, it is possible that it will do so in an amended pleading. Accordingly, the Section 20(A) claim will be dismissed with leave to amend.

**3. Claim Three: Violation of Section 10(b) and Rule 10b-5 Against PWC**

PWC moves to dismiss the claim against it on the basis that the Complaint does not plead scienter adequately. This Court has explained in a previous action that when asserting a claim under Section 10(b) against a public auditor, "a plaintiff must demonstrate that 'the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.' " *In re Redback Networks, Inc.,* 2006 WL 1805579, *6 (N.D.Cal. Mar.20, 2006) (citing *In re Software Toolworks, Inc.,* 50 F.3d 615, 627 (9th Cir.1994)). Accordingly, this motion turns on the question as to whether PWC was deceived by the individuals who backdated options or whether PWC knew about the backdating or allowed it to occur by acting recklessly. As discussed below, the Court concludes that while it may be able to do so in an amended complaint, Lead Plaintiff has not pled facts supporting a strong inference of knowledge or recklessness. Accordingly, this claim will be dismissed with leave to amend.[FN13]

> FN13. PWC argues that the asserted fact that the investigation into the backdating at Mercury cost over seventy million dollars means that it could not have been expected to discover the backdating. This argument ignores the obvious possibility that PWC's wrongdoing contributed to the expense of discovering the fraudulent activities.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 14

Slip Copy, 2007 WL 2209278 (N.D.Cal.), Fed. Sec. L. Rep. P 94,367
**(Cite as: Slip Copy)**

*13 Lead Plaintiff argues that PWC's alleged failure to heed six "red flags" is powerful evidence of scienter. However, the failure to heed these purported "red flags," even taken together, does not amount to deliberate recklessness or the failure to provide any audit at all. First, while Mercury discovered upon investigation that what appeared to be recourse notes in fact were not treated as such, Lead Plaintiff alleges no facts indicating that PWC knew or should have known of Mercury's alleged misconduct at the time it occurred. Second, the fact that options were granted on a broad range of dates within the year may have represented a deviation from past practice, but it does not suggest by itself that PWC was deliberately reckless in its audit. Third, Lead Plaintiff alleges no facts indicating that PWC knew of long delays between 'grant dates' and the approval of the grants, and, at least as currently alleged, PWC's failure to check a sufficient number of option grants amounts to negligence rather than deliberate recklessness. Fourth, it is unreasonable to describe PWC as reckless for failing to connect a decline in option grants after the passage of the Sarbanes-Oxley Act with the backdating of options, particularly in light of the possibility of other explanations for such a decline. Fifth, even if PWC had discovered an improper loan to Landan, it is not clear that such a discovery would have led it to discover the improper backdating of stock options. Finally, the fact that PWC inherited a client that previously had taken a charge due to a mistake in backdating did not by itself put PWC on notice that illegal backdating might be occurring at Mercury.

If proved, PWC's alleged failure to exercise due care and exhibit a proper degree of professional skepticism, to evaluate Mercury's internal controls properly, and to gather sufficient evidence to support its unqualified endorsements of Mercury's financial statements all reflect poorly on the quality of work performed by PWC. However, while such actions may amount to negligence, they do not rise to the level of deliberate recklessness. Nor does the scope of the restatement rendered necessary by the backdating alter the insufficient character of the other allegations. Instead, the allegations against PWC amount to a series of allegations about improprieties at Mercury and a conjecture that

PWC must have known about it. As currently pled, this is the type of "fraud by hindsight" theory barred by the PSLRA. *See Silicon Graphics,* 183 F.3d at 488.

### IV. ORDER

Good cause therefor appearing, IT IS HEREBY ORDERED that the motions to dismiss are GRANTED with leave to amend. Any amended complaint shall be filed within thirty days of the issuance of this order.

N.D.Cal.,2007.
In re Mercury Interactive Corp. Securities Litigation
Slip Copy, 2007 WL 2209278 (N.D.Cal.), Fed. Sec. L. Rep. P 94,367

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.