# EXHIBIT 1

Westlaw.

Slip Copy                                                                                        Page 1

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

C

In re Ditech Networks, Inc. Derivative Litigation
N.D.Cal.,2007.

United States District Court, N.D. California,
San Jose Division.
In re DITECH NETWORKS, INC. DERIVATIVE
LITIGATION.
**No. C 06-5157 JF.**

July 16, 2007.

Darryl Paul Rains, Morrison & Foerster, LLP, Palo
Alto, CA, Diane Elizabeth Pritchard, Morrison &
Foerster, LLP, San Francisco, CA, for Defendants.

ORDER [FN1] GRANTING MOTION TO
DISMISS FOR FAILURE TO STATE A CLAIM
UPON WHICH RELIEF CAN BE GRANTED
WITH LEAVE TO AMEND; DEFERRING
MOTION TO DISMISS FOR FAILURE TO
MAKE DEMAND

FN1. This disposition is not designated for
publication and may not be cited.JEREMY
FOGEL, United States District Judge.

**I. BACKGROUND**

**1. Procedural Background**

\*1 This derivative action arises from the
alleged backdating and springloading of stock
options by directors and officers of nominal
defendant Ditech Networks, Inc. ("Ditech" or "the
Company"). Plaintiff Donald W. Newman filed the

initial complaint on August 23, 2006. The Court has
consolidated the Newman action and two other
actions under the caption of the instant case. On
March 2, 2007, Plaintiffs filed an amended
consolidated complaint ("the Complaint"). The
Complaint asserts claims against the following
individuals ("the Individual Defendants").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 2

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

| Defendant | Role at the Company |
|---|---|
| Timothy K. Montgomery | President, CEO, and director, September 1998 to present.<br><br>Chairman of the Board of Directors ("the Board"), October 1999 to present.<br><br>Senior Vice President of Sales and Marketing, November 1997 to September 1998. |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

| | |
|---|---|
| Gregory M. Avis | Director, February 1997 to present. |
| | Member, Compen sation Commi ttee, 1999 to present. |
| William A. Hasler | Director, May 1997 to present. |
| | Member, Compen sation Commi ttee, at least 1999 to present. |
| | Member, Audit Commi ttee, at least 1999 to present. |
| Andrei M. Manoliu | Director, June 2000 to present. |
| | Member, Audit Commi ttee, 2003 to present. |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 4

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

| | |
|---|---|
| Edwin L. Harper | Director, December 2002 to present. |
| David M. Sugishita | Director, February 2003 to present. |
| | Member, Audit Committee, 2003 to present; Chair of Audit Committee, 2004 to present. |
| Serge Stepanoff | Vice President of Engineering & Development for Echo Cancellation Products, September 1996 to May 2002. |
| William J. Tamblyn | Chief Financial Officer, June 1997 to present. |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

| | |
|---|---|
| | Execu tive Vice Presi dent, May 2005 to present.       Vice Presi dent, June 1997 to May 2005. |
| Toni M. Bellin | Vice Presi dent of Operat ions, Dece mber 1998 to July 2001. |
| Robert T. DeVin cenzi | Senior Vice Presi dent of Sales for Altamar Netwo rks, July 2000 to June 2003. |
| Lowell B. Tran sgrud | Vice Presi dent, Operat ions, July 2001 to present. |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 6

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

| | |
|---|---|
| James H. Grady | Vice President, Business Development, 2005 to present. |
| | Vice President, Worldwide Sales, July 2003 to 2005. |
| Lee H. House | Vice President, Echo Engineering, May 2002 to present. |
| Ian M. Wright | Senior Vice President of Engineering for Optical Networking Products, February 2000 to present. |
| Chalan M. Aras | Vice President of Marketing, May 2004 to present. |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

Senior Director of Product Management, October 2003 to May 2004.

Complaint ¶¶ 14-30. The Complaint describes Montgomery, Stepanoff, Tamblyn, Bellin, DeVincenzi, Transgrud, Grady, House, Wright, and Aras as "the Officer Defendants;" Avis and Hasler as "the Committee Defendants;" and Montgomery, Tamblyn, Transgrud, House, Avis, Hasler, Manoliu, Sugishita, and Grady as "the Insider Selling Defendants." Complaint ¶¶ 24, 27.

The Complaint asserts nine claims: (1) violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, against the Individual Defendants; (2) violation of Section 14(a) of the Securities Exchange Act and Rule 14a-9 promulgated thereunder, against the Individual Defendants; (3) violation of Section 20(a) of the Securities Exchange Act, against defendants Montgomery, Tamblyn, Avis, Hasler, Sugishita, Harper, and Manoliu; (4) accounting, against the Individual Defendants; (5) breach of fiduciary duty and/or aiding and abetting, against the Individual Defendants; (6) unjust enrichment, against the Individual Defendants; (7) rescission, against the Officer Defendants; (8) insider selling and misappropriation of information, against the Insider Selling Defendants; and (9) breach of fiduciary duty and/or aiding and abetting relating to the May 18, 2004 option grants, against the Individual Defendants.

**\*2** On April 2, 2007, the Individual Defendants moved to dismiss the Complaint for failure to state a claim upon which relief can be granted ("Motion One"), and Ditech moved to dismiss the Complaint for failure to make demand ("Motion Two"). Plaintiffs oppose both motions. The Court heard

oral argument on June 8, 2007.

## 2. Allegations Made in the Complaint

Pursuant to the Company's shareholder-approved stock option plans, the exercise price of options may not be less than the fair market value of the stock on the date the option is granted. Complaint ¶ 38. However, the Complaint alleges that

[t]he Compensation Committee, with the knowledge and approval of the other members of the Board, knowingly and deliberately violated the terms of the [Company's stock option] Plans ... by knowingly and deliberately backdating grants of stock options to make it appear as though the grants were made on dates when the market price of Ditech stock was lower than the market price on the actual grant dates, thereby benefitting the recipients of the backdated options.

Complaint ¶ 37; *see also* Complaint ¶ 46. Nine stock option grants allegedly were backdated:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 8

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

| Purported Date | Recipient | Number of Options | Exercise Price |
| --- | --- | --- | --- |
| 8/10/1999 | Montgomery | 253,888 | $9.00 |
| 8/10/1999 | Stepanoff | 125,020 | $9.00 |
| 8/10/1999 | Tamblyn | 149,586 | $9.00 |
| 10/4/1999 | Bellin | 50,000 | $24.69 |
| 8/1/2000 | DeVincenzi | 133,934 | $22.50 |
| 1/10/2001 | Montgomery | 400,000 | $7.19 |
| 1/10/2001 | DeVincenzi | 160,000 | $7.19 |
| 1/10/2001 | Tamblyn | 145,000 | $7.19 |
| 1/10/2001 | Wright | 300,000 | $7.19 |

Complaint ¶ 41.[FN2] The grants dated August 10, 1999 coincided with the second-lowest quarterly price, those dated October 4, 1999 and August 1, 2000 coincided with the lowest price of their respective months, and those dated January 10, 2001 coincided with the second-lowest price of the six-month period ending on April 30, 2001. Complaint ¶¶ 43-45.[FN3]

FN2. Two further alleged backdated grants were made on July 6, 2000, but were cancelled on March 19, 2003. Complaint ¶ 41 n.3.

FN3. The Complaint includes no allegations regarding the actual date of the option grants, of any public announcement by the Company of options backdating or the need to restate earnings, or of any investigation by the Company or by the SEC.

Defendants allegedly engaged in option springloading in 2004. This is a practice "when directors grant options at the market value on the date of grant, at a time the directors know that the shares are actually worth more than the market value because the directors possess material non-public information." Complaint ¶ 48. Three

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

springloaded stock option grants allegedly were
made on May 18, 2004.

| Purpo rted Date | Recipient | Number of Options | Exercise Price |
|---|---|---|---|
| 5/18/04 | Tamblyn | 125,000 | $13.37 |
| 5/18/04 | Tran sgrud | 125,000 | $13.37 |
| 5/18/04 | Aras | 100,000 | $13.37 |

Complaint ¶ 49. The grant price coincided
with the third lowest price of 2004. *Id.* The
Company announced positive results on May 27,
2004, and Ditech shares closed at $20.61 per share
on May 28, 2004. Complaint ¶ 51.

As alleged in the Complaint, two proxy
statements, filed on August 18, 2000 and August 8,
2001, respectively, falsely reported the backdated
option grants. Complaint ¶ 61. Defendants also are
alleged to have disseminated false financial reports,
Complaint ¶¶ 54-61, concealed their misconduct,
Complaint ¶¶ 62-63, and violated GAAP
accounting principles, SEC regulations, and IRS
rules and regulations. Complaint ¶¶ 64-86.
During the period from October 5, 1999 to
December 9, 2004, the Individual Selling
Defendants are alleged to have sold over $100
million in Ditech stock while in the possession of
materially adverse non-public information regarding
the backdating of stock options. Complaint ¶ 87.
These alleged actions of the Individual Defendants
constituted breaches of their fiduciary duties and
were not, and could not have been, products of the
exercise of good faith business judgment.
Complaint ¶¶ 88-89.

*3 Plaintiffs claim that they have not made a
demand on the Board because "demand would be a
futile and useless act because the Board is incapable
of making an independent and disinterested
decision to institute and vigorously prosecute this

action."Complaint ¶ 94. At the time that this action
was commenced, the Board consisted of six
directors: Montgomery, Avis, Hasler, Manoliu,
Sugishita, and Harper. Complaint ¶ 95. According
to Plaintiffs, five directors are incapable of
considering independently and disinterestedly a
demand to commence and prosecute this action
vigorously. *Id.* The reasons for each director's
alleged incapacity to do so are summarized in the
table below:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 10

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

| Director | Reasons for Lack of Independence and Disinterestedness |
|---|---|
| Montgomery | Received backdated stock options. |
| | Sold Ditech stock for proceeds in excess of $39 million on the basis of inside information. |
| Avis | Sold Ditech stock for proceeds in excess of $43 million on the basis of inside information. |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 11

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

Knowi
ngly and
delibe
rately
backd
ated
stock
option
grants as
a
member
of the
Compen
sation
Commi
ttee, and
is
substan
tially
likely to
be held
liable for
breac
hing his
fiduciary
duties.

Colluded
with the
Officer
Defend
ants,
demonst
rating
that he is
unable
or
unwil
ling to
act
indepen
dently.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 12

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

|        |                                                                                                                 |
| ------ | --------------------------------------------------------------------------------------------------------------- |
|        | Has served as Managing Partner of Summit, a venture capital and private firm, since 1990. Summit invested in Ditech in 1997 and is still listed as a Summit portfolio company. |
| Hasler | Sold Ditech stock for proceeds in excess of $4.4 million on the basis of inside information. |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 13

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

> Knowi
> ngly and
> delibe
> rately
> backd
> ated
> stock
> option
> grants
> and
> appro
> ved,
> signed,
> and
> dissem
> inated
> false
> financial
> state
> ments
> and
> other
> false
> SEC
> filings as
> a
> member
> of the
> Audit
> and
> Compen
> sation
> Commit
> tees, and
> is
> substan
> tially
> likely to
> be held
> liable for
> breac
> hing his
> fiduciary
> duties.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                        Page 14

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

| | |
|---|---|
| | Colluded with the Officer Defendants, demonstrating that he is unable or unwilling to act independently. |
| Manoliu | Sold Ditech stock for proceeds in excess of $441,000 on the basis of inside information. |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                       Page 15

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

> Knowi
> ngly and
> delibe
> rately
> appro
> ved,
> signed,
> and
> dissem
> inated
> false
> financial
> state
> ments
> and
> other
> false
> SEC
> filings as
> a
> member
> of the
> Audit
> Commi
> ttee, and
> is
> substan
> tially
> likely to
> be held
> likely for
> breac
> hing his
> fiduciary
> duties.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 16

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

|  | Colluded with the Officer Defendants, demonstrating that he is unable or unwilling to act independently. |
|--|--|
| Sugishita | Sold Ditech stock for proceeds in excess of $516,000 on the basis of inside information. |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

Knowi
ngly and
delibe
rately
appro
ved,
signed,
and
dissem
inated
false
financial
state
ments
and
other
false
SEC
filings as
a
member
and
Chair of
the
Audit
Commi
ttee, and
is
substan
tially
likely to
be held
liable for
breac
hing his
fiduciary
duty.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 18

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

> Colluded
> with the
> Officer
> Defend
> ants,
> demonst
> rating
> that he is
> unable
> or
> unwil
> ling to
> act
> indepen
> dently.

*\*4 Id.*

## II. LEGAL STANDARD

### 1. Motion to Dismiss

For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). However, the court is not required "to accept legal conclusions case in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged."*Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir.1994). Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Department of Corrections*, 66 F.3d 245, 248 (9th Cir.1995). When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir.1996). Leave to amend is to be granted with extreme liberality in securities fraud cases, because the heightened pleading requirements imposed by the PSLRA are so difficult to meet. *See Eminence Capital, LLC v.*

*Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir.2003).

On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *North Star International v. Arizona Corporation Commission*, 720 F.2d 578, 581 (9th Cir.1983); *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.1986); *Beliveau v. Caras*, 873 F.Supp. 1393, 1395 (C.D.Cal.1995). However, under the "incorporation by reference" doctrine, the Court also may consider documents that are referenced extensively in the complaint and are accepted by all parties as authentic, even though the documents are not physically attached to the complaint. *In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d 970 (9th Cir.1999).

### 2. The Demand Requirement

A derivative complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort."Fed.R.Civ.P. 23.1. The existence and satisfaction of a demand requirement is a substantive issue governed by state law. *See Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 96-97, 111 S.Ct. 1711, 114 L.Ed.2d 152

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 19

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

(1991).[FN4] When the challenged decision is that of the board in place at the time of the filing of the complaint, failure to make demand may be excused if a plaintiff can raise a reason to doubt that a majority of the board is disinterested or independent or that the challenged acts were the product of the board's valid exercise of business judgment. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984); *see also Ryan v. Gifford,* 918 A.2d 341, 352 (Del.Ch.2007) (discussing *Aronson* ). However, " [w]here there is no conscious decision by the corporate board of directors to act or refrain from acting, the business judgment rule has no application."*Rales v. Blasband,* 634 A.2d 927, 933 (Del.1993); *see also Ryan,* 918 A.2d at 352 (discussing *Rales* ). In such a situation, demand may be excused only if a plaintiff "can create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."*Id.* at 353 (citing *Rales,* 634 A.3d 933-34).

> FN4. The parties agree that Delaware law applies to the instant action because Ditech is incorporated in Delaware.

## III. DISCUSSION

**1. Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted**

a. *Claim One: Violation of Section 10(b) and Rule 10b-5*

i. Sufficiency of the Allegations

**\*5** Plaintiffs allege securities fraud in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder. Complaint ¶

99. Plaintiffs summarize their claim as follows:
Plaintiffs allege that (1) Defendants committed a variety of manipulative and deceptive acts, including backdating stock option grants and producing and disseminating false financial statements, false proxy statements, and false Form 4s, ¶¶ 54-63; (2) Defendants' misconduct was in furtherance of their scheme to defraud the Company, ¶¶ 88-90, 98-103; (3) Defendants engaged in their fraudulent scheme knowingly and deliberately, i.e., with scienter, ¶¶ 54-59, 61-63; and (4) the Company relied on Defendants' fraud in granting the Officer Defendants options to purchase Ditech common stock, ¶¶ 37-38, 41, 46-49-53.

Opposition to Motion One 18.[FN5]

> FN5. Plaintiffs do not assert that springloading supports liability under the federal claims.

Section 10(b) makes it unlawful
[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person to use interstate commerce(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240. 10b-5. In cases involving publicly-traded securities and purchases or sales in public securities markets, the elements of an action

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                   Page 20

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

under Section 10(b) and Rule 10b-5 are: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 341-42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

Plaintiffs must meet two heightened pleading standards. Fed.R.Civ.P. 9(b) requires that "the circumstances constituting fraud ... be stated with particularity."The Ninth Circuit has explained that a "plaintiff must include statements regarding the time, place, and nature of the alleged fraudulent activities, and that mere conclusory allegations of fraud are insufficient."*In re GlenFed, Inc. Securities Litigation,* 42 F.3d 1541, 1548 (9th Cir.1994). A plaintiff asserting fraud "must set forth an explanation as to why the statement or omission complained of was false or misleading."*Id.* (internal quotation marks omitted); *see also Yourish v. California Amplifier,* 191 F.3d 983, 992-93 (9th Cir.1999). The Private Securities Litigation Reform Act ("PSLRA") raises the pleading standard further:

*6 (1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant-

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4b(1)-(2).

Plaintiffs assert that they "undeniably plead all of the elements necessary to state a claim for " scheme liability." The Court disagrees. The Complaint alleges a very limited number of facts that pertain to a subset of the defendants, but then attempts to impose liability on all the Individual Defendants. In addition to this global deficiency, at least two major inadequacies require dismissal.[FN6]

> FN6. In dismissing this claim on these grounds, the Court expresses no opinion as to other argued grounds for dismissal forwarded by the Individual Defendants, such as the sufficiency of the pleading of damage to Ditech or causation. Nor does the Court deem it necessary to discuss arguments it does not reach as to the other claims.

First, Plaintiffs assert that their claim is for violation of Rule 10b-5(a) and (c), not for violation of Rule 10b-5(b), which pertains to material untrue statements or omissions. *Id.* This assertion is confusing given Plaintiffs' emphasis on the alleged production and dissemination of false financial statements, proxy statements, and Form 4's. In light of this ambiguity, while Plaintiffs may have stated with particularity some portion of the supposed universe of Defendants' fraudulent conduct, the extent of this alleged fraudulent conduct remains unclear. Not only must Plaintiffs give Defendants notice of what acts constitute the alleged violations, but, as discussed below, the nature of the violation is relevant to the statute of limitations analysis. Accordingly, Plaintiffs may not proceed with this claim as presently stated.

