# EXHIBIT 3

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**
In re ESS Technology, Inc. Securities Litigation
N.D.Cal.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
In re ESS TECHNOLOGY, INC. SECURITIES
LITIGATION
No. C-02-04497 RMW.

Dec. 1, 2004.

Luke O Brooks, Patrick J. Coughlin, Lionel Z.
Glancy, Michael M. Goldberg, John K. Grant,
Robert A. Jigarjian, William S. Lerach, Kevin Ruf,
David R. Scott, for Plaintiff(s).
Meredith N. Landy, for Defendant(s).

ORDER ON DEFENDANTS' MOTION TO
DISMISS PLAINTIFF'S SECOND AMENDED
COMPLAINT AND STRIKE PORTIONS
THEREOF

WHYTE, J.

[Re Docket No. 89]

*1 This Document Relates to: ALL ACTIONS.

Currently before the court is the motion by
defendants ESS Technology, Inc. ("ESST"), Robert
L. Blair ("Blair"), Patrick Ang ("Ang"), Frederick
S.L. Chan ("Chan"), and James Boyd ("Boyd")
(collectively "defendants") to dismiss lead plaintiff
Steve Bardack's ("Bardack" or "plaintiff") Second
Amended Complaint ("SAC") or to strike portions
thereof. Plaintiff opposes the motions. The motion
was heard on March 19, 2004. The court has read
the moving and responding papers and heard the
argument of counsel. For the reasons set forth
below, the court denies the motion to dismiss Count

I as to defendants Blair, Boyd and ESST except as
to allegations of fraud committed prior to February
27, 2002.[FN1] Those allegations are stricken and
dismissed. The motion to dismiss Count I as to
defendants Ang and Chan and Count III as to
defendant Chan is granted. The motion to dismiss
Count II is denied as to all defendants.

> FN1. Defendants have not moved to strike
> claims on behalf of class members who
> purchased ESST shares after February 27,
> 2002.

I. BACKGROUND

A. General Nature of Case

This is a securities fraud action brought on
behalf of a proposed class of persons who
purchased the publicly-traded securities of ESST
between the dates of January 23, 2002 and
September 12, 2002 ("class period"). Plaintiff
contends that certain ESST officers and directors
made false and misleading statements concerning
ESST's operations and the prospects for the year
2002. Plaintiff alleges that in December 2001,
ESST's founder, defendant Chan, learned that one
of ESST's competitors, MediaTek, had developed a
superior competing chip that would be offered at
approximately the same price as ESST's chip, and
that at least one of ESST's largest customers,
Shinco, intended to shift its business to MediaTek.
From this foundation, plaintiff alleges that various
statements made by defendants between January 23,
2002 and September 12, 2002 with respect to
ESST's financial outlook were false and misleading.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

**B. Procedural Background**

Plaintiff filed this securities fraud action on September 13, 2002. On January 21, 2003, the court appointed plaintiff Barrack to serve as lead plaintiff for the proposed class. Barrack then filed an amended complaint on February 6, 2003, which defendants moved to dismiss. However, prior to the noticed May 23, 2003 hearing on the motion, the parties submitted a stipulation allowing plaintiff to file an amended complaint and taking defendants' motion off calendar.

Plaintiff then filed a First Amended Complaint ( "FAC"),[FN2] on May 20, 2003. The FAC alleged three causes of action: (1) violation of section 10 of the 1934 Act and Rule 10b-5 promulgated thereunder as against all defendants; (2) violation of section 20(a) of the 1934 Act against the individual defendants; and (3) violation of section 20A of the 1934 Act against defendant Chan. Defendants again moved to dismiss on June 18, 2003. On October 3, 2003 the court granted defendants' motion to dismiss with 30 days leave to amend the complaint.

> FN2. This was actually the second amended complaint filed by Barrack.

**\*2** On November 3, 2003 plaintiff filed a Second Amended Complaint ("SAC"). Defendants now move to dismiss the SAC.

**C. Plaintiff's Allegations**

Plaintiff alleges that starting on January 23, 2002 with ESST's announcement of fourth quarter results for 2001, and continuing through September 12, 2002 when ESST revised earnings and revenue downward, defendants misled investors by making a number of false and misleading statements designed to boost the price of the stock. SAC ¶¶ 22-37. One motivation for this purported scheme was the February 1, 2002 Secondary offering of 5.52 million shares of ESST stock, which raised $45 million for ESST at a price of $19.38 per share. SAC ¶ 21. According to plaintiff, negative news

about the loss of a major customer, Shinco, was on the horizon, yet defendants failed to reveal such information. This omission allegedly kept the share price inflated, which gave defendants Chan, Boyd, and Blair an opportunity in the following months to take profits before the release of negative information.

Plaintiff's argument focuses in part on his allegation that ESST's management advised analysts at A.G. Edwards on September 9, 2002 that the third quarter was tracking as expected, just three days before ESST announced that the third quarter revenues would be between $60 and $64 million, down from the previous estimate of $86 to $90 million, and that net earnings would be between $.13 and $.21 instead of between $.35 and $.38. SAC ¶ 35, Ex. 2. Plaintiff asserts that ESST knew before the September 9 report to A.G. Edwards that it would not meet earnings estimates because, in a conference call on October 23, 2002, Boyd, the Chief Financial Officer for ESST, admitted *"by the late part in August* it became obvious there was going to be a problem with the quarter."SAC Ex. 4 (emph.added).

**D. Factual Background**

Defendant ESST is a designer, developer, and marketer of highly-integrated digital processor chips used in multimedia applications. SAC ¶ 13. ESST chips are the primary processors driving digital video and audio players including DVD, video CD and MP3 players. *Id.* Defendant Chan is ESST's founder and chairman. Defendant Blair is ESST's president and chief executive officer. Defendant Boyd is ESST's chief financial officer, and defendant Ang is ESST's chief operating officer. SAC ¶¶ 14(a)-(d), 15. Plaintiff alleges that, with knowledge to the contrary as early as December 2001, defendant ESST made a number of positive statements in its filings and in conference calls during the January 23, 2002 to September 12, 2002 class period.

Plaintiff quotes heavily from numerous press releases and conference calls made by ESST during

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                           Page 3

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

the class period and appears to allege that they were all intentional falsehoods. Defendants made upward adjustments to expected first and second quarter revenues in conference calls and press releases. The forecasts were met. Defendant ESST failed, however, to meet its expected third quarter revenue estimates, which ultimately resulted in a 30% drop in ESST's share price. The public statements with which plaintiff takes issue can be divided generally into the following categories: (1) misleading statements leading up to the Secondary offering (SAC ¶¶ 21-22); (2) misleading statements regarding first quarter revenue and earnings (SAC ¶¶ 23-26); (3) misleading statements regarding second quarter revenue and earnings (SAC ¶¶ 27-28, 30); (4) misleading statements regarding third quarter revenue and earnings (SAC ¶¶ 29-30, 32-35); and (5) misleading statements about market share and competition (SAC ¶¶ 26-27, 31).

*3 During the class period, plaintiff claims that certain officers made optimistic forecasts, downplayed competitive pressures and potential customer defections, and predicted that ESST would continue to be the market leader in DVD chips. *See, e.g.,* SAC ¶¶ 26, 31.

A significant portion of plaintiff's allegations that defendants knowingly made misleading statements are based on information obtained from anonymous sources. The court first turns to the SAC's allegations with respect to the information provided by these unnamed witnesses. The court will then proceed to plaintiff's allegations concerning false statements made and finally to the allegations of scienter.

1. Information Provided By Confidential Witnesses

In an attempt to plead the requisite scienter, plaintiff presents information allegedly obtained from a number of confidential witnesses about defendants' knowledge of the MediaTek product and ESST's impending losses of sales.

a. Confidential Witness 1

Confidential Witness 1 ("CW1") voluntarily contacted plaintiff and "represented that he was involved in the preparation of ESST's financial results and had personal contact with Chan and defendant Blair."SAC ¶ 16(a). CW1 states:

that Chan learned in December 2001 from Steven Shen ("Shen") that MediaTek had developed a new DVD chip that combined the encoder function with the servo chip function, that the chip would be offered at the same price as a single ESST chip, resulting in a 50% price reduction and that four of ESST's largest customers, including Shinco, APEX, Chang Hong and TONIC intended to purchase the new chip and that Shinco had decided to shift at least 50% of its purchases [from ESST] to MediaTek.

*Id.* According to CW1, Chan assigned the company's Hong Kong director, Andy Ho, to confirm this information. Two days later, the Hong Kong director advised Chan that "ESST's customers intended to cut their purchases in six to twelve months."*Id.*

Chan then reportedly began looking to acquire a company with technology that could compete with MediaTek. Finally, CW1 "states that ESST reacted to the adverse information regarding the expected competition with MediaTek, by offering chips at lower prices to their existing customers so that the customers would stock-pile the DVD chips."*Id.*

Plaintiff provides no information about CW1's job title, tenure at ESST or job responsibilities. Although CW1 provides details about what Chan allegedly learned from Steven Shen about MediaTek's new DVD chip, and a potential shift in customer purchases in six to twelve months, plaintiff fails to state how CW1 came to learn of this information. Notably, plaintiff fails to establish a nexus between CW1's job responsibilities and his allegations, so there is no basis upon which to infer that CW1 had first hand knowledge of these events, or that he was basing his information on anything more than rumor. Further, CW1's allegations regarding customer purchase orders are vague as to what commitments those customers had actually

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

made. Since the information from CW1 lacks meaningful detail and evidence of reliability, it fails to support a 'strong inference' of scienter. Even accepting the veracity and reliability of CW1's contentions, defendants' actions after learning of this competing chip do not suggest that defendants knew that ESST would not meet its earnings projections.

b. Confidential Witness 2

**\*4** Confidential Witness 2 ("CW2") was employed as a software engineer at ESST's corporate headquarters during the class period. SAC ¶ 16(b). CW2 "states that in December 2001, ESST implemented a plan to reduce its workforce in response to expected competitive pressures in 2002."*Id.* CW2 "recalls being told by his supervisor in December 2001 that ESST had some 'tough times ahead' and that one of ESST's competitors was 'going to kick the * * * * out of us.' ' *Id.* CW2 also "recalls that during December 2001, Chan (who typically made one or two business trips to Asia a quarter) increased the frequency of his trips to Asia in response to competitive problems and slipping business in the Far East and made a number of trips in December," ostensibly to meet with customers in Asia who were threatening to cut orders. *Id.*

CW2 apparently has no firsthand basis for this information but relies instead on an unnamed source. [FN3]Accordingly, the information fails to meaningfully support a 'strong inference' of scienter. Even accepting CW2's basis as adequate, CW2 merely describes pressure from competitors and ESST's efforts to maintain market share.

> FN3. CW2 also alleges a slowdown in demand in December 2001, a plan to reduce workforce, "tough times ahead," and vague statements about ESST competitors taking market share. SAC ¶ 16(b). All of these allegations come from other unnamed sources, and CW2 has no firsthand basis for making them.

c. Confidential Witness 3

Confidential Witness 3 ("CW3") was employed as a senior software engineer during the class period and "confirms that ESST began laying off employees in December 2001."SAC ¶ 16(c). He does not provide a basis for his knowledge or his conclusion that the layoffs were in response to competitive pressure from MediaTek's new DVD chip.

d. Confidential Witness 4

Confidential Witness 4 ("CW4") was an employee in ESST's IT department during the class period and states "that beginning in late 2001 ESST was under considerable pressure to control costs" and that "ESST was threatened with losing some of its market share for its DVD chips."SAC ¶ 16(d).

CW4 provides no nexus between his job duties and his statement and no foundation upon which to conclude that the layoffs were in response to competitive pressures from MediaTek's new DVD chip or, more significantly, that the layoffs meant that defendants knew they could not produce and obtain the numbers represented.

e. Confidential Witness 5

Confidential Witness 5 ("CW5") was a senior design engineer at ESST during the class period. CW5 states "that he had discussions with colleagues in April 2002 regarding the competitive threat presented by MediaTek and how this was resulting in ESST losing market share."SAC ¶ 16(e). CW5 also "recalls that ESST did not have a chip that could compete with MediaTek's new offering."*Id.* As a senior design engineer, CW5 would presumably have technical knowledge about MediaTek's new chip and how it compared with ESST's product. However, no foundation is offered as to his knowledge about ESST's market share.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

### f. Confidential Witness 6

Confidential Witness 6 ("CW6") was an applications engineer at ESST during the class period and states that ESST started reducing employees in late 2001. SAC ¶ 16(f). In addition, CW6 attended a new DVD product demonstration in March 2001 and was told that a second session would be held in July 2001. CW 6 states that this second session was canceled due to failure of the DVD product at the initial test stage. This allegation regarding the reason for the cancellation lacks a basis for first hand knowledge and provides no specifics about the product demonstration, or its significance to the development by ESST of an upgraded chip, or ESST's ability to compete with MediaTek or other competitors.

### g. Confidential Witness 7

**\*5** Confidential Witness 7 ("CW7") was an employee at Shinco, one of ESST's customers who allegedly intended to transfer half of its ESST purchases to MediaTek. CW7 was a sales director during the class period and states that "he was responsible for sales of Shinco's DVD products and was familiar with Shinco's practices in dealing with suppliers."SAC ¶ 16(g). CW7 states that Shinco has started to shift to a new "system-on-a-chip" DVD chip in the first half of 2002. *Id.* CW7 further states that the design and production of DVD products is a six-to-eight month process as it requires considerable investment in research, development and testing, and opines that "Shinco would have advised ESST of the change to the new chip in late-2001."*Id.*

CW7 provides no basis for knowing first hand that Shinco's orders to ESST had decreased, or that ESST knew of Shinco's alleged plan to place fewer orders. Further, the allegation that Shinco "would have alerted ESST" in late 2001 of their shift to a new chip is speculative.

### h. Confidential Witness 8

Confidential Witness 8 ("CW8") was an ESST chip production planner during the Class period, responsible for planning and placing wafer and chip orders with ESST's wafer and chip manufacturers.[FN4]SAC ¶ 16(h). During the first quarter of 2002, CW8 states that Patrick Yeto, ESST's Vice President of Operations (who reported directly to Blair), directed the department to stop wafer and chip orders from these manufacturers as a result of MediaTek's competition. In August 2002, CW8 received an email from Yeto directing him to cut back production of certain DVD chips-representing over 30% of ESST's forecasted revenues-by 20% to 50%.

> FN4. Taiwan Semiconductor Manufacturing Company, United Microelectronics Corporation, Advanced Semiconductor Engineering, and Silterra.

CW8 also states that ESST's weekly sales flash reports in August 2002 were actually decreasing rather than increasing, and these reports were submitted directly to Blair.

CW8's statement about stopping the purchase of wafers in the first quarter of 2002 provides little specific information (e.g. the status of existing inventory, length of stoppage, etc.). The alleged August direction to cut production by 20% to 50%, although lacking specifics about the circumstances, does tend to bolster other evidence that by August ESST knew it would not make its third quarter earning forecasts.

### i. Confidential Witness 9

Confidential Witness 9 ("CW9") was an ESST Director of Sales responsible for supervising sales to DVD manufacturers in China during the class period. SAC ¶ 16(i). CW9 states that ESST knew by May 2002 that ESST was losing market share because of MediaTek's sales to ESST's customers, including Shinco.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 6

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

j. Confidential Witness 10

Confidential Witness 10 ("CW10") was an ESST Senior Marketing Manager also responsible for sales to DVD manufacturers in China during the class period. SAC ¶ 16(j). CW10 states that ESST realized it was losing market share to MediaTek and Zoran Corporation by early 2002, and that this loss would negatively impact earnings. ESST allegedly had specific knowledge of loss of market share at Shinco, and a loss to MediaTek of about 20%. This information was allegedly conveyed to Lawrence Ko, a supervisor in ESST's China office.

k. Confidential Witness 11

**\*6** Confidential Witness 11 ("CW11") was employed as a manager of sales administration by ESST during the class period. CW11 "was aware that competition from MediaTek constituted a significant problem in the second half of 2001 and that in late 2001 ESST was aware of a significant loss of business due to MediaTek's product introductions of advanced DVD chips."SAC ¶ 16(k). ESST's development of a competing chip was allegedly six to eight months behind Blair's public representations. In light of these sales trends and customer migration, CW11 states that ESST's third quarter public revenue forecasts had "no meaningful basis."

Similar to plaintiff's allegations attributed to other confidential witnesses, the information allegedly obtained from CW9, CW10 and CW11 lack meaningful foundation, details and specificity. These allegations, even taken as true, do not support a strong inference that defendants were consciously making false and misleading statements before mid-2002 when other evidence suggests ESST recognized it would have an unfavorable third quarter.

l. Confidential Witness 12

Confidential Witness 12 ("CW12") was an area

sales manager at ESST during the class period. CW12 states that ESST had two major design cycles each year, one starting in August for spring release, and the other in January for August release. SAC ¶ 16(l).

m. Confidential Witness 13

Confidential Witness 13 ("CW13"), an employee at Dynax Electronics during the class period, merely identifies Shen as the president of Dynax. SAC ¶ 16(m).

2. False Statements

During the Class period, plaintiff alleges that defendants made various false statements beginning with one made February 28, 2002 and continuing until the revelation of the truth on September 12, 2002. Specifically, plaintiff claims that defendants assured investors in March, April, May, June and July 2002 that ESST was not at risk of losing significant market share to competitors, including MediaTek, Inc., and that ESST would continue to report large revenue increases throughout 2002. Defendants stated on July 24, 2002 that ESST expected to report third quarter 2002 revenues of $86 to $90 million. In an August 8, 2002 ESST press release, defendants repeated their assurance that third quarter 2002 revenues would reach $86 to $90 million. One month later, on September 9, 2002, ESST assured financial analysts that the quarter was tracking according to expectations. On September 12, 2002, only three days after ESST management advised that the third quarter was on track, ESST publicly announced that third quarter revenues would miss defendants' public forecast of $86 to $90 million and that revenues would be between $60 and $64 million and that earnings per share would not be between $.35 and $.38 as previously estimated but between $.13 and $.21.

In an October 23, 2002 conference call, defendants admitted that in August 2002 they were aware that ESST was experiencing critical negative

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 7

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

trends. During the October 23, 2002 conference call, defendant Blair stated that sales did not ramp as expected in mid-August and that the weak demand impacted all product lines and all geographies. Defendant Boyd admitted that "by the late part in August it became obvious there was going to be a problem with the quarter."(SAC ¶ 35, Ex. 4).

### 3. Scienter

*7 Plaintiff claims that the information obtained from the confidential witnesses shows that defendants knew they were making false representations. Plaintiff further contends that ESST knew that it was facing a significant financial downturn before its secondary offering completed on February 1, 2002, and that defendants were motivated not to disclose that adverse information so that the offering would be successful. ESST obtained an infusion of $45 million from the offering. SAC ¶ 19. Plaintiff also alleges that the individual defendants were further motivated in their scheme to keep ESST's stock price inflated because they stood to gain by selling their own shares during or around the time of the offering.

Plaintiff also claims that defendants engaged in channel stuffing in order to meet fourth quarter results in December 2001, to complete the secondary offering on February 1, 2002, and to benefit Chan so he could sell $55 million of his shares. Channel stuffing "is the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as distributors no longer make orders while depleting their excess supply."*Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir.1998)."[C]hannel stuffing claims may have some probative value insofar as the channel stuffing was done so as to artificially inflate income, but there may also be other legitimate reasons for attempting to achieve sales earlier."*Broudo v. Dura Pharms.*, 339 F.3d 933, 940 (9th Cir.2003); *see Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir.1999) (value of channel stuffing evidence weak, and does not support strong inference of scienter). Here,

plaintiff fails to state with particularity the facts upon which the allegations of channel stuffing are based.

### II. LEGAL STANDARD

To determine whether a private securities fraud complaint can survive dismissal under Federal Rule of Civil Procedure 12(b)(6), the court must determine whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or with deliberate recklessness made false or misleading statements to investors. *In Re Read-Rite*, 335 F.3d 843, 846 (9th Cir.2003); *Ronconi v. Larkin* 253 F.3d 423, 429 (9th Cir.2001)."In an effort to deter abusive and frivolous securities fraud claims, Congress enacted the PSLRA, which amended the 1934 Act and raised the pleading standards for private securities fraud claims."*No. 84 Employer-Teamster v. America West Holding ("America West" )*, 320 F.3d 920, 931 (9th Cir.2003) (citing *In re Silicon Graphics Inc. Sec. Litig. ("Silicon Graphics" )*, 183 F.3d 970, 973 (9th Cir.1999))."[P]laintiffs proceeding under the PSLRA can no longer aver intent in general terms of mere 'motive and opportunity' or 'recklessness,' but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Silicon Graphics*, 183 F.3d at 979;*America West*, 320 F.3d 920 at 931 ("The PSLRA altered the pleading requirements for private litigants by requiring that a complaint plead with particularity both falsity and scienter."); *Ronconi*, 253 F.3d at 429 n. 6.

