# EXHIBIT 7

## Westlaw.

Slip Copy                                                                Page 1

Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

**H**
S.E.C. v. Todd
S.D.Cal.,2007.

United States District Court,S.D. California.
SECURITIES and EXCHANGE COMMISSION,
Plaintiff,
v.
John J. TODD and Robert D. Manza, Defendants.
**No. 03CV2230 BEN (WMc).**

May 30, 2007.

Karen L. Matteson, Securities and Exchange Commission, Los Angeles, CA, for Plaintiff.
Robert D. Rose, John C. Dineen, Vincent J. Brown, Sheppard Mullin Richter and Hampton, San Diego, CA, Brandon Roker, James Sanders, McDermott Will and Emery, Los Angeles, CA, for Defendants.

ORDER GRANTING IN PART DEFENDANTS'
MOTIONS FOR JUDGMENT AS A MATTER OF
LAW, DENYING DEFENDANTS' MOTIONS
FOR NEW TRIAL WITHOUT PREJUDICE, AND
GRANTING IN PART PLAINTIFF'S MOTION
FOR ENTRY OF JUDGMENT IMPOSING
RELIEF [Dkt. Nos. 270, 286, 288, 289, 290, 291,
294, 299]

ROGER T. BENITEZ, United States District Judge.

## I. INTRODUCTION

*1 Defendants John J. Todd ("Todd") and Robert D. Manza ("Manza") (collectively, " Defendants"), move for judgment as a matter of law pursuant to Fed.R.Civ.P. 50, and for a new trial pursuant to Fed.R.Civ.P. 59. Plaintiff Securities and Exchange Commission ("SEC") moves for entry of judgment imposing relief.

## II. DISCUSSION

*A. Rule 50 Motions*

Rule 50 allows the Court to grant judgment as a matter of law either before or after the case is submitted to the jury. The rule provides:

If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed.R.Civ.P. 50(a)(1). The jury's verdict must be upheld if it is supported by "substantial evidence" .*Wallace v. City of San Diego,* 479 F.3d 616, 624 (9th Cir.2007)*(citing Johnson v. Paradise Valley Unified School District,* 251 F.3d 1222, 1227 (9th Cir.2001).*"Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence."Id.* In making this determination, the court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion. *See Johnson v. Paradise Valley,* 251 F.3d at 1227-28. While the court must review the entire evidentiary record, it must disregard all evidence favorable to the moving party that the jury is not required to believe. *Id.* at 1227.The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party. *Id.* Judgment as a matter of law may be granted only where, so viewed, the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict. *McLean v. Runyon,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

Page 2

222 F.3d 1150, 1153 (9th Cir.2000). The Court must apply this standard under the correct governing law, meaning there must be sufficient evidence to support the jury's conclusion for each and every element of the claims presented. *See Settlegoode v. Portland Public Schools,* 371 F.3d 503, 510 (9th Cir.2004).

*1. Section 17(a) Claim*

The SEC brought a claim against Todd under § 17(a) of the Securities Act. This claim requires that Todd made material misrepresentations, directly or indirectly, in the offer or sale of a security, with scienter (for § 17(a)(1)) or negligently (for § 17(a)(2) and (3)). In particular, the SEC brings the § 17(a) claim on the basis of a prospectus supplement filed with the Commission on September 15, 2000 which incorporated the Q2 2000 Form 10-Q by reference.

**\*2** In its Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment, the SEC stated that "there is no dispute that Todd signed a prospectus offering Gateways securities for sale", a statement which the Court unfortunately and mistakenly accepted as true when it denied Todd summary judgment on the § 17(a) claim. The evidence at trial showed that the prospectus supplement was unsigned. The SEC presented no other evidence connecting Todd to the supplement. In its Opposition to Todd's Rule 50 motion, the SEC essentially concedes this point, and instead relies on the incorporation by reference of the Q2 2000 Form 10-Q, which was signed by Todd. In doing so, the SEC relies on the portion of § 17(a) which assigns liability for "indirectly" making material misrepresentations in the offer or sale of securities, as well as a flexible construction of the federal securities laws. *See SEC v. Zandford,* 535 U.S. 813, 819 (2002) (finding that § 10(b) of the Securities Exchange Act should be "construed not technically and restrictively, but flexibly to effectuate its remedial purpose") (internal quotations and citations omitted).

The Court finds that even in effectuating the

remedial purpose of the securities law, § 17(a) is not flexible enough to be stretched that far. The SEC asserts that "the fact that Todd did not physically file the Supplement himself is irrelevant." The Court agrees with this statement, and if the only piece of evidence missing was Todd's walk to the mailbox with the supplement, the statement would be relevant. But that is not the case. The sole connection between Todd and the prospectus supplement was the Q2 2000 10-Q which he signed and which was incorporated by reference in the supplement. There was no evidence presented at trial that Todd had even seen the prospectus supplement before, let alone been involved in its preparation, directly or indirectly. If the Court were to allow the verdict to stand on this claim, it would in essence allow potential liability in perpetuity for documents signed by an officer of a company, regardless of whether that officer has any knowledge or control over their future use.

In deciding the Rule 50 motions, it is the Court's obligation to apply the correct governing law to the evidence presented at trial. *See Settlegoode v. Portland Public Schools,* 371 F.3d at 510. Application of the correct governing law is perhaps the most critical duty of the Court in considering a Rule 50 motion, particularly when faced with a complex case, and the concurrent possibility of jury confusion. "The jury's role as the finder of fact does not entitle it to return a verdict based only on confusion, speculation or prejudice; its verdict must be reasonably based on evidence presented at trial."*Goldhirsh Group, Inc. v. Alpert,* 107 F.3d 105, 108 (2d Cir.1997) (quoting *Michelman v. Clark-Schwebel Fiber Glass Corp.,* 534 F.2d 1036 (2d Cir.1976)).

The Court is mindful of Rule 50's requirement that a verdict be allowed to stand if there is substantial evidence to support it, even if contradictory conclusions could be drawn from that evidence. *Wallace v. City of San Diego,* 479 F.3d at 624. But that requirement must always be coupled with the application of the correct governing law. Of the claims at issue in this complex case, and of the many elements of those claims, whether Todd made the alleged misrepresentations in connection with the prospectus supplement was the simplest on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                        Page 3

Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

its face. The evidence was not disputed. There was no battle of experts. And yet the jury found in favor of the SEC, in spite of a complete absence of evidence on an essential element. This raises serious concerns for the Court in regard to the jury's understanding of the law in relation to the evidence that it heard at trial.

**\*3** The evidence presented by the SEC at trial was insufficient as a matter of law to sustain a claim against Todd under § 17(a). The Court grants Todd's motion for judgment as a matter of law as to this claim.

*2. Section 10(b) and Rule 10b-5 Claims*

A finding of liability under Section 10(b) and Rule 10b-5 requires a legally sufficient showing of: (1) a material misrepresentation; (2) in connection with the purchase or sale of a security; (3) with scienter; (4) by use of jurisdictional means. *SEC v. Rana Research, Inc.,* 8 F.3d 1358, 1364 (9th Cir.1993). The second and fourth elements were not in dispute at trial.

To satisfy the first element, the SEC must have presented substantial evidence at trial to show that Todd and Manza made misrepresentations, and those misrepresentations were material. To fulfill the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988) . A company is not required to disclose every financial fact. It is only required to disclose information if there is a statutory requirement to do so, or if failure to do so would render the statements it has made materially misleading. *See Oran v. Stafford,* 226 F.3d 275, 285 (3d Cir.2000). In applying the standard under *Basic,* it is important to keep in mind the key phrase "total mix of information". This means not that a fact when viewed in isolation might have been important to an investor, but that when taken into account with all the other information available, it would have

altered that "total mix". In other words, the question is not, "if a reasonable investor knew x, and only x, would that significantly affect her thinking about investing in this security?". The proper question in viewing materiality is "if a reasonable investor knew a, b, c, d, e, f, g, and now *also x,* would that significantly affect her thinking about investing in this security?". In a case such as this one, with intense focus on several transactions, it is easy to lose sight of that critical distinction set out by the Supreme Court in *Basic.* 485 U.S. at 231-32.

In addition to a material misrepresentation, the SEC must have presented substantial evidence at trial that the misrepresentation was made with scienter. Scienter is defined as a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12 (1976). Scienter may also be established by a showing of recklessness.*SEC v. Dain Rauscher, Inc.,* 254 F.3d 852, 856 (9th Cir.2001). Reckless conduct is conduct that consists of a highly unreasonable act or omission that is an " 'extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " *Id.* (quoting *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1568-69 (9th Cir.1990) (en banc)).

*a. ACS*

**\*4** In Q2 2000, Gateway sold a portion of its loan portfolio to Associates Commerce Solutions for $54 million. On the same date, Gateway entered into an agreement with another Associates subsidiary, ACONA, to loan ACONA $50 million in the form of a note at 6.125% interest. The SEC claims that Todd orchestrated this transaction as part of the scheme to meet revenue consensus for the second quarter, and that it should have been accounted for as a multi-element transaction, rather than as a separate sale and loan. They also claim that as part of this scheme, Todd hid the connection between the transactions from PwC.

Both the theory of liability surrounding this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 4

Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

transaction, and the evidence presented are curious. The theory of liability is curious because it focuses primarily on the idea that this was one multi-element transaction, and Todd is liable for making material misrepresentations because he treated it as two separate transactions, and did not disclose to Gateway or PwC that it was really one. This theory, and the evidence presented, do not manage to meet the basic threshold element of a fraud claim-namely, a misrepresentation. Giving the SEC all reasonable inferences that this was in fact a multi-element transaction-its essential premise of liability in relation to the ACS transaction-the evidence that it led to a misrepresentation, let alone a material one, simply doesn't stand up to examination.

The bulk of the SEC's evidence at trial had to do with whether these transactions were related. The Court finds there was substantial evidence to support an inference that they were. But that is only the first step in finding there was substantial evidence that as a result, Gateway's financials were materially misstated. The question that must be answered is whether there was any accounting significance to recording the transactions separately instead of together, and whether Gateway's financial statements for the quarter would have looked any different. The SEC relies on its expert, Professor Arnold, for this point. Professor Arnold testified that had Gateway *not recorded any gain* on the transaction, its earnings per share ("EPS") would have been approximately one penny less. He also testified that had Gateway accounted for the transaction as one multi-element transaction, and under his interpretation of GAAP, that it would have had to defer *part of the gain* on the sale over the course of the life of the loan. What he never addressed however, was what Gateway's financials, or EPS would have looked like had it recognized what he believed to be a proper portion of the gain on this transaction in Q2 2000. Accepting his testimony, Gateway simply couldn't record *all* of the gain upfront. But he based his opinion regarding misstatement and materiality on what EPS would look like had Gateway recorded *none* of it. Based on Professor Arnold's testimony, the jury had no way of knowing whether Gateway's Q2 2000 10-Q was materially misstated on the basis of the ACS

accouting.

**\*5** Professor Arnold and the SEC also relied on a theory that the transaction was improperly recorded because Gateway should have recorded it using a different interest rate than the one it actually gave ACONA. Professor Arnold testified that the relevant interest rate for Gateway's accounting purposes was the internal market rate of the borrower, as opposed to the rate used in the transaction. But as with the issue of whether this was two transactions or a single multi-element transaction, the interest rate issue is a road to nowhere. Because once again, Professor Arnold never testified what the difference would actually be had Gateway recorded the transaction using the rate he believed they should have used; a rate which incidentally he testified in response to the Court's own inquiry, Gateway may have had no way of knowing.

The Court does not believe this is substantial evidence which can support a claim of a misrepresentation with respect to the ACS transaction. Even if it could, the evidence of materiality is scant. The SEC's theory, and Professor Arnold's in support, is that the supposed incorrect accounting of the ACS transaction was material because it brought a gain of a little over a penny in EPS, thereby allowing Gateway to exceed, rather than just meet, analyst consensus estimates. As discussed above, the evidence does not substantially support this claim. But even if it did, the Court must ask, why is this penny different from all other pennies? Gateway's EPS for the quarter was $ 0.37, $ 0.36 of which was earned through other transactions throughout the quarter. The idea that a transaction becomes qualitatively material because it boosts EPS by a penny, or as the SEC would have the Court think of it "*the* penny" opens a materiality minefield. Under this approach, any and all transactions that contribute to EPS are material, depending on which one the SEC chooses to focus on at a given moment. Courts have disapproved of this view of materiality, frequently viewing amounts under a certain threshold as immaterial as a matter of law. *See e .g. In re Anchor Gaming Securities Litigation,* 33 F.Supp.2d 889, 895 (D.Nev.1999) (finding EPS impact of $ 0.03 or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

2.5% immaterial as a matter of law); *In re Westinghouse Securities Litigation,* 90 F .3d 696, 713 (3d Cir.1996) (finding a quantitative analysis of materiality appropriate when information may be " relevant" to investors in that it is the type of information investors care about, but the amount may be "*de minimus,*" "trivial," and "hardly conducive to informed decisionmaking") (internal quotations and citations omitted).

The final piece of the SEC's theory as to the significance of the ACS transaction is that Todd supposedly hid the relatedness of the two parts of the transaction, both contributing to the misrepresentation and showing his scienter. Drawing all reasonable inferences in favor of the SEC, the evidence is still to the contrary. Todd disclosed the full transaction to the Board, as demonstrated by the July 11, 2000 presentation which included the statement "Gateway Sold a Portion ($54M) of its Consumer Loan Portfolio as a Premium *for Cash and a Note from Associates*" (emphasis added). Similarly, in the year-end audit, PwC reviewed the transaction and noted both the dual agreements with Associates, the interest rate being offered, and reviewed the agreements " without exception". All the information was on the table in front of both the Board and the auditors. The only thing that seems to be hidden is the SEC's after-the-fact interpretation of the events and the accounting, known to nobody but them until they presented that particular theory to Mike McLaughlin, PwC's engagement partner, at his SEC deposition two years later. With respect to the ACS transaction, the Court finds that the SEC failed to present substantial evidence of a material misrepresentation, or of scienter.

*b. higher risk lending*

**\*6** Beginning in Q2 2000, Gateway began to offer financing to consumers with weaker credit. Gateway used a tier system to categorize different levels of creditworthiness. Tier I being the strongest. Tier V and above represented the consumers who would be considered higher-risk based on FICO scores or other traditional credit standards. Todd viewed Tier V and above as an untapped market for Gateway and initiated a program in which Gateway would sell higher-margin computers to those customers. As part of this initiative, Gateway did not allow consumers to customize their computer, but rather sold them a model that it had produced but that it couldn't sell to its primary market. Before initiating this program, Gateway intended to take a full write off of the cost of that inventory.[FN1] By selling the computers and providing financing, Gateway hoped to realize some eventual return. Gateway's banking arm informed Todd that it lacked sufficient information on Tier V and above to predict what the rate of default could be, but believed that it could be up to 50%.

> FN1. The Court notes that at this late date in these proceedings, counsel for the SEC seems to believe that Gateway literally gave money to higher-risk buyers, rather than extend credit and create an account receivable complete with loan loss reserve. (April 26, 2007 Hearing Transcript at p. 134-137).

The SEC does not challenge Gateway's accounting for these loans, but rather contends that the disclosure was insufficient. Under Regulations S-K, 17 C.F.R. § 229.303, and Regulation S-X, 17 C.F.R. § 210.10-01, a company is required to disclose any known trends or uncertainties that will have a material impact on sales, revenue or income. The SEC asserts that the increase in higher tier lending was just such a trend, and the failure to disclose it as such constitutes a material omission. It is undisputed that Gateway's Q2 2000 10-Q did not contain a specific disclosure of the lending. It is also undisputed that the Q3 2000 10-Q and the 2000 10-K did contain disclosures regarding the lending, but the SEC challenges the adequacy of those disclosures.

Both the SEC and its expert, Professor Arnold premise liability under § 10(b) and Rule 10b-5 in relation to the higher-risk loans on the alleged violation of these regulations, particularly S-K, Rule 303. But the case law is clear that "the '

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

demonstration of a violation of the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b-5. Such a duty to disclose must be separately shown."*Oran v. Stafford*, 226 F.3d at 288 (quoting *Alfus v. Pyramid Tech. Corp.*, 164 F.Supp. 598, 608 (N.D.Cal.1991)). This conclusion is based in large part on the SEC's own interpretation of S-K, Rule 303 ("SK-303"), which imposes a far broader materiality standard than the standard imposed by the Supreme Court under *Basic.See Oran v. Stafford*, 226 F.3d at 288 (citing Exchange Act Release No. 34-26831, 54 Fed.Reg. 22427, 22430 n. 27). Therefore, regardless of whether the increase in higher tier lending constitutes a known trend under SK-303, the SEC still must show that the omission would have " significantly altered the total mix of information." *Id. See also In re Verifone Securities Litigation*, 11 F.3d 865, 870 (9th Cir.1993) (SEC regulation S-K and Exchange Rules can not be imported as a surrogate for a straight materiality analysis under § 10(b) and Rule 10b-5); *In re Campbell Soup Company Securities Litigation*, 145 F.Supp.2d 574, 590-591 (D.N.J.2001) (violation of regulation SK-303 does not necessarily violate § 10(b)).

**\*7** With regard to the Q2 2000 10-Q, the Court finds there is an initial issue as to whether the SEC presented substantial evidence at trial that the higher tier lending qualified as a known trend under SK-303. Todd initiated the program in that quarter as a strategy to increase revenue. The SEC focused extensively on the fact that this was a strategic initiative. But a strategic initiative is not the same thing as a "known trend" under SK-303. *In re Canandaigua Securities Litigation* is instructive on this issue. 944 F.Supp. 1202, 1210-1212 (S.D.N.Y.1996). In that case, the plaintiffs alleged that Canandaigua violated SK-303 by failing to disclose as a "trend or uncertainty" its new strategy of pricing its new products below market level. After an extensive analysis of the policies behind Regulation S-K, the court found that "the emphasis on financial condition and operational results suggests that information concerning management decisions such as pricing plans properly fall outside of S-K 303 disclosure."Further, "there is a significant difference between events and trends

affecting 'operations,' such as the closure of a plant or the increase in costs of raw materials, and competitive marketing strategies and plans."*Id.* at 1210-1211.The court also noted that in highly competitive consumer-based industries, it made little sense to impose an obligation to disclose to competitors (which is the effect of public disclosure) sensitive pricing and marketing decisions. "S-K 303's mandate to disclose material ' trends and uncertainties' does not contemplate furnishing competitors with an analytical blueprint of a company's business strategy".*Id.* at 1211.

The plaintiffs in *Canandaigua* argued that the marketing strategy should have been disclosed under SK-303 because "a material effect on the registrant's financial condition or results of operations" was "reasonably likely to occur".*Id.* at 1212.In support of that argument, they used the same approach that the SEC uses here, namely they pointed to the risks of the strategy, and the potential for serious losses if it did not work. The court found that this is true of practically every business decision, and to impose this theory of disclosure on SK-303 would not only be absurd in a competitive market, but would effectively "bury shareholders in an avalanche of trivial information."*Id.* (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976)). This Court must agree with that analysis. The SEC presented extensive testimony on the risk of the strategy of higher tier lending. It is undisputed that those in charge of Gateway's banking arm did not think it was a good idea. But that is the nature of a business decision or strategy-it involves risk. The essence of the SEC's theory and the evidence it presented is that this particular strategy involved too much risk. But "too risky" is not the standard for disclosure either under SK-303 or § 10(b) and Rule 10b-5. "Too risky" is the essence of fraud by hindsight. Had the strategy been successful, the Court has no doubt we would not be hearing about it now. The Court finds that the SEC failed to present substantial evidence of a material omission with regard to higher tier lending in Q2 2000.

**\*8** As is the case with the ACS transaction discussed above, even if the Court found there had been substantial evidence of a material omission,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

the SEC failed to present substantial evidence of Todd's scienter with regard to this failure to disclose in the second quarter. Scienter requires a showing that Todd acted with intent to deceive, or else acted recklessly, such that his actions were highly unreasonable and an extreme departure from the standards of ordinary care. *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9th Cir.1990) (en banc). With regard to the Q2 2000 10-Q, the SEC presented no evidence that Todd knew or should have known that disclosure was required (presuming that it was). Mike McLaughlin testified that he did not believe disclosure of the loans was required in the Q2 2000 10-Q. If the auditor did not believe disclosure was necessary after conducting the interim review, it is hard to understand how Todd, who was not a CPA, could have been expected to think that it was. This is not recklessness, it is not even negligence.

While the issues with regard to the Q3 2000 10-Q and the 2000 10-K are somewhat different, the outcome is the same. Gateway included disclosures of the lending in the Q3 2000 10-Q, and more extensive disclosures in the 10-K. In the Q3 2000 10-Q, it broke out as a line item caption the amount of financed receivables, and included a note on finance receivables in the Management Discussion & Analysis ("MD & A"). Professor Arnold testified that in his opinion, the disclosure in the 10-Q should have been more extensive. He also testified that the receivables should have been broken out by tier in order to comply with S-X and S-K. This is once again Monday morning quarterbacking. A registrant is not required to be clairvoyant in predicting what disclosures an expert will require of it years after the fact. It is only required to disclose information as required by statute, regulation, or GAAP and to make the financial statements not materially misleading. Arnold takes issue with the disclosures as "boilerplate", but the Court is unaware of any requirement for original wording or a creative turn of phrase. Boilerplate language becomes boilerplate because it is generally considered sufficient to convey the necessary information. Professor Arnold's testimony was the sole evidence presented by the SEC in support of the claim that the disclosures in the Q3 2000 10-Q were insufficient and therefore constitute a material

omission. The Court finds this does not qualify as substantial evidence.

Further, once again there is a total failure to show scienter. With regard to Todd, in support of his scienter, the SEC relies in part on an email in which he inquired of Manza whether they had to make the disclosures in the Q3 2000 10-Q if they were going to securitize the portfolio. The SEC finds this objectionable because Todd did not " embrace disclosure". (SEC Opp. to Todd's Motion for JMOL at p. 20). This choice of language by the SEC is telling with regard to its approach to this case-compliance with the law as written is not sufficient-corporate officers must go beyond and " embrace" it (whatever that may mean), or else be accused of fraud. The law does not require cheerful compliance, or excessive compliance, or even willing compliance, only compliance. And in the face of a failure to comply, that failure must have been either intentional, or reckless such that it was an extreme departure from the standards of ordinary care. The evidence with respect to the disclosures in the Q3 2000 10-Q is not open to differing interpretations on this point. Manza informed Todd that he believed they would have to disclose the financing receivables in the 10-K, and possibly in the Q3 10-Q. Todd inquired as to whether it was really required. Manza explored the issue with his staff, and determined that it was. He also brought it to McLaughlin's attention, and discussed with him what the appropriate disclosures would be for the 10-Q. PwC provided its suggestion, Gateway opted for a more abbreviated disclosure, and PwC found it unobjectionable. These facts are undisputed. McLaughlin further testified that had he believed the disclosure was insufficient, he would have objected and brought it to the attention first of management, then of the Audit Committee. While the company did not adopt the disclosure recommended by the auditor, the auditor found the one it did make to be adequate. Once again, the only requirement is compliance with the law. Todd and Manza were not obligated to adopt PwC's recommendation in full in order to comply with the law so long as the disclosure they adopted was adequate. Their auditor told them it was. As a matter of law, there can be no scienter under these facts. This is not an extreme departure from the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

Page 8

standards of ordinary care, this is compliance with those standards.

**\*9** The disclosures in the 10-K were far more extensive, appearing in several places throughout the document and specifically noting the increase in reserves in response to the increase in the company's participation in higher risk financing categories. There was no evidence to support an inference that anyone advised Todd or Manza that these additional disclosures were insufficient. PwC did not object, nor was there evidence that Todd or Manza should have known in any other way that these disclosures were supposedly inadequate. The Court finds that there is not substantial evidence to support a finding of liability with regard to the higher tier lending.

*c. Lockheed*

Lockheed Martin was Gateway's third party IT services provider. This outsourcing relationship began in 1999. Gateway owned the computers and servers that Lockheed used to provide IT services. In the third quarter 2000, Gateway sold that equipment to Lockheed for approximately $47 million, and booked it as revenue. Approximately one third of the equipment was Gateway branded, while the remainder consisted of non-Gateway branded items, such as Sun and IBM servers. The SEC asserts the recognition of revenue was improper under GAAP because it should have been recorded as a fixed asset sale and that it was materially misleading to record it as revenue.[FN2]

> FN2. The SEC clarifies its position with regard to Lockheed in its Opposition to Manza's Motion for JMOL in that it does not contend the sale itself was improper or lacked economic substance, only that it should not have been recorded as revenue. (Mem. in Opp. to Manza's Motion for JMOL at p. 15, n. 13).

First, the Court must address whether substantial evidence was presented at trial which would support a finding that the transaction led to a material misrepresentation. As the SEC now concedes, the transaction itself is not inherently problematic-Gateway had several issues in its outsourcing relationship with Lockheed that it could cure by selling Lockheed the equipment. Lockheed would also benefit by owning the equipment by becoming more entrenched with Gateway and being able to charge more for its services. But this does not affect the issue of the propriety under GAAP of recording the sale as revenue.

Unlike the two transactions discussed above, the bulk of the evidence regarding the Lockheed transaction revolved around differing interpretations of GAAP. GAAP encompasses "a wide range of acceptable procedures, such that 'an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures when that accountant prepares a financial statement.' " *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1020-21 (5th Cir.1996) (quoting *Godchaux v. Conveying Techniques, Inc.,* 846 F.2d 306, 315 (5th Cir.1988) ); *see also In re Cirrus Logic Sec. Litig.,* 946 F.Supp. 1446, 1457 (N.D.Cal.1996) ("it should be noted that GAAP is not a set of rules ensuring identical treatment of identical transactions; rather, it tolerates a range of reasonable treatments, leaving the choice among alternatives to management."); *In re GlenFed. Inc. Sec. Litig.,* 42 F.3d 1541, 1549 (9th Cir.1994) (en banc) (recognizing that "flexible accounting concepts do not always (or perhaps ever) yield a single correct figure.").

**\*10** The SEC takes the position that a sale of fixed assets cannot be recorded as revenue. It is still unclear to the Court what GAAP provision it relies on for this position. The SEC's expert, Professor Arnold, testified conclusively that GAAP is in writing. He also testified that he had not found a provision of GAAP that says that a sale of fixed assets cannot be booked as revenue. After spending approximately 1,130 hours on this engagement for the SEC, at a cost of $450,000, Professor Arnold could not identify any provisions or provision of GAAP which would support the SEC's position with respect to the Lockheed accounting. Rather, he testified that he didn't have to, because it was "

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

interpretation".

Defendants presented evidence that the transaction could have been recorded correctly under GAAP, relying on Statement of Financial Accounting Concept # 6, which defines revenues as "inflows or other enhancements of assets of an entity or settlements of its liabilities (or a combination of both) from delivering or producing goods, rendering services, or other activities that constitute the entity's ongoing major or central operations."Under defendants' interpretation of Concept 6, it would have been proper to record the income from the Lockheed transaction as revenue because it was from Gateway's ongoing major or central operations-selling computer equipment. Defendants' expert provided a useful illustration of this interpretation by way of a furniture company. A furniture company's major and central operation is furniture sales. Therefore, if a customer walked into a showroom and wanted to buy a desk that was not on the showroom floor, but rather being used as a " fixed asset", i.e. by the sales staff, that desk would be reclassified to inventory and the sale would generate revenue. With regard to revenue recognition, it wouldn't matter that the desk was not classified as inventory at that moment, because the sale was still in the nature of the company's major and central operations. On the other hand, if the company sold the computer sitting on top of the desk, it would not generate revenue because the company's major and central operation is the sale of furniture. Under this reading of Concept 6, Gateway could reclassify the computer equipment it sold to Lockheed into inventory (which it did), and record revenue on it because Gateway's major and central operation is the sale of computers. It could not, however, have recorded revenue on the desks the computers sat on, had those also been sold. Nowhere in GAAP is there any further written explanation of what constitutes a "major and central operation" for purposes of revenue recognition.

GAAP allows for a range of reasonable treatments leaving the choice among alternatives to management. *Lovelace v. Software Spectrum Inc.,* 78 F.3d at 1020-21. The SEC asks this Court to ignore not only this principle, but the lack of any basis in GAAP for its stance that the sale of fixed assets cannot be recorded as revenue. The Court finds that Professor Arnold's unfounded " interpretation" of GAAP does not qualify as substantial evidence that Defendants' choice of accounting for the Lockheed transaction was unreasonable. The SEC has therefore failed to present substantial evidence that the Lockheed transaction led to a material misstatement.

