**E-Filed 9/27/2010**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MERCURY INTERACTIVE, LLC., et al.,<br><br>Defendants. | Case Number 5:07-cv-02822-JF/PVT<br><br>ORDER[1] GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS, WITHOUT LEAVE TO AMEND<br><br>[re: document nos. 124, 129, 132] |

Defendants Amnon Landan ("Landan") and Douglas Smith ("Smith") move to dismiss certain claims of the second amended complaint ("SAC") pursuant to Fed. R. Civ. P. 12(b)(6). Defendant Susan Skaer ("Skaer") moves to dismiss all claims asserted against her. Plaintiff Securities and Exchange Commission ("SEC") opposes the motions. The Court has considered the moving and responding papers and the oral argument of counsel. For the reasons discussed below, all three motions will be granted in part and denied in part, without leave to amend.

---

[1] This disposition is not designated for publication in the official reports

**I. BACKGROUND**

The SEC commenced this civil action on May 31, 2007, alleging that Mercury Interactive, Inc. ("Mercury") and four of its senior executives committed numerous violations of the Securities Exchange Act of 1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act") in the course of implementing a stock options backdating scheme. The SEC's allegations regarding that scheme are described at length in this Court's prior orders issued September 30, 2008 and September 15, 2009 and need not be repeated in detail here. In brief, the SEC alleges that under Generally Accepted Accounting Principles ("GAAP"), a company is required to record a compensation expense each time it grants a stock option with an exercise price below the stock's market price on the grant date; such options are referred to herein as "backdated" or "in-the-money" options. SAC ¶¶ 19-20. Mercury and the four individual defendants allegedly orchestrated forty-five such option grants between 1997 and April 2002 while concealing the in-the-money nature of the grants and thus concealing associated compensation expenses of $258 million. SAC ¶¶ 44, 134, 226.

The operative SAC alleges claims for: (1) fraud in connection with the offer or sale of Mercury stock in violation of § 17(a) of the Securities Act; (2) fraud in the purchase or sale of Mercury stock in violation of § 10(b) of the Exchange Act and Rule 10b-5 thereunder; (3) record keeping violations of § 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder; (4) making false or misleading statements or omissions in connection with an audit in violation of Exchange Act Rule 13b2-2; (5) fraud in the filing of annual and quarterly reports in violation of § 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder; (6) providing false certifications of Forms 10-K and 10-Q in violation of Exchange Act Rule 13a-14; (7) record keeping violations of § 13(b)(2)(A) of the Exchange Act; (8) failure to maintain internal accounting controls in violation of § 13(b)(2)(B) of the Exchange Act; (9) violation of reporting requirements of § 16(a) of the Exchange Act and Rule 16a-3 thereunder; (10) fraud in the solicitation of proxies in violation of § 14(a) of the Exchange Act and Rule 14a-9 thereunder; and (11) repayment under § 304 of the Sarbanes-Oxley Act. The SEC seeks permanent injunctive relief, disgorgement of wrongfully obtained benefits plus prejudgment interest, civil monetary

penalties, an order precluding the individual defendants from serving as officers or directors of any public company, and repayment of bonuses and stock profits.

Landan moves to dismiss the ninth and eleventh claims. Smith moves to dismiss the ninth, tenth and eleventh claims. Skaer moves to dismiss all claims against her.

## II. LEGAL STANDARD

Dismissal under Fed. R. Civ. P. 12(b)(6) "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). At the same time, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, — U.S. —, 129 S.Ct. 1937, 1950 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

A heightened pleading standard applies to claims of fraud. Fed. R. Civ. P. 9(b) (requiring that a party alleging fraud must "state with particularity the circumstances constituting fraud"). This standard extends to claims grounded in fraud, that is, claims in which fraudulent conduct serves as an element. *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404-05 (9th Cir. 1996). To meet this standard, the plaintiff must allege the "who, what, where, when, and how" of the fraudulent conduct. *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation omitted). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Thus the SEC may allege scienter in conclusory fashion. *SEC v. Levin*, 232 F.R.D. 619, 623 (C.D. Cal. 2005) (holding that "the complaint need only state that the required scienter existed"); *see also SEC v. ICN Pharmaceuticals, Inc.*, 84 F.

