# EXHIBIT 2

```
                  UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

                     SAN FRANCISCO DIVISION

                            --oOo--

SECURITIES AND EXCHANGE          )
COMMISSION,                      )
                                 )
           Plaintiff,            )
                                 )   Case No.
      vs.                        )   5:07-CV-02822 WHA
                                 )
MERCURY INTERACTIVE, LLC         )
(F/K/A MERCURY INTERACTIVE,      )
INC.), AMNON LANDAN, SHARLENE    )
ABRAMS, DOUGLAS SMITH and        )
SUSAN SKAER,                     )
                                 )
           Defendants.           )
_____)




                    VIDEOTAPED DEPOSITION OF

                         KATHY HAWKES

              _____

                  Wednesday, February 22, 2012




REPORTED BY:  ANA M. DUB, RMR, CRR, CSR 7445
(JOB NO. 2001-440946)
```

Page 42

1  records existing, when Cindy Hall worked at
2  Mercury -- that's the tax person -- it would be
3  right around that time.
4      Q.  Okay.  We're going to see some e-mails
5  later that I think are from 1999 --
6      A.  Okay.
7      Q.  -- between you and Ms. Fregoso discussing
8  option issues.
9          I assume that if she's having discussions
10 with you about stock option issues, it's safe to
11 assume that at that time period she was reporting to
12 you.
13     A.  Yes.
14     Q.  Okay.  That's helpful.
15         Okay.  Let's just -- I want to drill down
16 for a second on the stock and payroll.
17     A.  Okay.
18     Q.  When Susie was reporting to you, can you
19 give me a flavor of what Susie's job
20 responsibilities were as they relate to employee
21 stock options and how that filtered up to you?
22     A.  Okay.  So Susie was responsible both for
23 payroll and stock options and ESPP, employee stock
24 purchase plan.  And she was the hands-on person at
25 that time and had no -- I believe at this time --

Page 43

1  well, when I first started, she only was herself in
2  her department.  I don't know by this time if she
3  had -- how many people were working for her by '98.
4          But she was responsible for all the
5  preparation of running the payroll on a bimonthly
6  basis, I think.
7      Q.  Mm-hmm.
8      A.  And she was also responsible for all of
9  the stock option grants and recordkeeping, including
10 there was a software package called Equity Edge that
11 she would maintain.  And at the time, there was only
12 one license and that was on her computer.
13     Q.  Okay.  And the license refers to license
14 for what?
15     A.  Sorry.  The software license, meaning you
16 only had -- you didn't have it on all computers.
17     Q.  Right.
18     A.  She was -- her computer was the sole place
19 that -- at that time that Equity Edge would be used.
20     Q.  Got it.  So if someone entered something
21 into Equity Edge, it would have to be on her
22 computer?
23     A.  At that time, yes.
24     Q.  Okay.  Got it.  And did that change at
25 some point in time?

Page 44

1      A.  It may have changed because I believe Jeff
2  Albrecht was hired, and he was -- he probably had
3  that on his computer too.  That's -- I believe, I
4  guess.
5      Q.  Okay.
6      A.  So . . .
7      Q.  Okay.  So in terms of between at least
8  when Ms. Fregoso began reporting to you, whatever
9  date that was, at least through March of 2000, can
10 you give me a sense of who reported to who in the
11 structure of stock option -- the stock option
12 process?
13     A.  Sure.  So I don't know -- I don't believe
14 Jeff was hired at that time.
15     Q.  Right.
16     A.  She may have had a payroll person
17 underneath her, and she could have asked them to do
18 some kind of task related to it.  I couldn't -- that
19 would be a guess.
20     Q.  And "she" is Susie?
21     A.  "She" is Susie.
22     Q.  Okay.
23     A.  Right.
24     Q.  Got it.
25     A.  So Susie reported to me, and I reported to

Page 45

1  Dave Kempski.
2      Q.  Okay.
3      A.  And Dave Kempski reported to Sharlene.
4      Q.  Okay.  And the process that was used to
5  grant employee stock options, is that something that
6  was exposed to these -- the people you just listed?
7      A.  Yeah.  And I was taught it when I started
8  having Susie work for me.
9      Q.  Okay.  Tell me about who taught it to you.
10     A.  Well, I believe Susie would have explained
11 the basics to me --
12     Q.  Mm-hmm.
13     A.  -- of what she was doing because I would
14 have needed to review her documents for clerical
15 errors.
16     Q.  Okay.
17     A.  And then, as time went on, there were more
18 people involved.  It became a much greater task.
19         And so if I had learned things, Dave
20 Kempski could have explained things to me.
21         I know that we learned things along the
22 way from -- you know, if Susan was finding out new
23 regulations or things, then she might explain those
24 to us as a group.  Or Sharlene may explain things to
25 us before Susan came on board.