Second, the Complaint fails to allege scienter sufficiently. The Complaint alleges no *facts* that give rise to a strong inference that the non-director defendants knew that the options they received were backdated or that the directors who joined after the final alleged backdated grant participated in the backdating scheme. Even the participation and knowledge of the remaining members of the board during the time of the options grants is pled without

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                              Page 21

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

factual particularity. Instead, the Complaint alleges generically that the Compensation Committee acted "with the knowledge and approval of the other members of the Board."Complaint ¶¶ 37, 40, 42. The high rank of various Defendants within the Company is insufficient, without more, to impose liability, and the conclusory allegation that each individual defendant had knowledge or acted with reckless disregard of the truth is insufficient to state a claim even under the more liberal Rule 12(b)(6) standard. *See e.g. Assoc. Gen. Contractors, Inc. v. Metro. Water Dist. of So. Cal.,* 159 F.3d 1178, 1181 (9th Cir.1998); *see also Bell Atlantic v. Twombly,* ---U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929, ---- - ---- (May 21, 2007) (explaining that a plaintiff's obligation to state the ground for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do") (citations omitted).

*7 Other courts within this district have considered the presence or absence of a pattern of backdating, primarily in the context of the demand futility requirement. *See e.g. In re CNET Networks, Inc. Deriv. Litig.,* 483 F.Supp.2d 947 (N.D.Cal.2007); *In re Zoran Corp. Deriv. Litig.,* 2007 WL 1650948 (N.D.Cal. June 5, 2007); *In re Openwave Systems Inc. Deriv. Litig.,* 2007 WL 1456039 (N.D.Cal., May 17, 2007); *In re Linear Tech. Corp. Deriv. Litig.,* 2006 WL 3533024 (N.D.Cal. Dec.7, 2006). As currently pled, the Complaint alleges fraudulent conduct by labeling various grants as backdated and describing them as having been made at low points within certain defined periods. *See e.g.* Complaint ¶¶ 37, 42-46. While counsel for Plaintiffs represented at oral argument that the statistical likelihood of the options having been granted properly is very low, that theory is not alleged in the Complaint or in a document that the Court may consider on this motion. Even assuming that the *factual* allegations of the Complaint are true, many explanations other than options backdating exist for the coincidence of the grants and a low share price.[FN7]The following factual detail likely would strengthen the Complaint: the degree to which the options were granted at the discretion of the compensation committee or the board, versus at fixed, preestablished times; the actual grant dates of the options and the appropriate price of the options; the date that the options were exercised; whether required performance goals were met before the options were granted; the presence or absence of other major corporate events, such as an acquisition, at the time of the grants; and the results of any requests by Plaintiff for information.

> FN7. The Court does not hold that a plaintiff must allege a pattern of backdating in order to state a claim under Section 10(b), to establish demand futility, or to state a claim for breach of fiduciary duty. *See CNET,* 483 F.Supp.2d at 956-58 (describing analytical methods as one way to support an inference of illegal conduct when "direct evidence is rare and difficult to uncover"). For example, a plaintiff likely could proceed past the pleading stage by alleging sufficient factual detail as to the mechanics of an option backdating scheme, including the specific roles and mental states of the various participants. In such a case, the fact that the defendants only backdated one option grant or did not grant themselves the largest possible benefit (and thus failed to generate a statistically implausible pattern) would not be an automatic bar to liability.

ii. Statute of Limitations

[A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of-
 (1) 2 years after the discovery of the facts constituting the violation; or
 (2) 5 years after such violation.

28 U.S.C. § 1658(b); *see e.g. In re Heritage Bond Litig.,* 289 F.Supp.2d 1132, 1147-48 (C.D.Cal.2003). This statute of limitations is not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 22

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

subject to equitable tolling. *Durning v. Citibank, In'l,* 990 F.2d 1133, 1136-37 (9th Cir.1993). Claim one, asserting a violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act, alleges and involves fraud. *See* Complaint ¶ 99. Accordingly, Section 1658 applies to this claim. Because the practice of backdating options came to light in 2005, the Court concludes that the two-year discovery period does not bar the instant action. Accordingly, the applicable period for this analysis is the five-year period of repose.[FN8]

> FN8."A statute of repose is a fixed, statutory cutoff date, usually independent of any variable, such as claimant's awareness of a violation."*Munoz v. Ashcroft,* 339 F.3d 950, 957 (9th Cir.2003) (citing *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 363, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991)).

In light of the statute's focus on the "violation," the Court first must decide what comprises the alleged violation. The primary focus of the claim appears to be on the backdating of options.[FN9]To the extent that the claim is based upon the backdating itself, the period of repose starts on the date that the option grant was made. *See Durning,* 990 F.2d at 1136 (noting that the federal rule is that a cause of action accrues at the completion of the sale of the instrument); *Falkowski v. Imation Corp.,* 309 F.3d 1123, 1130 (9th Cir.2002) (describing the grant of an option as "a purchase or sale" under the Securities Litigation Uniform Standards Act). The last alleged purported date of a backdated option is January 10, 2001. This option was reported in a proxy statement filed with the SEC on August 8, 2001, so even though the actual date of the options grant is not alleged, it could not have been granted after that date. Because the initial complaint was filed on August 23, 2006, any improper transaction under Section 10(b) must have occurred after August 23, 2001. Accordingly, this claim is time-barred to the extent that it is based upon the actual backdated grants.

FN9. Plaintiffs do not argue that option

springloading would support a claim under the federal securities laws.

**\*8** Plaintiffs also appear to suggest that the Individual Defendants violated Section 10(b) by disseminating false financial statements. However, as noted above, Plaintiffs state in opposition to the instant motion that they do not assert a claim under Rule 10b-5(b), which makes it unlawful to make an untrue statement or to omit a material fact. Opposition to Motion One 18. Consequently, it is by no means clear how the alleged fraudulent financial statements fit into the first claim. Plaintiffs have not pled them as an independent violation of Section 10(b); indeed, they appear to acknowledge their failure to do so by disclaiming any need to plead the elements of a violation of Rule 10b-5(b). *See* Opposition to Motion One 18. While Plaintiffs refer to a fraudulent scheme in the Complaint, *see e.g.* Complaint ¶¶ 2-4, they do not allege such a scheme with any particularity and, as noted above, fail to allege with any factual detail the involvement of a large number of the Individual Defendants. In light of these inadequacies, the Court concludes that it is premature to rule out the possibility that Plaintiffs will be able to plead a violation of Section 10(b) based upon fraudulent financial statements that is not time-barred. In reaching this conclusion, the Court notes the Individual Defendants' argument that the period of repose starts when the misrepresentation is made for the first time. At least one court in this district has accepted this argument, *see Zoran,* 2007 WL 1650948 \*21(citing *Asdar Group v. Pillsbury, Madison, and Sutro,* 99 F.3d 289, 294-95 (9th Cir.1996) ("[A] statute of limitations [for a Section 10(b) claim] ordinarily begins to run when an act occurs that gives rise to liability ....")) [FN10] As it indicated at oral argument, the Court is highly skeptical of a continuing wrong theory [FN11] that would allow the revival of a time-barred claim under Section 10(b) upon the issuance of a further financial statement that failed to correct the prior false statement. Such a theory appears to approximate the effects of the fraudulent concealment doctrine of equitable tolling, a doctrine that does not apply in the Section 10(b) context.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 23

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

FN10. The court explained in *In re Dynex Capital, Inc. Sec. Litig.,* 2006 WL 314524 *5 (S.D.N.Y. Feb 10, 2006) that while it concluded that a series of misrepresentations were not barred by the period of repose when the alleged securities transaction fell within the five-year period, it had held in a previous case that a claim was time-barred when the underlying securities transaction fell outside the five-year period.*Dynex,* 2006 WL 314524 at n. 4 (citing *Shalam v. KPMG, L.L.P.,* 2005 WL 2139928 *2 (S.D.N.Y. Sept.6, 2005)). Thus, even if *Dynex* were binding authority, which it is not, it would not necessarily dictate the outcome suggested by Plaintiffs.

FN11. Any such theory would be distinct from the continuing wrong exception, recognized by other courts, *see e.g. Bateson v. Magna Oil Corp.,* 414 F.2d 128, 130 (5th Cir.1969), to the continuous ownership requirement of Rule 23.1 that allows standing to maintain a claim for an entire course of a continuing wrong even if a portion of those events occurred prior to the plaintiff's acquisition of stock in the nominal defendant.

iii. Leave to Amend

Counsel for Plaintiffs represented at oral argument that he believed that Plaintiffs could allege further facts that would allow them to address both the time-bar and the current lack of particularity in the Complaint. Accordingly, this claim will be dismissed with leave to amend.

b. *Claim Two: Violation of Section 14(a)*

Rule 14a-9 provides:
No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

*9 17 C.F.R. § 240.14a-9(a). To state a claim under Rule 14a-9 and Section 14(a), a plaintiff must allege a false or misleading statement or omission of material fact; that the misstatement or omission was made with the requisite level of culpability; and that it was an essential link in the accomplishment of the transaction. *Desaigoudar v. Meyercord,* 223 F.3d 1020, 1022 (9th Cir.2000).

The Individual Defendants argue that the extended limitations period under 28 U.S.C. § 1658 does not apply to actions under Section 14(a), and that a Section 14(a) claim must be filed one year after discovery of the facts constituting the violation, and in no event more than three years following publication of the false statement. Individual Defendants' Motion 8 (citing *In re Exxon Mobil Corp. Sec. Litig.,* 387 F.Supp.2d 407, 424 (D.N.J.2005); *In re Global Crossing, Ltd. Sec. Litig.,* 313 F.Supp.2d 189, 196-97 (S.D.N.Y.2003)). Plaintiffs do not respond to this argument, and the Court concludes that it should apply the one/three-year limitations period. *Accord Zoran,* 2007 WL 1650948 * 24. The last proxy statement containing an allegedly false statement was filed on August 8, 2001, Complaint ¶ 61, and the initial complaint was filed on August 23, 2006. Plaintiffs provide no specific argument explaining why the Section 14(a) claim is not time-barred, but they appear to imply that it survives under a continuing wrong theory. However, nothing is pled that would support such a theory, as even the part of the fraudulent scheme pled with respect to that claim apparently ends in 2001, outside the three-year period of repose. *See* Complaint ¶ 106. Moreover, it is unclear how false statements in financial filings other than proxy statements (such as Form 4's) could revive a claim under Section 14(a), which pertains to proxy statements. Accordingly, the Court

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                           Page 24

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

concludes that claim two is time-barred as currently pled and should be dismissed with leave to amend.

The Individual Defendants also argue that Plaintiffs fail to allege which Defendants made the false statements, specific facts that support a strong inference of negligence, and specific facts supporting causation. The Court does not reach the Individual Defendants' challenges to the sufficiency of the allegations, but notes that, assuming without deciding that the PSLRA also applies to Section 14(a) claims, *see e.g. In re Textainer Partnership Securities Litig.,* 2005 WL 3801596 (N.D.Cal. March 8, 2005), *In re McKesson HBOC, Inc. Sec. Litig.,* 126 F.Supp.2d 1248, 1267 (N.D.Cal.2000), greater specificity likely would strengthen this claim considerably.[FN12]

> FN12. This Court has held in another action that the PSLRA has foreclosed the application of the "group published pleading" doctrine, which provides that when false or misleading information is conveyed in group published statements, it is reasonable to presume that the statements are the result of the collective actions of the company's officers. *In re Nextcard, Inc. Sec. Litig.,* 2006 WL 708663 *2-3 (N.D.Cal. March 20, 2006). Since it is not clear to what extent the first claim is based upon false statements made by the defendants, *see* Opposition to Motion One 18, that holding may not be relevant to the first claim. However, it likely will be relevant to the sufficiency of any amended claim under Section 14(a).

c. *Claim Three: Violation of Section 20(a)*

To state a claim under Section 20(a), a plaintiff must allege (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1065 (9th Cir.2000). As discussed above, Plaintiffs have failed to state a claim for a primary violation of the securities laws. The statute of limitations

analysis pertaining to the Section 10(b) claim applies equally to the Section 20(a) claim. *See e.g. In re Heritage Bond Litigation,* 289 F.Supp.2d at 1148. Accordingly, this claim also will be dismissed with leave to amend.

d. *Claims Four to Nine: Violations of Delaware Law*

i. Statute of Limitations

**\*10** The parties agree that a three-year statute of limitations applies to the claims asserted under Delaware law. Plaintiffs argue that the running of this period was tolled because the injury was inherently unknowable, because the defendants engaged in fraudulent concealment, and because Plaintiffs relied on the competence and good faith of a fiduciary. "[P]laintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled."*In re Dean Witter P'Ship Litig.,* 1998 WL 442456 *6 (Del.Ch. July 17, 1998). The Complaint alleges that the Individual Defendants colluded with one another to "conceal[ ] the improper backdating of stock options."Complaint ¶ 6(d); *see also* Complaint ¶ ¶ 57, 114, 120. It also identifies the signatories to seven Form 10-K filings that disseminated false financial statements. Complaint ¶ 55. Under Delaware law, if a plaintiff "alleges that defendants intentionally falsified public disclosures, defendants may not rely on the statute of limitations as a defense until plaintiff is placed on inquiry notice that such filings were fraudulent."*Ryan,* 918 A.2d at 360. The Court concludes that Plaintiffs have pled intentional falsification of proxy statements and other public disclosures sufficiently to toll the statue of limitations under the fraudulent concealment doctrine. The Individual Defendants do not argue that the claims would be time-barred even if the statute of limitations was tolled until the Plaintiffs were put on inquiry notice. Accordingly, the Court concludes that the state law claims are not time-barred.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 25

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

ii. Sufficiency of the Claims

(1) Claims Four and Seven: Accounting and Rescission

The Individual Defendants argue that the fourth and seventh claims in the Complaint should be included as remedies, not as independent claims. Plaintiffs do not respond to this argument in their opposition. The Court agrees with Defendants that Plaintiffs should include accounting and rescission as remedies in any amended complaint.

(2) Claim Five: Breach of Fiduciary Duty

As discussed above, the Complaint contains no factual allegations as to the knowledge of the options recipients and instead makes only conclusory allegations that do not satisfy Rule 12(b)(6). While the PSLRA does not apply to this claim or the other claims under Delaware law, because the options backdating sounds in fraud, *see* Complaint ¶ 99, Plaintiffs also must plead the circumstances of the fraud with particularity. Fed.R.Civ.P. 9(b); *Atlantis Plastic Corp. v. Sammons,* 558 A.2d 1062, 1066 (Del.Ch.1989) (stating same rule under Delaware law). Plaintiffs fail to do so. Accordingly, this claim will be dismissed with leave to amend.

(3) Claim Six: Unjust Enrichment

The Individual Defendants argue that the Complaint fails to state a claim for unjust enrichment because Plaintiffs fail to allege that other adequate remedies are not provided by law or that the options recipients were enriched unjustly. Individual Defendants' Motion 25. Plaintiffs do not respond to these arguments in their opposition. Plaintiffs asserted the validity of this claim at oral argument, however, and at least one Delaware case suggests that option backdating will support a claim for unjust enrichment. *Ryan,* 918 A.2d at 361.

Accordingly, while the Court concludes that the unjust enrichment claim should be dismissed, leave to amend will be granted.

(4) Claim Eight: Insider Selling

**\*11** The Complaint alleges that the Insider Selling Defendants breached their fiduciary duties of loyalty and good faith by selling stock when in possession of material, non-public information. Complaint ¶¶ 115-18. To determine the sufficiency of insider selling allegations, Delaware courts look to whether a complaint contains " particularized facts providing an inference of insider trading."*Guttman v. Huang,* 823 A.2d 492, 503 (Del.Ch.2003). The Complaint alleges that the Insider Selling Defendants sold a certain amount of shares for a certain amount of "proceeds garnered" within a range of dates. Complaint ¶ 87. For example, it alleges that Montgomery sold 1,163,200 shares between the dates of October 5, 1999 and December 16, 2004, for proceeds garnered of $39,188,259. *Id.* It does not identify the date or amount of individual transactions; instead, it provides only aggregate totals by defendant. Accordingly, the Complaint fails to allege particularized facts sufficient to state a claim for insider selling. The eighth claim will be dismissed with leave to amend.[FN13]

> FN13. Plaintiffs do not respond to the Individual Defendants' argument that the Complaint fails to state a claim for insider selling due to the lack of such specificity and appear to have abandoned this claim. However, in light of the statements made by counsel for Plaintiffs and the grant of leave to amend the rest of the Complaint, leave to amend is also appropriate as to this claim.

(5) Claim Nine: Breach of Fiduciary Duty by Options Springloading

The Complaint alleges that the Individual

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 26

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

Defendants "breached their fiduciary duties by ... engaging in a scheme to grant spring-loaded stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct."Complaint ¶ 122.[FN14]The Complaint alleges that Tamblyn, Transgrud, and Aras received springloaded options on May 18, 2004. Complaint ¶ 49. The Complaint also alleges that "the Individual Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate cause of action designed to divert corporate assets to themselves and/or other Company insiders."Complaint ¶ 123.[FN15] However, the Complaint does not allege which defendants authorized the grants, approved the grants, or intended or had knowledge that the grants were springloaded. Nor does the Complaint allege the specific material information that had not been made public previously. As is the case with the fifth claim, because the springloading claim sounds in fraud, *see* Complaint ¶ 128 (describing stock option grants in the relevant period as obtained by fraud), Plaintiffs must plead the circumstances of the fraud with particularity. Fed.R.Civ.P. 9(b); *see also Atlantis Plastics Corp.,* 558 A.2d at 1066 (stating same rule under Delaware law). Plaintiffs fail to do so here. While it is not clear that Plaintiff will be able to state a claim for breach of fiduciary duty by identifying only one allegedly improper grant date, the law in this area is still developing and the Delaware Chancery has permitted at least one claim for breach of the duty of loyalty and good faith to proceed on a springloading theory. *See In re Tyson Foods,* 919 A.2d 563, 593 (Del.Ch.2007). Accordingly, the claim will be dismissed with leave to amend.