*8 To survive the higher pleading standards required by the PSLRA, the complaint must " specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed."15 U.S.C. § 78u-4(b)(1); *America West*, 320 F.3d at 931. The complaint must also "state with particularity facts

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 8

giving rise to a strong inference that the defendant acted with the required state of mind."15 U.S.C. § 78u-4(b)(2). The dual pleading requirements of §§ 78u-4(b)(1) and (b)(2) are incorporated into a single inquiry, because falsity and scienter are generally inferred from the same set of facts. *Read-Rite Corp.,* 335 F.3d at 846;*Ronconi,* 253 F.3d at 429. If a plaintiff fails to plead either the alleged misleading statements or scienter with particularity, his or her complaint must be dismissed. *See America West,* 320 F.3d at 931-32;§ 78u-4(b)(3)(A). Here, plaintiff relies on the statements of various confidential witnesses to establish falsity and, in large part, to show scienter. As discussed below, the pleading standard is met as to defendants Blair, Boyd and ESST except as to allegations of fraud prior to February 27, 2002.

The PSLRA provides a safe harbor from liability for certain forward-looking statements. Forward-looking statements contain "a projection of revenues, income, or earnings per share, management's plans or objectives for future operations, and a prediction of future economic performance."*In re Splash Tech. Holdings, Inc. Sec. Lit.,* 160 F.Supp.2d 1059, 1068 (N.D.Cal.2001); 15 U.S.C. § 78u-5(i)(1)(A)-(C). Assumptions underlying these statements are also forward-looking. *Id.;*15 U.S.C. § 78u-5(i)(1)(D). On the other hand, statements concerning historical or current facts are not forward-looking.*In re Splash,* 160 F.Supp.2d at 1068. For Safe Harbor protection under the PSLRA to apply, the forward-looking statements must either be: (1) accompanied by " meaningful cautionary statements identifying important factors that could cause actual results to differ materially;" or (2) must not be made with actual knowledge of falsity. *See*15 U.S.C. § 78u-5(c)(1)(A); 15 U.S.C. § 78u-4(b)(1)-(2).) "It is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood."*Yourish v. Cal. Amplifier,* 191 F.3d 983, 997 (9th Cir.1999).

"A present-tense statement can qualify as a forward-looking statement as long as the truth or falsity of the statement cannot be discerned until some point in time after the statement is made."*In re Splash,* 160 F.Supp. at 1067;*Harris v. Ivax*

*Corporation,* 182 F.3d 799, 805 (11th Cir.1999), reh'g denied, 209 F.3d 1275 (11th Cir.2000) (classifying the statement "the challenges unique to this period in our history are now behind us" as forward-looking)."Whether a statement qualifies for the safe harbor is an appropriate inquiry on a motion to dismiss."*In re Splash,* 160 F.Supp.2d at 1068;15 U.S.C. § 78u-5(e).

### III. ANALYSIS

A. Section 10(b) of the 1934 Act and Rule 10(b)(5) Promulgated Thereunder

*9 Plaintiff's SAC lists several statements made by defendants, in particular several financial projections for the third quarter of 2002, which are forward-looking. SAC ¶¶ 25-31. For example, plaintiffs cite defendants' press release dated June 24, 2002, which updates guidance for the third quarter, stating that "ESS expects third quarter revenue and earnings to exceed previous guidance." *Id.* at ¶ 29.Other examples include a press release dated July 24, 2002 where defendants state, "We believe we will maintain our leadership position in the areas of new products, features and services.... With these new product introductions, we believe we can continue to lead the high growth market for digital home entertainment products...."*Id.* at ¶ 30.This same press release reiterates defendants' estimate of revenues of $86 to $90 million with earnings per share o $.35 t0 $.38 for the third quarter.*Id.* at ¶ 30.Plaintiff's complaint also cites a July 24, 2002 conference call, during which defendants' CEO stated, "I think we will remain the dominant supplier at Shinco...."*Id.* at ¶ 31.Each of these statements involve predictions about economic performance, the truth or falsity of which could not be discerned until some point after it was made. Similarly, the veracity of statements in paragraphs 25 through 28 about future trends and performance issued with first and second quarter results could not be determined until some point after the statements were made. Consequently, these

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

statements are forward-looking, and protected by the PSLRA Safe Harbor provisions if they were accompanied by either meaningful cautionary statements, or the defendants had no actual knowledge of their falsity.

"Cautionary statements must, within context, be meaningful; boilerplate, generalized warnings do not suffice to balance specific predictions."*In re Clorox Co. Sec. Litig.*, 238 F.Supp.2d 1139, 1142 (N.D.Cal.2002). In *Clorox* the plaintiffs claimed that during an April 22, 1999 conference call Clorox materially misrepresented the financial health of one of its companies. *Id.* at 1144.The court found that the challenged statements were forward-looking because a Clorox representative " began the conference call by asserting that some of her statements would be forward-looking, and a prediction about future events is self-evidently a forward-looking statement."*Id.* at 1145.The court also found the representative made meaningful cautionary statements when she "began the call by disclaiming certainty, and referred listeners to additional cautions in Clorox's June 30, 1998, Form 10K filing. That filing contained additional, albeit general, statements about the potential difficulties Clorox might face and the potential problems with the merger."*Id.* The court found that these "cautions provide the requisite contextual warnings for the Safe Harbor provision ... to apply."*Id.*

Defendants' warnings in the instant case are almost identical to those presented by Clorox. Plaintiff claims that defendant made misleading statements in several press releases. However, each of these press releases warn that the matters discussed in each respective press release include forward-looking statements. The releases also disclaim certainty and direct readers to defendants' SEC filings (Form 10-K and Form 10-Q). ESST's Form 10-K for 2001 includes an extensive discussion about increased pricing pressures, strong competition from competitors with significant competitive advantages, and concerns about sales being concentrated with relatively few distributors and customers. That the 2001 Form 10-K predates the 2002 press releases does not affect its applicability to statements made in 2002. The *Clorox* court relied on Clorox's 1998 Form 10-K

even though the challenged statements were made in April 1999. Consequently, it is permissible to rely on defendants' 2001 10-K to provide meaningful cautionary statements for the challenged press releases made in 2002. ESST's press releases, therefore, contain sufficient meaningful cautionary language related to its forward-looking statements in the releases to protect ESST under the PSLRA's Safe Harbor provisions.

*10 In addition, the evidence does not support the allegation that defendants had actual knowledge of the falsity of their statements until sometime in mid-2002. Plaintiff relies on the information obtained from the anonymous sources. "Reliance on confidential witnesses is not *per se* improper under the PSLRA, notwithstanding its requirement that a plaintiff plead 'all facts' when making allegations based on information and belief."*In re Northpoint Communications Group, Inc., Sec. Litig.*, 221 F.Supp.2d 1090, 1097 (N.D.Cal.2002) ( " *Northpoint II* " ) (citing *In re McKesson HBOC, Inc., Sec. Litig.*, 126 F.Supp.2d at 1271. "To contribute meaningfully toward a 'strong inference' of scienter, however, allegations attributed to unnamed sources must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge." *Northpoint II*, 221 F.Supp.2d at 1097 (citations omitted); *In re U.S. Aggregates, Inc. Securities Litigation*, 235 F.Supp.2d 1063, 1075 (N.D.Cal.2002). Such detail should include each witness' job title, tenure, and a description of his or her responsibilities while at the company, as this " background detail allows for a better evaluation of each witness' basis of knowledge."*Id.* Further, when such allegations must prove a "strong inference" of scienter, a basis for establishing first hand knowledge, rather than secondhand rumor, is required. *See id.* at 1098.Witnesses must also state how they came to learn of the information provided. *Northpoint I*, 184 F.Supp.2d at 1000. Here, plaintiff relies on confidential sources but fails in the main to provide the particularized information that would permit a reasonable conviction that defendants knew their forward looking statements were false when made. At most, the sources suggest that ESST faced competitive pressures, made efforts to contain costs, and may have learned sometime in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

mid-August 2002 that their estimates for the third quarter were not going to be met. They do not permit a strong inference that defendants knew before mid-2002 that their revenue and earning estimates could not be met or that their competitive advantage could not be maintained.

Plaintiff also points to certain sales of ESST shares by defendants Blair, Boyd and Chan as showing scienter. Blair sold 5000 shares at $18.85 per share on January 23, 2002, 5000 shares on January 24, 2002 at $19.60 per share, 20,000 shares on March 7, 2002 at $25.00 per share and 20,000 shares on March 11, 2002 at $25.01. The total revenue received for these shares was $1,289,200 (29% of his holdings). It appears that Blair's sales were disclosed pursuant to a pre-planned trading program established in December 2001. Request J. Notice Ex. U. Defendant Chan sold 2,300,000 shares on February 6, 2002 at $18.22 per share and 720,000 shares on March 11, 2002 at $18.22 for total revenue of $13,118,400 (22% of his holdings). Defendant Boyd sold 20,000 shares on May 7, 2002 at $25.78 per share for total revenue of $515,600 (29% of his shares). Defendant Ang, ESST's Executive Vice President and Chief Operating Officer ("COO"), made no sales. The timing and amounts of these sales do not suggest that defendants were scheming to keep the price of ESST shares up while they unloaded part of their holdings. Sales took place before the first alleged misleading statement and before there is convincing evidence that defendants recognized that the third quarter would be down from expectations. Further, although the revenue realized from the sales was significant, the percentage of holdings sold do not suggest an attempt to unload a majority of their shares.

\*11 "Insider stock sales are not inherently suspicious...."*In re Vantive,* 283 F.3d at 1092. For stock sales to be probative of scienter, insider trading must be "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."*In re Silicon Graphics,* 183 F.3d at 986, quoting *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989). The factors to consider when evaluating the probity of insider

stock sales are: (1) the amount and percentage of shares sold by the insider; (2) the timing of the sales; (3) whether the sales were consistent with the insider's prior trading history.*In re Silicon Graphics,* 183 F.3d at 986. Each factor should be considered, while none is dispositive. *See In re Vantive,* 283 F.3d at 1092-93 (sale of 74% of shares, while suspicious, did not raise a strong inference of scienter where remaining factors did not raise suspicion). Here, the timing of the individual defendants' insider trading does not support an inference of scienter. Nor does the percentage of shares sold. *See, e.g., Ronconi,* 253 F.3d at 435 (amount sold by CEO and CFO not suspicious where they sold 10% and 17%, respectively, of shares and options.); *cf. America West,* 320 F.3d at 939 (amount suspicious where nine. individual defendants all sold between 88% and 100% of holdings).

Plaintiff argues that three statements made by Boyd and Blair are not forward-looking. Specifically, plaintiff cites a September 9, 2002 meeting between those defendants and A.G. Edwards wherein defendants stated: (1) the third quarter was progressing as expected, (2) that third quarter pricing trends continued to play out as expected without material variance, and (3) the third quarter was tracking as expected. Opp. at 8. [FN5] Plaintiff is correct that these are not forward-looking statements, because their truth or falsity could be determined at the time they were made. *See Harris v. Ivax Corp.,* 183 F.3d 799, 866 (11th Cir.1999) (explaining that observed facts such as "prices have continued to decline" do not constitute assumptions and are not forward-looking statements). Thus, the question is whether the Second Amended Complaint pleads sufficient facts showing defendants were deliberately or consciously reckless when making the three statements. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 931 (9th Cir.2003) ( "In this Circuit the required state of mind [under the PSLRA] is one of 'deliberate or conscious recklessness.' '). The court concludes that it does.

    FN5. The statements made during this

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

interview became the basis of a subsequent A.G. Edwards analyst report which stated, "We had the opportunity to meet with management of ESS Technology yesterday[.] The following are the more salient points from our meeting: Business Update-Pricing trends continue to play out as expected, with no material variance either positively or negatively.... Q3 appears to be tracking according to expectations."SAC ¶ 35, Ex. 2.

The facts showing that there is a strong inference that defendants knew before September 12, 2002 that the third quarter revenues and earnings were "not tracking according to expectations" include: (1) the admission by Blair on October 23, 2002 that "by the late part in August it became obvious there was going to be a problem with the [third] quarter;" (2) the temporal proximity between the September 9, 2002 statement that ESST would meet its estimates and the September 12, 2002 disclosure that ESST would miss its forecast by $26 million; and (3) the e-mail from Yeto to CW8 directing a cutback of certain DVD chips representing over 30% of ESST's forecasted revenues by 20%.

*12 The temporal proximity between the September 9 assurance and the September 12 announcement that third quarter revenues would be $26 million short is not in itself enough to satisfy the requirements of Rule 9(b). However, it certainly bolsters the allegations that defendants knew their positive statements on September 9 were false when made. *See Yourish v. California Amplifier,* 191 F.3d 983, 997 (9th Cir.1999).

The court, in determining whether plaintiff has sufficiently alleged scienter, can properly consider the total of the allegations made by plaintiff.

In assessing whether Plaintiffs have sufficiently pled scienter, we must consider whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness. In determining whether a strong inference of scienter exists, we must consider all reasonable inferences, whether or not favorable to

the plaintiff.

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1230 (9th Cir.2004).

Defendants Ang and Chang submit that plaintiff has failed to allege that they made or participated in any of the allegedly misleading statements. Plaintiff counters the SAC is sufficient to hold them in the case pursuant to the "group-published" doctrine because of their positions at ESST. Although the law is not settled as to the effect of the PSLRA on the "group-published" doctrine, it appears that "[i]n order to satisfy the stringent pleading requirements of the PSLRA, a complaint seeking to attribute information published by an organization to an individual defendant should state, with particularity, facts indicating that the individual defendant was directly involved in the preparation of the allegedly misleading statements."*In re Lockheed Martin Corp. Securities Litigation,* 272 F.Supp.2d 928, 936 (C.D.Cal.2002). Plaintiff has failed to do this with respect to defendants Ang and Chang. Therefore, the motion to dismiss Count I as to them is granted.

**B. Section 20(a) of the 1934 Securities Act (Control Liability)**

Plaintiff contends that by reason of their executive and managerial positions with ESST the individual defendants had the power and authority to cause ESST to engage in the wrongful conduct alleged. Neither side's briefing addresses the control liability question. However,

[i]n order to prove a prima facie case under Section 20(a), a plaintiff must prove: (1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator. In order to make out a prima facie case, it is not necessary to show actual participation or the exercise of power; however, a defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation.

Whether the defendant is a controlling person is an intensely factual question, involving scrutiny

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 12

Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions. "Control" is defined in the regulations as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."

**\*13** *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 945 (9th Cir.2003) (internal citations omitted). In light of the significant and responsible positions of Chan and Ang, a factual question exists as to whether they were controlling persons.

### C. Section 20A of the 1934 Act

Under Section 20A of the 1934 Securities Act,
[a]ny person who violates any provision of this title or the rules and regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable ... to any person who, contemporaneously with the ... sale of securities that are the subject of such violation, has purchased ... of the same class.

Plaintiff contends that Chan's sales in on February 6, 2002 and February 19, 2002 violated Section 20A. However, the SAC does not show that Chan had material nonpublic information in February 2002. Therefore, Count III is dismissed.

### D. Leave to amend

Leave to amend is to be freely granted when justice so requires. *See*FED. R. CIV. P. 15(a); *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir.2000) (leave to amend should be granted unless the district court "determines that the pleading could not possibly be cured by the allegation of other facts "). Plaintiff has filed three amended complaints. Because plaintiff has had ample opportunity to plead a viable complaint, leave to amend is denied. "

[T]he purpose of the PSLRA would be frustrated if district courts were required to allow repeated amendments to complaints filed under the PSLRA." *Miller v. Champion Enterprises Inc.,* 346 F.3d 660, 692 (9th Cir.2003); *see Lipton,* 284 F.3d at 1039 (where basic facts alleged and analyzed, and plaintiff cannot cure flaws in pleading, dismissal with prejudice proper); *Silicon Graphics,* 183 F.3d at 991 (denying leave to amend where defects in pleadings not curable by amendment).

### IV. ORDER

For the foregoing reasons, it is hereby ordered that the motion to dismiss Count I as to defendants Blair, Boyd and ESST is denied except as to allegations pleading fraud prior to February 27, 2002. Those allegations are stricken and dismissed. The motion to dismiss Count I as to defendants Ang and Chan and Count III as to defendant Chan is granted. The motion to dismiss to Count II is denied as to all defendants.

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

N.D.Cal.,2004.
In re ESS Technology, Inc. Securities Litigation
Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Westlaw.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

S.E.C. v. Collins & Aikman Corp.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
SECURITIES and EXCHANGE COMMISSION,
Plaintiff,
v.
COLLINS & AIKMAN CORPORATION, David
A. Stockman, J. Michael Stepp, Gerald E. Jones,
David R. Cosgrove, Elkin B. McCallum, Paul C.
Barnaba, John G. Galante, Christopher M.
Williams, and Thomas V. Gougherty, Defendants.
No. 07 Civ. 2419(SAS).

Dec. 21, 2007.

**Background:** Securities and Exchange
Commission (SEC) brought action alleging that
officers and directors of automobile parts producer
were involved in securities fraud. Defendants filed
motions to dismiss.

**Holdings:** The District Court, Shira A.
Scheindlin, J., held that:

(1) SEC sufficiently alleged securities fraud
claims against defendants, and

(2) SEC stated a claim against corporate officer
for aiding and abetting securities fraud.

Motions denied.

**[1] Conspiracy 91 ☞13**

91 Conspiracy
    91I Civil Liability
        91I(A) Acts Constituting Conspiracy and
Liability Therefor
        91k12 Persons Liable

91k13 k. In General. Most Cited Cases

**Securities Regulation 349B ☞60.40**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.39 Persons Liable
                    349Bk60.40 k. In General; Control
Persons. Most Cited Cases
A person who participates in a fraudulent scheme
by performing purely administrative duties without
knowledge of the purpose of the scheme has not
employed a manipulative or deceptive device and so
has not incurred liability for securities fraud;
similarly, a person who participates in a conspiracy
to commit a securities law violation but takes no
concrete steps in furtherance of the violation has not
run afoul of section 10(b). Securities Exchange Act
of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. §
240.10b-5.

**[2] Securities Regulation 349B ☞60.40**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.39 Persons Liable
                    349Bk60.40 k. In General; Control
Persons. Most Cited Cases
Participation in a scheme can be sufficient for
securities fraud liability only if that participation
took the form of actions or statements that were
independently deceptive or fraudulent. Securities
Exchange Act of 1934, § 10(b), 15 U.S.C.A. §
78j(b); 17 C.F.R. § 240.10b-5.

**[3] Securities Regulation 349B ☞60.51**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

349BI(C)7 Fraud and Manipulation
   349Bk60.50 Pleading
      349Bk60.51 k. In General. Most Cited Cases
An express allegation of deliberate misconduct can be sufficient to plead scienter in a securities fraud action. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[4] Federal Civil Procedure 170A ⟸636**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak633 Certainty, Definiteness and Particularity
            170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases
Even though Private Securities Litigation Reform Act (PSLRA) does not apply to actions brought by the Securities and Exchange Commission (SEC), the SEC is subject to federal rule governing pleading of fraud, and must therefore plead a " strong inference" of scienter. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.App.(2000 Ed.).

**[5] Securities Regulation 349B ⟸60.15**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.11 Transactions Subject to Regulation
               349Bk60.15 k. Connection with Purchase or Sale. Most Cited Cases
An individual who perpetrates a fraud does not violate section 10(b) if the fraud is not connected to the sale of securities; a defendant need not have communicated the statement at issue directly to investors, but the defendant must either have known or should have known that the statement would be communicated to investors. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[6] Securities Regulation 349B ⟸60.40**

349B Securities Regulation

349BI Federal Regulation
   349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
         349Bk60.39 Persons Liable
            349Bk60.40 k. In General; Control Persons. Most Cited Cases

**Securities Regulation 349B ⟸60.51**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.51 k. In General. Most Cited Cases
"Group pleading doctrine" creates a presumption in federal securities cases that statements in prospectuses, registration statements, annual reports, press releases, and group-published information are the collective work of those individuals with direct involvement in the everyday business of the company; the allegation of direct involvement within the group is crucial to the operation of the doctrine.