**\*11** Even if it had, substantial evidence was also lacking to support a finding of scienter on the part of either Todd or Manza with respect to Lockheed. As noted above, the SEC now concedes the transaction itself is not problematic. GAAP violations, without more, are not sufficient to show scienter. *See In Re Software Toolworks, Inc.,* 50 F.3d 615, 627 (9th Cir.1994). With respect to Manza, the SEC relies heavily on his testimony that he would not have initially booked the entire amount as revenue, as well as the similar initial impressions of several of his accounting staff. The evidence was undisputed that both Manza and his staff gained comfort with the accounting on the basis of analogizing it to the non-Gateway branded items sold from the Country Stores, including display items, as well as consideration of Concept 6. For this to be evidence of scienter, the Court would have to apply a rule of law that absurdly holds that changing one's mind as a result of research and discussion is "an extreme departure from the standards of ordinary care". Such a holding does not square with either case law or logic.

To support its allegations of scienter, the SEC also relies on a theory that the accounting was hidden from PwC. But as was the case with ACS, giving all reasonable inferences to the SEC, the evidence does not support such a finding. The evidence is undisputed that Manza brought the Lockheed transaction to McLaughlin's attention. He did so at a meeting with McLaughlin, and at least one or two other people. McLaughlin testified that the purpose of the meeting was to discuss significant and unusual transactions, which it was understood, PwC would then review. He further testified that Manza followed up with him and asked if PwC had looked at the Lockheed transaction, asking to the effect of whether he was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                        Page 10

Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

alright with it, and he responded that he was. The SEC further quibbles with Manza's communication with PwC on the issue by claiming that it was not enough to bring the transaction to their attention as unusual and significant, but he needed to specifically tell them to check the revenue recognition. The Court is left to wonder whether Manza was also supposed to conduct the Q3 2000 quarterly review for PwC-there is a certain point at which a business professional must be able to trust that when he asks his auditor to review something, the auditor does his job and looks at the whole transaction. Making that assumption falls within the standards of ordinary care for the Controller of a large company. The fact that the transaction was "unusual" does nothing to change that, as it was brought to McLaughlin's attention at a meeting the purpose of which was to discuss unusual transactions.

Additional evidence further belies the theory that PwC was unaware of the revenue aspect of the transaction. In its quarterly review, PwC noted the Lockheed sale in one of its workpapers, noted that it was recorded in the "trade receivables" account, and passed on reclassifying the amount because it was de minimis. As McLaughlin testified, the "trade receivables" account was a revenue account. Gateway had only ever used it as a revenue account. In other words, PwC saw the sale recorded in an account reserved for revenue, and passed further review. To the extent that PwC was "unaware" of the accounting for the Lockheed transaction, it was not because of Manza. The Court finds the SEC failed to produce substantial evidence as required under Rule 50 to show Manza acted with scienter with respect to the Lockheed transaction.

**\*12** The SEC's evidence of scienter for Todd relies primarily on his own testimony that he wanted to book the revenue from Lockheed, that he added it to his "gap-closure list", and that he pushed back against Manza's initial impression that revenue could not be booked on the non-Gateway branded equipment. As stated above, discussion back and forth among professionals, as well as reconsideration of initial impressions is not sufficient to show scienter. Additionally, the desire of a corporate officer to generate revenue and meet

analyst expectations is not an extreme departure from the standards of ordinary care. The SEC introduced no evidence to the contrary. Nor is it a reasonable inference that keeping track of the company's performance is evidence of intent to defraud. As it does with Manza, the SEC takes issue with Todd for not being more specific in his conversations with McLaughlin. In support of this, it references Todd's testimony that he asked McLaughlin if he was "comfortable" with the "revenue" on Lockheed, to which McLaughlin responded "yes." This actually supports the opposite inference from that the SEC wishes the Court to draw. The analysis above with respect to Manza's communications to PwC applies equally to Todd. The Court finds there was not substantial evidence to support a finding Todd acted with scienter with respect to Lockheed.

*d. VenServ*

Gateway sold approximately $20 million of computers to Venserv in September 2000. Venserv was a reseller who bought the computers to sell to higher credit risk customers. Gateway had relationships with several other resellers, including Rentway, Insight and Advanced Micro. Venserv went on to later purchase an additional $30-50 million in Gateway computers over the course of the two companies' business relationship. As part of this $20 million sale to Venserv, Gateway entered into a Reseller Agreement and a Referral Agreement. The Reseller Agreement was relatively standard and Gateway utilized it, or a very similar agreement, with its other reseller partners.

Unlike the other transactions at issue in this case, the parties agree that revenue was improperly recognized on the VenServ transaction in Q3 2000. The SEC initially argued that revenue was improperly recognized because the sale did not meet the criteria for a bill-and-hold transaction. But in its Opposition to Manza's Motion for JMOL, it steps away from that position, and in fact refers to it as "irrelevant". (SEC Mem. in Opp. to Manza's Motion for JMOL at p. 10). Instead, it now takes a position consistent with the evidence presented at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 11

Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

trial, that the reason the revenue should not have been recognized in the third quarter is that the earnings process was not complete. The Referral Agreement provided that Gateway would refer customers to VenServ who had gone through more traditional financing routes (including through Gateway itself) and were unsuccessful in financing a computer. The $20 million in sales to VenServ was to a large degree contingent upon these referrals. All the witnesses were in accord that this contingency should have prevented Gateway from recognizing the revenue in the third quarter because the earnings process was not yet completed, and the referral obligation constituted a substantial continuing obligation to VenServ. The content of the Referral Agreement came to PwC's attention in Q4 2000 during the fourth quarter review/year end audit. At that time, Manza agreed with PwC that the contingency in the Referral Agreement meant the revenue should be reversed, and it was restated prior to the release of the 10-K.

**\*13** The sole issue with respect to VenServ is therefore scienter. A GAAP violation, without more, is not sufficient to support a finding of scienter. *See In Re Software Toolworks, Inc.,* 50 F.3d at 627. With respect to Manza, the SEC relies on several "red flags" that it believes should have led Manza to conclude the revenue should not be booked. The first of these is an email which blind carbon copied Manza and laid out possible terms of the VenServ agreement, which if carried through, the SEC theorizes would have made revenue recognition inappropriate. But it is undisputed those were not in fact the final terms of the agreement. Second is the fact that after the computers were sold by VenServ, they were sent to Gateway for the warranty to be registered. This practice was investigated internally at Gateway with respect to another reseller, Rentway, and deemed not to have an impact on completion of the earnings process. Shortly after this investigation concluded, Manza exchanged emails with his plant controllers, the focus of which was to be sure the sales "were being handled in accordance with GAAP".

Third was the discovery by Manza that Gateway was "leasing" at least one employee to VenServ. The employee or employees were

Gateway employees who would have otherwise been laid off, but instead were leased to VenServ, which did not have its own sales staff. The SEC did not introduce any basis for believing that this would impact the completion of the earnings process or represented a significant continuing obligation on Gateway's part with respect to the computers. The final "red flag" the SEC relies on is that the inventory being kept in a warehouse for VenServ was invaded by warehouse staff and shipped to RentWay customers. The evidence was undisputed that when Manza discovered this fact, he immediately brought it to Todd's attention, and Todd disciplined those employees because it was VenServ's inventory. The final two pieces of information the SEC points to-the warehousing fees paid by Gateway and the extended payment terms-cannot be considered with regard to Manza's scienter, because by the SEC's own evidence, they came to his attention after the Q3 2000 10-Q had been filed.

As the parties agree, the "dramatic" reason (to quote Professor Arnold) the revenue from the VenServ transaction had to be reversed was the contingent nature of the sale based on Gateway's obligation under the Referral Agreement to refer sufficient customers to VenServ.

Even Professor Arnold agreed it would have been a close call whether the revenue recognition was proper given some of the other factors without the contingency in the Referral Agreement. McLaughlin also testified that the accounting was ambiguous, such that one accountant's view of the transaction could be different from another's. He further testified that he believed a lack of communication within Gateway led to Manza being unaware of the Referral Agreement until he followed up on a PwC inquiry in late December 2000 or early January 2001. The SEC presented no evidence that would support an inference that Manza knew of the terms of the Referral Agreement prior to that time. The evidence the SEC relied on showed only that given what Manza knew at the time (which is how revenue recognition is determined), the accounting was ambiguous. This is not substantial evidence of intent to defraud or recklessness. To allow this to stand for an "extreme

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

departure from the standards of ordinary care" would be to dilute those words to an untenable degree. The Court finds the SEC failed to produce substantial evidence to conclude Manza acted with scienter with respect to the VenServ transaction.

**\*14** With respect to Todd, the evidence the SEC relies on is illusory. There is a dispute as to whether he signed the Referral Agreement, or just the Reseller Agreement. Even if he actually signed both, the SEC introduced no evidence that he was aware of the accounting implications of the Referral Agreement. Further, when he was informed that employees had improperly invaded the VenServ inventory to fill Rentway's order, the evidence was undisputed that he was angry and disciplined the employees. The SEC posits that he could have been upset because this error of the employee " threatened to expose the fraudulent revenue scheme" . (SEC Mem. in Opp. to Todd's Motion for JMOL at p. 27). Under Rule 50, the SEC is entitled to all reasonable inferences; it is not entitled to wholly unsupported innuendo. The Court finds the SEC failed to introduce substantial evidence to find that Todd acted with scienter with respect to the VenServ transaction.

For the reasons discussed above, the Court grants both Todd and Manza's Motions for Judgment as a Matter of Law with respect to the claims under § 10(b) and Rule 10b-5.

*3. Section 13 Claims*

In addition to the claims for securities fraud, the SEC brought claims against both defendants for (1) aiding and abetting violations of § 13(a) of the Securities Exchange Act (the "reporting provisions" ); (2) aiding and abetting violations of § 13(b)(2)(A) of the Securities Exchange Act and Rule 13b2-1 thereunder (the "books and records provisions"); and (3) violations of Rule 13b2-2 (false statements to auditors).

In order to find aider and abettor liability for section 13 violations, the SEC must show that: "(1) [Gateway] violated the relevant securities laws; (2)

[Defendants] had knowledge of the primary violation and of his or her own role in furthering it; and (3) [Defendants] provided substantial assistance in the primary violation."*Ponce v. Securities and Exchange Commission,* 345 F .3d 722, 737 (9th Cir.2003). As discussed above, there was substantial evidence to support a finding that Gateway's Q3 2000 10-Q was materially misstated on the basis of the VenServ transaction. Scienter is not required to find aiding and abetting liability under § 13(a) and Rules 12b-20 and 13a-13. *Id.* at 737 n. 3;*see also SEC v. McNulty,* 137 F.3d 732, 736 (2d Cir.1998) (scienter not an element of claims under §§ 13(a) and 13(b)); *SEC v. Savoy Industries, Inc.* 587 F.2d 1149, 1167 (D.C.Cir.1978) (reporting provisions of § 13 not intended to be antifraud provisions, and therefore do not require scienter). Both Todd and Manza knowingly entered into the VenServ transaction, and assisted in the preparation of the misstated Q3 2000 10-Q. The Court therefore finds a reasonable jury could have found them liable for aiding and abetting violations of the reporting provisions.

Similarly, there was substantial evidence that Gateway committed books and records violations on the basis of the incorrect accounting for the Venserv transaction. For the same reasons as described above with respect to aiding and abetting § 13(a) violations, there was substantial evidence which would allow a reasonable jury to conclude both Defendants aided and abetted the § 13(b)(2)(A) violations. Rule 13b2-1 provides that " [n]o person shall directly or indirectly, falsify or caused to be falsified, any book, record, or account" that a company is required to keep under the books and records provisions of the Securities Exchange Act. There is no scienter requirement under this rule, rather liability is premised on standards of " reasonableness".*SEC v. Softpoint, Inc.,* 958 F.Supp. 846, 865-866 (S.D.N.Y.1997). Because the rule includes "indirectly causing to be falsified", and has no scienter requirement, on the basis of the VenServ transaction, a reasonable jury could have found that both Defendants violated Rule 13b2-1.

**\*15** The final claim the SEC brought was for violations of Rule 13b2-2, which states in relevant part:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

(a) No director or officer of an issuer shall, directly or indirectly:

(1) Make or cause to be made a materially false or misleading statement to an accountant in connection with; or

(2) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:

(i) Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or

(ii) The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.

17 C.F.R. § 240.13b2-2. The SEC bases this claim on both defendants signing the Q3 2000 Management Representation Letter to PwC, in particular the statement in that letter that the financial statements were made in accordance with GAAP.

The Court has yet to find a case where a claim of Rule 13b2-2 violations was sustained without knowledge of the falsity of the statements at issue. *See e.g. SEC v. Cohen,* No. 4:05CV371-DJS, 2007 WL 1192438 at *19 (E.D. Mo. April 19, 2007) (finding knowledge of falsity of statements required to find liability under Rule 13b2-2); *McConville v. SEC,* 465 F.3d 780, 789 (7th Cir.2006) (finding substantial evidence supported 13b2-2 violation when 10b-5 violations had been proven, and substantial evidence supported finding knowledge of the falsity of the statements); *SEC v. Sandifur,* No. C05-1631C, 2006 WL 538210 at *9 (W.D.Wash. March 2, 2006) (finding 13b2-2 violation sufficiently alleged when defendant knowingly concealed information auditor would find critical to approve deal, and primary section 10(b) violation had been sufficiently alleged); *SEC v. Dauplaise,* No. 6:05CV1391 ORL 31KRS, 2006 WL 449175 at *3, 8 (M.D.Fla. Feb. 22, 2006) (finding 13b2-2 violation sufficiently alleged when CEO knew of default on note and receivership and failed to disclose to accountants, and primary section 10(b) violation had been alleged); *SEC v. Orr,* No. 04-74702, 2006 WL 542986 at *16-18

(E.D.Mich. March 6, 2006) (considering defendants' knowledge, or recklessness in not knowing statements made to auditors were false); *SEC v. Autocorp Equities, Inc.,* No. 2:98-CV-00562 PGC, 2004 WL 1771608 at *6 (D.Utah Aug. 4, 2004) (finding 13b2-2 liability only appropriate upon showing that defendant later learned previous statements to auditors were false and failed to correct them).

In order to impose liability under Rule 13b2-2, Defendants therefore would have had to know when they signed the management representation letter that the Q3 2000 10-Q was not prepared in accordance with GAAP. For the reasons discussed above with respect to scienter under the § 10(b) and 10b-5 violations, the SEC failed to introduce substantial evidence to support a finding that Defendants knew their statements in the management representation letter were false.

***16** The Court therefore grants both Todd and Manza's Motions for Judgment as a Matter of Law with respect to the claim under Rule 13b2-2, and denies both Motions with respect to the claims for aiding and abetting violations of §§ 13(a) and 13(b)(2)(A), and violations of Rule 13b2-1.

*B. Rule 59 Motions for New Trial*

The Court finds to the extent it has granted the Motions for Judgment as a Matter of Law, it need not reach the Motions for New Trial. With respect to the claims for which the Court denies the Motions for Judgment as a Matter of Law, the Court's judgment is no different when applying the standard under Rule 59. Under Rule 59, a court may grant a new trial when the jury's verdict is against the clear weight of the evidence. *Landes Constr. Co. v. Royal Bank of Canada,* 833 F.2d 1365, 1371 (9th Cir.1987)."If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial."*Id.* at 1371-72 (internal citations omitted). Having weighed the evidence, and assessed the witnesses' credibility as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 14

Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

is allowed under Rule 59, for the reasons set forward with respect to the Rule 50 Motions, the Court cannot say that the verdict is "contrary to the clear weight of the evidence" with regard to the claims for aiding and abetting violations of § 13(a), § 13(b)(2)(A) and violations of Rule 13b2-1. *See Murphy v. City of Long Beach,* 914 F.2d 183, 187 (9th Cir.1990).

For the reasons stated above, the Motions for New Trial are denied without prejudice as to the § 17(a), § 10(b) and Rule 10b-5, and Rule 13b2-2 claims, and denied with prejudice as to the remaining claims.

*C. SEC's Motion for Relief*

Based on the jury verdicts, the SEC moves for the following relief against both defendants: (1) a permanent injunction prohibiting future violations of the securities laws; (2) a permanent officer and director bar; (3) disgorgement; and (4) civil penalties. The Court determines both equitable relief and the amount of any civil penalty. *See Tull v. United States,* 481 U.S. 412, 427 (1987) (finding that while jury trial was required to determine liability in case with both legal and equitable claims, court should determine the amount of civil penalty, if any).

*1. Permanent Injunction*

The SEC seeks to permanently enjoin both defendants from future violations of the securities laws. In order to obtain a permanent injunction, the burden falls on the SEC to show a reasonable likelihood of future violations. *SEC v. Murphy,* 626 F.2d 633, 655 (9th Cir.1980). In predicting the likelihood of future violations, the Court must assess the totality of the circumstances.*Id.* As part of that assessment, the Court may consider several factors, including the existence of past violations; the degree of scienter involved; the isolated or recurring nature of the infraction; the defendant's recognition of the wrongful nature of the conduct;

the likelihood because of defendant's professional occupation that future violations might occur; and the sincerity of defendant's assurances against future violations. *Id.* The primary purpose of injunctive relief is to deter future violations, not to punish the violators. *SEC v. Koracorp Industries, Inc.,* 575 F.2d 692, 697 (9th Cir.1978).

**\*17** There is no evidence of past violations on the part of either defendant. To the extent that the violations at issue in this case qualify as the past violations the Court is to consider, those now consist of aiding and abetting violations of the reporting provisions and the books and records provisions, both non-fraud violations committed without scienter. While the SEC points to *SEC v. Murphy* as a case in which an injunction issued for violations that are not scienter-based, the court in that case made a finding that defendant acted at least recklessly, which is the standard for scienter in this Circuit. 626 F.2d at 655. The Court is also to consider the degree of scienter involved, a factor which here militates against the issuance of an injunction. Defendants acted without scienter. The misstatements that occurred as a result of the accounting for the Venserv transactions involved neither intent nor an extreme departure from the standards of ordinary care. Defendants erred, and at the end of the day made accounting choices which were later deemed incorrect. This is not the level of scienter for which an injunction, permanent or otherwise, is appropriate. The remaining factors do not change the totality of the circumstances with regard to a likelihood of future violations. The infractions were isolated. The Defendants have not " recognized the wrongfulness of their conduct" in the sense that they argue that they did not in fact commit a fraud. This is a wholly appropriate position during the pendency of Rule 50 and Rule 59 motions, and as discussed above, the Court believes it to be a justified one. Having listened to the testimony of both Defendants at trial, the testimony of those who worked with them, and reviewing the various submissions in support and in opposition to this motion, the Court finds the defendants are not likely to engage in future violations of the securities laws. The request for a permanent injunction is therefore denied.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 15

Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

*2. Officer and Director Bar*

The SEC seeks a permanent bar on both Defendants acting as officers or directors of any public company. The Court is only authorized to issue such a bar in response to a violation of § 17(a)(1) or § 10(b) (the antifraud provisions).15 U.S.C. § 77t(e); 15 U.S.C. § 78u(d)(2). Defendants have not committed violations of the antifraud provisions. The Court therefore may not issue such a bar. Even if it was authorized to do so, the Court finds that the factors it may consider do not support such relief. Those factors include: (1) the egregiousness of the underlying violation; (2) the defendant's "repeat offender" status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that the misconduct will recur.*SEC v. First Pacific Bancorp,* 142 F.3d 1186, 1193 (9th Cir.1998).

It is helpful to view the facts of *First Pacific Bancorp* for an example of when an officer and director bar is appropriate. *Id* . In that case, after fraudulently diverting $500,000 from one offering, the defendant knowingly used his own money to close an offering that had failed to meet the minimum requirement. He was held jointly and severally liable with the corporate defendants because he was chairman of the board, CEO and majority shareholder. Further, his actions resulted in putting off the inevitable failure of a bank, the failure of which the court found him responsible for. During that time, he paid himself hundreds of thousands of dollars in salary, commissions, consulting, management and legal fees. FDIC and California bank examiners found he was paying himself excessive compensation in the amount of two to three times what a CEO of a comparable institution would receive, and was using it to cover his heavy personal debt and excessive standard of living. *Id.* at 1191-1192.These are the types of facts that demonstrate "egregiousness" of an underlying violation. While there may be less egregious facts than those of *First Pacific Bancorp* that would still qualify for an officer and director bar, the SEC has not made a showing that either Todd or Manza's conduct qualifies. The request for a permanent

officer and director bar is therefore denied.

*3. Disgorgement*

**\*18** The SEC seeks disgorgement from both defendants of their "ill-gotten gains" consisting of their salaries, bonuses, and in Todd's case, severance package when he left Gateway. From Todd, the SEC seeks $1,726,250 consisting of $206,250 in salary for the second and third quarters of 2000 plus a cash severance of $1,520,000. From Manza the SEC seeks $85,150 consisting of $58,750 in salary for the third quarter and $26,400 in bonus for that quarter. In addition, the SEC requests pre-judgment interest in the amount of $593,541.83 from Todd and $40,388.87 from Manza.

Disgorgement is intended to force a defendant to surrender his unjust enrichment. *SEC v. Rind,* 991 F.2d 1486, 1493 (9th Cir.1993). It is not a punitive remedy. The SEC therefore must be able to show unjust enrichment, and that the disgorgement it requests is a reasonable approximation of a defendant's ill-gotten gains. *SEC v. JT Wallenbrock & Associates,* 440 F.3d 1109, 1113-1114 (9th Cir.2006). The SEC falls short on both counts. First, it fails to show unjust enrichment. Defendants did not profit from the reporting and books and records violations. They did not cash in stock options, nor otherwise exploit this supposed scheme. Second, it lacks the requisite nexus between the supposed ill-gotten gains and the requested disgorgement. The SEC's position that Defendants should give up their salaries for the time at issue is untenable-it is basically a statement that because of several business decisions or errors, nothing else they did during that period matters. This is punitive. The SEC also failed to show unjust enrichment with respect to Manza's bonus for the third quarter. The Management Incentive Program (" MIP"), Gateway's bonus structure that applied to Manza, was supposed to be the great smoking gun-the motivation behind the scheme to increase revenues. But the undisputed evidence at trial showed that the MIP was actually a series of gradations of bonus based on performance of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

company. It was not an all or nothing proposition, nor was it based solely on meeting analyst consensus. If Gateway missed analyst consensus, Manza still got a bonus, albeit a slightly smaller one. Specifically, it would have been $6000 less, not the $26,400 the SEC asks for in disgorgement. Finally, the SEC fails to show any nexus between Todd's severance package and the violations. There was no evidence at trial that Todd was fired because of the violations at issue here, nor that he received the severance package because of them. The Court finds that disgorgement is not an appropriate remedy for the violations in this case.

*4. Civil Penalties*

The SEC seeks civil monetary penalties in the amount of $220,000 from Todd and $110,000 from Manza. The civil penalty provision of the Exchange Act provides for three "tiers" of penalty, to be imposed in an amount "determined by the court in light of the facts and circumstances."15 U.S.C. § 78u(d)(3)(B)(i). The SEC seeks third tier penalties, which are appropriate when "the violation ... involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."15 U.S.C. § 78u(d)(3)(B)(iii). There has been no evidence presented of losses or a significant risk of loss to anybody due to the violations at issue. Nor did the violations involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement", which by itself would qualify for a second tier penalty. 15 U.S.C. § 78u(d)(3)(B)(ii).

**\*19** The Court finds that in light of the facts and circumstances, first tier civil monetary penalties are appropriate. Both defendants were found liable for aiding and abetting violations of § 13(a), § 13(b)(2)(a), and violating Rule 13b2-1 with respect to the VenServ transaction. In light of all the facts and circumstances, the Court assesses a civil penalty against Manza of $10,500, consisting of $3,500 per violation, and $16,500 against Todd, consisting of $5,500 per violation. Todd was the

CFO, and ultimately responsible for Gateway's financial statements. The Court believes a higher penalty is therefore appropriate.

### IV. CONCLUSION

For the reasons stated above, the Court:
1. GRANTS Defendant Todd's Motion for Judgment as a Matter of Law as to the § 17(a) claims; the § 10(b) and Rule 10b-5 claims; and the Rule 13b2-2 claims;
2. GRANTS Defendant Manza's Motion for Judgment as a Matter of Law as to the § 10(b) and Rule 10b-5 claims; and the Rule 13b2-2 claims;
3. DENIES both Defendants' Motions for Judgment as a Matter of Law as to the remaining claims;
4. GRANTS Plaintiff SEC's Motion for Relief as to civil penalties in the amount of $10,500 against Manza and $16,500 against Todd;
5. DENIES Plaintiff SEC's Motion for Relief as to permanent injunction, officer and director bar and disgorgement; and
6. DENIES both Defendants' Motions for New Trial as to the § 17(a) claims; the § 10(b) and Rule 10b-5 claims; and the Rule 13b2-2 claims without prejudice, and as to the remaining claims with prejudice.

IT IS SO ORDERED.

S.D.Cal.,2007.
S.E.C. v. Todd
Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8

LEXSEE 2006 U.S. DIST. LEXIS 33938

**SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v. HENRY C. YUEN, ELSIE M. LEUNG, JONATHAN B. ORLICK, and CRAIG M. WAGGY, Defendants.**

**Case No. CV 03-4376 MRP (PLAx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

*2006 U.S. Dist. LEXIS 33938*

**March 16, 2006, Decided
March 16, 2006, Filed**

**SUBSEQUENT HISTORY:** Findings of fact/conclusions of law at, Injunction granted at *SEC v. Yuen, 2006 U.S. Dist. LEXIS 34759 (C.D. Cal., May 8, 2006)*

**PRIOR HISTORY:** *SEC v. Yuen, 2005 U.S. Dist. LEXIS 41231 (C.D. Cal., Sept. 2, 2005)*
*SEC v. Gemstar-TV Guide Int'l, Inc., 401 F.3d 1031, 2005 U.S. App. LEXIS 4617 (9th Cir. Cal., 2005)*

**COUNSEL:** [*1] For Securities and Exchange Commission, Plaintiff: Andrew J Dunbar, Elizabeth Perry Smith, John B Bulgozdy, Jose F Sanchez, Karoll L K Pollock, Kelly Curtis Bowers, Martin J Murphy, Sandra J Harris, SEC -- Securities & Exchange Commission, Nicolas Morgan, Los Angeles, CA; Michael A Piazza, Robert H Conrrad, Jr, United States Securities and Exchange Commission, Los Angeles, CA; Thomas A Zaccaro, Akin Gump Strauss Hauer and Feld, Los Angeles, CA.

For Hogan and Hartson, Movant: Andrew R Shoemaker, Hogan & Hartson, Boulder, CO; Richard L Stone, Hogan & Hartson, Los Angeles, CA.

For Ernst and Young LLP, Movant: Paris Wynn, Robert B Hubbell, Heller Ehrman White & McAuliffe, Los Angeles, CA.

For Bloomberg, L.P., Los Angeles Times Communications, LLC, Movants: Andrew J Thomas, Janet Lynn Grumer, Susan E Seager, Davis Wright Tremaine, Los Angeles, CA.

For Henry C Yuen, Defendant: David C Wheeler, Joseph John Sheehan, Wheeler and Sheehan, Los Angeles, CA; Frederick A Haist, Palmer Lombardi and Donohue, Los Angeles, CA; Michelle A Rice, Niall E O'Hegarty, Paul R Niehaus, Sean R O'Brien, Stanley S Arkin, Arkin & Kaplan, New York, NY; Kieran P Ringgenberg, Boies Schiller and [*2] Flexner, Oakland, CA.

For Elsie M Leung, Defendant: David W Shapiro, John F Cove, Jr, Kieran P Ringgenberg, Boies Schiller & Flexner, Oakland, CA; David C Wheeler, Frederick A Haist, Palmer Lombardi and Donohue, Los Angeles, CA; Michelle A Rice, Niall E O'Hegarty, Paul R Niehaus, Sean R O'Brien, Stanley S Arkin, Arkin & Kaplan, New York, NY.

For Craig M Waggy, Defendant: Dylan Ford, Jonathan E Rich, Lisa A Callif, Proskauer Rose, Los Angeles, CA; Jack P DiCanio, Richard Marmaro, Skadden Arps Slate Meagher and Flom, Los Angeles, CA.

For Jonathan B Orlick, Defendant: Aaron C Gundzik, John W Cotton, Cotton & Gundzik, Los Angeles, CA; Edward P Davis, Jr, Pamela R Davis, DLA Piper Rudnick Gray Cary US, San Francisco, CA; Robert W Brownlie, Susan D Resley, Gray Cary Ware & Freidenrich, San Diego, CA.

For Peter C Boylan, Defendant: Patricia L Glaser, Mark G Krum, Mark Patrick Lynch, Christensen Fink Jacobs Glaser Weil & Shapiro, Los Angeles, CA.

For Gemstar-TV Guide International Inc, ThirdParty Defendant: Alexandra Verkh, Hogan and Hartson, Los Angeles, CA; Kimberly S Greer, Fish & Richardson, San Diego, CA; Poopak Nourafchan, Hogan and Hartson,

Los Angeles, CA;  [*3]  Sean T Prosser, Morrison and Foerster, San Diego, CA; Richard L Stone, Hogan & Hartson, Boulder, CO.

For USA, intervenor, Intervenor: Gregory J Weingart, Munger Tolles and Olson, Los Angeles, CA.