Supp. 2d 1097, 1098-99 (C.D. Cal. 2000).[2]

## III. DISCUSSION

**A.    Ninth Claim**

Landan and Smith[3] move to dismiss the ninth claim, which alleges violations of § 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rule 16a-3 thereunder, 17 C.F.R. § 240.16a-3. Those provisions require officers, directors, and beneficial owners of more than ten percent of any class of equity security registered pursuant to § 12 of the Exchange Act to file periodic reports disclosing any change of beneficial ownership of those securities. An initial statement by an insider is to be made on Form 3, and subsequent statements of changes in beneficial ownership are to be made on Form 4 or Form 5.  17 C.F.R § 240.16a-3.

Although it concedes that the individual defendants filed the requisite forms, SAC ¶¶ 50, 73, 105, 112, 127, 148, the SEC claims that they nonetheless are liable under § 16(a) because the forms contained false or misleading statements regarding the grant dates, expiration dates, and exercise prices of the options. The Court previously dismissed the § 16(a) claim on the ground that the SEC had failed to identify with particularity which forms were at issue. The SEC has cured this pleading deficiency. However, a more serious problem is that the face of the complaint now indicates that the subject forms accurately reflected the transactions that resulted in changes in beneficial ownership. The SEC argues that the forms disclosed a "transaction date" that was not the proper "measurement date" for accounting purposes. However, the fact that *the company* failed to record the transactions properly has little bearing on *the individuals'* reporting requirements under § 16(a). The SEC has not cited, and the Court has not discovered, any case in which § 16(a) liability was found based upon facts such as those alleged here. Accordingly, the ninth claim will be dismissed without leave to amend as to Landan and Smith.

---

[2] The more stringent pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") do not apply to actions brought by the SEC. *ICN Pharmaceuticals*, 84 F. Supp. 2d at 1099.

[3] Skaer moves to dismiss all claims against her, including the ninth claim. Her motion will be discussed separately, below.

### B. Tenth Claim

Smith moves to dismiss the tenth claim, which alleges violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 thereunder, 17 C.F.R. § 240.14a-9. Those provisions impose liability for the issuance of proxy statements containing materially false or misleading statements. To state a claim under §14(a), a plaintiff must show that (1) the defendant made a material misrepresentation or omission in a proxy statement, (2) the misrepresentation or omission was made with the requisite level of culpability, and (3) the misrepresentation or omission was an essential link in the accomplishment of a transaction proposed in the proxy solicitation. *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000). The essential link requirement can "only be established when the proxy statement at issue *directly authorizes* the loss-generating corporate action." *Hulliung v. Bolen*, 548 F. Supp. 2d 336, 341 (N.D. Tex. 2008) (emphasis added).

The Court previously dismissed this claim against Smith on the ground that the only two proxy statements filed after Smith became the CFO – the statements dated April 11, 2002 and April 3, 2003 – were filed after the last alleged in-the-money grant on April 1, 2002. The Court held that under those circumstances the proxies could not have been an essential link in the accomplishment of the backdating scheme. The SEC has not alleged additional proxy statements, *see* SAC ¶ 221 (alleging Smith's participation in proxy statements dated April 11, 2002 and April 3, 2003), but instead makes a new legal argument that the proxy statements signed by Smith were "an essential link in the re-election of Mercury's outside directors, the subject of each proxy solicitation." Opp. at 26. This allegation does not appear in the SAC, but even if it did, it is inadequate to support a claim under § 14(a). As noted above, liability arises when the proxy statement at issue "directly authorizes the loss-generating corporate action." Re-electing Mercury's outside directors after the backdating scheme had ceased does not meet this test. Accordingly, the tenth claim will be dismissed without leave to amend as to Smith.

### C. Eleventh Claim

Landan and Smith move to dismiss the eleventh claim, seeking reimbursement for bonuses and stock profits pursuant to § 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243. That

5

section provides in relevant part as follows:

> If an issuer is required to prepare an accounting restatement due to the *material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement* under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for–
>
> (1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period *following the first public issuance or filing* with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and
>
> (2) any profits realized from the sale of securities of the issuer during that 12-month period.