Page 46

1      But it was on-the-job training.
2      Q.  Got it.  So you mentioned that -- I think
3  you said Ms. Fregoso, when you first started doing
4  this, explained to you the basics of how the company
5  granted stock options.  Is that correct?
6      A.  That's correct.
7      Q.  Okay.  What do you recall about that
8  initial discussion?
9      A.  I don't recall an exact discussion.
10     Q.  Mm-hmm.
11     A.  I don't remember, in my mind, sitting
12 down.  But she would have explained the way that
13 they'd been done from, as far as I knew, forever,
14 before -- as long as Mercury was doing stock option
15 grants.
16         They would collect the people that needed
17 to get stock options, and she would list them on a
18 document, on a Word document.  And then at some
19 point she would be told that the grant date was a
20 specific date and that she needed to use the price
21 on that date.
22     Q.  Okay.
23     A.  The ending price on that date.
24     Q.  And why would you have to use the price on
25 the grant date selected?

Page 47

1      A.  The ending price on that date and the
2  grant date needed to be the same because otherwise
3  you would have an expense in your P&L.
4      Q.  Okay.  And by "expense," you mean a
5  compensation charge?
6      A.  Yes.
7      Q.  Okay.  And how did you learn that that was
8  the rule?
9      A.  Through the on-the-job training.
10     Q.  Okay.  And that rule that you just
11 described for us, that whatever date was selected as
12 the grant date, it had to be the closing price on
13 that date as well, is that something that others in
14 the accounting department knew?
15     A.  Well, Dave Kempski knew that, and Sharlene
16 knew that.  I don't know if some of the people that
17 worked for me might have known that.  Some of these
18 staff people didn't necessarily get options at their
19 level, or if they did, they were very small.
20     Q.  Okay.
21     A.  But as the company grew and we had option
22 grants of much larger amounts that would be
23 distributed to managers and executives, many -- many
24 people knew that that was the way it was granted.
25         And I would say it was a conversation that

Page 48

1  people would have.  If they called up Susie and
2  said, "Hey, I'm a new employee" or "How do I get my
3  stock options?  How are they granted?" that kind of
4  thing, it would have been something that she
5  explained to them too.
6      Q.  And when you say "explained to them," what
7  would she have explained?
8      A.  She would have said, "Well, you're" -- you
9  know, "We've got you on the list for the next stock
10 grant.  We don't know yet when that is" or "We know
11 when that is," depending on the situation.
12         And when the -- you know, if the grant
13 date was known, "Here's your stock price."  If it's
14 not known, she would have said, you know, "We'll
15 select the price and it'll be the price on that
16 day."
17     Q.  Okay.
18     A.  And . . .
19     Q.  So you mentioned a second ago that you
20 believe Dave and Sharlene, Dave Kempski and Sharlene
21 Abrams understood the rule.
22         Why do you think Mr. Kempski understood
23 the rule that you just described?
24     A.  The rule about the grant date with the
25 pricing being the ending price at the end of the

Page 49

1  day?
2      Q.  Yes, ma'am.
3      A.  I would -- either he had learned it from
4  working in public companies with PwC because he was
5  also from PwC, or he, I guess, would have been told
6  it by someone else.
7      Q.  Okay.  And in the course of your
8  employment with Mercury, did you have occasion to
9  discuss that rule with Mr. Kempski?
10     A.  We may have discussed it, but it was more
11 of a matter of the way it was.  It wasn't as if it
12 was an issue that needed to be discussed over and
13 over.  It was the process as it was done at Mercury.
14     Q.  So it was clear that that's what you were
15 doing?
16     A.  Yeah.
17     Q.  And he was -- you believe that he saw
18 that's what was being done?
19     A.  That's correct.
20     Q.  Okay.  What about Ms. Abrams?  How did you
21 come to get to the opinion that Ms. Abrams had the
22 same view as you, Mr. Kempski, and Ms. Fregoso as to
23 the rule?
24     A.  Similarly, as I mentioned to you about
25 Dave, it was -- I would have assumed at the time

13 (Pages 46 to 49)

```
 1                CERTIFICATE OF REPORTER
 2       I, ANA M. DUB, a Certified Shorthand Reporter,
 3   hereby certify that the witness in the foregoing
 4   deposition was by me duly sworn to tell the truth,
 5   the whole truth, and nothing but the truth in the
 6   within-entitled cause;
 7       That said deposition was taken down in
 8   shorthand by me, a disinterested person, at the time
 9   and place therein stated, and that the testimony of
10   the said witness was thereafter reduced to
11   typewriting, by computer, under my direction and
12   supervision;
13       That before completion of the deposition,
14   review of the transcript [ ] was [X] was not
15   requested.  If requested, any changes made by the
16   deponent (and provided to the reporter) during the
17   period allowed are appended hereto.
18       I further certify that I am not of counsel or
19   attorney for either or any of the parties to the
20   said deposition, nor in any way interested in the
21   event of this cause, and that I am not related to
22   any of the parties thereto.
23              DATED:  March 7, 2012.
24              _____
25              ANA M. DUB, RMR, CRR, CSR No. 7445
```

333