> FN14. The Complaint repeats certain paragraph numbers. This cite refers to the paragraph bearing this number that appears under the heading "Count IX," not that which appears under the heading "Count V."

> FN15. In a portion of a recent decision concluding that plaintiffs had failed to allege sufficient facts to establish demand futility, the Delaware Court of Chancery

observed that a "spineless 'and/or' is a telling concession that [plaintiff] cannot cross even the minimal Rule 11 threshold." Order Dismissing Complaint 51, *Desimone v. Barrows,* Case No. 2210-VCS (Del.Ch., June 7, 2007). While not directly applicable to the instant motion, this reference to Rule 11 bears notice as it reminds Plaintiffs that any amended complaint must be based upon appropriate investigation.

While the Court appreciates the efforts of counsel for each side to bring to its attention new cases in this rapidly developing area of law, it concludes that it should defer a detailed discussion of *Desimone.*Its distinction of *In re Tyson Foods,* 919 A.2d 563, 593 (Del.Ch.2007) and its discussion of demand futility likely will provide guidance to the Court in subsequent motion practice. However, the Complaint's lack of detail makes a similar analysis premature in the instant action.

**2. Motion to Dismiss for Failure to Make Demand**

a. *Standing Under Rule 23.1*

**\*12** Ditech argues that Plaintiffs lack standing because they allege only that they have held stock in Ditech at all relevant periods. *See* Complaint ¶¶ 10-12. Ditech cites a number of non-binding cases from other districts in support of this proposition. Because the Court will dismiss the Complaint with leave to amend on other grounds, it need not decide the appropriate level of detail in the pleading of share ownership. Nonetheless, it recommends that Plaintiffs amend this aspect of the Complaint.

b. *Disinterestedness and Independence*

Ditech argues that Plaintiffs have failed to allege sufficient facts to raise a reasonable doubt as to the disinterestedness and independence of a majority of the present Board. Ditech concedes that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 27

Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec. L. Rep. P 94,440
**(Cite as: Slip Copy)**

Montgomery is not independent or impartial, and Plaintiffs do not argue that Harper cannot act independently or impartially. Accordingly, the question as to the independence and disinterestedness of the Board revolves around four members: Avis, Hasler, Manoliu, and Sugishita. Hasler and Avis were on the Board during the entire period of alleged backdating. Complaint ¶¶ 25-26. Manoliu joined the Board prior to the final alleged backdated grant. Complaint ¶ 28. Sugishita joined the Board prior to the alleged springloaded grant. Complaint ¶ 29. Ditech points out that the Company's policy that the compensation committee makes option grant decisions would limit the challenged decisions to a subset of the existing Board. Motion Two 22. However, Plaintiffs allege that this policy was not followed in multiple respects and that, while the Compensation Committee backdated the grants, the other members of the Board had knowledge and approved of the backdating. Complaint ¶ 37. Accordingly, assuming that an amended complaint alleges with sufficient particularity that each of these directors approved the option grants or otherwise participated in wrongful conduct, Plaintiffs may be able to plead demand futility on the basis of an insufficient number of disinterested and independent directors. However, the Court concludes that it is premature to make such a determination because Plaintiffs have failed to allege with sufficient particularity that any options backdating or other actionable misconduct occurred at Ditech.

c. *The Business Judgment Rule*

Ditech argues that the second prong of the *Aronson* demand futility test, which inquires whether a plaintiff can identify a reason to doubt that the challenged acts were the product of the board's valid exercise of business judgment, does not apply because the "board that would be considering the demand did not make a business decision which is being challenged in the derivative suit."*Rales,* 634 A.2d at 933-34. As discussed above, the threshold question is the role of the members of the board when the Complaint was filed. "Where at least one half or more of the board

in place at the time the complaint was filed approved the underlying challenged transactions, which approval may be imputed to the entire board for purposes of proving demand futility, the *Aronson* test applies."*Ryan,* 918 A.2d at 353. As with the disinterestedness and independence inquiry, assuming that Plaintiffs can amend to add sufficient particularity, it appears possible that this aspect of the *Aronson* test applies to some or all of the surviving claims. However, the Court also concludes that it is premature to determine the presence or absence of a valid business judgment behind the decision to engage in the alleged misconduct.

## IV. ORDER

**\*13** Good cause therefor appearing, IT IS HEREBY ORDERED that the motion to dismiss for failure to state a claim upon which relief can be granted is GRANTED WITH LEAVE TO AMEND and the motion to dismiss for failure to make demand is DEFERRED. Any amended complaint shall be filed within thirty days of the date of this order.

N.D.Cal.,2007.
In re Ditech Networks, Inc. Derivative Litigation
Slip Copy, 2007 WL 2070300 (N.D.Cal.), Fed. Sec.
L. Rep. P 94,440

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**
In re Enron Corp. Securities, Derivative & "ERISA"
Litigation
S.D.Tex.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. Texas, Houston
Division.
In re ENRON CORPORATION SECURITIES,
DERIVATIVE & "ERISA" LITIGATION
Mark NEWBY, et al., Plaintiffs
v.
ENRON CORPORATION, et al., Defendants.
THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA, et al., Individually and On Behalf
of All Others Similarly Situated, Plaintiffs,
v.
MILBANK, TWEED, HADLEY & MCCLOY
LLP, Andrews & Kurth LLP, and the Goldman
Sachs Group, Inc., Defendants.
**No. MDL-1446, Civ.A. H-01-3624, Civ.A.
H-04-0088.**

Dec. 5, 2005.

OPINION AND ORDER

HARMON, J.
*1 H-04-0088 is a putative class action brought
by the Regents of the University of California,
which also serves as Lead Plaintiff of the *Newby*
class action, and Nathaniel Pulsifer, Trustee of the
Shooters Hill Revocable Trust, on behalf of
purchasers of Enron Corporation's ("Enron's") [FN1]
publicly traded equity and debt securities between
October 19, 1998 and November 27, 2001, alleging
that violations of the federal securities laws [FN2] by
Defendants Milbank, Tweed, Hadley & McCloy
LLP, Andrews & Kurth L.L.P.,[FN3] and the
Goldman Sachs Group, Inc. and Goldman Sachs &
Co. operated as a fraud or deceit on purchasers of
Enron's publicly traded securities, artificially
inflated the price of the Enron securities, and

thereby caused injury to Plaintiffs.

> FN1. The Amended Complaint states, "
> Enron's publicly traded securities include
> the publicly traded securities of entities
> related to Enron, the repayment of which
> was dependent upon Enron's credit,
> financial condition and ability to pay." # 9
> at 2 n. 1.

As will be discussed, whether a number of
securities were publicly traded is at issue here.

> FN2. Section 10(b) of the Securities Act of
> 1934 ("1934 Act"), 15 U.S.C. § 78j(b),
> Rule 10b-5, 17 C.F.R. § 240.10b-5, and §§
> 11 and 15 of the Securities Act of 1933 ("
> 1933 Act"), 15 U.S.C. §§ 77k and 77o.

> FN3. The Court recently granted Andrews
> & Kurth's motion to dismiss the claims
> against it. # 43 in H-04-0088.

Pending before the Court in H-04-0088, are
motions to dismiss filed (1) by Milbank Tweed
Hadley & McCloy LLP ("Milbank
Tweed")
(instrument # 20) for failure to state a claim under
Section 10(b) of the Securities Exchange Act of
1934, 15 U.S.C. § 78j(b), and Rule 10b-5
thereunder, and (2) by Defendants Goldman, Sachs
& Co. and The Goldman Sachs Group, Inc.
(collectively, "Goldman Sachs") (instrument # 17)
for failure to state a claim under Sections 11 and 15
of the Securities Act of 1933, 15 U.S.C. §§ 77k(a)
and 77o. After careful consideration of all
submissions and the applicable law, for reasons
stated below the Court grants Milbank Tweed's
motion to dismiss and denies Goldman Sachs'
motion to dismiss.

In H-04-0088, Plaintiffs' governing pleading is
their Amended Complaint, which expressly
incorporates (# 9 at 2) the *Newby* First Amended
Consolidated Complaint (# 1388 in H-01-3624).[FN4]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 2

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

The Court refers the parties to, and hereby incorporates, its memoranda and orders in *Newby,* in particular the Memorandum and Order *Re* Secondary Actors' Motions to dismiss (# 1194, issued on 12/19/02) and the Court's March 25, 2003 Memorandum and Order (# 1299), [FN5] as well as those addressing the same transactions at issue here, because the Court's prior rulings address in detail many of the facts alleged here and the relevant law and because the parties base some of their arguments on those decisions.

> FN4. In *Newby,* the original complaint was filed on October 22, 2001; the First Consolidated Complaint was filed on April 8, 2002; and the First Amended Consolidated Complaint was filed on May 14, 2003.

Milbank Tweed was named as a defendant in H-04-0088 in a complaint filed on January 9, 2004, subsequently withdrawn and replaced by the Amended Complaint, filed on February 6, 2004.

> FN5. Published as *In re Enron Corp. Sec. Litig.,* 235 F.Supp.2d 549 (S.D.Tex.2002).

Milbank Tweed

A. Allegations of the Amended Complaint

Milbank Tweed is described in the Amended Complaint as a sophisticated Wall Street law firm of over 450 attorneys that represents public corporations and financial institutions in structuring complex financial transactions and in completing securities offerings.

The Amended Complaint alleges that between 1997 and December 2001 Milbank Tweed [FN6] extensively represented Enron and Enron-controlled entities in over 125 matters (specified in # 9 at ¶¶ 17-18),[FN7] spread across all of Enron's operations; that it simultaneously represented Enron's commercial banks/securities underwriters (including

Citigroup, J.P. Morgan Chase, Credit Suisse First Boston, Deutsche Bank, and Barclays) in numerous Enron-related financial transactions [FN8] involving deceptive devices, contrivances and financial misrepresentations (Amended Complaint at ¶ 19); and that it contemporaneously structured and documented billions of dollars of fraudulent off-balance-sheet financings as part of an alleged *Ponzi* scheme and course of business that operated as a fraud or deceit on purchasers of Enron or Enron-related securities. Thus in major Enron financial transactions during the Class Period, Milbank Tweed represented parties on all sides of the table, even though under the law the parties were supposed to be independent; significantly these same clients were also allegedly major participants in the fraudulent *Ponzi* scheme described more fully in *Newby.* Specifically Plaintiffs complain that Milbank Tweed acted as counsel for Enron at the same time it represented J.P. Morgan, Citigroup, Credit Suisse First Boston, Deutsche Bank and Barclays, whose interests were supposedly adverse to those of Enron, but all of which are alleged to have been primary violators in a fraudulent scheme and course of business under § 10(b) and Rule 10b-5.[FN9]

> FN6. The Amended Complaint (# 9) at ¶¶ 12 and 13 asserts that the Milbank Tweed lawyers participating in the fraudulent scheme and course of business were part of the firm's Global Corporate Finance Department and specifically identifies as the primary participating attorneys Tray Davis, Frank Puleo, Dave Stagliano, Mel Immergut, Richard Wight, and Langdon Van Norden. It further alleges that these lawyers had "vast experience in putting together extraordinarily complex financial transactions, and ... understood the accounting and disclosure implications of these transactions that involved public companies."*Id.*

> FN7. Milbank Tweed insists these were "plain vanilla" transactions and that Plaintiffs have not and cannot point to any

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

red flags that should have alerted Milbank to the fact that anything was improper about them. Nor have Plaintiffs, nor can they, point to e-mail exchanges, documents or other evidence supporting any inference that Milbank Tweed was aware of how Enron was reporting the accounting for these transactions.

The Court observes that the first objection misses the point. The gist of Plaintiffs' assertions is not that Milbank Tweed's representation of Enron in these transactions was wrongful, but that its subsequent representation of several banks, pursuant to a mandate from Enron, in a series of allegedly fraudulent transactions involving Enron-controlled entities for the purpose of hiding Enron's debt, in which the parties were supposed to be independent, created a conflict of interest and was a factor among other allegations (disguising commodities trades as loans and artificially inflating revenue, writing offering memoranda without disclosing such deception, etc.) that Plaintiffs maintain give rise to a strong inference of scienter on the part of Milbank Tweed.

> FN8. These include, but are not limited to, the following: (1) $300,000,000 Mahonia VI prepay, December 1997; (2) $250,000,000 Mahonia VII prepay, June 1998; (3) $1,150,000,000 Marlin I transaction, December 1998; (4) $475,000,000 Firefly minority interest, December 1998; (5) $1,500,000,000 Osprey I transaction, September 1999; (6) $825,000,000 Yosemite Securities Trust I, November 1999; (7) 211,250,000 English pounds Yosemite Securities Co. Ltd., February 2000; (8) $70,000,000 Osprey Certificates transaction, July 2000; (9) $125,000,000 Pelican Bidder/Enron Swap financing, July 2000; (10) $550,000,000 Enron Credit Linked Note Trust financing, August 2000; (11) $1,080,000,000 Osprey II transaction, October 2000; (12) $330,400,000 Mahonia XI prepay, December 2000; (13) $550,000,000 Enron Credit Linked Note Trust II, 222,500,000 Euros Enron Euro Credit Linked Note Trust, and 139,000,000 English pounds

> Enron Sterling Credit Linked Note Trust, all three in May 2001; (14) $28,500,000 Sundance Industrial financing, June 2001; and (15) $915,000,000 Marlin II transaction, July 2001.

> FN9. The Amended Complaint, for example, asserts that Milbank Tweed structured the Mahonia deals with J.P. Morgan Chase while representing J.P. Morgan Chase, the Delta deals with Citigroup while representing Citigroup, and the Firefly, Marlin, and Osprey transactions with Credit Suisse First Boston while representing that bank, at the same time Milbank Tweed was acting as counsel for Enron in a substantial number of matters. It further claims that these were all intrinsically fraudulent transactions serving no legitimate business purpose.

**\*2** Plaintiffs assert that Milbank Tweed played an integral role in the charged *Ponzi* scheme by structuring and documenting seventeen of Enron's " significant" off-balance-sheet-financing transactions through controlled partnerships and special purpose entities ("SPEs") to hide billions of dollars of debt, distort the balance sheet, create artificial income, and inflate the results from Enron's operations, i.e., by fabricating financing strength and growth. The complaint further claims that between 10/99 and 8/01 Milbank Tweed wrote false and misleading offering memoranda [FN10] and circulars (identified in ¶ 24 of the Amended Complaint, # 9) for nine offerings that raised billions of dollars through the sale of Enron and Enron-related securities, which were to be "distributed to investors and other market participants."Amended Complaint at ¶ 16, 21, 24. Milbank Tweed allegedly knew these offering circulars were false and misleading because it had helped to devise, structure, and document many of the underlying transactions that falsified Enron's reported financial condition. In addition, the complaint charges Milbank Tweed with substantial involvement with the SPEs and their inherently fraudulent financing transactions, which were employed as deceptive devices, contrivances, manipulations and financial misrepresentations, listed in ¶ 19, to defraud investors.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

> FN10. Copies of the Offering Memoranda for the Osprey, Marlin and Yosemite notes in dispute are exs. 5,7, and 10 to # 21.

The disguised loan transactions were purportedly designed and utilized to hide billions of dollars of debt and to raise the cash essential to maintain liquidity and create an image of financial solvency and health for Enron in the alleged *Ponzi* scheme's "massive falsification of Enron's financial statements."[FN11]The loan transactions included the "Mahonia" prepay deals in which J.P. Morgan Chase allegedly disguised loans to Enron as paid forward commodities (oil and gas) trades with Mahonia, Ltd. and Mahonia Natural Gas Limited;[FN12] the Delta prepay deals with Citigroup;[FN13] and the Firefly, Marlin, and Osprey share trust transactions [FN14] with Credit Suisse First Boston. Plaintiffs complain that between 10/99 and 8/01 Enron directed this series of nine securities offerings of Enron-related and Enron-controlled entities; six of these (Enron credit-linked notes) [FN15] shifted the credit risk of Citigroup's disguised loans of billions of dollars in the Delta transactions to unknowing purchasers of Enron securities. According to the complaint, Enron further mandated that the underwriters or initial purchasers of the nine securities offerings employ Milbank Tweed as their counsel; moreover, it was Enron, not the underwriters or initial purchasers, that paid the fees of that law firm directly or out of the offering. [FN16]All the key actors in these offerings were law firms and banks that were already purportedly participants in the encompassing fraudulent *Ponzi* scheme and course of business. Plaintiff the Regents urges the Court to follow its earlier conclusion in *Newby* that a claim that, over the years, repeated exposure to, involvement in, and approval of these inherently fraudulent and manipulative transactions and devices, "patterns of fraud that must have grown more evident and more unmistakable," is sufficient to satisfy the pleading requirement for scienter under Section 10(b), Rule 10b-5, and the Private Securities Litigation Reform Act of 1995 (" PSLRA"), 15 U.S . C. §§ 77 and 78.[FN17]

> FN11. Amended Complaint at ¶ 21, 27.

> FN12. Milbank Tweed emphasizes that it is not alleged to have established Mahonia and that no securities were issued as part of the Mahonia transactions.

> FN13. Credit-linked notes are private placements of debt securities issued by offshore trusts or corporations created by Enron.

Plaintiffs claim that four of the credit-linked note Private Placements, dubbed "Yosemite" by the Enron Bankruptcy Examiner Neal Batson, were issued to fund the Delta prepay transactions.

> FN14. In each of these share trust transactions, Enron created a Delaware statutory business trust to serve as the issuer to sell notes and certificates of beneficial interest to the institutional private placement market. # 29, ex. 9.

The complaint charges Milbank Tweed with structuring and documenting these allegedly inherently fraudulent transactions involving Firefly, Osprey, and Marlin, serving no legitimate business purpose (in other words, "financial manipulations"), for Credit Suisse First Boston and, with that knowledge, writing the offering circulars for the sale of securities to raise funds to hide losses and to fund deals and keep the *Ponzi* scheme afloat.