**[7] Securities Regulation 349B ⟸60.40**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.39 Persons Liable
               349Bk60.40 k. In General; Control Persons. Most Cited Cases
While a securities fraud defendant may be liable for her own false statement regardless of whether it was attributed to her, a defendant cannot be responsible for a statement she did not make. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[8] Securities Regulation 349B ⟸27.39**

349B Securities Regulation
   349BI Federal Regulation
      349BI(B) Registration and Distribution
         349BI(B)6 Fraudulent Transactions
            349Bk27.37 Grounds of and Defenses

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                      Page 3

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

to Liability
                    349Bk27.39    k.    Scienter;
Knowledge or Intention. Most Cited Cases
Subsection of the Securities Act of 1933 which
makes it unlawful to employ any "device, scheme or
artifice" to defraud embodies a scienter
requirement, but subsections making it unlawful to
obtain money or property by means of any untrue
statement of a material fact or any omission to state
a material fact or to engage in any transaction which
operates or would operate as a fraud or deceit upon
the purchaser do not. Securities Act of 1933, §
17(a)(1-3), 15 U.S.C.A. § 77q(a)(1-3).

**[9] Securities Regulation 349B ⚖══60.45(2)**

349B Securities Regulation
      349BI Federal Regulation
            349BI(C) Trading and Markets
                  349BI(C)7 Fraud and Manipulation
                        349Bk60.43 Grounds of and Defenses
to Liability
                    349Bk60.45    Scienter,    Intent,
Knowledge, Negligence or Recklessness
                        349Bk60.45(2)  k.  Aiders  and
Abettors. Most Cited Cases
Knowledge prong for liability for aiding and
abetting securities fraud can be satisfied by proof of
recklessness only if the alleged aider and abettor
breached a fiduciary duty; otherwise, the violation
must be knowing. Securities Exchange Act of 1934,
§ 20(e), 15 U.S.C.A. § 78t(e).

**[10] Securities Regulation 349B ⚖══60.51**

349B Securities Regulation
      349BI Federal Regulation
            349BI(C) Trading and Markets
                  349BI(C)7 Fraud and Manipulation
                        349Bk60.50 Pleading
                              349Bk60.51  k.  In  General.  Most
Cited Cases
Securities and Exchange Commission (SEC)
sufficiently alleged securities fraud claims against
officers and directors of automobile parts producer;
SEC identified specific fraudulent transactions and
fraudulent statements giving rise to inferences that
defendants acted deliberately to defraud investors
and/or engaged in activities designed to conceal

their fraud from the audit committee's investigators.
Securities Exchange Act of 1934, § 10(b), 15
U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[11] Securities Regulation 349B ⚖══60.45(1)**

349B Securities Regulation
      349BI Federal Regulation
            349BI(C) Trading and Markets
                  349BI(C)7 Fraud and Manipulation
                        349Bk60.43 Grounds of and Defenses
to Liability
                    349Bk60.45    Scienter,    Intent,
Knowledge, Negligence or Recklessness
                        349Bk60.45(1)  k.  In  General.
Most Cited Cases
While    deliberate    illegal    behavior    constitutes
conscious misbehavior sufficient to support a strong
inference of scienter for purposes of alleging
securities fraud liability, behavior that is not
necessarily criminal but is knowingly fraudulent is
also sufficient. Securities Exchange Act of 1934, §
10(b), 15 U.S.C.A. § 78j(b).

**[12] Securities Regulation 349B ⚖══60.51**

349B Securities Regulation
      349BI Federal Regulation
            349BI(C) Trading and Markets
                  349BI(C)7 Fraud and Manipulation
                        349Bk60.50 Pleading
                              349Bk60.51  k.  In  General.  Most
Cited Cases
Securities and Exchange Commission (SEC) has
stated a claim against corporate officer for aiding
and abetting securities fraud; complaint alleged with
specificity that officer was involved in the certain
fraudulent transactions, thus placing him on notice
as to the transactions that he allegedly aided and
abetted, and complaint further alleged that he knew
of the fraud perpetrated by company, and that he
rendered substantial assistance in connection with
the transactions. Securities Exchange Act of 1934, §
20(e), 15 U.S.C.A. § 78t(e).

**[13] Securities Regulation 349B ⚖══35.23**

349B Securities Regulation
      349BI Federal Regulation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                    Page 4

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

349BI(C) Trading and Markets
    349BI(C)1 In General
        349Bk35.23 k. Periodic Reporting;
Accounting and Reports. Most Cited Cases
To state a claim under Securities and Exchange
Commission (SEC) rule prohibiting falsified books,
records or accounts, a plaintiff need only allege that
the defendant contributed to the issuance of
materially misleading financial statements. 17
C.F.R. § 240.13b2-1.

Christopher R. Conte, Esq., J. David Fielder, Esq.,
John David Worland, Jr., Esq., Securities and
Exchange Commission, Washington, DC, Robert B.
Blackburn, Esq., Securities and Exchange
Commission, Assoc. Regional Director, New York,
NY, Mark Kreitman, Esq., H. Michael Semler, Esq.
, Securities and Exchange Commission,
Washington, DC, for Plaintiff.
Howard M. Shapiro, Esq., Joseph Keith Brenner,
Esq., Andrew B. Weissman, Esq., Wilmer Cutler
Pickering Hale & Dorr, LLP, Washington, DC, for
Defendant David A. Stockman.
Gandolfo Vincent DiBlasi, Esq., David Edward
Swarts, Esq., Stacey Rubin Friedman, Esq., Sullivan
and Cromwell, LLP, New York, NY, for Defendant
J. Michael Stepp.
Jeffrey A. Simes, Esq., Laurie L. Levin, Esq.,
Richard Mark Strassberg, Esq., Goodwin Procter,
LLP, New York, NY, for Defendant Elkin B.
McCallum.
Carl Spencer Kravitz, Esq., Lenora Miles Rigby,
Esq., Zuckerman Spaeder, LLP, Washington, DC,
Adrienne Urrutia Wisenberg, Esq., Solomon Louis
Wisenberg, Esq., Wisenberg & Wisenberg, PLLC,
Washington, DC, Laura Elizabeth Neish, Esq.,
Zuckerman, Spaeder, Goldstein, Taylor & Kolker,
LLP, New York, NY, for Defendant Paul C.
Barnaba.
Michael Ross, Esq., Law Offices of Michael Ross,
New York, NY, for Defendant Gerald E. Jones.
Ken Laves Hashimoto, Esq., Arnold & Porter, LLP,
New York, NY, for Defendant David R. Cosgrove.
Michael Shapiro, Esq., Buchanan Ingersoll PC,
New York, NY, for Defendant John G. Galante.
James Alfred Mitchell, Esq., Stillman, Friedman &
Shechtman, P.C., New York, NY, for Defendants
Collins & Aikman Corporation, Christopher M.
Williams, and Thomas V. Gougherty.

Helen Virginia Cantwell, Assistant U.S. Attorney,
New York, NY, for the United States.

*OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

**I. INTRODUCTION**

    *1 This action is brought by the Securities and
Exchange Commission ("SEC") against the Collins
& Aikman Corporation ("C & A" or the "Company"
) and David A. Stockman, J. Michael Stepp, David
R. Cosgrove, Elkin B. McCallum, Paul C. Barnaba,
John G. Galante, Gerald E. Jones, Christopher M.
Williams, and Thomas V. Gougherty. The
Complaint alleges that the defendants were involved
in securities fraud during a period spanning roughly
late 2001 through early 2005. C & A has consented
to an order of final judgment and is no longer a
party to this action. Defendants Stockman,
McCallum, Stepp, Cosgrove, and Barnaba (the "
Individual Defendants") move to dismiss the
Complaint. For the reasons set forth below, their
motions are denied.

**II. BACKGROUND**[FN1]

**A. Parties**

    C & A is a Delaware corporation engaged in
the production of automobile parts.[FN2] It employs
approximately 12,000 workers, and until May 2005
its shares were traded on the New York Stock
Exchange.[FN3]

    Stockman is a co-founder and partner of
Heartland Industrial Partners ("Heartland"), a
private equity firm that acquired a controlling
interest in C & A in 2001.[FN4]Stockman joined C &
A's Board of Directors in 2001 and became CEO in
August 2003.[FN5]Stepp was CFO of C & A from
1995 to 1999 and from January 2002 to October

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

2004, and served as a consultant to the Company in the interim.[FN6]He served on the Board from 2001 to 2006.[FN7] Cosgrove was C & A's Vice President of Finance during part of 2002, Vice President for Financial Planning and Analysis from August 2002 to October 2004, and then Corporate Controller, a position he held through May 2005.[FN8] McCallum, a significant shareholder of C & A and a member of the Board from September 2001 through May 2004, owns Joan Fabrics, one of C & A's suppliers.[FN9] Barnaba was Director of Financial Analysis for C & A's Purchasing Department from April 2002 to December 2004, when he became a Vice President and Director of Purchasing for C & A's Plastics Division.[FN10]

### B. The Round-Trip Transactions

After Heartland acquired a controlling interest in C & A and Stockman became involved in its management, C & A began perpetrating various accounting frauds "designed in part to create the appearance that C & A's financial performance was improving under Stockman's direction."[FN11]In 2001, C & A solicited a three million dollar loan from McCallum that would be represented for accounting purposes as income (a "round-trip transaction").[FN12] McCallum transferred the money to C & A in January 2002 and C & A recognized it as a reduction of costs that had the effect of increasing income.[FN13]Pursuant to their understanding, C & A later transferred $3 million in equipment to McCallum.[FN14]

In late 2002, C & A further inflated its reported income by purchasing assets from McCallum at a price exceeding their market value in return for "rebates" of the excess.[FN15]These arrangements were personally negotiated by Stockman, and Stepp assisted in collecting the payments.[FN16]McCallum provided false documentation that represented some of these payments as rebates on a supply contract. [FN17]These payments totaled approximately $14.8 million.[FN18]In 2003, in response to an investigation into the payments by C & A's Audit Committee, Stockman, Stepp, and McCallum made false statements to conceal the fraud.

### C. The Rebate Transactions

*2 Supply contracts sometimes provide for suppliers to pay rebates if the parties conduct a specified volume of business.[FN19]Generally Accepted Accounting Principles ("GAAP") permit customers to take such rebates into account as purchase price reductions only when the specified business has been effected.[FN20]

In 2002, C & A's Purchasing Department began to arrange for suppliers to create documents that tied rebates to past purchases so that the rebates would have the immediate effect of increasing reported income.[FN21]One example occurred in 2002, when PPG Industries, Inc., a paint supplier, agreed to a rebate in return for new business. Barnaba, at C & A's direction, then solicited a side letter stating that the rebate was based on past purchases.[FN22] This side letter was used to justify immediate recognition of the rebate, and served as a template for future side letters negotiated in a series of similar transactions.[FN23]Stockman, Cosgrove, Stepp, and Barnaba were involved in perpetrating the scheme.[FN24]Some of the transactions were negotiated by or at the direction of Stockman, who involved the Fabrics Division in the scheme in mid-2004.[FN25]

A variation of the false rebate transaction involved purchases of capital equipment. Under GAAP and federal income tax law, the purchase price of capital equipment cannot be immediately deducted as an expense in the period it is incurred, but can be depreciated over a time period that bears some relation to the expected lifetime of the equipment. GAAP specifies that rebates on capital equipment affect the purchase price of the equipment, and so cannot be recognized as immediate income.[FN26]However, C & A improperly characterized rebates received on capital purchases as income. Stockman, Barnaba, and Cosgrove produced false documentation to support the fraudulent accounting treatment.[FN27]

### D. Overstatement of Earnings

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

In August 2004, C & A sold $415 million in restricted senior subordinated notes (the "Notes"). [FN28] The offering memoranda incorporated C & A's financial statements from 2001 through the second quarter of 2004.[FN29]Stockman, Stepp, and Cosgrove participated in drafting these memoranda or presenting them to investors.[FN30]Stockman and Stepp certified that C & A's financial statements for various segments of this period were accurate when they were made.[FN31]C & A misstated its earnings in the Forms 10-Q and 10-K that it filed with the SEC from 2001 through 2004.[FN32]C & A also filed a registration statement (the "Registration Statement") [FN33] in connection with the planned exchange of unrestricted notes for the 2004 restricted notes (the "Notes Exchange").[FN34] This statement included C & A's financial statements from 2001 through third quarter 2004 and was signed by Stockman, Stepp, and Cosgrove.[FN35]

**E. False Statements**

C & A repeatedly misrepresented its financial condition to investors.[FN36] These false statements were made, *inter alia,* during presentations and earnings calls that enabled C & A to obtain additional funding [FN37] and in a March 17, 2005 press release (the "March 17 Press Release") that misstated C & A's earnings.[FN38]At Stockman's direction, the March 17 Press Release falsely stated that C & A had $86 million available, though in actuality only twelve million dollars was accessible. [FN39]The March 17 Press Release also misstated the scope of the Audit Committee's investigation into the rebate transactions.[FN40]

*3 On March 17, Stockman (with Cosgrove's assistance) conducted a call with investors (the "Earnings Call"), during which he intentionally or recklessly made false statements regarding C & A's estimated income and capital expenditures for the first quarter 2005.[FN41]C & A also issued a press release on April 4, 2005 (the "April 4 Press Release") that stated C & A had approximately $81 million in "available liquidity" as of March 31, 2005, when in fact C & A had materially less.[FN42]

C & A also misstated its finances in order to enhance its ability to borrow money. The General Electric Capital Corporation ("GECC") made loans to C & A through a securitized accounts receivable facility.[FN43]At Stockman's direction, C & A added $ 120 million in ineligible receivables to the borrowing base under the GECC agreement.[FN44]

**F. Prior Proceedings**

On May 17, 2005, C & A filed for voluntary reorganization under Chapter 11 of the Bankruptcy Code.[FN45]The SEC brought this action on March 26, 2007. On March 30, 2007, C & A consented to entry of final judgment against it and waived its right to appeal.[FN46]On July 6, 2007, the United States Attorney for the Southern District of New York sought to intervene to stay discovery on the ground that eight of the Individual Defendants were also defendants in a criminal proceeding that relates to the same underlying facts.[FN47] On September 10, 2007, this Court granted the Government's motion to intervene and imposed a partial stay of discovery.[FN48]

In connection with these transactions, the SEC asserts that all defendants violated section 10(b) of the Securities Exchange Act of 1934 (the " Exchange Act") and Exchange Act Rule 10b-5. [FN49] The SEC also asserts a variety of other claims against defendants.[FN50]

**III. LEGAL STANDARD**

**A. Motion to Dismiss**

When deciding a defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint"[FN51] and " draw all inferences in the light most favorable to the non-moving party[ ]."[FN52] Nevertheless, the court need not accord "[l]egal conclusions, deductions or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 7

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

opinions couched as factual allegations ... a presumption of truthfulness."[FN53]

In deciding a motion to dismiss, the court is not limited to the face of the complaint, but "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[FN54] However, "before materials outside the record may become the basis for a dismissal ... it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."[FN55]

"Federal Rule of Civil Procedure 8(a)(2) requires ...'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[FN56] To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility." [FN57]Although the complaint need not provide "detailed factual allegations," [FN58] it must "amplify a claim with some factual allegations ... to render the claim *plausible.*"[FN59] The standard is no longer that a complaint can be dismissed only if there us "no set of facts" that plaintiff could prove "which would entitle him to relief."[FN60]Rather, the complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' "[FN61]

**\*4** However, "[s]ecurities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss."[FN62]Those heightened pleading requirements are imposed by Federal Rule of Civil Procedure 9(b).[FN63] A complaint alleging securities fraud must satisfy Rule 9(b)'s requirement that "the circumstances constituting fraud ... be stated with particularity."[FN64]This pleading constraint serves to provide a defendant with fair notice of a plaintiff s claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."[FN65]To comply with the requirements of Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where

and when the statements were made, and (4) explain why the statements were fraudulent."[FN66] Allegations that are conclusory or unsupported by factual assertions are insufficient."[FN67]

Where a complaint alleges a false statement, the complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made."[FN68] In situations "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."[FN69]

**B. Exchange Act Section 10(b) and Rule 10b-5**

**1. Extent of Liability**

Section 10(b) of the Exchange Act creates civil liability for a wide range of securities fraud.[FN70] Enacted in the wake of the stock market crash of 1929, it was intended to "protect investors engaged in the purchase and sale of securities by implementing a policy of full disclosure."[FN71] [T]he Supreme Court has emphasized repeatedly that Section 10(b) 'should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes.' "[FN72]

To state a claim under section 10(b), a plaintiff must allege that the defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities."[FN73]Rule 10b-5, which interprets section 10(b), prohibits employment of a "scheme" to defraud. However, there is some tension between the proposition that participation in a fraudulent scheme is sufficient to incur liability and the Supreme Court's admonition in *Central Bank of Denver, N.A. v. First Interstate Bank, N.A.* that "the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act.... We cannot amend the statute to create liability for acts that are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

not themselves manipulative or deceptive within the meaning of the statute."[FN74]

Second Circuit precedent in this area is not a model of clarity. The circuit has held that an individual who " 'participated in [a] fraudulent scheme' " can be a primary violator under section 10(b).[FN75] However, the circuit has also stated that "[a]llegations of 'assisting,' 'participating in,' 'complicity in' and similar synonyms ... all fall within the prohibitive bar of *Central Bank*."[FN76] Due perhaps to this lack of guidance, district courts in this circuit have not reached a consensus on whether participation in a scheme is sufficient to incur liability under section 10(b).[FN77]

*5 Analysis of liability under section 10(b) must begin with the text of the statute, which provides that it is unlawful for any person "directly or indirectly" to employ "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe" in connection with the sale of securities.[FN78] Rule 10b-5 prohibits use of "any device, scheme, or artifice to defraud," making a misstatement of material fact, and engaging in "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the sale of securities. But the SEC cannot expand liability beyond the scope imposed by the statute,[FN79] and *Central Bank* clarified that the statute extends only to persons who actually made material misstatements or employed deceptive devices.

[1] What, then, does it mean to "participate" in a fraudulent scheme? A person who participates in such a scheme by performing purely administrative duties without knowledge of the purpose of the scheme has not employed a manipulative or deceptive device and so has not incurred liability under section 10(b).[FN80] Similarly, a person who participates in a conspiracy to commit a securities law violation but takes no concrete steps in furtherance of the violation has not run afoul of the statute.[FN81] By contrast, a person who, in concert with others, participates in a securities fraud scheme by making false statements does incur liability under section 10(b).

[2] Participation in a scheme can thus be sufficient for liability under section 10(b) only if that participation took the form of actions or statements that were independently deceptive or fraudulent. Where a person is alleged to have participated in a scheme to violate securities laws, it is necessary to examine closely the extent of the alleged participation to determine whether the person is accused of an actual misrepresentation or the employment of a fraudulent device. In the absence of such an accusation, a claim based on mere "participation" is legally insufficient.

This is not to suggest that there is no utility in pleading a fraudulent scheme. Several persons may act in concert to commit a violation of section 10(b) that might not be actionable were it not for their cooperation. For example, if one person were to *create* a false prospectus knowing that it would be transmitted to investors, and another were to then *transmit* that prospectus to investors knowing it to be false, each individual would have contravened the text of section 10(b) by employing a fraudulent device in connection with the sale of securities. Yet if a complaint described only the actions taken by the first person, omitting all mention of the second person, it would fail to describe with adequate specificity how the individual violated section 10(b).

## 2. Scienter

[3] Scienter, in relation to securities fraud, is " the intent to deceive, manipulate, or defraud."[FN82] Scienter can be pled by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[FN83] "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."[FN84] Under this theory of scienter, a plaintiff must show that the defendant's conduct is " 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' "[FN85] Thus, an express allegation of deliberate misconduct can be sufficient to plead scienter.[FN86] "The inquiry ... is whether all of the facts alleged, taken collectively, give rise to a *strong inference* of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."[FN87]

*6 Scienter requires an inquiry independent from the question of whether the person committed a prohibited act.[FN88] A person who negligently employs a deceptive device in connection with the sale of securities would have run afoul of the statute's text but would not incur liability due to the lack of scienter.

[4] The PSLRA codified the strong inference requirement for pleading scienter in private securities actions, but that standard also applies to all actions brought in this Circuit that are governed by Rule 9(b).[FN89] Thus, even though the PSLRA does not apply to actions brought by the SEC, the SEC is subject to Rule 9(b) and must therefore plead a "strong inference" of scienter.