**JUDGES:** HONORABLE MARIANA R. PFAELZER, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** MARIANA R. PFAELZER

**OPINION**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| I. FINDINGS OF FACT | | 1 |
| A. | Background | 1 |
| B. | Procedural History | 7 |
| C. | Yuen's Management And Control Of Gemstar | 8 |
| D. | Gemstar's Financial Reporting | 9 |
| E. | Revenue Recognition Under GAAP And | |
| | Gemstar Revenue Policies | 13 |
| F. | IPG Advertising Revenue Targets | 14 |
| G. | Gemstar's Independent Auditors | 18 |
| H. | Recording And Reporting Of | |
| | IPG Licensing Revenue | 20 |
| | 1. Scientific-Atlanta $ 113.5 Million Licensing | |
| | Revenue Under License and Settlement Agreement | 20 |
| | 2. Time Warner Cable $ 18.1 Million Licensing | |
| | Revenue | 26 |
| | 3. $ 23.5 Million Licensing Revenue From Up-Front Payment | |
| | Under AOL IPG Agreement | 29 |
| I. | Recording And Reporting Of IPG | |
| | Advertising Revenue | 30 |
| | 1. Thomson Relationships | 30 |
| | a) Background Of The Various Thomson | |
| | And Gemstar Transactions | 30 |
| | b.) Purported Oral Modification Of DSS | |
| | Agreement | 30 |
| | c) e-Book Inventory Purchase | |
| | And e-Book Licensing Restructuring | 36 |
| | 2. Fantasy Sports $ 20 Million IPG Advertising | |
| | Revenue Recorded In 2001 | 39 |
| | 3. $ 26 Million IPG Advertising | |
| | Revenue From Tribune's Purchase Of WGN Business | |
| | From Gemstar | 44 |
| | 4. $ 17.5 Million Prepaid IPG | |
| | Advertising From Motorola Settlement. . . . | 47 |
| | 5. Shifting Of $ 5.6 Million 2001 Revenue From | |
| | Media Sector To IP Sector. . . . | 51 |
| J. | Yuen's Compensation from Gemstar. . . . | 55 |
| K. | Yuen's Destruction Of Evidence And Obstruction | |
| | Of Justice. . . . | 56 |
| L. | Testimony of Yuen and Leung. . . . | 56 |

2006 U.S. Dist. LEXIS 33938, *

|                                                              | Page |
| :----------------------------------------------------------- | ---: |
| II. CONCLUSIONS OF LAW . . . .                               |   56 |
| A. Jurisdiction                                              |   56 |
| B. Liability                                                 |   57 |
| 1. Yuen Committed Securities Fraud. . . .                    |   57 |
| a) Yuen Made Misrepresentations And                          |      |
| Omissions Of Material Fact About                             |      |
| Gemstar's IPG Licensing And IPG                              |      |
| Advertising Revenues. . . .                                  |   58 |
| b) Yuen Acted With Requisite Mental State. . . .             |   62 |
| c) Reliance On KPMG's Accounting                             |      |
| Work Or Advice To Negate Scienter . . . . . . . . . . .      |   65 |
| d) Yuen's Misrepresentations And Omissions                   |      |
| Were Made "In Connection With" Securities                    |      |
| Transactions. . . . .                                        |   67 |
| 2. Yuen Violated The Periodic Reporting And Record           |      |
| Keeping Control Requirements. . . .                          |   67 |
| a) Reporting Violations: Section 13(a) Of                    |      |
| The Exchange Act And Rules 12b-20,                           |      |
| 13a-1, 13a-11, And 13a-13 Thereunder. . . .                  |   68 |
| b) Record-Keeping Violations: Sections 13(b)(2)(A)           |      |
| Of The Exchange Act And Rule 13b2-1 Thereunder               |   70 |
| 3. Yuen Misrepresented To Auditors In Violation of Rule      |      |
| 13b2-2 Of Exchange Act. . . .                                |   71 |
| C. Remedies. . . .                                           |   72 |

[*4] This action came on for trial on December 7, 2005, against Defendant Henry C. Yuen ("Yuen"). Plaintiff Securities and Exchange Commission ("Commission") charged Yuen with (1) securities fraud, (2) violation of the periodic reporting, record-keeping, and internal control provisions of the federal securities laws, and (3) lying to auditors. The Court, having considered the testimony of the witnesses, the evidence submitted by the parties, the pleadings and other documents filed in this action, and the legal arguments of counsel, makes the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

### A. Background

1. Gemstar-TV Guide, International, Inc. ("Gemstar" or the "Company"). a Delaware corporation with offices in Pasadena, California, is a media and technology company focused on developing, licensing, and providing products and services that simplify and enhance consumer entertainment.

2. Gemstar's securities are registered with the Commission pursuant to *Section 12(g) of the Exchange Act.* Gemstar's common stock is traded on the Nasdaq Stock market under the symbol "GMST," and its stock is cov-

ered by securities analysts who routinely issue [*5] quarterly and annual earnings estimates.

3. Defendant Henry C. Yuen ("Yuen") was the co-founder of Gemstar's predecessor company, and served as Gemstar's Chief Executive Officer ("CEO") from August 1994 to November 7, 2002, President from August 1994 to July 2000, Chairman of the Board of Directors from January 1999 to April 2003, and a director from April 1992 to April 2003. Before 1989, Yuen was a research scientist and held various faculty positions. Yuen holds a B.S. in Mathematics, a Ph.D. in Applied Mathematics, and a Juris Doctor degree.

4. Elsie M. Leung ("Leung") was Gemstar's Chief Financial Officer ("CFO") from 1994 to November 7, 2002, a Co-President from July 2000 to November 7, 2002, Chief Operating Officer or a Co-Chief Operating Officer from January 1996 to November 7, 2002, and a director from 1994 to May 2003. Before Gemstar, Leung worked for Yuen at his private company, Gemstar Development Corporation ("GDC"), as in-house controller and financial officer from approximately 1990 through-out 1995, and then, when Gemstar International Group Limited ("GIGL") was formed and became a NASDAQ-listed public foreign company, as the chief financial offi-

2006 U.S. Dist. LEXIS 33938, *

cer of GIGL. GIGL was [*6] managed by a small, tightly knit group, which included Yuen and Leung.

5. Beginning in 1999 and continuing through the third quarter of 2002 (the "relevant period"), Gemstar licensed for a fee an interactive program guide for television ("IPG") that allowed viewers to navigate, sort, select, and schedule television programming for viewing and recording. The IPG technology was installed on consumer electronic devices such as television sets as well as on cable and digital set top boxes and transmitted via cable systems.

6. By 2000, Gemstar was selling advertising on the IPG, which was a new medium for advertising. Throughout the relevant period, Gemstar was the only company in the United States selling advertising on an IPG.

7. Gemstar was formed as a result of a merger between GIGL and TV Guide, Inc. ("TV Guide"), which published TV Guide magazine. GIGL and TV Guide entered into a merger agreement in October 1999. The merger with TV Guide closed on July 12, 2000.

8. The merged company had an Office of the Chief Executive comprised of Yuen, Leung, Joachim Kiener ("Kiener"), and Peter Boylan ("Boylan") ("senior management"). During the relevant period, Yuen and Leung worked out of [*7] Gemstar's Pasadena office. Boylan and Kiener, who had been the CEO and COO of TV Guide, negotiated the merger on behalf of TV Guide and came to Gemstar with the TV Guide merger.

9. After its merger with TV Guide in July 2000, in addition to reporting consolidated financial results, Gemstar started to categorize its business into three main segments and to report revenues separately for each of these segments. One business segment was the Technology and Licensing Sector ("Licensing Sector"), which developed, licensed and protected proprietary technologies, such as Gemstar's IPG. Another segment was the Interactive Program Sector ("Interactive Sector" or "IP Sector"), which reported revenues from advertising, interactive services, and e-commerce on Gemstar's interactive platforms, including the IPG. The third business segment was the Media and Services Sector (the "Media Sector"), which reported revenues from Gemstar's established, non-interactive platforms and media properties such as the TV Guide Magazine, the TV Guide Channel, and SkyMall catalogue sales.

10. In 2000 and early 2001, internal disagreements among members of Gemstar's senior management developed regarding the future [*8] of TV Guide's print business as well as Yuen's internal and public financial targets for IPG advertising and the IP Sector. Kiener, who was a member of senior management and head of Gem-

star's advertising sales force, as well as other Gemstar employees, told Yuen that Yuen had set overly aggressive and unrealistic revenue projections for 2001 IPG advertising and IP Sector revenues. Yuen disagreed, explaining to Kiener in October and November 2000 that any mention of poor expectations or weak performance to the market would cause the market to question the merger between Gemstar and TV Guide, would negatively impact Gemstar's stock price, and ultimately would destroy the company.

11. By March 2001, and continuing throughout 2001, Yuen knew there also was a substantial shortfall in actual and projected 2001 IPG advertising revenues from Gemstar's advertising sales force when compared to Yuen's public 2001 guidance for the IP Sector. Kiener recommended to Yuen and other members of senior management that they seek legal advice about the company's legal exposure related to its public guidance, to issue an earnings warning for 2001 *IPG* advertising revenue, and to, at the very least, [*9] revise downward Yuen's $ 100 million guidance for 2001 IP Sector revenue. Yuen did not follow any of Kiener's recommendations.

12. Despite the Company's internal problems and disagreements, throughout 2001 and early 2002 Gemstar and Yuen consistently reported to the market that Gemstar was meeting its own projections as well as analyst expectations concerning IPG licensing and IPG advertising revenues and earnings as reported in the Licensing and IP Sectors. Yuen stated in Gemstar's press releases and analyst conference calls that the Licensing and IP Sectors were the fastest growing segments of the business, comprised the vast majority of the Company's valuation, and were the value and revenue drivers for the Company.

13. In public filings, analyst conference calls, and earnings releases, Yuen and Leung attributed the growth in revenues and earnings before interest, taxes, depreciation and amortization ("EBITDA") in the Licensing and IP Sectors directly and primarily to the growth in IPG licensing and IPG advertising revenues.

14. By meeting Gemstar's targets and analyst expectations for 2001, Yuen was able to show to the market that he had succeeded in establishing IPG as a profitable [*10] business for Gemstar and as an attractive new mass media for interactive entertainment and advertising.

15. On April 1, 2002, Gemstar filed and disclosed for the first time in its Form 10-K for the year ended December 31, 2001, that Gemstar had recorded $ 107.6 million in IPG licensing revenue from Scientific-Atlanta, Inc. ("Scientific-Atlanta") that was the subject of litigation and had been accrued under an expired agreement, as well as $ 20 million in IPG advertising revenue from a

barter transaction related to Gemstar's acquisition of certain intellectual property from Fantasy Sports Properties, Inc. ("Fantasy Sports").

16. The market reacted negatively to these disclosures. On April 2, 2002 Gemstar's stock price declined by approximately 37%, causing a market loss in excess of $ 3 billion.

17. At the end of March 2002 and early April 2002, Yuen disposed of seven million Gemstar shares, receiving an initial payment of $ 59 million.

18. In mid-April 2002, the Commission called an informal meeting with Gemstar to discuss the accounting of the Scientific-Atlanta and Fantasy Sports transactions. Yuen and Leung, among others, were present at this meeting.

19. Thereafter, the Gemstar [*11] Board of Directors (the "Board") authorized and the Audit Committee conducted an independent review of the Company's accounting procedures and policies with respect to the Company's 2001 financial statements.

20. On June 27, 2002, the Commission issued Order No. 4-460, which required Yuen and Leung to file with the SEC a statement in writing, under oath, declaring that Gemstar's most recent Form 10-K and any Form 8-K filed subsequent thereto: (i) did not contain any untrue statement of material fact; (ii) did not omit to state a material fact necessary to make the statements made in the SEC filings not misleading; and (iii) had been reviewed with the Company's Audit Committee, or in the absence of an Audit Committee the independent members of the Company's Board of Directors.

21. On August 14, 2002, as part of a Form 8-K, a filing used to report "material events or corporate changes" that may have an effect on the value of a company's securities, Gemstar filed sworn statements from Yuen and Leung declaring that they were not able to certify the accuracy of the financial statements and that they were not able to comply with written Commission orders to do so. Gemstar also disclosed [*12] in this Form 8-K that it intended to restate its 2001 financial results and to reverse $ 20 million of revenues and $ 20 million of related amortization expenses associated with a non-monetary transaction, and make substantial corrections.

22. On September 25, 2002, Gemstar filed yet another Form 8-K disclosing: (i) that it had been notified by NASDAQ that its securities were subject to delisting for failure timely to file a Form 10-Q for the quarter ending on June 30. 2002; (ii) that because of an unresolved dispute between Gemstar and its outside auditors KPMG LLP ("KPMG"), the company could not file its quarterly Form 10-Q report; and (iii) that resolution of these ac-

counting and financial matters involving restatement of financial statements was "uncertain" and "unpredictable."

23. In October 2002, the Commission began a formal investigation of Gemstar and issued investigative subpoenas to Gemstar and its officers. On October 17, 2002, the Commission issued a formal order of investigation against Gemstar, a copy of which was contemporaneously provided to Yuen.

24. Around this same time period, Yuen and Leung negotiated a new deal with the Company's Board to resign as executive [*13] officers in exchange for stock, stock options, and payments in excess of $ 37 million from Gemstar (the "termination cash payments"). Yuen's portion of the termination cash payments is $ 29.48 million. Gemstar reported these developments on November 12, 2002, in another Form 8-K filing.

25. The termination cash payments, however, were not paid to Yuen and Leung at the time. Upon application by the Commission, the Court issued an order in June 2003, which was affirmed by the Ninth Circuit en banc on March 22, 2005, placing the contemplated one-time termination cash payments into an escrow on the ground that the payments were extraordinary subject to Section 1103 of the Sarbanes-Oxley Act, *15 U.S.C. § 78u-3(c)(3). SEC v. Gemstar-TV Guide Int'l, Inc., 401 F.3d 1031, 1034-1048.*

26. Since November 2002, Gemstar has restated or reversed IPG licensing and IPG advertising revenues totaling approximately $ 357 million of which in excess of $ 230 million were the result of transactions at issue in this case.

### B. Procedural History

27. On June 19, 2003, the Commission filed its original complaint in this action against defendants Yuen and Leung.

28. On [*14] January 5, 2004, the Commission filed a Second Amended Complaint, which added Peter Boylan, Gemstar's former Chief Operating Officer and Co-President, Jonathan Orlick ("Orlick"), Gemstar's former General Counsel, and Craig Waggy ("Waggy"), TV Guide's Chief Financial Officer, as defendants.

29. On August 9, 2004, the Commission filed the Consent of Defendant Peter C. Boylan to Entry of Final Judgment of Permanent Injunction and Other Relief (the "Boylan Consent"). As part of the Boylan Consent, Boylan agreed to, without admitting to or denying liability, a judgment that, among other things, enjoined him from committing fraud and required him to pay $ 150,000 in disgorgement and $ 150,000 in civil penalties. On August 12, 2004, the Court entered the Final Judgment of

Permanent Injunction and Other Relief as To Defendant Peter C. Boylan.

30. On July 23, 2004, the Commission filed its Third Amended Complaint, the operative complaint in this action, against Yuen, Leung, Orlick, and Waggy.

31. On January 14, 2005, the Commission filed the Consent of Defendant Jonathan B. Orlick to Entry of Final Judgment of Permanent Injunction and Other Relief (the "Orlick Consent"). As part of the Orlick [*15] Consent, Orlick agreed to, without admitting to or denying liability, a judgment that, among other things, enjoined him from committing fraud and barred him for ten years from serving as an officer or director of a public company. In addition, as part of the Orlick Consent, Orlick agreed to a judgment that required him to pay $ 150,000 in disgorgement and $ 150,000 in civil penalties. On January 18, 2005, the Court entered the Final Judgment of Permanent Injunction and Other Relief as To Defendant Jonathan B. Orlick.

32. In late January 2005, the week before the first trial date, the parties informed the Court that the Commission's staff and Waggy had arrived at a negotiated settlement pending Commission approval. On January 26, 2005, the Court entered the Stipulation and Order Staying Action Against Defendant Craig M. Waggy Pending Entry of Final Judgment.

33. In January 2005, the parties arrived at negotiated settlements with Yuen and Leung. Those negotiations did not result in final agreements, however, and the matter was set for trial.

34. On November 29, 2005, the parties informed the Court that Leung and the Commission's staff had arrived at a negotiated settlement, which [*16] is currently pending Commission approval. On December 1, 2005, the Court entered the Stipulation and Order (1) Severing Plaintiff's Claims and Causes of Action Against Defendant Elsie M. Leung; and (2) Staying the Severed Action Against Defendant Elsie M. Leung Pending Entry of Final Judgment.

## C. Yuen's Management And Control Of Gemstar

35. Gemstar was managed by Yuen and Leung, both of whom were directly involved in and knowledgeable about the business operations, accounting, and financial reporting of Gemstar.

36. Yuen supervised the structuring of transactions, and communicated with and provided information to Gemstar employees regarding those transactions.

37. As testified to by Gemstar's outside auditors and documented in their workpapers for the 2000 and 2001 yearly audits: (1) Yuen and Leung had a highly con-

trolled and autocratic management style, and most if not all high-level decisions were made by them or with their knowledge; and (2) Yuen and Leung controlled the flow of information and wanted to know when information was being shared with other people. Gemstar's former management as well as key finance and business employees corroborated KPMG's testimony concerning [*17] Yuen's and Leung's management style and control over Gemstar's business, financial, and accounting operations.

38. Yuen also played a significant role in Gemstar's accounting. Yuen specifically discussed and supported the accounting for transactions at issue in this case with Gemstar's finance employees, Audit Committee, Board members, and outside auditors.

39. Yuen also played a significant role in Gemstar's financial reporting. Yuen reviewed and approved Commission filings and earnings press releases, and signed Gemstar's Forms 10-K for the relevant period.

40. Yuen conducted the quarterly conference calls with Wall Street analysts covering Gemstar, and led senior management's discussion and answering of analyst questions during the calls related to the transactions at issue in this case. Yuen also spoke directly with analysts and institutional investors outside of the analyst conference calls.

41. Yuen ran the meetings of Gemstar's Board and made presentations with Leung showing the revenues and EBITDA for each of the Company's business sectors and for the company as a whole.

42. Yuen and Leung were present at all Gemstar Audit Committee Meetings in 2001 and 2002. Following [*18] the merger, from approximately July 2000 through June 2001, Leung served as the Chairperson of Gemstar's Audit Committee.

43. Yuen had direct contact and personally negotiated with potential and existing licensees and advertisers.

## D. Gemstar's Financial Reporting

44. Public companies report the financial results of their operations in periodic reports filed with the Commission, earnings press releases issued to the public, and conference calls held with securities analysts and investors. Gemstar reported its financial results in quarterly reports on Form 10-Q, and in annual reports on Form 10-K filed with the Commission.

45. Gemstar filed with the Commission Forms 10-K for the fiscal years ended March 31, 2000, December 31, 2000, and December 31, 2001. Gemstar also filed quarterly reports on Forms 10-Q for the quarters ended June 30, 1999, September 30, 1999, June 30, 2000, September 30, 2000, March 31, 2001, June 30, 2001, September 30,

2001, and March 31, 2002. Gemstar also filed a current report on Form 8-K, dated September 25, 2002, that contained preliminary financial and other information for the quarter ended June 30, 2002.

46. Gemstar issued its press releases [*19] and held conference calls with securities analysts and investors on a periodic basis, usually shortly before the time Gemstar made its filings with the Commission.

47. In its financial reports beginning with the quarter ended September 30, 2000, in addition to reporting its consolidated results, Gemstar reported unaudited "pro forma" financial results for its Media, Licensing, and Interactive Sectors. The reason for the "pro forma" financials results was explained as follows: "The Company believes pro forma results represent a better comparative standard for assessing revenues, expenses, and EBITDA trends, as the pro forma presentation includes the results of operations of TV Guide for all periods presented." (Plaintiff Ex. 6100 at 15-18). [1] Yuen further explained Gemstar's justification for segmenting the company during a November 2000 analyst conference call as follows: "We have segmented the company . . . because they actually compete in different areas. They have to be run differently. . . . Another reason for the segmentation is to provide the community with a fair means of valuing these companies as they are compared to their peers and to apply the proper multiples to each [*20] of these businesses." (Plaintiff Ex. 150 at 2).

> 1  All citations contained herein to "Plaintiff Ex." are to exhibits presented by the Commission at trial. All citations contained herein to "Defendant Ex." are to exhibits presented by the Defendant at trial.

48. Gemstar, through Yuen, Leung, and others, emphasized to securities analysts and the public that the best measure of the company's financial performance was not its consolidated financial statements for the company as a whole, but rather its Licensing and Interactive Sectors' revenue, and Gemstar's definition of EBITDA, which it used as a measure of cash flow.

49. As early as November 2000, Yuen made it clear to analysts and investors that IP would be the fastest growing sector within Gemstar and, in time, the largest portion of revenue for the Company. Gemstar and Yuen touted growth in the Licensing and Interactive Sectors as the "value drivers" and "core sectors" of Gemstar, emphasized increases in revenue and EBITDA in these sectors, and downplayed [*21] expected declines in revenue from TV Guide as reported in the Media Sector.

50. Beginning in November 2000, Gemstar and Yuen also provided financial projections by sector to analysts and investors. During a November 16, 2000

conference call with securities analysts and investors, Yuen forecast that, in 2001: (i) Licensing Sector revenue would increase by 30% to 35% over 2000 Licensing Sector revenues, and Licensing Sector EBITDA would increase by 50% over 2000 Licensing Sector EBITDA; and (ii) IP Sector revenue would increase by 400% to 450% over 2000 IP Sector revenues, IP Sector EBITDA would round up to less than 10% of the revenues, and quarterly IP Sector revenue would grow about 40% to 50% with operational breakeven in the last quarter of 2001.

51. Throughout 2001, Yuen reaffirmed Gemstar's guidance for the IP Sector in analyst conference calls. During the May 14, 2001 Conf. Call, Yuen stated that, for the IP Sector, "current average analyst expectations for Q2 are $ 19.9 million in revenue and $ 8.6 million in negative EBITDA" are "consistent with our target" and "[f]or the fiscal year, our target is slightly higher than the current consensus expectations of $ 105 million [*22] in revenue and $ 22 million in negative EBITDA." (Plaintiff Ex. 6032 at 15). Yuen also reaffirmed Gemstar's guidance with respect to IPG advertising: "[D]uring our guidance call, we were very much hoping to have a 50% type of quarter to quarter growth, but last quarter, we have outperformed our previous expectations and therefore the number went up. This time, therefore, we only have 37% growth, but it is really quite in line with our original targets. . . . I think the expectations that we have put out, I don't have it now in front of me, is probably still consistent with the quarter to quarter type of growth that we originally had in our minds." Id. at 21. Similarly, during the November 14, 2001 Conf. Call, Yuen stated that "we will still be targeting for the year slightly in excess of $ 100 million or so, very close to the consensus expectations" for the IP Sector. (Plaintiff Ex. 2277 at 16). Yuen further stated during the November 14, 2001 Conf. Call that: "From the EBITDA standpoint, . . . we are comfortable with the current targets for all of the sectors, and we reconfirm our target to break-even and go positive in the Interactive Platform sector in Q4." Id.

52. On [*23] March 18, 2002, almost two weeks before disclosing the Scientific Atlanta accrual and Fantasy Sports transactions on April 1, 2002, Gemstar issued a press release and convened an analyst conference call to announce its financial results for the quarter and year ended December 31, 2001. Yuen and Leung, among others, represented Gemstar during the call.

53. During the March 18, 2002 analyst conference call, Yuen reported that Gemstar had met its revenue and earnings projections and analyst expectations for the IP and Licensing Sectors for 2001. Gemstar reported IP Sector revenues of $ 101.4 million for 2001, exceeding Yuen's $ 100 million guidance by $ 1.4 million, reflecting an increase of 339% over 2000 revenues. Gemstar reported Licensing Sector revenues of $ 327 million, an

increase of 30% over 2000 revenues, and EBITDA of $ 229.2 million, an increase of 42% over 2000 EBITDA. Gemstar also reported that it had achieved break-even EBITDA in the fourth quarter 2001 in the IP Sector, as Yuen had projected in November 2000.

54. On May 15, 2002, Gemstar announced its financial results for the first quarter of 2002. The earnings release announced the "second consecutive profitable quarter" [*24] for the IP Sector with a $ 1.7 million EBITDA. (Plaintiff Ex. 2548 at 3-4).

### E. Revenue Recognition Under GAAP And Gemstar Revenue Policies

55. Under Generally Accepted Accounting Principles ("GAAP"), as described in Statement of Financial Accounting Concepts Number 5 of the Financial Accounting Standards Board, revenues are not recognized until realized or realizable and earned. (Plaintiff Ex. 10161 at 3 (Staff Accounting Bulletin ("SAB") 101); *In re Daou Systems, Inc., 411 F.3d 1006, 1016 (9th Cir. 2005)* ("under GAAP, 'revenue must be *earned* before it can be recognized.'") (emphasis in original)). Revenues are realized when goods and services are exchanged for cash or claims to cash, whereas revenues are realizable when assets received or held are readily convertible to known amounts of cash or claims to cash. (Ex. 10161 at 3 (SAB 101)). Revenues are earned when an entity has substantially accomplished what it must to be entitled to the benefits represented by the revenues. *Id.*

56. SAB 101 states that, "revenue generally is realized or realizable and earned when all four of the following criteria are met:

> . Persuasive evidence of an arrangement [*25] exists;
>
> . Delivery has occurred or services have been rendered;
>
> . The seller's price to the buyer is fixed or determinable; and
>
> . Collectibility is reasonably assured."

*Id.* SAB 101 adopts the four criteria above from the American Institute of Certified Public Accountants' Statement of Position ("SOP") 97-2, which is dated October 27, 1997 and effective March 31, 1998. *Barrie v. Intervoice-Brite, Inc., 397 F.3d 249, 258 (5th Cir. 2005)* ("SAB 101's stated purpose was to provide additional guidance in applying GAAP principles to revenue recognition in financial statements. SAB 101 added a topic entitled 'Revenue Recognition' that restated SOP 97-2's test for revenue recognition.").

57. Following GAAP, Gemstar's internal revenue recognition policy for licensing revenue required the existence of an agreement or arrangement before any licensing revenue could be recognized.

58. It was Gemstar's policy and practice, consistent with GAAP, not to record licensing revenue based on the belief that Gemstar would recover licensing fees through pending litigation. Both Leung and Yuen knew that GAAP did not allow revenue to be recorded under such circumstances, [*26] which is commonly referred to as a "gain contingency."

59. Gemstar's public filings before April 2002 did not disclose that it recognized licensing revenue when no licensing agreement or arrangement existed, when a license expired, or when litigation over Gemstar's patents was pending.

60. With respect to IPG advertising revenue, Gemstar's internal revenue recognition policy required that the advertising be aired and that the customer actually request the advertising on the IPG platform.

61. Both Yuen and Leung repeatedly represented to the auditors that this was Gemstar's internal revenue recognition policy with respect to IPG advertising. Yuen and Leung represented in the management representation letters they signed in connection with the 2001 audit and first quarter 2002 review that: "Interactive program guide advertising revenue recognized has been requested by the customer and is supported by affidavits of airing." (*See, e.g.,* Plaintiff Ex. 3019 at P 32, Plaintiff Ex. 3026 at P 37). Yuen understood that the auditors required Gemstar to show that the IPG advertisements were actually requested by the customer in order to recognize IPG advertising revenues.

### F. IPG Advertising  [*27]  Revenue Targets

62. Yuen and Leung were directly involved in developing, setting and announcing internally and to analysts the IPG advertising and IP Sector revenue projections and results for 2001. Yuen explained to Gemstar's Board as early as November 2000, that by reporting financial results by sector, the Company would be able to separate out the fast-growing businesses, which Yuen believed were the value drivers of the Company and comprised 90% of its valuation, from the slow-growing or flat assets such as the TV Guide magazine, which, even though they generated the majority of the revenues, were given low multiples and market value due their slow growth.

63. Yuen and Leung established the IPG advertising revenue targets in a "top-down" approach. Yuen repeatedly rejected the internal revenue projections for IPG advertising sales proposed by the Company's advertising sales executives and told Kiener and others at Gemstar

that these figures could not be used as the basis for Yuen's guidance to analysts. Yuen told Kiener as early as August 2000 that: "This is completely unacceptable. The street, based on our successes so far with 2.5 sales people and TVG's previous statements, [*28] expects some sort of explosive growth. I have already telegraphed the message that we will be executing a controlled growth instead of 'explosive growth,' but we cannot suffer any departure from the trend that I have laid out . . ., or else no one will believe the synergy story we have." (Plaintiff Ex. 138).