15 U.S.C. § 7243(a) (emphasis added).

The Court engaged in a detailed analysis of this section in its September 2009 order. It rejected Defendants' retroactivity argument based upon its conclusion that at least some of the wrongful conduct alleged – e.g., Defendants' filing of financial reports concealing the compensation expenses resulting from the alleged backdating scheme – occurred after the effective date of the Act.[4] The Court nonetheless dismissed the claim with leave to amend under the following rationale:

> However, the Court agrees with Defendants that the SEC has not identified adequately "the first public issuance or filing . . . of the financial document embodying such financial reporting requirement." *See* 15 U.S.C. § 7243(a)(1). The statute authorizes recovery of bonuses and stock profits received by the CEO and CFO during the twelve-month period following such "first public issuance or filing." *Id*. Defendants argue persuasively that, with respect to each in-the-money options grant, the "first public issuance or filing" was the quarterly report that should have reflected the compensation expense resulting from the options grant. The last alleged options grant occurred in April 2002. Any compensation expense associated with that options grant should have been reported in the quarterly report for the second quarter of 2002, encompassing April, May, and June 2002. That quarterly report was the August 13, 2002 Form 10-Q. However, the SEC does not allege the August 13, 2002 Form 10-Q as a basis for its § 304 claim. Instead, the SEC alleges that the claim is based upon subsequent filings that also fail to disclose the compensation expense. By definition, none of these subsequent filings is the "first" one. Accordingly, the Court concludes that none of the subsequent filings can support the SEC's § 304 claim.

---

[4] Defendants request that the Court reconsider its decision with respect to retroactivity. The Court has considered all of Defendants' arguments and remains of the opinion that its earlier analysis of this issue was correct.

Order of 9/15/2009, p. 10.

The SEC now alleges violations of § 304 based upon the August 13, 2002 Form 10-Q and the March 14, 2003 Form 10-K. It asserts that both forms are "first" public issuances or filings within the meaning of the statute because one is a quarterly report and one is an annual report. Defendants argue that only the August 13, 2002 is a "first" public issuance and that any claim based upon that form is without merit because the information contained therein was published in an earlier press release.

There do not appear to be any cases directly on point. After re-examining the language of the statute, the Court is persuaded by the SEC's argument that because separate reporting requirements compel the filing of both quarterly and annual reports, *see* Securities Exchange Act Rules 13a-1 (annual reports) and 13a-13 (quarterly reports), the "first" annual report to conceal the material information may trigger application of § 304 even if such report is filed after the "first" quarterly report to conceal the information. The Court likewise agrees with the SEC that the disclosure of the information in an earlier press release is immaterial to the question of whether the subject Forms 10-Q and 10-K concealed compensation expenses that Defendants were legally obligated to disclose in those reports.

Defendant Landan makes a new argument, pointing out that the remedy for a § 304 violation is to repay the ill-gotten gains to the "issuer," and that an "issuer" no longer exists. Mercury Interactive, Inc. obviously was an issuer at the time of the events giving rise to potential application of § 304. However, Hewlett Packard Company subsequently acquired all of the outstanding public shares of Mercury Interactive, Inc. and transformed the company into Mercury Interactive LLC, a non-trading subsidiary. Another district court recently addressed the viability of a § 304 claim when the issuer is acquired and its stock is delisted and deregistered. *See SEC v. Jenkins*, — F. Supp. 2d —, 2010 WL 2347020, at *7 (D. Ariz. June 9, 2010). That court concluded that as long as the company was an issuer at the time it filed its misstated financials, the SEC may bring an enforcement action under § 304. *Id*. This Court agrees with the reasoning set forth in *Jenkins*. Moreover, to the extent that Landan argues that permitting a § 304 claim might result in a "windfall" to Hewlett Packard, the Court concludes that in the event liability

7

arises under § 304 Hewlett Packard is a more appropriate recipient than a wrongdoer adjudged liable under the statute.

Accordingly, the Court will deny the motions to dismiss the eleventh claim.

**D.   Skaer**

The Court previously dismissed all claims against Skaer on the ground that the scope of the allegations against her was unclear – the Court asked the SEC to be as detailed as possible regarding her involvement when repleading.  The SEC has added more than thirty paragraphs describing Skaer's role in the backdating scheme.  The Court concludes that these allegations are sufficient with respect to the majority of the claims asserted against her.

The SAC alleges the following facts:  prior to 2000, Skaer was a partner in a law firm and at times acted as outside counsel for Mercury.  SAC ¶ 11.  Between November 2000 and November 2005, she served as Mercury's general counsel and secretary.  *Id.*  "As Mercury's General Counsel, Skaer was responsible for determining whether stock options were being granted in a manner consistent with Mercury's Stock Option Plan."  *Id*.  Skaer was aware that under the company's plan approved by the shareholders, options were to be priced at one hundred percent of fair market value on the date of the grant.  SAC ¶ 37.  Skaer knew that in-the-money options would result in a compensation charge to the company.  SAC ¶¶ 41-42.