> FN15. Thus Milbank Tweed allegedly represented the underwriter/initial purchasers (a group of investment banks and financial institutions that purchased the credit-linked notes and subsequently sold them to other sophisticated investors) and wrote the offering circulars for them to maintain liquidity and sustain the false picture of financial health created in part by these underlying fraudulent transactions.

> FN16. Milbank Tweed responds that even if these vague allegations are taken as true, they fail to raise an inference of scienter because compared to the total number of suspect transactions in the *Ponzi* scheme, Milbank's work on these few transactions was very limited, insufficient to show that it was so deeply involved as to know about

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

the larger fraudulent scheme.

FN17. What this Court actually said was that the scienter requirement may be partially satisfied by pleading facts showing a defendant's "regular pattern of related and repeated conduct," such as the alleged designing, structuring and documenting of the fraudulent transactions charged here, "deliberate and repeated actions with shared characteristics ... through which Defendants all profited handsomely, many exorbitantly. The very pattern that is alleged undermines claims of unintentional or negligence behavior and supports allegations of intent to defraud. Furthermore, the intrinsic nature of these devices and contrivances was fraudulent so that those intimately involved in structuring the entities and arranging the deals, especially more than one, would have to have been aware that they were an illicit and deceptive means to misrepresent Enron's actual financial state and mislead investors about securities, or at minimum, would have had to have been severely reckless as to that danger."*Enron,* 235 F.Supp.2d at 694-95.

**\*3** Plaintiffs argue that under the law, to legitimately book as a trading liability, and not as debt, a prepay transaction using a special purpose entity on Enron's books, the three parties involved had to be independent, the trades among the three parties could not be linked, the trades had to contain price risk, and there had to be legitimate business reasons for the trades. Amended Complaint at ¶ 29. Plaintiffs maintain that the substantial prepays structured by Milbank Tweed, involving Citigroup, J.P. Morgan Chase, Barclays, and Credit Suisse First Boston, do not meet these requirements. In these transactions the banks were related to their offshore SPEs, which the banks themselves created and controlled; the trades among the parties were linked, i.e., the contracts relating to the trades were structured so that a default in one trade affected the other trades; there was no price risk; and there was no legitimate business reason for purchasing the commodities used in the trades, but instead false

accounting was to disguise as cash flow from operations or energy trades what were actually loans to Enron that had to be repaid.[FN18]The complaint asserts that because Milbank Tweed structured and documented these prepay transactions and other bogus transactions, Milbank Tweed knew that the parties were not independent entities and that the prepay transactions allowed Enron to hide billions of dollars in debt while overstating its cash flow and inflating it reported earnings, thus enabling the company to maintain its investment-grade credit rating and access to capital.[FN19]In addition to false accounting, Milbank Tweed treated these transactions as loans on Enron's tax returns to claim their interest as a business deduction. In sum, Milbank allegedly structured these bogus prepay transactions, documented them, and implemented them as trading activity for deceptive purposes, knowing that they were devices and contrivances to deceive investors.

FN18. In its ruling on motions to dismiss in *Newby,* this Court noted that Congressional investigators have concluded that the prepays like the Mahonia and Delta transactions had no legitimate economic purpose, but appeared to be devices that allowed Enron to obtain millions in concealed loans, and are examples of a pattern of subterfuge loans described by Lead Plaintiff's First Amended Consolidated Complaint. *In re Enron Sec. Litig.,* 235 F.Supp.2d 549, 696-97 (S.D.Tex.2002). Moreover, this Court concluded that "the intrinsic nature of these devices and contrivances was fraudulent so that those intimately involved in structuring the entities and arranging the deals, especially more than one, would have to have been aware that they were an illicit and deceptive means to misrepresent Enron's actual financial state and mislead investors about Enron securities, or at a minimum, would have had to have been severely reckless as to that danger."*Id.* at 694.These comments are incorporated in Plaintiffs' Amended Complaint, # 9 at 31-32.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

FN19. According to ¶ 32 of the Amended Complaint,

Enron was able to account for prepay proceeds as cash flow from energy trades, rather than loans, only with the help of Milbank Tweed and the defendant bank involved in each bogus deal. The banks funded the prepays, participated in bogus commodity trades and used their off-shore entities-sham trading partners-for the explicit purpose of allowing Enron to disguise these multimillion-dollar loans as legitimate trading activity. Milbank Tweed structured and documented these deals to achieve these deceptive purposes, knowing that they were, in fact, manipulative devices and contrivances intended to deceive investors.

Moreover, according to the complaint, because Milbank Tweed worked with a number of the financial institutions involved in the fraudulent scheme in illicit transactions designed to conceal Enron's actual financial condition, it was aware of Enron's actual precarious state and vulnerability to defaulting on any major credit transaction. To persuade these banks to participate in the scheme to defraud investors, Milbank Tweed allegedly devised "exit strategies" to insulate them from economic risk. Amended Complaint at ¶ 33. For example, to protect Citigroup from the credit risk of its Delta loans to Enron, Milbank Tweed allegedly wrote misleading offering circulars for Enron's Yosemite credit-linked notes connected to the Delta prepays, which failed to disclose the significant fact that Citigroup and Enron owned the equity in the Yosemite vehicles. That fact had to be known to Milbank Tweed because it had drafted the equity-certificate documents and overseen their execution.[FN20]The circulars with their false and misleading financial information about Enron, written by Milbank Tweed,[FN21] were intended to lure investors to purchase these Enron securities and thereby shift the economic risk in the Delta prepays from Enron, in its impaired financial condition, to unknowing public investors, i.e., putative class members. For details see Amended Complaint at ¶ 36-37. As another instance of Milbank Tweed's insulating a scheme participant, the complaint represents that although under the law commercial bank loans are not insurable, Milbank Tweed

helped J.P. Morgan Chase obtain insurance by disguising what were actually loans in Mahonia VI, VII, and XI to appear to be legitimate commodities trades, despite the fact that there was never any intent to physically deliver the oil or gas in the Mahonia commodity transactions; the insurers were thus allegedly deceived into guaranteeing the performance of the deals.[FN22]The complaint asserts that neither J.P. Morgan Chase nor Citigroup would have participated in the Mahonia and Delta prepays without such protection.

FN20. Similarly the amended complaint asserts that Milbank Tweed knew about the fraudulent prepaid swaps with Enron through Citigroup and its SPE Delta, which were contractually related to the credit-linked-notes trusts, because Milbank Tweed had structured and documented those swaps, drafted the relevant documents, and represented both Citigroup and Delta in the transactions. # 29 at 25-26.

Complicating the situation where plaintiff has alleged fraud by omission under § 10(b), as the Court has noted elsewhere, are two often conflicting concerns: the plaintiff must show that the defendant had a duty to disclose, *Chiarella v. United States,* 445 U.S. 222, 228 (1980); and under the attorney-client privilege, the attorney has a duty not to disclose or tattle on his client to third parties. See subsequent discussion.

FN21. Milbank Tweed complains that Plaintiffs fail to identify what parts of the offering memoranda it wrote. Moreover it points out that the language in the memoranda expressly states that Enron and Citibank are each responsible for information appearing under "Description of Enron" and "Description of Citibank, N.A.," respectively. *See, e.g.,* McGuinness Decl. (# 21), ex. 7 (Yosemite I offering memorandum).

FN22. Highlighting the element of reliance, Milbank Tweed protests that Plaintiffs fail to explain how the alleged fraud on the insurance companies is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

transformed into a § 10(b) claim by a public shareholder who never heard of the transaction.

While the allegation by itself does not constitute a claim under § 10(b), the Court observes that it may serve as one fact that may support an inference of scienter in Milbank Tweed's involvement in the alleged scheme to defraud investors.

*4 The Amended Complaint at ¶¶ 39-40 also asserts that Milbank Tweed participated with Credit Suisse First Boston in structuring and documenting the manipulative transaction and contrivance called Firefly, which, in ways similar to the Mahonia and Delta deals, was designed to conceal $475 million of Enron debt by characterizing it as a minority shareholder's equity investment, while simultaneously providing the corporation with much needed cash. The complaint asserts that Milbank Tweed structured Firefly to permit Enron to refinance $475 million of Enron's failed investment in Elektro, a Brazilian electricity distribution company, that had resulted in a loss to Enron of nearly $1 billion. According to Plaintiffs, Milbank Tweed knew about the Elektro loss because it had represented the lenders on the original project-finance structure of Elektro and because it had advised Credit Suisse First Boston on restructuring the financing to avoid the loss. Ultimately Firefly was folded into another structured transaction, Osprey, also created, structured, and documented by Milbank Tweed, working with Enron and Credit Suisse First Boston, to continue to hide Enron's huge losses and debt. Amended Complaint ¶¶ 40-45. The amended complaint identifies eleven "losing investments" that Enron "dumped" into Osprey. *Id.* at ¶ 42.

The complaint, referencing Enron Bankruptcy Examiner Neal Batson's Second, Third, and Final Reports, goes into substantial detail about the Osprey transactions (¶¶ 41-45), designed to hide $2.65 billion of Enron debt, disguise over $1.7 billion in losses, and defraud investors by misleading offering memoranda that (1) failed to disclose that Osprey would loan all proceeds to Enron, (2) falsely represented that Enron did not guarantee the Osprey debt, and (3) did not disclose

that nearly every Enron investment sold to Osprey was at book value, far in excess of its actual market value. *Id.* Milbank Tweed also allegedly included false and materially misleading Enron financial statements in the offering documents.

In September 2000, Plaintiffs assert, Osprey II was used to refinance Firefly. The complaint further charges that Osprey, with its subsidiary, Whitewing, was designed to serve as a "dumping ground" for more that $2 billion of losing investments, including Elektro, to falsely inflate Enron's earnings, and to artificially pump up its stock prices from 1999-2001, allowing Milbank Tweed and Credit Suisse First Boston to raise more cash for Enron through additional Osprey security issuances. Amended Complaint at ¶¶ 43-44. Osprey I and II, according to the complaint, showed similarities to the *Ponzi* scheme's other share-trust transactions, specifically Nighthawk, designed by Citigroup, and Marlin, underwritten by Credit Suisse First Boston. In these deals, an Enron-controlled group of entities would issue debt secretly guaranteed by Enron and secured by Enron common stock, with the secret-debt guarantee not recorded on Enron's balance sheet. As these transactions were structured, if Enron's increasingly precarious investment credit rating slumped and stock price fell below specified levels, a "trigger" event would occur, as happened in 2001 two days before Enron filed for bankruptcy. A trigger event required already debt-ridden Enron to repay the notes, issue additional equity or pay the difference in cash. According to the amended complaint, Milbank Tweed wrote misleading offering memoranda for all the Osprey securities issuances, concealed that Osprey would loan all proceeds from the securities to Enron, misrepresented that the securities were not guaranteed by Enron when in actuality they secretly were,[FN23] referenced Enron's numerous false financial statements, and concealed the true extent of Enron's debt by failing to disclose that nearly every Enron investment sold to Osprey was recorded at book value, substantially above its current market value.[FN24]

FN23. Plaintiffs allege that the cover pages of both the 1999 and 2000 Osprey

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 8

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

debt-offering memoranda stated, "The Senior Notes are not guaranteed by, and the Security for the Senior Notes does not represent a guarantee by, Enron."

FN24. In response to charges that it " dumped" losing investments into Osprey, Milbank Tweed maintains that it did disclose in the Osprey memoranda as a risk factor that Enron would sell assets to Osprey at prices and on terms largely determined by Enron and that investors had no assurance that such prices or terms would be what objective third-parties might negotiate. *See* Osprey I Offering Memorandum, # 21, ex. 5 at 13 ("None of the Whitewing Assets will be acquired prior to the closing of this Offering and there can be no assurance as to any such acquisition or the terms thereof. Enron intends that each acquisition of Whitewing Assets will be at a price and on other terms determined by internal Enron negotiations conducted on arms length basis, and the holders of the Osprey Trust Certificates ... will have certain consent rights with respect to such acquisitions, but there can be no assurance that such prices and other terms will reflect those that would be agreed by unaffiliated third parties...."); Osprey II, # 21, ex. 6 at 15 ("Enron intends that each additional acquisition of Whitewing Assets will be at a price and on other terms ... [rest the same as above]").

Even if Enron's potential liabilities were not listed on Enron's balance sheet, over which Milbank Tweed had no control and about which it claims it was ignorant, Milbank Tweed objects that they were disclosed in the Osprey and Marlin offering documents, including the note trigger events resulting in Enron's obligations to make certain payments and Enron's guarantee of the notes. # 20 at 34-36, 80-81 and n. 56, *citing* McGuinness Decl. (# 21), Ex. 5 (Osprey I offering memorandum) at 7, 8-9; Ex. 6 (Osprey II offering memorandum) at 1-2, 56-57, 67, 82; Ex. 11 (Marlin II offering memoranda) at 8, 91.

**\*5** The complaint asserts that Milbank Tweed,

with Credit Suisse First Boston, was also involved in the structuring and documenting of the similarly fraudulent Marlin transactions and related securities issuances and offering memoranda, developed with the participation of Credit Suisse First Boston, Deutsche Bank, and Enron and used for purposes parallel to those of the Osprey and Firefly transactions, but in Marlin specifically to hide Enron's $2 billion losses in Wessex Water Services Ltd. Amended Complaint at ¶¶ 46-49.[FN25] As in these other transactions, in Marlin the Enron-controlled entities issued debt guaranteed by Enron and its equity shares, with trigger note events; neither the debt nor the guarantee was recorded on Enron's balance sheet nor disclosed in the offering circular, which also expressly stated the Marlin securities were not guaranteed by Enron.

FN25. Plaintiffs assert that Milbank Tweed's offering circular *inter alia* did not disclose that Enron had grossly overpaid for the Wessex Water entity.

In sum, the complaint charges that Milbank Tweed's direct and knowledgeable participation, cumulatively, in the Mahonia, Yosemite, Delta, Marlin, Firefly, and Osprey transactions demonstrates that it knew about Enron's actual financial condition and that Enron's financial statements were misrepresentations. Milbank Tweed concurrently represented Enron, many of its subsidiaries and controlled entities, and its three investment banks, J.P. Morgan Chase, Citigroup, and Credit Suisse First Boston, all allegedly major players in the fraudulent scheme and course of business using deceptive transactions as devices, contrivances, and manipulative devices to defraud unknowing purchasers of Enron securities. Enron further required that the three banks be represented by Milbank Tweed and paid the law firm's fees or furnished them out of the offering proceeds, thus giving Enron control of the representation,[FN26] throughout the period of the alleged *Ponzi* scheme. According to the complaint, Milbank Tweed materially furthered that scheme by structuring and documenting the inherently fraudulent transactions, which were without legitimate business purposes and functioned as manipulative devices to falsify

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 9

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

Enron's financial status, hide its debt, inflate its cash flow, defraud investors, and perpetuate the *Ponzi* scheme. As another part of the scheme, Milbank Tweed provided false and misleading offering memoranda for securities issuances on behalf of these entities to draw in further cash from unsuspecting investors to feed the Ponzi scheme.

> FN26. As for Enron's paying Milbank Tweed's fees associated with the Foreign Debt Securities offerings, the law firm responds that in the investment banking world it is

entirely normal ... for a bank's customer to approve and pay for counsel who will work on the bank's behalf, either directly or indirectly through the bank's compensation. Moreover, because bankers are usually reimbursed for their expenses, including counsel, it makes no difference economically if the investment bank or its customer pays the fees directly to the lawyer or indirectly to the bank. And as a matter of law, the party that pays a lawyer's fees does not thereby become the client. *See, e.g., Mason Tenders Dist. Council Pension Fund v. Messera,* 4 F.Supp.2d 293, 300 (S.D.N.Y.1998) (stating " 'the payment of legal fees by a third person creates no attorney-client relationship or privity between the attorney and his client's benefactor" ') (citation omitted). A lawyer's fees are often paid by a third-party-in insurance, civil rights, and indigent criminal defense practice, for example, such payment arrangements are commonplace-and this is entirely appropriate. *See Restatement (Third) of The Law Governing Lawyers* § 134 cmts. b and c (2000); *Model Rules of Prof'l Conduct R.* 1.7 cmt. 12 (2003) ("A lawyer may be paid from a source other than the client ... if the client is informed of that fact and consents and the arrangement does not compromise the lawyer's duty of loyalty or independent judgment to the client").

\# 20 at 74-75. Plaintiffs respond that they are not alleging the existence of an attorney-client relationship between Enron and Milbank Tweed. Instead their focal point is Enron's insistence that the banks use Milbank Tweed in this allegedly too " cozy world."

The Court examines that demand and allegations regarding fees as factors in the totality of circumstances that must be taken into consideration in determining whether Plaintiffs have adequately alleged a fraud scheme and scienter.

**B. Milbank Tweed's Motion to Dismiss and Plaintiffs' Opposition**

Milbank Tweed moves to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 9(b) and PSLRA, Pub.L. No. 104-67, 109 Stat. 737 (1995), codified as amended, 15 U.S.C. §§ 77 and 78, for failure to state a claim under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

Milbank Tweed objects that the gist of the complaint is that Enron, not Milbank Tweed, intentionally violated accounting rules in its financial statements and failed to make adequate disclosures as required by law; it insists that Milbank Tweed was not involved in these decisions or misrepresentations. Milbank Tweed maintains that it did not make any Enron-related accounting or disclosure decisions nor serve as Enron's counsel for securities filings or SEC filings, but that Arthur Andersen and Vinson & Elkins were Enron's accounting advisor and disclosure advisor, respectively. Moreover, Enron made these challenged disclosures; Plaintiffs cannot allege that Milbank Tweed made or created any actionable misstatements or omissions for investors to rely upon in the purchase of Enron securities. Furthermore, because Enron was one of the most admired corporations and the seventh largest company in the country and because its auditor, Arthur Andersen, one of the "big four," had given Enron a clean bill of health on which it was reasonable for Milbank Tweed, which is not alleged to have accounting expertise, to rely, Milbank Tweed maintains it had no reason to suspect something was wrong with Enron's financial statements. In accord with this Court's prior rulings, Milbank Tweed contends that its position or status as counsel to the financial institutions, by itself, is not sufficient to allege scienter, i.e., that Milbank Tweed knew about Enron's internal problems. No facts have been alleged showing that Milbank Tweed knew how Enron and Andersen booked the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 10

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

prepay transactions or that the transactions lacked a legitimate business purpose or did not comply with accounting criteria.