In *Tellabs,* the Supreme Court determined that to plead a "strong inference of scienter" in the context of the PSLRA, a complaint must allege facts that give rise to an inference of scienter at least as strong as any competing inference.[FN90] It is unclear whether district courts must now find that the inference of scienter raised in actions not governed by the PSLRA, but governed by Rule 9(b), be at least as compelling as any other inference. I need not reach this thorny (albeit interesting) issue, however, because I find that even under this heightened standard, the SEC has pled scienter.

### 3. Additional Elements[FN91]

[5] Because section 10(b) creates liability for statements made "in connection with the sale or purchase of securities," liability attaches only if a person knows or should know that her statement will be communicated to investors.[FN92] An

individual who perpetrates a fraud does not violate section 10(b) if the fraud is not connected to the sale of securities. A defendant need not have communicated the statement at issue directly to investors, but the defendant must either have known or should have known that the statement would be communicated to investors.[FN93]

Alleged misstatements must be material. "It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."[FN94] A fact is considered material if there is a " substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares" of the stock.[FN95] Similarly, a plaintiff must show that there was a "substantial likelihood that the disclosure of [an] omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available,"[FN96] and that at the time of the investment, a reasonable investor would have considered the omitted information as significant.[FN97] While the materiality question is not often amenable to disposition as a matter of law,[FN98] if " it cannot be said that a reasonable investor would consider [the statement in question] important in light of adequate cautionary language that is set forth in the applicable disclosure documents," then the alleged misstatement is immaterial as a matter of law.[FN99]

### 4. Responsibility for Violative Actions

*7 Liability under section 10(b) must be premised on a person's actions, but it is not always clear when a certain false statement can be attributed to that person. It is undoubtedly sufficient, however, if the defendant spoke or authored the offending statement.

[6] A common situation arises where a false or misleading statement is contained in a document such as a prospectus or registration statement that has no single author. In this circuit, the "group pleading doctrine" creates " 'a presumption that statements in prospectuses, registration statements, annual reports, press releases, [and]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 10

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

group-published information ... are the collective work of those individuals with *direct involvement* in the everyday business of the company.' "[FN100] The allegation of direct involvement within the group is crucial to the operation of this doctrine.[FN101]

A related problem arises when a false statement is made by one person with the substantial involvement of another. *Central Bank* holds that assisting another in a violation of section 10(b) is not itself actionable under that section. But the Second Circuit has found several times that an " individual [can be] sufficiently responsible for [an] entity's speech such that he could properly be said to have *made* the false statement."[FN102]

### 5. Attribution Requirement

The Second Circuit recently held that under the "bright line standard" that applies in this district, a person cannot be liable under section 10(b) for a false statement unless the statement is attributed to that person at the time of its dissemination to the public.[FN103] According to the Circuit, the imposition of an attribution requirement is a consequence of *Central Bank's* holding that liability only attaches for the specific actions prohibited by the text of section 10(b).[FN104] This reasoning, however, appears to be a *non sequitur*. *Central Bank* 's holding that a person must commit a fraudulent act or make a false statement does not necessarily require that the misstatement be attributed to that person. As the Circuit has recognized in other cases, the attribution requirement has its roots in reliance.[FN105] An individual who relies on a statement that he believes was made by one person cannot then assert a claim against another.[FN106]

[7] In private actions, the purpose behind the attribution requirement is immaterial because private plaintiffs must separately plead reliance. But in an action brought by the SEC, the issue is significant because the SEC need not plead reliance. If the attribution requirement is motivated by the need to show reliance, which I find to be the more cogent analysis, then it does not apply to actions

brought by the SEC. Rather, the SEC need only allege that "the defendant was sufficiently responsible for the statement-in effect, caused the statement to be made-and knew or had reason to know that the statement would be disseminated to investors."[FN107] However, the reach of section 10(b) beyond the bright line standard is limited. While a defendant may be liable for her own false statement regardless of whether it was attributed to her, a defendant cannot be responsible for a statement she did not make.

### C. Other Claims

### 1. Section 17(a) of the Securities Act

**\*8** [8] Section 17(a) makes it illegal for a person, in connection with the offer or sale of securities, "(1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact . ..; or (3) to engage in any transaction ... which operates or would operate as a fraud or deceit upon the purchaser."[FN108] The SEC is required to allege scienter for violations of section 17(a)(1), but not (2) or (3).[FN109] Because the elements of section 17(a)(1) and section 10(b) are "essentially the same, " if a complaint is sufficient to state a claim under section 10(b) and Rule 10b-5, it is also sufficient to state a claim under section 17(a).[FN110]

### 2. Section 13(b)(5) of the Exchange Act

Section 13(b)(5) of the Exchange Act provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" required to be maintained pursuant to section 13(b)(2).[FN111] Section 13(b)(2)(A) requires certain corporations to maintain "books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Page 11

transactions and dispositions of the assets of the issuer ....."[FN112]

### 3. Rules 13b2-1 and 13b2-2

Rule 13b2-1 provides that "[n]o person shall, directly or indirectly, falsify or cause to be falsified, any book, record or account" maintained pursuant to section 13(b)(2)(A).[FN113] Scienter is not a requirement for violations of Rule 13b2-1.[FN114] Rule 13b2-2 prohibits directors, officers, and those acting under their direction from making false statements to auditors if it was or should have been known that those statements would lead to materially misleading financial statements.[FN115] The SEC has determined that scienter is not required for a violation of this Rule.[FN116]

### 4. Section 20(e) of the Exchange Act

[9] Exchange Act section 20(e) provides that a person who "knowingly provides substantial assistance" to another who violates the Exchange Act is "deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided."[FN117] While *Central Bank* made clear that there is no liability for aiding and abetting securities fraud under section 10(b), there is liability for aiding and abetting under section 20(e).[FN118] The distinction is significant in that only the SEC, not private plaintiffs, can bring a claim under section 20(e).

Pleading a violation of section 20(e) requires the complainant to allege facts that show "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation."[FN119] In this Circuit, the knowledge prong can be satisfied by proof of recklessness only if the alleged aider and abettor breached a fiduciary duty.[FN120] Otherwise, the violation must be knowing.[FN121]

### IV. DISCUSSION

*9 The Complaint pleads with the requisite specificity each element of its claims against each defendant. Defendants' motions to dismiss are therefore denied in their entirety. Although many of defendants' challenges to the adequacy of the Complaint can be addressed in a conclusory fashion, the adequacy of the pleadings for the claims brought under section 10(b) and Rule 10b-5 merits more expanded discussion.

### A. Exchange Act Section 10(b) and Rule 10b-5

[10] The Complaint alleges that C & A, Stockman, McCallum, and Stepp violated section 10(b) in connection with the Round-Trip Transactions.[FN122] It further charges that C & A, Stockman, Cosgrove, McCallum, and Barnaba violated section 10(b) in connection with the Rebate Transactions.[FN123] Finally, the SEC asserts that C & A and Stockman violated section 10(b) in connection with the March 17 Press Release,[FN124] Bond Presentation,[FN125] and the April 4 Press Release;[FN126] and that C & A, Stockman, and Cosgrove violated section 10(b) in connection with the Earnings Call.[FN127]

### 1. The Individual Defendants

#### a. Stockman

In March 2002, Stockman negotiated an agreement whereby C & A would purchase a company from McCallum for seven million dollars more than its actual value, and McCallum would then return the excess in the form of "rebates" from another company he owned.[FN128] Stockman and McCallum also met in late 2002 to negotiate similar Round Trip Transactions.[FN129] When C & A's Audit Committee investigated these transactions, Stockman made false statements to the Committee and provided false documents in an effort to

--- F.Supp.2d ----                                                                    Page 12

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

conceal the fraud.[FN130]

Stockman was also involved in the Rebate Transactions. He met with the employees of the Purchasing Department and identified suppliers to target, the size of the rebates to demand, and incentives to offer.[FN131]He further instructed that income from these rebates be used to offset present income, although he knew or should have known that such accounting treatment was inappropriate.[FN132]For example, during a May 27, 2003 conference call, Stockman instructed purchasing officials to increase income for the present quarter by "pulling ahead" rebates that should apply in future quarters.[FN133] As a result, more than one million dollars in rebates were improperly booked as income in that quarter.[FN134]At a meeting in North Carolina in May 2004, Stockman similarly instructed the Fabrics Division to solicit rebates and to create documentation that would justify treatment of these rebates as immediate income.[FN135]

The SEC has thus identified specific allegedly fraudulent statements made by Stockman and provided detailed information as to the content of their statements and the circumstances under which they were made. The facts alleged, taken as true, create an inference that Stockman acted deliberately to defraud investors, and this inference is at least as strong as any other inference that could be deduced from these facts.

*10 Notwithstanding the clear inferences to be drawn from these allegations, Stockman asserts that they fail to present the requisite strong inference of scienter.[FN136]As discussed above, a plaintiff subject to Rule 9(b) must plead sufficient facts to raise a strong inference of scienter, and such an inference must be at least as strong as any competing inference raised by the pled facts. However, "strong inference of scienter" is not a magic incantation that a defendant need merely recite to defeat all claims. Rule 9(b) demands specificity, but it does not demand that a plaintiff plead every fact that forms the alleged violations, and a defendant cannot defeat a claim by pointing to facts that are omitted if the allegations as pled meet the requisite standard. The SEC has provided detailed allegations that defendants deliberately

engaged in a wide-ranging series of fraudulent transactions. Allegations of intentional misrepresentation are sufficient to plead scienter if the facts alleged are relatively strong.[FN137]The allegations in this Complaint are more than adequate to plead scienter even under the heightened standards imposed by the Supreme Court in *Tellabs*.

**b. McCallum**

In late 2001, McCallum transferred three million dollars to C & A knowing that although it was a loan, C & A would account for the money as income.[FN138]In March 2002, McCallum agreed to accept three million dollars in equipment as repayment.[FN139]In that month, McCallum also agreed to sell a business to C & A for seven million dollars more than its actual value and repay the difference as a "rebate." [FN140]McCallum also agreed to similar Round-Trip Transactions with respect to other assets, and provided C & A with false documentation to support this fraudulent activity.[FN141]In response to an investigation into the transactions by C & A's Audit Committee, McCallum made false statements and provided the Audit Committee with false documentation.[FN142] Notwithstanding McCallum's arguments to the contrary, these allegations, taken together, are more than sufficient to plead both falsity and scienter.

McCallum asserts that the SEC failed to allege facts that suggest these transactions were false. In support of his contention, McCallum argues that C & A's Audit Committee found that the transactions were not fraudulent.[FN143]This is not persuasive. The Complaint alleges that defendants, including McCallum, engaged in activities designed to conceal their fraud from the Audit Committee's investigators.[FN144]The investigation's failure to discover deliberate wrongdoing may indicate that there was no wrongdoing, but it may also indicate that defendants successfully concealed such wrongdoing. If defendants are correct, the accuracy of the report will be borne out through discovery.

McCallum also argues that because he is not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                 Page 13

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

alleged to have any knowledge of how C & A intended to account for the false transactions, there is no reason to believe he acted with scienter.[FN145] However, the Complaint clearly alleges that McCallum entered into the Round-Trip Transactions knowing that C & A would book the loans as income.[FN146]Contrary to McCallum's contentions, the most compelling inference that can be drawn from these facts is that McCallum acted with scienter.

### c. Stepp

   *11 The allegations against Stepp demonstrate how accusations of involvement in a fraudulent scheme can state a claim provided that they allege a specific use of a fraudulent device by the defendant. Stepp, C & A's Chief Financial Officer from 1995 to 1999 and 2002 to 2004 and consultant to C & A in the interim,[FN147] is alleged to have participated in several of the fraudulent transactions. With respect to the Round-Trip Transactions, the Complaint alleges that Stepp "helped arrange and collect the payments from McCallum" and made false statements to conceal the transactions from the Audit Committee investigation.[FN148]Stepp is alleged to have supervised employees who negotiated some of the Rebate Transactions, participated in meetings in which the transactions were discussed, and known of the false documentation prepared to support the transactions' fraudulent accounting.[FN149]

   In addition, the SEC alleges that in late 2001, Stepp informed McCallum that the three million dollars he was asked to contribute to C & A would be returned to McCallum in early 2002.[FN150] While this statement, on its own, might not be sufficient to incur liability under section 10(b), in light of Stepp's alleged involvement in the fraudulent schemes and his knowledge of the fraudulent nature of the transaction at issue, it is sufficient to state a claim under section 10(b).

   Stepp argues that the claims against him fail because he is not accused of making a fraudulent statement.[FN151]However, "[n]ot every violation of

the anti-fraud provisions of the federal securities law can be, or should be, forced into a category headed 'misrepresentations' or 'nondisclosures'."[FN152] It is reasonable to infer from the allegations in the Complaint that Stepp's intent in making this statement to McCallum was an essential part of creating the deceptive financial statements that would be communicated to investors. The Complaint thus identifies a deceptive device intentionally used by Stepp in connection with the purchase or sale of securities.

### d. Cosgrove

   The Complaint alleges that Cosgrove authored side letters for use in the Rebate Transactions knowing that such side letters would be used to fraudulently misrepresent C & A's income.[FN153] Cosgrove also advised C & A's Purchasing Department on drafting side letters to be used by that department in a similarly fraudulent manner.[FN154]The Complaint lists several other fraudulent transactions in which Cosgrove was involved. For example, in April 2004, Cosgrove directed C & A personnel to obtain false documents from a supplier that had agreed to participate in a one million dollar Rebate Transaction.[FN155]These incidents constitute the use of a deceptive device in connection with the sale of securities in violation of section 10(b).

   [11] Cosgrove argues that the Complaint fails to allege facts sufficient to support a strong inference of scienter.[FN156]Cosgrove suggests that where motive is not apparent, a plaintiff must allege " 'deliberate illegal behavior' " to demonstrate scienter.[FN157]Cosgrove misstates the law. Misbehavior does not require a finding of illegal behavior. The Second Circuit has made clear that while deliberate illegal behavior constitutes conscious misbehavior sufficient to support a strong inference of scienter, behavior that is not necessarily criminal but is knowingly fraudulent is also sufficient.[FN158] The facts alleged are more than adequate to support a strong inference of scienter.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*12** Cosgrove also asserts that the Complaint is insufficient to plead falsity because it fails to identify the specific provision of GAAP that C & A allegedly violated.[FN159]However, Rule 9(b) does not require the court to delve into the minutiae of accounting regulations at the pleading stage. On the contrary, at this stage, it is sufficient for plaintiff to allege with specificity defendant's fraudulent actions. Because the SEC has alleged with particularity that Cosgrove intended to falsify C & A's financial statements, Cosgrove has more than adequate notice of the fraudulent activity at issue.[FN160]

**e. Barnaba**

The Complaint alleges that as part of the Rebate Transactions, Barnaba "initially served as liaison between Cosgrove and C & A's Purchasing Department, knowingly conveying Cosgrove's directions on how the rebates should be structured to implement the fraud and ensuring that Cosgrove's instructions were carried out."[FN161]It further states that Barnaba "supervised Purchasing Department employees in soliciting documentation" for use with the fraudulent rebates.[FN162]While Barnaba is correct that allegations of involvement in a scheme are insufficient to state a claim under section 10(b),[FN163] knowingly supervising employees who are carrying out a fraudulent scheme is itself the employment of a deceptive device. These allegations, together with the supporting facts alleged, are sufficient to state a claim.

**2. Other Issues**

**a. Materiality**

Certain defendants argue that the transactions pled in the Complaint were immaterial.[FN164]SEC guidance indicates that "[q]ualitative factors may cause misstatements of quantitatively small amounts to be material."[FN165]Therefore, "magnitude by

itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment."[FN166]Among the relevant factors is "[w]hether the misstatement involves concealment of an unlawful transaction."[FN167]

As noted, materiality is a mixed question of law and fact and is thus not generally suitable for treatment on a motion to dismiss. Surely investors would consider the involvement of officers of a company in complex and wide-ranging schemes to inflate the company's income to be material even if the scheme had not yielded substantial results. Thus, I cannot find, at this stage, that the alleged deception is immaterial as a matter of law.

**B. Aiding and Abetting C & A's Section 10(b) Violation**

[12] The Complaint alleges that Barnaba aided C & A's violation of section 10(b) in contravention of section 20(e) of the Exchange Act. Barnaba argues that it is not clear which violations he is accused of aiding and abetting. However, the Complaint alleges with specificity that Barnaba was involved in the Rebate Transactions, thus placing Barnaba on notice as to the transactions that he allegedly aided and abetted. The Complaint further alleges that Barnaba knew of the fraud perpetrated by C & A, and that he rendered substantial assistance in connection with the Rebate Transactions. The SEC has stated a claim against Barnaba for aiding and abetting liability.

**C. Section 17(a) of the Securities Act**

**\*13** The SEC asserts that Stockman, Stepp, and Cosgrove violated section 17(a) by releasing the Registration Statement knowing that it contained false information.[FN168]The SEC has identified the statement, pled falsity and scienter as discussed above, and adequately alleged that the statement was made in connection with the sale of the Notes. The statement is attributable to these three

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

defendants under the group pleading doctrine. These allegations are therefore sufficient to state a claim.

**D. Aiding and Abetting C & A's Section 13(a) Violations, Falsification of Financial Records, Misleading of Independent Auditors, and Filing of False Certifications**

C & A allegedly filed false statements with the SEC in violation of section 13(a) of the Exchange Act. Stockman, Stepp, Cosgrove, McCallum, and Barnaba are allegedly responsible for aiding and abetting that violation in contravention of section 20(e). The SEC further alleges that C & A failed to maintain accurate financial records and to establish adequate internal controls in violation of section 13(b), and was aided and abetted by Stockman, Stepp, Cosgrove, McCallum, and Barnaba. The SEC also claims that Stockman, Stepp, Cosgrove, McCallum, and Barnaba circumvented C & A's internal controls and falsified its financial records in contravention of section 13(b)(5). The Complaint further states that the defendants falsified C & A's records in violation of Rule 13b2-1 and misled C & A's auditors in violation of Rule 13b2-2. Finally, the Complaint alleges that Stockman and Stepp filed false certifications in connection with C & A's financial statements.

As described above, the Complaint adequately alleges that the defendants committed deceptive acts with the goal of distorting C & A's financial statements. For the same reasons, I find that the Complaint states a claim against defendants for aiding and abetting these violations.

Stepp contends that the Complaint fails to allege with sufficient particularity what false information was provided to C & A's auditors.[FN169] While the allegations with respect to violations of section 13 are indeed sparse, the Complaint is evaluated as a whole and defendants cannot succeed on a motion to dismiss by lifting certain claims out of context and asserting that they lack specificity. The Complaint, viewed as a whole, provides detailed allegations about the false statements made by defendants to the auditors.

[13] Barnaba argues that he cannot be liable for violations of Rule 13b2-1 because the SEC failed to allege that he was responsible for C & A's accounting or that he made false statements directly to an auditor.[FN170] Barnaba misstates the law. To state a claim under Rule 13b2-1, a plaintiff need only allege that the defendant "contributed to the issuance of materially misleading financial statements ...."[FN171] As detailed above, the SEC has alleged that Barnaba did contribute to the issuance of a materially misleading financial statement. Barnaba also asserts that the SEC's claim under section 13(b)(5) for evading C & A's internal accounting controls fails as a matter of law because the SEC has failed to specify which of C & A's internal controls Barnaba evaded.[FN172] Barnaba again misstates the law. Prior to discovery, the SEC need not have detailed knowledge of C & A's internal control system. To satisfy Rule 9(b), the SEC must only plead sufficient detail to demonstrate a plausible claim and must plead Barnaba's alleged fraudulent action with specificity.[FN173] Requiring a plaintiff to provide the level of detail which Barnaba advocates would impose a burden beyond that contemplated by Rule 9(b).

*14 Barnaba further argues that because he is not alleged to have made a statement directly to an auditor, the SEC has failed to state a claim for violation of Rule 13b2-2. Barnaba's argument is directly contradicted by the text of the Rule, which prohibits any person acting at the direction of an officer or director from "directly or *indirectly*" misleading a company's accountants.[FN174]

**V. CONCLUSION**

For the reasons discussed above, defendants' motions to dismiss are denied. The Clerk of the Court is directed to close these motions (Nos. 50, 54, 58, 62, and 65 on the Docket Sheet). A conference is scheduled for January 25, 2008, at 3:30 p.m.