64. Kiener continued throughout the latter part of 2000 to try to convince Yuen that the revenue projections provided by the Company's advertising sales force were realistic and that Yuen's $ 100 million figure for IPG advertising revenues should be lowered at least to $ 50 million. Kiener explained to Yuen that the reason Gemstar could not achieve $ 100 million in 2001 was not due to the advertising sales force as Yuen maintained but rather to real obstacles that Gemstar was facing in the market place related to introducing a new advertising medium that had limited functionality, limited distribution, and virtually no media research to prove its effectiveness. Kiener further explained to Yuen that clients did not have funds allocated in their budgets to this type of new advertising medium.

65. On November 13, 2000, in response to criticism from analysts regarding the Company's [*29] failure to provide clear cut guidance for 2001 and a decline in Gemstar's stock price, senior management held another earnings call.

66. Before the November 16, 2000 analyst conference call in which Yuen announced Gemstar's guidance, Kiener, once again, tried to dissuade senior management from announcing Yuen's internal $ 100 million IPG advertising revenue forecast to analysts. In an email to senior management, Kiener stated, among other things, that: (i) Yuen's Interactive Sector forecast of approximately $ 125 million, which included the $ 100 million from IPG advertising, was extraordinarily aggressive and a "huge stretch based on the current assessment of the market place and the rate of acceptance for the platform" based on "all the feedback from clients and agencies"; (ii) existing expectations for the IP Sector from all but one analyst are significantly below Yuen's proposed $ 125 million figure at an average of $ 60 million; (iii) the $ 125 million "is predicated upon a number of things falling into place with zero room for error" including $ 50 million from transactions by the advertising sales force and $ 52 million in "corporate deals"; (iv) the "corporate deals" are "not [*30] all . . . 'in thre [sic] bag" and "could be particularly tricky as to timing and calendarization over the 4 quarters"; and (v) "the short term upside of recovery of stock price" was not "worth the exposure of

getting pummeled if we fail in one or more of the 2001 quarters." (Plaintiff Exs. 147, 9213).

67. Yuen dismissed Kiener's arguments. Yuen responded to Kiener's November 15, 2000 email in relevant part as follows: "I . . . do not think that the damage is over if we come out with a doom and gloom forecast. I think what happened was only the beginning. Now people are question [sic] Gemstar's wisdom to merge with TV Guide, [and] we need to give them a good strong reason by backing up all of our merger reasons." (Plaintiff Ex. 9213).

68. Gemstar did not have a budget of revenues and expenses in place when Yuen announced his $ 100 million guidance for IP Sector revenues. Thereafter, Yuen instructed Gemstar's senior management to fit the budget to the guidance and develop cost cutting strategies to compensate for any negative profit impacts resulting from any revenue shortfalls. In December 2000, Yuen told senior management in an email: "The guidance for 2001 has already been [*31] announced. We must deliver. . . . I have instructed Elsie to make sure the following occurs: (a) maintain EBITDA if our revenues is [sic] on track; (b) and if the revenues fall short, we need to further improve EBITDA to counterbalance the negative."

69. Yuen knew, by March 2001, and throughout 2001, that Gemstar's advertising sales force did not have enough IPG advertising market sales and revenue to meet his $ 100 million guidance and analyst expectations without the strategic advertising deals. In a February 2001 email to Kiener and other members of senior management, Yuen acknowledged that "the shortfall is significant" and, to fill the gap, he planned "to use Motorola for Q1" and "Fox . . . [to] come in strategically (rather than through normal sale) to help out in the 3Q and 4Q, not in Q1." (Plaintiff Ex. 9218). Yuen also knew as of March 2001, that the advertising sales force projected only $ 1.45 million in IPG advertising revenue for the first quarter of 2001 and no more than $ 2.5 million in IPG advertising revenue for the second quarter 2001, in part because advertisers were not buying IPG advertising as a line item and there was a depressed advertising market.

70. [*32] On March 5, 2001, there also was an internal conference call involving Yuen, Leung, Boylan, Kiener, and Waggy to prepare for Gemstar's fourth quarter 2000 earnings call (the "internal March 2001 conference call"). During this call, Kiener, raised concerns about Gemstar's ability to meet the $ 100 million revenue projection for 2001 IPG advertising and the revenue growth of 50% per quarter in 2000 for IPG advertising, as announced by Yuen during the November 16, 2000 conference call.

71. During the internal March 2001 conference call, Kiener recommended to Yuen that Gemstar issue an earnings warning in light of the actual and projected IPG advertising sales for 2001. Yuen rejected this recommendation, stating that he did not see any reasons for an earnings warning, in part because of the corporate deals in the works that would help meet the $ 100 million target for IPG advertising revenue. Yuen explained during this call that based on the expected IPG advertising revenue from the corporate deals, the advertising sales force would only need to make up a shortfall of approximately $ 30 million for 2001. The corporate deals that were referenced during the March 2001 conference call included [*33] Motorola for $ 17.5 million, Tribune for $ 16 million, Fantasy Sports for $ 20 million, and Fox for $ 15 million, for a total of $ 68.5 million.

72. In March 2001, Kiener suggested to Yuen and other members of Gemstar's senior management that Gemstar obtain legal advice as to whether the Company had an obligation to revise its IP Sector guidance downward in light of the fact that the internal projections for the advertising sales force were substantially below Yuen's November 2000 IP Sector guidance. Kiener also expressed to Yuen his concern over legal exposure the Company might face related to its failure to revise its guidance downward. Yuen stated that no change in guidance was necessary and that he was comfortable with his interpretation and did not need to seek legal advice.

### G. Gemstar's Independent Auditors

73. KPMG was the independent auditor for Gemstar before and after the merger with TV Guide.

74. KPMG's workpapers for the relevant period documented KPMG's procedures, analyses, and conclusions related to Gemstar. KPMG documented: (1) procedures, decisions, and conclusions reached concerning Gemstar's routine and non-routine revenue streams; (2) fraud risk factors [*34] identified by the KPMG engagement team and the team's responses to those risk factors; (3) detailed summaries of the analyses and testing which KPMG performed on a quarterly and yearly basis for IPG licensing and IPG advertising revenue streams related to Scientific-Atlanta, Motorola, Thomson, Time Warner Cable, and Fantasy Sports; and (4) oral representations made by Yuen, Leung, and other members of Gemstar's senior management to KPMG's engagement team during its quarterly reviews and yearly audits.

75. Some of the oral representations that Yuen and Leung made during KPMG's quarterly reviews and yearly audits were documented in management representation letters that were signed by Yuen and Leung and provided to KPMG. The management representation letters that were signed by Yuen and Leung were re-

quired by KPMG as part of the quarterly reviews and audits of Gemstar's financial statements and represented important audit evidence. Yuen knew the importance of KPMG's management representation letters, that the auditors relied on these letters as part of their audit work, and that the audit would not have been completed if they had not received these letters.

76. Yuen and Leung directed [*35] KPMG to work with Gemstar's legal department in drafting the language of and finalizing the management representation letters they signed. The first drafts of the management representation letters were usually prepared by KPMG's engagement team and then provided to Gemstar for review and approval. The engagement team discussed with Yuen and Leung the representations in the management representation letters that concerned the customers and transactions at issue in this case.

77. KPMG relied on the oral and written representations made by Yuen and Leung in evaluating Gemstar's accounting for the transactions at issue here, in completing KPMG's quarterly reviews and yearly audits, and in issuing KPMG's audit opinions for Gemstar's year-end financial statements.

78. On October 20, 2004, the Commission issued an administrative order which censured KPMG. KPMG and the members of the engagement team did not deny that they had engaged in improper professional conduct in auditing Gemstar's financial statements. *In the Matter of KPMG LLP, Bryan E. Palbaum, John M. Wong, Kenneth B. Janeski, David A. Hori, 2004 SEC Lexis 2388 * 2 (October 20, 2004).* In its administrative order, [*36] the Commission also imposed sanctions against several KPMG auditors for failing to exercise professional care and skepticism, failing to obtain sufficient competent evidential matter, and relying on management representations. *2004 SEC Lexis 2388 *33-*36.* The Order states that KPMG failed to "test[] Gemstar's representations," "substituted management's representations" for competent revenue evidence, and failed to "exercise[] professional care and skepticism." *Id.*

### H. Recording And Reporting Of IPG Licensing Revenue

#### 1. Scientific-Atlanta $ 113.5 Million Licensing Revenue Under License and Settlement Agreement

79. In April 1997, Scientific-Atlanta and StarSight Telecast, Inc. entered into a three-year License and Settlement Agreement ("LSA"), wherein Scientific-Atlanta agreed to settle an ongoing arbitration dispute by, among other things, paying a per unit fee for each unit incorporating an IPG until July 1999. Gemstar acquired StarSight in May 1997.

80. Both before and after the LSA expired, Gemstar representatives attempted unsuccessfully to negotiate a new agreement with Scientific-Atlanta.

81. Throughout the negotiations before and [*37] after the LSA's expiration, Scientific-Atlanta consistently maintained that it was not infringing Gemstar's patents and did not owe Gemstar any payments for past infringement. In December 1998-almost eight months before the LSA expired in July 1999-Scientific-Atlanta filed a declaratory judgment suit against Gemstar in order to have a court determine that it was not infringing any of Gemstar's patents. Scientific-Atlanta sent a letter to Gemstar dated March 17, 2000, that stated it owed Gemstar no further royalties under the LSA and that Scientific-Atlanta's obligations under the LSA were completed. At no time during this period did Gemstar and Scientific-Atlanta ever renew the terms of the LSA or reach any agreement that Scientific-Atlanta would continue to pay royalties or license fees under the terms of the LSA, and no one at Scientific-Atlanta ever represented or proposed to Gemstar that Scientific-Atlanta would sign a new licensing agreement or that it was willing to extend the terms and conditions of the expired LSA as if it had not expired.

82. Throughout the negotiations with Scientific-Atlanta, Orlick kept Yuen and Leung informed of the status of the negotiations and the [*38] litigation between Gemstar and Scientific-Atlanta, including the fact that the negotiations ultimately did not result in any agreement and that the lawsuits brought by and against SA did not settle.

83. Gemstar initially stopped recording any revenue from Scientific-Atlanta after the LSA expired. For the quarters ended September 30, 1999 and December 31, 1999, Gemstar did not record any revenue from Scientific-Atlanta and removed Scientific-Atlanta from its list of "major licensees" in its public disclosures for that quarter, including its press release and Form 10-Q.

84. Beginning with the quarter and year ended March 31, 2000, however, Gemstar began recording and reporting revenue from Scientific-Atlanta based upon the economic terms of the expired LSA. Yuen approved the decision to begin recording the Scientific-Atlanta revenue and approved the continued accrual of the Scientific-Atlanta revenue.

85. In May 2000, after the close of the fiscal year and during the audit of Gemstar's fiscal year ended March 31, 2000, Yuen and Leung were involved in discussions concerning the accrual of revenue from Scientific-Atlanta. Yuen and Leung met with Gemstar's outside auditors, KPMG, during [*39] this period to discuss Scientific-Atlanta revenues. KPMG identified the post-LSA Scientific-Atlanta revenue accruals as a critical audit area in the course of each of the audits and reviews in which KPMG considered the Scientific-Atlanta accruals. KPMG questioned the Scientific-Atlanta revenue accruals during its reviews and audits because: (1) there was no licensing contract signed between Gemstar and Scientific-Atlanta after the LSA expired; (2) the parties were engaged in litigation; and (3) the receivables from Scientific-Atlanta were aging and growing each quarter. The KPMG engagement team evaluated, and had discussions with Yuen, Leung and others about, the Scientific-Atlanta revenue accruals during each quarterly review and yearly audit KPMG performed, commencing with the March 31, 2000 audit.

86. In connection with each of the quarterly reviews and audits following the audit for fiscal year ended March 31, 2000, Yuen and Leung signed management representation letters dated August 14, 2000, November 14, 2000, August 13, 2001, March 18, 2002, and May 15, 2002 to KPMG. In letters dated March 18, 2002 and May 15, 2002, Yuen and Leung represented: "During discussions with Scientific-Atlanta, [*40] Scientific-Atlanta has represented to the Company its willingness to extend the terms and conditions of the expired contract as if it had not expired."

87. Yuen knew at the time he signed those management representation letters that KPMG relied on the representations therein as part of their audit confirmation work. Yuen also knew that if the auditors had not received those representations, the audit would not have been completed.

88. In addition to his written misrepresentations in the management representation letters, Yuen also made oral misrepresentations to KPMG about Scientific-Atlanta and the Scientific-Atlanta litigations. Yuen told KPMG at various times throughout the period between 2000 and early 2002 that, despite the ongoing litigation, Scientific-Atlanta was willing to extend the LSA as if it had not expired, that the Scientific-Atlanta receivable was collectible, and that a settlement with Scientific-Atlanta would soon be finalized. Yuen also told KPMG during the 2001 year-end audit that during settlement discussions Scientific-Atlanta had discussed settlement amounts equal to or in excess of the revenues Gemstar had accrued and that Gemstar was engaged in ongoing settlement [*41] discussions with Scientific-Atlanta. Yuen repeated those representations during Audit Committee meetings that KPMG attended.

89. KPMG understood, based on their conversations with Yuen and members of senior management that: (1) settlement discussions occurred throughout 2000-2002; (2) Scientific-Atlanta was prepared to sign a new contract at the LSA rates; and (3) the only reason no new contract had been signed or amounts accrued under the

expired contract paid was because Gemstar was trying to license additional patents not covered under the LSA. Based on its conversations with Yuen, Leung and Orlick, KPMG understood that if Gemstar had not wanted the additional Gemstar patents included in the new contract, then Scientific-Atlanta was prepared to sign the new contract based on the same rates and the same technology provided by the expired LSA. By early 2002, Yuen told KPMG that Scientific-Atlanta had offered to enter into a new agreement on the same terms as the expired LSA.

90. Gemstar calculated the revenue owed by Scientific-Atlanta by applying the IPG licensing fees under the expired LSA to the cable set-top box sales disclosed in Scientific-Atlanta's quarterly press releases.

[*42] 91. Gemstar never disclosed in its public filings for 2000, 2001, or the first quarter of 2002 that: (1) there was no licensing agreement or other arrangement in effect with Scientific-Atlanta; (2) Scientific-Atlanta was not making any payments, and disputed that it owed Gemstar any IPG licensing fees under the expired agreement; (3) Gemstar and Scientific-Atlanta were far from settling the litigation between the companies; (4) there had been no significant progress to negotiate a new agreement; and (5) because in 2000 Scientific-Atlanta stopped reporting to Gemstar the number of units it shipped, Gemstar used Scientific-Atlanta's earnings releases to calculate the revenue accrual after the LSA expired.

92. Gemstar recorded and reported $ 12.23 million of revenue and a corresponding account receivable from Scientific-Atlanta for the year ended March 31, 2000. The $ 12.23 million was 14.5% of Gemstar's reported revenues for the year and accounted for 28.3% of Gemstar's net earnings.

93. From the period ending March 31, 2000, through the period ending March 31, 2002, Gemstar recorded and reported a total of $ 113.5 million in Licensing Sector revenue attributed to Scientific-Atlanta [*43] based on the terms of the expired LSA. During this period, Gemstar had not received from Scientific-Atlanta any of this revenue, and had never recorded a reserve on its books related to the Scientific-Atlanta receivable during this period. Gemstar never received a promise to pay, or any other acknowledgment from Scientific-Atlanta that it owed the amounts recorded by Gemstar. Throughout this entire period, Gemstar never sent an invoice to Scientific-Atlanta, or otherwise demanded payments for the specific amounts recorded and reported in Gemstar's financial statements.

94. The revenue that was recorded as a receivable from Scientific-Atlanta based upon the expired and disputed LSA was material to Gemstar's financial results and enabled Gemstar to meet Yuen's financial forecasts.

95. In Gemstar's Form 10-K for the fiscal year ended December 31, 2000, signed by Yuen and Leung, Gemstar failed to disclose that Gemstar recognized a material amount of IPG licensing revenue that had not been received and that was purportedly owed under an expired and disputed agreement that was the subject of litigation. Although during this period Gemstar disclosed that it was engaged in litigation with [*44] Scientific-Atlanta over patent infringement, it never disclosed that it was recognizing revenue from Scientific-Atlanta in its periodic reports for the periods ended March 31, 2000 through September 30, 2001. Likewise, although Gemstar continued to list "major licensees" in its public statements throughout this period, Scientific-Atlanta was not included in the list.

96. Throughout 2001 and 2002, Yuen told the Audit Committee that an arrangement was in place between Gemstar and Scientific-Atlanta. Yuen told the Audit Committee at its August 13, 2001 and March 17, 2002 meetings that Scientific-Atlanta agreed to pay at least the IPG licensing fee that was in place under the expired agreement, but was refusing to pay additional IPG licensing fees for patents not covered by the agreement.

97. During Gemstar's internal investigation, Yuen repeated the misrepresentations he made to KPMG and to the Audit Committee. In a July 1, 2002 interview, Yuen told Counsel for the Audit Committee and the Chair of the Audit Committee, James Meyer ("Meyer"), that Yuen and Orlick had met in Chicago with James McDonald, Scientific-Atlanta's CEO and William Eason, Scientific-Atlanta's General Counsel. Yuen [*45] also stated during the interview that Scientific-Atlanta had agreed to pay the amount provided for in the expired LSA that covered the StarSight technology and a small amount to cover Gemstar's technology. Yuen also stated that McDonald had stated that Scientific-Atlanta factored into its cost of sales the rate under the expired LSA. This was important to the Audit Committee's investigation because it provided an indication that Scientific-Atlanta intended to pay the revenues that Gemstar had accrued.

98. Scientific-Atlanta revenue was not properly recorded and reported as revenue. Gemstar's recognition of revenue from Scientific-Atlanta under the expired LSA did not conform to GAAP. First, there was no agreement or evidence of an arrangement in existence with respect to the Scientific-Atlanta accrual. Second, collectibility of the Scientific-Atlanta receivable was not reasonably assured given that Scientific-Atlanta was litigating any potential IPG licensing fees Gemstar claimed, no substantial progress had been made in settling the litigation, and Scientific-Atlanta's management denied any infringement and refused to pay what Gemstar demanded. Third, the revenue was not realized [*46] or realizable

because the Scientific-Atlanta receivable was in dispute, and Gemstar had been unable to effect a settlement.

99. In 2002, after Yuen and Leung resigned as Gemstar officers, Gemstar reversed its recognition of all $ 113.5 million of revenue from Scientific-Atlanta that had been reported in its financial statements.

**2. Time Warner Cable $ 18.1 Million Licensing Revenue**

100. In May of 1999, Gemstar entered into a contract with America Online, Inc. ("AOL") pursuant to which AOL licensed Gemstar's IPG technology.

101. In January of 2000, AOL announced its intention to merge with Time Warner, Inc. ("Time Warner"). The merger was not consummated until January 2001

102. Time Warner owned and controlled Time Warner Cable, Inc. ("Time Warner Cable"). Time Warner Cable made use of set-top boxes containing IPG technology.

103. After AOL had announced the merger with Time Warner, Gemstar engaged in discussions with AOL concerning their relationship.

104. Gemstar took the position that Time Warner Cable was automatically subject to the terms of Gemstar's May 1999 agreement with AOL, and that the merged entity ("AOL Time Warner") should pay Gemstar license fees for [*47] set-top boxes distributed by Time Warner Cable at the rate set forth in the May 1999 agreement.

105. Gemstar also claimed that Time Warner Cable was obligated to pay for past patent infringement related to IPG technology included in set-top boxes provided to Time Warner Cable by Scientific Atlanta. Gemstar's claims under the AOL IPG licensing agreement and for patent infringement were referred to as "past sins" claims.

106. In January of 2001, AOL made a non-binding proposal which included a payment to Gemstar of $ 50 million to settle Gemstar's past sins claims.

107. In April 2001, Yuen and Boylan attended a meeting with Richard Parsons ("Parsons"), Robert Pittman ("Pittman") and David Colburn ("Colburn"), senior executives of AOL Time Warner in order to address disputes over whether Time Warner Cable was covered by the AOL IPG agreement.

108. At the conclusion of the meeting, Pittman instructed Colburn to move ahead to resolve the issues between the parties.

109. Gemstar and representatives of AOL Time Warner continued to discuss their relationship through-

out 2001 and into 2002. Those discussions included the extent to which AOL Time Warner would be responsible to pay for set-top [*48] boxes shipped by Time Warner Cable, and how the 1999 agreement might be amended to address those set-top boxes.

110. Gemstar accrued revenue for the Time Warner Cable boxes in the quarters ending September 30, 2001, December 31, 2001 and March 31, 2002. The form 10-K and 10-Qs covering these quarters were filed on November 14, 2001, April 1, 2002 and May 15, 2002, respectively. In total $ 18.1 million of revenue was recorded and reported.

111. The accruals were based upon the terms of the AOL IPG contract, which Gemstar believed applied to Time Warner Cable as a result of the merger, and the status of the negotiations.

112. KPMG approved the accrual of all the AOL Time Warner revenues. When KPMG approved the accruals for the AOL Time Warner revenues, it was aware that: (i) AOL had not paid any of the accrued amounts; (ii) the contract that formed the basis for the accrual was still in negotiation; and (iii) that Gemstar and Time Warner disputed the extent of past sins liability.

113. KPMG detailed in a workpaper for the period ended December 31, 2001, that "as of 12/31/2001 the company had not agreed to any renegotiated terms with AOL." (Plaintiff Ex. 3037 at KP00464)

114. At [*49] the March 17, 2002 Audit Committee meeting relating to the 2001 year-end financials, KPMG stated that the AOL Time Warner accrual was not material to Gemstar's financial statements.

115. In connection with the March 30, 2002 financials, Gemstar and KPMG created a memorandum dated May 14, 2002. The memorandum concluded:

> "While negotiations for a new license agreement continue and final settlement post-merger past sins has not been reached, the Company continues to believe the entire accrual as of March 31, 2002, will be collected either through successful completion of negotiations which will result in a payment of an amount equal to or greater than $ 18.1 million (the Company has no intention to settle for less), or through legal enforcement of the AOL license agreement should negotiations be terminated on the amended agreement." (Emphasis added). (Defendant Ex. 16492 at KP 07747).

116. The Audit Committee approved the accrual of the AOL Time Warner revenues even though it was aware that AOL Time Warner had not paid any money, and that negotiations were ongoing.

117. At a May 12, 2002 Audit Committee meeting, the AOL Time Warner accrual was discussed, including the fact [*50] that an agreement was not signed and negotiations continued. KPMG representatives attended this meeting.

118. The Audit Committee decided to disclose the AOL Time Warner accrual in its 10-Q for the quarter ended March 31, 2002, a filing which was issued on May 15, 2002.

119. Insufficient evidence was presented that Yuen misled KPMG or the Audit committee with respect to the AOL Time Warner accrual, the status of the past sins negotiations or whether AOL acknowledged that Time Warner Cable was covered by the AOL agreement.

120. The fact that the April 2001 meeting with AOL Time Warner executives resolved the stalemate between the parties and led to the negotiations concerning an amendment to the existing agreement is corroborated by the parties' conduct following the meeting, including documents indicating that an amendment was being negotiated, as well as the offers made by AOL Time Warner.

121. The specific content of the April 2001 meeting was not material to KPMG. KPMG's workpapers in the period August 2001 to May 2002 reflect KPMG's knowledge that the "coverage" issue and "past sins" issue had not been finally resolved. KPMG approved the accrual nonetheless.

**2. $ 23.5  [*51]  Million Licensing Revenue From Up-Front Payment Under AOL IPG Agreement**

122. In May 1999, Gemstar and AOL entered into an IPG licensing agreement ("AOL IPG Agreement"). Generally, the agreement provided for AOL to have an eight-year license to use Gemstar's IPG technology, with Gemstar providing technology and support services to AOL. AOL agreed to pay Gemstar an up-front fee of $ 25 million, a monthly fee for each AOL subscriber who accessed the IPG through AOL, and a share of AOL's advertising revenue from the, IPG.

123. In May 1999, AOL paid Gemstar $ 23.5 million for the up-front fee of $ 25 million, less a $ 1.5 million credit provided for in an earlier agreement.

124. Gemstar recorded and reported the up-front fee over five quarters, beginning with the quarter ended June 30, 1999, and continuing through the quarter ended June 30, 2000.

125. Insufficient evidence was offered that Yuen was involved in the accounting for the $ 23.5 million up-front license fee related to the AOL IPG agreement or that he misled KPMG with respect to this transaction.

126. KPMG reviewed and approved Gemstar's accounting for the $ 23.5 million up-front fee on two separate occasions.

127. [*52] KPMG concluded at the time that the accounting treatment for the AOL initial fee was consistent with GAAP because Gemstar had agreed to be available to provide services to AOL in the first year of the agreement as reflected in the $ 23.5 million initial fee. Under GAAP, as interpreted by KPMG, the $ 23.5 million was appropriately recognized on a straight-line basis over the expected period of performance of such services -- here, twelve months.

128. Even if the initial fee at issue were deemed a pure license fee, KPMG believed that it would nonetheless have been permissible under applicable accounting literature for Gemstar to have recognized all of it upfront.

**I. Recording And Reporting Of IPG Advertising Revenue**

**1. Thomson Relationships**

**a) Background Of The Various Thomson And Gemstar Transactions**

129. Thomson, S.A. ("Thomson"), a French corporation based in Paris, France, manufactures consumer electronics, including RCA products. Thomson licensed various technologies from Gemstar.

130. Gemstar improperly recorded and reported IPG advertising revenue from Thomson during 2001 and 2002 relating to three different transactions: a DSS Agreement, [*53] an e-Book Inventory Purchase, and the restructuring of an e-Book Licensing Agreement which led to a $ 20 million advertising commitment.

**b) Purported Oral Modification Of DSS Agreement**

131. In 1999, Gemstar entered into an agreement with Thomson under which Thomson acquired a license to incorporate Gemstar's IPG technology into DirecTV satellite units (the "DSS Agreement"). In addition to the terms of this license, the DSS Agreement also provided that Thomson would pay Gemstar a $ 9 licensing fee for each unit sold, and that Gemstar would pay Thomson a "market development fund" ("MDF") of $ 4 for each unit sold. MDF are market development funds that are fundamental tools used in merchandising consumer electronics, and are used to help teach the retail community and the consumer about a new technology. Gemstar pro-

vided a portion of the MDF under the DSS Agreement, either 30% or 70% of the $ 4 MDF fee, in advertising from Gemstar (the "advertising value" portion), and a portion paid in cash. The proportional split between advertising and cash depended on whether the unit sold contained Gemstar's IPG (the "MDF split").

132. By the end of 2000, Thomson disputed the amount [*54] of MDF it was owed in cash by Gemstar. Discussions were held between Thomson representatives and Yuen at this time concerning this dispute over the amount of MDF owed in cash by Gemstar. During these discussions, a proposal was made by James Meyer, who in addition to his position on the Gemstar Audit Committee, was also then the Senior Executive Vice President and Chief Operating Officer of the Americas for Thomson, to modify the DSS agreement to include a $ 4 "platform fee" in lieu of the MDF. In contrast to a MDF, a platform fee is a subsidy from a service provider that is intended to compensate a manufacturer for something that was included in a product, at some extra cost, that helps enable the service provider's service. In connection with this modification, Meyer also proposed that Thomson would commit to purchase some amount of IPG advertising in 2001. Although Meyer's proposal regarding the replacement of the MDF component of the DSS Agreement with a platform fee and the related advertising purchase was discussed on several occasions and in some detail, no final agreement was reached and the DSS Agreement was never modified.

133. For 2000, Gemstar recorded $ 9 per unit in [*55] licensing revenue and a $ 1.20 per unit expense for Thomson related to the DSS agreement. This $ 1.20 amount represented 30% of the $ 4 MDF. During 2000, Gemstar did not record any revenue from the "advertising value" portion of the MDF under the DSS Agreement for 2000.

134. In early 2001, Yuen told Leung that Thomson had orally agreed to modify the DSS Agreement (the "oral modification"). The oral modification purported to change the per-unit $ 4 MDF split to a per-unit $ 4 platform fee. In addition, Yuen indicated that Thomson also verbally agreed to purchase $ 2.80 in IPG advertising per DSS unit shipped under the DSS Agreement for 2001.

135. In early 2001, consistent with Yuen's description of the purported oral modification to the DSS Agreement, Leung directed Gemstar to change its accounting of the DSS Agreement, with a resulting increase in IP Sector revenue. For 2001, Gemstar recorded $ 9 per unit as Licensing Sector revenue, $ 4 per unit as an expense for the purported new platform fee, and $ 2.80 per DSS unit as IPG advertising revenue.

136. Gemstar recorded approximately $ 10.1 million in IPG advertising revenue in 2001 based upon the purported oral modification to the [*56] DSS Agreement.

137. Leung and Yuen controlled the timing and placement of all advertising run by Thomson under the purported oral modification of the DSS agreement. Each quarter in 2001, either Yuen or Leung instructed Gemstar's Manager of Licensing, Lisa Jochums ("Jochums"), of a specific dollar amount or dollar amount range that Thomson had requested in IPG advertising.