The forty-five in-the-money grants alleged in the SAC were approved by Mercury's Board, its Compensation Committee, or the Stock Option Committee.  SAC ¶ 44.  Skaer is not alleged to have been a member of the Board or of either committee.  However, she created the "unanimous written consent" documents by which the Compensation Committee members approved a number of the in-the-money grants; those documents indicated that they grants were "as of" earlier dates (in other words, they were backdated).  *See, e.g.*, SAC ¶¶ 85-89, 95.  She also directed her staff to create such documents.  *See, e.g.*, SAC ¶¶ 101-104.  Skaer herself selected some of the backdated grant dates.  *See, e.g.*, SAC ¶ 98.  "Skaer had substantial involvement in the preparation and creation of the books and records of Mercury, including its annual and quarterly reports, stock option consents and board meeting minutes, proxy statements, and Forms 3, 4, and 5 filed with the Commission documenting stock option grants and

exercises." SAC ¶ 105.

Each of the 10-K annual reports filed 2001 stated that it was company policy to grant options with an exercise price equal to the stock's market price on the grant date and that, accordingly, "no compensation cost has been recognized in the statements of operations." SAC ¶ 132. In later 10-Ks, Mercury disclosed compensation expenses incurred as a result of the acquisition of other companies, but it again failed to disclose the compensation expenses incurred as a result of the backdated stock options it had issued. SAC ¶ 133. In fact, Mercury incurred substantial compensation expenses as a result of the backdated stock options – in July 2006, Mercury restated its financials for fiscal years 2002-2004, and restated selected financial date for fiscal years 2000-2004. SAC ¶ 134. The restatement reflected that Mercury had failed to disclose compensation expenses in an aggregate amount of $258 million. *Id*. "Skaer drafted and prepared the Annual Reports on Form 10-K for at least the 2001, 2002, 2003, 2004 and 2005 fiscal years." SAC ¶ 135. Specifically, Skaer directed her staff in Mercury's legal department to work with the finance department to prepare the draft filings; Skaer then personally reviewed the filings and went over their substance with the CFO. SC ¶ 136. Skaer similarly was involved in the preparation of a number of quarterly reports. SAC ¶ 139. "Skaer knew that she was aiding and abetting the making of the false statements in the financial statements." SAC ¶ 140.

These and similar allegations in the SAC are sufficient to allege Skaer's knowing participation in the alleged backdating scheme. Skaer's argument that she was simply a subordinate performing ministerial tasks is unpersuasive in light of her role as General Counsel. Likewise unpersuasive is her assertion that the SEC has been inconsistent in initially claiming that she was involved in only three of the backdated grants and now claiming that she was involved in more grants. The Court asked the SEC to provide more detail with respect to Skaer's role in the alleged scheme, and the SEC has done so. The SEC's discovery of and/or decision to plead additional facts against Skaer is an appropriate response to the Court's order.

Skaer argues that some of the allegations in the SAC are contradicted by various emails and other documents submitted with her request for judicial notice. While it is true that the Court may consider documents referenced in a pleading under the incorporation by reference

doctrine, *see Stac Elecs. Sec. Litig.*, 89 F.3d at 1405 n.4, Skaer asks the Court to engage in fact-finding based upon those documents – for example, to find that she did not choose a particular grant date even though the SAC alleges expressly that she did so. This type of analysis is inappropriate in the context of a motion to dismiss. The Court's ruling is without prejudice to a subsequent motion for summary judgment based upon the documents in question.

Accordingly, Skaer's motion will be denied as to all claims with the exception of the ninth claim, which will be dismissed as to her for the reasons discussed in part III. A. above.

### IV. ORDER

(1) as to Landan, the ninth claim is DISMISSED WITHOUT LEAVE TO AMEND; his motion otherwise is DENIED;

(2) as to Smith, the ninth and tenth claims are DISMISSED WITHOUT LEAVE TO AMEND; his motion otherwise is DENIED; and

(3) as to Skaer, the ninth claim is DISMISSED WITHOUT LEAVE TO AMEND; her motion otherwise is DENIED.

Dated:  9/27/2010

_____
JEREMY FOGEL
United States District Judge

Case No. 5:07-cv-02822-JF/PVT
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS, WITHOUT LTA
(JFLC2)