*6 Milbank Tweed addresses the allegations that it represented financial institutions which were counterparties to Enron in fifteen significant off-balance sheet-financing transactions, structured and documented by Milbank Tweed.[FN27]Nine of the fifteen transactions were unregistered, private placements of securities under 17 C.F.R. § 230.144A or Regulation S. 17 C.F.R. §§ 230.901-230.905,[FN28] issued by entities other than Enron, for which Milbank Tweed served as counsel to the initial purchasers and which Plaintiffs admit they did not purchase.[FN29]The remaining six,[FN30] in which named Plaintiffs admittedly did not participate, were private non-securities financial transactions ("Commercial Financial Transactions" or contracts),[FN31] which cannot give rise to a direct claim under the securities laws. Therefore Milbank Tweed contends that Plaintiffs lack standing to assert claims based on these transactions. [FN32]Milbank Tweed, in addition, maintains that it did not represent Enron in any of the transactions at issue, but instead well-known banks and financial institutions.[FN33]It argues its provision of legal services to the financial institutions in the disputed transactions does not constitute the wrongdoing, but that Enron's improper accounting for the transactions is the gist of the fraud at issue.

FN27. See footnote 8 for the fifteen transactions at issue. Amended Complaint at ¶ 19.

FN28. The nine private placements are the (1) $1,150,000,000 Marlin I transaction, December 1998; (2) $825,000,000 Yosemite Securities Trust I, November 1999; (3) $1,500,000,000 Osprey I transaction, September 1999; (4) 211,250,000 English pounds Yosemite Securities Co. Ltd., February 2000; (5) $70,000,000 Osprey Certificates transaction, July 2000; (6) $550,000,000 Enron Credit Linked Note Trust financing, August 2000; (7) $1,080,000,000 Osprey

II transaction, October 2000; (8) $550,000,000 Enron Credit Linked Note Trust II, 222,500,000 Euros Enron Euro Credit Linked Note Trust, and 139,000,000 English pounds Enron Sterling Credit Linked Note Trust, all three in May 2001; and (9) $915,000,000 Marlin II transaction, July 2001. Amended Complaint ¶ 19.

Milbank Tweed represents that members of the United States public were not allowed to invest in these private placement securities; United States purchasers were limited to Qualified Institutional Buyers ("QIBs," defined in 17 C.F.R. § 230.144A). The offering memoranda expressly state that they are confidential and for use solely in connection with the offering of the Notes. Thus, argues Milbank Tweed, Plaintiffs could not have reasonably relied upon these nine offering memoranda.

In response Plaintiffs object that the Amended Complaint clearly and expressly includes purchasers of the Foreign Debt Securities in the definition of the putative class. Amended Complaint at 70, ¶ 80 & n. 4. Moreover, they note that this Court has previously held that a Lead Plaintiff may assert Rule 10b-5 claims based on securities it did not purchase, specifically the Foreign Debt Securities, as long as it has a class representative that has purchased them. # 1999. (If no class representative is found, claims based on these securities will fail.) It has also found that whether Foreign Debt Securities offers can be considered public offerings for the purpose of § 12(a)(2) liability is a determination involving factual issues that should not be decided merely on pleadings. # 2036.

Furthermore, insist Plaintiffs, documents do not have to be in a public offering for liability to attach under § 10(b) and Rule 10b-5 because unregistered offerings are only exempt from fraud liability under the 1933 Act, but not under the 1934 Act. *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 692 & n. 6 (1985); *Ruefenacht v. O'Halloran,* 737 F.2d 320, 328 (3d Cir.1984), *aff'd,*471 U.S. 701 (1985); *In re Software Toolworks Sec. Litig.,* 50 F.3d 615 (9th Cir.1995)(upholding summary judgment under § 10(b) against an accountant for drafting non-public documents to the SEC); Louis Loss & Joel

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

Seligman, *Securities Regulations* § 3-A-1 (3d ed.2004). The Court agrees there is judicial precedent for this argument.

Nevertheless, the Court would point out that if Milbank Tweed's motion to dismiss were denied, because Plaintiffs rely on a fraud-on-the-market theory for a presumption of justifiable reliance, Plaintiffs would have to demonstrate at the class certification hearing that there was an efficient market for these securities. *Unger v. Amedisys, Inc.,* 401 F.3d 316 (5th Cir.2005)(discussing factors to be weighed in rigorous analysis to determine whether a security was traded in an efficient market). Under the facts presented thus far, Plaintiffs would have an uphill battle to establish presumptive reliance. The offering memoranda prominently indicate that these notes were intended to be private offerings to QIBS; named Plaintiffs did not purchase them, but would have to demonstrate that they proximately caused Plaintiffs' and other nonpurchasing class members' losses; and some notes state that they are being sold in a new market or that there is no assurance of the development or liquidity of a market for them. *See, e.g., In re Safety-Kleen Corp. Bondholders Litigation,* No. 3:00-1145-17, 2004 WL 3115870, *4-5 (D.S.C. Nov. 1, 2004)("Courts have repeatedly held that the market for new issues is not efficient.").

Plaintiffs reiterate that the Amended Complaint charges Milbank Tweed not with accounting manipulations, but, as with Vinson & Elkins, with false and misleading statements about Enron's financial health and with scheme liability that, *inter alia,* involved the key transactions that Milbank devised, structured, and documented in the nine offering circulars authored by Milbank Tweed that raised $6 billion dollars to feed the *Ponzi* scheme.

Plaintiffs also emphasize that purchasers of these Foreign Debt Securities are included in their putative class definition; furthermore this Court previously ruled that Lead Plaintiff could assert claims on behalf of all Enron securities purchasers as long as it had a class representative for each class of securities. The Court notes that the Imperial County Employees Retirement Systems ("ICERS") has intervened and may be permitted to serve as a class representative for purchasers of Marlin II notes. The complaint has alleged that Milbank's false or misleading circulars contributed to the artificial inflation of the price of Enron securities in this fraud-on-the-market case. In addition, the circulars were distributed to the public and the Foreign Debt Securities were rated by Moody's and Standard and Poor's, which relied on the offering circulars and which likely influenced the market. # 29, Ex. 23. Even if they were not distributed publically, they did reach investors and were intended to solicit investors.

> FN29. Because it was acting as counsel to the investment banks and not to Enron, Milbank Tweed contends that it could not " speak" on behalf of Enron.

> FN30. These six are the (1) $300,000,000 Mahonia VI prepay, December 1997; (2) $250,000,000 Mahonia VII prepay, June 1998; (3) $475,000,000 Firefly minority interest, December 1998; (4) $125,000,000 Pelican Bidder/Enron Swap financing, July 2000; (5) $330,400,000 Mahonia XI prepay, December 2000; and (6) $28,500,000 Sundance industrial financing, June 2001. Amended Complaint ¶ 19.

> FN31. The Commercial Financial Transactions, according to Milbank Tweed, are composed of three time-barred transactions (Mahonia VI, Mahonia VII, and Firefly) and three others: the $330,400,000 Mahonia XI prepay, December 2000; the $125,000,000 Pelican Bidder/Enron Swap financing, July 2000; and the $28,5000,000 Sundance Industrial financing, June 2001.

> FN32. Milbank Tweed points out that Plaintiff the Regents purchased only Enron common stock, while Nathaniel Pulsifer bought only Enron 7% Exchangeable Notes. The private placement memoranda were for what Lead Plaintiff elsewhere calls "Foreign Debt Securities." Milbank notes that Plaintiffs freely concede that they did not purchase these securities and therefore no purchasers of the Foreign Debt Securities have sued Milbank Tweed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

Because Plaintiffs did not buy the securities at issue, Milbank Tweed contends that they could not have been injured by any statement in or suffered a loss because of or in reliance upon the memoranda and that they lack standing to assert claims based on those transactions.

FN33. Milbank Tweed objects,

To attempt to create a greater sense of involvement in Enron's accounting scheme, Plaintiffs copied Milbank's disclosures to the Bankruptcy Court of its relationship to Enron-related transactions directly into the Amended Milbank Complaint.... Plaintiffs then list the transactions in which Milbank represented Enron. *Plaintiffs do not allege any wrongdoing by Milbank in connection with these transactions or assert that there was in fact anything improper about any of these transactions.*These are plain vanilla, normal transactions that the complaint does not question. These transactions, far from giving Milbank knowledge of any fraud at Enron, would have instead conveyed to Milbank a picture of Enron as a normal operating corporation....

# 20 at 14-15.

In response, Plaintiffs, who do not and did not plead wrongdoing by Milbank Tweed in these " plain vanilla, normal transactions," but have instead pled conflicts of interest in the firm's representation of parties on all sides of the table in the transactions that are in dispute to demonstrate a fraudulent scheme or course of business. In their response, Plaintiffs quote from articles in *Business Week* and *The Washington Post* that highlight the questionable conflicts of interest involving Milbank Tweed in the bankruptcy court, as well as those alleged in the complaint. # 29 at 83-84 and Exs. 20 and 22. This Court agrees with Milbank Tweed that Plaintiffs' brief in response to the motion to dismiss and these extraneous articles cannot be used to amend or supplement their governing complaint. Nevertheless, their allegations of conflicts of interest in the firm's multiple representations of Enron and of the banks in transactions where they were supposed to be separate and independent, though somewhat conclusorily pled, are in the Amended Complaint.

Challenging the Amended Complaint's allegation at ¶ 38 that "[i]nternal communications [FN34] show that it was common knowledge among Enron, J.P. Morgan Chase, and Citigroup employees that the Mahonia and Delta prepays were designed to achieve false accounting-*not legitimate business*-objectives and that Enron was accounting for prepay proceeds as trading activity-not debt," Milbank Tweed insists that the four internal documents, relied upon by Plaintiffs as reflecting common knowledge of the fraudulent accounting for the Mahonia and Delta prepays, on their face, were not sent to Milbank Tweed and that Plaintiffs have not shown that Milbank Tweed knew anything about Enron's accounting.[FN35]Plaintiffs' claim that Milbank Tweed was part of "an elaborate, giant accounting fraud scheme" lacks supporting factual allegations that Milbank Tweed even knew of the scheme or of Enron's fraudulent intent: there are no allegations that Milbank Tweed received any of the key documents or knew of any other documents or testimony indicating that Enron was falsifying its accounting and disclosures.[FN36]

FN34. Plaintiffs quote four internal memos or e-mails written by employees of Citibank and J.P. Morgan Chase that were set out in Bankruptcy Examiner Neal Batson's Third Report. Amended Complaint¶ 38.

Plaintiffs, conceding that Milbank Tweed may not have received these four internal documents, counter by arguing that "due to its financial sophistication and intimate involvement in these deals representing the bankers who wrote these incriminating memos, it 'was necessarily privy to its client's confidences' and 'as a law firm highly sophisticated in commercial matters, had to know of the alleged ongoing illicit and fraudulent conduct." ' # 29 at 27, *quoting Enron,* 235 F.Supp.2d at 704 (discussing allegations against Vinson & Elkins). Such allegations will not meet the pleading standard under the PSLRA for § 10(b) claims. In addition, urge Plaintiffs, Milbank Tweed holds itself out as having specialized knowledge in structured finance and capital finance and had to know that the types of transactions it repetitively structured (at least fifteen over five years, e.g., Marlin, Firefly, Osprey

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

Page 13

and the Delta and Mahonia prepays) served no legitimate business purpose, but instead were manipulative devices designed to falsify Enron's financial results and deceive investors. This Court has previously held that repetitive exposure to and involvement in a pattern of inherently fraudulent transactions with no legitimate business interest may give rise to a strong inference of scienter. *Enron,* 235 F.Supp.2d at 693-94. Plaintiffs also charge that like Vinson & Elkins, Milbank Tweed " 'effected the very' deceptive devices and contrivances that were at the heart of the alleged Ponzi scheme." *Enron,* 235 F.Supp.2d at 704.

> FN35. Plaintiffs respond that while Milbank Tweed may not have received any of the four e-mails, "its financial sophistication and intimate involvement with these deals representing the bankers who wrote these incriminating memos, it ' was necessarily privy to its client's confidences' and 'as a law firm highly sophisticated in commercial matters, had to know of the alleged ongoing illicit and fraudulent conduct." ' # 29 at 27 n. 9, *quoting Enron,* 235 F.Supp.2d at 704. They also ask "if the law firm's client J.P. Morgan knew the true nature of the deals, how could Milbank-who actually structured the transaction-not know its illegitimate purpose?" # 29 at 64.

While it is clear to the Court that such allegations, by themselves, do not satisfy the heightened pleading standards for scienter under the PSLRA, the Court looks at all the allegations as a whole in the complaint to determine whether the complaint states a claim against Milbank Tweed.

> FN36. With letters attached as evidence (# 21, Exs. 3 and 4; # 31, Exs. 15 and 16), Milbank Tweed also argues that after they filed their initial complaint, Milbank Tweed's counsel demanded that Plaintiffs comply with Fed.R.Civ.P. 11 and withdraw false allegations about Milbank Tweed's representation of banks, underwriters and institutional investors in most of the transactions targeted by Plaintiffs. The letters show that Milbank Tweed's counsel

informed Plaintiffs that Milbank Tweed had not been involved at all in more that 75% of those seventy-one transactions on which the initial complaint was based. Milbank Tweed maintains Plaintiffs in response withdrew their initial complaint, in which they had alleged that Milbank Tweed had represented the three financial institutions in seventy-one transactions, i.e., in nearly all of Enron's off-balance sheet deals, and thereby knew that Enron's financial condition and statements were falsified. Letter of Milberg Weiss' G. Paul Howes, Ex. 4 to # 21 ("In response to your letters of January 23 and 29, this letter is to advise you and your client that we will withdraw our allegations as to the 54 transactions listed in your Schedule A, and we will amend the complaint by February 6, 2004.") Plaintiffs then filed their Amended Complaint, which now accuses Milbank Tweed of participating in only fifteen of the original seventy-one transactions. Milbank Tweed contends that Plaintiffs' withdrawal of 75% of their scienter allegations strongly implies that Plaintiffs have no basis for alleging that Milbank Tweed knew the remaining fifteen, challenged in the Amended Complaint, were part of a huge fraudulent scheme. The firm further challenged the amended complaint's allegation that Milbank Tweed earned "in excess of $150 million" in fees for Enron-related representations; Howes agreed to substitute "tens of millions." # 31, Exs. 15, 16 and 17 Milbank Tweed points to the affidavit of Stephen Blauner, filed with the Enron Bankruptcy Court, which shows the firm's fees (which it insists were its "customary professional fees") for representations of Enron and subsidiaries from 1997-2001 amounted to $17.8 million, less than 1% of Milbank Tweed's revenue for the five-year period. # 31, Ex. 18. (Significantly, Milbank Tweed concedes that this amount does not include fees it earned from non-Enron clients for services allegedly related to concealing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 14

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

Enron financial matters, the heart of the claims against Milbank Tweed. # 31 at 16 n. 13.) Thus, insists Milbank Tweed, Plaintiffs' argument that the magnitude of the fees constitutes motive for securities fraud fails. Milbank Tweed concludes that the withdrawal of these allegations shows that "Plaintiffs never had any basis for their securities fraud allegations against Milbank." # 31 at 2.

Disagreeing with the law firm's characterization, Plaintiffs object that voluntarily amending, shortening, and sharpening a complaint is not an admission that the original allegations were false.

The Court is concerned not with claims that have been abandoned, but only with whether the governing amended complaint now states a claim against Milbank Tweed.

Milbank Tweed further argues that the claims arising from four of these remaining fifteen transactions are time-barred, and there are no factual substantive allegations as to what Milbank Tweed did or knew with respect to Pelican Bidder and Sundance. (The Court agrees that the governing complaint lacks such facts, although Plaintiffs' opposition to the motion to dismiss includes some discussion of these transactions, # 29 at 65-66 n. 17, the Sundance deal with Citigroup, and at 72 n. 19, the Pelican Bidder with CFSB, Vinson & Elkins, and Enron.) Mere exposure to or participation in the other transactions is not sufficient in itself to create a strong inference of scienter. Nor is there any allegation that Milbank Tweed was involved in or regularly informed about Enron's day-to-day internal operations. It objects to Plaintiffs' efforts to smear it with such vague, general and conclusory allegations as "by '99 the Company had a long-term attorney-client relationship with Milbank and Enron's top executives-especially CFO Fastow-had a high degree of confidence that the law firm would do Enron's bidding in the Mahonia, Delta, Marlin, Osprey, and Firefly transactions."Amended Complaint at ¶ 22.

Milbank Tweed compares the allegations against it to those against other parties that the Court has dismissed for failure to state a claim. For example, it urges, the Court dismissed federal

securities fraud claims against Enron's General Counsel, James Derrick, because the allegations did not establish that he was a primary actor in the alleged *Ponzi* scheme, even though he sat on Enron's Executive and Management Committees and served as an officer and director of New Power; the Court found that the complaint lacked specific factual allegations and failed to plead scienter with respect to Derrick. # 1347 at 32-36. The Court also dismissed claims against Kirkland & Ellis ("K & E" ), even though it purportedly drafted offering memoranda and represented SPEs, because K & E made no public disclosures and because K & E did not represent Enron with regard to its allegedly fraudulent financial statements. # 1194 at 300-01. The Court found that a claim had been stated against Vinson & Elkins because it made public statements and represented Enron with respect to its financial disclosures. *Id.* at 297-300.Andrews & Kurth, also outside corporate counsel to Enron, provided legal services to Enron in connection with twenty-eight FAS 140 transactions and issued at least twenty-four legal opinions, more involvement in the purported fraudulent scheme than Plaintiffs allege against Milbank Tweed, insists Milbank Tweed. Milbank Tweed argues that under the facts alleged, Milbank's role was more similar to that of the dismissed parties than to that of Vinson & Elkins and urges that the claims against Milbank Tweed should also be dismissed.