SO ORDERED.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 16

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

FN1. The facts summarized in this Opinion are drawn from the Complaint and are presumed to be true for the purpose of these motions. This Opinion does not discuss the claims against those defendants who have not moved to dismiss.

FN2. *See* Complaint ("Compl.") ¶ 10.

FN3. *See id.*

FN4. *See id.* ¶ 11.

FN5. *See id.*

FN6. *See id.* ¶ 12.

FN7. *See id.*

FN8. *See id.* ¶ 14.

FN9. *See id.* ¶ 15.

FN10. *See id.* ¶ 16.

FN11. *Id.* ¶ 20.

FN12. *See id.* ¶ 21.

FN13. *See id.* ¶ 21.

FN14. *See id.*

FN15. *See id.* ¶¶ 22, 23.

FN16. *See id.* ¶ 25.

FN17. *See id.* ¶ 23.

FN18. *See id.* ¶ 24.

FN19. *See id.* ¶ 26.

FN20. *See id.*

FN21. *See id.* ¶ 27.

FN22. *See id.* ¶ 28.

FN23. *See id.* ¶ 28-30.

FN24. *See id.* ¶ 30-32, 35, 38-40.

FN25. *See id.* ¶ 33-35, 37.

FN26. *See id.* ¶ 43.

FN27. *See id.* ¶¶ 43-48.

FN28. *See id.* ¶ 149.

FN29. *See id.*

FN30. *See id.*

FN31. *See id.* ¶ 50.

FN32. *See id.* ¶ 51.

FN33. *See* 1/27/05 SEC Form S-4, Collins & Aikman Corp., SEC Accession No. 0000950136-05-000418.

FN34. *See* Comply ¶ 53.

FN35. *See id.*

FN36. *See id.* ¶ 54.

FN37. *See id.*

FN38. *See id.* ¶¶ 55-57.

FN39. *See id.* ¶ 58.

FN40. *See id.* ¶¶ 59, 61.

FN41. *See id.* ¶¶ 63-66.

FN42. *Id.* ¶ 68; *see id.* ¶¶ 67-71.

FN43. *See id.* ¶ 70.

FN44. *See id.*

FN45. *See id.* ¶ 10.

FN46. *See* 3/30/07 Final Judgment as to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Defendant Collins & Aikman Corporation.

FN47.*See* 7/6/07 Letter from Helen V. Cantwell, Assistant United States Attorney; *see also United States v. Stockman,* 07 Cr. 220(BSJ).

FN48.*See* 9/10/01 Order.

FN49.*See* Compl. ¶¶ 79-87.

FN50. The section 10(b) claims are found in Count Two. The SEC also makes the following claims: that Stockman, Stepp, and Cosgrove violated section 17(a) of the Securities Act of 1933, which prohibits the offering of securities by means of false statements, by selling the Notes (Count One); that Barnaba violated section 20(e) of the Exchange Act, which prohibits " provid[ing] substantial assistance" to another person in connection with a violation of the Exchange Act, for aiding and abetting C & A's violation of section 10(b) (Count Three); that the Individual Defendants aided and abetted C & A's violation of section 13(a) of the Exchange Act, which requires issuers of registered securities to file accurate reports with the SEC, in violation of section 20(e) (Count Five); that the Individual Defendants aided and abetted C & A's violation of section 13(b)(2) of the Exchange Act, which requires issuers of registered securities to maintain accurate financial books and record transactions in accordance with GAAP (Count Seven); that the Individual Defendants violated section 13(b)(5) of the Exchange Act, which prohibits circumvention of internal controls (Count Eight); that the Individual Defendants violated Rule 13b2-1 of the Exchange Act, which prohibits falsification of books subject to section 13(b)(2)(A) (Count Nine); that the Individual Defendants violated Rule 13b2-2 of the Exchange Act, which prohibits directors and officers and those acting under their direction from interfering with the investigation of an

independent auditor (Count Ten); and that Stockman and Stepp violated Rule 13a-14 of the Exchange Act, which requires certain officers to file certificates in connection with reports filed pursuant to section 13(a) (Count Eleven).

FN51.*Bell Atlantic Corp. v. Twombly,* ---U.S. ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007).*Accord In re NYSE Specialists Sec. Litig.,* 503 F.3d 89, 95 (2d Cir.2007).

FN52.*In re NYSE Specialists,* 503 F.3d at 95.

FN53.*Id.* (quotation omitted).

FN54.*ATSI Commc'ns v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007).

FN55.*Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006).

FN56.*Erickson v. Pardus,* --- U.S. ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (quoting Fed.R.Civ.P. 8(a)(2)).

FN57.*See Bell Atlantic,* 127 S.Ct. at 1970.

FN58.*Id.* at 1964.*Accord ATSI,* 493 F.3d at 98 n. 2 (applying the standard of plausibility outside *Twombly's* anti-trust context).

FN59.*Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (emphasis in original).

FN60.*Bell Atlantic,* 127 S.Ct. at 1969 (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). *Accord id* ("The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard").

FN61.*ATSI,* 493 F.3d at 98 (quoting *Bell Atlantic,* 127 S.Ct. at 1965).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

FN62.*Id.* at 99.

FN63. The heightened pleading standards imposed by the Private Securities Litigation Reform Act ("PSLRA") do not apply to actions brought by the SEC. *See* 15 U.S.C. § 78u-4(b) ("The provisions of this subsection shall apply in each private action arising under this title that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure.").

FN64.Fed.R.Civ.P. 9(b).*See also ATSI,* 493 F.3d at 99.

FN65.*ATSI,* 493 F.3d at 99 (citing *Rombach v. Chang,* 355 F.3d 164, 171 (2d Cir.2004)).

FN66.*Rombach,* 355 F.3d at 170 (quotation omitted).*Accord ATSI,* 493 F.3d at 99 (citing *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000)).

FN67.*ATSI,* 493 F.3d at 99.

FN68.*Rombach,* 355 F.3d at 172 (quotation omitted).

FN69.*Novak,* 216 F.3d at 309 (citation omitted).

FN70.*See* 48 Stat. 881 (June 6, 1934), codified at 15 U.S.C. § 78a *et seq.*

FN71.*United States v. Bilzerian,* 926 F.2d 1285, 1297 (2d Cir.1991).

FN72.*In re Parmalat Sec. Litig.,* 376 F.Supp.2d 472, 501 (S.D.N.Y.2005) (quoting *SEC v. Zandford,* 535 U.S. 813, 819, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002) ).

FN73.*SEC v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2d Cir.1999).

FN74.*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511

U.S. 164, 177, 114 S.Ct. 1439, 128 L.Ed.2d 119(1994).

FN75.*SEC v. U.S. Envtl., Inc.,* 155 F.3d 107, 111 (2d Cir.1998) (quoting *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1471 (2d Cir.1996)).*Accord Levitt v. Bear Stearns & Co.,* 340 F.3d 94, 103 (2d Cir.2003) ("In the wake of *Central Bank,* this Court has held that a primary violator is one who participated in the fraudulent scheme or other activity proscribed by the securities laws.") (quotations omitted).

FN76.*Shapiro v. Cantor,* 123 F.3d 717, 720 (2d Cir.1997).

FN77.*Compare Parmalat,* 376 F.Supp.2d at 501 ("[T]he Second Circuit ... ruled out the possibility that a defendant could be liable merely for 'participating' in the misstatements or omissions of others without attribution to that defendant.") *with In re Salomon Analyst AT&T Litig.,* 350 F.Supp.2d 455, 472-73 (S.D.N.Y.2004) ("[S]ubsections (a) and (c) of Rule 10b-5[ ] ... describe causes of action for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant.") *and Rich v. Maidstone Fin.,* No. 98 Civ. 2569, 2002 WL 31867724, at *8 n. 6 (S.D.N.Y. Dec.20, 2002) ("Despite the language ... that suggests otherwise, the Second Circuit continues to permit plaintiffs to allege 'participation in' a securities fraud scheme as one manner in which a plaintiff may state a claim under § 10(b) and Rule 10b-5.").*See generally Salomon Analyst,* 350 F.Supp.2d at 473 (observing that courts in this district typically "permit[ ] claims against insiders that allege substantial knowing participation or orchestration"); *Rich,* 2002 WL 31867724, at *8 n. 6 (reviewing Second Circuit precedent).

FN78.15 U.S.C. § 78j.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

FN79.*See Zandford,* 535 U.S. at 816 n. 1, 122 S.Ct. 1899 ("The scope of Rule 10b-5 is coextensive with the coverage of § 10(b) ....").

FN80. It must be emphasized that the reason liability does not attach is not that the person lacks scienter. The question of scienter is never reached because as an initial matter, the person did not engage in the unlawful conduct.

FN81.*See Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,* 135 F.3d 837 (2d Cir.1998) (finding that *Central Bank* precludes action for conspiracy under section 10(b)).

FN82.*Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193-94, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

FN83.*ATSI,* 493 F.3d at 99 (citing *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 168-69 (2d Cir.2000)). The Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* noted that it had "previously reserved the question whether reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b-5," but that "[e]very Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required."--- U.S. ----, 127 S.Ct. 2499, 2507 n. 3, 168 L.Ed.2d 179 (2007). The Court declined to address the issue. *See id.*("The question whether and when recklessness satisfies the scienter requirement is not presented in this case."). Thus, Second Circuit law, which permits scienter to be shown by recklessness, continues to bind this Court.

FN84.*Kalnit v. Eichler,* 264 F.3d 131, 142 (2d Cir.2001).

FN85.*Id.* (quoting *Honeyman v. Hoyt (In re Carter-Wallace, Inc. Sec. Litig.),* 220 F.3d 36, 39 (2d Cir.2000)).

FN86.*See Suez Equity Investors v. Toronto-Dominion Bank,* 250 F.3d 87, 100 (2d Cir.2001).

FN87.*Tellabs,* 127 S.Ct. at 2509 (emphasis added).

FN88.*See U.S. Envtl.,* 155 F.3d at 111.

FN89.*See Turkish v. Kasenetz,* 27 F.3d 23 (2d Cir.1994) (citing *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987)).

FN90.*Tellabs,* 127 S.Ct. at 2509.

FN91. In private actions, courts also require a plaintiff to demonstrate reliance, causation, and damages. These requirements, however, do not apply to actions brought by the SEC. *See SEC v. North Am. Research & Dev. Corp.,* 424 F.2d 63, 84 (2d Cir.1970); *SEC v. KPMG LLP,* 412 F.Supp.2d 349, 375 (S.D.N.Y.2006).

FN92.*Wright v. Ernst & Young LLP,* 152 F.3d 169, 175 (2d Cir.1998).

FN93.*See id.*(citing *Anixter v. Home-Stake Prod.,* 77 F.3d 1215, 1226 (10th Cir.1996) ).

FN94.*Basic, Inc. v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).*Accord Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

FN95.*Azrielli v. Cohen Law Offices,* 21 F.3d 512, 518 (2d Cir.1994).*Accord Basic,* 485 U.S. at 231, 108 S.Ct. 978 (applying the materiality standard established in *TSC Indus. v. Northway Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) to Rule 10b-5 actions).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

FN96.*TSC Indus.,* 426 U.S. at 449, 96 S.Ct. 2126.

FN97.*See Glazer,* 964 F.2d at 154-55.

FN98.*See, e.g., Halperin v. eBanker USA.com,* 295 F.3d 352, 357 (2d Cir.2002).

FN99.*In re Regeneron Pharm., Inc. Sec. Litig.,* No. 03 Civ. 3111, 2005 WL 225288, at *14 (S.D.N.Y. Feb.1, 2005) (citing *Halperin,* 295 F.3d at 357).

FN100.*In re Refco, Inc. Sec. Litig.,* 503 F.Supp.2d 611, 641 (S.D.N.Y.2007) (emphasis added) (quoting *In re BISYS Sec. Litig.,* 397 F.Supp.2d 430, 438 (S.D.N.Y.2005)).*Accord U.S. Envtl.,* 155 F.3d at 112 ("The Supreme Court in *Central Bank* never intended to restrict § 10(b) liability to supervisors or directors of securities fraud schemes while excluding from liability subordinates who also violated the securities laws.").

FN101.*See In re Refco,* 503 F.Supp.2d at 641.I note that three circuits have found that the group pleading doctrine was abrogated by the PSLRA. *See Winer Family Trust v. Queen,* 503 F.3d 319, 334-37 (3d Cir.2007); *Financial Acquisition Partners v. Blackwell,* 440 F.3d 278, 287 (5th Cir.2006); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 602-03 (7th Cir.2006), *rev'd on other grounds,*--- U.S. ----, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Although the PSLRA does not apply here, it could be argued that because the PSLRA is a codification of the pleading standard that applies in this circuit, group pleading is unacceptable under Rule 9(b).
The Second Circuit has not addressed this issue, and the majority of courts in this district have found that the PSLRA does not abrogate group pleading. *See In re Refco,* 503 F.Supp.2d at 641;*In re BISYS,* 397 F.Supp.2d at 439 n. 42 (collecting cases). I agree with the observation of Judge Gerard

Lynch that "there [is no] apparent contradiction between the idea that each defendant's role must be pled with particularity and the fact that corporate officers may work as a group to produce particular document."*In re Refco,* 503 F.Supp.2d at 641-42.

FN102.*KPMG LLP,* 412 F.Supp.2d at 375 (citing *First Jersey Sec.,* 101 F.3d at 1471 and *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63 (2d Cir.2001)) (emphasis added).

FN103.*See Lattanzio v. Deloitte & Touche LLP,* 476 F.3d 147, 152 (2d Cir.2007); *see also Wright,* 152 F.3d at 175.

FN104.*See Lattanzio,* 476 F.3d at 152.

FN105.*See Wright,* 152 F.3d at 175 (citing *Anixter,* 77 F.3d at 1225).

FN106.*See id.*

FN107.*KPMG LLP,* 412 F.Supp.2d at 375.

FN108.15 U.S.C. § 77q(a).

FN109.*See Aaron v. SEC,* 446 U.S. 680, 691, 697, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) ("It is our view, in sum, that the language of § 17(a) requires scienter under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3)."); *Sante Fe Indus. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Ernst & Ernst.* 425 U.S. at 199, 96 S.Ct. 1375.

FN110.*Monarch Funding Corp.,* 192 F.3d at 308.

FN111.15 U.S.C. § 78m(b)(5).

FN112.*Id.* § 78m(b)(2)(A).

FN113.17 C.F.R. § 240.13b2-1.

FN114.*See SEC v. McNulty,* 137 F.3d 732, 740-41 (2d Cir.1998).

FN115.*See*17 C.F.R. § 240.13b2-2.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN116.*See*SEC Release No. 34-15570 (" [T]he Commission has determined that a ' scienter' requirement should not be included in the Rule. The inclusion of such a requirement would be inconsistent with the language of new section 13(b)(2)(A), which contains no words indicating that the Congress intended to impose a 'scienter ' requirement.").

FN117.15 U.S.C. § 78t(e).

FN118.*See*15 U.S.C. § 78t.

FN119.*IIT v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980).*Accord United States v. District Council,* No. 90 Civ. 5722, 2007 WL 2697135, at *16 (S.D.N.Y. Sept.17, 2007) (citing *IIT* ).

FN120.*See Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.,* 602 F.2d 478, 484 (2d Cir.1979); *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983).

FN121.*See Edwards & Hanly,* 602 F.2d at 484.

FN122.*See* Comply ¶ 81.

FN123.*See id.* ¶ 82.

FN124.*See id.* ¶ 83.

FN125.*See id.* ¶ 85.

FN126.*See id.* ¶ 86.

FN127.*See id.* ¶ 84.

FN128.*See id.* ¶ 22.

FN129.*See id.* ¶ 23.

FN130.*See id.* ¶ 25.

FN131.*See id.* ¶ 31.

FN132.*See id.*

FN133.*See id.*

FN134.*See id.* ¶ 32.

FN135.*See id.* ¶ 36.

FN136. Memorandum of Law in Support of Defendant David A. Stockman's Motion to Dismiss the Complaint, at 11-40.

FN137.*See Kalnit,* 264 F.3d at 142.

FN138.*See* Comply ¶ 21.

FN139.*See id.*

FN140.*See id.* ¶ 22.

FN141.*See id.* ¶ 23.

FN142.*See id.* ¶ 25.

FN143.*See* Memorandum in Support of Motion to Dismiss by Defendant Elkin B. McCallum ("McCallum Mem."), at 10.

FN144.*See, e.g.,* Compl. ¶ 25 (alleging that "McCallum made false statements to the Audit Committee").

FN145.*See* McCallum Mem. at 14-16.

FN146.*See* Compl. ¶ 21. For this reason, McCallum's argument that he cannot be liable for aiding and abetting C & A's violations because he did not know of their intended accounting treatment fails as well. *See* McCallum Mem. at 19-20.

FN147.*See* Compl. ¶ 12.

FN148.*Id.* ¶ 25.

FN149.*See id.* ¶ 42.

FN150.*See id.* ¶ 21.

FN151.*See* Memorandum of Law of J. Michael Stepp in Support of His Motion to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                              Page 22

--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Dismiss the Complaint ("Stepp Mem."), at 11.

FN152.*Competitive Assocs. v. Laventhol, Krekstein, Horwath & Horwak,* 516 F.2d 811, 814 (2d Cir.1975).*Accord In re Laser Arms Corp. Sec. Litig.,* 794 F.Supp. 475, 488 (S.D.N.Y.1989).

FN153.*See id.* ¶ 30.

FN154.*See id.* ¶ 42.

FN155.*See id.* ¶ 43.

FN156.*See* Memorandum of Law in Support of Defendant David R. Cosgrove's Motion to Dismiss the Complaint (" Cosgrove Mem."), at 12.

FN157.*Id.* at 12 (quoting *Novak,* 216 F.3d at 308).

FN158.*See, e.g., Novak,* 216 F.3d at 313 (finding that a plaintiff successfully pled scienter where "the Complaint alleges that the defendants engaged in conscious misstatements with the intent to deceive").

FN159.*See* Cosgrove Mem. at 17.

FN160.*Id.*

FN161. Compl. ¶ 42.

FN162.*Id.*

FN163.*See* Memorandum of Law in Support of Defendant Paul C. Barnaba's Motion to Dismiss ("Barnaba Mem."), at 12.

FN164.*See, e.g.,* McCallum Mem. at 17 (noting that the challenged transactions resulted in a "paltry $14.8 million of revenue").

FN165.Staff Accounting Bulletin ("SAB") No. 99, 64 Fed.Reg. 45150, 45152 (1999).

The Second Circuit has described these standards as "persuasive ... for evaluating the materiality of an alleged misrepresentation."*Ganino,* 228 F.3d at 163.

FN166.SAB, 64 Fed.Reg. at 45152.

FN167.*Id.*

FN168. The SEC also alleges that these defendants violated section 17(a) by " participat[ing] in the road shows and/or prepar[ing] the materials for those road shows, knowing that those materials contained false or misleading information." Compl. ¶ 75. Were this the only allegation in this claim, I would be inclined to dismiss this claim. However, given that the other allegation is sufficient to state a claim, it is not necessary to partition this claim and dismiss one portion.

FN169.*See* Stepp Mem. at 19.

FN170.*See* Barnaba Mem. at 25.

FN171.*SEC v. 800america.com, Inc.,* No. 02 Civ. 9046, 2006 WL 3422670, at *10 (S.D.N.Y. Nov. 28, 2006).

FN172.*See* Barnaba Mem. at 26.

FN173.*See Rombach,* 355 F.3d at 170.

FN174.*See*17 C.F.R. § 240.13b2-2 (emphasis added).

S.D.N.Y.,2007.
S.E.C. v. Collins & Aikman Corp.
--- F.Supp.2d ----, 2007 WL 4480025 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1

Not Reported in F.Supp.2d, 2005 WL 1206841 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

**H**
S.E.C. v. Lucent Technologies Inc.
D.N.J.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. New Jersey.
SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,
v.
LUCENT TECHNOLOGIES INC., Nina Aversano,
Jay Carter, Alice Leslie Dorn, William Plunkett,
John Bratten, Deborah Harris, Charles Elliot,
Vanessa Petrini, Michelle Hayes-Bullock, and
David Ackerman, Defendants.
**No. Civ. 04-2315(WHW).**

May 20, 2005.