138. Throughout 2001, Yuen and Leung knew that Thomson representatives disputed the IPG advertising that Gemstar was running on behalf of Thomson, and sought confirmation from Gemstar that Thomson was not being billed for IPG advertising run by Gemstar without approval pursuant to the MDF split of the DSS Agreement. Nevertheless, Yuen and Leung instructed Gemstar personnel to continue to run and record revenue in 2001 for IPG advertising on behalf of Thomson.

139. Yuen knew that the DSS Agreement had not been modified in 2001 to replace the MDF split with a platform fee, or to provide for the purchase of IPG advertising at a rate of $ 2.80 per DSS unit shipped under the DSS Agreement. From November 2001 through March 2002, Yuen sent several emails to Gemstar employees as well as Thomson representatives in which [*57] he acknowledged that the DSS Agreement still had an MDF split in 2001, and offered various proposals to resolve the MDF split dispute for 2001, in each case without ever mentioning any oral modification or platform fee.

140. In early 2002, during the 2001 audit work, KPMG informed Yuen and Leung of the importance of getting signed audit confirmations from Thomson for receivables recorded on Gemstar's books for 2001. KPMG told Yuen and Leung that KPMG needed confirmations returned by Thomson without exception to have as part of the audit evidence and to support management's representations to KPMG about the Thomson transactions and receivables, including all of the IPG advertising run for Thomson in 2001. KPMG specifically warned Yuen that if KPMG did not receive the Thomson audit confirmations, KPMG could not complete the 2001 audit.

141. During February 2002, when Gemstar was involved in its 2001 year-end audit by KPMG, the dispute between Thomson and Gemstar regarding the amount of advertising associated with the MDF split had not been resolved. After various proposals were exchanged between Gemstar and Thomson regarding the DSS Agreement, Yuen learned in early 2002, that Thomson was willing [*58] to pay $ 2.80 in advertising for 2000 and 2001, on the condition that Gemstar agree that the advertising portion of the MDF split for 2002 and thereafter

would be $ 1.20. On February 28, 2002, Yuen instructed Gemstar's Vice President of Business Development, Mark Jeffress ("Jeffress") to accept Thomson's proposal.

142. As part of the parties' agreement, Gemstar requested that Thomson "reaffirm" an accounts receivable confirmation for the 2001 IPG advertising amounts.

143. By March 11, 2002, Gemstar had not received the confirmations that Yuen needed for KPMG to complete its audit. On March 12, 2002, Yuen sent to Thomson a draft rider to the DSS Agreement, which set forth Gemstar's willingness to accept Thomson's interpretation of the MDF split under the DSS Agreement beginning in calendar year 2002. Yuen also attached two draft confirmation letters, one seeking confirmation of $ 12,425,348 in IPG advertising and the other seeking confirmation of the $ 9 per unit licensing fee Thomson agrees to pay Gemstar.

144. On March 12, 2002, the same day Thomson signed the audit confirmation letters confirming, among other things, the 2001 IPG advertising and the $ 9 per unit licensing fee [*59] under the DSS Agreement, Yuen signed the rider to the DSS Agreement.

145. Gemstar's accounting for the DSS Agreement for 2001 did not comport with GAAP, because recognition of the revenue was not in accordance with the terms of the agreement between Gemstar and Thomson, Thomson had not requested or authorized the advertising (with exception of a $ 600,000 advertising buy that had been authorized by Thomson), and payment by Thomson was uncertain. It was also not possible to determine the fair value of the advertising, because Gemstar did not have any comparable transactions in the medium of IPG, advertising to support any valuation.

146. Because the DSS Agreement had not been modified, GAAP required Gemstar management to record the $ 9 licensing fee on a net basis (after subtracting any cash MDF). Because the DSS Agreement had not been modified, the accounting methodology should not have been modified, and Gemstar should not have recorded IPG advertising revenue related to the DSS Agreement. This had been the recommendation provided to Gemstar by KPMG during the 2000 audit work in early 2001. The KPMG auditors believed this issue had become moot because they believed, based on Yuen's [*60] representations, that the MDF had been replaced by a platform fee under the DSS Agreement for 2001.

147. The Thomson DSS IPG advertising revenue was material to Gemstar's financial statements, and enabled Gemstar to meet Yuen's projections, as well as those of analysts. The $ 10.1 million was approximately 10% of Gemstar's reported IP Sector revenue for 2001. Because Gemstar exceeded its IP Sector guidance by $

1.4 million, and reported break-even EBITDA for the fourth quarter 2001, the amount of IPG advertising revenue represented by this transaction was material in 2001.

148. KPMG did not object to Gemstar's accounting related to the DSS Agreement for 2001 based on Yuen's and Leung's representations that the DSS Agreement had been verbally modified in 2001, and that the MDF fee had been replaced by a platform fee for 2001. Yuen and Leung represented to KPMG that the DSS Agreement was orally modified to provide for a $ 4 platform fee instead of the $ 4 MDF, and that Thomson separately agreed to purchase IPG advertising on a stand-alone cash basis. Yuen knew Thomson had not agreed to such a modification.

149. Neither Yuen, Leung, nor anyone else at Gemstar ever told KPMG that [*61] Thomson had not agreed to the platform fee and was disputing the terms of the DSS Agreement throughout 2001, that the MDF was still part of the DSS Agreement in 2001, or that Thomson had agreed to sign an IPG advertising audit confirmation requested by KPMG in part because Yuen agreed to accept Thomson's interpretation of the MDF under the DSS Agreement going forward in 2002.

150. Yuen and Leung represented in their March 18, 2002 Management Representation Letter that the "[t]ransactions with Thomson" were "properly recorded or disclosed in the consolidated financial statements" for 2001.

151. After Yuen and Leung resigned as Gemstar officers, Gemstar reversed the recognition of approximately $ 8.7 million of the IPG advertising revenue connected to the oral modification of the DSS Agreement and restated its financial statements.

### c) e-Book Inventory Purchase And e-Book Licensing Restructuring

152. Gemstar recorded and reported $ 9.6 million in IPG advertising revenue from two Thomson e-Book transactions in the last quarter of 2001 and the first two quarters of 2002. This IPG advertising revenue related to the unwinding of a business and licensing relationship that Gemstar [*62] and Thomson had entered into in 1999 to produce e-Book, a handheld electronic device that allowed users to download and view reading material. Thomson manufactured the device and Gemstar supplied the technology and content.

153. Under the 2000 e-Book licensing agreement, Gemstar granted Thomson a five year license to the e-Book technology for $ 25 million. In late 2000, Thomson and Gemstar began selling e-Books. By mid 2001, Thomson decided to exit the e-Book business due to poor sales and Gemstar's failure to provide adequate content.

154. In October 2001, Gemstar, through Yuen, and Thomson agreed that Gemstar would purchase Thomson's remaining e-Book inventory, and Thomson would purchase IPG advertising.

155. The initial terms of the transaction provided that Gemstar was to purchase approximately 40,000 of the model REB 1100 e-Book for $ 116 each and approximately 9,000 of the model REB 1200 e-Book for $ 299 each (for a total purchase price of approximately $ 7.3 million) and Thomson was to purchase $ 2 million in IPG advertising from Gemstar in the fourth quarter 2001. On November 8, 2001, Yuen received a copy of the initial e-Book inventory purchase agreement, which contained [*63] these initial terms negotiated between Yuen and Thomson.

156. During November 2001, Yuen agreed to change the deal to increase the IPG advertising purchase by Thomson. Yuen agreed to Thomson's proposal that Gemstar pay a higher per unit price for Thomson's e-Book inventory and Thomson purchase a commensurate amount from Gemstar in IPG advertising.

157. On November 14, 2001, Thomson sent Gemstar revised documents relating to the e-Book inventory purchase, reflecting an increase in the overall purchase price of the e-Book inventory of approximately $ 4.6 million, and an additional *IPG* advertising commitment by Thomson of $ 4.6 million for 2002.

158. The e-Book inventory transaction was finalized on or about November 15, 2001. The final documents relating to this transaction included side letters and related promissory notes from Thomson agreeing to purchase $ 2,287,200 in IPG advertising in the fourth quarter 2001, and $ 4.6 million in IPG advertising for 2002.

159. The November 19, 2001 side letter and promissory note relating to the Thomson $ 4.6 million IPG advertising purchase for 2002 reflected the additional amount Gemstar agreed to pay for Thomson's e-Book inventory.

[*64]   160. After the transaction was completed, Yuen and Leung received by email on December 3, 2001, a summary of the final terms, financial figures, and per unit prices related to the e-Book inventory transaction. The summary stated that Gemstar agreed to purchase the REB 1100's for $ 200 a unit and the REB 1200's for $ 499 a unit for a total purchase price of $ 11,642,500, and that Thomson agreed to spend $ 2,287,000 on advertising to be run in 2002, and $ 4.6MM for advertising to be run in 2002. The email further stated that Thomson would sign an unconditional, irrevocable promissory note for the advertising buy on December 15, 2001 concurrently with Gemstar making payment for the inventory asset purchase.

161. Yuen knew of and approved the structure of the e-Book inventory purchase transaction, including the fact that the IPG advertising purchase was always a term of the transaction.

162. In February or March 2002, as part of the 2001 audit, KPMG discussed the e-Book inventory purchase transaction with Yuen and Leung. Based on these conversations, KPMG understood that Gemstar had purchased the e-Book inventory for cash, and that there were no other components of this transaction. [*65] Neither Yuen nor anyone at Gemstar ever told KPMG that there was any IPG advertising component of this deal.

163. Between November 2001 and January 2002, Yuen negotiated a restructuring of the e-Book licensing agreement with Thomson (the "restructuring"), which included a reduction of the total licensing fee from $ 25 million to $ 20 million, a $ 20 million market development fund ("e-Book MDF") to be paid by Gemstar to Thomson ($ 2.5 million quarterly for 2002 and 2003), and a $ 20 million IPG advertising purchase to be paid by Thomson to Gemstar ($ 2.5 million quarterly for 2002 and 2003).

164. The transaction was finalized on or about February 20, 2002. The final documentation relating to the restructuring of the e-Book licensing agreement included: the new e-Book Licensing Agreement signed by Yuen, side letters signed by Jeffress and a corresponding promissory note signed by Yuen relating to $ 20 million in MDF, side letters addressed to Yuen and signed by Thomson and a corresponding promissory note relating to Thomson's purchase of IPG Advertising in 2002 and 2003. Yuen knew and approved the terms of this transaction.

165. Although KPMG knew that Thomson had entered into an [*66] agreement in early 2002 to purchase $ 20 million in IPG advertising from Gemstar in 2002 and 2003, KPMG did not know that at the same time Gemstar had agreed to provide $ 20 million in cash for the e-Book MDF support for 2001, 2002 and/or 2003. Neither Yuen, Leung nor anyone at Gemstar told KPMG that the $ 20 million advertising agreement entered into in early 2002 by Thomson was connected in any way to any market development funds offered by Gemstar, or to the restructuring of the e-Book licensing agreement.

166. The IPG advertising revenue from both the e-Book inventory purchase and the e-Book licensing restructuring was material to Gemstar's financial statements, and enabled Gemstar to meet Yuen's projections, as well as those of analysts. In the fourth quarter of 2001, Gemstar recorded and reported approximately $ 2.3 million in revenue from the e-Book inventory transaction, which was approximately 6.2% of IP Sector revenue.

During the first two quarters in 2002, Gemstar recorded and reported approximately $ 3.65 million in IP Sector revenue from these e-Book deals, or approximately 16% of IP Sector revenue each quarter.

167. Gemstar's accounting for these transactions did not [*67] comply with GAAP. There was no evidence to support any economic substance associated with the agreement to overpay for the e-Book inventory or to "round-trip" the MDF funds to provide IP Sector revenue. Gemstar appears to have created the e-Book MDF obligation solely for the purpose of providing funds for Thomson to 'purchase' a corresponding amount of IPG advertising from Gemstar.

168. Gemstar did not disclose that a material amount of its IP Sector revenues for the fourth quarter of 2001 and the first three quarters of 2002 resulted from these transactions with Thomson. Gemstar also did not disclose that it had increased the amount it paid for the e-Book inventory so that Thomson could purchase an equal amount of IPG advertising. Gemstar failed to disclose that it agreed to pay an e-Book MDF to Thomson that was used to purchase an equal amount of IPG advertising.

169. After Yuen and Leung resigned as Gemstar officers, Gemstar reversed the recognition of Thomson's IPG advertising revenue relating to the e-Books inventory purchase and the e-Books licensing restructuring.

## 2. Fantasy Sports $ 20 Million IPG Advertising Revenue Recorded In 2001

170. Gemstar recorded and [*68] reported $ 20 million in IP Sector revenue in 2001 from Fantasy Sports.

171. Fantasy Sports is a Virginia corporation with its principal place of business in Reston, Virginia. Fantasy Sports operates an internet-based business engaged in the creation and implementation of fantasy sports games. During the late 2000 to early 2001 time period, Gemstar was involved in negotiations with Fantasy Sports to purchase the Fantasy Sports business and intellectual property from them.

172. On November 10, 2000, Jeffress informed Yuen and Leung in an email that Fantasy Sports was interested in pursuing a transaction with Gemstar. There was no mention of IPG advertising at that time.

173. By February 15, 2001, Fantasy Sports, through one of its principals, had agreed to sell its entire business to Gemstar for approximately $ 5 to $ 10 million. At this time, the Fantasy Sports transaction included a side letter for the purchase of advertising in an amount above $ 5 million on whatever advertising platform Gemstar dictated.

174. On March 23, 2001, Gemstar and Fantasy Sports entered into a letter of intent and term sheet called "Agreement in Principle." The Agreement in Principle provided that (1) [*69] Gemstar would acquire Fantasy Sports' intellectual property for $ 21 million; (2) Gemstar would pay $ 2 million for an option giving it the right to acquire 100% of the Company at a price of $ 3 million within two years; (3) Fantasy Sports would agree to "guarantee to purchase at least $ 20 million in advertising revenue by end of 2001;" and (4) Fantasy Sports would agree "that such advertising will be made at TV Guide's discretion and the money therefore shall come from the Escrow Account . . ." (Plaintiff Ex. 196).

175. On June 28, 2001, Gemstar entered into a transaction with Fantasy Sports in which Gemstar (1) acquired Fantasy Sports' intellectual property for approximately $ 20.75 million, of which $ 750,000 was to be paid in cash and $ 20 million was to be paid in the form of advertising run by Gemstar at Gemstar's discretion in 2001; and (2) paid $ 2 million to acquire a two-year option to purchase Fantasy Sports for $ 3 million.

176. During this time period, Leung and others kept Yuen informed about the status of the negotiations and about discussions with KPMG involving the Fantasy Sports transactions. Yuen received emails between February 2001 and April 2001 that described [*70] the proposed structure and deal terms of the Fantasy Sports transaction.

177. On or about February 28, 2001, Yuen learned that Gemstar had set the amount of proposed advertising purchases by Fantasy Sports at $ 20 million in exchange for Gemstar purchasing Fantasy Sports' intellectual property for $ 20 million and paying $ 2 million for an option to acquire all the shares of Fantasy Sports. Yuen also learned the parties were contemplating Fantasy Sports' prepaying advertising of $ 20 million through the use of an escrow account.

178. In a February 28, 2001 email, Boylan forwarded a business summary to Yuen and Leung that provided detailed financial information about Fantasy Sports. The summary reflected that Fantasy Sports projected gross revenues of $ 732,000 for 2000 and $ 1.75 million for 2001, and that it had been operating at a loss since 1996 and projected a loss of almost $ 200,000 for 2000 and only $ 200,000 in EBITDA for 2001.

179. Yuen learned by April 2001 that Fantasy Sports did not have the need for $ 20 million in IPG advertising nor cash to pay for it. Jeffress told Yuen and Leung in a March 27, 2001 email that Gemstar's cash investment, "would enable fantasysports [*71] to buy advertising on our IPG platforms" and that "[g]iven that the fund would go into an escrow account -- there is not a huge risk here but a potentially strong upside." (Plaintiff Ex. 9066).

180. For the year 2001, Gemstar recorded and reported a total of $ 20 million in IP Sector revenue from Fantasy Sports. No cash payment from Fantasy Sports to Gemstar for the $ 20 million in purported advertising was ever made.

181. The $ 20 million in recorded and reported revenue from Fantasy Sports for 2001 was material to Gemstar's financial statements. This revenue was 19.7% of Gemstar's total 2001 IP Sector revenue, and contributed substantially to Gemstar's ability to meet its projected IP Sector revenues for 2001. Because Gemstar exceeded its IP Sector guidance by $ 1.4 million, and reported break-even EBITDA for the fourth quarter 2001, the amount of IPG advertising revenue represented by this transaction was material.

182. Gemstar's recognition of revenue from the Fantasy Sports transaction throughout 2001 did not conform with GAAP. The advertising revenue was never earned because it resulted from a transaction that lacked economic substance and was merely a pretext to permit [*72] Gemstar to record IP Sector revenue. Yuen knew Fantasy Sports did not have the financial ability to pay for the advertising. All of the $ 20 million that Gemstar purportedly received for the advertising came solely from Gemstar's agreement to purchase the Fantasy Sports' intellectual property that was purportedly valued at $ 20.75 million.

183. Although required by GAAP, Gemstar lacked any reasonable basis to determine the fair value of the IPG advertising. In 2001, Gemstar did not have standalone IPG advertising transactions with unrelated parties from which the company received cash in amounts comparable to those recognized in connection, with the Fantasy Sports transaction. Gemstar could not use the IPG advertising run for the strategic or corporate customers as cash comparables because Gemstar controlled the placement of the advertising on the IPG platform, the specific quarter in which to run and record revenue from the IPG advertising, the specific dollar amount to run and record as IPG advertising revenue each quarter, and the rate charged for the IPG advertising. Gemstar senior management, including Yuen, falsely represented to KPMG that IPG advertising revenue recorded for [*73] 2001 from the strategic advertising deals involving Thomson, Motorola, and Tribune was the result of standalone cash transactions and supported the IPG advertising revenue recorded by Gemstar for Fantasy Sports.

184. Because Gemstar paid no more than $ 3 million total in cash to Fantasy Sports to obtain the intellectual property and option to purchase the business, there was no basis under GAAP to recognize the $ 20 million in advertising revenue in 2001.

185. In connection with KPMG's second or third quarter review of Gemstar's financial statements, KPMG recommended to Gemstar that the Fantasy Sports transaction should be disclosed in the quarterly filings in part because the transaction was non-monetary. Leung rejected KPMG's recommendation stating that she did not believe the disclosure was necessary because it was not material.

186. Yuen and Leung, however, knew by February 2001, that barter and non-monetary transactions had to be disclosed in the company's public filings.

187. During the 2001 year-end audit, KPMG again recommended to Gemstar that it disclose the Fantasy Sports transaction in the Form 10-K. Gemstar agreed and disclosed in its Form 10-K that it had entered [*74] into a non-monetary transaction involving the purchase of $ 20 million in IPG advertising from Gemstar in 2001, in exchange for intellectual property.

188. Prior to the Audit Committee investigation, no one at Gemstar ever told KPMG or the Audit Committee that one of the principals from Fantasy Sports was willing to sell the company, including the intellectual property, for somewhere between $ 5 to $ 10 million; that Gemstar dictated the purchase of IPG advertising as a condition of the deal; that Fantasy Sports was willing to buy whatever amount of IPG advertising Gemstar requested; and that Gemstar selected the IPG advertising platform and the dollar amount recorded in IPG advertising for Fantasy Sports each quarter in 2001.

189. In November 2002, Gemstar announced that it was reversing recognition of the $ 20 million in IPG advertising from the Fantasy Sports transaction.

### 3. $ 26 Million IPG Advertising Revenue From Tribune's Purchase Of WGN Business From Gemstar

190. Gemstar recorded and reported $ 26 million of IP Sector revenue related to the sale of Gemstar's WGN. distribution business for the periods ended June 30, 2001, through September 30, 2002.

191. The Tribune [*75] Company ("Tribune") operates various media businesses, including the WGN TV station. Under a 1990 agreement, a Tribune affiliate supplied a Gemstar affiliate with the WGN signal for nationwide distribution.

192. In or about December 1999, before the Gemstar-TV Guide merger was consummated, Tribune informed TV Guide that it wanted to end the relationship by buying the WGN distribution business. In or about August 2000, after the merger with TV Guide, Gemstar sent a proposal to Tribune to sell the WGN distribution business for approximately $ 300 million. On or about November 21, 2000, Gemstar sent another proposal to

Tribune for the sale of the WGN rights for $ 224 million, of which 50% was to be paid by a five-year, $ 112 million advertising commitment by Tribune. Tribune then sent a counter-proposal to Gemstar, which included an advertising component. However, members of senior management of Tribune who were involved in the negotiation of the transaction testified that Tribune had not otherwise been interested in advertising with Gemstar and had viewed the advertising component of the transaction primarily as a means of acquiring the WGN distribution business from Gemstar.

193. [*76] In or about April 2001, Gemstar and Tribune finalized the transaction. The final transaction included, among others, two agreements: (1) a Stock Purchase Agreement in which Tribune paid $ 106 million in cash to Gemstar for the stock of the WGN distribution business; and (2) an Advertising Agreement in which Tribune committed to purchase $ 100 million of advertising from Gemstar over a six-year period, regardless of whether Tribune used the advertising. The documentation for the transaction was split at the direction of Gemstar into these two component parts to create a "clean trail" for tax and audit purposes. However, the Stock Purchase Agreement included an express closing condition requiring the execution of the Advertising Agreement. Yuen received copies of the final documents.

194. Gemstar controlled the timing and placement of the advertising that it ran for Tribune. The Advertising Agreement provided that Gemstar had sole discretion over the timing and placement of the advertising, provided that Gemstar could not run more than 50% of any year's advertising in any one quarter, and that at least 15% of the advertising had to be run in TV *Guide* magazine.

195. Although negotiations [*77] with Tribune were conducted mainly out of TV Guide's Tulsa headquarters by a team headed by Boylan, Yuen was informed of the progress of the negotiations, knew that the advertisement element of the deal constituted a portion of the purchase consideration for the distribution business, and directed Boylan to ensure that the deal was structured so that Gemstar had control over the timing and placement of the advertising purchased by Tribune.

196. Yuen and Gemstar's senior management misled KPMG concerning the connection between the Stock Purchase Agreement and the Advertising Agreement. KPMG became aware of the Advertising Agreement only after seeing a reference to it. In response to its inquiry about the Advertising Agreement, Leung and Waggy told KPMG that the Advertising Agreement was not related to, but rather was negotiated separately from, the sale of the WGN distribution business. Waggy also told KPMG that Tribune wanted to purchase and re-

quested advertising from Gemstar, and that Gemstar sold Tribune the advertising at fair value based upon arm's length negotiation.

197. No one at Gemstar told KPMG that Gemstar requested the advertising purchased by Tribune as part of the sale [*78] of the WGN business, that the advertising transaction was negotiated as part of the sale of the WGN business, or that Gemstar controlled the timing and dollar amount of IPG ad spending each quarter.

198. KPMG was never consulted about nor provided advice on whether the Advertising Agreement should have been disclosed in Gemstar's public filings, earnings releases, or analyst conference calls.

199. Despite the fact that he had been kept informed of the details of the Tribune transaction throughout its negotiation and execution, Yuen failed to disclose in Gemstar's press releases, conference calls, and public filings that the Tribune advertising revenue was part of the deal for the sale of the WGN distribution business, that Gemstar had requested the IPG advertising purchase, and that Gemstar controlled the timing, platform placement, and dollar amount of IPG advertising run per quarter.

200. In Gemstar's May 14, 2001 press release, Gemstar disclosed the sale of the WGN distribution business, but stated that although certain specific terms of the transaction wee confidential, the transaction was not material to either company. Likewise, at the May 14, 2001 analyst conference call, [*79] Yuen disclosed that Gemstar had sold the WGN distribution business, but noted that the terms of the transaction were confidential.

201. Gemstar's recognition and reporting of $ 26 million in Tribune advertising revenue failed to comply with GAAP. Gemstar violated SAB 101 in that the fair value of the advertising assigned by Gemstar to the Tribune transaction was not reliable, verifiable, and objectively determinable because: (1) the Advertising Agreement was linked to the Stock Purchase Agreement, and Tribune wanted to purchase the WGN distribution rights, not advertising; (2) the IPG was a new advertising medium with practically unlimited capacity; (3) there was no other legitimate contemporaneous advertising deal with which to reasonably compare the $ 100 million Advertising Agreement; and (4) the advertising was entirely at Gemstar's discretion and control. Gemstar should have allocated such advertising to the sale of the WGN distribution business as if the entire arrangement were a single element transaction.

202. Yuen thus knew that Gemstar's publicly reported financial results, SEC filings and press releases contained material misstatements and omitted to disclose

material [*80] information regarding the recognition and reporting of revenue from Tribune.

203. After Yuen and Leung resigned as Gemstar officers, Gemstar reversed the recognition of $ 26 million in IPG advertising revenue and allocated it to the sale of the WGN distribution business and interest income.

### 4. $ 17.5 Million Prepaid IPG Advertising From Motorola Settlement

204. Gemstar recorded and reported $ 17.5 million in IP Sector revenue from a 2001 settlement with Motorola, Inc. ("Motorola"). This reporting for the periods ended March 31, 2001 through March 31, 2002 was in violation of GAAP.

205. Motorola is a Delaware corporation with its principal place of business in Schaumburg, Illinois. In 1992, predecessors of Gemstar and Motorola entered into a license and technical assistance agreement that enabled Motorola to use Gemstar's IPG technology.

206. In May 1997, Gemstar commenced an arbitration alleging a breach of the 1992 agreement and misappropriation of technology and trade secrets by Motorola. In November 1998, Gemstar filed a patent infringement suit against Motorola. Gemstar obtained a favorable arbitration award in March 2000. In May 2000, Motorola filed a court action [*81] to set aside the award, and Gemstar counterclaimed in June 2000.

207. In the fall of 1999, Gemstar and Motorola commenced negotiations to settle this litigation. Yuen was Gemstar's principal negotiator until the July 2000 merger with TV Guide, after which Boylan took over at Yuen's request. Although Boylan negotiated the deal on Gemstar's behalf, during the negotiations Gemstar's negotiators repeatedly stated to Motorola that they had to run proposals by Yuen or that Yuen would have to make a decision.

208. Yuen regularly received updates from Boylan on the status of the negotiations with Motorola as well as the latest versions of the draft agreement. Orlick also updated Yuen and provided the latest version of the draft agreement.

209. From the fall of 1999 through approximately August 2000, the negotiations did not include any provision for Motorola to purchase advertising from Gemstar.

210. In or around September 2000, Gemstar proposed to Motorola that $ 45 million of the payment could be used by Motorola as prepaid advertising.

211. On October 8, 2000, Motorola and Gemstar signed a settlement agreement, which, effective September 2000, resolved all issues between the parties. [*82] Motorola agreed to pay Gemstar $ 188 million in cash

and to allow Gemstar to characterize $ 17.5 million of that amount as advertising to be run over a 48 month period. Under the agreement, Gemstar retained final discretion as to timing and platform placement of the advertising.

212. Gemstar's control of advertising timing and platform placement allowed it to determine for Motorola when to air advertising, the platform on which to air it (such as the *IPG* or *TV Guide* magazine), and the quarterly dollar amount to record. All of the Motorola advertising under the settlement agreement ran on the IPG and was recorded as IP Sector revenue. Yuen knew that Gemstar controlled the timing and platform placement for the advertising.

213. Yuen knew that without running the IPG advertising for Motorola in 2001, Gemstar would not have met Yuen's $ 100 million guidance for the IP Sector. Indeed, Yuen often looked to Motorola to fill in any shortfall in IPG advertising revenue. In a December 30, 2000 email to Kiener and other members of senior management, Yuen wrote: "it is now too late to bring in Motorola, as I was assured by all that we were fine with the quarter, we cannot insert the [*83] advertising in time to make up the number if my interpretation somehow fall short." (Plaintiff Ex. 9217). Similarly, on February 9, 2001, Yuen told Kiener concerning the internal IPG advertising projections that, "the shortfall is significant. . . . We plan to use Motorola for Q1." (Plaintiff Ex. 9218).

214. KPMG was told that the advertising component of the Motorola settlement agreement was a separate transaction and that Motorola had wanted to buy the advertising. KPMG met with Yuen, Leung, and Boylan, and was told that the accounting was consistent with the parties' negotiations and Gemstar's past and current business practices. No one at Gemstar told KPMG that Gemstar had requested that part of the settlement payment be characterized as prepaid advertising or that Motorola had no actual control over the platform on which the advertising would run under the settlement agreement. Gemstar never consulted KPMG, nor did they provide advice, as to whether the Motorola advertising agreement should have been disclosed in Gemstar's public filings, earnings releases, or analyst conference calls.