*7 As counsel to the banks, Milbank emphasizes that it is further removed from Enron's accounting fraud and, at most, only a secondary actor in the alleged scheme. The law firm contends that the complaint's reiteration of the vague, undefined, and conclusory phrase, "structured and documented," [FN37] without any specific details, fails to show that Milbank Tweed knowingly or recklessly committed securities fraud. Moreover some of Plaintiffs' generalizations are inconsistent; e.g., while Plaintiffs assert that Milbank Tweed structured, documented, and implemented the Yosemite transactions, in *Newby* they allege that Vinson & Elkins did that. They charge Milbank Tweed with structuring and documenting the Marlin and Osprey transactions, but in *Newby* the consolidated complaint alleges that a group of ten bankers from Credit Suisse First Boston worked

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

with Arthur Andersen and Vinson & Elkins to create a number of SPEs, including Marlin, Firefly, Mariner, Osprey, Whitewing, and the Raptors.[FN38]

> FN37. Plaintiffs respond by pointing to ordinary definition of the phrase in three dictionaries, in essence "to put together systematically," "organize," "design," " construct." # 29 at 3 n. 2.

> FN38. Plaintiffs respond that such arguments "def[y] common sense" and that "there is no inconsistency in alleging that more than one party had a hand in structuring and documenting Mahonia or any of the other alleged transactions." They maintain that their other complaints "never stated that parties who worked on these complex deals did so to the exclusion of other culpable actors." The Court concurs. # 29 at 59. They insist that the complexity of the devices and contrivances employed in the total scheme required more than the services of one firm.

The Court agrees that that merely because Milbank Tweed was not named as a defendant in *Newby* when other alleged participants in the same transactions and schemes were named should not bar a claim against it here if Plaintiffs can state a claim and ultimately prove that Milbank Tweed was a primary actor in violating the securities statute.

Nor have Plaintiffs pleaded a scheme liability claim, insists Milbank Tweed. Section 10(b) requires pleading that each defendant committed a manipulative or deceptive act for liability to attach. Plaintiffs have only alleged that Milbank performed the normal activity of a law firm; [FN39] mere participation in a transaction does not translate into participation in a scheme without specific acts demonstrating that the participant knowingly employed a manipulative act or scheme to enrich itself. Milbank Tweed maintains that it merely received routine fees for routine services and had no stake in the transactions by which funds were purportedly diverted from investors for the benefit of Enron or Enron insiders or Milbank Tweed.[FN40] This Court, in accordance with Fifth Circuit law,

has held that motive and the opportunity to commit fraud are insufficient by themselves to plead scienter, although these factors may be considered in the total mix of facts and circumstances. *See also Melder v. Morris,* 27 F.3d 1097, 1102-03 (5th Cir.1994) (dismissing complaint for failure to plead scienter where "plaintiffs' only allegations of the accounting firm's intent in participating in the securities fraud [were] that the firm sought to ... protect and enhance the substantial auditing and other fees received," and increasing incentive compensation and income). Here, Milbank Tweed insists, Plaintiffs have failed to plead that the law firm had any motive, other than the inadequate one of earning routine professional fees,[FN41] or opportunity to commit fraud. It is not alleged to have traded in Enron stock, received bonuses linked to the corporation's earnings, invested in Enron's partnerships, nor profited from the alleged fraud.

> FN39. Plaintiffs object that "representing the defendant banks and Enron in repeatedly devising, structuring and documenting bogus transactions, and repeatedly writing false and misleading offering circulars by which billions in worthless securities were foisted on unsuspecting class members" do not constitute "ordinary legal services." # 29 at 4. This is not an issue to be decided on a 12(b)(6) motion to dismiss.

> FN40. The Amended Complaint at § 52 asserts that Milbank Tweed's participation in the scheme "enabled its bank clients to pocket hundreds of millions of dollars in fees and excessive interest charges, while the law firm earned millions." In their opposition to the motion to dismiss, despite the amended complaint's substitution of "tens of millions" of dollars, Plaintiffs state that Milbank received $150 million in fees ("its share of the fruits of the fraudulent scheme") from 1997-2001 in its representation of Enron and the commercial bank and securities writers which participated in the alleged *Ponzi* scheme. # 29 at 11-12, 13.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

FN41. Although acknowledging the rule that generally the receipt of professional fees is insufficient to raise a strong inference that the professional firm committed fraud, Plaintiffs respond by contending that when the magnitude of fees reaches the level that a client cannot be considered ordinary or average, large fees for a professional firm can provide motive. *In re Complete Management Sec. Litig.,* 153 F.Supp.2d 314, 335 (S.D.N.Y.2001) (finding that payment of more than $1 million in fees for consulting work to Arthur Andersen over a three-year class period supported a strong inference of scienter by the auditors to "maintain the considerable revenues" in the future); *In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620, 655-56 (E.D.Va.2000) (payment of $188,000 in financial rewards in addition to consulting fees and defendant's agreement to sell MicroStrategy products and serve as a consultant provided "more weight to a stronger inference of scienter"). Here Plaintiffs allege not only substantially more money in fees paid to Milbank Tweed, but also that it "designed and structured the very engines of fraud." # 29 at 82 n. 22.

While Plaintiffs focus on the total sum in fees paid to Milbank, they fail to show with any specific allegations that those fees were not the usual fees charged by Milbank Tweed. While Plaintiffs provides a rough estimate of fees paid by Enron for the "plain vanilla" transactions that are unconnected with the alleged fraud, they do not provide figures for Milbank's various financial institution clients nor demonstrate that the fees were excessive. This Court has previously and frequently stated that compensation for services alone is insufficient to plead scienter under § 10(b). Because fees appear to be the only motive identified by Plaintiffs for Milbank Tweed's alleged participation in the fraud, such lack of specificity is fatal.

Not only have the original seventy-one claims been reduced to fifteen in the Amended Complaint, but Milbank Tweed contends that four of the fifteen

transactions are time-barred by the three-year statute of repose, in accord with this Court's earlier rulings,[FN42] and that the remaining eleven, in view of the vast number of suspect transactions by Enron, are insufficient to give rise to the requisite strong inference that Milbank Tweed knew (or acted with severe recklessness regarding the fact that) Enron's financial accounting disclosures were falsified or that Milbank Tweed acted with fraudulent intent, or to demonstrate that Milbank Tweed participated as a primary actor. The law firm criticizes Plaintiffs' failure to provide particularized facts as to what Milbank Tweed knew or how and when it learned of such information to support the complaint's persistent conclusory charges, such as "Milbank Tweed knew that Enron was treating the proceeds of these transactions as cash flow from operations." Amended Complaint at ¶ 31.[FN43]Indeed, argues Milbank Tweed, the Amended Complaint does not contain "a single particularized factual allegation supporting *any* inference that Milbank intentionally or recklessly defrauded Enron's investors." # 20 at 66.

FN42. The four transactions at issue here that are purportedly time-barred are the (1) $300,000,000 Mahonia VI prepay, December 1997; (2) $250,000,000 Mahonia VII prepay, June 1998; (3) $1,150,000,000 Marlin I transaction, December 1998; and (4) $475,000,000 Firefly minority interest, December 1998. Milbank Tweed notes that no claims arising out of Mahonia VI and VII can survive because these transactions occurred before the putative class period, 10/19/98-11/27/01, identified in the Amended Complaint at ¶ 19.

The applicable limitations period for Rule 10b-5 claims was that established in *Lampf,* one year after discovery of the facts constituting the violation and within three years after the violation. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 358 (1991). Claims that were stale when the Sarbanes-Oxley Act, Pub.L. 107-204 § 804(b), 116 Stat. 745 (July 30, 2002), codified at 28 U.S.C. § 1658, was enacted were not revived by it. # 1999 at 25-60. *See # 1999 in Newby.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiffs point out that under the tolling agreement signed by Milbank Tweed and *Newby* Lead Plaintiff, dated September 10, 2002 (Ex. 10 to # 29), claims asserted against Milbank Tweed thereafter would be deemed filed as of that date. Thus, pursuant to the tolling agreement, the Court concludes that although this suit was not filed until January 9, 2004, the claims against Milbank Tweed are deemed filed on September 10, 2002; therefore, under the three-year statute of repose, all claims arising before September 10, 1999 are time-barred under the statute of repose. (Plaintiffs, # 29 at 53, mistakenly assert the tolling agreement was signed April 6, 2002). Thus any claims arising out of the four disputed transactions (Mahonia VI prepay, December 1997; (2) $250,000,000 Mahonia VII prepay, June 1998; (3) $1,150,000,000 Marlin I transaction, December 1998; and (4) $475,000,000 Firefly minority interest, December 1998) are time-barred.

Nevertheless, Plaintiffs argue, even if claims arising out of the four transactions are time-barred, this Court has previously ruled that transactions outside the limitations period may still be used as evidence to establish a scheme and/or scienter. *Enron,* 235 F.Supp.2d at 689. The Court agrees.

Milbank Tweed has raised an issue in its reply memorandum (# 31 at 40-41) that would warrant further briefing if the Court found that Plaintiffs have adequately pleaded a claim against the firm. Milbank Tweed argues that the September 10, 2002 tolling agreement did not apply to purchasers of the Foreign Debt Securities, who were not added to the *Newby* class until the May 14, 2003 Amendment. Because waivers must be made knowingly, Milbank Tweed maintains that it cannot be deemed to have waived limitations on this issue.

> FN43. The law firm notes that in *Newby* this Court dismissed claims against James Derrick, Enron's in house counsel, *inter alia* because Lead Plaintiff failed to allege any specific facts demonstrating the Derrick was trained in accounting or personally involved in creating misleading statements.

*8 Milbank Tweed insists that it never made a false statement or omission nor used or employed manipulative or deceptive devices for imposition of liability under Rule 10b-5, and that Plaintiffs have not alleged any facts demonstrating that it had. The only misstatements and omissions alleged are not in connection with the public sales of Enron securities, but in the offering memoranda of the unregistered, nonpublic transactions that expressly state they are confidential and not intended for public use.[FN44] Like K & E, Milbank Tweed is not alleged to have participated in drafting or authoring any of Enron's financial disclosures, nor was any document drafted by Milbank Tweed made public.

> FN44. Milbank Tweed notes that this Court has recognized the extra layer of protection from liability for securities fraud accorded to attorneys because of " the attorney-client relationship with its attendant confidentiality, loyalty and zealous representation requirements and policy concerns."*Enron,* 235 F.Supp.2d at 598. In addition to this Court's speaker test, in expressing concern about opening the floodgates of professional liability any one who might use the allegedly misleading information provided by an attorney, the Court took a "restrictive approach: and limited standing to those in the intended audience who actually relied on it; the "speaking" attorney had to know or expect that a third-party would rely on the statement. *Id.* at 611.Milbank insists that it was not the author or co-author of any information about Enron and thus did not "speak" about its financial status. Moreover it could not have expected that the Offering Memoranda, which were expressly designated as confidential, would be relied upon by anyone for whom the face of the document said it was not intended. Milbank Tweed contends that Plaintiffs have confused two distinct issues: who is the intended audience and whether an offering is "public."

The Court notes that its prior opinion focused not only on the intended audience of a particular statement, but of the *Ponzi* scheme as a whole, of which Vinson & Elkins was allegedly a critical part.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 18

Unlike K & E, whose work is protected by the attorney client privilege and which did not speak outside of that relationship so there could be no reliance on its purported misrepresentations, Plaintiffs have alleged that Milbank Tweed did speak out to the public in offering memoranda for securities issued by entities secretly related to Enron, as was known by Milbank Tweed, and whose investment funds would go to shoring up Enron, in nine misleading offering memoranda.

Milbank Tweed also claims that Plaintiffs cannot meet the requirement of reasonable reliance because they have not alleged, and cannot allege, that anyone in the putative class based his decision to purchase Enron securities on any statement or act by Milbank Tweed. The offering memoranda were not prepared for Enron shareholders generally, as expressly noted on their faces.

Milbank Tweed maintains that any fault arising from the Mahonia, Delta, Firefly, Marlin, and Osprey transactions lies not with the law firm, but with Enron and how it reported them: "There would not have been a fraud if Enron had reported the transactions properly on its financial statements, and there is not one single fact showing or implying that Milbank knew, at the time, that Enron was going to misreport the transactions." # 31 at 18. Milbank Tweed contends that Plaintiffs have failed to allege scienter for the claims against it. This Court has recognized that under the PSLRA, guilt by association and group pleading no longer suffice to state a claim under § 10(b) and Rule 10b-5. Nor does the payment of ordinary professional fees suffice as a "motive" to commit securities fraud.

Milbank Tweed makes a detailed effort to distinguish its role from those of other defendants against whom the Court has found that a claim has been stated by Lead Plaintiff in *Newby.* While some of its arguments the Court finds unpersuasive, the Court notes the more cogent distinctions, though they are relative in degree. Differentiating itself from Vinson & Elkins, for whom Enron was the largest client, accounting for more that 7% of the firm's revenues, Milbank Tweed's disclosed, gross revenues from services of the Enron-related companies was only $17.8 million, only 1% of its

revenue for the five-year period. Plaintiffs have argued that Milbank Tweed's repeated exposure to allegedly fraudulent Enron SPEs and transactions gives rise to a strong inference of scienter, though the number is far fewer than those involving either V & E or K & E. Milbank Tweed contends that the reduction in the number of Plaintiffs' claims, based on seventy-one transactions in the original complaint to fifteen transactions in the amended complaint, also diminishes the weight of their allegations as to nature and extent of Milbank's contacts with the alleged fraud: thus Milbank Tweed maintains the claims against it are insufficient to demonstrate that it was a primary violator of § 10(b) and Rule 10b-5. The Court responds that it is the not percentage of Milbank Tweed's business nor the pared down number of transactions giving rise to claims here that is the focus of the Court's attention; what matters is the significance and specificity of factual allegations regarding Milbank's services in knowingly effecting and carrying out the alleged *Ponzi* scheme.

*9 Milbank Tweed also emphasizes that none of the investigations [FN45] undertaken and none of the factual development since *Newby* was filed in 2001 have suggested that Milbank was at fault in the Enron debacle.[FN46] The Court notes that this argument by itself is unpersuasive if Plaintiffs can adequately allege and ultimately prove Milbank Tweed is liable under § 10(b).

> FN45. Investigations include those by Bankruptcy Examiners Neal Batson and Harrison Goldin, Congressional and other government bodies, and parties in other lawsuits.
>
> FN46. Plaintiffs point out that Milbank Tweed has been sued by the Connecticut Resources Recovery Authority in H-02-1579 and H-03-1558 for the same conduct they allege here. Its conduct has also been questioned in the media.

Finally, the law firm argues under *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627 (2005) (holding that a private

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 19

plaintiff investor alleging securities fraud in fraud-on-the-market case [FN47] may not plead (or ultimately prove), that loss causation under the 1934 Act cannot be plead adequately merely by alleging (or ultimately proving) that the price of the security purchased was inflated at the time of purchase due to the defendant's misrepresentation. [FN48]Milbank Tweed contends that Plaintiffs fail to plead loss causation as to Milbank Tweed's actions.

> FN47. In a § 10(b) case where the plaintiffs are unable to prove the element of actual reliance on a defendant's material fraudulent misrepresentations and/or omissions, the fraud on the market doctrine provides a rebuttable presumption of reliance if the defendant made them publically, if the defendant's shares were traded in an open and efficient market, in which prices are determined by all available information, and if the plaintiffs traded the shares between the time the defendant made those misrepresentations and the time the truth or the falsity of those misrepresentations was revealed. *Basic Inc. v. Levinson,* 485 U.S. 224, 241-42 (1988); *Greenberg v. Crossroads Systems, Inc.,* 364 F.3d 657 (5th Cir.2004). The presumption may be rebutted by a showing by defendant that "severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at fair market price."*Id.* at 224;*id.* at 661-62.In a § 10(b) case, to establish a classwide rebuttable presumption of reliance and thus satisfy the predominance requirement, before a class can be certified, in less organized markets a plaintiff must demonstrate that the security at issue was traded in an efficient market. *Unger v. Amedisys, Inc.,* 401 F.3d 316, 322-25 (5th Cir.2005)(" Because Rule 23 mandates a complete analysis of 'fraud on the market' indicators, district courts must address and weigh factors both for and against market efficiency.").

> FN48. To state a claim for a private, implied right of action for damages under section 10(b) and Rule 10b-5, a plaintiff must allege (1) a material misrepresentation or omission or fraudulent scheme; (2) in connection with the purchase or sale of a security; (3) scienter; (4) reliance; (5) an economic loss; and (6) "loss causation." *Dura Pharmaceuticals,* 125 S.Ct. at 1631. The Supreme Court's decision focused on the last two elements.

Because Plaintiffs withdrew their first complaint and filed an Amended Complaint, Milbank Tweed argues that they should not be accorded a third bite at the apple through further amendment and that the Amended Complaint should be dismissed with prejudice. Milbank Tweed contends that the purpose of the PSLRA's heightened pleading standards to prevent harassing strike suits is frustrated when a court permits repeated amendments. Among the factors a court in its discretion may consider in deciding whether to permit amendment are "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of the amendment."*Schiller v. Physicians Res. Group, Inc.,* 342 F.3d 563, 566 (5th Cir.2003). Milbank Tweed argues that all these factors, when applied here, support dismissing the complaint with prejudice: (1) because Plaintiffs waited to sue until after the Bankruptcy Examiner completed his report in hopes that the Examiner would find fault with the law firm; [FN49] (2) because discovery in related cases began in the summer of 2003, allowing another amendment would prejudice Milbank Tweed, whose entitlement to a stay of discovery would be undermined; (3) because Plaintiffs have conceded that the withdrawn complaint was baseless; and (4) amendment would be futile.