Mark A. Adler, Larry Ellsworth, Charles E. Cain,
Washington, D.C., for Securities and Exchange
Commission.
Barry H. Evenchick, Walder, Hayden & Brogan,
P.A., Roseland, NJ, Carmen J. Lawrence, David B.
Hennes, Teresa M. Venezia, Ginny Edwards, Fried,
Frank, Harris, Shriver & Jacobson LLP, New York,
NY, for Defendant.

OPINION

WALLS, J.
    *1 Defendant Alice Leslie Dorn moves to
dismiss the First, Third and Fourth Counts of the
Complaint. The motion is decided without oral
argument pursuant to Fed.R.Civ.P. 78.


FACTS AND PROCEDURAL BACKGROUND

    Plaintiff SEC, by its Complaint alleges that:
Lucent Technologies Inc. ("Lucent") fraudulently
and improperly recognized revenue and pre-tax

income in violation of generally accepted
accounting principles ("GAAP") during its fiscal
year 2000. As a result, Lucent improperly
overstated its pre-tax income that fiscal year by
sixteen percent. Lucent prematurely recognized
$511 million of revenue and $91 million in pre-tax
income in quarterly results during Lucent's fiscal
year 2000. The remaining $637 million in revenue
and $379 million in pre-tax income should not have
been recognized during Lucent's fiscal year 2000.
The SEC alleges that Lucent's violations of GAAP
were due to the fraudulent and reckless actions of
the named individual defendants, officers,
executives and employees of Lucent. And, the
GAAP violations were also the result of deficient
internal controls which led to numerous accounting
errors by others.

    The defendant Dorn was Lucent's vice
president of indirect sales for North America from
November 1998 to December 2000. She reported
directly to another defendant, Nina Aversano, the
president of Lucent's North American sales and
service provider networks. According to plaintiff, in
the first quarter of Lucent's fiscal year 2000, Dorn
and Aversano began engaging in a pattern and
practice of orally granting two of Lucent's
distributors, Anixter International, Inc. ("Anixter")
and Graybar Electric Company ("Graybar"), certain
rights and privileges beyond those enumerated in
their respective distribution agreements. Granting
Anixter and Graybar these rights made it improper
under GAAP for Lucent to recognize revenue from
sales to these distributors at the time of the sale.
More specifically, the SEC alleges that Lucent
violated FASB Concepts Statement No. 5, which
prohibits revenue recognition unless and until
realizable and earned, and FASB Statement No. 48,
which identifies circumstances when revenues may
not be recognized because they are not sufficiently
realizable or earned. In the past, Lucent recorded
transactions that exhibited such uncertainties as
consignment sales, with revenue deferred until
resale by the distributor. During Lucent's fiscal year

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1206841 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

1999 until the end of its fiscal year 2000, however, Lucent modified its accounting policy and began recognizing revenue upon delivery to distributors. This change meant that Lucent violated GAAP in several transactions because the extra-contractual commitments made by Dorn to distributors resulted in uncertainties surrounding those transactions, so charges the SEC.

The SEC complains that despite knowing, or being reckless in not knowing, that the verbal side agreements made revenue recognition improper under GAAP, Dorn failed to inform Lucent's finance department of the side agreements and, on some occasions, affirmatively misrepresented the facts to members of Lucent's finance department.

**\*2** The SEC goes on to allege the following: Dorn gave explicit extra-contractual assurances in connection with five transactions. The first transaction was a sale to Anixter of approximately $335 million of product over the course of Lucent's fiscal years 1999 and 2000 for resale to MCI/Worldcom. About this transaction, Dorn was told by an Anixter executive that its exposure was too great to take on more of Lucent's product without assurances that Anixter could sell the product to a customer other than MCI/Worldcom or could return the product to Lucent if not sold. In Dorn's presence, Aversano assured the executive that it would not be an issue. Dorn herself also gave assurances to Anixter executives that if a resale did not go through, Lucent would substitute the product that Anixter bought for another product that its customer might need, Lucent would find other customers for Anixter to sell the product to and, if that did not work, Anixter could return the product to Lucent. When Dorn was questioned by Lucent's chief accountant sometime in June or July of 2000, Dorn falsely told him that there were no verbal agreements or side deals that would indicate there were any rights of return beyond the provisions noted in the distributor agreements. Then in October or November 2000, Dorn acknowledged to an Anixter executive that commitments had been made to Anixter and that if Anixter could not sell the product, Anixter would not have to continue to carry it.

The second transaction was a sale to Anixter of approximately $38 million of product at the end of Lucent's first quarter of its fiscal year 2000. In connection with this sale, Dorn represented to several Anixter executives that Anixter would be able to sell the product, but that it could be returned to Lucent if it did not sell. Dorn explicitly told the executives that Aversano had authorized the right of return. Anixter was unable to sell the majority of the product and Lucent paid holding fees to Anixter until the inventory was returned to Lucent in September 2000.

Plaintiff further charges that the third transaction was a sale to Anixter of $89 million of product over the course of Lucent's second and third quarters of its fiscal year 2000 for resale to ICG Communications, Inc. ("ICG"). In connection with this sale, Dorn gave an Anixter executive assurances, including that it had the right to return the product if the sales did not work out. Dorn also agreed to give Anixter a holding fee to compensate it for each day the resale to ICG was delayed beyond the projected resale date, and to compensate it for any outstanding receivable balances from ICG. There were approximately $46 million in outstanding receivables from ICG and Lucent agreed to compensate Anixter for it.

The fourth transaction was a sale to Graybar of approximately $250 million of product over the course of Lucent's first through third quarters of its fiscal year 2000 for resale to U.S. West Communications, Inc. ("U.S.West"). In connection with this sale, Dorn made or authorized representations to Graybar employees. Dorn told Graybar executives that the Lucent product would be off Graybar's books by the end of the year, that Lucent would reconfigure the Lucent product and arrange its sale to another regional bell operating company if sales to U.S. West did not work out, and that Graybar would not get hurt in the transactions. Ultimately, nearly all of the product Graybar purchased in the second and third quarters of fiscal year 2000 was returned to Lucent.

**\*3** The fifth transaction was a sale to Graybar of approximately $61 million of product in Lucent's third quarter of fiscal year 2000 for resale to three

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 3

Not Reported in F.Supp.2d, 2005 WL 1206841 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

local exchange carriers. Dorn told a Graybar executive that Graybar would not get hurt in the transaction, and that Lucent would help them sell the product to other customers if the transactions did not work out. The transactions did not work out and Graybar returned the product to Lucent.

The SEC complains that Dorn acted with knowledge or recklessly engaged in the fraudulent conduct described, and that as a result of her fraudulent conduct, Lucent violated GAAP. The SEC also alleges that Dorn knew, or was reckless in not knowing, that as a result of the fraudulent conduct, Lucent filed materially misleading forms 10-Q with the Securities and Exchange Commission for the first three quarters of its fiscal year 2000, and that revenue was improperly included in Lucent's October 23, 2000 unaudited financial statements that were filed with the Commission in a form 8-K on October 24, 2000. In December 2000, Lucent agreed to take back $352 million in inventory that Anixter and Graybar were unable to sell. Overall, Aversano and Dorn's fraudulent conduct resulted in Lucent materially overstating its pre-tax income for fiscal year 2000 by approximately seven percent.

Based on these allegations, plaintiff alleges four counts against Dorn. Count One of the Complaint alleges that Dorn violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 10b-5, and that she is also liable for aiding and abetting Lucent in violating such laws. Count Three alleges that Dorn aided and abetted Lucent in violating Section 13(a) of the Exchange Act, Rules 12b-20, 13a-11 and 13a-13 by causing Lucent to file materially false and misleading financial statements. Count Four alleges that Dorn aided and abetted Lucent in violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act by causing Lucent's books and records to be inaccurate and by assisting in Lucent's failure to maintain sufficient internal accounting controls. Count Five alleges that Dorn violated Section 13(b)(5) of the Exchange Act and Rule 13b2-1 by knowingly circumventing Lucent's system of internal accounting controls and knowingly falsifying, or causing to be falsified, Lucent's books and records. Dorn now moves to dismiss Counts

One, Three and Four for failure to state a claim upon which relief can be granted.

## STANDARD FOR A RULE 12(b)(6) MOTION TO DISMISS

On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), a court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 374 n. 7 (3d Cir.2002). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

**\*4** While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegation. *Miree v. DeKalb County, Ga.,* 433 U.S. 25, 27 n. 2 (1977). Moreover, the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. Fed.R.Civ.P. 8(a)(2); *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). The Court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. *Sentinel Trust Co. v. Universal Bonding Ins. Co.,* 316 F.3d 213, 216 (3d Cir.2003); *seealso*5A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1357 at 299 (2d ed.1990).

"A 'document integral to or explicitly relied on in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.' " *Mele v. Federal Reserve Bank of N.Y.,* 359 F.3d 251, 255 n. 5 (3d Cir.2004) (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997)). "Plaintiffs cannot prevent a court from looking at the texts of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1206841 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

the documents on which its claim is based by failing to attach or explicitly cite them." *Id.*

## DISCUSSION

### I. Count One-Primary Liability

Dorn's main challenge to the Complaint is that the SEC has failed to plead facts demonstrating that Dorn knew, or was reckless in not knowing, that any of the conduct she engaged in was improper from an accounting perspective. With regard to the requirement that a plaintiff plead facts demonstrating that a defendant acted with scienter, the Third Circuit has defined "scienter" in the context of securities fraud as "a mental state embracing intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable (conduct), involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."*In re Alpharma Inc. Sec. Litig.,* 372 F.3d 137, 148 (3d Cir.2004) (quoting *In re Ikon Office Solutions, Inc.,* 277 F.3d 658, 667 (3d Cir.2002)). Rule 9(b) provides that, in the context of pleading fraud, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally."As this Court has previously noted, the additional requirement of the Private Securities Litigation Reform Act of 1995 (" PLSRA") that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,"15 U.S.C. § 78u-4(b)(2), does not apply to actions brought by the SEC. *SEC v. Lucent Technologies, Inc.,* 2005 WL 771228, *6 (D.N.J. April 6, 2005).

*5 To adequately plead scienter, regardless whether the PSLRA applies, plaintiffs "must allege facts that could give rise to a 'strong' inference of

scienter."*Burlington Coat Factory,* 114 F .3d at 1422. A plaintiff must either "(1) identify circumstances indicating conscious or reckless behavior by defendants or (2) allege facts showing both a motive and a clear opportunity for committing the fraud."*Id.* As said, because the PSLRA does not apply, the SEC is exempt from the PSLRA's additional requirement of pleading scienter with particularity. *See In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 533-35 (3d Cir.1999) (the PSLRA differs from the previous standard for pleading scienter only in that it requires that it be pled with particularity).

### A. Conscious or Reckless Behavior

Dorn charges that only two of the paragraphs in the Complaint address scienter, that those allegations are conclusory, and that the SEC has not pled any facts to support the allegations. Dorn relies on *Burlington Coat Factory* where the circuit held that "[i]t is not enough for plaintiffs to allege generally that defendants 'knew or recklessly disregarded each of the false and misleading statements for which [they were] sued'; plaintiffs must allege facts that could give rise to a 'strong' inference of scienter."114 F.3d at 1422 (citations omitted). The SEC counters that it has satisfied the requirements for pleading scienter, regardless of whether the Court evaluates the allegations under the "strong inference" standard articulated in *Burlington Coat Factory,* or under Rule 9(b) which allows scienter to be pled generally.

There are no allegations from which the Court could infer that Dorn had any knowledge of accounting principles or that she had any role in Lucent's decisions to recognize revenue in connection with the transactions Dorn executed. The SEC relies on *SEC v. Dunlap,* 2002 WL 1007626, *6 (S.D.Fla. March 27, 2002), for the proposition that persons who are not accountants can still be held liable when the companies they work for violate GAAP. The *Dunlap* court found that knowledge or recklessness could be inferred by virtue of the defendant's position with the company. *Id.* at *6, n. 8. The Third Circuit, however, has

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1206841 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

indicated its unwillingness to impute knowledge on the basis of one's position within a company in the context of pleading fraud in accordance with Rule 9(b): "[g]eneralized imputations of knowledge do not suffice, regardless of the defendants' positions within the company."*Advanta,* 180 F.3d at 539. Furthermore, while the SEC alleges that Lucent changed its accounting policy, thereby making the side agreements significant for revenue recognition purposes, the SEC does not allege, nor can the Court infer, that Dorn was aware of this change in policy and that it affected her business group. As to the SEC's allegation that Dorn made an affirmative misrepresentation to Lucent's chief accountant that there were no side agreements granting a right of return greater than what was already specified in the distributor agreements, this allegation does not give rise to the strong inference of scienter that is required. Had the SEC alleged that Dorn possessed some knowledge of accounting principles and Lucent's change in accounting policy, then this allegation would be sufficient. Without such supporting factual allegations, however, the Court cannot stretch this allegation as far as the SEC wishes. That Dorn did not tell the chief accountant about the side agreements does not mean that she knew the agreements would be significant to how revenue from those transactions was recognized, and it would be unreasonable to infer such without additional factual allegations. While the SEC charges that Dorn did not need to be an accountant to realize that the side agreements would lead to improper revenue recognition, the SEC offers no compelling reason why this Court should charge regular business people with knowledge of accounting principles. For these reasons, the Court finds that the SEC has failed to adequately plead scienter by way of facts that provide strong circumstantial evidence of conscious misbehavior or reckless.

B. Motive and Opportunity

*6 Even though the SEC has failed to sufficiently plead scienter under the "conscious or reckless behavior" test, the Court must consider whether the SEC has adequately pled scienter under the "motive and opportunity" test articulated in *Burlington Coat Factory.*"Motive entails allegations that the individual corporate defendants stood to gain in a concrete and personal way from one or more of the allegedly false or misleading statements and wrongful nondisclosures."*Wilson v. Bernstock,* 195 F.Supp.2d 619, 633 (D.N.J.2002). Opportunity refers to "the means and likely prospect of achieving such concrete benefits by the means alleged."*Id.*

With regard to motive and opportunity, the SEC alleges:
In their drive to realize revenue, meet internal sales targets and/or obtain sales bonuses, Nina Aversano, Jay Carter, Leslie Dorn, William Plunkett, John Bratten, Deborah Harris, Charles Elliot, Vanessa Petrini, and Michelle Hayes-Bullock, in their respective capacities as officers, executives and employees of Lucent improperly granted, and/or failed to disclose, various side agreements, credits and other incentives (collectively "extra-contractual commitments") to induce Lucent's customers to purchase the company's products.

(Compl. at ¶ 3.) Dorn argues that the SEC has failed to sufficiently plead motive and opportunity because this sole allegation refers to reasons that courts have found insufficient to constitute scienter. In *In re Crown American Realty Trust Sec. Litig.,* 1997 WL 599299, *25 (W.D.Pa.Sept.15, 1997), the court found that the plaintiffs' allegations were tantamount to an assertion that the reason the defendant failed to disclose certain information was because of its desire to improve its financial situation to enhance its ability to finance further capital improvements. The court held that "such a motive, without more" was insufficient to plead scienter in compliance with Rule 9(b).*Id.* Moreover, in *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994), the court found that to allege motive "a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold."The court cited approvingly *Ferber v. Travelers Corp.,* 785 F.Supp. 1101, 1107 (D.Conn.1991) for the statement that "[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated. On a practical

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1206841 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

level, were the opposite true, the executives of virtually every corporation in the United States could be subject to fraud allegations."

To rebut Dorn's argument, the SEC advances *Weiner v. The Quaker Oats Co.,* 129 F.3d 310, 318 n. 8 (3d Cir.1997), for the proposition that a desire to preserve one's job is a sufficient motive for purposes of scienter. In *Weiner,* the complaint alleged that "Quaker's management took advantage of specific opportunities to communicate with the investment community in order to inflate the price of Quaker stock, fend off a widely-rumored potential takeover, and preserve management's own jobs."The SEC's reliance on this case is misplaced. First, as the complaint alleged more than continued employment as the motive for the defendants actions, it would be misleading to say that a desire to keep a job alone is sufficient to show motive. Second, and even more significant is that the SEC did not allege that Dorn was motivated by a desire to remain employed, but rather a related desire to obtain a sales bonus. As the Second Circuit has recognized, however, incentive compensation is insufficient for purposes of pleading scienter under the motive and opportunity test.*Shields,* 25 F.3d at 1130. For these reasons, the SEC's allegations fall far short of satisfying the "motive and opportunity" test. See*Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068-69 (5th Cir.1994) (allegation that defendants acted for the purpose of creating an artificially inflated picture of the company's financial condition, increasing market share, gaining competitive advantage, maintaining an inflated stock price, preserving defendants' positions, obtaining compensation for themselves, and/or inflating the value of their shares and stock "does not set out facts sufficient to lead to a proper inference of scienter.").

*7 The SEC's failure to adequately plead scienter under either the "conscious or reckless behavior" test or the "motive and opportunity" test requires the Court to grant Dorn's motion to dismiss Count One of the Complaint.

*II. Count One-Aiding and Abetting Liability*

In addition to alleging a primary violation of Section 10(b) and Rule 10b-5, the SEC also asserts a claim against Dorn for aiding and abetting liability for providing substantial assistance to Lucent in its primary violation of these laws. To state a claim for aiding and abetting, a plaintiff must show: (1) that there has been an underlying securities violation; (2) that the alleged aider-abettor had knowledge of that act; and (3) that the aider-abettor knowingly and substantially participated in the wrongdoing. *Monsen v. Consolidated Dressed Beef Co., Inc.,* 579 F.2d 793, 799 (3d Cir.1978). Dorn argues that the SEC has failed to allege facts that would support a finding that Dorn knowingly and substantially participated in Lucent's violation. Dorn relies on *Cammer v. Bloom,* 711 F.Supp. 1264, 1299-1300 (D.N.J.1989) . In *Cammer,* the defendant was charged with an aiding and abetting claim under Rule 10b-5. The plaintiff stock holders alleged that the company had improperly recognized revenue. In discussing the knowing and substantial participation element of aiding and abetting liability, the court found that the broad conclusory allegation that the defendant knowingly and recklessly participated in the issuance of false and misleading statements to the investing public to be insufficient. *Id.* It was alleged that the defendant was a director and outside attorney for the company and that he sold certain amounts of company stock during the class period. *Id.* In finding the allegations insufficient, the court said:

There are no allegations, for example, that Kagan, as part of his duties as a director, was on the audit committee of the Board of Directors. There are no allegations that he exercised any responsibility for the Company's day to day operations. Indeed nothing at all is alleged in the Amended Complaint from which it can be inferred that Kagan knew of or participated in the fraud.

*Id.* (footnote omitted). The court dismissed the claim against Kagan and granted the plaintiff leave to amend their complaint to "replead with particularity any facts which would suggest Kagan had knowledge of, or involvement in, the accounting and reporting practices at Coated Sales." *Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1206841 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

As in *Cammer,* no facts have been alleged here that would suggest that Dorn knowingly participated in Lucent's misstatement of revenue and income. Without allegations that show Dorn had knowledge of accounting principles or Lucent's policy regarding how and when revenue should be recognized in transactions such as the ones Dorn is alleged to have executed, the SEC has not sufficiently pled the third element of an aiding and abetting claim. For this reason, the SEC cannot maintain its Section 10(b) aiding and abetting claim against Dorn, and Dorn's motion to dismiss this claim is granted.

*III. Counts Three and Four*

**\*8** Count Three alleges that Dorn aided and abetted Lucent in violating Section 13(a) of the Exchange Act and Rules 12b-20, 13a-11 and 13a-13 by causing Lucent to file materially false and misleading financial statements in forms 10-Q for the first three quarters of its fiscal year 2000 and in a form 8-K filed on October 24, 2000 with regard to Lucent's fourth quarter results.[FN1] Count Four alleges that Dorn aided and abetted Lucent's failures to keep accurate books, records, and accounts that fairly reflected Lucent's transactions and assets in violation of Section 13(b)(2)(A). Count Four also alleges that Dorn aided and abetted Lucent's failures to maintain an adequate system of internal accounting controls such that there could be a reasonable assurance that Lucent's financial statements would be prepared in conformity with GAAP in violation of Section 13(b)(2)(B).[FN2] The elements for these aiding and abetting claims are the same as those for a Section 10(b) claim: (1) a primary violation by Lucent, (2) the aider-abettor had knowledge of that act, and (3) the aider-abettor knowingly and substantially participated in the wrongdoing. *Monsen,* 579 F.2d at 799. Dorn challenges these claims on the ground that the SEC failed to allege any facts that would suggest that she knowingly and substantially participated in the misstatement of Lucent's financials, its failure to keep accurate books and records, or its failure to maintain an adequate system of internal controls. Because the SEC did not allege facts that would

support an inference that Dorn knew it was improper to recognize revenue in the transactions she executed, the third element of its aiding and abetting claims has not been adequately pled. It follows then that Counts Three and Four must also be dismissed.