215. Gemstar's accounting for the Motorola IPG prepaid advertising did not comply with GAAP [*84] because the fair value of the IPG advertising provided by Gemstar was not realizable, verifiable, or objectively determinable, and the $ 17.5 million in prepaid advertising should have been recognized as licensing revenue over the ten-year term of the licensing provisions.

216. Yuen and Leung failed to disclose that Gemstar was recognizing revenue in violation of GAAP, or that it was recognizing the revenue on an accelerated basis in

violation of its agreement with Motorola. They each knew that, even though the advertising commitment was for four years, Gemstar had recorded the entire amount of prepaid advertising in about 15 months, exercising discretion over the timing and placement of the advertising. They also knew that the advertising was directly linked and intertwined with the licensing component of the Motorola settlement and that Gemstar proposed the advertising component.

217. Yuen and Leung failed to disclose in Gemstar's public filings that the Motorola settlement agreement contained an advertising component. In its Form 10-K for the year ended December 31, 2000, Gemstar only disclosed that it entered into a "long-term make-and-sell license agreement" through which Gemstar [*85] had received approximately $ 190 million from Motorola related to the settled arbitration, litigation, and future license fees. Yuen and Leung failed to disclose that the settlement included $ 17.5 million in prepaid advertising, or any advertising component, and their description of the agreement as only a licensing agreement omitted material facts about the agreement, including its impact on Gemstar's IP Sector revenue.

218. In its 2001 Form 10-K and first quarter 2002 Form 10-Q, Gemstar made a general disclosure regarding its strategic advertising. Gemstar disclosed that it had relationships with licensees, vendors, and strategic partners, many of which purchased a "significant amount" of IPG advertising, but that it "believe[d] that these transactions [were] not related." This statement was false and misleading because Yuen and Leung knew that the Motorola IPG advertising buy was part of the overall settlement with Motorola, and not a separate transaction.

219. Gemstar also misrepresented the Motorola settlement transaction in its October 16, 2000 press release and conference call when it disclosed that it had reached a settlement with Motorola. In the press release, Gemstar [*86] disclosed that it had entered into a "long-term make-and-sell license agreement for Gemstar-TV Guide's IPG technology and patents to interface with GMST's IPG's." (Plaintiff Ex. 10142 at 1). The press release stated: "Specific terms of the agreement are confidential but include payments to Gemstar-TV Guide International, Inc. relating to the settled litigations as well as license fees going forward." *Id.* The press release, however, failed to disclose that the settlement agreement included $ 17.5 million in prepaid advertising to be aired at Gemstar's discretion.

220. In Gemstar's October 16, 2000 conference call to announce the Motorola settlement, the "primary terms" of the settlement were stated to be: (1) that Motorola had "entered into a global in scope, long term make and sell only license agreement. . . . "; and (2) that

Motorola "agreed to certain payment obligations under this agreement that approach approximately $ 200 million." (Plaintiff Ex. 4074 at 1). Yuen and Leung represented Gemstar on this conference call. During the call, Yuen failed to disclose that $ 17.5 million of the settlement had been designated for prepaid advertising to be aired at Gemstar's discretion.

[*87] 221. In March 2003, Gemstar restated its financial statements to recognize the $ 17.5 million as licensing revenue over the ten-year term of the agreement, and restated the IP Sector revenues.

### 5. Shifting Of $ 5.6 Million 2001 Revenue From Media Sector To IP Sector

222. Yuen and Leung were involved in diverting revenue from the Media and Licensing Sectors to the IP Sector for 2001.

223. In the second half of 2001, Gemstar recognized and reported as IP Sector revenue at least $ 5.6 million for IPG advertising that, in fact, related to Gemstar's sale of print or channel advertising.

224. During 2001, the focus of the advertising sales department at Gemstar was to package IPG advertisements together with print or broadcast ads so as to generate as much revenue as possible on the IPG platform. This resulted in reducing the profitability of print and broadcast because some of their revenues were passed to IPG while the applicable costs remained in the other sectors.

225. Gemstar accomplished this shift in revenue from TV and print to IPG in a number of ways: (1) if an advertiser agreed to use IPG as well as TV or print, Gemstar would allocate most, if not all of the revenue [*88] to IPG regardless of the actual breakdown between the different media; (2) if an advertiser purchased TV or print media, Gemstar would bonus them with IPG advertising and then allocate some or all of the revenue to the IPG; (3) Gemstar approached advertisers who had committed to spending money either on TV or in the TV Guide magazine and tried to get them to buy IPG advertising. If the client was not interested, then Gemstar offered the opportunity to get onto the IPG platform at no additional charge. Gemstar then allocated some or all of the TV or magazine advertising revenue to the IPG platform.

226. In early 2001, Yuen learned that Gemstar's advertising sales force was having difficulty selling IPG advertising and was highly likely not to meet the forecasts.

227. Between March and June 2001, Yuen informed Jeffrey Mahl, the President of the Media Sales Group of Gemstar, about approaching current advertisers and con-

vincing them to move 10% of the traditional advertising to IPG.

228. However, the advertising sales force had difficulty finding advertisers willing to shift 10% of traditional advertising to IPG. Accordingly, Yuen and the advertising sales force attempted to devise [*89] a new strategy to drive business to the IPG. One new strategy discussed with Yuen was rather than attempting to convince advertisers to shift 10% of print and channel advertising to the IPG, Gemstar would approach a fewer number of advertisers and convince them to shift 100% of their print or channel advertising to the IPG, in exchange for Gemstar providing them print or channel advertising at no cost.

229. Shortly after July 23, 2001, Yuen received a copy of an email (the "Harty Email") that listed three possible approaches to shift revenue to the IPG. The Harty Email stated these approaches would "jump start IPG sales for the remainder of 2001." (Plaintiff Ex. 6).

230. The second approach listed in the Harty Email involved approaching "existing clients who are committed to running print pages during the remainder of 2001 and convert them to IPG buys. We don't get any incremental money, but we invoice them for the IPG and run the print pages without an invoice as free. Our print forecast would be reduced." (Plaintiff Ex. 6).

231. A few days after July 23, 2001, Yuen instructed Mahl to implement the second approach as listed in the Harty Email given to him. After his instruction, [*90] Yuen was regularly updated on the progress of implementing the second approach of the Harty Email.

232. On August 2, 2001, Yuen and Leung were informed in an email that the 2001 print forecast needed to be reduced by $ 7.5 million due to the shifting of revenue from print to IPG strategy in the second half of 2001.

233. On August 29, 2001, Leung again was informed by email, from Victoria Stull ("Stull"), that revenue was being shifted from the print and channel to the IPG. Stull wrote in the email: "Here is the perfect example of how we are going to get in trouble if we do not get something established. They took an existing deal with Bose . . . for Q4 . . . to be worth $ 350k and are adding 350k of IPG to the deal and selling it for a package price of $ 350 which they want to allocate 100% of to IPG. I don't have an issue with the concept (except the 100% to IPG part), but we have to be careful on how we document and calculate what we deliver -- no one can tell me how much IPG we expect to deliver." (Plaintiff Ex. 10).

234. On October 15, 2001, Yuen and Leung were informed in an email that the advertising department had started to push the second option from the Harty Email. The [*91] advertising department again informed Yuen

about the difficulty of selling IPG advertising and problems they were encountering in implementing Yuen's strategy.

235. In October 2001, Gemstar employee David Aimone told Yuen and Leung of the shifting of revenues from print and channel to IPG in connection with communications regarding the 2002 budget.

236. On October 23, 2001, Jochums sent to Yuen and Leung an email explaining the shifting of revenues from the print and channel to the IPG for one of Gemstar's advertisers. The email stated that "Wrangler agreed to run on the IPG during 4th quarter in excha[n]ge for three of their print advertisements running at no value. . . . Wrangler would not be charged for their . . . insertions via a print invoice. Instead, these dollars would be invoiced via an IPG invoice." (Plaintiff Ex. 10418).

237. In this same email, Jochums informed Yuen and Leung that "I am beginning to receive numerous emails like this one -- which appear to be circulating to a lot of people. I have told Dave Aimone on several occasions that the information that I see for multiplatform should not show an ad value for print with no ad value associated with IPG. Just [*92] wanted to give you a heads up -- this really needs to be addressed sooner rather than later. I have several other emails similar to this one -- and just recently received a fax which is even worse." (Plaintiff Ex. 10418).

238. Gemstar's practice of shifting advertising revenue from the print and channel platform to the IPG violated GAAP because (1) the advertisers had already committed to purchase print advertising; (2) Gemstar gave the advertisers an equal amount of IPG advertising for free; and (3) Gemstar shifted the revenue from the Media Sector to the IP Sector by invoicing the advertisers for the IPG and print advertising together, but recording the revenue only as IPG advertising revenue.

239. At least $ 5.6 million of print and channel advertising revenue was shifted to the IP Sector. The $ 5.6 million constituted 5.4% of Gemstar's total 2001 IP Sector revenue, and without this revenue Gemstar would not have met Yuen's projection for IP Sector revenue in 2001. Because Gemstar exceeded its IP Sector guidance by $ 1.4 million, and reported break-even EBITDA for the fourth quarter 2001, the amount of IPG advertising revenue represented by this transaction was material.

240. [*93] Neither Yuen, Leung or anyone at Gemstar told KPMG that (i) for 2001, Gemstar was providing equal amounts of IPG advertising as a "discount" to its existing print and channel customers in connection with multi-platform advertising sales but only recording IPG advertising revenue from these transactions; (ii) that before the close of the 2001 audit that Gemstar offered IPG

advertising at no additional cost to customers who had committed to purchase advertising on other platforms and recorded IPG advertising revenue from these multi-platform transactions; and (iii) that before the close of the 2001 audit that Gemstar had sold advertising on multiple platforms to customers but only invoiced and/or recorded advertising revenue for the IPG platform from these transactions.

241. Yuen knew that the shifting of revenue from the Media Sector to the IP Sector in 2001 violated GAAP, and that Gemstar's public statements, including periodic filings and press releases, contained material misstatements and omitted to state material facts about this improper revenue recognition practice.

242. After Yuen and Leung resigned as officers, Gemstar reallocated at least $ 5.6 million in revenue to the [*94] Media Sector.

**J. Yuen's Compensation From Gemstar and Amounts Allegedly Owed To Him Under a Restructuring Agreement**

243. From 1999 through 2002, Yuen received approximately $ 24 million in salary and bonuses, exercised stock options for a taxable profit of approximately $ 14.6 million, and realized approximately $ 59 million from the disposition of Gemstar securities.

244. Portions of Yuen and Leung's compensation were based on Gemstar's reported financial results. Increases in Yuen's base salary and incentive compensation were directly tied to and largely derived from Gemstar's reported financial results, including growth in revenues and EBITDA for both the Company as a whole and specifically for the IP and Licensing Sectors.

245. Yuen contends that additional cash payments from Gemstar of approximately $ 29.48 million, which consist of a termination fee, and amounts due from salary, bonus, and vacation pay (the "termination payments")are still owed to him in connection with the Restructuring Agreements that led to his and Leung's termination from Gemstar in November 2002.

**K. Yuen's Destruction Of Evidence And Obstruction Of Justice**

246. Beginning on or about [*95]  November 6, 2002, Yuen began deleting from the hard drive of his Gemstar office computer (the "hard drive") e-mails and other items, such as Gemstar corporate documents, that were within the scope of the Commission's October 28, 2002 subpoena, which Yuen had received before November 6, 2002.

247. In addition, after receiving a subpoena to testify, and the day before he was scheduled to testify before the Commission on April 1, 2003, Yuen installed a

program called "Eraser 2003" on his Gemstar office computer and "wrote over" and erased all of the unallocated space on the hard drive, thereby making it impossible to retrieve any files that had been manually deleted.

**L. Testimony of Yuen and Leung**

248. In resolving the factual disputes in this case, the court did not find the testimony of either Yuen or Leung to be persuasive or credible. However, in reaching its factual conclusions, the court gave no weight to the evidence concerning Yuen's destruction of evidence, which is unnecessary to either the court's factual findings or its conclusions of law.

**II. CONCLUSIONS OF LAW**

**A. Jurisdiction**

1. This Court has jurisdiction over this action pursuant to [*96]  Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), *15 U.S.C. §§ 77t(b), 77t(d)(1),* and *77v(a),* and Sections 21(d)(1), 21(d)(3)(A). 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), *15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e)* and *78aa.*

2. Yuen directly or indirectly made use of the mails, means or instruments of transportation or communication in interstate commerce, or means or instrumentalities of interstate commerce in connection with the transactions, acts, practices and courses of business described above. Yuen disseminated materially false and misleading statements through Commission filings and press releases, as well as through telephone conference calls with analysts covering Gemstar.

**B. Liability**

**1. Yuen Committed Securities Fraud**

3. *Section 10(b) of the Exchange Act, Rule 10b-5 of the Exchange Act,* and *Section 17(a) of the Securities Act* (collectively referred [*97]  to as the "antifraud provisions of the federal securities laws" expressly prohibit misrepresentations and omissions of material fact as well as any manipulative or deceptive devices or conduct which operates as a fraud or deceit upon investors. *See SEC v. Rana Research, Inc., 8 F.3d 1358, 1361 (9th Cir. 1993); SEC v. First Jersey Securities, Inc., 101 F.3d 1450 (2d Cir. 1996).*

4. Section 10(b) of the Exchange Act, *15 U.S.C. § 78j(b),* and Rule 10b-5, *17 C.F.R. § 240.10b-5,* thereunder, prohibit fraud in connection with the purchase or sale of any security. *Section 10(b) of the Exchange Act* and *Rule 10b-5* thereunder make it unlawful to, among other things, (1) "employ any manipulative or deceptive device"; (2) "make any untrue statement of material fact or to omit to state a material fact necessary in order to

make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." *15 U.S.C. § 78j(b)*; *17 C.F.R. § 240.10b-5* [*98] .

5. Section 17(a) of the Securities Act, *15 U.S.C. § 77q(a)*, prohibits fraud in connection with the offer or sale of securities. *Section 17(a)* makes it unlawful to: (1) "employ any device, scheme, or artifice to defraud"; (2) "obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are were made, not misleading"; and (3) "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." *15 U.S.C. § 77q(a)*.

6. To establish liability under Section 10(b) of the Exchange Act, *15 U.S.C. § 78j(b)*, Rule 10b-5, *17 C.F.R. § 240.10b-5*, of the Exchange Act, and/or Section 17(a) of the Securities Act, *15 U.S.C. § 77q(a)(1)*, the Commission must prove by a preponderance of the evidence three basic elements: (1) a material misrepresentation, omission of material fact, or other fraudulent device; (2) in connection with the purchase, offer, or sale of a security; [*99] and (3) with the requisite mental state. *SEC v. Rana Research, Inc., 8 F.3d at 1364*; *SEC v. TLC Investments and Trade Co., 179 F.Supp.2d 1149, 1153 (C.D. Cal. 2001)*.

### a) Yuen Made Misrepresentations And Omissions Of Material Fact About Gemstar's IPG Licensing And IPG Advertising Revenues

7. Violations of the antifraud provisions require that the misrepresentations and omissions concern material facts. *Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)*. A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)*.

8. One of the main purposes of the antifraud provisions is "to substitute a philosophy of full disclosure for the philosophy of caveat emptor," *SEC v. Capital Gains Research Bureau, 375 U.S. 180, 186, 84 S. Ct. 275, 280, 11 L.Ed.2d 237 (1963)*, and thus to ensure that investors obtain disclosure of material facts in connection with their investment decisions, *SEC v. Hasho, 784 F.Supp. 1059, 1106 (S.D.N.Y. 1992)* (citing [*100] *Affiliated Ute Citizens v. United States, 406 U.S. 128, 151, 92 S. Ct. 1456, 1471, 31 L.Ed.2d 741 (1972))*.

9. Accordingly, liability under the antifraud provisions of the federal securities laws arises not only from affirmative misrepresentations but also from failures to disclose material information. *SEC v. Glt Dain Rauscher, Inc., 254 F.3d 852, 855-856*. As the Ninth Circuit has made clear, federal securities law "'imposes a duty to disclose material facts that are necessary to make disclosed statements, *whether mandatory or volunteered*, not misleading.'" *SEC v. Fehn, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996)* (citations omitted) (emphasis added); *see also Ackerman v. Schwartz, 947 F.2d 841, 846 (7th Cir. 1991)* ("Federal [securities] law requires persons to tell the truth about material facts once they commence speaking"); *U.S. v. Cannistraro, 800 F. Supp. 30, 81 (D.N.J. 1992)* ("it is a well-settled principle that once disclosures are made, there is a duty to disclose all material information regardless of a fiduciary duty owed to the shareholders. . . . Once a defendant chooses to speak, he or she is [*101] not free to lie or mislead.")

10. The Ninth Circuit further has stated that "'[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.'" *In re Convergent Technologies Sec. Lit., 948 F.2d 507, 512 (9th Cir. 1991)* (citations omitted). "[T]he disclosure required by the federal securities laws is measured not by literal truth, but by the ability of material to accurately inform rather than mislead [investors]." *Id.*; *see, e.g., SEC v. C.R. Richmond & Co., 565 F.2d 1101, 1106-1107 (9th Cir. 1977)* (finding advertisements "deceptive and misleading in their overall effect even though when narrowly and literally read, no single statement of material fact was false").

11. The Commission need only prove one misrepresentation or omission of material fact to establish liability. *Provenz v. Miller, 102 F.3d 1478, 1484 (9th Cir. 1996)* (citing *In re Convergent Technologies Sec. Lit., 948 F.2d 507, 512 (9th Cir. 1991)* (citations omitted)).

12. As discussed in the above findings of fact, from at least the period ended March 31, 2000, through [*102] the first quarter 2002, Yuen misrepresented and caused Gemstar to misrepresent the company's financial performance by overstating the company's IPG licensing and IPG advertising revenues and earnings.

13. Yuen knew but failed to disclose in earnings press releases, analyst conference calls, and Commission filings that (1) a substantial amount of the reported IPG licensing revenue for 2000 and 2001 was being recognized under an expired and disputed licensing agreement involving Scientific-Atlanta; and that (2) a substantial portion of reported IPG advertising revenue for 2001 and early 2002 was the result of undisclosed round-trip, non-

monetary, or multi-element transactions in which the customer did not request and/or want IPG advertising.

14. As part of the so-called "strategic" or "corporate" advertising deals entered into by Gemstar with Motorola, Tribune, Fantasy Sports, and Thomson, Gemstar's CFO, Leung, with Yuen's knowledge and at his direction, controlled the timing, platform selection, and dollar amount of the advertising and ran all advertising on the IPG to meet Gemstar's revenue targets for the IP Sector in 2001 and early 2002. The fact Gemstar could determine the IPG [*103] advertising to run and to record as revenue each quarter was never disclosed to investors, analysts, or the Commission.

15. The Court finds that by a preponderance of the evidence that Yuen made misrepresentations to and withheld material information from the auditors and the market. Gemstar's financial statements reflect those misrepresentations and omissions.

16. These misrepresentations and omissions were material because there is a substantial *likelihood* that a reasonable investor would consider the misrepresented and omitted information important in making an investment decision. *Basic, 485 U.S. at 231-32; TSC Indus., 426 U.S. at 449.* Indeed, the Ninth Circuit has held that information relating to a company's financial condition and profitability is generally material. *SEC v. Murphy, 626 F.2d 633, 653 (9th Cir. 1980).*

17. Accounting, auditing, and legal authorities recognize that the concept of "materiality" is not limited to a percentage of a company's total profits, but rather requires *assessment* of qualitative and quantitative factors so that even quantitatively small amounts can still present a materially misleading [*104] picture of a company's health. *See* SAB No. 99, *64 Fed. Reg. 45150, 45152 (August 19, 1999)* ("Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are . . . Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability."); *Fecht v. Price Co., 70 F.3d 1078, 1080-81 (9th Cir. 1995)* (rejecting argument that omission was not material "because it is the profitability of the Company as a whole, not any particular aspect of the Company's operations, that is significant."); *Ganino v. Citizens Utils. Co., 228 F.3d 154, 163 (2d Cir. 2000)* (recognizing that SAB No. 99 is persuasive and stating that, to the extent magnitude is measured, the line item at issue "should be compared to like items on the corporate financial statement"); *In re Kidder Peabody Sec. Litig., 10 F. Supp 2d 398, 410 (S.D.N.Y. 1998)* (declining to hold as a matter of law that misstatements affecting profits by no more than 2.54% were immaterial); [*105] *In re*

*Home Health Corp. of America, Inc. Sec. Litig., 1999 U.S. Dist. LEXIS 1230, 1999 WL 79057 at * 6-7 (E.D. Pa. Jan. 20, 1999)* (declining to hold immaterial as a matter of law failure to report loss of a de minimis percentage of total revenue where qualitative factor rendered the loss significant).

18. Yuen's misrepresentations and omissions were both quantitatively and qualitatively material. Yuen's misrepresentations concerned Gemstar's revenues and earnings in the Licensing and Interactive Sectors, which Yuen and others in Gemstar's senior management claimed were key indicators of Gemstar's present and future performance. IPG licensing and IPG advertising revenues that were recorded and reported in violation of GAAP allowed Gemstar to meet Yuen's financial targets by significant percentages. The fact Gemstar's stock lost a third of its market value following the company's announcement on April 1, 2002, that it had recorded over $ 100 million in licensing revenues from Scientific-Atlanta and $ 20 million in IPG advertising revenue from a nonmonetary transaction -- all of which was disclosed before there was any disclosure about any revenue and earnings restatements, accounting improprieties by Gemstar's senior management, or the existence of any SEC investigation -- is [*106] evidence that investors considered this previously omitted information material.

### b) Yuen Acted With Requisite Mental State

19. Violations of *Section 17(a)(1), Section 10(b)*, and *Rule 10b-5* require scienter, while violations of *Section 17(a)(2)* and *(a)(3)* only require negligence. *SEC v. GLT Dain Rauscher, Inc., 254 F.3d 852, 856 (9th Cir. 2001).*

20. Scienter is defined as a "mental state embracing intent to deceive, manipulate, or defraud." *Provenz v. Miller, 102 F.3d at 1491* (quotations and citations omitted). In the Ninth Circuit, scienter may be established by a showing of reckless conduct, and proof of this element can be inferred from circumstantial evidence. *Id.* (citing *Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568-69 (9th Cir. 1990)* (en banc), *cert. denied, 499 U.S. 976, 111 S. Ct. 1621, 113 L. Ed. 2d 719 (1991); SEC v. Burns, 816 F.2d 471, 474 (9th Cir. 1987)).*

21. The Ninth Circuit has held that the recklessness standard can be established by demonstrating (1) a defendant's motive and opportunity to engage in securities fraud; and (2) red flags casting doubt on the truthfulness or accuracy of representations. [*107] *Howard v. Everex Systems, Inc., 228 F.3d 1057, 1063-65 (9th Cir. 2000).* The recklessness standard is cited here for completeness, as the court has found and concluded that Yuen acted with an intent to deceive, manipulate and defraud, which is the mental state required for scienter.

22. The evidence at trial established that Yuen acted with scienter in his conduct with respect to the transactions challenged by the Commission, with the exception of the AOL and Time Warner transactions.

23. Yuen was informed of the true facts and circumstances surrounding the improper recording and reporting of revenue from the transactions at issue in this case but did nothing to stop the improper revenue recognition and reporting practices, and instead made misrepresentations and omissions to the Audit Committee, the outside auditors, and the public to ensure that Gemstar met its financial targets for the IP and Licensing Sectors.

24. Despite knowing that there was no contractual or other licensing arrangement between Gemstar and Scientific-Atlanta, Yuen directed and approved the improper recording and reporting of IPG licensing revenue from Scientific-Atlanta. Indeed, he provided [*108] the purported basis for beginning these licensing accruals. Yuen intentionally misled Gemstar's outside auditors and the Audit Committee about:

> . that Scientific-Atlanta had agreed to extend and pay the same IPG licensing rates as set forth in the expired licensing and settlement agreement, when he knew there was no reasonable, basis for such representations; and
>
> . that the IPG advertising revenue from Thomson and other strategic or corporate partners had resulted from stand-alone cash transactions that were not connected or related to any other agreement or relationship, when he knew there was no reasonable basis for such representations.

25. The evidence at trial further established that Yuen did not have a reasonable basis to support the guidance for 2001 revenues and earnings for the Interactive Sector that Yuen announced in a November 2000 analyst conference call and press release and reconfirmed to the market throughout 2001. Not only did Yuen know at the time that as of year-end 2000 there was no internal budget in place for 2001 relating to revenues and expenses for the Interactive Sector, but Yuen also ignored obvious warnings brought to his attention in the [*109] latter part of 2000 and early 2001 that showed that his 2001 guidance for IPG advertising revenues was unrealistic and not supported by the internal projections of Kiener, as well as other Gemstar's advertising sales force executives. 26. Yuen also knew in late 2000 and throughout 2001, but failed to disclose to analysts, inves-

tors, and the SEC that in order to achieve the $ 100 million in IPG advertising sales that Yuen projected, Gemstar was relying on its optional sources of IPG advertising from undisclosed multi-element, non-monetary, roundtrip, and fraudulent multi-platform advertising transactions that Yuen knew gave Gemstar complete control over the timing, platform selection, and dollar amount of advertising recorded each quarter.

27. Yuen knew that Gemstar was recording and reporting IPG advertising revenue from customers who had not requested or wanted IPG advertising on a stand-alone basis, or at all, but failed to stop or disclose this improper revenue recognition practice.

28. Yuen directed Gemstar's advertising sales force to shift advertising sales and revenue from the print and channel platform to the IPG to improve the financial results of the Interactive Sector, [*110] where the IPG advertising revenue was recorded and reported by Gemstar.

29. Yuen held significant amounts of Gemstar securities during the period of Gemstar's overstatements of revenue and earnings, and his salary and bonus were tied to results in the IPG advertising and IPG licensing sectors. Yuen negotiated an agreement to receive approximately $ 29.48 million in payments in connection with his termination, all of which occurred before the Company disclosed any restatements or improper accounting improprieties about which he knew.

### c) Reliance On KPMG's Accounting Work Or Advice To Negate Scienter

30. Yuen contends that his good faith reliance on Gemstar's auditors negates any finding of scienter. This contention, however, misreads the prevailing law and is contrary to the Court's Memorandum of Decision Re: Plaintiff's and Defendants' Motions for Summary Judgment ("MOD"), entered September 6, 2005. MOD at 8. Under applicable legal precedent, Yuen must show that the prerequisites for his purported reliance upon Gemstar's auditors are met. Except with respect to the AOL and Time Warner transactions, he has not done so.

31.

> As the Ninth Circuit has explained: If [*111] a company officer knows that the financial statements are false and misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance.

*Goldfield, 758 F.2d 459, 467* (quoting *United States v. Erickson, 601 F.2d 296, 305 (7th Cir. 1979)).* [2]

> 2  *See also SEC v. Bonastia, 614 F.2d 908, 914 (3d Cir. 1980); SEC v. Softpoint, Inc., 958 F. Supp. 846, 864-65 (S.D.N.Y. 1997), aff'd 159 F.3d 1348 (Table) (2d Cir. 1998); SEC v. McNulty, 1996 U.S. Dist. LEXIS 10649, 1996 WL 422259, at * 7 (S.D.N.Y. July 29, 1996)* (holding businessman liable for quarterly report he signed even though it had been prepared by an accountant).

32. The Ninth Circuit in *Provenz v. Miller, 102 F.3d at 1491,* made clear that "[i]f . . . defendants withhold material information from their accountants, defendants [*112] will not be able to rely on their accountant's advice as proof of good faith."

33. Contrary to Yuen's contention, good faith reliance upon the advice of auditors does not negate the fact a defendant acted with scienter, nor is it a complete defense to securities fraud. As this Court previously noted in its Memorandum of Decision, reliance on a professional is not an affirmative defense but merely one factor that a court may consider, along with the rest of the evidence presented, when evaluating whether a defendant acted with scienter.

34. Courts consistently have held that defendants who claim good faith based upon reliance on a professional must show they "(1) made a complete disclosure to [the professional]; (2) requested [the professional's] advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice." MOD at 8 (citing *SEC v. Goldfield Deep Mines, 758 F.2d at 467); see also SEC v. Caserta, 75 F.Supp.2d 79, 94-95 (E.D.N.Y. 1999)* (collecting cases); *SEC v. Kenton Capital, Ltd., 69 F.Supp.2d 1, at 10 n.7 (D.D.C. 1998).*

35. Numerous courts specifically have [*113] held that a claim of "good faith" or reliance on professionals is not available when a defendant has withheld material information from the professionals. *See Provenz, 102 F.3d at 1491; SEC v. Goldfield Deep Mines, 758 F.2d at 467; C.E. Carlson, Inc. v. SEC, 859 F.2d 1429, 1436 (10th Cir. 1988); SEC v. Savoy Industries, Inc., 215 U.S. App. D.C. 7, 665 F.2d 1310, 1314 n.28 (D.C. Cir. 1981); Bisno v. United States, 299 F.2d 711, 719-720; SEC v. Fitzgerald, 135 F.Supp.2d 992, 1024 (N.D. Cal. 2001); SEC v. Kenton Capital, Ltd., 69 F. Supp.2d at 10 n.7.*

36. Because the evidence in this case shows that Yuen misrepresented to and withheld material information from the auditors with respect to the challenged transactions (excluding the AOL and Time Warner trans-

actions), Yuen cannot rely on KPMG's advice or audit work to negate scienter.