> FN49. Objecting to this characterization of the timing of their suit, Plaintiffs respond that they signed a tolling agreement with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

Milbank Tweed on April 6, 2002 and sued only after failing to resolve their claims against the firm. As noted, the Court finds that they may assert claims arising from transactions occurring three years prior to the date of that tolling agreement. Plaintiffs further insist that what the Examiners did or did not discover about Milbank Tweed is irrelevant to the question whether they have stated a claim against the firm. The Court agrees.

## C. Court's Decision

This Court has recognized there are two kinds of claims under § 10(b), as implemented by and delineated in Rule 10b-5, in connection with the sale or purchase of securities: (1) under Rule 10b-5(b), liability for a materially false or misleading statement or omission; and (2) under Rule 10b-5(a) and (c), for nonrepresentational acts, i.e., for "employ[ing] any device, scheme or artifice to defraud" or for "engag[ing] in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person"*Enron,* 235 F.Supp.2d at 568-78. Both kinds have been alleged by Plaintiffs against Milbank Tweed. After reviewing all of the submissions and careful consideration, the Court concludes for the following reasons that Plaintiffs have failed to state a claim under § 10(b) in connection with the purchase or sale of securities issued by Enron-related entities against Milbank Tweed for either (1) false and misleading statements and/or omissions about Enron's financial health under Rule 10-5(b) or (2) for participating in a course of business or scheme that operated as a fraud on purchasers of stock under Rule 10(b)(a)-(c).

*10 It is well established that to state a cause of action under the first category a plaintiff must allege that the defendant made (a) a misstatement or omission (2) of material fact (3) in connection with the purchase or sale of security (4) with scienter, (4) on which the plaintiff justifiably relied, (5) and which reliance proximately caused injury to him. *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 865 (5th Cir.2003). Scienter is "a mental state embracing

intent to deceive, manipulate or defraud."*Id.* at 866, *citing Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12 (1976). The Fifth Circuit has further defined scienter as including "severe recklessness" that is " 'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." ' *Id., quoting Nathenson v. Zonagen, Inc.,* 267 F.3d 400, 408 (5th Cir.2001). Plaintiff must allege facts that support a strong, not a weak, inference of scienter.*Id.* at 867.Allegations of motive and opportunity, alone, are not sufficient to give rise to a strong inference of scienter because such a low standard " 'would effectively eliminate the state of mind requirement as to all corporate officers and defendants." ' *Id., quoting Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir.1994).

The only public misrepresentations asserted by Plaintiffs against Milbank Tweed are the offering memoranda for Osprey, Marlin and Yosemite notes. The Court finds that the complaint fails to identify with the particularity required by the PSLRA any material misrepresentations or omissions by Milbank Tweed in the offering memoranda and, even more, fails to plead sufficient facts to give rise to a strong inference of scienter on Milbank Tweed's part.[FN50]

> FN50. Moreover their claims of justifiable reliance are tenuous, if not nonexistent, as to the plaintiffs thus far named in this action (the Regents and Pulsifer), neither of which purchased the notes at issue and which do not claim they were the investor audience expressly targeted by the private placement memoranda. See footnote 28 of this opinion. Indeed, Milbank Tweed's challenge to named Plaintiffs' standing appears justified since this action, though consolidated with *Newby* for pretrial matters, is separate from the *Newby* class action even though it adopts the *Newby* complaint. Procedurally, the Regents has

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 21

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

not moved to be nor been designated as Lead Plaintiff in this suit, nor shown that it met the PSLRA's prerequisites to do so.

As alleged material misrepresentations by Milbank Tweed in violation of the 1934 Act, Plaintiffs first point to the offering memoranda's incorporation by reference of Enron's purportedly fraudulently "doctored" financial statements and reports.

This Court previously adopted the standard of the SEC for determining under § 10(b) if a secondary party is a primary violator in making a material public misrepresentation. *Enron,* 235 F.Supp.2d at 585-91. Emphasizing that a plaintiff must adequately plead and ultimately demonstrate the elements of scienter and reliance under the heightened requirements of the PSLRA, this Court quoted from an SEC brief,

"[W]hen a person, acting alone or with others, creates a misrepresentation [on which the investor-plaintiff relied], the person can be liable as a primary violator ... if ... he acts with the requisite scienter."..."Moreover it would not be necessary for a person to be the initiator of a misrepresentation in order to be a primary violator. Provided that a plaintiff can plead and prove scienter, a person can be a primary violator if he or she writes misrepresentations for inclusion in a document to be given to investors, even if the idea for those misrepresentations came from someone else."... Furthermore, "a person who prepares a truthful and complete portion of a document would not be liable as a primary violator for misrepresentations in other portions of the document. Even assuming such a person knew of misrepresentations elsewhere in the document and thus had a requisite scienter, he or she would not have created those misrepresentations. "[citations omitted]

*11 *Id.* at 588.

Here, admittedly, there were multiple contributors of information to each of the offering memoranda, but Plaintiffs have not identified those portions written by Milbank Tweed, no less shown that Plaintiffs relied on Milbank Tweed's statements. What Milbank Tweed is not alleged to

have written is important. As Milbank Tweed points out, it is not alleged to have created, prepared, nor provided Enron with advice regarding, Enron's financial statements and reports, nor to have represented Enron with respect to issuing them or filing them with the SEC. The offering memoranda, although varying in the language used, expressly claim that the information incorporated by reference was furnished by Enron and by the issuers; moreover the memoranda state that the initial purchasers, whom Milbank represented, do not warrant the accuracy or completeness of that information.[FN51]They also state that the parties providing the information (Enron or the issuers) are responsible for the accuracy of the information they have provided. Plaintiffs have also failed to allege whether Milbank Tweed or any other contributors of information in the offering memoranda had final control over the memoranda's contents. More important, in light of Milbank's sophistication and expertise in the securities area, as evidenced in its own brochures and advertisements as well as claimed by Plaintiffs, while the Court finds somewhat disingenuous Milbank's blanket statements that it lacked knowledge and skills to review and/or did not examine Enron's accounting or its financial statements, Plaintiffs have not met their burden to allege specific facts that show Milbank Tweed knew about, or with severe recklessness ignored signs of, the alleged fraudulent accounting and misleading financial statements, no less that it knowingly drafted the alleged misrepresentations for inclusion in the offering memoranda. They have not shown that Milbank Tweed knew that it was publishing materially false information or that it was severely reckless in publishing this information. *Abrahms v. Baker Hughes, Inc.,* 292 F.3d 424, 430 (5th Cir.2002).

FN51. For example, the Yosemite I offering memorandum (# 21, McGuinness Decl., ex. 7 at ii-iii) provides, "Enron with respect to the information appearing under 'Description of Enron' ... accepts responsibility ... for the information contained in this Memorandum ... with respect to the information provided by such party under the applicable heading.";

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 22

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

the Osprey 1, ex. 5 at ii, states, "The information contained and incorporated by reference in this offering memorandum has been furnished by the issuers and Enron. The initial purchasers [represented by Milbank Tweed] make no representation or warranty as to the accuracy or completeness of any such information...."

Plaintiffs charge that Osprey was designed to permit Enron to dump losing investments and thereby "cook its books." The offering memoranda, at the time they were written by Milbank Tweed, state that no assets would be purchased by Whitewing before the closing of the offerings. *See* footnote 24 of this opinion. Moreover, the memoranda warn that Enron by internal negotiations would determine the price and conditions of Whitewing's acquisitions and that there was no guarantee that they would be as favorable as what might be offered by an independent third party. *Id.* Plaintiffs have not alleged facts showing how Milbank Tweed, at the time it drafted the memoranda, would have known what assets of Enron would be acquired by the Osprey Trust, at what price, and under what terms. In addition, the offering memoranda on their face expressly state in capital letters that they are intended for QIBs as defined under Rule 144A, 17 C.F.R. § 230.144A; [FN52] such investors are sophisticated and experienced and would recognize potential danger in such a warning. Moreover, Plaintiffs allege no facts demonstrating that Milbank Tweed knew before any purchases of Enron assets by Whitewing, or after it structured and documented these transactions, what the terms and conditions of any sale were.

> FN52.*See generally* this Court's discussion of public and private offerings in *In re Enron Corp. Securities, Derivative & " ERISA" Litig.,* 310 F.Supp.2d 819, 860-66 (S.D.Tex.2004).

**\*12** Plaintiffs also complain that the first pages of the Osprey and Marlin offering memoranda inaccurately state that Enron does not guarantee the notes at issue and that the memoranda failed to

disclose to prospective investors the trigger events that would activate substantial financial obligations for Enron. The Court disagrees: the offering memoranda clearly disclose Enron's contingent liability based on defined trigger events. # 21 (McGuinness Decl.): ex. 5 at 7, 8-9 (Osprey I); ex. 6 at 1-2, 56-57 67, 82 (Osprey II); ex. 11 at 8, 91 (Marlin II). Moreover, the Court agrees with Milbank Tweed that the memoranda's statements that Enron was not guaranteeing the notes were not inconsistent with the disclosure of the trigger events, nor were they misrepresentations, because the trigger events were technically not a guarantee. [FN53] A nonperformance by the persons (or in this case, trusts) primarily liable under the notes (Osprey Trust or Marlin Trust) was not what triggered Enron's obligation, nor was that obligation the cash payment by Enron of the full amount owed by the trusts. Instead the trigger event was extraneous, i.e., a drop in Enron's credit rating or stock price. # 29 at 35.

> FN53.*See Black's Law Dictionary* at 705 (6 th ed. West 1990) defines "guaranty" as follows:
> A collateral agreement for the performance of another's undertaking.... A promise to answer for payment of debt or performance of obligation if the person liable in the first instance fails to make payment or perform obligation. An undertaking by one person to be answerable for the payment of some debt, or the due performance of some contract or duty, by another person, who himself remains liable to pay or perform the same. A promise to answer for the debt, default, or miscarriage of another person.

Without having pled a specific public material misrepresentation made with scienter by the law firm, Plaintiffs have failed to state a claim against Milbank Tweed under § 10(b) and Rule 10b-5(b).

As for scheme liability under § 10(b) and Rule 10b-5(a) or (c), Plaintiffs claim that the law firm's role in designing, structuring and documenting fifteen, similar, fraudulent transactions to lure in investors as part of the alleged *Ponzi* scheme makes it liable. This Court has previously concluded that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 23

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

scienter may be partially satisfied by pleading facts showing a defendant's "regular pattern of related and repeated conduct," such as the alleged designing, structuring, and documenting of the fraudulent transactions charged here, "deliberate and repeated actions with shared characteristics ... through which Defendants all profited handsomely, many exorbitantly. The very pattern that is alleged undermines claims of unintentional or negligent behavior and supports allegations of intent to defraud. Furthermore, the intrinsic nature of these devices and contrivances was fraudulent so that those intimately involved in structuring the entities and arranging the deals, especially more than one, would have to have been aware that they were an illicit and deceptive means to misrepresent Enron's actual financial state and mislead investors about securities, or at minimum, would have had to have been severely reckless as to that danger."*Enron,* 235 F.Supp.2d at 694-95.

As indicated, Plaintiffs have failed to plead facts demonstrating that Milbank Tweed profited in any way beyond its usual fees. Nor do they identify any other motive. There are no allegations that Milbank Tweed traded in Enron stock, received bonuses linked to the corporation's earnings, invested in Enron's partnerships, nor profited in any other way from the alleged fraud.

**\*13** Furthermore, those transactions that are pled regarding Milbank Tweed's role as a purported primary violator in the alleged overall scheme are reduced by a limitations bar (footnote 42 of this opinion) and by statutory requirements. The Court has found that any claims that might have arisen out of four of the fifteen targeted transactions involving Milbank (1) Mahonia VI prepay, December 1997; (2) $250,000,000 Mahonia VII prepay, June 1998; (3) $1,150,000,000 Marlin 1 transaction, December 1998; and (4) $475,000,000 Firefly minority interest, December 1998) are time-barred, although they may help support an inference of scienter. Moreover, the Commercial Financial Transactions, composed of three time-barred transactions (Mahonia VI, Mahonia VII, and Firefly) and three others, Mahonia XI prepay, Pelican Bidder/Enron Swap financing, Sundance Industrial financing, were not "in connection with" security sales or

purchases.[FN54]Thus, even if these six transactions provide support for a finding scienter, only nine transactions remain as a potential basis for § 10(b) and Rule 10b-5(a) or (c) liability claims.

> FN54. Also, as pointed out by Milbank Tweed, there are no factual substantive allegations in the Amended Complaint as to what Milbank Tweed did or knew with respect to Pelican Bidder and Sundance.

Furthermore, given the special privilege accorded to attorneys in their actions on behalf of their clients, given counsel's duties of loyalty, confidentiality, and zealous representation, simply noting counsel's repeated involvement in nine transactions on behalf of its institutional/initial-investor clients is insufficient under the law, as the law existed before enactment of the Sarbanes-Oxley Act, to partially establish scienter or to allow a third party to impose liability on Milbank Tweed for legal services on behalf of its clients. *See generally Enron,* 235 F.Supp.2d at 598-611. This Court has determined that in the securities context that attorneys who affirmatively elect to "speak[ ] out, whether individually or as essentially an author or coauthor in a statement or report, whether identified or not, about their client's financial condition, do have a duty to third parties not in privity not to knowingly or with severe recklessness issue materially false statements on which they intend or have reason to expect that those third parties will rely."*Id.* at 610.

As noted, Plaintiffs have failed to identify with the particularity required by the PSLRA any material misrepresentations in Milbank Tweed's only alleged statements to third parties, i.e., the offering memoranda for the Osprey, Marlin and Yosemite notes. As for any alleged fraud by omission, Plaintiffs have not alleged that Milbank Tweed had the duty to disclose such omissions to Plaintiffs. Nor, as noted, have Plaintiffs alleged sufficient facts to give rise to a strong inference of scienter. Nor have they shown why Milbank Tweed would have reason to expect purchasers of public Enron securities generally to have relied on the offering memoranda. Because Plaintiffs fail to show

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                   Page 24

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

that Milbank Tweed, with scienter, spoke out in materially false statements to third-party investors in Enron-related securities generally, Plaintiffs fail to state a claim against the law firm under § 10(b) /Rule 10b-5(a) or (c).

**\*14** Because the pleadings are deficient in these ways, the Court need not reach the issue of pleading of loss causation under *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S.Ct. 1627 (2005).

Finally, because these pleading deficiencies are not cured in Plaintiffs' allegations in their opposition to the motion to dismiss about the Sundance deal with Citigroup (# 29 at 65-66 n. 17) and the Pelican Bidder with CFSB, Vinson & Elkins, and Enron (*id.* at 72 n. 19), the Court denies Plaintiffs' request for leave to amend.

Goldman Sachs

A. Allegations

Goldman Sachs & Company is the investment banking arm of, and is owned by, The Goldman Sachs, Group, Inc.,[FN55] an integrated global banking, securities and investment management firm that offers financial advisory and underwriting services, issues research through analyst reports on global markets and growth sectors to corporations and institutional investors, as well as providing market-making, merchant banking, and clearing services. Goldman Sachs was added to this case by the Amended Complaint.

> FN55. When discussing both, the Court refers to them as "Goldman Sachs."

Goldman, Sachs & Co. was lead underwriter for the 1999 $222.5 million offering of Enron's 7% Exchangeable Notes, due July 31, 2002, mandatorily exchangeable into the common stock of

Enron Oil and Gas ("EOG"), first offered to the public on August 10, 1999, and for which Plaintiffs allege it is liable for negligently filing a false registration statement under § 11 of the 1933 Act. Plaintiffs allege The Goldman Sachs Group, Inc., as a control person of Goldman Sachs & Co., is liable under § 15 of the same Act. Plaintiffs expressly state that they are not alleging fraud against Goldman Sachs.

Plaintiffs assert that Goldman Sachs failed to make a diligent and reasonable investigation and had no reasonable grounds to believe that the statements in the Registration Statements and Prospectuses at the time they became effective were true; in essence they claim Goldman Sachs' involvement as an underwriter in this single offering should have alerted Goldman Sachs to uncover the fraud.

B. Motion to Dismiss

Claiming that it is now public knowledge that Goldman Sachs was an outsider with respect to Enron, deliberately excluded from Enron's banking business, and, in fact, adverse to Enron as early as 1997 in the Portland General merger and in its subsequent divorce from EOG, an independently operated company affiliated with Enron that was 55% owned by Enron, Goldman Sachs maintains that it became involved in the August 1999 Exchangeable Notes underwriting only because it had been representing an independent Special Committee of EOG in the 1998-99 arms'-length negotiations in an effort to reacquire most of Enron's interest in EOG and raised $600 million for that transaction by an underwriting of EOG securities. Because Enron realized that Goldman Sachs was marketing EOG to the same investors that might purchase the Exchangeable Notes, which would constitute an interest in EOG upon their exchange, Enron asked Goldman Sachs to participate in the August 1999 Notes offering.[FN56]

> FN56. Salomon Smith Barney and Bank of America Securities LLC served as the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 25

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

other underwriters on the Notes offering.

*15 Emphasizing its minimal involvement in underwriting one offering of Enron securities in comparison to the more extensive role other defendant entities, Goldman Sachs highlights the fact that the Exchangeable Notes offering was the only offering, and indeed its sole relevant involvement, that Goldman Sachs had with Enron during the entire Class Period.[FN57] Moreover with respect to allegations that the registration statement and prospectus contained false statements, Goldman Sachs responds that the registration statement and prospectus, and Form S3 filings for the prospectus, which the complaint alleges were false and misleading, were substantively consistent with the financial statements that Enron had filed with the SEC setting out its financial results for 1997, 1998, and the first quarter of 1999. These SEC filings incorporated by reference Enron's quarterly financial statements reviewed by Arthur Andersen and Enron's annual financial statements, which had received unqualified audit opinions from Arthur Andersen. Andersen had also given written consent to the incorporation of its audit opinions for Enron's 1997 and 1998 annual financial statements.