> FN1. Section 13(a) and the rules referenced provide that an issuer of securities must file certain documents with the SEC and that such documents must contain certain information so as to not be misleading. Implicit in these provisions is the requirement that the information submitted be true and correct. *GAF Corp. v. Milstein,* 453 F.2d 709, 720 (2d Cir.1971).

> FN2. Sections 13(b)(2)(A) and 13(b)(2)(B) provide:
> (2) Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall-
> (A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
> (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that-
> (i) transactions are executed in accordance with management's general or specific authorization;
> (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
> (iii) access to assets is permitted only in accordance with management's general or specific authorization; and
> (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 8

Not Reported in F.Supp.2d, 2005 WL 1206841 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

CONCLUSION


Defendant Dorn's Motion to Dismiss is
GRANTED. Counts One, Three and Four of the
Complaint are dismissed without prejudice.

D.N.J.,2005.
S.E.C. v. Lucent Technologies Inc.
Not Reported in F.Supp.2d, 2005 WL 1206841
(D.N.J.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

Westlaw.

Not Reported in F.Supp.2d                                                        Page 1

Not Reported in F.Supp.2d, 2005 WL 2000665 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**

S.E.C. v. Morris
S.D.Tex.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. Texas, Houston
Division.
SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,
v.
Gary V. MORRIS, Defendant.
**No. Civ.A. H-04-3096.**

Aug. 18, 2005.

Stephen J. Korotash, Ft. Worth, TX, for Plaintiff.
Timothy R. McCormick, Thompson & Knight,
Dallas, TX, for Defendant.

MEMORANDUM AND ORDER

ROSENTHAL, J.
   *1 The Securities and Exchange Commission
sued Gary V. Morris, former Chief Financial
Officer of Halliburton Company, for violating
sections 17(a)(2) and (a)(3) of the Securities Act,
15 U.S.C. §§ 77q(a)(2)-(a)(3), and section 13(a) of
the Exchange Act, 15 U.S.C. § 78m(a), as well as
Exchange Act Rules 12b-20, 13a-1, and 13a-13, 17
C.F.R. §§ 240-13a-1, 13a-13, and 12b-2a. The
allegations arise from Halliburton's alleged change
in the second quarter of 1998 in its accounting
treatment of claims for additional compensation for
contracts, without an accompanying disclosure of
the change in periodic reports and other public
statements. The SEC alleges that Morris was "
responsible" for ensuring that the periodic reports
he reviewed and signed and the earnings releases
and analyst statements he reviewed were accurate
and complied with Generally Accepted Accounting
Principles. (Docket Entry No. 1). Morris moved to
dismiss both the section 17(a) and 13(a) claims
under Rule 12(b)(6) of the Federal Rules of Civil

Procedure. (Docket Entry Nos. 6-7). The SEC
responded and filed an amended complaint. (Docket
Entry Nos. 14, 15). Morris then moved to dismiss
the amended complaint. (Docket Entry No. 18-20).
The SEC again responded, (Docket Entry No. 23),
and Morris replied. (Docket Entry No. 25).

   Based on the pleadings; the motions, responses,
and reply; and the applicable law, this court grants
the motion to dismiss the section 13(a) claim;
denies the motion to dismiss the section 17(a)
claim, and sets a status conference for September
12, 2005, at 8:45 a.m., in Courtroom 11-B. The
reasons for the ruling on the motion to dismiss are
set out below.

I. Background

   Morris served as Halliburton's Chief Financial
Officer during 1998 and 1999, the period relevant
to the SEC's allegations. (Docket Entry No. 14,
Amended Complaint, ¶ 1). Halliburton's securities
are registered under section 12(b) of the Exchange
Act and traded on the New York Stock Exchange.
Halliburton offered and sold securities under
registration statements filed in June 1998 and
October 1998 and a supplement filed in November
1998. In the amended complaint, the SEC alleges
that as CFO, Morris signed these registration
statements-Forms S-8 and S-3-on Halliburton's
behalf. (*Id.,* ¶ 10-11). Morris also "reviewed,
edited, and signed" the periodic reports Halliburton
filed annually (Form 10-K) and quarterly (Form
10-Q).(*Id.,* ¶ 25). Morris also "directed others to
prepare Halliburton's earnings releases and analyst
teleconference scripts, which he reviewed."(*Id.,* ¶
26). The SEC alleges that because "[e]ach of
Halliburton's registration statements incorporated
future filings of the company ... Halliburton's
material misleading statements and omissions were
made in the offer or sale" of securities. (*Id.,* ¶ 11).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2

Not Reported in F.Supp.2d, 2005 WL 2000665 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

The basis for the SEC's complaint is an accounting change it alleges Halliburton adopted in the second quarter of 1998. The change affected Brown and Root Energy Services (BRES), a business unit of the Energy Services Group, one of Halliburton's two primary reporting segments.[FN1] The accounting issue is when to recognize as revenues claims for additional compensation on construction contracts. The SEC alleges that from at least 1993 through the first quarter of 1998, Halliburton had recognized claims for additional compensation on contracts "during the period such claims are resolved."The SEC alleges that Halliburton stated that it followed this approach in its annual Form 10-K reports. In the second quarter of 1998, however, Halliburton began recognizing as revenue claims for additional contract compensation arising from cost overruns that Halliburton had not resolved with its customers. The SEC alleges that Halliburton did not report this accounting change until March 2000, in its 1999 Form 10-K. The SEC alleges that the failure to disclose this change for eighteen months, over six reporting periods, made the periodic reports and other public statements issued during those periods materially misleading.

> FN1. The other reporting unit is the Engineering & Construction Group.

**\*2** In mid-1997, Brown & Root began several large engineering, procurement, and construction (EPC) projects, that incurred large cost overruns. ( *Id.,* ¶¶ 12-14). The SEC alleges that in the second quarter of 1998, Halliburton changed its accounting treatment:

> by offsetting cost overruns on the BRES EPC contracts with estimated recoveries on claims that had not been resolved with customers. Although permitted under Generally Accepted Accounting Principles ("GAAP") in appropriate circumstances, this practice deviated from Halliburton's longstanding conservative practice of recognizing income only from resolved claims. As a result of the accounting change, losses from cost overruns on several EPC contracts in the BRES business unit were reduced or eliminated.

*(Id.,* ¶¶ 16-17). The SEC also alleges

Halliburton omitted from its 1998 Form 10-K the claims recognition statement that had appeared in previous Forms 10-K, but did not explain the change.[FN2]*(Id.,* ¶ 21).

> FN2. The SEC alleges that Halliburton compounded the problem by " incorporating by reference" its historical claims recognition practice statement in its Forms 10-Q filings for the second and third quarters of 1998. (*Id.,* ¶ 22).

The SEC does not allege that Halliburton violated GAAP or the securities laws in the change in accounting treatment. Rather, the SEC alleges that the failure to disclose the change, which increased reported income and made quarter-to-quarter income comparisons between 1997 and 1998 more favorable, violated GAAP and the SEC's Regulation S-X and made the public reports materially misleading.[FN3] According to the amended complaint, Morris knew of Halliburton's accounting change and its impact on Halliburton's income, but "failed to ensure that Halliburton disclosed the accounting change and its impact on Halliburton's income."Morris also "failed to ensure" that Halliburton did not incorporate by reference its former claims recognition policy in the second and third quarter Forms 10-Q, when that policy was no longer in effect. (*Id.,* ¶ 23). As a result, the SEC asserts that Morris is responsible for a material misrepresentation that the second and third quarter 1998 Forms 10-Q, the 1998 Form 10-K, and the 1999 Forms 10-Q, were prepared in accordance with GAAP and Commission Regulation S-X, which allegedly required disclosure of the accounting change. (*Id.,* ¶ 25).

> FN3. The SEC alleges that the increases in pretax income attributable to the accounting change ranged from a high of approximately $87 million reported in the 1998 Form 10-K (a 46 percent increase from $191 million to the reported $279 million) to $36 million in the third quarter of 1998 (when Halliburton reported a loss of $610 million, but omitting the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2000665 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

unapproved claims would have increased the loss by 5.7 percent to $646 million). The amended complaint sets out the comparisons alleged to be misleading. In the second quarter of 1998, Halliburton's reported pretax income of $229 million would have been $184 million without including revenues from unresolved claims for additional compensation, a difference of $45 million or 24.8 percent. In the first quarter of 1999, Halliburton reported pretax income of $149 million, but without including the unresolved claims for additional compensation in the revenue amount, its income would have been $130 million, a difference of $19 million or 14.8 percent. In the second quarter of 1999, Halliburton reported pretax income of $146 million, but without the unresolved claims for additional compensation, its income would have been $136 million, a difference of $10 million, or 7.5 percent. In the third quarter of 1999, Halliburton reported a pretax income of $103 million, while its income without the additional compensation claimed but not yet resolved with its customers would have been $92 million, a difference of about $11 million, or 11.6 percent. (Docket Entry No. 14, p. 5).

The SEC also alleges that Morris is responsible for his failure to correct materially misleading information in earnings releases and analyst teleconference scripts that he reviewed in the second and third quarters of 1998. Morris allegedly attended the teleconferences as Halliburton's president "read aloud the misleading information in the scripts regarding the company's income. Morris never cautioned the president about the misleading statements."(*Id.,* ¶ 26). Finally, the SEC's complaint lists the specific misleading statements in each periodic filing, earnings release, and analyst teleconference over the relevant six quarters. (*Id.,* ¶ ¶ 27-43).

The SEC asserts two claims against Morris. First, Morris violated sections 17(a)(2) and 17(a)(3) of the Securities Act by making untrue statements of

material facts or omissions of material facts necessary in order to make the statements made not misleading in the offer or sale of securities. (*Id.,* ¶ ¶ 46-49). The SEC alleges that Morris negligently engaged in this conduct. Second, the SEC alleges that Morris aided and abetted Halliburton's violations of section 13(a) of the Exchange Act and related rules, by knowingly providing substantial assistance to Halliburton in filing materially misleading annual and quarterly reports. (*Id.,* ¶ ¶ 50-53). The SEC seeks a permanent injunction and a civil money penalty.

**\*3** Morris has moved to dismiss the SEC's amended complaint.[FN4] The first issue is whether Morris is subject to liability under section 17(a) of the Securities Act in the absence of allegations that he either owned or directly and actively participated in offering or selling Halliburton securities. The second issue is whether the SEC has alleged facts that, if proven, could meet the scienter requirements of aiding and abetting liability under section 13(a). Morris also claims that the disclosures at issue were not misleading as a matter of law. (Docket Entry No. 19, at 21). Morris argues that what the SEC characterizes as a change in accounting policy or principle was instead the application of an accepted accounting rule to certain "qualifying contracts." Morris argues that the change in accounting treatment corresponds to a change in the type of contract Brown & Root used, moving from " cost-plus" construction contracts to "fixed-fee" projects, rather than a change in accounting principle that would require disclosure. Under GAAP, Halliburton was permitted to recognize as revenues unresolved claims against customers for cost overruns on fixed-fee contracts when it was " probable that the claim will result in additional contract revenue" and the "amount can be reliably estimated." American Institute of Certified Public Accountants' Statement of Position 81-1(.65). Morris emphasizes that the recognition of revenue was proper under GAAP and that the SEC has never claimed that Halliburton had to restate its revenues. Morris challenges the SEC's assertion that there was a change in accounting principle under GAAP or that any change in accounting treatment was material so as to require disclosure.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 4

Not Reported in F.Supp.2d, 2005 WL 2000665 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

FN4. The SEC also filed civil enforcement actions against Halliburton and its controller, Robert Muchmore, Jr., containing substantially identical allegations. Both defendants settled and entered agreed final judgments. Without admitting or denying the complaint's allegations, Halliburton paid a $7.5 million civil penalty and Muchmore paid a $50,000 penalty. *SEC v. Halliburton Co .,* No. 04-CV-3097 (S.D.Tex. Aug. 25, 2004) (Atlas, J.). The same defendants also consented to cease and desist orders barring future violations of Securities Act Section 17(a) and Exchange Act Section 13(a) and related rules. *In re Halliburton Co.,* 2004 WL 1737425, at *1 (Aug. 3, 2004).

## II. The Legal Standard for a Motion to Dismiss

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief may be granted."FED. R. CIV. P. 12(b)(6).Rule 12(b)(6) dismissal is appropriate only if there is no set of facts that could be proven consistent with the complaint allegations that would entitle the plaintiff to relief. *Scanlan v. Texas A & M Univ.,* 343 F.3d 533, 536 (5th Cir.2003). The court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Id.* In order to avoid dismissal, however, a court need not "accept as true conclusory allegations or unwarranted deductions of fact."*Id.* (quoting *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498 (5th Cir.2000)).

In considering a Rule 12(b)(6) motion to dismiss, a court must limit itself to the contents of the pleadings, with one important exception. In *Collins,* 224 F.3d at 498-99, the Fifth Circuit approved the district court's consideration of documents the defendant attached to a motion to dismiss. In *Collins* and later in *Scanlan,* the Fifth Circuit made it clear that "such consideration is limited to documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim."343 F.3d at 536, citing *Collins,* 224 F.3d at 498-99. Other courts approve the same practice,

stating that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."*Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993); *see also Field v. Trump,* 850 F.2d 938, 949 (2d Cir.1998); *Branch v. Tunnell,* 14 F.3d 449, 453-54 (9th Cir.1994).

## III. The Claim Under Section 17(a) of the Securities Act

**\*4** In his motion to dismiss the amended complaint, Morris argues that he was neither an " offeror" nor a "seller" under section 17(a) of the Securities Act, which states in part:

It shall be unlawful for any person in the offer or sale of any securities ... by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C.A. § 77q(a) (West 2005). Morris argues that the § does not allege facts that, if proven, would show that he was involved in "the offer or sale" of Halliburton securities because the amended complaint does not allege that he either owned the securities offered for sale or sold or directly and actively participated in their offer or sale. (Docket Entry No. 19, at 11). Morris points to the Securities Act's definition of "offer" and "sale" in section 2(a)(3) for support: "The term 'sale' or ' sell' shall include every contract of sale or disposition of a security or interest in a security, for value. The term 'offer to sell', 'offer for sale', or ' offer' shall include every attempt to offer to dispose

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                 Page 5

Not Reported in F.Supp.2d, 2005 WL 2000665 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

of, or solicitation of an offer to buy, a security or interest in a security for value."15 U.S.C. § 77b(a)(3). Acknowledging that "few courts have interpreted the terms 'offer' and 'sale' in the context of § 17(a)," Morris argues that the Fifth Circuit's decision in *Meadows v. §*, 119 F.3d 1219, 1225 n. 9 (5th Cir.1997), "confirmed" that these words are interpreted consistently under section 12 and section 17 of the Securities Act. Morris cites several cases holding that one is not a buyer or seller of a security under section 12 unless one directly and actively participates in soliciting a sale and is motivated in part by a desire to serve personal interests or those of the securities owner. *See Meadows,* 119 F.3d at 1225;*Spiegel v. Tenfold Corp.,* 192 F.Supp.2d 1261, 12169 (D.Utah 2002); *VT Investors v. R & D Funding Corp.,* 733 F.Supp. 823, 839 (D.N.J.1990).

The question is whether the consonant definitions of "offer" and "sale" in sections 12 and 17 also restrict liability for section 17 claims to the same individuals and entities who could be found liable under section 12. In *Meadows,* the Fifth Circuit expressly avoided this "interpretive issue." 119 F.3d at 1224 ("The Division disputes Meadow's interpretation of § 17(a), arguing that § 17(a) encompasses more than just 'offerors' or 'sellers' because it applies to 'any person *in* the offer or sale of any security (emphasis added). We need not resolve this interpretive issue."). The *Meadows* court noted that its own research found no case on point, but "recognize[d] the Supreme Court has stated that the language of § 17(a) 'does not require that the fraud occur in any particular phase of the selling transaction,' and 'that '[t]he statutory terms [offer and sale] ... are expansive enough to encompass the entire selling process, including the seller/agent transaction." ' *Id.* at 1224 n. 8 (alterations in original) (*citing United States v. Naftalin,* 441 U.S. 768, 773, 99 S.Ct. 2077, 2081, 60 L.Ed.2d 624 (1979)).

*5 The statutes imposing liability under sections 12 and 17 are not identical. Section 12(2) of the Securities Act, 15 U.S.C. § 771(2), states:

"Any person who-
(2) offers or sells a security ... by means of a prospectus or oral communication, which includes

an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading ... shall be liable ... to the person purchasing such security from him....

15 U.S.C.A. § 771(2) (West 2005). Liability attaches to "any person" who "offers or sells a security." By contrast, in section 17, liability attaches to "any person in the offer or sale of any securities."That section states:It shall be unlawful for any person in the offer or sale of any securities ... (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C.A. § 77q(a) (West 2005).

The SEC cites several cases in which individuals who make, create, or assist in the preparation or dissemination of material misrepresentations or omissions in the offer or sale of securities are subjected to liability under section 17(a).*See SEC v. First Jersey Secs. Inc.,* 101 F.3d 1050, 1467 (2d Cir.1996); *SEC v. Softpoint, Inc.,* 958 F.Supp. 846, 862 (S.D.N.Y.1997); *SEC v. Whitworth Energy Res. Ltd.,* 2000 U.S.App. Lexis 31237, at *6 (9th Cir. Dec. 1, 2000) (affirming partial summary judgment against individual and corporate defendants for failing to disclose source of investor distributions); *SEC v. Buntrock,* 2004 WL 1179423, at *10 (N.D.Ill. May 25, 2004) (denying corporate officers' motion to dismiss control person liability claim under § 17(a)). In several of these cases, courts found section 17(a) liability without analyzing the extent to which the defendants were involved in the offer or sale of securities and whether they would benefit from the offer or sale. In *Softpoint,* 958 F.Supp. at 846, a district court granted summary judgment against a former officer and director of a corporation for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2000665 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

violating, among other things, section 17(a) of the Securities Act. The former officer, Stoeckline, prepared and disseminated press releases, periodic SEC reports, and registration statements. Stoeckline also received Softpoint stock as compensation, which he sold through his codefendant company, and received the proceeds from the sale of Softpoint stock that had been issued to another codefendant. *Id.* at 852.The court held that because Stoeckline had signed public filings containing material misrepresentations and participated in schemes to inflate his company's income through unlawful stock sales, his "activities fall unmistakably within the broad scope of conduct prohibited by Sections 17(a) and 10(b) and Rule 10b-5."*Id.* at 862.

*6 In *SEC v. Whitworth Energy Resources,* an unpublished decision, the Ninth Circuit upheld a district court's grant of summary judgment against three individuals and three corporate defendants for violating section 17(a).2000 U.S.App. Lexis. 31237, at *1. The defendants operated an oil and gas syndication business. Two of the corporate entities, owned and controlled by two individual defendants, raised several million dollars from investors in securities offerings. All three individual defendants "shared duties in drafting, selecting and reviewing the offering materials" for the public offering. The defendants "violated securities law when they failed to disclose the source of their distributions to investors" and failed to disclose a related entity's debt. Citing section 17(a), with other sections of the Securities Act, the court stated that " liability arises where offering materials to prospective investors contain materially false or misleading statements, including omissions of material facts."*Id.* at *7.

Morris notes that in most of these cases, the defendants participated in offering or selling securities to a greater degree than "merely signing public filings," which he asserts is the extent of the SEC's allegations as to his role in the asserted misrepresentations. (Docket Entry No. 19, p. 14). Morris both understates the SEC's allegations as to his involvement and overstates the conclusions that can be gleaned from the sparse case law on the subject.

The SEC does not merely allege that Morris " signed" periodic public reports and registration statements incorporating those public reports. The SEC alleges that Morris reviewed and edited these reports before signing them, with knowledge of the change in the accounting treatment as to when to recognize unresolved claims from contract cost overruns as revenue, and with knowledge of the impact of that change on earnings. As to the cases under section 17(a), they do not specifically hold that a defendant must either own the security offered or sold or actively participate in the offer or sale. To the contrary, most of the cases do not analyze the defendants' degree of involvement in selling or offering securities. *See, e.g., Softpoint,* 958 F.Supp. at 862 (noting that signing public filings, preparing and disseminating press releases and reports "fall unmistakably within the broad scope" of 17(a) and other antifraud provisions); *Whitworth,* 2000 U.S.App. Lexis, at *6 (" Defendants violated securities laws when they failed to disclose the source for their distributions to investors and Condor's claimed debt. Under section 17(a) [and other antifraud provisions], liability arises where offering materials to prospective investors contain materially false or misleading statements, including omission of material facts.").