### d)  Yuen's Misrepresentations And Omissions Were Made "In Connection With" Securities Transactions

37. The "in connection" requirement is satisfied here, as Yuen's fraudulent statements and omissions coincide with securities transactions. *SEC v. Zandford, 535 U.S. 813, 822, 122 S. Ct. 1899, 153 L. Ed. 2d 1 (2002).* [*114] Consistent with *Zandford,* the Ninth Circuit has repeatedly stated that this requirement "is met if the fraud alleged 'somehow touches upon' or has 'some nexus' with 'any securities transaction.'" *SEC v. Rana Research, Inc., 8 F.3d 1358, 1362 (9th Cir.), cert. denied, 510 U.S. 963, 114 S. Ct. 439, 126 L. Ed. 2d 372 (1993)* (citations omitted). Because Yuen disseminated false and misleading information in periodic reports, in press releases, and to securities professionals for the express purpose of reporting the revenues of a publicly traded company, defendant's conduct was clearly "in connection" with a securities transaction. *See id.* ("[w]here the fraud alleged involves public dissemination in a document such as a press release, annual report, . . . or such document on which an investor would presumably rely, the 'in connection with' requirement is generally met").

### 2. Yuen Violated The Periodic Reporting, Record Keeping, And Internal Control Requirements

38. As a corporation with securities registered with the Commission, Gemstar filed periodic reports with the Commission and was required to maintain a system of accounting that facilitated accurate reporting. To [*115] establish a violation of the periodic reporting, record keeping, and internal control requirements, the Commission is not required to establish scienter. *SEC v. McNulty, 137 F.3d 732, 740-41 (Section 13 of the Exchange Act and the rules thereunder do not require scienter);); SEC v. Savoy Indus., Inc., 190 U.S. App. D.C. 252, 587 F.2d 1149, 1167 (D.C. Cir. 1978)* (no showing of scienter is required to establish violation of *Section 13(a) of the Exchange Act); SEC v. Softpoint, Inc., 958 F. Supp. 846, 865-66 (S.D.N.Y. 1997)* (under *Rule 13b2-1* "[t]here is no scienter requirement; liability is predicated on 'standards of reasonableness.'"), *aff'd, 159 F.3d 1348 (2d Cir. 1998); see also, SEC v. World Wide Coin Inv., Ltd., 567 F. Supp. 724, 749 and 751 (N.D. Ga. 1983)* (neither the books and records provision of *Section 13(b)(2)(A)* nor the accounting controls provision of *13(b)(2)(B)* requires scienter).

### a)  Reporting Violations: Section 13(a) Of The Exchange Act And Rules 12b-20, 13a-1, 13a-11, And 13a-13 Thereunder

39. *Section 13(a) of the Exchange Act* and *Rules 12b-20, 13a-1, 13a-11,* and *13a-13* (the "reporting provisions") [*116] require issuers of securities registered pursuant to *Section 12 of the Exchange Act,* such as Gemstar, to file with the Commission accurate periodic and current reports. An issuer violates these provisions if it files a report that contains materially false or misleading information. *SEC v. Falstaff Brewing Corp., 203 U.S. App. D.C. 28, 629 F.2d 62, 72 (D.C. Cir. 1980); SEC v. Savoy Indus., Inc., 190 U.S. App. D.C. 252, 587 F.2d 1149, 1165 (D.C. Cir. 1978). Rule 12b-20* under the Exchange Act similarly requires that these reports contain any material information necessary to make the required statements made in the reports not misleading. *See Savoy Indus., 587 F2d. at 1167.* Moreover, *Rule 4.01(a)(1)* of Regulation S-X requires that financial statements not be misleading and states that a financial statement that is not prepared in accordance with GAAP is presumptively misleading or inaccurate. *17 C.F.R. § 210.4-01(a)(1).*

40. Secondary liability is also available under *Section 20(e) of the Exchange Act* against "any person that knowingly provides substantial assistance" to another violator of the Exchange Act. *15 U.S.C. § 78t(f).* For [*117] aiding and abetting liability, the Commission must prove the existence of an independent primary violation, "substantial assistance" in the commission of the primary violation, and actual knowledge by the alleged aider and abettor of the primary violation and of his or her own role in furthering it. *SEC v. Fehn, 97 F.3d 1276, 1288 (9th Cir. 1996).*

41. Yuen aided and abetted Gemstar's primary violations of the reporting provisions. First, Gemstar committed primary reporting violations by filing with the Commission reports on Form 10-Q for the quarters ended June 30, 1999, September 30, 1999, December 31, 1999, June 30, 2000, September 30, 2000, March, 31, 2000, June 30, 2001, September 30, 2001, March 31, 2002; annual reports on Form 10-K for the fiscal years ended March 31, 2000, December 31, 2000, and December 31, 2001; and current reports on Forms 8-K, dated September 26, 2002, that contained financial statements that did not comply with GAAP and that misrepresented and omitted to disclose material information regarding the transactions discussed above (with the exceptions of the AOL and Time Warner transactions), the company's IPG licensing and IPG advertising [*118] business, and the revenues and earnings for the IP and Licensing Sectors.

42. Second, Yuen provided substantial assistance in the commission of Gemstar's reporting violations. Yuen was involved in structuring and approving transactions. Yuen directed Gemstar's employees to increase IP and Licensing Sector revenues and communicated with Gemstar's outside auditors, Audit Committee and analysts regarding the transactions discussed above. Yuen re-

viewed and approved Commission filings and earnings press releases. Yuen also signed Gemstar's Forms 10-K. Yuen also signed false and misleading representation letters to Gemstar's outside auditors in connection with their annual audits and quarterly reviews.

43. Third, Yuen had actual knowledge of Gemstar's primary violations and his role in furthering them. Yuen was informed of all of the facts and circumstances surrounding the recording and reporting of revenues for each of the transactions at issue. He, nevertheless, participated in approving and causing the filing of the reports that he knew contained financial statements that improperly recognized and reported revenue and that misrepresented and omitted to disclose material information [*119] concerning Gemstar's revenues and earnings.

44. By engaging in the conduct described above, Yuen aided and abetted Gemstar's violations of Section 13(a) of the Exchange Act, *15 U.S.C. § 78m(a),* and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder, *17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11,* and *240.13a-13.*

**b)    Record-Keeping    Violations:    Sections 13(b)(2)(A) Of The Exchange Act And Rule 13b2-1 Thereunder**

45. *Section 13(b)(2)(A) of the Exchange Act* requires reporting companies registered pursuant to *Section 12 of the Exchange Act* to "make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflect the transactions . . . of the issuer." *15 U.S.C. § 78m(b)(2)(A).* These provisions have been read to require issuers to employ and supervise reliable personnel, to ensure that transactions are executed as authorized, to segregate accounting functions, and to have procedures designed to prevent errors and irregularities. *SEC v. World Wide Coin Invs., Ltd., 567 F. Supp. at 750.* [*120] *Rule 13b2-1* under the Exchange Act prohibits any person from directly or indirectly falsifying any book, record, or account described in *Section 13(b)(2)(A). 17 C.F.R. § 240.13b2-1.*

46. Yuen aided and abetted Gemstar's violations of *Section 13(b)(2)(A) of the Exchange Act* and violated *Rule 13b2-1* under the Exchange Act. Gemstar's books and records failed to accurately and fairly reflect Gemstar's transactions in that they recognized revenue for IPG licensing where there was no licensing agreement or other arrangement and for IPG advertisements that were not requested by a customer. By directing the shifting of revenue from the print and channel advertisements to the IPG platform, Yuen caused Gemstar to create false and misleading books and records to support this improper revenue recognition practice. Yuen substantially assisted in Gemstar's record-keeping violation, and *Rule 13b2-1,* by directing the improper recognition of IPG licensing

revenue and approving the shifting of revenues on Gemstar's books from one advertising platform to another, in order to recognize IPG advertising revenue.

47. By engaging in the conduct described above, Yuen aided and [*121] abetted Gemstar's violations of Section 13(b)(2)(A) of the Exchange Act, *15 U.S.C. § 78m(b)(2)(A)*, and violated Exchange Act Rule 13b2-1, *17 C.F.R. § 240.13b2-1*, by, directly or indirectly, falsifying or causing to be falsified Gemstar's books, records, and accounts subject to *Section 13(b)(2)(A) of the Exchange Act*.

### 3. Yuen Misrepresented To Auditors In Violation of Rule 13b2-2 Of Exchange Act

48. Rule 13b2-2 of the Exchange Act, *17 C.F.R. § 240.13b2-2*, prohibits an officer or director of an issuer from making or causing to be made a materially false or misleading statement, or omitting to state information necessary to render statements not misleading, to an accountant in connection with any required audit of the issuer's financial statements or the preparation of a report required to be filed with the Commission.

49. Yuen misrepresented and omitted to disclose material information to KPMG regarding the Scientific-Atlanta and Thomson transactions. Yuen also omitted to disclose to KPMG that Gemstar, with his knowledge and approval, had shifted revenues from one advertising platform to another [*122] and structured transactions to be able to record IPG advertising revenue at its discretion to meet Gemstar's financial targets. These omissions rendered the statements made in public filings, earnings releases, and Conf. Calls false and misleading.

50. By engaging in this conduct, and in connection with audits and examinations of the financial statements of Gemstar and the preparation and filing of statements and reports required to be filed with the Commission, Yuen, directly or indirectly, made or caused to be made materially false or misleading statements to accountants and omitted to state, or caused another person to omit to state to accountants, material facts necessary in order to make statements made to the accountants, in light of the circumstances under which such statements were made, not misleading in violation of Exchange Act Rule. 13b2-2, *17 C.F.R. § 240.13b2-2*.

## C. Remedies

51. The Commission seeks the following relief against Yuen: (1) permanent injunction prohibiting future violations of the federal securities laws; (2) disgorgement of illgotten gains from the conduct at issue here; (3) payment of civil penalties; and (4) a [*123] permanent officer and director bar. Based on the findings of fact and law contained herein, the court is prepared to grant appropriate relief to the Commission, and will set a further hearing to hear and consider argument from the Commission and Yuen as to what remedies are to be granted and in what amounts.

DATED: March 16, 2006

HONORABLE MARIANA R. PFAELZER

UNITED STATES DISTRICT JUDGE

# EXHIBIT 9

Westlaw.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 2808224 (D.Ariz.)
**(Cite as: --- F.Supp.2d ----)**

Page 1

**C**
Weiss v. Amkor Technology, Inc.
D.Ariz.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Arizona.
Nathan WEISS, individually and on behalf of all
others similarly situated, Plaintiff,
v.
AMKOR TECHNOLOGY, INC., et al., Defendants.
**No. CV 07-0278-PHX-PGR.**

Sept. 25, 2007.

David S. Steuer, Karen Thomas Stefano, Keith E.
Eggleton, Wilson Sonsini Goodrich & Rosati, Palo
Alto, CA, David B. Rosenbaum, Maureen Beyers,
Osborn Maledon PA, Phoenix, AZ, for Defendants.

ORDER

PAUL G. ROSENBLATT, United States District
Judge.

**I. INTRODUCTION**

   *1 This is a securities class action brought on
behalf of persons who purchased common stock of
Defendant Amkor Technology, Inc. ("Amkor")
from July 26, 2001 through July 26, 2006. The
Lead Plaintiffs allege two distinct claims for
violation of the federal securities laws. First, Lead
Plaintiffs assert that Amkor and all the Individual
Defendants (certain former and current Amkor
officers and directors) made misrepresentations
concerning Amkor's stock option grants during the
Class Period. Second, the Plaintiffs assert that, for
part of the Class Period-October 2003 through July
2004-Amkor and some of the Individual Defendants
made several misrepresentations about demand for
Amkor's products and forecasts about financial
results.

**II.   PLAINTIFFS'   SUMMARY   OF
ALLEGATIONS**

**A. Amkor's Fraudulent Stock Option Practices**

   Amkor's publicly disclosed stock option plan
specifically identified the Compensation Committee
as the administrator of Amkor's stock option
program. During the Class Period, Churchill
(Chairman of the Committee) and George (member)
were the administrators of Amkor's stock options.
Among other responsibilities, Churchill and George
determined the exercise price and grant date of each
stock option and made recommendations to the
Board regarding any and all compensation issues.
Pursuant to Accounting Principles Board Opinion
No. 25 ("APB 25") and Amkor's stated accounting
policies, Amkor was required to record a
compensation expense whenever the Board
approved an option grant with an exercise price
lower than the market price on the date of the grant.
Throughout the Class Period, Amkor issued tens of
millions of dollars in stock options to its officers
and directors, purportedly in compliance with APB
25 and Amkor's own stated accounting policies.
Each of the Company's proxy statements and annual
reports represented that the "compensation cost for
stock-based plans is generally measured as the
excess, if any, of the quoted market price of our
company's stock at the date of the grant over the
amount an employee must pay to acquire the stock."

   The Plaintiff alleges that these statements were
materially false and misleading, and the Defendants
were engaged in a long-term, opportunistic scheme
to (i) backdate their stock option grants to days on
which Amkor's stock had reached its lowest price in
weeks if not months; and (ii) award stock options
shortly before positive earnings announcements.
Consequentially, each financial statement that
Amkor filed during the Class Period overstated the
Company's net income and understated its

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2808224 (D.Ariz.)
**(Cite as: --- F.Supp.2d ----)**

compensation costs.

Beginning in the spring of 2006, corporations throughout the United States began to reveal that they were under investigation for various stock option improprieties. Indeed, Amkor announced on July 26, 2006 that it formed a Special Committee and hired outside counsel to voluntarily investigate Amkor's historical stock option practices. Following the July 26 announcement, Amkor's stock price fell 17% from $7.51 per share to $6.25 per share. On August 16, 2006, Amkor admitted that the Special Committee identified numerous occasions on which Amkor failed to comply with APB 25 and GAAP, and advised investors that Amkor's previously issued financials should no longer be relied upon. Shortly thereafter, following Amkor's failure to timely file its 10-Q for the quarter-ended June 30, 2006, Amkor issued a series of press releases announcing that (i) it received a written Staff Determination by NASDAQ threatening to delist it, (ii) it was on the cusp of defaulting on its note indentures and (iii) it might need to file for Chapter 11 bankruptcy protection. The Plaintiffs maintains that as a result of these disclosures, Amkor's stock price closed at $5.05 per share on October 6, 2006, or nearly 20% lower than its closing price on July 27, 2006.

**\*2** On October 6, 2006, after the close of the market, Amkor issued its June 30, 2006 quarterly report, as well as its 2005 10-K/A and 1Q 10-Q/A, which restated Amkor's previously issued financial statements for every quarter for the period January 1, 1998 through June 30, 2006 (the "Restatement"), and resulted in a $106 million aggregate restatement of net income. Amkor also disclosed that the Special Committee completed its investigation and identified evidence demonstrating that the Restatement and GAAP violations resulted from an intentional fraud:

• In connection with its annual stock option grants to employees in 1999, 2000, 2001,2002 and 2004, the number of shares that an individual employee was entitled to receive was not determined until after the original grant date, and therefore incorrect measurement dates were used for financial accounting and reporting purposes;

• At least one former executive intentionally

manipulated Amkor's stock option pricing, and that at least two other former executives may have been aware of, or participated in, this misconduct;

• At least one former executive intentionally manipulated Amkor's Compensation Committee minutes, which misrepresented the actions taken at certain Compensation Committee meetings with respect to certain of the Company's stock option grants; and

• Amkor lacked proper processes and procedures for stock option grants, which constituted a material weakness in internal controls over financial reporting.

While the named Individual Defendants are not specifically identified by the Restatement, the Plaintiffs plead that Amkor's stock options were intentionally manipulated on numerous occasions by at least one executive. According to the Plaintiffs, each named Defendant personally administered, reviewed and/or approved the fraudulent stock option grants, and received backdated stock options during those periods of transgression.

**B. Amkor's Purported Return to Profitability**

The Complaint also alleges that, beginning in the third quarter of 2003, Defendants issued a series of materially false and misleading statements regarding Amkor's profitability, growth and customer demand, which inflated Amkor's stock price. These statements were purportedly based on certain third-party forecasts prepared by Amkor's customers. For instance, on October 27, 2003, Defendants Kim, Boruch and Joyce boasted that Amkor had achieved a "return to profitability" due largely to "accelerating demand" and "strengthened business." According to the Plaintiffs, the Defendants either knew or recklessly disregarded that Amkor's customers were allegedly "front-loading" their forecasts to compensate for Amkor's inability to meet demand in a timely manner, and that Amkor was suffering from rising material costs due to a "supplier backlash." As a result of these material misrepresentations, Amkor's stock price increased from $16.19 per share on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

October 27, 2003 to a high of $21.40 per share on December 2, 2003.

**\*3** On April 27, 2004, Amkor announced its financial results for the first quarter of 2004, which were significantly lower than expected because (i) Amkor was experiencing weakness in demand for its cell phone products and (ii) customer forecasts did not materialize. In an effort to offset the effect of this news, the Plaintiffs contend that Defendants issued positive guidance for the second quarter of 2004 based on allegedly strong customer forecasts. Following the April 27 disclosure, Amkor's stock price fell from $13.43 per share to $9.16 per share, marking a decline of nearly 32%. Thereafter, Amkor continued to reveal additional facts regarding its poor demand and lagging profitability, until it ultimately announced its dismal results for the second quarter of 2004; as a result of these disclosures, Amkor's stock price fell 29% on July 1, 2004 and over 12% on July 27, 2004.

**C. The SEC's Formal Investigation**

On October 12, 2004, Amkor disclosed that the U.S. Securities and Exchange Commission (the "SEC") commenced an informal inquiry into certain unspecified transactions by Amkor insiders. On August 22, 2005, Amkor announced that the SEC elevated the inquiry to a formal investigation. Then, on September 15, 2006, Amkor revealed that the SEC expanded its formal investigation, and requested documents relating to Amkor's stock option practices. On April 18, 2007, the SEC filed a Complaint in the U.S. District Court for the Eastern District of Pennsylvania alleging that, during 2003 and 2004, Amkor's former General Counsel made $290,000 from at least fifty improper insider trades in Amkor shares and stock options, a practice he was responsible for preventing. The SEC's formal investigation is still ongoing.

**III. LEGAL STANDARD AND ANALYSIS**

The Plaintiffs allege two distinct claims for

violation of the federal securities laws. First, the Plaintiffs assert that Amkor and all the Individual Defendants made misrepresentations concerning Amor's stock option grants during the Class Period. Second, the Plaintiffs contend that, for part of the Class Period-October 2003 through July 2004-Amkor and some of the Individual Defendants made numerous misrepresentations about demand for Amkor products and forecasts about future financial results.

Section 10(b) of the Exchange Act of 1934, 15 U.S.C. 78j(b), provides that it is unlawful to use or employ "any manipulative or deceptive device or contrivance" in contravention of the SEC rules in connection with the purchase or sale of any registered security. SEC Rule 10b-5 provides that it is unlawful to (a) employ "any device, scheme, or artifice to defraud," (b) "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make statements made, in light of the circumstances under which they are made, not misleading," and (c) "engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the security."In order to plead a claim under § 10(b)and SEC Rule 10b-5, the Plaintiffs must allege: (1) a misstatement or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiff relied; (5) which proximately caused the plaintiff's injury. *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 399 (9th Cir.2002), *accord, In re Daou Systems Inc. Sec. Litig.,* 411 F.3d 1006, 1014 (9th Cir.2005).

**\*4** A § 10(b)/Rule 10b-5 claim must meet the exacting pleading standards of the Private Securities Litigation Reform Act ("PSLRA") of 1995. The Ninth Circuit recognizes that the PSLRA "requires a plaintiff to plead a complaint of securities fraud with an unprecedented degree of specificity and detail" and that the PSLRA standard "is not an easy standard to comply with-it is not intended to be-and the plaintiffs must be held to it."*Eminence Capital, LLC v. Aspen, Inc.,* 316 F.3d 1048, 1052 (9th Cir.2003). The Ninth Circuit also recognizes, however, that there is no bright line rule as to how much detail is enough detail, *id.,* and that the bar of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                      Page 4

--- F.Supp.2d ----, 2007 WL 2808224 (D.Ariz.)
**(Cite as: --- F.Supp.2d ----)**

the PSLRA should not be raised any higher than is required under its mandates so as not to foreclose the litigation of legitimate securities fraud actions. *No. 84 Employer Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 946 (9th Cir.2003).

Under the PSLRA, when a plaintiff alleges that a defendant "made an untrue statement of material fact" or "omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading," the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed."15 U.S.C. § 78u-4(b)(1).

In addition to requiring the material misstatements and omissions be pleaded with particularity, the PSLRA requires that the complaint, "with respect to each act or omission" alleged to violate the statute, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."15 U.S.C. § 78u-4(b)(2). As interpreted by the Ninth Circuit, this scienter requirement means that the complaint "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct."*In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 974 (9th Cir.1999). This standard requires the pleading of facts that show more than simple recklessness or a motive and opportunity to commit fraud; it requires the pleading of facts that come closer to demonstrating intent. *Id.* At 974. In determining whether this standard has been met, the Court must examine not only whether each allegation is supported "by particularized facts and corroborating details," but also "whether the total of the plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that the defendants acted with deliberate or conscious recklessness."*No. 84 Employer-Teamster Joint Council Pension Trust Fund,* 320 F.3d at 931. In determining whether the complaint has shown a strong inference of scienter, the Court must consider

all inferences reasonably drawn from the allegations, including inferences unfavorable to the plaintiff. *Id.*

*5 In a very recent opinion, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* --- U.S. ----, ----, 127 S.Ct. 2499, 2504, 168 L.Ed.2d 179 (June 21, 2007), the United States Supreme Court held that to determine whether a plaintiff's complaint satisfies the PSLRA's strict pleading standard, a court, considering all of the facts alleged, "must engage in a comparative evaluation; it must consider, not only inferences urged by the Plaintiff, ... but also competing inferences rationally drawn from the facts alleged. The Supreme Court held that an inference of scienter must be more than merely " reasonable or permissible-it must be cogent and compelling, thus strong in light of other explanations. *Id.* at 2510.The Court concluded that a complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. *Id.*

If a plaintiff fails to plead the alleged misleading statements and omissions or the defendant's scienter with the required particularity, the complaint must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).*Ronconi v. Larkin,* 253 F.3d 423, 429 (9th Cir., 2001); § 78u-4(b)(3)(A).

**A. Loss Causation**

The Second Amended and Consolidated Complaint for Violations of the Federal Securities Laws ("SAC") alleges that Amkor's SEC filings during the Class Period were false when made because, as revealed in the October 6, 2006 Restatement, the Company's financial results regarding compensation expense and net income were inaccurate due to incorrect accounting for stock option grants and stock option controls were insufficient. The Defendants maintain that the SAC is deficient for failure to plead loss causation and must be dismissed under the standard advanced in *Dura Pharmaceuticals v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 5

--- F.Supp.2d ----, 2007 WL 2808224 (D.Ariz.)
**(Cite as: --- F.Supp.2d ----)**

In *Dura Pharmaceuticals,* the United States Supreme Court rejected the conclusion that loss causation is established by showing that "the price on the date of purchase was inflated because of the misrepresentation."*Id.* at 342.Instead, the Court concluded that to properly plead loss causation in a fraud claim, a plaintiff must allege that the price fell after the truth came to light about a misrepresentation, and that the plaintiff suffered damages as a result. *Id.* at 342-43.

The following are the Plaintiffs' loss causation allegations which they argue clearly explain the causal connection between the relevant disclosures and Amkor's declining stock price.
• On July 26, 2006, Amkor revealed that the Board formed a special Committee and hired outside counsel to investigate Amkor's stockoption practices. Following that announcement, the Company's stock price declined 17% from $7.51 per share to$6.25 per share, wiping out $222 million in market capitalization.
• On August 16, 2006, Amkor disclosed that it " identified a number of occasions on which the measurement date used for financial accounting and reporting purposes for option awards granted to certain ... employees was different from the actual grant date."Amkor also revealed that the range of potential adjustments would likely be material, and that Amkor's previously issued financials for 2005 and 2006 should no longer be relied upon.
**\*6** • Between July 27, 2006 and October 6, 2006, Amkor's stock price declined nearly20% due to investors' increasing concern that the Company would (i) be de-listed by NASDAQ, (ii) default on its note indentures and (iii) file for Chapter 11 bankruptcy protection.
• On October 6, 2006, Amkor filed its long delayed June 30, 2006 quarterly report and the Restatement, which, in effect, eliminated these severe financial consequences.Thus, it came as no surprise that Amkor's stock price increased thereafter.

According to the Plaintiff, these allegations directly tie the relevant disclosures to Amkor's declining stock price and thus notify the Defendants of the required causal connection. The Plaintiffs

contend that nothing more is required at this stage of the proceedings.

The Defendants, however, argue that the Plaintiffs cannot rely on the July 26 Release as a disclosure correcting the Company's prior statements regarding its stock option grants and, therefore, does not plead loss causation as required by *Dura.*As pointed out by the Defendant, the only mention of the stock option matter was two single sentences: "The Company also announced today that its Board of Directors has formed a special committee of independent directors to undertake a voluntary review of Amkor's historical stock option practices. The committee will be assisted by independent counsel."What the July 26 Release primarily discusses are the second quarter financial results, recent financing transactions, and a new testing facility. The release also forecasts a weak third quarter for Amkor with a flat to a 2% increase in sales from the second quarter. Since this is not a disclosure correcting the Company's prior statements regarding its stock options, the Defendants contend that it follows that the release does not plead loss causation.

The Defendants maintain that the real corrective disclosure came on August 16, 2006, when Amkor announced the initial results of the Special Committee investigation that the Company would have to restate prior financial statements because of incorrect measurement dates. Then on October 6, 2006, Amkor issued its Restatement and disclosed that certain prior grant measurement dates were incorrect, the Company had weak internal controls related to the grant process, and then Amkor specifically corrected certain financial results through the fiscal year 2005. The Defendant notes that although these are corrective disclosures which expose the misrepresentations, the Plaintiff cannot rely on them to plead loss causation for two reasons: (1) Amkor's stock price increased after these announcements; and (2) the Class Period is not extended to include them.

As numerous Courts have concluded, *Dura* indeed requires Plaintiffs to plead loss causation by alleging that the stock price fell after the truth of a misrepresentation about the stocks was revealed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

See id. at 342;*Glaser v. Enzo Biochem, Inc.,* 464
F.3d 474 (4th Cir.2006). Dura swept away
precedent holding that it is enough to show
causation if the alleged misrepresentation "touches
upon" the economic loss. *Dura,* 544 U.S at 343.
Furthermore, in material misstatement and omission
cases, such as this one, a plaintiff must allege that
the subject of the fraudulent statement or omission
was the cause of the actual loss suffered, i.e., that
the misstatement or omission concealed something
from the market that, when disclosed, negatively
affected the value of the security. *Initial Public
Offering Sec. Litig.,* 399 F.Supp.2d 261, 266
(S.D.N.Y.2005). In this case, the Plaintiffs have
failed to link their losses to the alleged
misrepresentations by showing that the Amkor stock
price dropped upon revelation of the true state of
the facts. As noted by the Defendants, once a
corrective disclosure was issued the stock price
actually increased.

*7 The Plaintiffs maintain that the Defendants
are essentially arguing that Plaintiffs must identify a
disclosure that is a mirror image of the facts alleged
to have been concealed, but contend that *Dura* does
not impose this rigid requirement. According to the
Plaintiffs, if the Complaint alleges that investors
incurred losses once "the relevant truth [began] to
leak out" then *Dura's* loss causation standard is
satisfied. *Dura,* 544 U.S at 342. The Plaintiff argues
that the July 26 Release partially disclosed the fraud
at Amkor, signaling to investors that the Board had
identified incriminating evidence given its decision
to form a Special Committee and hire outside
counsel. Furthermore, the Plaintiff contends that the
press release followed a series of news articles
regarding improper stock option practices
uncovered at various other companies; therefore,
investors were acutely aware of the implications of
the July 26 Release.

The Court is not persuaded by the Plaintiffs
arguments. The July 26 Release says nothing about
prior alleged false statements. The only mention of
the stock option matter is the announcement that the
Amkor Board formed a Special Committee to
undertake a voluntary review of Amkor's historical
stock option practices and that the Committee
would be assisted by independent counsel. As noted

by the Defendants, this press release does not
signal, much less state, that any prior option grants
were incorrect, that Amkor's internal controls were
weak, that there was evidence supporting a finding
that one former executive had intentionally
manipulated stock option pricing or that prior
financial statements were incorrect in any way.
Clearly, the primary focus of the July 26 Release
was a discussion of the company's second quarter
results, recent financing transactions, a new wafer
bumping and test facility, capital expenditures,
financial liquidity and a forecast for a weak third
quarter. The stock price drop following the July 26
Release cannot be the proximate result of the stock
option misrepresentations and omissions alleged in
the SAC.*Dura* explains that a plaintiff cannot prove
loss causation where an alleged loss could be the
result of changed economic circumstances, changed
investor expectations, new industry-specific or
firm-specific facts, conditions or other events. *See
also In re Loewen Group Inc. Sec. Litig.,* 395
F.Supp.2d 211, 218 (E.D.Pa.2005).