> FN57. Plaintiffs respond that there in no " one free pass defense" under the securities laws and that a single underwriting can give rise to liability. They note that the Court has already found a properly stated § 11 claim against Goldman Sachs based on its underwriting of the same offering in H-02-3185, *Silvercreek Management, Inc., et al. v. Salomon Smith Barney, Inc. et al.,* instrument # 67. Nor is there authority for the contention that an underwriter is relieved of its duty of due diligence if false or misleading statements are well secreted or complex. Furthermore, disagreeing that Goldman Sachs was involved with Enron only with respect to this Exchangeable Notes underwriting, Plaintiffs as an example point to a *Wall Street Journal* article reporting that Goldman Sachs was consulted by Enron about Yosemite financing and that Jeff McMahon informed

Goldman Sachs that Enron needed to keep investors in the dark about transactions underlying Yosemite, i.e., the Delta prepays. # 23 at 6 n. 3.

Goldman Sachs argues that the § 11 claims against it should be dismissed first because in the *Newby* amended complaint, incorporated by reference into the complaint here,[FN58] Plaintiffs' extensive and specific allegations of the elaborate fraud and the extreme secrecy with which it was effected, which precluded an outsider from discovering any scheme, should negate the single, conclusory allegation against Goldman Sachs that it should have uncovered the fraud because of its single underwriting.

> FN58. Goldman Sachs notes that it is not even mentioned in the detailed *Newby* complaint.

Second, the § 15 control person claim fails for three reasons: (1) there is no underlying Section 11 claim against Goldman, Sachs & Co.; (2) the § 15 claim is time-barred [FN59] because the tolling agreement relied upon by Plaintiffs was signed only by Goldman, Sachs & Co., does not purport to bind "parents" or "affiliates," [FN60] and thus does not cover claims against The Goldman Sachs Group, Inc., which are therefore deemed filed on January 9, 2004; and (3) Plaintiffs have failed to plead the elements of controlling person liability.

> FN59. The 1933 Act's statute of limitations is one year after discovery, but in no event more than three years after the securities were offered to the public. 15 U.S.C. § 77m . The Exchangeable Notes were offered to the public on August 10, 1999. The tolling agreement, dated April 4, 2002, between the Regents of the University of California and Goldman, Sachs & Co., stated that any claims that might brought by Lead Plaintiff arising out of Goldman, Sachs & Co.'s relationship with Enron, were tolled and if and when filed, would be deemed to have been filed on April 4, 2002 for limitations

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

purposes, *inter alia.* This suit was actually filed on January 9, 2004.

FN60. The tolling agreement states that it binds "each of the parties and their respective successors, assigns, and legal representatives." # 18, Ex. A at ¶ 3.

Plaintiffs respond that they have pled a *prima facie* case against Goldman Sachs under §§ 11 and 15 and that in the context of a motion to dismiss, the Court must take allegations by the plaintiff as true and resolve all ambiguities in its favor. They maintain that Goldman Sachs' due diligence argument is an affirmative defense on which the underwriter bears the burden of proof and which is properly raised after the motion to dismiss is denied. *Enron,* 258 F.Supp.2d at 639 ("Lead Plaintiff does not have the burden of pleading and proving Defendants' affirmative defenses of due diligence and/or reliance on an expert's opinion under § 11(b)(3), which expressly places that burden on Defendants. Nor is the fact-specific determination of 'the reasonableness' of a defendant's investigation or of his reliance on the opinion of an expert 'a question properly resolved on a motion to dismiss.'[citation omitted]").

**\*16** As for the tolling agreement and the time-bar, Plaintiffs assert that there is a fact issue whether the parent corporation, The Goldman Sachs Group, is bound by the subsidiary's agreement, especially in light of the control person claim against the parent and the fact that Goldman Sachs holds itself out as an integrated financial services organization (¶ 15). Plaintiffs argue that the question should not be resolved based on pleadings. They further point to the Court's earlier ruling that where the named party defendant, e.g., a parent corporation, is challenged as the wrong defendant, the question should be addressed by appropriate motion with evidence and a brief, and the issue might not be resolvable even on summary judgment. [FN61]*Enron,* 235 F.Supp.2d at 648 n. 85; # 1392 at 2 in *Newby.*

FN61. Goldman Sachs objects to the parallel because unlike Plaintiffs here, the

*Newby* complaint alleged actual involvement in the wrongdoing by the affiliates. Moreover, Goldman Sachs contends that it is well established that principles of contract and agency law govern whether an affiliated non-signatory to a contract is bound by that agreement. *Bridas A.A.P.I.C. v. Gov't of Turkmenistan,* 345 F.3d 347 (5th Cir.2003), *cert. denied sub nom.State Concern Turkmenneft v. Bridas,* 541 U.S. 937 (2004). In Bridas, which addressed an arbitration agreement, the Fifth Circuit held that federal courts have recognized six theories under which an affiliated non-signatory to a contract may be bound by that contract: "(a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary."*Id.* at 355. Goldman Sachs emphasizes that none of these theories has been pled in the complaint nor have supporting factual allegations been made.

Goldman Sachs urges the Court to find that the allegations on the face of the complaint establish their affirmative defense and therefore dismissal under Rule 12(b) is proper. The Court observes that a review of its submission demonstrates that rather than relying on allegations in the complaint in H-04-0088, Goldman Sachs' motion is grounded in the incorporated *Newby* complaint, with its general allegations of fraud and concealment of information about Enron's financial state, *inter alia* against other underwriters, and to Goldman Sachs' claims in its own brief.[FN62]Because the *Newby* complaint did not name Goldman Sachs as a defendant nor make any allegations against it, the Court finds that the *Newby* complaint is relevant but not controlling or clearly determinative of the current claims against Goldman Sachs.[FN63]The Court finds that the claims in *Newby* are not sufficient to justify dismissal of the claims on H-04-0088's pleadings under Rule 12(b)(6). Nor are contentions made by Goldman Sachs in its own brief.

FN62. Another key distinction is that some

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 27

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

of the *Newby* complaint's § 11 claims against similarly situated defendants were grounded in fraud.

FN63. Goldman Sachs distinguishes the Court's denial of dismissal of claims against it in *Silvercreek* on the grounds that the *Silvercreek* complaint did not incorporate the *Newby* complaint's detailed allegations of secrecy and other defendants' intimate relationships with Enron that Goldman Sachs here claims precluded its discovery of the fraud.

An underwriter is a "person who buys securities directly or indirectly from the issuer and resells them to the public."*In re WorldCom, Inc. Sec. Litig.,* 308 F.Supp.2d 338, 343 (S.D.N.Y.2004) .Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k(a), creates a private cause of action against underwriters, *inter alia,* for filing a registration statement any part of which "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading."In passing the provision, Congress imposed a stringent standard of liability on underwriters and others playing a direct role in a registered offering to "provide the necessary incentive to ensure their careful investigation of the offering" to protect investors by making the underwriters responsible for the truth of the registration statement and prospectus. *In re WorldCom, Inc. Sec. Litig.,* 346 F.Supp.2d 628, 657 (S.D.N.Y.2004) (quoting "The Regulation of Securities Offerings, SEC Release No. 7606A, 63 Fed.Reg. 67174, 67230, 1998 WL 833389 (Dec. 4, 1998)) (addressing underwriters' defenses of due diligence and reliance on WorldCom's audited financial statements on summary judgment), *subsequent determination,* No. 02 CIV 3288 DLC, 2005 WL 668790 (S.D.N.Y.2005).

**\*17** For a claim against an underwriter under § 11, a plaintiff need only allege that the plaintiff purchased a security and that the registration statement contained a false and misleading statement regarding a material fact. *Herman & MacLean v. Huddleston,* 459 U .S. 375, 381-82

(1983); *In re Enron Corp. Sec. Litig.,* 258 F.Supp.2d 576, 594-95 (S.D.Tex.2002). Unlike claims under § 10(b), under § 11 a plaintiff generally does not have to establish scienter, causation (materiality) or reliance. *Herman & MacLean,* 459 U.S. at 381-82;*Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1222 (1ˢᵗ Cir.1996) ; *Enron,* 258 F.Supp.2d at 639. For such claims that are not grounded in fraud, but in strict liability or negligence, the plaintiff need not meet heightened pleading standards nor demonstrate scienter. *Enron,* 258 F.Supp. at 639;*In re Enron Corp. Sec. Litig.,* 235 F.Supp.2d 549, 596 (S.D.Tex.2002).

Plaintiffs contend that Enron's 2001 restatement of its previously issued financial reports from 1997-2000, incorporated by reference into the registration statement and prospectus, establishes that they were false. The Court agrees that this contention is sufficient to allege the requisite false statements under § 11 for purposes of a Rule 12(b)(6) motion.

Section 11(b) offers the underwriter two affirmative due defenses: (1) the first, dubbed by courts as the "due diligence defense," employing a negligence standard, applies to the "non-expertised" portions (i.e., those portions not constituting or not relying on an expert's opinion) of the registration statements and relieves an underwriter of liability if, after a reasonable investigation by the underwriter, it had reasonable grounds to believe and did believe that at the time the registration statement became effective, that the registration's statements were true and not misleading (15 U.S.C. § 77k(b)(3)(A)); and (2) the "reliance defense," which applies when the underwriter is entitled to rely on any portion of the registration statement purported to be made on the authority of an expert's opinion and which relieves the underwriter of liability if, at the time the registration statement became effective, it had no reasonable grounds to believe and did not believe, that the statements in the registration statement were untrue or that there was an omission of material fact necessary to make the statements not misleading (15 U.S.C. § 77k(b)(3)(B)).*WorldCom,* 346 F.Supp.2d at 662-63. The standard for determining what constitutes a reasonable investigation under the due diligence defense and what constitutes a reasonable

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 28

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

ground for belief is identical: the standard of reasonableness of a prudent man in the management of his own property. 15 U.S.C. § 77k(c); *WorldCom*, 346 F.Supp.2d at 663.

There is little judicial authority regarding what is required to establish either of the two defenses, but those courts that have addressed the questions have provided some guidance.

**\*18** Accountants are among those identified as " experts" in section 11(a)(4), 15 U.S.C. § 77k(a)(4), and audited financial statements are considered expertised portions of a registration statement. *WorldCom*, 346 F.Supp.2d at 664,*citing In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 623 (9th Cir.1994), and *Enron*, 235 F.Supp.2d at 613. As explained by Judge Cote,

While financial statements are prepared by the management of a company, an accountant serving as the company's auditor may give an opinion as to whether the financial statements have been presented in conformity with [generally accepted accounting principles ("GAAP") ]. This opinion is given after the accountant has performed an audit of the company's books and records. Audits are generally completed once a year in connection with a company's year-end financial statements. There are ten audit standards with which an auditor must comply in performing its annual audit. They are known as Generally Accepted Auditing Standards (" GAAS"). If an auditor signs a consent to have its opinion on financial statements incorporated into a company's public filings, the opinion may be shared with the public through incorporation.

Public companies are also required under the Exchange Act to file quarterly financial statements which are referred to as interim financial statements. While not subject to an audit, interim financial statements included in Form 10-Q quarterly reports are reviewed by an independent public accountant using professional standards and procedures for conducting such reviews, as established by GAAS....

*WorldCom*, 346 F.Supp.2d at 664.

The underwriter may rely on an accountant's opinion as an expert opinion for a reliance defense

under § 11(b)(3)(C) if three prerequisites are satisfied: (1) the opinion must be reported in the registration statement; (2) it must be an audit opinion; and (3) the accountant must have consented to its incorporation into the registration statement. *Id.* at 664-65.Reviews of unaudited interim financial statements, even where the auditor provides the underwriter with a "comfort letter" containing representations about the auditor's review of the interim financial statement, do not constitute such opinions and are not considered to be expertised statements for purposes of a reliance defense; thus the underwriter must demonstrate affirmatively that after conducting a reasonable investigation, that it had a reasonable ground to believe and did believe that the unaudited interim financial data was true.*Id.* at 665-66.Furthermore, there are no rigid or clear standards or rules for measuring what is reasonable, since that determination varies with the circumstances of each case, but an underwriter's reliance on audited financial statements may not be automatic. *Id.* at 672-73.What constitutes a "red flag" or "storm warning" in the context of § 11 claims that would demonstrate that a defendant had "no reasonable ground to believe and did not believe" that the expertised portions of a registration statement are true "depends upon the facts and context of a particular case."*Id.* at 673.For instance in *Software Toolworks*, 50 F.3d at 623-24, the backdating of a sales contract so the company could recognize revenue in a particular fiscal year could have constituted a red flag that should have deprived the underwriters of their reliance defense had they not demanded that the auditor explain its accounting, provide written confirmation of certain contracts, and confirmed the auditor's accounting method with other accounting firms. *Id.* at 673.Where red flags appear, the underwriter must "look deeper and question more" in its due diligence investigation. *Enron*, 235 F.Supp.2d at 707,*cited in WorldCom*, 346 F.Supp.2d at 677. "[T]he existence of red flags can create a duty to investigate even audited financial statements."*WorldCom*, 346 F.Supp.2d at 679.

**\*19** The degree of diligence required of underwriters to establish a defense under § 11 has not been clearly defined. In *Escott v. BarChris*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 29

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

*Constr. Corp.,* 283 F.Supp. 643, 697 (S.D.N.Y.1968), even though the lead underwriter or its attorney read annual reports and prospectuses of other companies in the field and the issuer's earlier prospectuses, annual reports, recent unaudited interim financial statements, and major contracts, as well met with and asked pertinent questions and received satisfactory answers that resulted in revisions of the prospectus at issue, the court found that the underwriter had not performed a reasonable investigation because it made "almost no attempt to verify management's representations," but relied instead on the representations of the company's officers or its counsel. *Id.;WorldCom,* 346 F.Supp.2d at 674. In *Feit v. Leasco Data Processing Equip. Corp.,* 332 F.Supp. 544, 582 (E.D.N.Y.1971), the Honorable Jack B. Weinstein reiterated, " 'Tacit reliance on management assertions is unacceptable; the underwriters must play devil's advocate" ' and demonstrate " 'a high degree of care in investigation and independent verification of the company's representations." ' *WorldCom,* 346 F.Supp.2d at 675-76 *(quoting Feit ).See also Software Toolworks,* 50 F.3d at 615; *Phillips v. Kidder, Peabody & Co.,* 933 F.Supp. 303, 318, 319 n. 11, 323 (S.D.N.Y.1996), *aff'd,*108 F.3d 1370 (2d Cir.1997), all discussed in *WorldCom,* 346 F.Supp.2d at 676-77.

As for the section 11 claims against Goldman Sachs based on alleged misrepresentations in a registration statement and prospectus, the Court finds that Plaintiffs have met the undemanding standard for pleading such a claim. Furthermore, the arguments of Goldman Sachs based on due diligence and reliance on financial statements expertised by Arthur Andersen's review are clearly defenses not properly raised to a 12(b)(6) motion; indeed they raise fact issues that may even preclude summary judgment. *See, e.g., In re Software Toolworks Inc. Sec. Litig.,* 50 F.3d 615 (9th Cir.1994) (addressed on summary judgment); *In re WorldCom, Inc. Sec. Litig.,* 346 F.Supp.2d 628 (S.D.N.Y.2004) (addressing underwriters' defenses of due diligence and reliance on WorldCom's audited financial statements on summary judgment), *subsequent determination,* No. 02 CIV 3288 DLC, 2005 WL 668790 (S.D.N.Y.2005); *Phillips v. Kidder, Peabody & Co.,* 933 F.Supp. 303, 323

(S.D.N.Y.1996) (addressed on summary judgment), *aff'd,*108 F.3d 1370 (2d Cir.1997); *Escott v. BarChris Constr. Corp.,* 283 F.Supp. 643 (S.D.N.Y.1968) (addressed after a bench trial); *Feit v. Leasco Data Processing Equip. Corp.,* 332 F.Supp. 544 (E.D.N.Y.1971) (addressed after a bench trial).

With respect to claims under § 15, the Court notes that it has previously ruled that under the Fifth Circuit standard, a plaintiff need only allege the power to control the controlled person, and not the actual exercise of control and participation in the fraud. Although questioning that ruling, Goldman Sachs claims that Plaintiffs have not even alleged how The Goldman Sachs Group, Inc. had the power to control Goldman, Sachs & Co.'s conduct. *Enron,* 235 F.Supp.2d at 565 ("[A] plaintiff needs to allege some facts beyond a defendant's position or title that show that the defendant had actual power or control over the controlled person."). This Court agrees, but because dismissal on pleadings without an opportunity to replead is a harsh remedy and because the pleading standard for such a claim is low in comparison with that under other securities law provisions, the Court grants leave to Plaintiffs to amend or supplement the current complaint to attempt to state a controlling person claim against The Goldman Sachs Group, Inc.

*20 Accordingly, the Court

ORDERS the following:

(1) Milbank Tweed's motion to dismiss the claims against it (# 20) is GRANTED;

(2) Goldman Sachs' motion to dismiss (# 17) is DENIED; and

(3) Plaintiffs' request for leave to amend is GRANTED as to control person claims and the limitations challenge (explaining why the parent corporation, The Goldman Sachs Group, is bound by the subsidiary's tolling agreement) against The Goldman Sachs Group under § 15. Plaintiffs shall file a supplement or amended complaint within twenty days of entry of this order. Goldman Sachs shall file a timely answer.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 30

Not Reported in F.Supp.2d, 2005 WL 3704688 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**


S.D.Tex.,2005.
In re Enron Corp. Securities, Derivative &
"ERISA" Litigation
Not Reported in F.Supp.2d, 2005 WL 3704688
(S.D.Tex.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.