Morris identifies one case from outside the jurisdiction that appears to limit section 17(a) to defendants directly and actively involved in selling or offering securities for sale. In *Buford White Lumber Co. Profit Sharing and Savings Plan & Trust v. Octagon Properties, Ltd.,* 740 F.Supp. 1553, 1569 (W.D.Okla.1989), a private plaintiff who had purchased securities sued a law firm that had prepared prospectuses and offering circulars on behalf of a client for the sale of those securities. The plaintiff alleged that the documents contained false and misleading statements that violated sections 12 and 17(a) and other antifraud provisions. The court granted the defendant law firm's motion to dismiss the section 17(a) claim, finding that "no private cause of action lies for violations of section 17(a)."*Id.* at 1568.The court then added that, alternatively, "section 17(a), as Defendant notes, applies to those who offer or sell securities.... Plaintiffs have failed to allege facts showing that the Defendant was an offeror or seller

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 7

Not Reported in F.Supp.2d, 2005 WL 2000665 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

for purposes of section 17(a)."*Id.* at 1569-70.

*7 The *Buford* court did not analyze the statutory language of section 17(a). As noted, that section attaches liability to "any person in the offer or sale of any securities" while section 12 applies to "[a]ny person who-(2) offers or sells a security." The court did not distinguish between the two sections. The *Buford* case is also distinguishable in that the defendant was a law firm whose involvement in selling securities was limited to preparing offering materials for the issuer. Morris, as alleged in the amended complaint, served as chief financial officer for the entity offering its own securities for sale, and Morris signed the SEC reports and registration statements accompanying those offerings.

Although little case law exists on this precise question, the Supreme Court's unanimous decision in *Naftalin* interpreted section 17(a) expansively. *See*441 U.S. at 778 ("Unlike much of the rest of the [Securities] Act, [section 17(a) ] was intended to cover any fraudulent scheme in an offer or sale or securities, whether in the course of an initial distribution or in the course of ordinary market trading."); *id.* at 773 ("The statutory terms, which Congress expressly intended to define broadly, are expansive enough to encompass the entire selling process, including the seller/agent transaction.") (citations omitted). In *Meadows,* the Fifth Circuit interpreted section 17(a) broadly, consistent with the only Supreme Court guidance available. *See Meadows,* 119 F.3d at 1224 n. 8;*see also Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 573, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (approving of and relying on *Naftalin'* s broad interpretation of section 17(a)). In denying defendant's motion to dismiss, this court follows the direction provided by *Naftalin* and *Meadows.*

The motion to dismiss based on the argument that Morris is not a person alleged to have violated the statute "in the offer or sale of a security" is denied.

IV. The Claim Under Section 13(a) of the Exchange

Act

The SEC alleges that Halliburton violated section 13(a) of the Exchange Act, 15 U.S.C.A. § 78m(a) (West 2005), and Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. § 240.12b-20, 240.13a-1, and 240.13a-13, by filing materially misleading financial reports, and that Morris knowingly aided and abetted Halliburton's violations. To establish aider and abettor liability for securities violations, the plaintiff must show that: (1) a primary violator committed a securities violation; (2) the alleged aider and abettor had a general awareness of his role in the violation; and (3) the aider and abettor knowingly rendered substantial assistance in furtherance of it. *See Abbott v. Equity Group, Inc.,* 2 F.3d 613, 621 (5th Cir.1993).

Morris argues that the SEC's amended complaint does not allege facts that, if proven, would support an inference that Morris knowingly aided and abetted Halliburton's alleged section 13 and rules violations. Morris argues that Fifth Circuit authority interprets the "knowingly" requirement to require "both 'general awareness that [the defendant's] role was part of an overall activity that is improper' and *knowing* assistance in the violation. "(Docket Entry No. 19, p. 16) (emphasis and alterations in original). The SEC responds that Morris seeks "to superimpose on the plain language of section 20(e) an additional requirement that Morris knew his actions were improper and that he knew of his assistance in the violation."[FN5]

FN5. Section 20(e), "Prosecution of persons who aid and abet violations," states:
For purposes of any action brought by the Commission under paragraph (1) or (3) of Section 78u(d) of this title, any person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.
15 U.S.C.A. 78t(e) (West 2005).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                  Page 8

Not Reported in F.Supp.2d, 2005 WL 2000665 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

*8 The Fifth Circuit addressed the scienter requirement for aiding and abetting securities violations in *Woodward v. Metro Bank of Dallas,* stating as follows:

Without regard to set forth an inflexible definition of aiding and abetting, we find that a person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation.

522 F.2d 84, 94 (5th Cir.1975) (*quoting SEC v. Coffey,* 493 F.2d 1304 (6th Cir.1974)). In *Woodward,* the court stated that it would "assume ... the existence of a securities act violation" by the primary violator, and then determine the second element, whether an alleged aider and abetter had " general awareness that one's role was part of an overall activity that is improper."*Id.* at 95.In analyzing this second element, "the surrounding circumstances and expectations of the parties are critical. If the alleged aider and abettor conducts what appears to be a transaction in the ordinary course of his business, more evidence of his complicity is essential."*Id.* For the third element, knowing and substantial assistance, the *Woodward* court blended approaches from two other circuits:When it is impossible to find any duty of disclosure, an alleged aider-abettor may be found liable only if scienter of the high "conscious intent" variety can be proved. Where some special duty of disclosure exists, then liability should be possible with a lesser degree of scienter. In a case combining silence/inaction with affirmative assistance, the degree of knowledge required should depend on how ordinary the assisting activity is in the business involved. If the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b-5 liability without clear proof of intent to violate the Securities laws.

*Id.* at 97 (citations and footnotes omitted); *see also Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1126 (5th Cir.1988), *vacated on other grounds sub nomFryar v. Abell,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989).

The SEC "disagrees that the knowledge standard articulated in *Woodward* and *Howard* are consistent with the plain language of Section 20(e)" and argues that "the allegations in [the] Amended Complaint clearly meet the 'knowledge' standard advocated by Morris."(Docket Entry No. 23, p. 21). The SEC understates the legal standard for knowledge under section 13(a) and overstates what it alleged in the amended complaint.

The case law supports Morris's argument that *Woodward* is still applicable law. To state a claim for aiding and abetting, the plaintiff must allege facts that, if true, demonstrate: (1) a securities violation by a primary party; (2) that the aider and abettor had a general awareness of its role in the violation; and (3) that the aider and abettor knowingly rendered substantial assistance in that violation. *Abell,* 858 F.2d at 1126. "General awareness means knowledge which, though it may be adduced from reckless conduct, means actual awareness.... [H]ow 'knowing' an abettor must be depends upon how substantial the abettor's assistance is."*Id.*As the Fifth Circuit stated:

*9 Underlying the other two elements-"general awareness" and "knowing substantial assistance"-is a single scienter requirement that varies on a sliding scale from "recklessness" to "conscious intent." The plaintiff must show conscious intent, unless there is some special duty of disclosure, or evidence that the assistance to the violator was unusual in character and degree. In the latter two instances, a recklessness standard applies.

*Abbott,* 2 F.3d at 621 (citations and footnotes omitted); *see also Howard v. SEC,* 376 F.3d 1136, 1143 (D.C.Cir.2004); *Southwest Realty Ltd. v. Daseke,* 1992 WL 373166, at *11 (N.D.Tex. May 21, 1992) (stating that *Woodward*"divided the scienter requirement into two parts: knowledge of one's role in a fraud and commitment (or intent) to aid in the fraud's success"). A plaintiff can state a claim for aiding and abetting securities fraud by showing "severe" or "extreme" recklessness, but that requires allegations that the alleged aider and abettor "encountered 'red flags' or 'suspicious events creating reasons for doubt' that should have alerted him to the improper conduct of the primary violators."*See Howard,* 376 F.3d at 1143;*see also*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2000665 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

*Nathenson v. Zonagen, Inc.,* 267 F.3d 400, 408 (5th Cir.2001) (finding company president and CEO's " severe recklessness" provided the scienter necessary to prove securities fraud under Rule 10b-5).

The SEC's amended complaint states that " Morris, acting alone or in concert or others, in the manner set forth above, knowingly provided substantial assistance to Halliburton in its violations. ..." (Docket Entry No. 14, ¶ 53). The SEC argues that the following facts demonstrate that Morris had a general awareness that his conduct was part of an overall activity that was improper:

(1) "Morris was CFO and a licensed CPA who reviewed, signed and was responsible for the public filings of a prominent NYSE-traded company"; (2) " Morris knew that in 1998 the company implemented an accounting change that enhanced pre-tax income by as much as 46.1%"; (3) "Morris knew that Halliburton disclosed its accounting for unapproved claims in prior annual reports, omitted any disclosure relating to the accounting of unapproved claims in its 1998 Annual Report, and disclosed a new standard in its 1999 Annual Report which Morris knew was adopted during the previous fiscal year"; (4) "Morris violated multiple GAAP provision by failing to inform the investing public of the accounting change"; (6) "When Morris finally decided to disclose the change, it was misleading".

(Docket Entry No. 23, pp. 21-22). None of these allegations concern or establish Morris's knowledge of wrongdoing. *See Woodward,* 522 F.2d at 97 (stating "the degree of knowledge required should depend on how ordinary the assisting activity is in the business involved"). Instead, the SEC's allegations relate to ordinary business activities, without specifying facts that would show Morris's knowledge of participation in improper activity. *See id.*(stating "[i]f the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find [aiding and abetting] liability without clear proof of intent to violate the securities laws.").

*10 Although the SEC also argues that the allegations would, if proven, establish that Morris was reckless, it points to neither "red flags" or "

suspicious events" that should have put Morris on notice of Halliburton's improper conduct. *See, e.g., SEC v. Lucent Techs., Inc.,* 363 F.Supp.2d 708 (D.N.J.2005). In *Lucent,* the SEC alleged that the defendant corporation fraudulently and improperly recognized revenue and pre-tax income in violation of GAAP during fiscal year 2000. *Id.* at 711.That year, Lucent and its customer, AT & T Wireless Services (AWS) began to negotiate a new pricing regime that priced its equipment sales to AWS differently. The companies did not implement the new pricing until August 2000, several months after the new regime's anticipated April 2000 implementation date. One Lucent executive, Carter, authorized his subordinates to enter into an oral agreement with their AWS counterparts that the new pricing structure would apply retroactively to all products purchased after April 1, 2000. *Id.* During this interim period, Lucent provided equipment valued at $53 million to AWS that had not been invoiced, and sought to recognize revenue from the sale. AWS provided a purchase order priced under the old regime, with the express understanding that Lucent would provide a credit for that invoiced amount and AWS would ultimately pay only the price calculated under the new pricing structure. The SEC alleged that Lucent's recognition of revenue and operating income in the amount of $53 million violated GAAP and that individual officers aided and abetted Lucent's violations of Securities Act section 10(b), Exchange Act sections 13(a) & (b), and associated SEC rules. An individual defendant officer, Hayes-Bullock, moved to dismiss three counts of aiding and abetting Lucent's securities law violations, arguing that the SEC had failed to plead any allegations that would support either an inference that she knew or was reckless in not knowing that Lucent's revenue recognition violated GAAP. The SEC alleged that Hayes-Bullock knew of the oral side agreement, was responsible for ensuring that all transactions were GAAP-compliant, and personally drafted letters to the chief accountant that were misleading as to the side agreement's existence. *Id.* at 725.Because the SEC failed to allege when Hayes-Bullock knew of the alleged side agreement, the court dismissed the claim, stating that "the timing of this disclosure is critical because if [Hayes-Bullock] were not made

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 10

Not Reported in F.Supp.2d, 2005 WL 2000665 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

aware of the side agreement until after the revenue was recognized, this allegation would be irrelevant." *Id.* The court dismissed the aiding and abetting claims against this defendant.[FN6]In this case, as in *Lucent,* the SEC has alleged no facts showing that the defendant knew or was severely reckless in not knowing of his participation in a fraudulent scheme.

> FN6. The *Lucent* court also analyzed whether the SEC had properly stated the third aiding and abetting element-that Hayes-Bullock knowingly provided substantial assistance. Because the complaint alleged that she was responsible for ensuring that Lucent's financial statements complied with GAAP,

[t]he Court can infer from this allegation that part of Hayes-Bullock's job entailed reviewing each transaction, including the transaction at issue here, to ensure that it was accounted for in accordance with GAAP, and that Hayes-Bullock was familiar with GAAP. The Court cannot think of a better example of substantially assisting another to commit fraud than exists here. If Hayes-Bullock knew of the side agreement, signed-off on the revenue recognition anyway in violation of GAAP, and then assisted in drafting letters to the Chief accountant that suggested that there was no side agreement, this would satisfy the "substantial assistance" element of an aiding and abetting claim.

*Id.* at 726.

Morris's motion to dismiss the SEC's aiding and abetting claim is granted. Because the SEC has already amended and does not argue that, if allowed to amend, it would be able to plead additional facts showing that Morris had the requisite knowledge, the dismissal is with prejudice.

## V. The Claim That There Is No Underlying Violation by Halliburton

**\*11** Morris moves to dismiss on the basis that as a matter of law, Halliburton's disclosures were not misleading because: (1) GAAP did not require Halliburton to disclose its accounting judgment as

to when claims against customers for contract cost overruns are recognized as revenues; and (2) Halliburton had no duty to qualify its disclosures of true information about its accounting and finances. The SEC alleged in its amended complaint that Morris was responsible for the material misrepresentation that certain periodic reports were prepared in accordance with GAAP and Regulation S-X.[FN7]Specifically, the SEC points "without limitation" to disclosure requirements contained in Statement of Position (SOP) 81-1(.65) of the American Institute of Certified Public Accountants; Accounting Principles Board Opinion ("APB") No. 20; and Rules 4-01(a)(1), 10-01(a)(5), and 10-01(b)(6) of Regulation S-X. Morris argues that the SEC bases its entire amended complaint on GAAP violations, specifically APB 20, because the Regulation S-X rule violations all "depend on whether the Company failed to comply with GAAP. "(Docket Entry No. 19, p. 2 n. 24).

> FN7. Regulation S-X is the Commission's regulation that, the SEC argues, required the disclosure of Halliburton's accounting change.

Morris attached APB 20 to his motion to dismiss the amended complaint. (Docket Entry No. 20. att. 1). Morris argues that its accounting change does not require disclosure. According to APB 20:

A characteristic of a change in accounting principle is that it concerns a choice from among two or more generally accepted accounting principles. However, neither (a) initial adoption of an accounting principle in recognition of events or transactions occurring for the first time or that previously were immaterial in effect nor (b) adoption or modification of an accounting principle necessitated by transactions or events that are clearly different in substance from those previously occurring is a change in accounting principle.

3 Original Pronouncements: Accounting Standards APB Opinion No. 20, ¶ 8 (Financial Accounting Standards Board 2002/2003). Morris contends that the "SEC cannot meet either standard" because Halliburton clearly disclosed that it was " using estimating procedures as permitted under

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2000665 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

GAAP and, as the record will reflect, no such change in accounting principle occurred at all under APB 20."(Docket Entry No. 19, p. 9). Morris argues that "[s]ince APB 20 is the only GAAP provision that Halliburton allegedly violated, the SEC must prove that a change in accounting principle occurred to show that Halliburton's disclosures were misleading."(*Id.*, p. 21). According to Morris, no change in accounting principle occurred because Halliburton "adopted the use of SOP 81-1 to account for transactions that were previously immaterial in their effect and clearly differed in substance from their predecessors."[FN8] Morris argues that the SEC's amended complaint points out that BRES entered into fixed-price EPC contracts during the relevant period. (Docket Entry No. 14, ¶¶ 12-13).

> FN8. SOP 81-1 is entitled "Accounting for Performance of Construction-Type and Certain Production-Type Contracts." (Docket Entry No. 20, att. 2). This statement of position contains the FASB's guidance on GAAP for these type of contracts. The SEC acknowledges that Halliburton's alleged accounting change is "permitted under [GAAP] in appropriate circumstances," but argues that Halliburton's decision that "deviated" from its "longstanding conservative practice of recognizing income only from resolved claims" had to be disclosed to avoid misrepresentation. (Docket Entry No. 14, ¶ 16).

**\*12** The SEC complaint does not allege that BRES entered fixed-price EPC contracts for the first time in mid-1997. The amended complaint alleges that during the "relevant period BRES conducted a substantial portion of its business" using these contracts and that by mid-1997, BRES had "commenced several large fixed-fee" EPC projects. (*Id.*). At this motion to dismiss stage, this court cannot conclude that, as a matter of law, the accounting treatment for the claims for additional compensation from contracts "were previously immaterial in their effect and clearly different in substance from their predecessors."

Morris argues that even if Halliburton had a duty to disclose its use of SOP 81-1, "there is no legal basis justifying the SEC's claims that the disclosure should have included more than a statement that the change had been made."(Docket Entry No. 19, p. 22). For example, the SEC's amended complaint alleges that Halliburton's second quarter 1998 Form 10-Q did not disclose that without the accounting change, its reported income 24 percent increase in operating income would have in fact decreased 4.5 percent. (Docket Entry No. 14, ¶ 27). The SEC responds that Rule 12b-20 under the Exchange Act requires public companies to include in public reports "such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading."17 C.F .R. § 240.12b-20. Regulation S-X states in part:

> The interim financial information shall include disclosures either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim information presented not misleading.... [D]isclosure shall be provided where events subsequent to the end of the most recent fiscal year have occurred which have a material impact on the registrant. Disclosures should encompass for example, significant changes since the end of the most recently completed fiscal year in such items as: accounting principles and practices....

17 C.F.R. § 210.10-01(a)(5). Regulation S-X also states:[T]he registrant shall state the date of any material accounting change and the reasons for making it. In addition, for filings on Form 10-Q and Form 10-QSB, a letter from the registrant's independent accountant shall be filed as an exhibit ... in the first Form 10-Q and Form 10-QSB subsequent to the date of an accounting change indicating whether or not the change is to an alternative principle which in his judgment is preferable under the circumstances; except that no letter from the accountant need be filed when the change is made in response to a standard adopted by the Financial Accounting Standards Board which requires such change.

17 C.F.R. § 210.10-01(b)(6). The SEC alleges that because investors did not know that Halliburton

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2000665 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

had changed its "historic accounting policy," the company's quarter-to-quarter comparisons were materially misleading and violated section 17(a), Rule 12b-20, and Regulation S-X. According to the SEC, the accounting principles on which Halliburton relied also require disclosure of accounting changes. APB 20 states that "[t]he nature and justification for a change in accounting principle and its effect on income should be disclosed in the financial statement of the period in which the change is made. The justification for the change should explain clearly why the newly adopted accounting principle is preferable."(Docket Entry No. 23, att. A (APB No. 20) n. 17). Similarly, SOP 81-1, which applies to accounting of construction contracts, states that amounts of unapproved claims "if material, should be disclosed in the notes to the financial statements."(Docket Entry No. 20, att. 2 (SOP 81-1(.65)).

*13 Compliance with GAAP is a fact-specific issue. *Fine v. Am. Solar King Corp.,* 919 F.2d 290, 298 (5th Cir.1990); *In re Burlington Coat Factory Secs. Litig.,* 114 F.3d 1410, 1421 (3d Cir.1997) (" assuming that consistency with GAAP is enough to preclude liability, it is a factual question whether BCF's accounting practices were consistent with GAAP"); *SEC v. Caserta,* 75 F.Supp.2d 79, 91 (E.D.N.Y.1999). Neither compliance with GAAP nor the materiality of omitted disclosures can be resolved on a motion to dismiss. Morris's motion to dismiss on the grounds that GAAP did not require Halliburton to disclose its change in accounting treatment and that any failure to disclose was immaterial is denied, without prejudice to reasserting these arguments as the basis for a motion for summary judgment.

IV. Conclusion and Order

Morris's motion to dismiss is granted as to the aiding and abetting claim under section 13(a) and denied as to the negligence claim under section 17(a). A status conference is set for September 12, 2005, at 8:45 a.m., in Courtroom 11-B.

S.D.Tex.,2005.

S.E.C. v. Morris
Not Reported in F.Supp.2d, 2005 WL 2000665 (S.D.Tex.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.