As persuasively argued by the Defendants, the
increase in the market of Amkor stock after the
August 16, 2006 and October 6, 2006 public
disclosures further undermines Plaintiffs' assertion
that the price decline after the July 26 Release was
related to the initiation of the voluntary internal
investigation. If the market price increased upon the
disclosures of restatement measurement dates,
restated financial results back to 1998, evidence
supporting a finding of intentional manipulation of
stock option pricing and associated stock-based
compensation by one former executive and weak
internal controls, then the reasonable inference is
that the price decline after the July 26 Release was
not caused by the news about the commencement of
an internal investigation, but by the weak third
quarter outlook. Indeed, when Amkor previously
announced disappointing financial results and
lowered guidance, Amkor's stock market price
declined.

*8 As discussed above, courts since *Dura*
routinely reject complaints that fail to allege facts
that, if established, demonstrate the critical link
between the misrepresentations or omissions and
the investor's loss. *See, e.g., In re Compuware Sec.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                        Page 7

--- F.Supp.2d ----, 2007 WL 2808224 (D.Ariz.)
**(Cite as: --- F.Supp.2d ----)**

*Litig.,* 386 F.Supp.2d 913, 918 (E.D.Mich.2005) (finding complaint failed to plead loss causation and that "[wholly absent from its pleadings, ... is a nexus between the misrepresentations of which [plaintiff] complains and the losses they suffered"); *In re Initial Pub. Offering Sec. Litig.,* 399 F.Supp.2d 298, 308 (S.D.N.Y.2005) ("plaintiffs' failure to allege a corrective disclosure of the falsity of defendants' opinions precludes any claim that such falsity caused their losses"), *aff'd,*2006 WL 1423785 (2d Cir. May 19, 2006); *In re Gilead Scis. Sec. Litig.,* No. C03-4999, 2006 WL 1320466, at *7 (N.D.Cal. May 12, 2006) ("[p]laintiffs' allegations regarding loss causation are simply too attenuated"); *Ray v. Citigroup Global Mkts., Inc.,* No. 05-4362, 2007 WL 1080426, at *4 (7th Cir. Apr.12, 2007) (" plaintiffs must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception").

The Plaintiffs have failed to adequately allege that the July 26 Release regarding the internal investigation was a substantial cause of the drop in stock price thus the Complaint does not meet the pleading standards set forth in *Dura.*

**B. Scienter**

In addition to the failure to adequately plead loss causation, the Court finds the SAC deficient for another reason the SAC fails to allege scienter under the applicable legal standards.

The Plaintiffs allege that the "Defendants acted with scienter in that the Defendants knew that the public documents and statements issued or disseminated in the name of the company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws."The Plaintiffs plead that the " Defendants, by virtue of their receipt of information reflecting the truth regarding Amkor, their control

over, and/or receipt and/or modification of Amkor's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Amkor, participated in the fraudulent scheme alleged."[FN1]

**1. Restatement and Special Committee Findings**

The Defendants correctly argue that the Plaintiffs mistakenly rely on Amkor's October 6, 2006 Restatement and Special Committee Findings to plead scienter. A plaintiff cannot allege scienter simply because Amkor restated its financial statements. According to numerous courts, a mere violation of a generally accepted accounting principle (GAAP) or accounting rules fails to plead scienter. Instead, a complaint must allege specific facts that each individual defendant knew that the accounting for the subject transactions was incorrect at the time it was determined. Although allegations of accounting violations may provide some support for scienter allegations, they must be underpinned by other particularized allegations that defendants possessed the requisite mental state. *See In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1426 (9th Cir.1994); *In re U.S. Aggregates, Inc. Sec. Litig.,* 235 F.Supp.2d 1063, 1073 (N.D.Cal.2002) ("even an obvious failure to follow GAAP does not give rise to an inference of scienter" ); *DSAM Global Value Fund,* 288 F.3d at 390-91.

*9 Furthermore, as pointed out by the Defendants, the accounting rules at issue, specifically APB No. 25, are complex and require accounting expertise and judgment. As noted by the Court in *In re Sportsline.com Securities Litigation,* the misapplication of accounting rules to a particular company's stock option grants cannot be construed as a glaring example of scienter because the measurement date criteria embodied in APB No. 25 are far from obvious. 366 F.Supp.2d 1159, 1168 (S.D.Fla.2004). Although "[a]llegations of accounting violations may provide some measure of support for the Plaintiffs' ultimate allegation of scienter," they must be "underpinned by other particularized allegations that the Defendants

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2808224 (D.Ariz.)
**(Cite as: --- F.Supp.2d ----)**

possessed the requisite mental state."*In re Cornerstone Propane Partners, L.P. Sec. Litig.,* 355 F.Supp.2d 1069,1091(N.D.Cal.2005).

As previously stated in this opinion, scienter can be established under the PSLRA if a complaint adequately sets forth corroborating details and facts supporting allegations of each defendant's knowledge of problems adversely affecting corporate finances. *See also*394 F.Supp.2d at 1167. However, instead of providing such particularized allegations as to each Amkor Defendant's scienter, the Plaintiffs rely heavily on the Special Committee findings in their attempt to adequately plead the required state of mind. However, the Special Committee found evidence "that supports a finding of intentional manipulation of stock-option pricing and associated stock based compensation by [only one] former executive, including the preparation of Compensation Committee meeting minutes that misrepresented the actions taken at certain Compensation Committee meetings. Additionally, the Special Committee found "some evidence that supports a finding that two other former executives may have been aware of, or participated in, this conduct."As noted by the Defendant, the SAC has no factual allegations linking that finding to any of the Amkor Defendants.

First, Defendants Kim, Joyce, and Khaykin are not former executives as they were all current executives at Amkor when the Restatement was filed. Second, Defendants Churchill and George were never executive officers at Amkor, and Defendant Churchill was actually a current Amkor director when the Restatement was filed. Third, Defendants Freeman and Kyahkin did not become executive officers until January 2004 thus could not have been involved in the options issued in 2001 and 2002. Furthermore, Defendant Freeman left Amkor in August of 2004; therefore, he could not have manipulated stock option grants through June 2006.

The Plaintiffs argue that the SAC alleges particularized facts to collectively establish that the Defendants were Amkor's gatekeepers when it came to administering, recommending and approving the terms of stock options grants; thus the backdating

scheme could not have occurred without their individual knowledge and/or participation. However, in essence, the Plaintiffs have done little more than alleged the Individual Defendants' respective board or executive positions. To infer scienter by virtue of a position in a company " would eliminate the necessity for specially pleading scienter, as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position."*In re Autodesk, Inc. Sec. Litig.,* 132 F.Supp.2d 833, 844 (N.D.Cal.2000).

*10 For example, the Plaintiffs maintain that Defendants Khaykin and Freeman "had significant control over the Company's stock option practices," but the SAC fails to cite any facts in support of this conclusion other than the Defendants' positions as COO. In addition, as to Defendants Churchill and George, the Plaintiffs merely plead their membership on the Compensation Committee and their signatures on the annual form 10-Ks during each director's tenure with Amkor. There are no particularized allegations relating to these Defendants' notice of the stock option accounting or the particular activity that lead to the October 6 Restatement. The Special Committee's identification of evidence that the Compensation Committee meeting minutes prepared by a former executive misrepresented certain actions taken by the Compensation Committee does not raise a strong inference of scienter as to Churchill and George. What is missing from the SAC regarding the outside directors' scienter are factual allegations setting forth what information was presented to the outside directors about any of the alleged misrepresentations, omissions, GAAP violations, etc. that put them on actual or constructive notice of fraudulent activity. *See, e.g., Wojtunik v. Kealy,* 394 F.Supp.2d 1149, 1169 (D.Ariz.2005). Clearly, the Plaintiffs plead no facts to indicate that these directors knew of or participated in any such actions or that they recklessly disregarded wrongdoing by someone else.

The Plaintiffs allege that Defendants Kim, as CEO and Chairman, and Defendant Joyce, as CFO, executed sworn certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), 15 U.S.C. § 7262, which falsely attested to the accuracy of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 9

--- F.Supp.2d ----, 2007 WL 2808224 (D.Ariz.)
**(Cite as: --- F.Supp.2d ----)**

Amkor's financial statements and the effectiveness of its internal controls for every fiscal quarter from June 2002 through 2006. According to the Plaintiffs, the SOX certifications may provide additional evidence of scienter on the part of the certifying officers. The Court, however, finds Plaintiffs assertion unpersuasive. SOX certifications may provide additional evidence of scienter if a plaintiff alleges that not only were the certifications false and misleading, but also that the defendants had actual knowledge of their false or misleading nature or were deliberately reckless in issuing such statements at the time. *Limantour v. Cray, Inc.,* 432 F.Supp.2d 1129, 1160 (W.D.Wash.2006). The Plaintiffs cite *In re Lattice Semiconductor Corporation Securities Litigation,* to support their scienter allegations, but the Court finds such reliance misplaced. 2006 WL 538756 (D.Or. Jan.3, 2006). *Lattice* presented a significantly greater number of facts concerning inference of scienter than exists in the instant case. For example, in *Lattice,* the plaintiffs' allegations demonstrated that the company's former controller "made improper journal entries with the knowledge of at least some of the individual defendants. *Id.* at 32.Moreover, the *Lattice* plaintiffs provided evidence of specific internal reports, databases and meetings, the purpose of which was to keep the individual defendants informed of the company's financial situation during the relevant time period. *Id.* Other than general assertions about the Individual Defendants' roles and responsibilities and motivations, the Plaintiffs do not plead specific facts to support their allegations of scienter.

**2. Motive Allegations**

**\*11** The SAC also pleads scienter based on a motive to engage in fraud; however, the Ninth Circuit has concluded that allegations of a defendants' motive to engage in fraud alone are insufficient to plead scienter. *Silicon Graphics,* 183 F.3d at 979. The primary motive allegation in securities fraud cases is that the defendant was motivated to, and did, sell his company stock based on nonpublic material information for a direct personal profit. *See, e.g., Wojtunik,* 394 F.Supp.2d

at 1165-66. In this case, there are no allegations that any Individual Defendant sold Amkor stock for personal gain. Instead, the Plaintiffs assert that Defendants' motive was to manipulate the exercise of price options that they then awarded to themselves. However, missing from the SAC are any allegations that any individual defendant realized any direct economic gain from Amkor stock options. An option is the right to purchase the underlying security, and there are no allegations that any named defendant exercised his Amkor options and sold the stock for gain.

The Plaintiffs also allege that the Defendants' motive was to grant options at opportune times when the stock price was low. The SAC asserts that the Defendants were motivated to make such opportune timed grants at a lower price so that if and when the options were exercisable, the grant holders might be able to sell the underlying stock for greater gain. Although the SAC contains several three-month graphs purportedly to show a few instances of such opportune timing, there are no particularized facts supporting this motive allegation. Absent are any specific factual allegations that during the Class Period any officer or director defendant was involved in or was aware of the stock option practices and pricing manipulation discussed in the Special Committee's findings.[FN2]

**3. Allegations Regarding Defendant Boruch**

The SAC alleges that the Plaintiffs undertook an investigation to identify the former executives referred to in the Special Committee report, but that the information remains in the exclusive control of the Defendants. Specifically, the Plaintiffs plead the following:

[I]nformation obtained from a confidential witness and from the company's public filings supports a strong and reasonable inference that defendants Boruch, John Doe # 1, John Doe # 2and John Doe # 3 knew, or were reckless in not knowing, that Amkor had improperly accounted for its stock option grants.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2808224 (D.Ariz.)
**(Cite as: --- F.Supp.2d ----)**

However, the Plaintiffs do not provide a description of the information obtained from the confidential source nor do they identify the public filings which allegedly support the strong and reasonable inference that Defendant Boruch knew, or was reckless in not knowing, that Amkor had improperly accounted for its stock option grants. Furthermore, when using an unnamed confidential source to support their allegation, the Plaintiffs are required to describe the witness with sufficient particularity to support a probability that a person in the position occupied by the confidential witness would possess the information alleged. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.2d 1226, 1233 (9th Cir.2004). Moreover, the Plaintiffs fail to even allege rudimentary information regarding this confidential source such as the dates of employment. *See Limantour,* 432 F.Supp.2d at 1143 (failing to provide the dates of employment of a confidential source described as a " fatal flaw"). The SAC simply states that Confidential Witness "A" is a former Senior Vice President of Northern Asia Operations at Amkor and knew most of the company for nine years. The Plaintiffs must plead "with substantial specificity" how Confidential Witness "A" came to learn of the information they provide in the complaint." *See, e.g., In re North point Communications Group, Inc. Sec. Litig.,* 184 F.Supp.2d 991, 999-1001 (N.D.Cal.2001). The SAC falls far short of the required specificity with regard to Confidential Witness "A."

*\*12* The Plaintiffs allege that Defendant Boruch had significant control over Amkor's stock option practices because of his "high level position with the company."As previously noted, an allegation that a defendant knew or was deliberately reckless in not knowing the falsity of a statement by virtue of his or her position within a company is insufficient. *See, e.g., In re Infineon Technologies AG Sec. Litig.,* 2006 WL 2925680 *2 (N.D.Cal.2006). Furthermore, the SAC does not allege that this high-level position had anything to do with stock option granting practices.

The Plaintiffs also allege that Defendant Boruch's considerable control over Amkor's stock option granting practices arose through his

relationship with the Senior Vice President of Human Resources, Catherine Loucks, who was married to Boruch during the class period.[FN3]The Plaintiffs further assert that there is a strong basis for the inference of Boruch's involvement in light of the Special Committee's finding that Amkor's Human Resources personnel were inappropriately allowed to control and administer the stock option grant process without adequate input or supervision. However, the Court declines to make such a leap in logic. Although the Plaintiffs' allegation regarding Defendant Boruch's personal relationship with the Senior Vice President of Human Resources might be a conflict of interest, it does not strongly compel an inference of scienter on the part of this Individual Defendant.

The Plaintiffs, through their Confidential Witness "A" contend that Defendant Boruch greatly favored the use of stock option grants as a form of employee compensation, and that Boruch often pushed for issuance of stock based compensation because he felt that stock options were a good moral booster for employees. Even if the Plaintiffs had plead the required information regarding their Confidential Witness "A", the assertion that Defendant Boruch favored stock option grants due to their ability to boost morale does not advance Plaintiffs' theory that Defendant Boruch engaged in fraudulent activity. As noted by the Defendants, this allegation does nothing more than demonstrate this executive's interest in retaining quality employees.

**3. Amkor's Scienter**

Under Ninth Circuit law, "a defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter."*In re Apple Computer, Inc. Sec. Litig.,* 243 F.Supp.2d 1012, 1023 (N.D.Cal.2002)(*citing Nordstrom, Inc., v. Chubb & Son, Inc.,* 54 F.3d 1424, 1435-36 (9th Cir.1995). The Ninth Circuit has rejected the concept of "collective scienter" in attributing scienter to a corporation. *Nordstrom,* 54 F.3d at 1435-36. Since this Court concludes that the SAC fails to adequately plead scienter as to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2808224 (D.Ariz.)
**(Cite as: --- F.Supp.2d ----)**

Officer and Director Defendants, the SAC also fails to plead Amkor's scienter.

## C. Forecasting Allegations

. **\*13** As a separate claim, the Plaintiffs assert that Amkor and the Officer Defendants (excluding Churchill and George and the John Doe Defendants), violated the Federal Securities laws between October 2003 and July 2004. The Plaintiffs contend that several statements made during those months of the Class Period concerning Amkor's consumer demand, material costs and its 2004 first and second quarter forecasts of financial results were false when made.

The claim is based on (1) the October 27, 2003 press release including the forecast for the 2003 fourth quarter and the related positive forward-looking statements; (2) the November 3, 2003 Form 10-Q with alleged "substantially similar statements concerning the Company's operations and financial condition; (3) the Prospectus Supplement filed November 4, 2003 including prior financial statements and the Registration Statement by reference and stating that Amkor could "absorb large orders and accommodate quick turn-around times," and Amkor was in a "position to obtain low pricing on materials and manufacturing equipment," (4) the January 28, 2004 earnings release with the forecast for the 2004 first quarter and positive forward-looking statements and (5) the 2003 Form 10-K field March 4, 2004 with allegedly " substantially similar statements" concerning Amkor's operations and financial results.

The Plaintiffs assert that when the October 2003 through March 2004 statements were made, the Officer Defendants knew or recklessly disregarded that demand was not accelerating as customers were front-loading their forecasts sent to Amkor, Amkor was experiencing rapidly rising material costs due to supplier backlash, and Amkor had weak internal controls and accounting systems that prevented Amkor from efficiently managing material costs and forecasting demands. As argued by the Defendants, these conclusory assertions fail

to comply with the PSLRA's particularity requirements. The Plaintiffs are required to allege facts supporting these conclusions-such as which customers were supposedly front-loading forecasts, when and by how much, how much material costs were rising, when and how that was affected by the forecasts, and which internal controls were deficient, how and when. *See Ronconi*, 253 F.3d at 431. Furthermore, the Plaintiffs cannot rely on Amkor's April and July 2004 announcements to plead that the earlier statements were false when made or made with fraudulent intent as this is a clear "fraud by hindsight" pleading approach abolished by the PSLRA. *See Wojtunik*, 394 F.Supp.2d at 1161-62.

### 1. Confidential Witnesses

The Plaintiffs' claim is supported by information purportedly gathered from five confidential witnesses. The Defendants argue that Plaintiffs' reliance on these unidentified confidential witnesses ("CW") fails to satisfy the PSLRA's pleading standards as the CW allegations fail to provide the required specific facts. The Defendants maintain that the CWs allegedly were lower level employees with vague and generalized job responsibilities at Amkor at various times. Indeed, the Defendants point out that CW1 was not even employed at Amkor during the time relevant to the claim. Furthermore, the Defendants note that absent from the SAC is any claim from any CW that the allegedly false statements at issue were false when made. Rather than providing support for the Plaintiffs' claims, the Defendants assert that the CWs only convey routine company problems, vague or alleged instances of customer conduct at unspecified times, or the CWs' opinions. The Plaintiffs respond that the their confidential sources are reliable, corroborated and described with the requisite particularity.

**\*14** The precise amount of detail required in describing CWs varies based on the circumstances of the case; and the Plaintiffs are not required to name witnesses. *In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp 2d 980, 988 (N.D.Cal.2001); *see*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 2808224 (D.Ariz.)
**(Cite as: --- F.Supp.2d ----)**

*also Novak v. Kayaks,* 216 F.3d 300, 314 (2d. Cir.2000). In order to contribute meaningfully toward a strong inference of scienter, allegations attributed to CWs must be accompanied by sufficient particularized detail to support a reasonable conviction in the informant's basis of knowledge. The Plaintiffs must plead "with substantial specificity" how the CWs came to learn of the information they provide in the complaint." *In re North point Communications Group, Inc. Sec. Litig.,* 184 F.Supp.2d 991, 999-1001 (N.D.Cal.2001).

In *Daou Systems, Inc. Securities Litigation,* the Ninth Circuit stated that the plaintiffs therein described the CWs with a "large degree of specificity" where they (1) numbered each witness, (2) provided his or her job description, and (3) described his or her job responsibilities. 411 F.3d at 1016. Although in most instances the Plaintiffs provide the Court with basic information such as job titles and dates of employment, the Plaintiffs fail to provide a detailed basis for the CWs personal knowledge. Furthermore, the Court concludes that the CW allegations are simply too vague to support the PSLRA's pleading requirements.

The Plaintiffs allege that CW1, a former account specialist with Amkor from June 1997 to January 2003, explained that "inflated forecasts occurred because senior management failed to implement a centralized and effective forecasting system. According to CW1, "there was no strategic direction from the top on how to fix the forecasting system and better manage the account representatives."However, this allegation is simply CW1's purported opinion and offers no supporting facts as to the identity of "senior management," which forecasts were supposedly inflated and how, and what problems existed with management of the account representatives.

Next, the Plaintiffs allege that CW2, a former customer service and account manager with Amkor from January 2002 to February 2004, stated that Amkor was suffering from internal and external communication difficulties in later 2003. However, as the Defendants note, absent are specific facts such as which members of management, projects or

manager were involved, or when these events supposedly occurred. Although CW2 alleges that " upper-level management was also ineptly communicating with the Company's suppliers, as evidenced by the deficient raw materials forecasts it provided to them," there are no facts identifying the particular members of management and/ or the suppliers at issue nor which forecasts were made or how they were allegedly "deficient."

The Plaintiffs' CW3 is alleged to be a former senior accounting specialist employed by Amkor between 2002 and March of 2005. CW3 states that Amkor's raw material cost management and accounting systems were insufficient due to the fact that the Company suffered from widespread internal control weaknesses. However, this is simply an unsupported vague conclusion that does not satisfy the PSLRA.

**\*15** The Plaintiffs CW4 and CW5 also fail to meet the pleading standards mandated by the PSLRA and applicable case law as they merely reflect matters that companies deal with on a daily basis. Although these allegations may support an inference of negligence in the operations of the Company, they do not show that a fraudulent scheme was undertaken by the Defendants. *See, e.g., Sorkin, LLC v. Fischer Imaging Corp.,* 2005 WL 1459735, at \*9 (D.Colo. June 21, 2005); *Wenger v. Lumisys,* 2 F.Supp.2d 1231, 1247 (N.D.Cal.1998) ("All businesses from time to time suffer management problems and product delays, but many manage to 'do very well' despite those commonplace business wobbles.")

The Court notes that the SAC does generally describe the CWs job titles; however, the SAC fails to allege facts showing how the CWs possess the information attributed to them, that the CWs were involved in Amkor's forecasting process or that the CWs were in a position to possess knowledge about the forecasting process. *See, e.g., Limantour,* 432 F.Supp.2d at 1142 (rejecting CW allegations for failure to provide facts showing how CW, a senior financial analyst, became aware of the company's alleged internal weaknesses). Furthermore, there is no allegation by any CW directly asserting that the statements at issue were false.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 13

--- F.Supp.2d ----, 2007 WL 2808224 (D.Ariz.)
**(Cite as: --- F.Supp.2d ----)**

**2. Safe Harbor Provisions**

In addition, the forward-looking statements in the October 2003 through March 2004 releases cannot support the Plaintiffs claim for the additional reason that they are immune from liability under the Reform Act's safe harbor provisions. The Safe Harbor provision immunizes from liability "forward looking" statements either accompanied by " meaningful cautionary statements" or "immaterial." 15 U.S.C. § 78u-5(c). A forward looking statement includes: (A) a statement containing a projection of revenues, (B) a statement of the plans and objectives of management for future operations; (C) a statement of future economic performance; and (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A)(B) or (C).*Id.* at 78u-5(i)(1);*Employer Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.,* 353 F.3d 1125, 1132, n. 3(9th Cir.2004); *GSC Partners CDO Fund v. Washington,* 368 F.3d 228, 242-43 (3d Cir.2004). Furthermore, historical or present-tense statements can qualify as forward-looking if the truth of the statement cannot be discerned until some point in time after the statement is made." *In re Tibco Software, Inc. Sec. Litig.,* 2006 WL 1469654, at *26 (N.D.Cal. May 25, 2006)(holding statements were forward-looking and accompanied by meaningful cautionary language)

As shown by the Defendants, the October 27 and January 28 releases (and the April 27 release) are forward-looking statements. The October 27 release contained the following statement: "We are encouraged that strengthening customer forecasts may partially offset the seasonal weakness typical of our first calendar quarter [of 2004]." The January 28 release contained this statement: "We see 2004 as a year of great promise for Amkor."Finally, the November 4, 2003 Prospectus Supplement stated that Amkor could "absorb large orders" and was in a "position to obtain low pricing."

**\*16** Furthermore, all the announcements were accompanied by meaningful cautionary language. For example, the October 27, 2003 and the January 28, 2004 press releases identify that they include forward-looking statements which involve "a number of risks and uncertainties" such as the " highly unpredictable nature of the semiconductor industry; volatility of consumer demand for products incorporating our semiconductor packages ... timing and volume of orders relative to the production capacity ... dependence of raw material and equipment suppliers."The Court concludes that each statement has meaningful cautionary language sufficient to satisfy the Safe Harbor provisions.

**3. Non-Actionable Puffery**

The Defendants also argue that some of the statements in the aforementioned releases are mere puffery and therefore not actionable. It is true that " vague, generalized and unspecific assertions" of corporate optimism or statements of mere puffing cannot state actionable material misstatements of fact under the federal securities laws. *Glen Holly Entm't, Inc. v. Tektronix, Inc.,* 352 F.3d 367, 379 (9th Cir.2003); *Cornerstone,* 355 F.Supp.2d at 1087 . Some of the statements challenged by the SAC are, indeed, puffery: "We are encouraged that strengthening customer forecasts may partially offset the seasonal weakness typical of our first calendar quarter;""Over the past two years we have made substantial progress enhancing the profitability of our business;""We believe that 2004 will present exceptional growth opportunities for Amkor;""We see 2004 as a year of great promise for Amkor."*See, e.g., In re Splash Tech. Holdings, Inc. Sec. Litig.,* 160 F.Supp.2d 1059, 1076-77 (N.D.Cal.2001) (holding as puffery: "strong" demand, "better than expected" or "robust" results, "well positioned company"); *Limantour,* 432 F.Supp.2d at 1146 (holding as puffery: statements about being "very optimistic and expecting 2004 to be good, confident with prospects for growth"). Claims based on the statements will be dismissed for this reason as well.

**IV. CONCLUSION**

Based on the above analysis, the Court concludes that the SAC should be dismissed in its

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 14

--- F.Supp.2d ----, 2007 WL 2808224 (D.Ariz.)
**(Cite as: --- F.Supp.2d ----)**

entirety as it falls short of the PSLRA's stringent pleading requirements. The stock options allegations are insufficient to state a claim of fraud due to the Plaintiffs' failure to adequately plead loss causation as well as insufficient allegations giving rise to a strong inference of the Amkor Defendants' scienter. Specifically, the SAC's recitation of the Special Committees' findings in the Restatement fails to provide specific facts relating to the Amkor Defendants' scienter. While the Special Committee did uncover some evidence of misconduct attributable to former executives, this does automatically give rise to a private cause of action under federal securities law. Furthermore, the SAC's claim concerning statements made from the end of October 2003 through March 2004 were false when made is deficient as the Court finds said statements, as plead, immune from liability under the Safe Harbor provision of the Reform Act. Accordingly,

**\*17** IT IS ORDERED that the Amkor Defendants' Motion to Dismiss the Second Amended and Consolidated Complaint for Violations of the Federal Securities Laws (Doc. 105) is GRANTED.[FN4] The Clerk is directed to close the case. After filing three different versions of their Complaint, the Plaintiffs will not be given another opportunity to satisfy the PSLRA's pleading requirements.

IT IS FURTHER ORDERED that Defendant Boruch's Motion to Dismiss the Second Amended and Consolidated Complaint (Doc. 107) is GRANTED.

IT IS FURTHER ORDERED that the Lead Plaintiffs' Motion for Relief from the PSLRA Discovery Stay (Doc. 88) is DENIED as MOOT.

FN1. The Court takes issue with the manner in which the Plaintiffs drafted the " Additional Scienter Allegations." This paragraph, quoted directly from the SAC, is obviously vague. The Court finds Plaintiffs' use of disjunctives particularly problematic.

FN2. Furthermore, the SAC fails to allege

that the outside directors Churchill and George received any options. The absence of such allegations defeats an inference of motive to Messrs. Churchill and George. *See Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1037 (9th Cir.2002) (no inference of scienter where CEO was the only insider who allegedly sold stock); *Pension Fund v. Adeccco S.A.,* 434 F. Supp 2d 815, 834 (S.D.Cal.2006) (holding the same). Although the Plaintiffs admit that they cannot ascertain whether Churchill and George received stock options without discovery, they argue that given their service to the Company since 1998 and 1997 respectively, there is a strong likelihood that they both benefitted from these backdated option grants. However, the Plaintiffs offer no legal authority to support this assertion, and the Court, likewise, is aware of none.

FN3. The Plaintiffs do not allege when in the Class Period this marriage took place.

FN4. Although the Court only provided analysis regarding the Plaintiffs' Section 10(b) and Rule 10-b5 claims, it follows that the Plaintiffs Section 20(a) claims for controlling personal liability are dismissed as well.

D.Ariz.,2007.
Weiss v. Amkor Technology, Inc.
--- F.Supp.2d ----, 2007 WL 2808224 (D.Ariz.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.